# EXHIBIT B

**TO THE DECLARATION OF GINA ALTOMARE IN SUPPORT OF
PLAINTIFFS' MOTION TO FILE SECOND AMENDED COMPLAINT**

DEPOSITION OF MEGAN HAST

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF ALAMEDA

M.H., a minor, through his
Guardian Ad Litem, Michelle
Henshaw, JOSEPH HARRISON, KRYSTLE
HARRISON, MARTIN HARRISON, JR.,
and TIFFANY HARRISON, all          CASE NO. C11-2868
Individually and as Co-Successors  CW
in Interest of Decedent MARTIN
HARRISON,
              Plaintiffs,
  -vs-
COUNTY OF ALAMEDA, a municipal
corporation; SHERIFF GREGORY J.
AHERN, in his individual and
official capacities; DEPUTIES
MATTHEW AHLF, ALEJANDRO VAL VERDE,
JOSHUA SWETNAM, ROBERTO MARTINEZ,
ZACHARY LITVINCHUK, RYAN MADIGAN,
MICHAEL BARENO, FERNANDO
ROJAS-CASTANEDA, SHAWN SOBRERO,
SOLOMON UNUBUN, and DOES 1-20,
individually, jointly and
severally,
              Defendants.
_____/

DEPOSITION OF MEGAN HAST

Taken before JOAN GRIER
Certified Shorthand Reporter
State of California
C.S.R. License No. 8958

July 2, 2012

---

DEPOSITION OF MEGAN HAST

1            DEPOSITION OF MEGAN HAST
2
3        Pursuant to Notice of Taking Deposition, and on
4  Monday, July 2, 2012, at the hour of 9:59 a.m., at the
5  LAW OFFICES OF HADDAD & SHERWIN, 505 Seventeenth Street,
6  Oakland, California, before me, JOAN GRIER, Certified
7  Shorthand Reporter, personally appeared MEGAN HAST,
8  produced as a witness in the above-entitled action, who,
9  having been first duly sworn, was thereupon examined as a
10  witness to said action.
11
12
13            APPEARANCES
14
15        Julia Sherwin, Attorney at Law, and Gina
16  Altomare, Attorney at Law, HADDAD & SHERWIN, 505 17th
17  Street, Oakland, California 94612, were present on behalf
18  of the plaintiffs.
19
20        Benjamin Nisenbaum, Attorney at Law, LAW OFFICES
21  OF JOHN L. BURRIS, 7677 Oakport Street, Suite 1120,
22  Oakland, California 94621, was present, as indicated, on
23  behalf of the plaintiffs.
24
25
                                                    3

---

DEPOSITION OF MEGAN HAST

1              INDEX
2
3
4  Deposition of MEGAN HAST
5
6                    Page
7
8  Examination by:
9
10    MS. SHERWIN                   5
11    MR. NISENBAUM                66
12
13
14  Plaintiffs' Exhibits
15
16  1  Document titled "Timeline of Events for CJMH    7
       during 8/16/10 I/M Incident"; 3 pages
17
    2  Alameda County Department of Behavioral         7
18     Health Care Services - Mental Health
       Division Progress Notes, 8/16/10; 1 page
19
    3  Martin Harrison medical records from Alameda   25
20     County Prison Health Services; 13 pages
21  4  Nurse screener form, 8/13/10; 1 page       26
22  5  Alameda County Sheriff's Office Detention      39
       and Corrections Policy and Procedure No.
23     13.01; 4 pages
24  6  Fax cover page to Gina Altomare from Alameda   62
       County, 10/14/10; 2 pages
25
                                                    2

---

DEPOSITION OF MEGAN HAST

1        J. Randall Andrada, Attorney at Law, and Valerie
2  Ly, Attorney at Law, ANDRADA & ASSOCIATES, 180 Grand
3  Avenue, Suite 225, Oakland, California 94612, were present
4  on behalf of the defendants.
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                                    4

DEPOSITION OF MEGAN HAST

1    MEGAN HAST,
2    sworn as a witness by the Court Reporter,
3    testified as follows:
4    EXAMINATION BY MS. SHERWIN
5    MS. SHERWIN: Q. Have you had your deposition
6    taken before?
7    A. No.
8    Q. So I'll just briefly explain the process to
9    you. While we're in a law office and in a casual setting
10   right now, your deposition testimony is just as important
11   as court testimony.
12   You're under oath, so you need to answer all the
13   questions as truthfully as you can. If you don't
14   understand any of my questions, let me know, and I'll be
15   happy to repeat or rephrase the question just to make sure
16   you understand it.
17   If you need a break, feel free to let me know. I
18   don't imagine we'll be here very long, but if you need a
19   break, that's okay.
20   If you answer a question, we'll all assume that you
21   understood the question. So it's important to make sure
22   you understand the question. This isn't a memory test or
23   a test of guessing or speculating. So it's important to
24   just testify about what you know.
25   In a few weeks you'll get a transcript in a booklet
                                                          5

DEPOSITION OF MEGAN HAST

1    Q. Have you reviewed any documents before your
2    deposition today?
3    A. Yeah.
4    Q. What did you review?
5    A. My timeline and my note.
6    Q. Anything else?
7    A. And I saw my transcript.
8    Q. The transcript of your interview?
9    A. With the Sergeant.
10   MS. SHERWIN: Could you mark this as Exhibit 1 and
11   this one as Exhibit 2.
12   (Plaintiffs' Exhibit 1 was marked for
13   identification.)
14   (Plaintiffs' Exhibit 2 was marked for
15   identification.)
16   MR. ANDRADA: I'm sorry. Which one is No. 1?
17   MS. SHERWIN: No. 1 is the timeline.
18   Q. I'm going to hand you what our court reporter
19   has marked as Exhibits 1 and 2 to your deposition.
20   For the record, Exhibit 1 is a timeline of events
21   with a Bates stamp at the bottom of Pages 1074 through
22   1076.
23   And Exhibit 2 is a Department of Behavioral Health
24   Services Mental Health Division progress note with the
25   Bates stamp at the bottom of Page 130.
                                                          7

DEPOSITION OF MEGAN HAST

1    format that you'll be allowed to review and make any
2    changes that you like. But you need to know that if you
3    make substantive changes, either I or my co-counsel can
4    comment on those changes and ask the judge or the jury to
5    draw inferences that are adverse to you with respect to
6    your credibility. So it's important to make sure that you
7    give us your best testimony today.
8    You need to answer all the questions verbally. So
9    if you have an affirmative answer, you need say "yes"
10   instead of "uh-huh" so our court reporter can take it
11   down.
12   A lot of times in a normal conversation, you'll
13   anticipate what the person is saying and just go ahead and
14   answer the question. But I need you to please be patient
15   with me and let me get my question into the record before
16   you answer it, because the court reporter can only take
17   down one of us at a time.
18   From time to time, Mr. Andrada may object to one of
19   my questions, but you're still required to answer the
20   question unless he specifically instructs you not to
21   answer the question. Okay?
22   A. Okay.
23   Q. Could you please spell your first and last
24   name.
25   A. M-e-g-a-n H-a-s-t.
                                                          6

DEPOSITION OF MEGAN HAST

1    Ms. Hast, could you please take a look at these
2    documents and tell me whether they're the documents that
3    you reviewed prior to your deposition?
4    A. Yes.
5    MR. ANDRADA: Excuse me. Hang on.
6    THE WITNESS: Yes.
7    MS. SHERWIN: Q. And in Exhibit 1, you reviewed
8    all three pages, right?
9    A. Yes.
10   Q. Did you write each of those documents?
11   A. Yes. Yes.
12   Q. And at the time that you were writing those
13   documents, you were being thorough and accurate, correct?
14   A. Yes.
15   Q. You didn't leave any substantive information
16   out of either of the documents, as far as you recall, did
17   you?
18   MR. ANDRADA: Hang on. Objection. Vague and
19   ambiguous. Overly broad.
20   But go ahead. You can answer if you can.
21   THE WITNESS: To the best of my knowledge, yes.
22   MS. SHERWIN: Q. To the best of your knowledge,
23   no, you didn't leave anything out, right?
24   A. Oh, no. This is everything.
25   Q. What was your purpose in writing the timeline
                                                          8

DEPOSITION OF MEGAN HAST

1  in Exhibit 1?
2      A. To have more of an idea. I was asked if I had
3  an idea of times.
4      Q. Who asked you that?
5      A. My supervisor, I think, asked me if I had that.
6      Q. Who was that?
7      A. Millie Swafford.
8      Q. What is Millie Swafford's position?
9      A. She's the Director of Criminal Justice Mental
10 Health for the Behavorial Health Services.
11     Q. What was your purpose in writing the progress
12 note that was Exhibit 2?
13     A. That's the note that I wrote on my shift.
14 Every time I have a client that I see or don't see on my
15 shift, we have to write a note, a clinical note.
16     Q. So Exhibit 2 was the clinical note that you
17 wrote at the time that you had contact with anyone within
18 Alameda County regarding Martin Harrison, right?
19     MR. ANDRADA: I'm sorry. Objection. Vague and
20 ambiguous. Overly broad.
21     Go ahead and answer it if you can.
22     THE WITNESS: Yes. It was the note that I wrote on
23 my shift.
24     MS. SHERWIN: Q. Do you remember approximately
25 when you wrote the note?
                                                    9
Crangle Reporting Services (510) 653-1312

DEPOSITION OF MEGAN HAST

1  from the University of California Berkeley in social work.
2      Q. When did you receive your master's degree?
3      A. In 2007.
4      Q. And after receiving your master's degree,
5  that's when you became a registered associate social
6  worker?
7      A. Yes.
8      Q. What is your current employment?
9      A. Alameda County Behavioral Health Care Services
10 in the Criminal Justice Mental Health Department.
11     Q. Is that the same job that you had in August of
12 2010?
13     A. Yes.
14     Q. Do you have the same job assignments that you
15 had in August of 2010?
16     A. No.
17     Q. What is your current assignment?
18     A. I am working with the Behavioral Health Court.
19 That started in August of 2009. I also work with Criminal
20 Justice Mental Health also. But my position changed.
21     Q. When you say Criminal Justice Mental Health, is
22 that a part of Alameda County, as far as you know?
23     A. Yeah.
24     Q. So your employer would be Alameda County,
25 right?
                                                    11
Crangle Reporting Services (510) 653-1312

DEPOSITION OF MEGAN HAST

1      A. I don't remember the time, but I wrote it on my
2  shift.
3      Q. And what was your shift at that time in August
4  of 2010?
5      A. It was the p.m. shift for booking. Intake,
6  transfer, and release is what it's called. My shift is
7  3:30 to 11:30 p.m.
8      Q. Did you work Monday through Friday?
9      A. Yes. But not that shift.
10     Q. So you worked different shifts throughout the
11 week, but that particular day you were working the p.m.
12 shift, right?
13     A. Yes.
14     Q. We'll go over each of these documents a little
15 bit later.
16     Do you have any licenses other than a driver's
17 license?
18     A. I'm registered as an associate social worker.
19     Q. When did you receive that registration?
20     A. In 2007.
21     Q. Can you please briefly recount your education
22 beyond high school.
23     A. I received a bachelor's degree from the
24 University of North Carolina Chapel Hill in international
25 studies and Spanish. And I received my master's degree
                                                    10
Crangle Reporting Services (510) 653-1312

DEPOSITION OF MEGAN HAST

1      A. Yes.
2      Q. In August of 2010, your employer was Alameda
3  County, right?
4      A. Yes.
5      Q. Did you start working with Alameda County --
6  strike that.
7      When did you first start working with Alameda
8  County?
9      A. I started in 2007.
10     (Mr. Nisenbaum enters deposition room.)
11     MS. SHERWIN: Let's go off the record for one
12 second.
13     (Discussion off the record.)
14     MS. SHERWIN: Could you read back the last question
15 and answer.
16     (Record read as follows:
17     "QUESTION: When did you first start
18 working with Alameda County?
19     "ANSWER: I started in 2007.")
20     MS. SHERWIN: Q. In August of 2010, what, in
21 general, were your job duties?
22     A. I worked in the housing units in Santa Rita
23 Jail, and I worked -- it changed because that was -- I was
24 working with the Behavioral Health Court, which started in
25 2009. But I was still working with criminal -- with
                                                    12
Crangle Reporting Services (510) 653-1312

DEPOSITION OF MEGAN HAST

1 Criminal Justice Mental Health in the jail as well and had
2 a position there. And I would do -- for a while, I had a
3 permanent position in ITR, intake, transfer, and release
4 booking one day a week Mondays, Monday evenings. And I
5 don't remember if that was still my position at that time,
6 because I was doing -- I was working in the Behavioral
7 Health Court as well, and I was working at the jail. But
8 I also would do overtime with booking. Intake, transfer,
9 and release.
10 **Q.** So when you worked in the housing unit at Santa
11 Rita Jail in August of 2010, what were your job duties?
12 A. In the housing unit?
13 **Q.** Yes.
14 A. I saw clients who were referred to us, did
15 crises intervention, brief therapy, and referrals for
16 medication stabilization.
17 **Q.** When you did referrals for medication
18 stabilization, would that -- strike that.
19 Obviously, you're not allowed to prescribe
20 medication, right?
21 A. Right.
22 **Q.** So when you were doing a referral for
23 medication stabilization, would that sometimes involve an
24 inmate who was not on medication but, in your professional
25 opinion, needed to be evaluated by someone who had the
13

Crangle Reporting Services (510) 653-1312

DEPOSITION OF MEGAN HAST

1 **Q.** What is it?
2 MR. ANDRADA: Again, it's overly broad.
3 But go ahead.
4 THE WITNESS: From my understanding, it is a
5 medical emergency when somebody is withdrawing from
6 alcohol.
7 MS. SHERWIN: **Q.** Where did you receive that
8 understanding?
9 A. From my general education with understanding in
10 my classes in graduate school, learning about the
11 different substances abuses and some of the signs and
12 symptoms.
13 **Q.** So the understanding that you have regarding
14 what delirium tremens is comes from when you were at
15 UC Berkeley, right?
16 A. Yes.
17 **Q.** Does the Alameda County Department of
18 Behavioral Health have a policy manual for folks who are
19 working in the housing units to use?
20 A. The CJMH has policies and procedures for all of
21 the jail, all of the positions that we work.
22 **Q.** And those are documents that are accessible to
23 you?
24 A. Yes.
25 **Q.** Do you have your own copy, or is it someplace
15

Crangle Reporting Services (510) 653-1312

DEPOSITION OF MEGAN HAST

1 ability to prescribe medication that they might need?
2 A. Yes.
3 **Q.** In the course of your education and training as
4 a social worker, have you received training about alcohol
5 withdrawal?
6 MR. ANDRADA: Overly broad.
7 But go ahead if you can.
8 THE WITNESS: No specific training. We had
9 information in graduate school, classes where we studied
10 substance abuse.
11 MS. SHERWIN: **Q.** In the course of your work with
12 Alameda County prior to August of 2010, did you receive
13 any training in recognizing the signs and symptoms of
14 alcohol withdrawal?
15 A. No training.
16 **Q.** In the course of your employment with Alameda
17 County up to today, have you received any training in
18 recognizing the signs and symptoms of alcohol withdrawal?
19 A. No.
20 **Q.** In the course of your employment with Alameda
21 County, have you received any training in recognizing the
22 signs and symptoms of delirium tremens?
23 A. No.
24 **Q.** Do you know what delirium tremens is?
25 A. Yes.
14

Crangle Reporting Services (510) 653-1312

DEPOSITION OF MEGAN HAST

1 for people to use?
2 A. Yeah, it's available for -- I think it's also
3 available online. But there is a manual, I think.
4 **Q.** When you say "available Online," is it your
5 understanding that any member of the public can look
6 Online and find those?
7 A. Actually, I don't mean Online. I mean, in our
8 documents. I mean online on the computer.
9 **Q.** In your computer.
10 A. Not Online. Sorry. We have the documents on
11 our -- the files.
12 **Q.** When you say "CJMH," you're talking about
13 Criminal Justice Mental Health?
14 A. Yes.
15 **Q.** That's part of Alameda County?
16 A. Yes.
17 **Q.** Have you ever seen any CJMH policies or
18 procedures regarding delirium tremens?
19 A. Specifically, no. I haven't looked up a policy
20 and procedure regarding that.
21 **Q.** Have you seen any CJMH policies or procedures
22 regarding alcohol withdrawal?
23 A. Yes, I probably have. I don't remember. I
24 haven't looked -- I really haven't looked at that
25 recently.
16

Crangle Reporting Services (510) 653-1312

1    **Q.** Did you receive any training as long as you've
2    worked at Alameda County about what to do if you evaluate
3    an inmate who exhibits the signs and symptoms of the
4    medical emergency of delirium tremens?
5    MR. ANDRADA: Again, objection. Vague and
6    ambiguous. Overly broad.
7    Go ahead if you can. Do you want her to read it
8    back? She can read it back if you want.
9    THE WITNESS: The question, yeah.
10    (Record read as follows:
11    "QUESTION: Did you receive any
12    training as long as you've worked at
13    Alameda County about what to do if you
14    evaluate an inmate who exhibits the signs
15    and symptoms of the medical emergency of
16    delirium tremens?")
17    THE WITNESS: Yes. We've had -- I guess I don't
18    call it -- I don't call it training because we have staff
19    meetings, but they are trainings, I guess, essentially.
20    But we have talked about when -- when we notice certain
21    signs or symptoms what to do.
22    MS. SHERWIN: Q. Okay. What are the signs and
23    symptoms that you've been trained to notice with respect
24    to delirium tremens?
25    A. Specifically, I guess it can be a number of

17

1    Go ahead and answer the question as best you can.
2    If you want her to read it back, she can read it back.
3    THE WITNESS: Could you read it back, please.
4    (Record read as follows:
5    "QUESTION: Hallucination may be a
6    sign that the person is in severe alcohol
7    withdrawal rather than mild alcohol
8    withdrawal, right?")
9    MR. ANDRADA: Same objection.
10    But go ahead and answer it if you can.
11    THE WITNESS: Hallucinations don't necessarily mean
12    that somebody is in alcohol withdrawal. People can have
13    hallucinations without -- people that don't use substances
14    can have hallucinations.
15    MS. SHERWIN: Q. But if a person is in alcohol
16    withdrawal and is having hallucinations, that would be an
17    indication to you that their alcohol withdrawal is severe
18    rather than mild, right?
19    MR. ANDRADA: Again, same objections. Overly
20    broad. Vague and ambiguous.
21    Go ahead if you can.
22    THE WITNESS: Yes. It would be more serious.
23    MS. SHERWIN: Q. Have you been trained that
24    tachycardia or elevated heart rate is a sign of alcohol
25    withdrawal?

19

1    things. A lot of them are physical. If they have, like,
2    they're physically shaky, or they have, like, their pulse
3    is high, or they can also be exhibiting bizarre behavior
4    that some people would say is mental illness. Yeah. I
5    think -- I mean, those are some of them. A lot of them
6    are physical. Often, when I am asked to notice signs and
7    symptoms, if there is alcohol withdrawal, I look at that
8    as a medical issue as opposed to a mental health issue.
9    **Q.** Okay. And I'll ask you about that in one
10    second. But in terms of the signs and symptoms, I just
11    want to make sure we've got everything you can think of
12    right now.
13    A. Shaking. Elevated pulse. Sometimes, I guess,
14    they can be red. Sometimes, I think, like, clammy skin.
15    A lot of physical things, I think.
16    **Q.** And you said --
17    A. Disoriented also sometimes. Or confused.
18    **Q.** Have you been trained that a person who is
19    hallucinating may be in alcohol withdrawal?
20    A. Yes.
21    **Q.** Hallucination may be a sign that the person is
22    in severe alcohol withdrawal rather than mild alcohol
23    withdrawal, right?
24    MR. ANDRADA: Objection. Vague and ambiguous.
25    Overly broad. No foundation.

18

1    A. Yes. It can be.
2    **Q.** And if the person is agitated, that can be a
3    sign of alcohol withdrawal, right?
4    A. It can be.
5    **Q.** If the person has extreme anxiety, that could
6    be a sign of alcohol withdrawal, right?
7    A. Yes.
8    **Q.** And if the person is mumbling incoherently,
9    that can also be a sign of alcohol withdrawal, right?
10    A. Yeah.
11    **Q.** You mentioned earlier that you view alcohol
12    withdrawal as a medical issue rather than a mental health
13    issue. What do you mean by that?
14    A. When somebody is having alcohol withdrawal,
15    from what we've been trained at the jail, it's important
16    that medical personnel be dealing with it, because we
17    can't provide medications to deal with that. It's a
18    medical issue that needs to be addressed by medical
19    personnel.
20    **Q.** And it needs to be addressed immediately
21    because it's a medical emergency sometimes, right?
22    MR. ANDRADA: Objection. Vague and ambiguous.
23    Overly broad.
24    Listen to the question. Go ahead and answer it if
25    you can.

20

DEPOSITION OF MEGAN HAST

1     THE WITNESS: Can you repeat the question.
2     (Record read as follows:
3         "QUESTION: And it needs to be
4     addressed immediately because it's a
5     medical emergency sometimes, right?")
6     THE WITNESS: It can be.
7         MS. SHERWIN: Q. So when you evaluate an inmate
8  who exhibits the signs and symptoms of alcohol withdrawal,
9  is it your training that you are to refer that person for
10 evaluation by medical personnel?
11    A. Yes.
12    Q. And that medical personnel would include a
13 physician?
14    A. Yes. Primarily, it would be nursing staff at
15 the jail, whoever is there that can evaluate the person.
16    Q. Okay. And then the nursing staff would have to
17 have a physician take a look at the inmate in order to
18 prescribe the medication that he needs, right?
19        MR. ANDRADA: Objection. Vague and ambiguous.
20 Overly broad. May call for speculation. Assumes facts
21 not in evidence.
22    But go ahead if you can.
23    THE WITNESS: They would have to make that
24 decision.
25        MS. SHERWIN: Q. So when you encounter an inmate
21

Crangle Reporting Services (510) 653-1312

DEPOSITION OF MEGAN HAST

1  whether you know about any such policies in the jail.
2     THE WITNESS: It's a medical issue. As far as I
3  know, the County -- CJMH will evaluate people. If it's
4  deemed to be a substance withdrawal, that's a medical
5  issue, and that has to be dealt with by the medical staff
6  at the jail, which is not Alameda County.
7         MS. SHERWIN: Q. And do you know what the policies
8  or procedures within the jail are for caring for an inmate
9  who has gone into delirium tremens?
10        MR. ANDRADA: Again, same objections. Overly
11 broad.
12    Go ahead.
13    THE WITNESS: I don't know what the procedure is.
14 I mean, again, if somebody is evaluated to have a
15 substance issue -- a serious issue that they're
16 withdrawing, then that's a medical issue that would be
17 referred. That needs to be dealt with by them.
18        MS. SHERWIN: Q. When you receive a call to
19 evaluate an inmate who is disoriented to time and place
20 and acting in a bizarre manner, do you review his chart
21 before you see him?
22    A. Yes.
23    Q. How do you go about getting his chart?
24    A. I have to go search for it.
25    Q. Where would a chart typically be for an inmate
23

Crangle Reporting Services (510) 653-1312

DEPOSITION OF MEGAN HAST

1  who exhibits the signs and symptoms of alcohol withdrawal,
2  is it your understanding that what you need to do at that
3  point is get them medical professionals to take care of
4  the inmate?
5         MR. ANDRADA: Again, objection to the form. Vague
6  and ambiguous. Overbroad.
7     Go ahead.
8     THE WITNESS: Yes. I have to do the research and
9  actually evaluate a person to make a decision fully about
10 that. But if I evaluate someone and it looks like it is
11 alcohol withdrawal, which is a medical issue, then, yes, I
12 absolutely will let them know.
13        MS. SHERWIN: Q. As far as you're aware, what are
14 the policies and procedures within Alameda County for
15 detoxification of people who have alcohol dependency?
16    A. I don't know.
17    Q. Do you know what the policies and procedures
18 within Alameda County are for preventing alcohol
19 withdrawal?
20    A. For the entire county?
21        MR. ANDRADA: Hang on.
22        MS. SHERWIN: Within the jail.
23        MR. ANDRADA: Again, objection. Slow down. Stop.
24 Objection. Vague and ambiguous. Overly broad.
25    I think she's indicated that she wants to know
22

Crangle Reporting Services (510) 653-1312

DEPOSITION OF MEGAN HAST

1  who is housed in Housing Unit 33, for example?
2     A. Well, all of the charts are in a certain place.
3  Most charts. So I would go to that place to look for the
4  chart.
5     Q. Where are the charts?
6     A. What's called the muster room.
7     Q. When you receive a call to do an evaluation on
8  an inmate who is disoriented to time and place and acting
9  in a bizarre manner, the first thing you do is go to the
10 muster room to get the chart?
11    A. No.
12        MR. ANDRADA: Again, vague and ambiguous. Overly
13 broad.
14    You answered the question.
15    THE WITNESS: No.
16        MS. SHERWIN: Q. What's the first thing you
17 typically do?
18    A. I research the person. I look for them on the
19 computer. I see -- I look for what we call their -- on
20 mainframe to find their jail status. I look in our mental
21 health database to see if they have mental health history.
22 And I look in -- I try to find their nurse screener.
23    Q. When you say you try to find their nurse
24 screener, you're saying you try to find the person who
25 screened them?
24

Crangle Reporting Services (510) 653-1312

DEPOSITION OF MEGAN HAST

1   A. No.
2   **Q.** What is the nurse screener?
3   A. It's a form that a nurse fills out when they
4   interview someone when they -- in booking.
5   MS. SHERWIN: Mark that as Exhibit 3.
6   (Plaintiffs' Exhibit 3 was marked for
7   identification.)
8   MR. ANDRADA: Q. I'm going to hand you what has
9   been marked as Exhibit 3 to your deposition, which, for
10  the record, is a packet of documents that my office
11  received in response to our request for Martin Harrison's
12  complete medical records from Alameda County Prison Health
13  Services.
14  I'm going to direct your attention to the last two
15  pages of Exhibit 3 and ask you if those are documents that
16  you would call the nurse screener? Either of those
17  documents.
18  A. This document.
19  **Q.** The last page of Exhibit 3, right?
20  A. Yes.
21  **Q.** Let me get a copy of that specifically.
22  MR. ANDRADA: Let's take just two minutes. Can we
23  do that? It won't be long.
24  (Recess taken from 10:31 a.m. to 10:33 a.m.)
25  (Mr. Nisenbaum not present.)
                                                      25

Crangle Reporting Services (510) 653-1312

DEPOSITION OF MEGAN HAST

1   (Plaintiffs' Exhibit 4 was marked for
2   identification.)
3   MS. SHERWIN: Back on the record. While we're
4   waiting for Mr. Nisenbaum to return, I'll just hand the
5   witness what's been marked as Exhibit 4 to the deposition,
6   which, for the record, is the same page as the last page
7   of Exhibit 3 which the witness has identified as the nurse
8   screener.
9   (Mr. Nisenbaum re-enters deposition room.)
10  MS. SHERWIN: Q. Is Exhibit 4 the nurse screener
11  that you've said you tried to find before you go to see an
12  inmate that you're supposed to evaluate?
13  A. Yes.
14  **Q.** And what do you do after you find the nurse
15  screener?
16  MR. ANDRADA: Again, vague and ambiguous. Overly
17  broad.
18  But go ahead and answer it if you can.
19  THE WITNESS: I compile all the information that
20  I've researched. And I have to triage each of the
21  referrals that I have. So that's usually what I do. And
22  then, I go from there.
23  MS. SHERWIN: Q. When you say you have to triage
24  each of the referrals, what do you mean?
25  A. Whenever I get referrals, either from nurses or
                                                      26

Crangle Reporting Services (510) 653-1312

DEPOSITION OF MEGAN HAST

1   deputies, I have to -- I do this for every referral that I
2   get. I research them, and I have to get all this
3   information. And then I have to triage the referrals that
4   I get with the information.
5   **Q.** And when you say you have to triage them, what
6   do you mean?
7   A. I have to look at the information that I've
8   gotten, the referrals, and the circumstances with each
9   person, what's going on. And then I follow up with
10  interviewing, if that's what needs to happen --
11  **Q.** Where do you typically -- I'm sorry. I didn't
12  mean to interrupt you.
13  Go ahead.
14  A. -- for evaluation.
15  **Q.** Where do you typically find the nurse screener
16  when you look for it?
17  A. Initially, I look in booking. If a person
18  just -- has just been in jail or just entered the jail,
19  their nurse screener was in the -- is usually in the
20  nursing office, a copy of it, and I'll look there for it.
21  **Q.** For someone who has been in jail for three
22  days, do you typically find the nurse screener in the
23  nursing office?
24  A. Yes, usually.
25  **Q.** And you do all of this research and triage
                                                      27

Crangle Reporting Services (510) 653-1312

DEPOSITION OF MEGAN HAST

1   before you go to evaluate the inmate, right?
2   A. Yes.
3   **Q.** What is the next thing you do after you get the
4   information that you've identified?
5   MR. ANDRADA: Again, it's vague and ambiguous.
6   Overly broad.
7   Go ahead.
8   THE WITNESS: Like I said, with the information I
9   get, I triage where to go, what clients to see, or not
10  see.
11  MS. SHERWIN: Q. So you create an order for
12  yourself of the clients that you're going to see. Is that
13  what you mean?
14  A. I triage what I have in front of me. When I
15  come in, I have to check everything that is there when I
16  get there and continue throughout the shift. So I
17  triage -- I don't know how else to...
18  **Q.** When you first start your shift at Santa Rita
19  Jail, do you check the telephone messages?
20  A. Yes.
21  **Q.** And one of the things you're checking for is to
22  see if there are any inmates who need you to come and
23  evaluate them, right?
24  A. Yes.
25  **Q.** And then if you get a phone message to evaluate
                                                      28

Crangle Reporting Services (510) 653-1312

DEPOSITION OF MEGAN HAST

1 an inmate who is acting bizarrely and disoriented to time
2 and place, in general, what's the next thing you do after
3 receiving that phone message?
4        MR. ANDRADA: Again, vague and ambiguous. Overly
5 broad.
6        THE WITNESS: I research, try to get what
7 information I can. And with that information I follow up
8 with either the housing unit deputy, the nurse. Or, if
9 the person is in booking, follow it up.
10       MS. SHERWIN: Q. When you say you follow up, does
11 that mean you call the deputy to see if you can come and
12 see the inmate?
13       A. Yes.
14       Q. And so before you make that follow-up call to
15 the deputy, you've already typically done your triage
16 work, right?
17       A. Yes.
18       Q. Do you remember the incident involving Martin
19 Harrison in August of 2010?
20       A. Yes.
21       Q. Do you remember receiving the call from the
22 deputy on the answering machine requesting that you
23 evaluate the inmate?
24       A. Yes.
25       Q. I have also a copy of your interview by
                                                    29
Crangle Reporting Services (510) 653-1312

DEPOSITION OF MEGAN HAST

1 Sergeant Kyle Ritter. In your answering of Sergeant
2 Ritter's questions, you were honest and accurate, correct?
3       A. Yes, to the best of my knowledge.
4       Q. And you didn't leave any information out when
5 you were answering his questions, did you?
6        MR. ANDRADA: Again, objection. Vague and
7 ambiguous. Overly broad.
8        Go ahead.
9        THE WITNESS: I answered as best I could with what
10 I remembered.
11       MS. SHERWIN: Q. Having had a chance to review the
12 transcript of your interview, would it be fair to say that
13 nothing stood out in your mind as something you omitted
14 from your answers to Sergeant Ritter at that time?
15       A. I don't think so.
16       Q. Nothing stands out, as you sit here today?
17       A. I don't think so.
18       Q. Do you recall thinking that it was Deputy Wolfe
19 who left you the message regarding Martin Harrison?
20       A. I don't remember. If I wrote that, then that
21 is probably what I remembered. I can't remember right
22 now.
23       Q. The interview that you gave on September 23rd,
24 2010 was at a time when your memory of the events was much
25 more clear that it is today, right?
                                                    30
Crangle Reporting Services (510) 653-1312

DEPOSITION OF MEGAN HAST

1       A. Right.
2       Q. If you told Sergeant Ritter that you were
3 fairly sure that Deputy Wolfe was the person that left you
4 the message, you have no reason to dispute that today,
5 right?
6       A. Right.
7       Q. Do you remember doing the research regarding
8 Martin Harrison that you typically do when you receive one
9 of those calls?
10      A. Yes.
11      Q. Do you remember finding Mr. Harrison's nurse
12 screener form?
13      A. Yes. I think so.
14      Q. And that would have been something that you
15 reviewed before you called the deputies to see if you
16 could come and see Mr. Harrison, right?
17      A. Yes. Usually I do.
18      Q. Okay.
19      A. Yeah.
20      Q. I'm taking a look at Exhibit 2, which is your
21 progress note from August 16 of 2010. Do you see about
22 midway in the page where you state, quote, "Only reported
23 alcohol use and placed on CIWA"?
24      A. Yes.
25      Q. And Exhibit 2 was something that you wrote,
                                                    31
Crangle Reporting Services (510) 653-1312

DEPOSITION OF MEGAN HAST

1 correct?
2       A. Yes.
3       Q. What did you mean when you said, "Only reported
4 alcohol use and placed on CIWA?
5       A. From the sentence before, I was referring to
6 the nurse screener that I wrote: "Inmate came into
7 custody 8/13 denying mental health problems" in the nurse
8 screener. So no referral was made. Only reported alcohol
9 use and placed on CIWA. That would have been the
10 reference to what I saw on the nurse screener.
11      Q. And the nurse screener is Exhibit 4, right?
12      A. Uh-huh. Yes.
13      Q. And so when you reviewed the nurse screener,
14 you saw that with reference to Question No. 21 about
15 alcohol use, Martin Harrison reported that he drinks every
16 day, and his last drink was today, right?
17      A. Yes.
18      Q. And you also saw that Martin Harrison was
19 coming in with a history of alcohol withdrawal and was
20 placed on CIWA, correct?
21      A. Yes.
22      Q. So when you saw the letters C-I-W-A in the
23 nurse screener, that to you meant CIWA, correct?
24      A. Yes.
25      Q. What was your understanding of what CIWA meant?
                                                    32
Crangle Reporting Services (510) 653-1312

DEPOSITION OF MEGAN HAST

1     A. My understanding is that it's the observation
2  that the nursing staff has for someone who could
3  potentially have alcohol withdrawal.
4     Q. Do you know Nurse Sancho?
5     A. No.
6     Q. But you didn't have any problem reading her
7  handwriting on the nurse screener, right?
8     MR. ANDRADA: Objection. Vague and ambiguous.
9  Overly broad.
10    Go ahead.
11    THE WITNESS: Could you ask the question again.
12    (Record read as follows:
13    "QUESTION: But you didn't have any
14    problem reading her handwriting on the
15    nurse screener, right?")
16    THE WITNESS: Right.
17    MS. SHERWIN: Q. Do you have any knowledge of what
18  the Santa Rita Jail's policies and procedures are for an
19  inmate who is on CIWA?
20    A. It's the nursing -- it's the nursing procedure.
21  So my -- the understanding that I have of CIWA is that
22  that's what the protocol that the nursing staff uses for
23  alcohol withdrawal. And that -- I mean, that's -- I see
24  that, and I think they are on alcohol withdrawal protocol,
25  the CIWA.
33

DEPOSITION OF MEGAN HAST

1     Q. Do you have an understanding of what the
2  alcohol protocol for CIWA is?
3     A. I don't know specifically.
4     Q. So according to your understanding, that's
5  something that the nurses would be in charge of, right?
6     A. Yes.
7     Q. If the person needed medication or nutritional
8  support or close observation, that would be something that
9  the nurses would be in charge of making sure they get,
10 right?
11    A. Yes.
12    Q. Do you know what the acronym "CIWA" stands for?
13    A. I don't know.
14    Q. Do you know whether or not it stands for
15  Clinical Institute Withdrawal Assessment?
16    A. I don't know.
17    Q. In the course of your job with Alameda County
18  in Santa Rita Jail, have you ever filled out a CIWA
19  assessment form for anyone?
20    A. No.
21    Q. That's something the nurses would do, right?
22    A. To my understanding, yes.
23    Q. So let's take a look at Exhibit 2. You filled
24  this chart note out on August 16th, 2010, during the same
25  shift in which you were asked to evaluate Martin Harrison,
34

DEPOSITION OF MEGAN HAST

1  right?
2     A. Yes.
3     Q. What does the 311 and 1:00 refer to?
4     A. The 311 is the code that it says down at the
5  bottom for collateral. And the 1:00 is the time, like, an
6  hour. It signifies one hour.
7     Q. Are you saying that you spent one hour on this
8  issue?
9     A. Yeah.
10    Q. Could you please, starting with the received
11 message, read for us what you wrote in your progress note
12 of August 16th regarding Martin Harrison.
13    MR. ANDRADA: And read slowly. And you really get
14 a gold star if you can look at the reporter as you're
15 reading it. It makes it a little easier for her.
16    MS. SHERWIN: You don't have to look at the
17 reporter. She can hear you fine.
18    THE WITNESS: "Received message from Housing Unit
19 33 deputy regarding inmate who was placed on IOL in ISO
20 cell this a.m. due to bizarre behavior and statements.
21 Not oriented to place. Believed he was in his apartment
22 and women there. Per deputy, he was mumbling
23 incoherently. Saw a nurse but not receiving any meds.
24 Inmate came into custody 8/13. Denied mental health
25 problems in nurse screener so no referral made. Only
35

DEPOSITION OF MEGAN HAST

1  reported alcohol use and placed on CIWA. Inmate has no
2  PSP history. This writer initially unable to eval inmate
3  because deputy staff was unavailable. When this writer
4  went to eval, when deputy staff available, deputies
5  reported that inmate was tased during a struggle with
6  deputy staff while inmate was being moved to a different
7  cell as he had flooded current cell and broke his food
8  trays. Per deputy, inmate was agitated and yelling at the
9  wall that someone was trying to kill him. Inmate was sent
10 Code 3 to Valley Medical. Will schedule follow-up
11 TBA/M.D., 8/18."
12    MS. SHERWIN: Q. What did IOL in ISO cell mean
13 when you wrote that?
14    A. IOL is intensive observation log. And ISO cell
15 is an isolation cell.
16    Q. What is your understanding of the intensive
17 observation log?
18    A. It is when someone is being monitored by deputy
19 staff.
20    Q. Do you know how often the person is being
21 monitored?
22    A. There's different kinds of observations on the
23 intensive observation log. I think there's a close
24 observation and an intensive observation. I'm not exactly
25 sure. But I think there's 15 minutes and 30 minutes.
36

DEPOSITION OF MEGAN HAST

1    Q. And you weren't told in this voice mail from
2  the deputy which level of observation Martin Harrison was
3  on, correct?
4    A. No.
5    Q. Just that he was on intensive observation,
6  right?
7    A. Yes.
8    Q. And the line, "saw nurse but not receiving any
9  meds," is that something that the deputy said in his
10  message?
11    A. I don't remember if it was in the message or
12  when I talked to a deputy.
13    Q. In the course of your work as a social worker
14  in the Alameda County jail system, you understand the
15  acronym ETOH to refer to alcohol, right?
16    A. Yes.
17    Q. And you understood from the nurse screener that
18  Martin Harrison had a history of alcohol withdrawal,
19  right?
20    A. Well, it's written on here.
21    Q. The C with the line across it followed by HX
22  and then of ETOH and W/D, you understand that to mean with
23  history of alcohol withdrawal, right?
24    A. Yes.
25    Q. What did you mean when you said "has no PSP

37

Crangle Reporting Services (510) 653-1312

DEPOSITION OF MEGAN HAST

1  history"?
2    A. That's the mental health database, I guess,
3  that I research. It's the system that we have for Alameda
4  County.
5    Q. So your research indicated that Martin Harrison
6  had not been seen within Alameda County for any mental
7  health problems. Is that right?
8    A. Yes.
9    MR. ANDRADA: How you doing? All right?
10    THE WITNESS: Um-hmm.
11    MS. SHERWIN: Q. How long would it typically take
12  for you to get from your work area to Housing Unit 33 to
13  evaluate an inmate?
14    MR. ANDRADA: I'm sorry. You mean physically go
15  there?
16    MS. SHERWIN: Yeah.
17    MR. ANDRADA: Okay.
18    THE WITNESS: Maybe ten minutes. Five to ten
19  minutes, depending. It's pretty far away.
20    MS. SHERWIN: Q. If you were to walk there from
21  your work location without anyone stopping and
22  interrupting you, you should be able to get there within
23  five to ten minutes?
24    A. I would say yes.
25    MS. SHERWIN: Would you mark this, please.

38

Crangle Reporting Services (510) 653-1312

DEPOSITION OF MEGAN HAST

1    (Plaintiffs' Exhibit 5 was marked for
2  identification.)
3    MS. SHERWIN: Q. The court reporter has marked as
4  Exhibit 5 to your deposition Alameda County Sheriff's
5  Office Detention and Corrections Policy and Procedure
6  13.01, Medical and Health Care Services.
7    Have you ever seen this policy document before?
8    A. Yes, I think so. It's in our policy and
9  procedure.
10    Q. And is it your understanding that as an
11  employee of Alameda County you're required to follow the
12  written policies and procedures that apply to you in the
13  performance of your job?
14    A. Yes.
15    Q. Have you been trained to respond to
16  health-related situations within four minutes?
17    MR. ANDRADA: Objection. Vague and ambiguous.
18  Overly broad.
19    Go ahead.
20    THE WITNESS: No.
21    MS. SHERWIN: Q. Prior -- I'm sorry. Go ahead.
22    A. You asked for health?
23    Q. Health-related situations.
24    A. No. We don't respond to health-related
25  situations, as far as I know. That's a medical issue,

39

Crangle Reporting Services (510) 653-1312

DEPOSITION OF MEGAN HAST

1  health.
2    Q. You respond to mental health-related
3  situations, right?
4    A. Yes.
5    Q. Have you been trained to respond to mental
6  health-related situations within four minutes?
7    MR. ANDRADA: Vague and ambiguous as to what you
8  mean by respond and to mental health -- I think you said
9  mental health situations.
10    Go ahead and answer the question if you can.
11    THE WITNESS: I've been trained to respond as soon
12  as I can to referrals and to do my job.
13    MS. SHERWIN: Q. Have you ever received any
14  training within Criminal Justice Mental Health that the
15  Sheriff's Office sworn and civilian staff are to respond
16  to health-related situations within four minutes?
17    MR. ANDRADA: Again, vague and ambiguous. Overly
18  broad.
19    Go ahead if you can.
20    THE WITNESS: No, not that I know of.
21    MS. SHERWIN: Q. Have you been trained to
22  recognize the signs and symptoms of chemical dependency?
23    A. What do you mean by trained?
24    Q. Have you been trained within Alameda County,
25  since you've started working there, to recognize the signs

40

Crangle Reporting Services (510) 653-1312

DEPOSITION OF MEGAN HAST

1  and symptoms of chemical dependency?
2      A. Yes.
3      Q. And an inmate who comes into the jail with a
4  history of alcohol withdrawal would be someone who has
5  signs and symptoms of chemical dependency, right?
6      MR. ANDRADA: Objection. Vague and ambiguous.
7  Overly broad.
8      Listen to the question. Go ahead and answer the
9  question if you can.
10     THE WITNESS: Could you ask the question again?
11     MS. SHERWIN: Q. I'll ask you a different
12 question.
13     Let's take a look at Exhibit No. 4, please. You
14 saw Martin Harrison's nurse screener that he drinks every
15 day, and his last drink was that day, right?
16     A. Yes.
17     Q. And you also saw that he had a history of
18 alcohol withdrawal and was placed on a CIWA, correct?
19     A. Yes.
20     Q. So you understood that to mean that Martin
21 Harrison had signs and symptoms of chemical dependency
22 with the chemical being alcohol, right?
23     A. I understand that he reported that he had used
24 alcohol and had a history of alcohol withdrawal. Because
25 this, the nurse screener, they ask the inmate questions.

41

DEPOSITION OF MEGAN HAST

1  requesting a mental health evaluation of an
2      inmate, as far as you're aware?")
3      MR. ANDRADA: Again, it's vague and ambiguous.
4  Overly broad.
5      But go ahead if you can.
6      THE WITNESS: The referral procedure can come from
7  different places. I mean, referrals can come from many
8  different places. We get referrals from the nurse when
9  they've done the screener. And if somebody answers
10 certain questions that are mental-health related, or they
11 report a history of mental health, we also get -- we can
12 get referrals if somebody is acting bizarre or if they
13 want somebody to -- mental health to evaluate somebody or
14 interview them.
15     So the procedure -- I mean, they can put in a
16 mental health referral form. They can call us. And it
17 comes from many different places.
18     MS. SHERWIN: Q. The jail has a mental health
19 referral form that deputies use to refer inmates for
20 mental health evaluations, right?
21     A. There's a mental health form, referral form.
22 In my experience, it's usually been from nursing staff
23 that the referral forms come from. It's usually we get a
24 copy of that referral form from the nurse in booking,
25 usually, with a screener from somebody.

43

DEPOSITION OF MEGAN HAST

1  So I look at that and say this person reported -- like I
2  said in my note, they reported alcohol use. And they were
3  placed on CIWA.
4      Q. Okay. So what you're saying is, Martin
5  Harrison would have reported to the intake nurse that he
6  had a history of alcohol withdrawal, correct?
7      MR. ANDRADA: Calls for speculation as phrased.
8      But go ahead and answer the question if you can.
9      THE WITNESS: When I read the screener, what
10 they've written on the screener, I read as what they
11 reported to the nurse, I guess.
12     MS. SHERWIN: Q. And people who get alcohol
13 withdrawal get withdrawal because they're dependent on
14 alcohol, right?
15     MR. ANDRADA: Overly broad. Vague and ambiguous.
16     Go ahead if you know.
17     THE WITNESS: Yes.
18     MS. SHERWIN: Q. What is the procedure for
19 requesting a mental health evaluation of an inmate, as far
20 as you're aware?
21     A. Could you ask the question again.
22     MS. SHERWIN: Could you read the question back,
23 please.
24     (Record read as follows:
25     "QUESTION: What is the procedure for

42

DEPOSITION OF MEGAN HAST

1      Q. As far as you know, does Criminal Justice
2  Mental Health play any role in taking care of inmates who
3  are at risk of alcohol withdrawal?
4      MR. ANDRADA: Vague and ambiguous. Overly broad.
5      Go ahead.
6      THE WITNESS: We can evaluate them. We don't
7  provide the treatment. The medical provides treatment.
8  As far as my understanding is, when somebody has alcohol
9  withdrawal or any substance, it's the medical that
10 provides the treatment and care.
11     MS. SHERWIN: Q. Okay. So as far as you know,
12 once an inmate is placed on CIWA, Criminal Justice Mental
13 Health is not involved in taking care of the inmate with
14 respect to his risk for withdrawal from alcohol, for
15 example, right?
16     A. Right.
17     Q. Is it your understanding that deputies can
18 request a medical evaluation of an inmate at any time?
19     A. I don't know.
20     Q. Do you know what the procedure is within the
21 jail regarding handling medical evaluations of inmates
22 between the hours of 11:00 p.m. and 8:00 a.m.?
23     MR. ANDRADA: Again, vague and ambiguous. Overly
24 broad.
25     Go ahead.

44

## DEPOSITION OF MEGAN HAST

1    THE WITNESS: I don't know. I know our policy for
2  those. There's nursing staff 24 hours in the jail, but I
3  don't know their policy.
4    MS. SHERWIN: Q. What is your policy for
5  evaluating an inmate who has a mental health issue arise
6  between the hours of 11:00 p.m. and 8:00 a.m.?
7    MR. ANDRADA: Again, vague and ambiguous. Overly
8  broad.
9    THE WITNESS: If there is a mental health issue
10 between the hours of 11:00 p.m. and 8:00 a.m., there's an
11 on-call clinician that -- the number, along with a form,
12 is available for any staff, deputy or nursing staff, to
13 contact for -- there's, like, a list of situations that
14 they can call that on-call. But it's their -- that
15 information is there. There's not somebody on site.
16    So they'll usually call the on-call clinician.
17 It's up to the discretion. So I don't know exactly. But
18 we have a form that people, nursing and deputy staff, can
19 see, depending on the situation, to respond.
20    MS. SHERWIN: Q. Have you ever acted in the role
21 of on-call clinician?
22    A. No.
23    Q. But it's your understanding, if an inmate has a
24 mental health problem arise that requires an immediate
25 evaluation, the deputies can call the on-call clinician,

45

## DEPOSITION OF MEGAN HAST

1  announced, but it's what we write when we have -- it's a
2  new client. Somebody who isn't already assigned to a
3  clinician.
4    Q. So you were going to schedule an appointment
5  with Martin Harrison either with Criminal Justice Mental
6  Health or the M.D.?
7    A. No. That's -- the TBA/M.D. all means for
8  Criminal Justice Mental Health. It's a new person being
9  referred to CJMH for clinician appointment and possibly an
10 appointment, if necessary, with a psychiatrist. It's all
11 for CJMH.
12    Q. Does CJMH have on-call psychiatrists for the
13 jail?
14    A. There's on-call in the evenings and weekends
15 for medication bridging. So, yes, there's an on-call
16 psychiatrist.
17    Q. If an inmate has a psychiatric emergency
18 requiring treatment by a psychiatrist during the evening
19 or on a weekend, is there an on-call psychiatrist who
20 would be available to handle that?
21    A. During the hours that a clinician is available,
22 yes. That a clinician is at the jail, yes.
23    Q. I'm not sure what you mean by during the hours
24 of when a clinician is in.
25    Let's say an inmate has a psychiatric emergency at

47

## DEPOSITION OF MEGAN HAST

1  right?
2    A. Yes.
3    Q. Did you create -- let me see what this number
4  is -- Exhibit 2 in the course of your regular job duties?
5    A. Yes.
6    Q. At Santa Rita Jail?
7    A. Yes.
8    Q. And that was a document that you created to
9  document the work that you had done in connection with
10 Martin Harrison and was a part of your job as a
11 psychiatric social worker at the jail, right?
12    A. Yes.
13    Q. And that document would have gone into Martin
14 Harrison's medical chart, correct?
15    A. Yes. I think so.
16    Q. As far as you're aware?
17    A. (Witness nods head.)
18    Q. When you said at the bottom of Exhibit 2 that
19 you would schedule a follow-up, it looks like "TBA/M.D.
20 8/18," what did you mean by that?
21    A. That's just a follow-up appointment in our
22 clinic to follow up with a clinician and a doctor if
23 necessary. It's an appointment.
24    Q. And what does TBA stand for?
25    A. Well, I guess it actually means to be

46

## DEPOSITION OF MEGAN HAST

1  4:00 in the morning. If the inmate has a psychiatric
2  emergency requiring treatment or evaluation by a
3  psychiatrist at 4:00 in the morning, does the Alameda
4  County Santa Rita Jail have an on-call psychiatrist who
5  could respond to that emergency?
6    A. No.
7    Q. Would the inmate have to be transferred outside
8  of the jail to a psychiatric hospital in that
9  circumstance?
10    A. Yes, if it was a psychiatric emergency that
11 couldn't be dealt with in the jail.
12    Q. And if an inmate had a medical emergency like
13 delirium tremens at 4:00 in the morning, would the inmate
14 also have to be transferred outside of the jail at that
15 point?
16    MR. ANDRADA: No foundation. Calls for her to
17 speculate. It's vague and ambiguous and overly broad.
18    But go ahead.
19    THE WITNESS: I don't know because that's medical.
20 And just -- yeah, I don't know.
21    MS. SHERWIN: Q. Do you know whether or not, when
22 an inmate is placed on a CIWA because of a history of
23 alcohol withdrawal, the deputies in the jail are told to
24 watch for signs and symptoms of alcohol withdrawal with
25 respect to that inmate?

48

DEPOSITION OF MEGAN HAST

1       MR. ANDRADA: No foundation. Calls for her to
2   speculate. Vague and ambiguous.
3       But go ahead and answer it can you can.
4       THE WITNESS: I don't know. It's a medical
5   protocol.
6       MS. SHERWIN: Q.  Looking at the notes you wrote,
7   which are Exhibit 1, how long after your work with respect
8   to Martin Harrison did you write the timeline of events
9   that is Exhibit 1?
10      A. I think this was a couple of days after. I
11  don't know exactly when.
12      Q. And you wrote the document at the instruction
13  of your supervisor?
14      A. My supervisor was asking if I had a timeline
15  and if I could provide some sort of timeline.
16      Q. So at 4:00 in the afternoon on August 16, you
17  listened to a phone message that had been received about
18  30 minutes earlier asking for Criminal Justice Mental
19  Health to evaluate Martin Harrison, right?
20      A. Yes.
21      Q. And then you called the housing unit and spoke
22  with the technician a half an hour after you listened to
23  the message. Is that right?
24      A. If it says it here, then, yes. All of these
25  are abouts because I don't know exactly, exact times. I
                                                    49

Crangle Reporting Services (510) 653-1312

DEPOSITION OF MEGAN HAST

1   just guessed about it.
2       Q. What did you do during the 30 minutes between
3   the time you received the phone message and the time you
4   called?
5       A. I looked at -- well, I would imagine -- I don't
6   know for sure exactly what I did, but when I go on shift,
7   I listen to the messages. I try to get all of the
8   referrals, all of the information that I have, and triage.
9       Q. Okay.
10      A. Figure out what -- I look at what I have and
11  figure out what needs to happen.
12      Q. So when you do all of the research that you've
13  identified earlier, you do that for all of the inmates
14  before you call the housing units, correct?
15      A. Yes. Usually I want to have an idea about -- I
16  want to have research about this person so I know what's
17  going on with them.
18      Q. And in the call about Martin Harrison, you were
19  informed that Mr. Harrison was on intensive observation
20  because of bizarre behavior and statements, right?
21      A. Yes.
22      Q. And that he was not oriented to place,
23  believing that he was in his apartment and women were
24  there, correct?
25      A. Yes.
                                                    50

Crangle Reporting Services (510) 653-1312

DEPOSITION OF MEGAN HAST

1       Q. And you were also informed that he was mumbling
2   incoherently, right?
3       A. Yes.
4       Q. By time you made the call to the housing unit,
5   you found out from the nurse screener that Martin Harrison
6   had a history of alcohol withdrawal and was placed on a
7   CIWA, right?
8       A. Yes.
9       Q. And as we've discussed earlier in your
10  deposition today, hallucinating can be a sign of alcohol
11  withdrawal, right?
12      A. It can.
13      Q. And having bizarre behavior can be a sign of
14  alcohol withdrawal, right?
15      A. Yes, it can.
16      Q. And being disoriented to time or place can also
17  be a sign of alcohol withdrawal, right?
18      A. Um-hmm.
19      Q. You need to answer audibly.
20      A. Yes.
21      Q. And mumbling incoherently can also be a sign of
22  alcohol withdrawal, right?
23      A. Yes.
24      Q. At the time that you called the housing unit,
25  did you have any thought that Martin Harrison might be
                                                    51

Crangle Reporting Services (510) 653-1312

DEPOSITION OF MEGAN HAST

1   having alcohol withdrawal given all of the information you
2   had about him by that time?
3       A. It could have been, yes. It was a possibility.
4       Q. And if he was having hallucinations from
5   alcohol withdrawal, that would mean that his withdrawal
6   was more serious, correct?
7       MR. ANDRADA: Objection. Vague and ambiguous.
8   Overly broad. Calls for her to speculate.
9       But go ahead.
10      THE WITNESS: It could.
11      MS. SHERWIN: Q.  Now, when you called the housing
12  unit, you were told that the deputy would be leaving in a
13  half an hour, right?
14      A. Yes.
15      Q. But you did not go to the housing unit after
16  learning that the deputy would be leaving for half an hour
17  until a half an hour after your call. Is that correct?
18      A. It says about. So I'm not completely positive
19  of exact times, but I would say about, yeah.
20      Q. Did it occur to you that with the deputy
21  leaving in about half an hour, it would be a good idea to
22  go to the housing unit and evaluate Martin Harrison before
23  the deputy left?
24      A. Yes.
25      Q. And why didn't you do that?
                                                    52

Crangle Reporting Services (510) 653-1312

DEPOSITION OF MEGAN HAST

1     A. I had -- I would imagine that I was looking at
2  all of the referrals that I had and triaging. And so in
3  my process of triaging, I made that decision.
4     Q. Do you recall any of the other referrals that
5  you were looking at that day?
6     A. I don't remember exactly, no.
7     Q. Do you remember any of them?
8     MR. ANDRADA: I'm sorry. If she means names...
9     MS. SHERWIN: No. Not names. Just the situations
10 that the inmates were facing.
11    Q. Do you remember?
12    A. I don't remember. It was two years ago. I
13 don't remember.
14    Q. All of these symptoms that Martin Harrison was
15 displaying were consistent not only with alcohol
16 withdrawal but also consistent with severe alcohol
17 withdrawal or delirium tremens. Is that a fair statement?
18    MR. ANDRADA: Objection. Vague and ambiguous,
19 overly broad. No foundation.
20    But go ahead if you can.
21    THE WITNESS: Yes, they could be.
22    MS. SHERWIN: Q. And if Martin Harrison were in
23 delirium tremens, that would be a medical emergency
24 requiring immediate medical care. Is that right?
25    MR. ANDRADA: Objection. Vague and ambiguous.
                                        53

DEPOSITION OF MEGAN HAST

1     A. Yes.
2     Q. Did you ask for the housing unit to call
3 another deputy?
4     A. No.
5     Q. Did you call and see if you could get another
6 deputy there so you could evaluate Martin Harrison?
7     A. No.
8     Q. If you had asked for a deputy to come and help
9 you so you could evaluate Martin Harrison, do you have any
10 reason to think that no deputy would have come?
11    MR. ANDRADA: Calls for speculation.
12    But go ahead and answer if you can.
13    THE WITNESS: Can you ask the question again?
14    MS. SHERWIN: Q. Sure. If you asked for a deputy
15 to come so you could evaluate Martin Harrison, given your
16 experience at the Santa Rita Jail, a deputy would have
17 come and helped you, right?
18    A. Yes.
19    Q. When you evaluate an inmate who is behaving
20 bizarrely, not oriented to time or place, and mumbling
21 incoherently, what typically is the procedure that you and
22 the deputy follow with respect to you getting access to
23 the inmate to interview him?
24    A. Can you ask the question again?
25    MS. SHERWIN: Could you read that back, please.
                                        55

DEPOSITION OF MEGAN HAST

1    Overly broad. Calls for speculation.
2     Go ahead.
3    THE WITNESS: Yes, it could be.
4    MS. SHERWIN: Q. As you sit here today, can you
5 think of any other inmates who were facing a potential
6 medical emergency requiring immediate medical care on the
7 day that you received the call about Martin Harrison?
8     A. I don't remember. I mean, I have -- I don't
9 remember exactly.
10    Q. So you stopped by Mr. Harrison's housing unit
11 about half an hour after talking to the technician,
12 correct?
13    A. Yes.
14    Q. In the course of your triaging, after having
15 been informed that the deputy supervising Martin Harrison
16 would be leaving in half an hour, did you take into
17 account that fact?
18    A. Could you repeat the question?
19    Q. Sure. When you were triaging which inmate to
20 see first, did you take into account the fact that Martin
21 Harrison's supervising deputy would be leaving in half an
22 hour?
23    A. Yes. I think so.
24    Q. And by the time you stopped by the housing
25 unit, the deputy was already gone, right?
                                        54

DEPOSITION OF MEGAN HAST

1    (Record read as follows:
2     "QUESTION: When you evaluate an
3    inmate who is behaving bizarrely, not
4    oriented to time or place, and mumbling
5    incoherently, what typically is the
6    procedure that you and the deputy follow
7    with respect to you getting access to the
8    inmate to interview him?")
9    THE WITNESS: The deputy will usually go with me to
10 evaluate the client.
11    MS. SHERWIN: Q. And then, what typically happens
12 once you and the deputy are outside the client's cell
13 door?
14    A. Well, usually -- it depends. Either they'll
15 open the cuffing port, or fully open the door for me to
16 talk with them, or they'll bring the person out to talk
17 with me. Depending on the situation.
18    Q. If the inmate might possibly be dangerous, the
19 deputy opens the cuffing port, right?
20    MR. ANDRADA: Objection. Vague and ambiguous.
21 Overly broad.
22    Go ahead.
23    THE WITNESS: They sometimes do. Sometimes they
24 don't.
25    MS. SHERWIN: Q. So if a deputy opens a cuffing
                                        56

DEPOSITION OF MEGAN HAST

1  port, what happens at that point?
2      A. You interview a person.
3      Q. You interview the person through the cuffing
4  port?
5      A. Um-hmm.
6      Q. You need to answer audibly for the record.
7      A. Yes.
8      Q. Have you had deputies open the cuffing port and
9  handcuff the inmate through the port before you interview
10 them?
11     A. Not in my experience.
12     Q. If a deputy brings the inmate out for you to
13 interview them, where does the interview typically take
14 place?
15     A. It can take place either in the hallway, or it
16 can take place at one of the tables.
17     Q. And when you say "in the hallway," is that a
18 place that would be accessible to other people who are not
19 party to the conversation to hear the conversation?
20     A. Yeah, I guess so.
21     Q. When you say "at one of the tables," what are
22 you referring to?
23     A. There's tables in the housing unit. Like, in,
24 yeah, in the housing unit, where the pods are.
25     Q. When you interview inmates at the tables, are

57

DEPOSITION OF MEGAN HAST

1      THE WITNESS: No.
2      MS. SHERWIN: Q. What did you do after you saw
3  Martin Harrison standing at the toilet?
4      A. I walked out of the housing unit. I saw him as
5  I was walking out. As I was walking out and continued to
6  walk out.
7      Q. Where did you go?
8      A. Back to booking, I think.
9      Q. If you had evaluated Martin Harrison and
10 determined that he was exhibiting the signs and symptoms
11 of either alcohol withdrawal or delirium tremens, what
12 would you have done?
13     A. I would have probably contacted the nurse.
14     Q. Is there any policy or procedure within Alameda
15 County that governed what you would have done in response
16 to evaluating Martin Harrison and seeing that he was
17 exhibiting signs and symptoms of either alcohol withdrawal
18 or delirium tremens?
19     A. I believe I would contact the nurse, medical.
20     Q. By telephone?
21     A. Yes. Unless they were in the housing unit.
22 And let them know.
23     Q. Then you called the housing unit again around
24 6:00 p.m. and spoke with Deputy Ahlf, right?
25     A. Yes. That's what I wrote.

59

DEPOSITION OF MEGAN HAST

1  those interviews also taking place in a location where
2  people who are not a party to the conversation could hear
3  the conversation?
4      A. Potentially, yes.
5      Q. Now, you went and looked into Martin Harrison's
6  cell when you went to the housing unit around 5:00 p.m.,
7  right?
8      A. Yes.
9      Q. And it appeared to you that he was standing at
10 the toilet, correct?
11     A. Yes.
12     Q. At that point, did it occur to you to wait
13 until Mr. Harrison was done using the toilet and then call
14 a deputy to come and help interview the inmate?
15     MR. ANDRADA: Assumes facts not in evidence with
16 regard to use of the toilet. It's further vague and
17 ambiguous.
18     But go ahead.
19     THE WITNESS: Can you ask the question again.
20     (Record read as follows:
21     "QUESTION: At that point, did it
22 occur to you to wait until Mr. Harrison was
23 done using the toilet and then call a
24 deputy to come and help interview the
25 inmate?")

58

DEPOSITION OF MEGAN HAST

1      Q. And Deputy Ahlf told you that he was the one
2  who played Martin Harrison in the observation cell. Is
3  that right?
4      A. Yes.
5      Q. And he told you he did that about 4:00 in the
6  morning, right?
7      A. Yes.
8      Q. And Deputy Ahlf told you that he put Martin
9  into the observation cell because of Martin's bizarre
10 behavior, being disoriented to time and place, and
11 mumbling incoherently, correct?
12     A. Yes.
13     Q. And you knew that all of those signs and
14 symptoms are consistent with both alcohol withdrawal and
15 delirium tremens, right?
16     A. Yes.
17     Q. Deputy Ahlf told you that a nurse found that
18 Martin Harrison had not received any medications. Is that
19 correct?
20     A. Yes.
21     Q. Did you tell Deputy Ahlf to get a nurse to come
22 and evaluate Martin Harrison?
23     A. I don't remember.
24     Q. Did it occur to you, given the fact that Martin
25 Harrison was exhibiting signs and symptoms consistent with

60

1  both alcohol withdrawal and the medical emergency of
2  delirium tremens, that Mr. Harrison should be evaluated by
3  medical professionals?
4      A. I don't know. I would assume, yes. Yeah.
5      Q. Did you call anyone in the medical staff after
6  talking to Deputy Ahlf?
7      A. I don't remember if I did or not.
8      Q. Do you recall having done anything to get
9  Martin Harrison medical care after your conversation with
10  Deputy Ahlf?
11     A. I don't remember.
12     Q. Do you recall having done anything to get
13  Martin Harrison medical care at any time?
14     A. I don't remember if I did or not. I would
15  imagine that I would have called the nurse to find out.
16  Usually I will. But I don't remember if I did
17  specifically.
18     Q. And if you had contacted the nurse to get
19  Martin Harrison medical care, you would have included that
20  in your progress note or your timeline of events, right?
21     A. Probably, yes.
22     Q. Okay. So the fact that there is no such call
23  documented in either of those documents you wrote
24  regarding Martin Harrison is an indication that you did
25  not do that, right?

61

1      A. Yeah. I guess so.
2      MS. SHERWIN: Please mark this next in order.
3      (Plaintiffs' Exhibit 6 was marked for
4  identification.)
5      MS. SHERWIN: Q. I'm going to hand you what has
6  been marked as Exhibit 6 to your deposition, which, for
7  the record, is a two-page fax that my office received in
8  response to our request for Martin Harrison's complete
9  records from Criminal Justice Mental Health Program.
10  Have you seen documents like that before today?
11     MR. ANDRADA: Vague and ambiguous as to what you
12  mean by documents like that.
13     MS. SHERWIN: Response to request for records.
14     Q. Have you seen documents like that before in the
15  course of your job?
16     A. Yeah. In charts.
17     Q. When you reviewed -- strike that.
18     When you did your research about Martin Harrison,
19  is it correct to say that you saw no records of Martin
20  Harrison ever being seen by anyone within Criminal Justice
21  Mental Health?
22     A. Correct.
23     Q. When you did your research on Martin Harrison,
24  did you see any medical plan related to him being placed
25  on the CIWA?

62

1      A. No.
2      Q. When you did your research on Martin Harrison,
3  did you see any individualized treatment plan for him
4  regarding management of his chemical dependency?
5      A. No.
6      Q. When you spoke to Deputy Ahlf on the telephone,
7  did he tell you that he did not request any evaluation of
8  Martin Harrison when he put him in the observation cell at
9  4:00 in the morning?
10     A. Can you ask the question again.
11     MS. SHERWIN: Read the question back, please.
12     (Record read as follows:
13     "QUESTION: When you spoke to Deputy
14     Ahlf on the telephone, did he tell you that
15     he did not request any evaluation of Martin
16     Harrison when he put him in the observation
17     cell at 4:00 in the morning?")
18     MR. ANDRADA: Do you understand?
19     THE WITNESS: I don't understand.
20     MR. ANDRADA: Then she can rephrase it.
21     MS. SHERWIN: Q. Did Deputy Ahlf tell you that he
22  never requested any evaluation of Martin Harrison when he
23  put Martin in the evaluation cell at 4:00 in the morning?
24     MR. ANDRADA: Again, vague and ambiguous. Overly
25  broad.

63

1      Go ahead.
2      THE WITNESS: No.
3      MS. SHERWIN: Q. Did he tell you that he had
4  requested an evaluation of Martin Harrison when he put
5  Martin in the isolation cell at 4:00 in the morning?
6      A. I don't remember. I think so. I don't know.
7      Q. In your creation of your time line, you were
8  being as complete as possible regarding the events related
9  to Mr. Harrison, correct?
10     A. I think so, yes.
11     MR. ANDRADA: How are you doing? Do you want to
12  take a break? Are you all right?
13     THE WITNESS: I'm fine.
14     MS. SHERWIN: Q. In your conversation with Deputy
15  Ahlf, he told you that the nurse had found that Martin was
16  not receiving any medication, and Deputy Ahlf placed him
17  in the ISO cell, right?
18     A. Yes.
19     Q. Was it your understanding -- I'm sorry. I
20  didn't mean to interrupt you.
21     A. No. I was just saying that's what I wrote.
22     Q. Was it your understanding that Deputy Ahlf was
23  telling you that he talked to a nurse before placing
24  Martin in the ISO cell?
25     MR. ANDRADA: Vague and ambiguous as to before.

64

DEPOSITION OF MEGAN HAST

1  But go ahead.
2  THE WITNESS:  That would be my understanding if he
3  was reporting from the nurse.
4  MS. SHERWIN:  Q.  Why didn't you go and evaluate
5  Martin Harrison after taking to Deputy Ahlf at 6:00 p.m.,
6  at about 6:00 p.m.?
7  A.  I would imagine I was triaging the -- all of
8  the people that I was seeing, which I do throughout my
9  shift.  And seeing those people and then getting there as
10  soon as I could.
11  Q.  But leaving aside what you imagine, as you sit
12  here today, do you know why you did not go to the housing
13  unit for another hour after talking to Deputy Ahlf?
14  A.  I was seeing other people?  That would be what
15  I think.
16  Q.  Did you tell Deputy Ahlf that Martin Harrison
17  might be in alcohol withdrawal or delirium tremens which
18  is a medical emergency?
19  MR. ANDRADA:  Well, assumes facts not in evidence.
20  It's overly broad.
21  But go ahead.
22  THE WITNESS:  I don't know if I told him that.
23  Given all of the information that I had, I would imagine
24  that I would have.  But I don't remember if I did or not.
25  MS. SHERWIN:  Q.  You should have told Deputy Ahlf
65

DEPOSITION OF MEGAN HAST

1  that Martin Harrison might be in alcohol withdrawal or
2  delirium tremens, right?
3  MR. ANDRADA:  Objection.  Vague and ambiguous.
4  Argumentative.
5  Go ahead if you can.
6  THE WITNESS:  Yeah.
7  MS. SHERWIN:  I have no further questions.
8  MR. NISENBAUM:  I just have a quick question.
9  EXAMINATION BY MR. NISENBAUM
10  MR. NISENBAUM:  Q.  What is the purpose of triaging
11  people?
12  A.  It's to determine the level of acuity.
13  Q.  What does that mean?
14  A.  We get calls and referrals for lots of people.
15  And we have to look at safety, and history, and
16  determining, I guess, triaging that way.  So if somebody
17  is a risk of safety to themselves or others because
18  they're in a safety cell or they're on an IOL for suicidal
19  or homicidal thoughts, those are -- that's part of the
20  triaging process is determining, I guess, that level of
21  safety.
22  Q.  Is triaging -- does that refer to the level of
23  potential dangerousness of a person's present condition?
24  A.  Yes.
25  Q.  And do you have the ability to, in the course
66

DEPOSITION OF MEGAN HAST

1  of looking through the cases, the case files that you
2  have, are there occasions where you come across a case
3  during triage that needs immediate attention where you
4  stop the process of triaging the other cases in order to
5  attend to the case that needs immediate attention?
6  A.  Yes.  I could get a call or -- I mean, I don't
7  usually just drop everything and run.  Because we get --
8  like I said, we get all of these different calls and
9  referrals from all these different places.  So I research
10  and try to collaborate with people to get as much
11  information as I can.
12  Q.  Are there times that you can use, like, a
13  telephone or some other means of communication to
14  communicate to somebody to closely supervise or closely
15  monitor an inmate while --
16  A.  Um-hmm, yes.
17  Q.  Let me finish the question.
18  -- while you're in the process of triaging or
19  completing your triaging process?
20  A.  Yes.
21  Q.  Did that happen in this case?
22  MR. ANDRADA:  Objection.  Vague and ambiguous.  Did
23  what happen?
24  MR. NISENBAUM:  Q.  Did you make a call or any have
25  communication with anyone while you were in the process of
67

DEPOSITION OF MEGAN HAST

1  triaging in order to ensure that Mr. Harrison was more
2  closely supervised during the time period when you would
3  not be able to attend to him because you were completing
4  triage?
5  A.  I did make contact.  I did call.  If somebody
6  is in an isolation cell, I would imagine that they are
7  being monitored.  That's the understanding of when someone
8  is in an isolation cell.  So they used isolation cell for
9  many different things.
10  So I do contact and make -- and talk with whoever I
11  can.  But when somebody is in an isolation cell, I would
12  imagine they are being monitored.
13  Q.  I know that there was a communication about the
14  deputy who would be leaving in half an hour.
15  A.  Um-hmm.
16  Q.  My question is, was there any communication
17  that you had with whoever you might have spoken with at
18  that time about making sure that Mr. Harrison was closely
19  supervised?
20  A.  Not that I know of.
21  Q.  And was there any communication that you had
22  with respect to ensuring that Mr. Harrison was closely
23  supervised before you could attend to him?
24  A.  No.
25  MR. NISENBAUM:  Thank you.
68

DEPOSITION OF MEGAN HAST

1  MR. ANDRADA: Okay.
2  MS. SHERWIN: No questions. Thanks.
3  (Deposition concluded at 11:45 a.m.)
4  ---oOo---
5
6
7
_____
MEGAN HAST
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                        69
Crangle Reporting Services (510) 653-1312

---

DEPOSITION OF MEGAN HAST

1              July 16, 2012
2
3
4  MEGAN HAST
   c/o J. RANDALL ANDRADA
5  ANDRADA & ASSOCIATES
   180 Grand Avenue, Suite 225
6  Oakland, California 94612
7
8  RE: Harrison vs. County of Alameda
9
10 Dear Ms. Hast:
11 Your deposition transcript has been prepared and is
   available at our office for reading, correcting and
12 signing, and shall remain so available for 35 days.
13 Should you wish to review your deposition transcript,
   please contact our office for an appointment.
14
15 Sincerely,
16
17
18 Joan Grier, C.S.R.
19
20
21
22
23 cc: All counsel
24
25
                                        71
Crangle Reporting Services (510) 653-1312

---

DEPOSITION OF MEGAN HAST

1  STATE OF CALIFORNIA )
          ) ss
2  COUNTY OF ALAMEDA  )
3
4
5  I, Joan Grier, hereby certify that the witness in the
6  foregoing deposition named
7
8              MEGAN HAST
9
10 was by me duly sworn to testify to the truth, the whole
11 truth, and nothing but the truth in the within-entitled
12 cause; that said deposition was taken at the time and
13 place herein named; that the testimony of said witness
14 was reported by me, a certified shorthand reporter and a
15 disinterested person, and thereafter transcribed into
16 typewriting.
17
18 And I further certify that I am not of counsel or
19 attorney for either or any of the parties to said
20 deposition, nor in any way interested in the outcome of
21 the cause named in said caption.
22
23 Date_____  _____
              Joan Grier, C.S.R.
24
25
                                        70
Crangle Reporting Services (510) 653-1312

Timeline of Events for CJMH during 8/16/10 I/M incident

~ about 1600  This writer listened to a phone message received about 1530 from HU33 Deputy asking for CJMH to evaluate I/M Harrison, Martin BDH226, who was placed in ISO cell/IOL for bizarre behavior.

~ about 1630  This writer called HU33 and spoke with the Technician who reported that the Deputy shift change would be happening and the Deputy would be leaving in about a half hour.

~ about 1700  This writer stopped by HU33 to see if a deputy was still in HU to do the evaluation of I/M, however, Tech reported that the Deputy was gone and the Deputy for the next shift had not arrived yet.  This writer briefly checked on I/M through the ISO cell window and he appeared to be standing at the toilet using the restroom, then left.

~ about 1800  This writer called HU33 to see if could come out to evaluate I/M and spoke with Deputy Ahlf, who reported that he was the one who had placed the I/M in the ISO cell about 0400 that morning due to his bizarre behavior, being disoriented to place, time, and mumbling incoherently.  Deputy reported that nurse found he was not receiving any meds, and deputy placed him in the ISO cell.

~ about 1900  This writer went to HU33 as soon as available to evaluate I/M, but Deputy Ahlf reported that I/M had become agitated when he tried to move him from the cell which he flooded and broke his food tray in, to a clean cell and I/M was tazed and was being sent to the hospital.



ACSO 1074

ACSO 1075

# ITR ACTIVITY LOG

| Source (enter code) | Last name, first name | PFN# | Service (enter code) | Outcome (enter codes) | APPT. DATE | Notes |
|---|---|---|---|---|---|---|
| / | | | 1S | 100-9,2 | 8/25 | meds bridge 14 days |
| / | | | 4/4 | 9 | 8/25 | |
| / | 5/ | | 5/1 | 7,1 | 8/19 | |
| / | | | 5/1 | 9 | 8/25 | |
| / | | | 1S | 9 | 8/25 | |
| 4 | Harrison, Martin | BAH226 | PM/NS | 22 | 8/18 | * if serv code 3 to Valley Med |
| / | | | M HR | 9 | 8/27 | |
| 4 | | (10C) | CN/NS | 1,7,14 | Cust 8/19 Ov | Open to Carlson |
| / | | | 1/S | 9 | 8/30 | |
| / | | | 1/S | 9,12 | 8/26 | meds bridge 14 days |
| / | | | MHR | 8 | 8/19 1124 | |
| / | 5/ | | MHR | 7 | 8/20 | |
| 6 | | | P/NS | 9,14,10 | 8/17 TCC | |

(10C)

1/S/C

### Source Codes
1. ITR Nurse
2. IOL List
3. Safety Cell
4. HU
5. ITR Deputy
6. Other

### Service Codes
IS = Initial Screening (333) – seen
MHR = Referral only (not seen)
PN-S = Progress Notes–Seen (371)
PN-NS = Progress Notes–Not Seen (371)
C=Class form only (371)
A=Assessment (331)

*Open = Patient has a CJ Spads Rite open episode OR patient has been screened previously during this incarceration and given an appointment (to be printed)

1. IOL initiated
2. IOL continued
3. IOL D/C'd
4. Safety Cell initiated
5. Safety Cell continued
6. Safety Cell D/C'd

### Outcome Codes (enter all that apply)
7. Mental house
8. Ad seg house
9. Mainline house
10. ICC
11. 5150
12. Bridge Meds ordered

13. Does not meet criteria
14. *Already Open
15. Other (specify)
16. NIC
17. Detoxing

18. Med verification sent
19. Med verification rec'd
20. Reckus mental
21. Reckus mainline
22. Other

Screener Name: M. HAO     AM (PM)     pag 1 of 2

ITR Activity Log, Rev. 10/26/09

Date: 8/10/12

page 1 of 2

ACSO 1076

# ITR ACTIVITY LOG

| Source (code) | Last name, first name | PFN# | Service (subr code) | Outcome (enter codes) | APPT. DATE | Notes |
|---|---|---|---|---|---|---|
| 1 | | ... | MHK | 718 | 8/19 ✓ | |
| 1 | | ..... | MHR | 9 | 8/25 | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

*Open = Patient has a CJ Santa Rita open episode OR patient has been screened previously during this incarceration and given an appointment (to be posted)

**Source Codes**

1. ITR Nurse
2. IOL List
3. Safety Cell
4. HU
5. ITR Deputy
6. Other

**Service Codes**

IS = Initial Screening (314) - team
MHR = Referral only (not seen)
P-N-S = Progress Notes-Seen (371)
P-N-NS = Progress Notes-Not Seen (311)
O=Class form only (171)
A=Assessment (331)

1. IOL initiated
2. IOL continued
3. IOL D/C'd
4. Safety Cell initiated
5. Safety Cell continued
6. Safety Cell D/C'd

**Outcomes Codes (enter all that apply)**

7. Mental house
8. Ad seg house
9. Mainline house
10. ICC
11. 5150
12. Bridge Meds ordered

13. Does not meet criteria
14. *Already Opm
15. Other (specify)
16. NIC
17. Detoxing

18. Med verification stat
19. Med verification rec'd
20. Reclass manual
21. Reclass mainline
22. Other

Screener Name: [signature] N. __ AM / PM    Page 2 of 2    Date: 8/16/10

ITR Activity Log Rev. 10/26/09

**Alameda County**
**Department of Behavioral Health Care Services**
**-Mental Health Division**

FYI

**Progress Notes**
Mental Health Services

Client Name:
Birthdate:
Chart No.:
PSP Client ID No.:

Harrison, Martin
BDH 226

Admit Date:
Reporting Unit:

Respond to problems/goals/objectives of treatment plan and signs and symptoms related to diagnosis. Include treatment interventions and address changes in the client's functioning. If there is little progress, include an explanation of the limited progress. Each month the clinician will complete a client stability ranking with justification. Use the stability rating criteria procedure and assign a numeric ranking. Identify the ranking and enclose the number in the box (e.g. Stability Rating [5]). Please sign each narrative with signature and title. Each progress note must include the following headings:

| Date | Amt. of Time | Loc. | Svc. Type | Prob. No. | |
|------|------|------|------|------|---|
| 8 | 16 | 13 | | | Received message from HU33 Dep re: I/M who was placed on 1% in ISD cell this AM due to |
| | 31 | 1 | | | bizarre behavior and statements, not oriented to |
| | 1 | 00 | | | place, believed he was in his apt and women were. Per dep he was mumbling incoherently. Saw nurse but not receive any medi. I/M came into custody 8/13, denied mH problems in nurse screener so no referral made. Dnh reported alcohol use and placed on CIWA. I/M has no PSP hx. This writer initially unable to eval I/M b/c dep staff was unavailable. When this writer went to eval when dep staff available deps reported that I/M was tazed during a struggle with dep staff while I/M was being moved to a different cell as he had flooded current cell and broke his fire sys. Per Dep I/M was agitated and yelling at the wall, that someone was trying to kill him. I/M was sent code 3 to Valley Medical. Will schedule f/u TBA/MD 8/18 |

A∏ EXHIBIT 2
Deponent Hast
Date 12-12 Rptr J6
WWW.DEPOBOOK.COM

Megan Hast, ASW
Psychiatric Social Worker
CJMH Staff # 8108
Date:                                    Stability Rating [   ]

Amt. of Time: In hours and minutes   Location: Office = 1, Field = 2, Telephone = 3, Home = 4, School Satellite = 5, Satellite = 6:
Service Type:

| 300 | No Show | 331 | Assessment | 361 | Medication Support | 391 | Group Rehabilitation |
|-----|---------|-----|-----------|-----|-------------------|-----|---------------------|
| 311 | Collateral | 341 | Individual Therapy | 371 | Crisis Intervention | 571 | Brokerage Services |
| 321 | Evaluation | 351 | Group Therapy | 381 | Individual Rehabilitation | 581 | Plan Development |

For AB3632 services the ending digit for each code is a (2) except for No Show

ACSO 130

# ALAMEDA COUNTY HEALTH CARE SERVICES AGENCY
## PUBLIC HEALTH DEPARTMENT

**CERTIFICATE OF DEATH**
STATE OF CALIFORNIA
USE BLACK INK ONLY / NO ERASURES, WHITEOUTS OR ALTERATIONS
VS-11A(REV 3/96)

3201001005318

STATE FILE NUMBER | LOCAL REGISTRATION NUMBER

**DECEDENT'S PERSONAL DATA**

| 1. NAME OF DECEDENT– FIRST (Given) | 2. MIDDLE | 3. LAST (Family) |
|---|---|---|
| MARTIN | CHESTER | HARRISON |

AKA, ALSO KNOWN AS – Include full AKA (FIRST, MIDDLE, LAST)

| 4. DATE OF BIRTH mm/dd/ccyy | 5. AGE Yrs. 50 | IF UNDER ONE YEAR Months / Days | IF UNDER 24 HOURS Hours / Minutes | 6. SEX M |
|---|---|---|---|---|

| 9. BIRTH STATE/FOREIGN COUNTRY CA | 10. SOCIAL SECURITY NUMBER | 11. EVER IN U.S. ARMED FORCES? YES [X] NO UNK | 12. MARITAL STATUS/SRDP (at Time of Death) DIVORCED | 7. DATE OF DEATH mm/dd/ccyy 08/18/2010 | 8. HOUR (24 Hours) 0459 |
|---|---|---|---|---|---|

| 13. EDUCATION – Highest Level/Degree (See worksheet on back) HS GRADUATE | 14/15. WAS DECEDENT HISPANIC/LATINO(A)/SPANISH? (If yes, see worksheet on back) YES [X] NO | 16. DECEDENT'S RACE – Up to 3 races may be listed (see worksheet on back) AFRICAN AMERICAN |
|---|---|---|

| 17. USUAL OCCUPATION – Type of work for most of life. DO NOT USE RETIRED CLERK | 18. KIND OF BUSINESS OR INDUSTRY (e.g., grocery store, road construction, employment agency, etc.) WHOLESALE ELECTRICAL SUPPLY | 19. YEARS IN OCCUPATION 24 |
|---|---|---|

**USUAL RESIDENCE**

20. DECEDENT'S RESIDENCE (Street and number, or location)

| 21. CITY OAKLAND | 22. COUNTY/PROVINCE ALAMEDA | 23. ZIP CODE 94607 | 24. YEARS IN COUNTY 15 | 25. STATE/FOREIGN COUNTRY CA |
|---|---|---|---|---|

**INFORMANT**

| 26. INFORMANT'S NAME, RELATIONSHIP KRYSTLE HARRISON, DAUGHTER | 27. INFORMANT'S MAILING ADDRESS |
|---|---|

**SPOUSE/SRDP AND PARENT INFORMATION**

| 28. NAME OF SURVIVING SPOUSE/SRDP–FIRST | 29. MIDDLE | 30. LAST (BIRTH NAME) |
|---|---|---|

| 31. NAME OF FATHER/PARENT–FIRST IRVILLE | 32. MIDDLE | 33. LAST HARRISON | 34. BIRTH STATE KS |
|---|---|---|---|

| 35. NAME OF MOTHER/PARENT–FIRST WILMANETTE | 36. MIDDLE | 37. LAST (BIRTH NAME) BOLLING | 38. BIRTH STATE TX |
|---|---|---|---|

**FUNERAL DIRECTOR / LOCAL REGISTRAR**

| 39. DISPOSITION DATE mm/dd/ccyy 08/30/2010 | 40. PLACE OF FINAL DISPOSITION RES: TIFFANY HARRISON |
|---|---|

| 41. TYPE OF DISPOSITION(S) CR/RES | 42. SIGNATURE OF EMBALMER ▸ NOT EMBALMED | 43. LICENSE NUMBER |
|---|---|---|

| 44. NAME OF FUNERAL ESTABLISHMENT CHAPEL OF THE CHIMES | 45. LICENSE NUMBER FD1240 | 46. SIGNATURE OF LOCAL REGISTRAR ▸ MUNTU DAVIS, M.D. | 47. DATE mm/dd/ccyy 08/27/2010 |
|---|---|---|---|

**PLACE OF DEATH**

| 101. PLACE OF DEATH VALLEY CARE MEDICAL CENTER | 102. IF HOSPITAL, SPECIFY ONE [X] IP OP SR/OP ER/OP DOA | 103. IF OTHER THAN HOSPITAL, SPECIFY ONE Hospice Nursing Home/LTC Decedent's Home Other |
|---|---|---|

| 104. COUNTY ALAMEDA | 105. FACILITY ADDRESS OR LOCATION WHERE FOUND (Street and number, or location) 5555 WEST LAS POSITAS BOULEVARD | 106. CITY PLEASANTON |
|---|---|---|

**CAUSE OF DEATH**

| 107. CAUSE OF DEATH Enter the chain of events – diseases, injuries, or complications – that directly caused death. DO NOT enter terminal events such as cardiac arrest, respiratory arrest, or ventricular fibrillation without showing the etiology. DO NOT ABBREVIATE. | | Time Interval Between Onset and Death | 108. DEATH REPORTED TO CORONER? [X] YES NO |
|---|---|---|---|
| IMMEDIATE CAUSE (Final disease or condition resulting in death) (A) ▸ CAUSE UNDER INVESTIGATION | | INVS | 109. CORONER'S FILE NUMBER 2010-02122 |
| Sequentially list conditions, if any, leading to cause on Line A. Enter UNDERLYING CAUSE (disease or injury that initiated the events resulting in death) LAST (B) | | (B) | 110. BIOPSY PERFORMED? YES [X] NO |
| (C) | | (C) | 110. AUTOPSY PERFORMED? [X] YES NO |
| (D) | | (D) | 111. USED IN DETERMINING CAUSE? [X] YES NO |

| 112. OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RESULTING IN THE UNDERLYING CAUSE GIVEN IN 107 |
|---|

| 113. WAS OPERATION PERFORMED FOR ANY CONDITION IN ITEM 107 OR 112? (If yes, list type of operation and date) | 113A. IF FEMALE, PREGNANT IN LAST YEAR? YES NO UNK |
|---|---|

**PHYSICIAN'S CERTIFICATION**

| 114. I CERTIFY THAT TO THE BEST OF MY KNOWLEDGE DEATH OCCURRED AT THE HOUR, DATE, AND PLACE STATED FROM THE CAUSES STATED. Decedent Attended Since (A) mm/dd/ccyy Decedent Last Seen Alive (B) mm/dd/ccyy | 115. SIGNATURE AND TITLE OF CERTIFIER | 116. LICENSE NUMBER | 117. DATE mm/dd/ccyy |
|---|---|---|---|
| | 118. TYPE ATTENDING PHYSICIAN'S NAME, MAILING ADDRESS, ZIP CODE | | |

**CORONER'S USE ONLY**

| 119. I CERTIFY THAT IN MY OPINION DEATH OCCURRED AT THE HOUR, DATE, AND PLACE STATED FROM THE CAUSES STATED. MANNER OF DEATH: Natural Accident Homicide Suicide [X] Pending Investigation Could not be determined | 120. INJURED AT WORK? YES NO UNK | 121. INJURY DATE mm/dd/ccyy | 122. HOUR (24 Hours) |
|---|---|---|---|

123. PLACE OF INJURY (e.g., home, construction site, wooded area, etc.)

124. DESCRIBE HOW INJURY OCCURRED (Events which resulted in injury)

125. LOCATION OF INJURY (Street and number, or location, and city and zip)

| 126. SIGNATURE OF CORONER / DEPUTY CORONER ▸ FREDERICK E HAMILTON | 127. DATE mm/dd/ccyy 08/19/2010 | 128. TYPE NAME, TITLE OF CORONER / DEPUTY CORONER FREDERICK E HAMILTON, SERGEANT |
|---|---|---|

| STATE REGISTRAR | A | B | C | D | E | | FAX AUTH.# |
|---|---|---|---|---|---|---|---|

*D10001001573087*

**★000782834★**

CERTIFIED COPY OF VITAL RECORDS



STATE OF CALIFORNIA } SS
COUNTY OF ALAMEDA

This is a true and exact reproduction of the document officially registered and filed with the Alameda County Health Care Services Agency.

DATE ISSUED: 08/31/2010

HEALTH OFFICER AND LOCAL REGISTRAR
ALAMEDA COUNTY, CALIFORNIA

This copy not valid unless prepared on engraved border displaying date and signature of Registrar.



ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE

# Prison Health Services

# Death Summary

**To:**   Lt. S. Sexton

**From:**   Dr. Maria Magat

**Date:**   August 18, 2010

**Re:**   Harrison, Martin, PFN: BDH226: DOB: ▮▮▮▮ DOD: 08/18/2010

Mr. Martin Harrison is a 50 year old male who came into custody on 8/13/10. He was screened and mentioned that he drinks alcohol on a daily basis and his last drink was on that day. He had normal vital signs and no other medical/health issues were noted.   He submitted a sick call slip on 8/15/10 but did not mention the nature of his medical concern. He was called to sick call on 8/17 however, he was a no show. On 8/16/10 at 1900, the PHS medical staff  responded to the inmate being tazed at the housing unit. They found the inmate in the ISO cell, noted to be combative with a spit mask on. The nurse was unable to obtain a blood pressure reading because of the inmate's behavior but obtained a pulse of 57, respiration of 12 and oxygen saturation of 97% on room air. Inmate suddenly was noted to become unresponsive and he was immediately moved to the  trauma room. In the trauma room, AED pads were applied but no reading/rhythm registered. CPR was immediately started and 911 was called. An IV line was established and IVF run. The fire department responded as well as the Paramedics who took over the resuscitation process. Inmate was then transferred to Valley Care Hospital and remained there until his demise.

Medical cause of death – cardiac arrest

Pathologic cause of death – coroner's report pending

Respectfully submitted,

Maria Magat, M.D.

1



Prison Health Services

# PROGRESS NOTES

| Date/Time Location | Name: HARRISON, MARTIN    DOB:                PFN: BDH 226 |
|---|---|
| 9/17/10 (0900) | I'm submitted sick call request - I'm was no show for sick call                              M Harris M. Harris ln |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

**Complete Both Sides Before Using Another Sheet**

SRJ-211 (11/07)



**PHS**

Prison Health Services

## PROGRESS NOTES

| Date/Time Location | |
|---|---|
| **Name:** HARRISON, Martin **DOB:** | **PFN:** BDH226 |

**8/16/80** ⑤ @ 1900 a call from H.U. 33 came across the radio as a 232, I/m tazed —

⑥ upon arrival to H.U. 33, @ 1908. I/m was lying on floor ☉ nurse Imperio taking V/S and several deputies around I/m. I/m has a "spit mask" on. and was found @ that time unresponsive, unable to be stimulated by smelling salt and verbal/physical stimuli — upon that time I/m was placed on the H.U. gurny and taken to the Trauma room. In the Trauma room @ 1913 still unresponsive and nurse Imperio unable to obtain a proper B/P. (see nurses progress notes for V/S) I immidiately obtained the AED located in the Trauma Room, placed the pads on the anterior of his chest and posterior back of inmate Harrison. Unable to obtain a reading from the AED, I persisted to initiate CPR and with that I yelled a CODE 3 @ Deputy Khin, — CPR 32-2 was initiated with Nurse Anna Blyakherova, LVN holding the

| Date/Time Location | Name: HARRISON, Martin DOB: ___ PFN: BOH 226 |
|---|---|
| 8/10/10 | the AMBU BAG. At 1925 the fire dept arrived, which Nurse Anna, Nurse ventura and myself continued to administer chest compression to assist the Fire dept till paramedics arrived. Nurse P. Cat, RN started a line to I/m's ® AC NS IV Fluid open wide. @ 1930-35 paramedics arrived and started a second line on I/m's ® ☒ AC. Which they started to administer cardiac drugs. Fire and Paramedics were in Trauma Room working on Mr. Harrison till 1950 when they left with mr. Harrison having an pulse and Fire dept continuing chest compress. Ⓐ Cardiac compromise. Ⓟ F/u c̄ Nursing Director / Assistant Direc. MD. Pt sent to Valley Care CONE 3.   _____ M. Anderson, RN   PM Shif Nursing Sep. |



Prison Health Services

## PROGRESS NOTES

| Date/Time Location | |
|---|---|
| Name: HARRISON, MARTIN | DOB:       PFN: BDH226 |

**8/16/10** ✓ > ✓/P TAREN : @ 1941 PER DEPUTY

**@ 1910** O > @ 1910, UPON LEARNING THAT AN 1/M GOT TAZED, I INFORMED ~~CHARGE~~ NURSE SUPERVISOR ā THE INFIRMARY NURSE OF POSSIBLE ADMITTANCE TO INFIRMARY, OUR CHARGE NURSE, MS. ANDERSON ASKED IF I NEEDED HELP, I SAID I WAS OKAY FOR I HAVEN'T SEEN THE 1/M MYSELF YET. I CALLED THE TECHNICIAN TO LET HER KNOW THAT I'M JUST WAITING FOR THEM TO CALL ME WHEN IT'S SAFE TO SEE THE 1/M FOR MEDICAL MANAGEMENT, TECHNICIAN SAID THAT IT IS NOT SAFE YET FOR THE 1/M IS STILL COMBATIVE / FIGHTING. THE DEPUTIES SEEN 1/M @ 1910 @ THE ISO-CELL ē SPIT MASK ON ā EXTREMITIES ON CHAIN CUFF. O2 SAT @ 97%. @ ROOM AIR. UNABLE TO OBTAIN BLOOD PRESSURE, 1/M IS STILL RESISTANT ā COMBATIVE. PULSE - 57 BPM, BREATHING @ 2 PER MINUTE. @ 1913 1/M WAS TRANSPORTED TO TRAUMA ROOM VIA GURNEY @ TRAUMA ROOM - 1/M WAS UNRESPONSIVE TO TACTILE ā VERBAL STIMULI. STILL UNABLE TO OBTAIN/OBTAIN BLOOD PRESSURE, O2 VIA REBREATHER @ 5LPM STARTED, CPR STARTED. @ 1915 CALLED FOR CODE 3. IVF LINE STARTED. PULSE @ 114, O2 SAT @ 98%. WHEN PARAMEDICS ARRIVED

<span style="text-align:right;display:block;">C. Imperio, RN</span>

**Complete Both Sides Before Using Another Sheet**

SRJ-211 (11/07)

19-04-976

# ALAMEDA COUNTY SHERIFF'S DEPARTMENT
## SANTA RITA JAIL/GLENN E. DYER DETENTION FACILITY

BDH2226

TEL: (925) 551-6700     **PPD SKIN TEST**     FAX: (925) 551-7693

Name: HARRISON, MARTIN    D.O.B.: _____    P.F.N.: 0107 852
BDH2226

_____ PPD Skin Test **NOT APPLIED** due to: _____

(Initiate PPD SKIN TEST EVALUATION Form)

_____ PPD Skin Test **APPLIED** with strength of 5TU at body site: _____

Date and Time: 08-13-10 1770    Nurse Signature: _____ Z. Sancho, LVN

Patient Location at time of PPD Skin Test interpretation: _____

**Date and Time Read:** 8/15/10    **Induration in millimeters:** 0mm

Nurse Signature: _____ dollanger/p

# NOTE TO PATIENT

## YOUR TEST MUST BE READ WITHIN 48-72 HOURS (2-3 DAYS)

### IF YOU ARE RELEASED BEFORE THE TEST IS READ

     A. CONTACT YOUR HEALTH CARE PROVIDER FOR THE
        TEST READING OR RETESTING, AND ANY FURTHER
        EVALUATION THAT MAY BE NEEDED.

     B. IF YOU DO NOT HAVE A HEALTH CARE PROVIDER,
        YOU MAY CONTACT ONE OF THE FOLLOWING CLINICS.

**WINTON WELLNESS CENTER**
24100 Amador St., Suite 250
Hayward, CA
Tel: (510) 266-1700

**EASTMONT WELLNESS CENTER**
6955 Foothill Blvd. (2nd Floor of Eastmont Mall)
Oakland, CA
Tel: (510) 567-5700

**BERKELEY RESIDENTS**
**Berkeley City Health Department**
830 University Avenue
Berkeley, CA
Tel: (510) 981-5350

Prison Health Services, Inc.
Santa Rita Jail

## EMERGENCY REFERRAL TO HOSPITAL FROM SANTA RITA JAIL

DATE: 8/16/10   TIME: 1915 HRS   HOSPITAL: VALLEY - ER

PATIENT NAME: HARRISON, MARTIN   DOB: ▮▮▮   PFN: BDH 226

MEDICAL PROBLEM (reason for referral) s/p Tazer - brought to the Trauma room unresponsive to tactile and verbal stimuli, unable to take BP, Respiration, Pulse 137 O2 sat 94% with mask rebreather @ 5LPM

AUTHORIZING TRANSPORT: O R. MAGAT

NURSE'S NAME: A. VENTURA RN

(Please Print)

Patient went out by:                        Patient was admitted
   SRJ Transport_____        Yes_____
   Regional Ambulance _____        No_____

If An Ambulance Is Needed:
1. **Transport Only:**
   The Shift Charge Nurse will:
   - **Call CODE 2 Ambulance, 1-888-650-5472** to order an ambulance for transport
   - Phone Command Post 1 CP1 Ext. 46600
   - Inform the control officer of ambulance pending arrival and have him alert back gate and order escort deputy to accompany patient.

2. **Code 3 (EMERGENCY)**
   The Shift Charge Nurse will:
   - **Phone Command Post 1 (CP1) Ext 46600**
   - Direct Control Officer to call 911 to have an ambulance sent to the jail, to alert the back gate that the ambulance will be arriving, and to supply any escort officer to the outside hospital
     Time Notified: 1915 HRS_____

IN LIFE THREATENING EMERGENCIES:
It is the responsibility of the Charge Nurse to:
- Notify the Head Nurse (home phone number posted in the dispensary, Nurse's Station, Conference Room, and front desk) who will inform the Program Administrator will be called (home phone number and beeper number on control).
- In addition, if the Medical Director has not already been notified, he will be contacted as once
  Time Notified: _____

PHS/SRJ-139 (11/08)

| FOR OFFICE USE ONLY |
|---|
| SY   SN |
| Insurance _____ |
| PHS PRE-CERT # |

**PHS**
PRISON
HEALTH
SERVICES
INCORPORATED

*Emergency Room Referral*

Date: _8_,_16_,_10_

From: _VALLEY STA RITA JAIL_
(Referring Physician/Institution)

Bill direct to:

Site Name: _____ Site# ___

To: _VALLEY_
(Consulting Physician/Address)

**Prison Health Services**
105 Westpark Dr., Suite 200
Brentwood, TN 37027
Attn: Claims Dept.

| PRISONERS PLAN ESCAPES! |
|---|
| DO NOT inform prisoners of the date/time of revisits or impending hospitalization. |

Inmate's Name: _HARRISON, MARTIN_

Inmate's I.D. # _BDH 226_

Date of Birth: ████████

Social Security # _____ - ____ - _____

Written by: _A. VENNRA RN_

UR Auth # ___

**ER PHYSICIANS:** If hospital admission is recommended, please notify PHS beforehand.

Name: _CHARGE NURSE_

Phone: ( _925_ ) _557  6701_

REASON FOR REFERRAL: Include date of onset, present treatment, history of injury or illness, include all x-rays and lab results with consultation.

_S/P   TAZER  —  un responsive to_
_tactile at verbal stimuli unable to_
_take BP  Respiration  Pulse 137  O2 Sat_
_94% with mask prebreather  /_

_ø  allergy  ø  medical problems per_
_screener_

T _____ P _____ R _____ B/P _____

Financial Responsibility _____

**PHYSICIAN'S REPORT**

Significant Findings, Including Tests Done: _____

Diagnosis: _____

Orders/Recommendations: _____

M.D. Signature _____ Date ___ / ___ / ___

# ValleyCare HEALTH SYSTEM.

19-04-97

## PATIENT REGISTRATION

| PATIENT INFORMATION | PATIENT EMPLOYER INFORMATION |
|---|---|
| HARRISON, MARTIN C | INMATE |
| DOB: ███  AGE: 050Y   SEX: M | OCC: INMATE |
| 5325 BRODER BLVD | |
| DUBLIN, CA 94568 | |
| PHONE:   925-551-6500 | |
| SOC SEC #: ███ | ALTERNATE PHONE:      -    - |

| GUARANTOR INFORMATION | GUARANTOR EMPLOYER INFORMATION |
|---|---|
| PRISON HEALTH SVC, INMATE | EMPLOYER GUARANTOR |
| 5325 BORDER ROAD | |
| DUBLIN, CA 94568 | |
| 925-551-6500        Rltn: OTHER | |

## EMERGENCY CONTACT INFORMATION

| LIVES WITH | RELATIVE |
|---|---|
| | |
| Home Phone: | Home Phone: |
| Alternate Phone: | Alternate Phone: |
| Emplyr & Phone: | Emplyr & Phone: |
|           Rltn: |           Rltn: |

| CARRIER 1/FC - 3060 | CARRIER 2/FC - 0000 | CARRIER 3/FC - 0000 |
|---|---|---|
| PRISON HEALTH SERVICE/TEX | | |
| 105 WEST PARK DR STE 300 | | |
| 3060 | | |
| BRENTWOOD, TN 37027 | | |
| Ph:  925-551-6500 | Ph: | Ph: |
| PRISON HEALTH SVC, INMATE | | |
| Policy / Grp # / Name | Policy / Grp # / Name | Policy / Grp # / Name |
| ███ | | |
| PFN/BDH226 | | |

| ADMIT DIAGNOSIS 1 & 2 | ADMIT NOTES 1 & 2 |
|---|---|
| CARDIAC ARREST HYPERTENSION | |

Accident: N      Code:        Date/Time:

| Admit Phys:   WONG, BILL N | Phone: 925-463-0590 |
|---|---|
| Attend Phys:  WONG, BILL N | Phone: 925-463-0590 |
| Primary PCP: | Phone: |
| Refer Phys: | Phone: |

| Admit Clerk:   CAEWHITEHE | | Revision Date:  8/17/10 |
|---|---|---|
| RLGN: NON       RACE: W | | Revision Time:  7:42:43 |
| VIP: BLANK CD-NON VIP | Clergy Visit: N | |
| DOB: ███ | Language:  English | Room/Bed: 2806-P |
| AT: 1        SC: 1    AGE: 050Y   SEX: M | Mrtl Sts: Unknown   Accom CD: 3 | |
| | LstAdmt: 8/16/2010   Trnsf From: | |

| ACCOUNT # | PT: | SVC: | ADM Date / Time: | DISC Date / Time: | MED REC # |
|---|---|---|---|---|---|
| 301528790 | C | ICU | 8/16/2010  21:41 | | 75-01-75 |

CAPADDPR01

# Prison Health Services Medical Request Form
## [Forma de la Petición de los Servicios Médicos]

- **Inmate** – do not write in shaded area. [El interno – no escribe en área sombreada.]
- Place this form in the sick call box or give it to medical staff. [Poner esta forma en la caja enferma de la llamada o darla al personal médico.]
- If you do not complete all information, your appointment may be delayed. [Si usted no termina toda la información, su cita puede ser retrasada.]
- A copy will be given to you after the visit. [Una copia le será dada después de la visita.]
- You may be charged $3.00 for each health care visit. [Usted puede ser cargado $3.00 para cada visita del cuidado médico.]

| DATE [FECHA] | NAME [NOMBRE]: LAST [PASADO]  FIRST [PRIMERO]  MIDDLE [MEDIO] | DOB [NACIMIENTO] | PFN [ID] |
|---|---|---|---|
| 8-15-10 | MARTIN HARRISON MARTIN CHESTER | ▮ | BD H Z26 |

**HOUSING LOCATION** [LOCALIZACIÓN DE LA CUBIERTA]
SRJ: UNIT [UNIDAD] E-33   POD/CELL [CÉLULA] D-2   GDDF: FLOOR [PISO] ____   POD/CELL [CÉLULA] ____

### CO-PAYMENT INFORMATION – TO BE FILLED OUT BY DEPARTMENTAL STAFF

1. ✓ Patient not seen: ____ NIC ____ DUPLICATE ✓ NO SHOW ____ REFUSED ____ OTA
2. ✓ Visit was for diagnosis or treatment of communicable disease condition.
3. ✓ Visit was for a follow-up requested by the clinician.
4. ✓ Visit was NOT exempt from co-payment. Send ORIGINAL WHITE page to Accounting.

| CLINICIAN'S SIGNATURE | CLINICIAN'S NAME (Print/Stamp) | DATE |
|---|---|---|
| M. Harris | M. Harris, LVN | 8/16/10 |

| Inmate's Signature [Firma Del Interno] | Patient Refused to Sign ☐ | Witness if Patient Refused to Sign |
|---|---|---|

Date of Triage: 8/16/10   Signature and Print Stamp: M. Harris   M. Harris, LVN
Disposition: ☒ Sick Call   ☐ Specialty Clinic   ☐ Other

### RELEASE OF RESPONSIBILITY [LANZAMIENTO DE LA RESPONSABILIDAD]

I am refusing sick call due to [Estoy rechazando la llamada enferma debido a]: _____

Date [FECHA] _____ Inmate's Signature [Firma Del Interno] _____ Refused to Sign [Rechazado para Firmar] ☐

| CLINICIAN'S SIGNATURE | CLINICIAN'S NAME (Print/Stamp) | Witness if Patient Refused to Sign |
|---|---|---|

**Tell us below why you want to see health care staff. In the area below, write down anything you want health care staff to know.** [Decimos abajo porqué usted desea ver a personal del cuidado médico. En el área abajo, anotar cualquier cosa que usted quisiera que el personal del cuidado médico supiera.]

I was told to.

| Signature of Patient [Firma de la Paciente] | Date [Fecha] 8-15-10 |
|---|---|

**WHITE: Accounting**   **PINK: Health Services File**   **CANARY: Inmate/Patient**   Revised 1/24/08

Alameda County Sheriff's Office

# INTAKE/RECEIVING SCREENING FORM

This form must be completed by the Intake/Receiving Staff
before the arrestee newbook/rebook is received at any Alameda County Jail Facility.

**ARRESTEE'S NAME:** _HARRISON, MARTIN_     **PFN:** _____

**BOOKING DATE:** _08\31\0_     **TIME:** _1620_

1. Is the arrestee hearing impaired and/or have any other impairments?     Yes_____     No _✓_

   Describe: _____

2. Does the arrestee appear to have any mental health problems?     Yes_____     No _✓_

   Describe: _____

3. Is the arrestee taking any prescription medications?     Yes_____     No _✓_

   Describe: _____

4. Is the arrestee pregnant?     Yes_____     No _✓_

5. Has the arrestee been pregnant in the past twelve months?     Yes_____     No _✓_

6. Do you have any information or have any observations been made which would indicate that the arrestee has experienced any of the following before, during, or subsequent to arrest?

   | | | |
   |---|---|---|
   | A. Loss of Consciousness | Yes_____ | No _✓_ |
   | B. Seizure | Yes_____ | No _✓_ |
   | C. Breathing Problems | Yes_____ | No _✓_ |
   | D. Bizarre or Aggressive Behavior | Yes_____ | No _✓_ |
   | E. Alcohol or Drug Intoxication | Yes_____ | No _✓_ |
   | F. Injury, Illness or Contagious Disease | Yes_____ | No _✓_ |

   Explain: _____

7. Was the arrestee involved or subjected to any of the following before, during, or subsequent to arrest?

   | | | |
   |---|---|---|
   | A. Auto Accident | Yes_____ | No _✓_ |
   | B. Physical Altercation (see #7) | Yes_____ | No _✓_ |
   | C. Chemical Agents | Yes_____ | No _✓_ |
   | D. Total Appendage Restraint Procedure | Yes_____ | No _✓_ |
   | E. Carotid Restraint | Yes_____ | No _✓_ |
   | F. Electric Stun Device | Yes_____ | No _✓_ |
   | G. Baton/impact Weapon | Yes_____ | No _✓_ |
   | H. Proned Restraint (see #7) | Yes_____ | No _✓_ |

8. Note approximate duration of Physical Altercation_____and / or Proned Restraint_____

   *An affirmative answer to any of the above questions shall require immediate medical evaluation to establish clearance by Prison Health Services prior to acceptance for Intake into the Alameda County Jail. In all such cases a supervisor shall be notified.

   | | | | | |
   |---|---|---|---|---|
   | **Intake/Receiving Staff** | ID# | **SRJ** | **GDJ** | **Other** |

   **MEDICALLY ACCEPTABLE FOR INTAKE:**     **YES**_____     **NO**_____

   | | | |
   |---|---|---|
   | **Medical/Mental Health Reviewer** | **Date** | **Time** |

   **Transfer to Santa Rita Jail as soon as possible:** _____     PD-803  (Rev 02/07/08)

PFN/AJIS 0107 85

NAME _____

DATE _____ TIME 1620

BDH2216 / D.O.B. [redacted]  SEX M  REMARKS _____ NEOA

PREVIOUS COMMITMENT _____  ALLERGIES _____ NEOA

**VISUAL OBSERVATIONS** (EXPLAIN "YES" ANSWERS) CIRCLE Y OR N  **YES  NO**

1. Is inmate unconscious, or showing signs of bleeding, injury, pain or other symptoms suggesting need for emergency medical referral? _____ Y (N)
2. Is inmate carrying prescribed medication? _____ Y (N)
3. Is there obvious fever or other evidence of infection? _____ Y (N)
4. Is there evidence of body vermin, rashes, needle marks? _____ Y (N)
5. Does inmate appear to be under the influence of, or withdrawing from drug, alcohol, or other unknown substance, or any signs of abnormal behavior? _____ Y (N)
6. Is there evidence of skin lesions, jaundice, or bruises? _____ GENERAL POPULATION Y (N)
7. Is inmate's mobility restricted in any way? _____ PEG Y (N)
8. Does inmate appear agitated, depressed, or confused? _____ GRIEVANCE PEG Y (N)
9. Does inmate appear developmentally delayed? _____ Y (N)
10. Does inmate have a prosthesis, eye glasses, contact lens: _____ not in possession(?) (Y) N

**INMATE QUESTIONNAIRE** (EXPLAIN "YES" ANSWERS) CIRCLE Y OR N

11. Ever had diabetes, seizures, asthma, ulcers, high blood pressure, or a heart condition? _____ Y (N)
12. Do you have a psychiatric disorder? What? _____ Last episode _____ Y (N)
13. Are you suicidal now or in the past? When? _____ How? _____ Y (N)
14. Been hospitalized by a psychiatrist or physician in the past year? If yes explain _____ Y (N)
15. Taking medications prescribed by a psychiatrist or physician? (Drug dose, frequency, and last dose) _____ Y (N)
16. On a special diet prescribed by a physician? What? _____ Y (N)
17. Been exposed to or have a contagious or communicable disease? (i.e. AIDS, Hepatitis, sexually transmitted disease, tuberculosis) _____ Y (N)
18. Do you have fever, chills, weight loss, night sweats, cough, fatigue, hemoptysis? _____ Y (N)
19. PPD Given _____ N/A _____ HX _____ of _____ Positive TB Skin test _____ (Y) N
20. Have any dental problems? Dentures? _____ (Y) N
21. Use Alcohol? (type, amount, last use?) _____ q D - today (Y) N
22. Use drugs? (type, amount, last use?) _____ Y (N)
23. Females: Last menses _____ Urine HCG Neg. _____ Pos. _____
    Pregnant? _____ Birth control? _____ Recent delivered or aborted? _____
24. Have any other medical or mental disabilities you have not told me about? _____ N/A Y (N)
25. Vital signs T 97.6 P 78 R 18 BP 130/79 - 142/85
26. Comments _____

27. Disposition: Emergency Treatment _____ Infirmary _____ Next Clinic _____ Future Clinic _____
    Isolation _____ Observation Log _____ Psychiatric _____

I acknowledge that I have answered all questions truthfully and that I have been told and shown in writing how to obtain medical services.

_____  Z. Sancho, LVN  08-13-10  _____
Nurses Signature        Date/Time        Inmates Signature

RFN/AJIS 0101852    NAME HARRISON, MARTIN    DATE 08 13 10    TIME 1620

CII BDH2116 /D.O.B. _____ SEX M REMARKS _____

PREVIOUS COMMITMENT ✓    ALLERGIES NKDA

## VISUAL OBSERVATIONS (EXPLAIN "YES" ANSWERS) CIRCLE Y OR N    YES   NO

1. Is inmate unconscious, or showing signs of bleeding, injury, pain or other symptoms suggesting need for emergency medical referral? _____ Y (N)
2. Is inmate carrying prescribed medication? _____ Y (N)
3. Is there obvious fever or other evidence of infection? _____ Y (N)
4. Is there evidence of body vermin, rashes, needle marks? _____ Y (N)
5. Does inmate appear to be under the influence of, or withdrawing from drug, alcohol, or other unknown substance, or any signs of abnormal behavior? _____ Y (N)
6. Is there evidence of skin lesions, jaundice, or bruises? GENERAL POPULATION Y (N)
7. Is inmate's mobility restricted in any way? _____ PEG. Y (N)
8. Does inmate appear agitated, depressed, or confused? GRIEVANCE PEG Y (N)
9. Does inmate appear developmentally delayed? _____ Y (N)
10. Does inmate have a prosthesis, eye glasses, contact lens: not in possession Y . N

## INMATE QUESTIONNAIRE (EXPLAIN "YES" ANSWERS) CIRCLE Y OR N

11. Ever had diabetes, seizures, asthma, ulcers, high blood pressure, or a heart condition? _____ Y (N)
12. Do you have a psychiatric disorder? What? _____ Last episode _____ Y (N)
13. Are you suicidal now or in the past? When? _____ How? _____ Y (N)
14. Been hospitalized by a psychiatrist or physician in the past year? If yes explain _____ Y (N)
15. Taking medications prescribed by a psychiatrist or physician? (Drug dose, frequency, and last dose) _____ Y (N)

Δπ EXHIBIT 4
Deponent LAST
Date 2/2/12 Rptr JG
WWW.DEPOBOOK.COM

16. On a special diet prescribed by a physician? What? _____ Y (N)
17. Been exposed to or have a contagious or communicable disease? (i.e. AIDS, Hepatitis, sexually transmitted disease, tuberculosis) _____ Y (N)
18. Do you have fever, chills, weight loss, night sweats, cough, fatigue, hemoptysis? _____ (Y) N
19. PPD Given N/A HX _____ of _____ Positive TB Skin test _____ (Y) N
20. Have any dental problems? Dentures? _____ (Y) N
21. Use Alcohol? (type, amount, last use?) ETOH - LID - today (Y) N
22. Use drugs? (type, amount, last use?) _____ Y (N)
23. Females: Last menses _____ Urine HCG Neg. _____ Pos. _____ Pregnant? _____ Birth control? _____ Recent delivered or aborted? _____
24. Have any other medical or mental disabilities you have not told me about? _____ Y (N)
25. Vital signs T 97.6 P 78 R 18 BP 120/79 - 102/61
26. Comments _____

_____ ETOH W/D _____

ACSO 140

27. Disposition: Emergency Treatment _____ Infirmary _____ Next Clinic _____ Future Clinic _____
Isolation _____ Observation Log _____ Psychiatric _____

I acknowledge that I have answered all questions truthfully and that I have been told and shown in writing how to obtain medical services.

_____ Z. Sancho, LVN    08-13-10    _____
Nurses Signature      Date/Time      Inmates Signature

| ALAMEDA COUNTY SHERIFF'S OFFICE DETENTION AND CORRECTIONS POLICY AND PROCEDURE | **NUMBER:** 13.01 | **PAGES:** 1 of 4 |
|---|---|---|
| | **RELATED ORDERS:** ACA 3-ALDF-4E-02, 4E-09, 4E-10, 4E-17, 4E-24 CALEA 72.6.1, 72.6.5 | |
| | **ISSUED DATE:** 07/01/89 | |
| | **REVIEW DATE:** 12/08/06 | |
| | **REVISION DATE:** 01/01/98 | |
| **CHAPTER:** Medical and Health Care Services | **SUBJECT:** Medical and Mental Health Care | |

I.   **PURPOSE:** To establish policy for providing community standards of health care for all inmates.

II.  **POLICY:** The Sheriff's Office will maintain contractual agreements with medical and mental health care professionals to provide all inmates with health care that meets community standards, and complies with all federal, state and local regulations. All health care services will be pursuant to written standards or direct orders, by personnel authorized by law. Nurse practitioners and physician's assistants may practice within the limits of applicable laws and regulations. Proper management of pharmaceuticals will be followed. All correctional and other staff are trained to respond to health-related situations within four minutes. The training program is established by Prison Health Services in the cooperation with the facility Commanding Officer. All medical, psychiatric and dental matters involving medical judgment are the sole province of the responsible physician and dentist. State and federal license, certification or registration requirements and restrictions apply to personnel who provide health care services to inmates.

III. **PROCEDURE:**

A.   All health care services, including medical, dental and mental health services, will be delivered under the control of Prison Health Services (PHS) and the Criminal Justice Mental Health Program (CJMH), in compliance with contractual agreements.

B.   All inmate initiated medical visits will cost the inmate $3.00 dollars. No inmate will be denied medical care due to their inability to pay a fee.

1.   Requests to be seen by a nurse/doctor/dentist will be reviewed by health care staff for fee applicability. No charge will be made for emergency care, initial intake screening, TB testing and subsequent readings, communicable disease treatment, health appraisals, mental health care deemed essential by the clinician, any prenatal/postnatal services, lab and diagnostic services, and any follow up or referral care.

2.   Non-inmate initiated visits, should be considered exempt from fees.

3.   Any inmate that feels he/she was incorrectly charged, may follow the grievance procedure as specified at each jail.

4.   Informational notices and videos will be made available to all inmates at intake and throughout incarceration.



ASC0 0455

C.    INMATE HEALTH CARE REQUESTS:

1.    Inmates will use a sick call request slip (Inmate Request for Health care: 455-001), to access the medical health care system.

2.    All copies of the sick call request slip will be forwarded to the sick call box, or medical personnel. The third copy will be sent back to the inmate at the conclusion of the medical visit.

D.    DEBITING INMATE'S ACCOUNT:

1.    After the inmate is seen by the health care provider, the provider will complete the sick call request slip, give the inmate the last copy, forward the original to the inmate's medical file and send the second copy to the Sheriff's Office, accounting department.

2.    If the inmate does not attend sick call, he/she will not be charged.

3.    Charges for health care will be deducted from the inmate's account when indicated by health care staff. AJIS code "MED" will be used. If the account balance is zero, no posting can be made and the visit is free.

4.    Revenue collected will be deposited into revenue account 455-6201, by accounting staff.

5.    Monthly statistical reports, will be used to determine the amount of visits billed, the amount of fees billed, the amount collected, the amount uncollectible, and the amounts that have been dropped from accounts receivable.

E.    Medical, dental and mental health matters involving clinical judgments, are the sole province of the responsible physician, dentist, psychiatrist or qualified psychologist respectively.

F.    Security regulations applicable to all facility personnel will apply to all health care personnel.

G.    PHS and CJMH administrators will meet with the facility Commanding Officer or designee at least quarterly, and submit quarterly reports on the health care delivery system and annual statistical reports.

H.    PHS and CJMH will maintain up-to-date written policies, procedures, and programs, which are reviewed at least annually, in cooperation with the Criminal Justice Medical Committee and revised if necessary. Each document must bear the date of the most recent review or revision and the signature of the reviewer.

I.    The facility Commanding Officer will ensure that adequate space, equipment, supplies, and materials are provided for health care delivered in each facility, in compliance with contractual agreement and through discussion with PHS and CJMH.

J.    PHS and CJMH will systematically determine health care personnel requirements in order to provide all inmates access to health care staff and services.

K.     PHS and CJMH will ensure their personnel are in compliance with all appropriate state and federal licensure, certification, or registration requirements and restrictions. The duties and responsibilities of their personnel will be governed by written job descriptions, approved jointly by PHS, CJMH and the facility Commanding Officer. Verification of current credentials and job descriptions will be maintained on file in the facility.

L.     PHS and CJMH will develop a training program, in cooperation with the facility Commanding Officer, to provide instruction to the Sheriff's Office sworn and civilian staff in the following areas:

1.     The ability to respond to health-related situations within four minutes.

2.     Recognition of signs and symptoms and knowledge of action required in potential emergency situations.

3.     Methods of obtaining assistance.

4.     Recognition of signs and symptoms of mental illness, retardation, emotional disturbance and chemical dependency.

5.     Procedures for patient transfers to appropriate medical facilities or health care providers.

6.     Additionally, the Sheriff's Office shall provide training for all sworn staff in the administration of first aid and cardiopulmonary resuscitation (CPR).

M.     Classification will consult with PHS and/or CJMH staff prior to taking action on housing assignments, program assignments, disciplinary action, or transfers in and out of the facility for inmates who are diagnosed as having a psychiatric illness.

N.     PHS and CJMH will develop policy and procedure for the proper management of pharmaceuticals, which addresses the following subjects:

1.     A formulary specifically developed to the facility.

2.     Prescription practices which require that:

a.     Psychotropic medications are prescribed only when clinically indicated as one facet of a program of therapy.

b.     "Stop order" time periods are required for all medications.

c.     The prescribing provider re-evaluates a prescription prior to its renewal.

d.     Procedures for medication receipt, storage, dispensing and administration or distribution.

e.     Maximum security storage and periodic inventory of all controlled substances, syringes and needles.

f.     Dispensing of medicine in conformance with appropriate federal and state law.

Policy and Procedure 13.01
Page 4 of 4

g.      Administration of medication which is carried out by persons properly trained as appropriate by state law and under the supervision of the health authority and facility Administrator or designee.

h.      Accountability for administering or distributing medications in a timely manner, according to physician orders.

O.      PHS and CJMH will ensure that persons administering medications do so under the direct supervision of the responsible physician and have received training appropriate to their assignment. They are accountable for administering medications according to orders and recording the administration of medications in a manner, and on a form, approved by the responsible physician.

P.      All treatment by health care personnel other than a physician, dentist, psychologist, optometrist, podiatrist, or other independent provider, is performed pursuant to written standing or direct orders by personnel authorized by law to give such orders. Nurse practitioners and physician's assistants may practice within the limits of applicable laws and regulations.

Q.      Health care staff will visit inmates in segregation three times a week, unless medical attention is needed more frequently.

R.      POLICE REIMBURSEMENT OF PRISONER MEDICAL COSTS: The following, guidelines have been developed to maximize local police agencies utilization of Criminal Justice Medical Program (CJMP) reimbursement for medical services provided to city prisoners. CJMP reimbursement rules are as follows; prior to booking an inmate in the County jail, a city prisoner with a medical need for a:

1.      Non-emergency:  Medical care is paid by CJMP when done at Ferment, Highland or Washington hospitals. The only non-emergency exceptions are for sexual abuse/assault cases or blood alcohol tests.

2.      Emergency:  (Life endangered) Medical care at any medical facility is covered by CJMP.

3.      Emergency Psychiatric:  Care is permitted at Highland Hospital for payment by CJMP. Note: Local police agencies frequently seek the above information from Sheriff's Office personnel. Should further information be required, the police agency is to be advised to call Health Care Services agency at (510) 268-2533.

ASC0 0458

Alameda County Behavioral Health Care Services
**CRIMINAL JUSTICE MENTAL HEALTH PROGRAM**
**Santa Rita Jail**
**5325 Broder Blvd.**
**Dublin, CA  94568**
**Tel: (925) 551-6740     FAX:  (925) 551-6727**

# FAX COVER PAGE
## for
## Records Requests

DATE:  10/14/10                          # of pages including cover sheet  2

TO:  Gina Attomare            FAX #: 510-452-5510
     Haddad & Sherwin

RE:  HARRISON, Martin              DOB: ███████

☐ As requested, faxing CJMH records on the above-named patient dated
_____ through _____.

☑ No record of treatment with CJMH.

*CONFIDENTIALITY NOTICE:  This transmission may contain privileged information and/or confidential information only for the use by the intended recipients.  Any usage, distribution, copying or disclosure by any other person, other than the intended recipient is strictly prohibited and may be subject to civil action and/or criminal penalties.  If you have received this transmission in error, please notify the sender by telephone and delete the transmission.*

Fax cover page for Records Requests  rev. 10/09

EXHIBIT 4
Depo_____
Date 7/12/12 Rptr JG
WWW.DEPOBOOK.COM

**ALAMEDA COUNTY**
**BEHAVIORAL HEALTH CARE SERVICES**
**2000 Embarcadero Cove, Suite 400**
**Oakland, CA 94606**

**Response To**
**REQUEST FOR RECORDS**

Date:          **10/14/10**

Requester:    **Gina Altomare**

Address:      **Haddad & Sherwin**
              **505 Seventeenth Street**
              **Oakland, CA 94612**

Patient Name:        **Harrison, Martin**

Provider(s) Rendering Treatment:    **No record of treatment with Criminal Justice**
                                    **Mental Health**

Date(s) of Treatment: Medical Record Information Provided:

( ) Entire Record              ( ) Laboratory Reports         ( ) Psychiatric Information General
( ) Medical History            ( ) Drug/Alcohol Treatment     ( ) Psychiatric Assessment
( ) Discharge Summary          ( ) HIV Information             ( ) Psychological Testing
( ) Record Notes               ( ) Other (specify)_____     ( ) Psychological Evaluation

*letter*
Records        Mailed [ ]          Faxed [ᴗ]          Date    **10/14/10**

Records Not Found [ᴗ]

                                    Signature _S. McClen, for_

                                              Sandy Dunch,
                                              CJMH
                                              (925) 551-6827