1  MICHAEL J. HADDAD, Esq./ State Bar #189114
   JULIA SHERWIN, Esq./State Bar #189268
2  GINA ALTOMARE, Esq./State Bar #273099
   GENEVIEVE K. GUERTIN, Esq./State Bar #262479
3  HADDAD & SHERWIN
   505 Seventeenth Street
4  Oakland, CA 94612
   Telephone:    (510) 452-5500
5  Facsimile:    (510) 452-5510

6  Attorneys for Plaintiffs Joseph Harrison, Krystle
   Harrison, Martin Harrison, Jr., and Tiffany Harrison

7

8                    UNITED STATES DISTRICT COURT

9              FOR THE NORTHERN DISTRICT OF CALIFORNIA

10 M.H., a minor, through his Guardian Ad Litem,      )
   Michelle Henshaw, JOSEPH HARRISON, KRYSTLE )    Case No. C11-2868 JST (MEJ)
11 HARRISON, MARTIN HARRISON, JR., and               )
   TIFFANY HARRISON, all Individually and as Co-     )
12 Successors in Interest of Decedent MARTIN         )
   HARRISON,                                          )
13                                                    )   PLAINTIFFS' RESPONSE IN
                                                      )   OPPOSITION TO MOTION FOR
14            Plaintiffs,                             )   SUMMARY JUDGMENT OR, IN
                                                      )   THE ALTERNATIVE, PARTIAL
15       vs.                                          )   SUMMARY JUDGMENT BY
                                                      )   DEFENDANTS CORIZON HEALTH,
16 COUNTY OF ALAMEDA, a municipal corporation;      )    INC. AND HAROLD ORR, M.D.
   SHERIFF GREGORY J. AHERN, in his individual and )
17 official capacities; DEPUTIES MATTHEW AHLF,       )
   ALEJANDRO VALVERDE, JOSHUA SWETNAM,               )
18 ROBERTO MARTINEZ, ZACHARY LITVINCHUK,            )
   RYAN MADIGAN, MICHAEL BARENO,                     )
19 FERNANDO ROJAS-CASTANEDA, SHAWN                   )   Date:   January 23, 2014
   SOBRERO, SOLOMON UNUBUN; MEGAN HAST,             )    Time:   2:00 p.m.
20 A.S.W.; CORIZON HEALTH, INC., a Delaware          )   Place:  Courtroom 9, 19th Floor
   corporation; HAROLD ORR, M.D.; ZELDA             )    Judge:  Hon. Jon S. Tigar
21 SANCHO, L.V.N.; and DOES 5-20, individually,      )
   jointly and severally,                            )
22                                                    )
                                                      )
23                                                    )
              Defendants.                             )
24 _____)

25

26

27

28

---

No. C11-2868 JST (MEJ):  PLFS' RESPONSE IN OPPO TO DEFENDANT CORIZON'S MSJ                    i

# TABLE OF CONTENTS

**Page No.**

TABLE OF AUTHORITIES ..................................................................................................iv

MEMORANDUM OF POINTS AND AUTHORITIES ..................................................1

I.    INTRODUCTION........................................................................................................1

II.   STATEMENT OF THE FACTS.................................................................................2

    A.    Corizon's Deliberately Indifferent Violation of Its Contract with Alameda County...2

    B.    Defendants Corizon and Orr Failed to Implement Required Training to County Correctional Staff Regarding Alcohol Withdrawal.......................................................3

    C.    Defendants Corizon and Orr Failed to Adequately Care for Inmates at Risk of, or Suffering from, Alcohol Withdrawal.............................................................................7

    D.    Corizon Allowed Incompetent Zelda Sancho, LVN, to Screen Patients Without Supervision..................................................................................................................8

    E.    Defendants Corizon and Orr Failed to Ensure that Mr. Harrison's Medical Records were Reviewed for Completeness and Accuracy when He was Transferred to Santa Rita Jail....................................................................................................................13

    F.    Plaintiffs Were Not Aware of These Defendants' Involvement Until July 2012.......14

    G.    Procedural History......................................................................................................15

III.   STANDARD OF REVIEW ....................................................................................15

IV.   LEGAL ARGUMENT .............................................................................................15

    A.    Defendants Corizon and Orr were Deliberately Indifferent to Mr. Harrison's Serious Medical Needs. .........................................................................................................15

        1.    Defendant Orr Is Corizon's Final Policy-Making Authority Within the Alameda County Jails and He Was Deliberately Indifferent.........................20

        2.    Defendant Corizon is Liable for Deliberate Indifference..............................22

            a.    Defendant Corizon's Established Customs Inflicted Constitutional Injury on Mr. Harrison and Plaintiffs...............................................22

            b.    Defendant Corizon's Failure to Train Correctional Officers Amounted to a Policy of Deliberate Indifference Toward Constitutional Rights..................................................................................................22

       c.      Corizon Is Liable for Dr. Orr's Deliberate Indifference....................22

B.    The Same Facts Establishing Deliberate Indifference Establish Defendant's Negligence. ..........................................................................................................22

C.    Plaintiffs Timely Pled their Claims Against Defendants Corizon and Orr..................23

D.    Defendants Corizon, Sancho, and Orr Violated the Bane Act, California Civil Code § 52.1..........................................................................................................26

V.     CONCLUSION ...............................................................................................28

1

**TABLE OF AUTHORITIES**

2

<u>Page No(s).</u>

3

4

**Federal Cases**

5

*Baker v. County of Sonoma*, 08-cv-03433-EDL, 2009 WL 330937 (N.D. Cal. Feb. 10, 2009) ........20

6

*Berry v. Baca*, 379 F.3d 764 (9th Cir. 2004)....................................................................................18

7

*Berry v. Peterman*, 604 F.3d 435 (7th Cir. 2010) ...........................................................................17

8

*Blankenhorn v. City of Orange,* 485 F.3d 463 (9th Cir. 2007) .........................................................19

9

*Bolbol v. City of Daly City*, 2011 U.S. Dist. LEXIS 81228 (N.D. Cal. July 11, 2011) ....................26

10

*Cabrales v. County of Los Angeles*, 864 F.2d 1454 (9th Cir. 1988) .................................................23

11

*Clouthier v. County of Contra Costa*, 591 F.3d 1232 (9th Cir. 2010) .........................................18, 22

12

*Conn v. City of Reno*, 591 F.3d 1081 (9th Cir. 2010) .......................................................................16

13

*Dillman v. Tuolumne County*, 2013 U.S. Dist. LEXIS 65206 (E.D. Cal. May 7, 2013) ..................27

14

*Estelle v. Gamble*, 429 U.S. 97 (1976)............................................................................................16

15

*Farmer v. Brennan,* 511 U.S. 825 (1994) ...................................................................................17, 18

16

*Frary v. County of Marin*, 2012 U.S. Dist. LEXIS 177517 (N.D. Cal. Dec. 13, 2012)....................19

17

*Funai Electric Company v. Daewoo Electrics Corporation*, 2007 U.S. Dist. LEXIS 102668 (N.D. Cal. 2007)................................................................................................................................23

18

*George v. Sonoma County Sheriff's Dept.*, 2008 U.S. Dist. LEXIS 103665 (N.D. Cal. Dec. 23, 2008).........................................................................................................................................19

19

*Gibson v. County of Washoe*, 290 F.3d 1175 (9th Cir. 2002), *cert. denied*, 537 U.S. 1106 (2003)...15, 17, 18

20

*Harper v. Lawrence County*, 592 F.3d 1227 (11th Cir. 2010)..........................................................16

21

*Hudson v. McMillian,* 503 U.S. 1 (1992) .........................................................................................17

22

*Hunt v. Dental Dep't,* 865 F.2d 198 (9th Cir. 1989) ...................................................................17, 19

23

*Hutchinson v. United States*, 838 F.2d 390 (9th Cir. 1988) .........................................................16, 22

24

*In re Swine Flu*, 764 F.2d 637 (1985) ..............................................................................................25

25

*Jett v. Penner*, 439 F.3d 1091 (9th Cir. 2006)..................................................................................16

26

27

28

*Lancaster v. Monroe County, Ala.*, 116 F.3d 1419 (11ᵗʰ Cir. 1997) ................................16

*Larez v. City of Los Angeles*, 946 F.2d 630 (9ᵗʰ Cir. 1991)...............................................19

*Liscio v. Warren*, 901 F.2d 274 (2d Cir. 1990) ...................................................................17

*Little v. City of Richmond*, 2013 U.S. Dist. LEXIS 149804 (N. D. Cal. 2013)..................27

*Long v. County of Los Angeles*, 442 F.3d 1178 (2006) .................................................18, 22

*Los Angeles Police Protective League v. Gates,* 907 F.2d 879 (9ᵗʰ Cir. 1990)..................19

*Martell v. Trilogy, Ltd.*, 872 F.2d 322 (9ᵗʰ Cir. 1989) ......................................................24

*Mateos-Sandoval v. County of Sonoma*, 2013 U.S. Dist. LEXIS 103549 (N.D. Cal. 2013) ............27

*McGuckin v. Smith,* 974 F.2d 1050 (9th Cir. 1992) ...........................................................17

*Mendocino Envt'l Center v. Mendocino County*, 192 F.3d 1283 (9ᵗʰ Cir. 1999)................15

*Merritt v. County of Los Angeles*, 875 F.2d 765 (9ᵗʰ Cir. 1989) ..................................23, 24

*Milgard Tempering v. Selas Corporation of America*, 902 F.2d 703 (9th Cir. 1990) ......................23

*Mishler v. Nevada State Bd. of Medical Examiners*, 1996 U.S. App. LEXIS 20590 (9ᵗʰ Cir. Aug. 15, 1996)................................................................................................24

*Munger v. City of Glasgow Police Department*, 227 F.3d 1082 (9th Cir. 2000) ................18

*Order of R. Telegraphers v. Railway Express Agency, Inc.,* 321 U.S. 342 (1944) ............25

*Preschooler II v. Clark County School Bd. of Trustees,* 479 F.3d 1175 (9ᵗʰ Cir. 2007) ...................19

*Redman v. County of San Diego*, 942 F.2d 1435 (9ᵗʰ Cir.1991)....................................17, 19

*Reeves v. Sanderson Plumbing Products*, 530 U.S. 133 (2000) .........................................15

*Rodriguez v. City of Modesto*, 2013 U.S. Dist. LEXIS 172958 (E.D. Cal. 2013) ..............27

*Sanchez v. City of Fresno*, 2013 U.S. Dist. LEXIS 68561 (E. D. Cal. May 14, 2013) ..................27

*Sierra Club v. Chevron U.S.A., Inc.*, 834 F.2d 1517 (9th Cir. Cal. 1987) .........................25

*Snow v. McDaniel*, 681 F.3d 978 (9ᵗʰ Cir. 2012) ..............................................................17

*Thomas v. Bible*, 983 F.2d 152 (9th Cir. 1993)..................................................................23

*Thompson v. Upshur County, Tex.*, 245 F.3d 447 (5ᵗʰ Cir. 2001) .....................................16

*Tsao v. Desert Palace, Inc.*, 698 F. 3d 1128 (9th Cir. 2012) .............................................18

*Washington v. United States*, 769 F.2d 1436 (9th Cir. Cal. 1985) .................................................25

*West v. Atkins*, 487 U.S. 42 (1988) .......................................................................................16

*Whitley v. Albers,* 475 U.S. 312 (1986) ...................................................................................17


**California Cases**

*Amaral v. Cintas Corp.*, 163 Cal. App. 4th 1157 (2008) ...................................................24

*Barnes v. Wilson*, 40 Cal. App. 3d 199 (1974)...........................................................................25

*Barrington v. A.H. Robbins Co.*, 39 Cal. 3d 146 (1985) ...........................................................24

*Bender v. County of Los Angeles*, 217 Cal.App.4th 968 (2013) ...........................................27

*Grudt v. City of Los Angeles*, 2 Cal. 3d 575 (1970) ...........................................................24

*Jones v. Kmart Corp.*, 17 Cal. 4th 329 (1998) ...........................................................27

*Venegas v. County of Los Angeles*, 32 Cal.4th 820 (2004) ...........................................27


**Statutes**

California Civil Code §52.1 ...........................................................................................................26

California Code of Civil Procedure § 474.......................................................................................24


**Rules**

Federal Rule of Civil Procedure 15(c)(1)(B) ...............................................................................24

## I.     INTRODUCTION

Defendant Corizon Health, Inc., enjoys a $250 million eight-year contract to provide medical services to Alameda County jail inmates.  The contract requires Corizon to adhere to all standards set forth by the National Commission on Correctional Health Care (NCCHC) and the American Correctional Association (ACA).  These standards require training for corrections officers annually (ACA) and biennially (NCCHC) on health matters, including recognizing the signs and symptoms of alcohol withdrawal.  Corizon falsely represents to NCCHC that it provides the required training, when in fact it has never provided the required training to corrections officers.

Corizon also represents to NCCHC that licensed Registered Nurses perform the intake medical assessments on jail inmates, when in fact it allows LVN's including Defendant Zelda Sancho, LVN -- who had failed the Registered Nurse's examination three times, and whom Corizon later determined was incompetent and/or grossly negligent -- to perform the intakes without any clinical supervision.  Defendant Sancho did the intake nursing assessment on Mr. Harrison.  Mr. Harrison informed Ms. Sancho that he drinks alcohol every day, his last drink was that day, and he has a history of alcohol withdrawal.  Ms. Sancho failed to get the most basic further information the assessment required, such as the type and amount of alcohol Mr. Harrison consumed.  Ms. Sancho initially decided to put Mr. Harrison on a Clinical Institute Withdrawal Assessment (CIWA) protocol for the safe detoxification of alcohol-dependent inmates.  However, Ms. Sancho changed her mind and sent Mr. Harrison into the general population with no medical follow-up.

Untreated, Mr. Harrison went into Delirium Tremens, a life-threatening form of severe alcohol withdrawal.  As set forth in Plaintiffs' response to the County Defendants' motion for summary judgment, Defendant Deputy Ahlf put Mr. Harrison into an isolation cell and failed to summon medical care for Mr. Harrison.

Deputy Ahlf, like all of the Defendant deputies, has not received the mandatory annual or biennial health related training, and failed to recognize Mr. Harrison's obvious signs and symptoms of severe alcohol withdrawal.

Twelve hours later, when another deputy requested Defendant mental health social worker Megan Hast to assess Mr. Harrison, she repeatedly delayed for three hours.  In the meantime, Mr. Harrison became paranoid due to his Delirium Tremens, and ten Defendant Deputies repeatedly

Tased and beat him into unconsciousness. He was sent to the hospital, where he never regained consciousness and died two days later.

Corizon determined that Ms. Sancho's assessment of Mr. Harrison was indefensible, but did nothing to determine if her errors on the Harrison assessment were done routinely. Just four days later, Ms. Sancho made the same errors on another patient, even though she was strongly counseled after the Harrison event. Corizon finally terminated Ms. Sancho's employment and reported her to the Board of Licensed Vocational Nurses as grossly negligent or incompetent. Numerous issues of material fact remain, precluding summary judgment.

## II.     STATEMENT OF FACTS

### A.     Corizon's Deliberately Indifferent Violation of Its Contract with Alameda County.

Defendant Alameda County contracts with Defendant Corizon Health, Inc., to provide all health services in Alameda County jails. Corizon's recently amended contract with the County has been extended to continue through June 30, 2016, and provides that Corizon will be paid up to $251,425,831.00 to provide medical services to Alameda County inmates for eight years (from 2008 to 2016).[1] (Ex. 39, Alameda County Medical Services Contract, COR 4389-4390).[2] To date, Corizon has been paid over $150 million on the contract. (Ex. 40, Gilbert Notes re: Payments).

Defendant Orr, Corizon's Regional Medical Director, is the highest acting official overseeing Corizon's operations at all Alameda County jails. In this position, Defendant Orr is responsible for overall healthcare delivery for Santa Rita Jail and Glenn Dyer Detention Facility. In addition to overseeing Corizon's operations in Alameda County, Defendant Orr also oversees all of Corizon's operations in California and Oregon. (Ex. 15, Orr PMK Dep. pp. 14:19 - 15:8, 171:12-17; Ex. 13, Gilbert PMK Dep 82:3-11).

Defendant Corizon's contract with Alameda County also requires accreditation from the National Commission on Correctional Healthcare (NCCHC). (Ex. 15, Orr PMK Dep., p. 171:4-11; 172:23 - 173:3; Ex. 39, Medical Services Agreement, p. 17). Defendants received accreditation from NCCHC and the American Correctional Association (ACA), by representing to these

---

[1] In 2011 alone, Defendant Corizon took in $1.4 billion in revenue. (Ex. 13, Gilbert PMK Dep., pp. 159:1 - 162:6; Press Release).
[2] Unless otherwise stated, all Exhibit references are to the Declaration of Julia Sherwin filed in opposition to Defendants' motions for summary judgment.

accrediting agencies that they comply with the agencies' mandatory standards.

Defendants Orr and Corizon have failed to implement in practice certain provisions of that contract that would have helped to prevent the harms that Mr. Harrison and Plaintiffs suffered.  As discussed below, Corizon completely failed to provide any of the mandatory training to corrections officers in recognizing the signs and symptoms of acute alcohol withdrawal.

In addition, the contract requires that intake medical screening "shall be performed for all inmates by a licensed registered nurse (RN) at the time of booking." (Ex. 39, Medical Services Agreement, pp. 64, 97).[3]  Corizon also represents to NCCHC that "Trained registered nurses complete receiving screening."  (Ex. 41, NCCHC Accreditation Report, J-E-02).

Corizon allowed Zelda Sancho, LVN – who had failed the Registered Nurse's exam three times -- to perform the intake screening on Martin Harrison with no clinical supervision.  (Ex. 9, Sancho Dep. pp. 17:12 – 21:19; Kathryn Burns, MD, MPH Decl. ¶10, Ex. A., Burns Report, p. 4).

Corizon's Person Most Knowledgeable about its contract with Alameda County, Lenore Gilbert, testified that LVN's may work completely without supervision of an RN.  (Ex. 13, Gilbert PMK Dep., pp. 145:9 - 148:21).  The only RN on a shift may be the charge nurse in charge of the entire facility, who may not even come to the booking area at all.   (Ex. 13, pp. 146:24 - 148:21).

Plaintiffs' expert, Kathryn Burns, MD, MPH, who is the chief psychiatrist of the Ohio prison system and a consultant for the Special Master overseeing California's prison system, confirms that Defendant Sancho was allowed to do her intake screening on Martin Harrison with no clinical supervision.  (Decl. of Dr. Burns, ¶10, Ex. A, Burns Report, p. 4).

There is no evidence that a supervising RN ever reviewed Ms. Sancho's intake screening for Mr. Harrison.  Had such supervision existed, a supervising RN should have recognized Defendant Sancho's failure to even complete the form properly, failure to obtain necessary information, and failure to put Mr. Harrison on CIWA protocols.

**B.** **Defendants Corizon and Orr Failed to Implement Required Training to County Correctional Staff Regarding Alcohol Withdrawal**

Defendants admit that "At least 80% of inmates generally have problems with alcohol

---

[3] If a Licensed Vocational Nurse does the intake screening, it must be done under the supervision of a Registered Nurse.  (Ex. 39, Med. Svcs. Agreement, p. 25).

1   and/or other drugs," and alcohol dependence is "extremely common" in the jail population.  (Ex. 15,

2   Orr PMK Dep. p. 92:19-93:4).  Accordingly, NCCHC's Essential Standards require that corrections

3   officers receive health-related training at least every two years, including training in recognizing

4   acute manifestations of intoxication and withdrawal.  (Ex. 43, NCCHC Standards, p. 37).

5         As the NCCHC Standards recognize, "[b]ecause correctional personnel are often the first to

6   respond to problems, they must be aware of the potential for emergencies that may arise, know the

7   proper response to life-threatening situations, and understand their part in the early detection of

8   illness and injury."  (Ex. 43, NCCHC Standards, p. 38.)

9         **NCCHC requires an outline verifying the course content and length of the course, and**

10   **a certificate of attendance must be kept on site at the jail for each employee who has received**

11   **the mandatory health-related training.**  (Ex. 43, NCCHC Standards, p. 37).  Neither the Corizon

12   Defendants nor the County have produced any documentation concerning the mandatory alcohol

13   withdrawal training provided to Alameda County corrections officers.  Indeed, the training records

14   for the Deputy Defendants all confirm that they did not receive the mandatory training.  (Ex. 44,

15   ACSO Training Records for Defendant Deputies).

16         Title 15 of the California Code of Regulations also provides that custody personnel should

17   be trained to recognize inmates undergoing drug or alcohol withdrawal, and to summon immediate

18   medical care for those inmates.  15 Cal. Code Regs. 1213.  Defendant Orr is aware of this legal

19   requirement.  (Ex. 15, Orr PMK Dep., pp. 111:20 - 112:14).  However, Defendant Orr admitted that

20   he and Corizon do not provide this training.  (Ex. 15, Orr PMK Dep., pp. 114:25 - 115:10).

21         Corizon's policy in place at the time of the incident provided that "Custody staff is trained

22   in recognizing AOD [alcohol or other drug] problems in inmates."  (Ex. 45, Policy J-G-08).

23   Alameda County's policy 13.01 further required *both* the County and Corizon to develop the

24   mandatory training program for deputies:

25         "PHS (now Corizon) and CJMH (Alameda County's Criminal Justice Mental Health) will

26   develop a training program, in cooperation with the facility Commanding Officer, to provide

27   instruction to the Sheriff's Office sworn and civilian staff in the following areas:

28         1.  The ability to respond to health-related situations within four minutes.

            …

4.  Recognition of signs and symptoms of …chemical dependency."

(Ex. 46, ACSO Policy 13.01, p. 3).

Even now, Corizon has a policy entitled, "Health Training for Correctional Officers," that provides that "Correctional officers who work with inmates receive health related training, which includes, at a minimum: …Recognizing acute manifestations of …intoxication and withdrawal." (Ex. 47, Corizon Policy J-C-04.00).  Corizon represents that corrections officers receive the required training every two years to comply with NCCHC standards, and every year to comply with ACA standards.  (Id., p. 2).

Yet, Defendants Corizon and Orr blatantly violate the law, national standards and their own policies, by failing to train custody staff in recognizing the signs and symptoms of alcohol withdrawal.  Terri Granlund, R.N., a PHS/Corizon employee for the past 24 years, is Corizon's Person Most Knowledgeable about training provided to Alameda County Sheriff's Office employees and agents from 2007 to the present regarding alcohol withdrawal.  (Ex. 35, Granlund Dep., pp. 7:14 - 8:8; 12:16-18).  Corizon has *never* provided the required training to Alameda County's correctional staff.  Ms. Granlund testified:

> Q.   As you sit here today, are you aware of any training that is provided to Alameda County Sheriff's Office employees on the issue of alcohol withdrawal?
> A.   No.
> Q.   Do you know what training, if any, Alameda County Sheriff's deputies who work at Santa Rita Jail receive on the topic of alcohol withdrawal?
> A.   No.
> Q.   Do you know anyone within Alameda County who you could contact to ask what training deputies at the jail receive?
> A.   Not offhand.
> Q.   As far as you're aware, has Corizon or its previous corporate name, Prison Health Services, ever provided any training to custody staff at the jail on the topic of chemical dependence?
> A.   To my knowledge, no.
> . . .

(Ex. 35, Granlund Dep, pp. 10:2 - 11:25).

> Q.   During the entire time that you worked first for Prison Health Services and then for Corizon, have you ever been aware of any training that either PHS or Corizon has provided to deputies at Santa Rita Jail concerning recognizing the signs and symptoms of alcohol withdrawal?
> A.   Not that I'm aware of.

(Ex. 35, Granlund Dep, pp. 36:24 - 37:5).

Additionally, Ms. Granlund, Corizon's Person Most Knowledgeable about training, testified that she had never even *seen* Corizon's Policy J-C-04.00 on Health Training for Correctional Officers.  (Ex. 35, Granlund Dep, pp. 43:17 - 44:8).

The training program that was to be jointly developed between PHS/Corizon and Alameda County, set forth in the County's Policy 13.01, ACSO 457, was never developed.

Defendant Alameda County also failed to train its staff in how to identify or handle inmates experiencing alcohol withdrawal.  ACSO Sergeant Cynthia Sass was designated as Defendant Alameda County's Person Most Knowledgeable regarding the County's training, policies and procedures concerning alcohol withdrawal.  (Ex. 48, Sass Dep., pp. 8:3 - 9:11).  Sgt. Sass testified that there is no training program addressing the recognition of signs and symptoms of chemical dependency, nor ever any program developed with Corizon to provide such health-related training to the Sheriff's Office sworn and civilian staff, despite ACSO's Detention and Corrections Policy and Procedure No. 13.01 on Medical and Health Care Services which mandates such training.  (Ex. 48, Sass Dep., p. 17:3-18; 18:25 - 22:21; Ex. 46, ACSO Policy and Procedure No. 13.01).

Concerning the joint training program between PHS/Corizon and the County, Sgt. Sass testified, "To my knowledge, I don't know about a formal training program."  (Ex. 48, Sass Dep. 21:16-21).

Sgt. Sass testified that deputies receive "very little" training about alcohol withdrawal, and "our information is rather cursory."  (Ex. 48, Sass Dep. p. 17:3-18).

Furthermore, Sgt. Sass testified that she was unaware of any policies, procedures or formal mechanism in place even to inform deputies when a person is at risk of alcohol withdrawal.  (Ex. 48, Sass Dep. pp. 32:19 - 34:21).

Defendant Deputy Ahlf's subsequent mishandling of Mr. Harrison reflects both Corizon's and the County's deliberately indifferent failure to provide the mandatory training.  As a result of the training failure, Defendant Deputy Ahlf did not recognize Mr. Harrison's obvious signs and symptoms of severe alcohol withdrawal.  Defendant Ahlf did not immediately summon medical care for Mr. Harrison but instead placed him in an isolation cell.  Had Defendants Corizon and Orr fulfilled their responsibility to provide the mandatory health training to corrections officers, Defendant Ahlf should have recognized Mr. Harrison's acute manifestations of withdrawal.

**C.    Defendants Corizon and Orr Failed to Adequately Care for Inmates at Risk of, or Suffering from, Alcohol Withdrawal**

Defendants also violate Title 15, their own policies, and NCCHC standards governing housing and caring for inmates at risk of alcohol withdrawal.

If an inmate has a history of alcohol abuse, he is a candidate for severe alcohol withdrawal or Delirium Tremens, and must be housed in an area of "constant observation."  (Ex. 43, NCCHC J-G-06, pp. 103-104; Ex. 49, Corizon Policy No. 153, p. 2).  National standards require that the "constant observation" be performed by qualified health care professionals or health-trained correctional staff.  (Ex. 43, NCCHC Standards, pp. 103-104).

Furthermore, Defendants must ensure that "[d]etoxification is done only under physician supervision" and that "[i]nmates experiencing severe, life-threatening intoxication (overdose) or withdrawal are transferred immediately to a licensed acute care facility."  (Ex. 43, NCCHC Standards, p. 103).  The NCCHC Standards also require that "severe withdrawal syndromes must never be managed outside of a hospital," and mandate that "[t]raining for correctional officers includes recognizing the signs and symptoms of intoxication and withdrawal."  (*Id.*, p. 105).

According to Corizon's alcohol withdrawal training PMK Terri Granlund, an inmate who is in severe alcohol withdrawal does "not necessarily" need to be transferred to a hospital, and Ms. Granlund is aware of patients at Santa Rita Jail who were in severe alcohol withdrawal and were not transferred to a hospital.  (Ex. 35, Granlund Dep., p. 27:1-13).

Ms. Granlund testified that the policies and procedures of Corizon provide that a person who is in severe alcohol withdrawal can be cared for at the jail.  (Ex. 35, Granlund Dep., p. 28:2-6).  Ms. Granlund is not aware of any Corizon policy or procedure requiring that an individual at risk for progression to more severe withdrawal be kept under constant observation by qualified health care professionals or health trained correctional staff.  (Ex. 35, Granlund Dep., pp. 47:20 - 49:2).

Furthermore, like the County's PMK Sgt. Sass, Ms. Granlund confirmed there is no mechanism, policy or procedure in place at Santa Rita Jail for informing custody staff that a particular inmate is at risk of going into alcohol withdrawal.  There is also no policy or procedure for informing custody staff to check for potential signs and symptoms of alcohol withdrawal in a particular inmate.  (Ex. 35, Granlund Dep., p. 21:2-18).

Defendant Harold Orr, MD, the Medical Director for Alameda County jails and Corizon's

1    Person Most Knowledgeable about policies and procedures for handling inmates with alcohol

2    withdrawal issues, confirms that, contrary to national standards, Defendants keep inmates suffering

3    from severe alcohol withdrawal in the jail, rather than transferring them to an emergency room.

4    (Ex. 15, Orr PMK Dep., pp. 68:2 - 73:18.)  Even though all of Martin Harrison's signs and

5    symptoms were consistent with Delirium Tremens or severe alcohol withdrawal, Dr. Orr testified

6    there was no requirement that Mr. Harrison be transferred to a hospital, as national standards

7    require.  (Ex. 15, Orr PMK Dep. pp. 70:9-20, 73:1 - 74:25).[4]

8    **D.**      **Corizon Allowed Incompetent Zelda Sancho, LVN, to Screen Patients Without**
             **Supervision.**

9

10           Plaintiffs fully briefed Defendant Sancho's incompetent handling of Martin Harrison's

11   intake assessment in their opposition to Defendant Sancho's motion for summary judgment.

12   Corizon and its managing agents admit that Ms. Sancho's performance was incompetent.

13           Mr. Harrison informed Ms. Sancho of his alcohol dependence, including that he drinks

14   every day, his last drink was that day, and he has a history of alcohol withdrawal. (Ex. 10, Intake

15   Screener; Ex. 9, Sancho Dep., pp. 26:17-20, 58:20-23).  Ms. Sancho's failure to document the type

16   of alcohol or amount of alcohol Martin Harrison consumed, as required by item 21 on the form, was

17   a failure to "get the basic, basic, basic, nursing information required to make a proper assessment."

18   (Ex. 10, Intake Screener; Ex. 11, Bill Wilson Dep., pp. 32:4-8; 54:18 – 55:1; Ex. 34, Wilson Arb'n

19   Testimony, COR 1651; Ex. 12, Gilbert Dep., pp. 80:16-21, 85:3-6).  Ms. Sancho's failure to

20   complete those two questions presented "life and death issues:"

21           It may seem like two questions, but that can lead to life or death if you don't get
             answers to those two questions and follow up appropriately.  **And that's what we**
22           **had here.**

23           (Ex. 34, Wilson Arb'n Testimony, COR 1677, emphasis added).

24           Ms. Sancho documented that Mr. Harrison had a "history of alcohol withdrawal" and she

25   planned to put him on "CIWA" -- Clinical Institute Withdrawal Assessment.  (Ex. 10, Intake

26   Screener).  If a person is at risk for developing alcohol withdrawal symptoms, he should be put on

27

28   _____

[4] Dr. Orr further asserts that a nurse briefly seeing an inmate once every eight hours meets the
requirement that the inmate be under "constant observation."  (Ex. 15, Orr PMK Dep. pp. 161:21 -
162:15).

1   CIWA for his safety.  (Ex. 15, Orr, PMK Dep., pp. 38:23 - 39:19; Ex. 12, Gilbert Dep., 94:8-23).

2   Ms. Sancho should have put Mr. Harrison on the CIWA protocol, as she planned to do before she

3   changed her mind.  (Ex. 18, Nurse Assessment Protocol Standardized Procedures; Ex. 10, Intake

4   Screener; Ex. 9, Sancho Dep. p. 103:2-23; Ex. 15, Orr PMK  Dep., pp. 39:20 - 40:3; Ex. 11, Wilson

5   Dep., pp. 49:22 – 50:4; Ex. 12, Gilbert Dep., pp. 91:5 - 92:13).

6        Had Defendant Sancho not crossed out "with history of alcohol withdrawal" and "CIWA,"

7   Mr. Harrison would have been on CIWA monitoring protocols.  (Ex. 12, Gilbert Dep., p. 81:2-8).

8   Instead, Ms. Sancho assigned Mr. Harrison a medical rating of "3," meaning he had no medical

9   needs and would receive no medical care, despite his obvious and serious medical needs.  (Ex. 9,

10  Sancho Dep. pp. 112:24 – 113:8; Ex. 11, Wilson Dep., p. 55:11-15).  Even with the limited

11  information she did document, Ms. Sancho should not have assigned Martin Harrison to a Level 3

12  care.  Martin Harrison should not have been a Level 3, "period."  (Ex. 11, Wilson Dep., p. 55:2-25;

13  Ex. 34, Wilson Arb'n Testimony, COR 1652).

14       "Without a doubt" Ms. Sancho jeopardized patient safety, and Mr. Wilson "did not in any

15  way, shape, or form feel comfortable having nurse Zelda go back and interact with patients."  (Ex.

16  11, Wilson Dep., p. 60:16-22; Ex. 34, Wilson Arb'n Testimony, COR 1635-1636).

17       Corizon's Assistant Health Services Administrator, Lenore Gilbert, confirmed that Ms.

18  Sancho's screening of Mr. Harrison was "incomplete and unsatisfactory."  (Ex. 14, 8/17/10 Gilbert

19  Memo, pp. 1-2).  When Ms. Gilbert asked Ms. Sancho if Mr. Harrison told her what kind of alcohol

20  he drank and how much he drank, Ms. Sancho asserted that Mr. Harrison told her he drank "two

21  beers" and she "forgot" to document it.  (Ex. 14, 8/17/10 Gilbert Memo, p. 2).

22       Corizon nurses are trained, *"IF IT WAS NOT DOCUMENTED, IT DIDN'T HAPPEN!"* (Ex.

23  21, Corizon Documentation Policy, emphasis in original; Ex. 11, Wilson Dep., pp. 85:3 - 86:21).

24  As Corizon admitted in its Employer Arbitration Brief, **"[I]f something is not written down, for**

25  **all practical purposes, *it did not happen*, because to allow otherwise would allow a nurse to**

26

27

28

1   **fabricate facts after the fact, when faced with discipline.”**  (Ex. 23, Corizon Arb'n Brief, COR

2   1114, n. 22). [5]

3        Even if Mr. Harrison told Ms. Sancho he only drank two beers, Ms. Sancho was required to

4   put Mr. Harrison in CIWA.  “**[S]tarting inmates who drink alcohol regularly on a CIWA is**

5   **critical for the safety of the inmate.”**  (Ex. 14, 8/17/10 Gilbert memo, p. 2, Emphasis added).

6   According to Defendant Orr, someone who drinks at least two beers every day, has a history of

7   alcohol withdrawal and comes into the jail smelling of alcohol with a red, puffy face, should be

8   provided medication and nutritional support in order to safely detox from alcohol.  (Ex. 15, Orr

9   PMK Dep., p. 95:10-19).  Defendant Orr admits that Mr. Harrison should have been placed on

10   CIWA protocols, and Defendant Sancho's intake assessment of Mr. Harrison was deficient because

11   she did not start Mr. Harrison on CIWA.  (Ex. 15, Orr PMK Dep. pp. 39:20 - 40:3, 95:10-19).

12        According to Defendant Corizon's own training on alcohol withdrawal, someone who drinks

13   just two beers a day is at significant risk of alcohol withdrawal and "whenever there is any reason to

14   believe that [an inmate] is at risk of alcohol withdrawal," that inmate should be placed on CIWA.

15   (Ex. 23, Corizon Arb'n Brief, pp. 18 - 20; Ex. 24, 2010 Substance Abuse Training; Ex. 12, Gilbert

16   Dep., 94:8-23).  Lenore Gilbert acknowledged that a person who drinks two beers a day, every day,

17   and then stops is bound to have a "physiological response."  (Ex. 12, Gilbert Dep., pp. 21:8 – 22:4).

18        Ms. Sancho should have put Mr. Harrison on CIWA even if Mr. Harrison told her he only

19   drank two beers a day.  (Ex. 11, Wilson Dep., pp. 49:22 – 50:4).  **And, even Defendant Sancho**

20   **herself admitted that an inmate stating that he drinks alcohol every day is “probably” enough**

21   **to require that he be put on CIWA.**  (Ex. 26, Sancho Arb’n Testimony, COR 1842).   Corizon

22   found Ms. Sancho’s excuses incredible and terminated her employment, for failing to substitute her

23   own clinical judgment for Mr. Harrison's alleged statements regarding his alcohol withdrawal

24   history, and for failing to institute CIWA protocols for Mr. Harrison.  (Ex. 29, Termination Letter;

25   Ex. 13, Gilbert PMK Dep., pp. 122:13 - 123:13; Ex. 11, Wilson Dep., pp. 58:23 - 60:22).

26        If Defendant Sancho had put Martin Harrison on CIWA withdrawal protocols, the alcohol

27   would likely have cleared Mr. Harrison’s system safely.  Defendant Orr testified that 90 percent of

28

---

[5] After this incident, Defendants terminated Ms. Sancho’s employment, in part due to her
incompetent handling of Martin Harrison’s intake assessment.  Ms. Sancho grieved the termination,
and it was upheld by the arbitrator. (Ex. 28, Arbitrator's Decision, COR 1023-1024).

the time, patients put on CIWA protocols are able to be detoxed safely without going into Delirium Tremens: "it's effective therapy.  It works.  If you get it started early, it works. … It is a very effective therapy, actually."  (Ex. 15, Orr PMK Dep., pp. 175:12 - 177:8).

Most cases of severe alcohol withdrawal occur within 72 hours of the person's last drink, and Martin Harrison's severe withdrawal occurred right on schedule. (Ex. 24, January 2010 In-Service Training; Ex. 15, Orr PMK Dep. p. 70:6-8).

At the August 17, 2010, counseling session with Corizon manager Lenore Gilbert, Ms. Gilbert instructed Ms. Sancho to put all inmates who drink alcohol regularly on CIWA withdrawal protocols for their safety.  (Ex. 14, 8/17/10 Gilbert Memo, p. 2).

Just four days later, Ms. Sancho again failed to ask a patient what type and amount of alcohol he drank.  She also abjectly refused to follow a physician's order with respect to another patient.  At the August 21, 2010, meeting concerning her repeated intake assessment failure, when asked why she again failed to document this essential information even after being told to do so four days earlier, Ms. Sancho stated, "Does this mean that I don't have to work there (ITR [Intake, Transfer and Release, or Booking]) anymore?"  (Ex. 32, 8/31/10 Gilbert Memo).

Ms. Sancho's question about not having to work in the booking area any more caused Ms. Gilbert to believe Ms. Sancho was looking for a way out of working in booking, and "Is that why she is doing an inadequate job?" (Ex. 32, 8/31/10 Gilbert Memo).

Corizon finally terminated Ms. Sancho's employment.  (Ex. 13, Gilbert PMK Dep., pp. 122:13 - 123:13).  Corizon reported to the California Board of Vocational Nursing and Psychiatric Technicians that Ms. Sancho displayed gross negligence or incompetence, including with respect to Mr. Harrison.  (Ex. 33, BVNPT Mandatory Reporting Letter).

Corizon's managing agents, Lenore Gilbert and Bill Wilson, admitted Zelda Sancho's deliberate indifference to Martin Harrison's serious medical needs, during the arbitration concerning the termination of Ms. Sancho's employment.

While Ms. Sancho's post-hoc excuse is that she "forgot" to document that Martin Harrison told her he drank "two beers" a day, she failed to ask what amount of beer – such as 40 ounce or 12 ounce – or what kind of beer – such as malt liquor or light beer.  (Ex. 26, Sancho Arb'n Testimony, COR 1846; Ex. 9, Sancho Dep., pp. 71:16 – 72:18).

Ms. Sancho "had no justifiable defense for the manner in which the intake screenings had been carried out."  (Ex. 11, Wilson Dep., p. 54:11-17; Ex. 34, Wilson Arb'n Testimony, COR 1632). Ms. Sancho "gave no defense" for her "egregious breach of medical care."  (Ex. 11, Wilson Dep., p. 89:10-22; Ex. 34, Wilson Arb'n Testimony, COR 1633).

In addition, Corizon made several factual admissions in its arbitration brief:

• If the patient's answers during the initial screening reveal "that there might be some risk that the individual could experience withdrawal symptoms," the nurse must use the CIWA form (Ex. 23, Corizon Arbitration Brief, COR 1105);

• CIWA should be used "whenever there is any reason to believe that the person is at risk of alcohol withdrawal"  (Ex. 23, Corizon Arbitration Brief, COR 1106);

• **"[I]f a person states that they drink every day, they should be put on a CIWA observation"**  (Ex 23, Corizon Arbitration Brief, COR 1111);

• Ms. Sancho has "no justifiable defense" for her handling of Martin Harrison's intake (Id.);

• "[T]he evidence is undisputed that [Sancho] failed to carry out the basic assessment procedures with respect to [Martin Harrison] to determine whether he was at risk for developing the progressive and potentially fatal symptoms of alcohol withdrawal.  Faced with an inmate who smelled of alcohol, who had a red, puffy face, who indicated that he drank alcohol 'daily' and that his last drink was that very day, she neglected to ask (or if she did ask, neglected to document) the type and amount of alcohol, in spite of the fact that the screening form *expressly directs* the nurse to ask and document at least these basic questions.  She neglected to start him on the CIWA assessment and monitoring tool, which if initiated, would have triggered at the very least additional assessments and medical monitoring.  [Sancho] gave no excuses other than 'she forgot.'  She had no defenses."  (Ex. 23, Corizon Arbitration Brief, COR 1113-1114, emphasis in original);

- **"[I]f something is not written down, for all practical purposes, *it did not happen*, because to allow otherwise would allow a nurse to fabricate facts after the fact, when faced with discipline."** (Ex. 23, Corizon Arbitration Brief, COR 1114, n. 22).

Corizon should have known that it had an incompetent LVN on staff, and should have either had Registered Nurses perform the intake screenings, as it represented to NCCHC that it does, or provided clinical supervision to Defendant Sancho by a Registered Nurse who reviewed her work.

**E.     Defendants Corizon and Orr Failed to Ensure that Mr. Harrison's Medical Records were Reviewed for Completeness and Accuracy when He was Transferred to Santa Rita Jail**

Despite Defendant Sancho's incompetence, if Corizon's other nursing staff had done the required review of his records before and after his transfer, Defendant Sancho's error would have been found and Martin Harrison could have been put on CIWA and avoided the severe alcohol withdrawal that led to his death.

When an inmate is transferred from one jail to another within the County, national standards -- and Alameda County and Corizon policies -- require that the inmate's medical records be reviewed for completeness before the inmate is transferred out, and that the receiving jail's medical staff must review the patient's chart within 12 hours of his arrival.  (Ex. 43, NCCHC Standard J-E-3; Ex. 50, Corizon Policy J-E-3; Ex. 51, Corizon Nurse New Employee Orientation; Ex. 52, Corizon New Employee Orientation,  p. 49; Ex. 39, Med. Svcs. Agreement, pp. 37-38, ¶ cc(1), pp. 41-42, ¶ 4(a)).  Defendant Corizon notes "All levels of healthcare providers are responsible.  Failure to recognize issues on arrival and a lack of follow through may result in unnecessary life threatening and emergent needs later."  (Ex. 51, New Nurse Orientation, COR 3682).

Martin Harrison was transferred from Glenn Dyer jail to Santa Rita jail on August 13, 2010.  No Glenn Dyer nurse checked his chart for accuracy and completeness prior to his transfer from Glenn Dyer, and no nurse checked his chart after his arrival at Santa Rita, both in violation of national standards and Defendants' policies.  Any nurse who checked Mr. Harrison's chart should have noted Ms. Sancho's incomplete assessment and inappropriate decision not to put Mr. Harrison on CIWA.  (Ex. 20, Martin Harrison Jail Medical Record).

Although Corizon's policy claims that an inmate's medical intake form will be reviewed for

completeness and accuracy within 12 hours of transfer, Ms. Gilbert testified that in fact, the "review" that takes place is merely to check that an inmate's intake screener, prescreening form, and PPD tuberculosis test forms are physically present in the medical chart.  (Ex. 13, Gilbert PMK Dep., p. 107:1-108:1).  This evidence directly contradicts Defendant Orr's self-serving statements in his Declaration that according to "routine practice," Mr. Harrison's screening form "would have been reviewed by another healthcare provider as part of the transfer process."  (Orr Decl., ¶18).

Just as Corizon has misrepresented its practice of what type of nurse performs intake screenings of inmates, Corizon also falsely represented to the NCCHC that its practice is to implement these transfer screenings.  (Ex. 31, NCCHC Accreditation Report, COR 4333).  As Ms. Gilbert confirmed, this is not, in fact, Corizon's custom and practice.

**F.    Plaintiffs Were Not Aware of These Defendants' Involvement Until July 2012**

As set forth in Plaintiffs' response to Defendant Sancho's motion for summary judgment, pp. 11-14, neither Defendant Corizon nor Defendant County revealed that jail medical staff were not employed by Alameda County until June 1, 2012.  It was not until Dr. Maria Magat's July 27, 2012, deposition that Plaintiffs learned of the role and liability of Defendant Sancho in Mr. Harrison's death.  (Ex. 38, Magat Dep., pp. 37:4-23, 44:7-9, 48:21-25, 49:1-6, 55:18-59:5, 62:6-12.).

Similarly, Plaintiffs only learned at Dr. Magat's depositions that Corizon and its medical director, Dr. Orr, not Defendant County, are responsible for making and enforcing all policies, procedures, and training related to the medical care of inmates in the Santa Rita Jail, including assessing inmates for possible alcohol withdrawal, detoxification of inmates who are alcohol dependent, preventing alcohol withdrawal in inmates, and handling inmates who are experiencing alcohol withdrawal.  (Ex. 38, Magat Dep., 13:21-14:11, 51:15-53:15.)  Dr. Magat did not know whether there are any written policies or procedures at the jail for safely detoxifying inmates from alcohol, and has never seen such a policy in the more than four years she has been employed as a physician there.  (Ex. 38, Magat Dep., 9:15-17, 33:12-34:2.)

Following this discovery, Plaintiffs promptly informed the County Defendants, at that time the only Defendants in this action, on August 23, 2012 of their intent to file a Second Amended Complaint naming Defendants Sancho, Corizon and Orr.  On August 23, 2012, Plaintiffs' counsel also informed the County's counsel that they also needed to include Ms. Hast as a Defendant.

1  When the County Defendants would not stipulate to Plaintiffs' proposed filing, Plaintiffs promptly

2  filed a Motion to Amend on September 12, 2012.

3  **G.    Procedural History**

4      Judge Wilken granted Plaintiffs' Motion for Leave to Amend on November 16, 2012.  (Doc.

5  45).  Plaintiffs promptly filed their Second Amended Complaint, naming Defendants Sancho,

6  Corizon and Orr for Doe Defendants on November 19, 2012.  (Doc. No. 46).

7      This Court denied Defendants Sancho, Corizon and Orr's Motion to Dismiss on April 18,

8  2013.  (Doc. No. 76).  Defendants' current motion raises many of the same arguments this Court has

9  already rejected, and is merely an untimely motion for reconsideration.

## III.    STANDARD OF REVIEW

11     In *Reeves v. Sanderson Plumbing Products*, 530 U.S. 133, 150-151 (2000), the Supreme

12  Court noted the standards for a motion for summary judgment:

> [T]he court must draw all reasonable inferences in favor of the nonmoving party, and it
> may not make credibility determinations or weigh the evidence. [ ]  **Credibility**
> **determinations, the weighing of the evidence, and the drawing of legitimate**
> **inferences from the facts are jury functions, not those of a judge. [ ]  Thus,**
> **although the court should review the record as a whole, it must disregard all**
> **evidence favorable to the moving party that the jury is not required to believe.**
> That is, the court should give credence to the evidence favoring the nonmovant as well
> as that evidence supporting the moving party that is uncontradicted and unimpeached,
> at least to the extent that the evidence comes from disinterested witnesses.

(emphasis added, internal citations and quotations omitted).  Questions involving state of mind are

generally factual issues inappropriate for resolution by summary judgment.  *Mendocino Envt'l*

*Center v. Mendocino County*, 192 F.3d 1283, 1302 (9th Cir. 1999).

## IV.    LEGAL ARGUMENT

**A.    Defendants Corizon and Orr were Deliberately Indifferent to Mr. Harrison's Serious**
**Medical Needs**

       Defendants owed Martin Harrison the duty, under the Fourteenth Amendment and the

California Constitution, Article 1, section 17, to provide for his serious medical needs.  Neither Mr.

Harrison nor his family were in any position to provide for his needs.  *Gibson v. County of Washoe*,

290 F.3d 1175 (9th Cir. 2002), *cert. denied*, 537 U.S. 1106 (2003).  Since Mr. Harrison was a

1    pretrial detainee, his right to receive care for his serious medical needs derived from the Due

2    Process Clause of the Fourteenth Amendment rather than the Eighth Amendment. *Id,* at 1187.

3    The Ninth Circuit summarized the deliberate indifference claim in *Conn v. City of Reno*, 591 F.3d

4    1081, 1091 (9th Cir. 2010) (emphasis added):

5          When an individual is taken into custody and thereby deprived of her liberty, the
           officials who hold her against her will are constitutionally obligated to respond if a
6          serious medical need should arise.  If, with deliberate indifference, these officials fail
           to respond appropriately and instead **act in a manner that will foreseeably result in**
7          **harm**, they violate her due process rights.  The same is true when a municipality,
           with deliberate indifference, **fails to train its law enforcement officers or fails to**
8          **adopt and implement policies when it is highly predictable that such inaction**
           **will result in constitutional violations**. [6]
9

10         This Court already has found that Mr. Harrison had the right not to be subjected to deliberate

11   indifference to his serious medical needs in jail (*citing Estelle v. Gamble*, 429 U.S. 97, 101 (1976);

12   *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)):

13         In order to state a deliberate indifference claim, Plaintiffs must first show a "serious
           medical need" such that "failure to treat a prisoner's condition could result in further
14         significant injury or the unnecessary and wanton infliction of pain." *Id.* (quotations and
           citations omitted).  Next, Plaintiffs must show that Defendants' response to the serious
15         medical need was deliberately indifferent. *Id.* The second prong may be established by
           allegations of "(a) a purposeful act or failure to respond to a prisoner's pain or possible
16         medical need and (b) harm caused by the indifference." *Id.* Deliberate indifference
           may be shown where prison officials or practitioners "deny, delay or intentionally
17         interfere with medical treatment." *Hutchinson v. United States*, 838 F.2d 390, 394 (9th
           Cir. 1988). In contrast, "mere negligence in diagnosing or treating a medical condition,
18         without more, does not violate a prisoner's Eighth Amendment rights." *Id.*
19

20   (Doc. 76, 4/18/13 Order Regarding Motion to Dismiss, pp. 7-8).

21         Alcohol withdrawal and Delirium Tremens constitute serious medical needs. *Thompson v.*

22   *Upshur County, Tex.*, 245 F.3d 447, 457 (5th Cir. 2001).  *See also, Lancaster v. Monroe County,*

23   *Ala.*, 116 F.3d 1419, 1425 (11th Cir. 1997) ("a jail official who is aware of but ignores the dangers

24   of acute alcohol withdrawal and waits for a manifest emergency before obtaining medical care is

25   deliberately indifferent"); *Harper v. Lawrence County*, 592 F.3d 1227, 1235-37 (11th Cir. 2010)

26   (denying qualified immunity where decedent did not receive any medical care for his severe alcohol

27

28   _____

[6] Deliberate indifference manifested by an independent contractor in its response to a prisoner's
needs is state action for which liability can attach under § 1983.  *West v. Atkins*, 487 U.S. 42 (1988).

withdrawal).  *Liscio v. Warren*, 901 F.2d 274, 276-77 (2d Cir. 1990) (doctor failed to inquire into cause of arrestee's delirium and failed to diagnose alcohol withdrawal).[7]

"'Deliberate indifference' is the conscious choice to disregard the consequences of one's acts or omissions."  Ninth Cir. Model Civil Jury Instruction 9.7.  In the context of a prisoner's medical needs claim, *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012), explains:

> [D]eliberate indifference requires "more than ordinary lack of due care for the prisoner's interests or safety." *Farmer [v. Brennan]*, 511 U.S. [825,] at 835 [(1994)] (quoting *Whitley v. Albers, 475 U.S. 312, 319, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1986)).* The state of mind for deliberate indifference is subjective recklessness. *See id.* at 835-41. **But the standard is "less stringent in cases involving a prisoner's medical needs . . . because 'the State's responsibility to provide inmates with medical care ordinarily does not conflict with competing administrative concerns.'"** *McGuckin v. Smith, 974 F.2d 1050, 1060 (9th Cir. 1992)* (partially overruled on other grounds) (quoting *Hudson v. McMillian, 503 U.S. 1, 6, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992))* (alterations omitted). **Similarly, "[i]n deciding whether there has been deliberate indifference to an inmate's serious medical needs, we need not defer to the judgment of prison doctors or administrators."** *Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir. 1989).*

"[A] prisoner need not prove that he was completely denied medical care in order to prevail."  *Id*, at 986.[8]  Nor does deliberate indifference require express intent to harm.  *Redman v. County of San Diego*, 942 F.2d 1435, 1442 (9th Cir.1991), *cert. denied,* 502 U.S. 1074 (1992).

"In order to comply with their duty not to engage in acts evidencing deliberate indifference to inmates' medical and psychiatric needs, jails must provide medical staff who are 'competent to deal with prisoners' problems.'"  *Gibson*, 290 F.3d at 1187.  Deliberate indifference can be proven by the failure to medically screen a new jail inmate with serious medical needs.  *Id.* at 1189-93.

Where County or Corizon customs or policies are implicated in this deliberate indifference, the County and/or Corizon will also be liable:

> We note that the question of whether the County policies violated Gibson's rights does not hinge on whether the County's policymakers knew that the County's policies would pose a substantial risk of serious harm to Gibson, in particular. As long as a

---

[7] Defendant Harold Orr, M.D. – Corizon's Medical Director and "PMK" about Defendants' policies concerning alcohol withdrawal in Alameda County jails – admits that the need to have withdrawal protocols in place to safely detoxify an alcohol-dependent person is a serious medical need. (Orr PMK, 95:10-19).

[8] Thus, the standard is not whether the defendant "ignored" the inmate, as Defendants claim, and the Seventh Circuit case, *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010), is not controlling.

1
2

> jury can infer that the policymakers knew that their policy of not screening certain incoming detainees would pose a risk to someone in Gibson's situation, we must reverse the summary judgment in favor of the County.

3

Id. at 1192, *citing*, *Farmer,* 511 U.S. at 843-44.

4
5

A *Monell* claim for § 1983 liability "may be stated in one of three circumstances:  (1) when

6

official policies or established customs inflict a constitutional injury; (2) when omissions or failures

7

to act amount to a local government policy of 'deliberate indifference' to constitutional rights; or (3)

8

when a local government official with final policy-making authority ratifies a subordinate's

9

unconstitutional conduct." *Dorger v. City of Napa*, 2012 U.S. Dist. LEXIS 124551 at *7 (N.D. Cal.

10

Aug. 31, 2012) (*citing Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1249-50 (9th Cir.

11

2010)). *See also, Tsao v. Desert Palace, Inc.*, 698 F. 3d 1128, 1139 (9th Cir. 2012) (private entities

12

subject to *Monell* liability under § 1983).

13

A municipality's failure "adequately to train its employees to implement a facially valid

14

policy can amount to deliberate indifference." *Long v. County of Los Angeles*, 442 F.3d 1178, 1188

15

(2006).  A plaintiff can prove a "failure-to-train" claim against a municipality "without showing a

16

pattern of constitutional violations where a 'violation of federal rights may be a highly predictable

17

consequence of a failure to equip law enforcement officers with specific tools to handle recurring

18

situations.'" *Id,* at 1186.

19

Furthermore, an unreasonably inefficient implementation of theoretically reasonable policies

20

can amount to deliberate indifference to constitutional rights. *Berry v. Baca*, 379 F.3d 764, 768 (9th

21

Cir. 2004).  And in the context of policies relating to persons under the influence of alcohol, "a

22

custom and policy of helping intoxicated individuals could be in place and yet the departments

23

could have failed to implement the policy because they did not train their officers adequately."

24

*Munger v. City of Glasgow Police Department*, 227 F.3d 1082, 1088 (9th Cir. 2000).  The *Munger*

25

court thus found a triable issue of fact regarding whether "the deprivation [death of the plaintiffs'

26

son] was caused by the police departments' deliberate indifference in failing to adequately train the

27

officers [in handling intoxicated persons]" *Id*.

28

**"Whether a local government has displayed a policy of deliberate indifference to the constitutional rights of its citizens is generally a jury question."** *Gibson*, 290 F.3d at 1194-1195.

The Ninth Circuit has "long permitted plaintiffs to hold supervisors individually liable in § 1983 suits when culpable action, or inaction, is directly attributed to them" and has "never required a plaintiff to allege that a supervisor was physically present when the injury occurred." *Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011), *cert. denied*, 132 S.Ct. 2101 (2012).  A supervisor such as Dr. Orr may be liable in his individual capacity:

> . . . for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation . . .; or for conduct that showed a reckless or callous indifference of the rights of others." *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991).  The requisite causal connection between the supervisor's wrongful conduct and the constitutional violation "can be shown by authorizing or approving practices that cause injury (see *Redman* [*v. County of San Diego*], 942 F.2d [1435,] 1447-48[(9th Cir. 1991)]; by inadequate training (see *Preschooler II v. Clark County School Bd. of Trustees, 479 F.3d 1175, 1183 [(9th Cir. 2007)]); by acquiescence in longstanding policy (see *Los Angeles Police Protective League v. Gates, 907 F.2d 879, 894 (9th Cir. 1990)); or by condoning actions of subordinates (see Blankenhorn v. City of Orange, 485 F.3d 463, 485-86 (9th Cir. 2007)).*"

*George v. Sonoma County Sheriff's Dept.*, 2008 U.S. Dist. LEXIS 103665, at *18 (N.D. Cal. Dec. 23, 2008).  *See also, Starr*, 652 F.3d at 1207-08.

Additionally, in *Frary v. County of Marin*, 2012 U.S. Dist. LEXIS 177517, at *8 (N.D. Cal. Dec. 13, 2012), the court found that the plaintiff had adequately alleged a claim for supervisory liability under § 1983 for failing to "properly train, assign, supervise, and guide his staff to take the necessary measures to ensure the health and safety of arrested persons."  In that case, the decedent died of a drug overdose while in custody despite law enforcement employees having been informed that the decedent had been carrying narcotics prior to his arrest, and having observed him to appear sick on more than one occasion while in custody.  *Id.*

And this Court has already ruled:

> Plaintiffs' allegations here, if true, establish that Corizon and Nurse Sancho knew that Mr. Harrison was at risk of a serious medical condition, that they violated prison and County procedure in failing to attend to his medical needs, and that they failed to satisfy the medical standard of care, which resulted in substantial harm. Viewed in the light most favorable to Plaintiffs, the allegations in the Second Amended Complaint sufficiently state a claim that Nurse Sancho was deliberately indifferent to Mr. Harrison's medical needs. *See Hunt v. Dental Dept.*, 865 F.2d 198, 200 (9th Cir. 1989) (prisoner's deliberate indifference allegations were sufficient where he alleged "prison officials were aware of his bleeding gums, breaking teeth, and his inability to eat properly, yet failed to take any action to relieve his pain or to

1
2
3

prescribe a soft food diet until new dentures could be fitted."); *Baker v. County of Sonoma*, 08-cv-03433-EDL, 2009 WL 330937, at *4 (N.D. Cal. Feb. 10, 2009) (allegations of prison officials denying prisoner his pain medication were sufficient to state deliberate indifference claim).

4    (Doc. 76, pp. 8-9).  With respect to Corizon and Orr specifically, this Court ruled:

5
6
7
8
9
10
11

Here, Plaintiffs allege the following policies, customs, practices, or lack thereof, constitute deliberate indifference to prisoners' medical needs: (1) failure to institute adequate procedures for the prevention and treatment of severe alcohol withdrawal; (2) failure to coordinate the healthcare assessment of inmates both generally and at the intake screening  process; (3) failure to institute, require, and enforce proper and adequate training, supervision, policies, and procedures concerning the handling of addicted prisoners; (4) denial of access to appropriate, competent, and necessary care for serious medical and psychiatric needs; and (5) failure to properly hire, train, instruct, monitor, supervise, evaluate, investigate, and discipline healthcare personnel.

12
13
14
15

With respect to Dr. Orr, Plaintiffs allege: (1) that he was Corizon Health's medical director; (2) that he was responsible for making and enforcing policies, procedures, and training related to the medical care of inmates, including medical care related to alcohol withdrawal, and (3) that he approved, tolerated, and/or ratified the wrongful acts and omissions of healthcare personnel with respect to Mr. Harrison's lack of adequate medical care.

16
17

In light of *Starr* and *Frary*, the Court finds that Plaintiffs have stated valid *Monell* claims against Corizon Health and Dr. Orr[.]

18    (Doc. 76, p. 14).

19
20

### 1.    Defendant Orr Is Corizon's Final Policy-Making Authority Within the Alameda County Jails and He Was Deliberately Indifferent

21    Defendant Orr, Defendant Corizon's Western Regional Medical Director, admitted that he is

22    Defendant Corizon's highest acting official overseeing Corizon's operations at all Alameda County

23    jails and is the person ultimately responsible for all healthcare at Alameda County jails.  (Ex. 15,

24    Orr PMK Dep., pp. 14:19 - 16:18; Ex. 13, Gilbert PMK Dep. p. 82:3-24).  Dr. Orr was produced as

25    Corizon's "Person Most Knowledgeable" pursuant to F.R.Civ.P. 30(b)(6), concerning its policies

26    related to alcohol withdrawal.  He testified that nobody "within the Corizon family" is more senior

27    to him with respect to establishing policies for patient care for Alameda County inmates.  (Ex. 15,

28    Orr PMK Dep. 22:25-23:4).

Dr. Orr is Corizon's final policy-making authority at the Alameda County jails, and he was responsible for, approved of, and tolerated the customs, practices and policies that led to the denial of medical care for Mr. Harrison's serious medical needs and ultimately Mr. Harrison's death.

Dr. Orr, as Corizon's Medical Director responsible for the operations at the Alameda County jails, failed to implement the required training to correctional officers regarding recognizing the signs and symptoms of alcohol withdrawal.  Ms. Granlund, Corizon's Person Most Knowledgeable about training, testified that Corizon has never provided the mandatory training to corrections officers on recognizing the signs and symptoms of alcohol withdrawal in the 24 years she has worked there.  (Ex. 35, Granlund Dep, pp. 10:2 - 11:25, 36:24 - 37:5, 43:17 - 44:8).

Similarly, as discussed above, Dr. Orr tolerated the custom and practice in which, despite Corizon's stated policy to the contrary, Corizon staff did not review inmates' medical intake forms for completeness and accuracy either before or after their transfer from Glenn Dyer Jail to Santa Rita Jail.  Additionally, Dr. Orr tolerated Corizon's custom and practice allowing Licensed Vocational Nurses to perform intake screenings without clinical supervision, despite its representations to NCCHC that Registered Nurses perform those screenings.

Additionally, Corizon and Dr. Orr fail to ensure that inmates who are in severe alcohol withdrawal are taken to a hospital for treatment, despite national standards dictating otherwise.  (Ex. 15, Orr PMK Dep., pp. 68:2 - 74:25).

In addition to tolerating and permitting the customs and practices that led to the deprivation of Mr. Harrison's constitutional rights, Dr. Orr also permitted Corizon's misrepresentation to NCCHC regarding Corizon's compliance with NCCHC standards in order to receive accreditation.

Finally, under Dr. Orr's management, Corizon employed Ms. Sancho, a clearly incompetent LVN who failed the RN exam three times, and who was ultimately fired for her incompetence.  Ms. Sancho violated the policy regarding CIWA protocols and alcohol withdrawal risk assessments for inmates in the exact same manner only four days after she was counseled for her incompetent handling of Mr. Harrison.  Despite this, Corizon did nothing to check whether Defendant Sancho had failed to implement CIWA protocols on inmates in the past.  (Ex. 11, Wilson dep, p. 59:10-19).

2.      **Defendant Corizon is Liable for Deliberate Indifference**

a.      **Defendant Corizon's Established Customs Inflicted Constitutional Injury on Mr. Harrison and Plaintiffs**

As shown above, Defendant Corizon's established customs of failing to train correctional employees in the signs and symptoms of alcohol withdrawal, failing to review transferred inmates' intake screening forms for completeness and accuracy, failing to have registered nurses conduct medical intake screenings, and failing to have registered nurses properly supervise licensed vocational nurses led to the violation of Mr. Harrison's constitutional rights, and death.

b.      **Defendant Corizon's Failure to Train Correctional Officers Amounted to a Policy of Deliberate Indifference Toward Constitutional Rights**

Corizon admits that "At least 80% of inmates generally have problems with alcohol and/or other drugs," and alcohol dependence is "extremely common" in the jail population.  (Ex. 15, Orr PMK Dep. p. 92:19-93:4).  Despite this, they fail to train correctional officers in recognizing the signs of alcohol withdrawal.  Under these circumstances, the violations of Mr. Harrison's and Plaintiffs' federal rights were a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations.  *Long*, 442 F.3d at 1186.

c.      **Corizon Is Liable for Dr. Orr's Deliberate Indifference**

As Shown in Section IV.A.1 above, Corizon's Medical Director, Defendant Orr, committed acts and omissions of deliberate indifference as a Corizon policy maker.  Corizon, therefore, is liable for deliberate indifference as well.  *Clouthier*, 591 F.3d at 1249-50.

Numerous issues of fact remain concerning Plaintiffs' deliberate indifference claims, and Defendants' Motion should be denied.

**B.      The Same Facts Establishing Deliberate Indifference Establish Defendant's Negligence**

As this Court noted in its order denying Defendants' Motion to Dismiss, mere negligence in diagnosing or treating a medical condition, without more, does not establish deliberate indifference.  (Doc. 76, p. 8)(*citing Hutchinson*, 838 F.2d at 394.  Rather, "deliberate indifference claims necessarily require more than 'mere negligence.'"  (Doc. 76, p. 11).  Since Defendants were deliberately indifferent, they were also negligent.

## C.      Plaintiffs Timely Pled their Claims Against Defendants Corizon and Orr

Judge Wilken rejected Defendants' arguments that Plaintiffs' claims are barred by the statute of limitations when she granted Plaintiffs' Motion to Amend on November 12, 2012.  (*See* Doc. No. 45).  This included her finding that the argument that Plaintiffs have alleged medical malpractice "plainly mischaracterizes" their claims, that "Plaintiffs do not assert any medical malpractice claims," and that "[t]he statute of limitations for medical malpractice claims is therefore irrelevant." (Doc. No. 45 at p. 10).

Similarly, this Court rejected Defendants Sancho, Corizon and Orr's arguments that Plaintiffs' negligence claims, which are based on the same set of conduct that comprises Plaintiffs' deliberate indifference and Bane Act claims, are barred by the statute of limitations.  This Court found that the California relation back doctrine permitted Plaintiffs to add Defendants Sancho, Corizon and Orr when they filed their Second Amended Complaint.  (Doc. No. 76, p. 12).

These ruling constitute the law of the case.  *Milgard Tempering v. Selas Corporation of America*, 902 F.2d 703, 715 (9th Cir. 1990) (under the law of the case doctrine, a court is generally precluded from revisiting an issue that has already been decided, either explicitly or by "necessary implication" by the same court).  *See also, Thomas v. Bible*, 983 F.2d 152, 155 (9th Cir. 1993); *Funai Electric Company v. Daewoo Electrics Corporation*, 2007 U.S. Dist. LEXIS 102668, pp. 27-28 (N.D. Cal. 2007).  Defendants Corizon and Orr's current arguments constitute an untimely and improper motion for reconsideration.

As Plaintiffs successfully argued both in their Motion for Leave to Amend and in their opposition to Defendants Sancho, Corizon and Orr's Motion to Dismiss, their claims against Defendants Corizon, Orr and Sancho were timely brought as they related back to the same operative facts as the first amended and original complaints and were brought promptly after Plaintiffs discovered the involvement of these Defendants.

The Ninth Circuit has held that California relation back provisions "constitute a substantive state policy that is applicable in federal civil rights actions."  *Merritt v. County of Los Angeles*, 875 F.2d 765, 768 (9th Cir. 1989) (*citing Cabrales v. County of Los Angeles*, 864 F.2d 1454, 1464 (9th Cir. 1988) (applying state relation back provisions to § 1983 action)).  *See also, Mishler v. Nevada*

1   *State Bd. of Medical Examiners*, 1996 U.S. App. LEXIS 20590, at *5 (9th Cir. Aug. 15, 1996)

2   ("*state* relation-back rules and not Fed. R. Civ. P. 15 govern § 1983 suits.") (emphasis in original).

3   Specifically, California Code of Civil Procedure § 474 provides for "Doe" pleading of unknown

4   defendants, and that once a complaint is amended to identify a Doe defendant, it will relate back to

5   the original complaint.  This provision for pleading of Doe defendants must be applied in a federal

6   civil rights action.  *Merritt*, 875 F.2d at 768.  Also, "[u]nder California relation back rules, there is

7   no notice-to-defendants requirement as in the federal rule."  *Id.*  Thus, the amended complaint

8   relates back for statute of limitations purposes to the date the original complaint was filed, even if

9   the newly identified defendant had no prior notice of the lawsuit.  *Id.*

10        Under California law, "An amended complaint relates back to the original complaint, and

11   thus avoids the statute of limitations as a bar against named parties substituted for fictitious

12   defendants, if it: (1) rests on the same general set of facts as the original complaint; and (2) refers to

13   the same accident and same injuries as the original complaint."  *Barrington v. A.H. Robbins Co.*, 39

14   Cal. 3d 146, 150 (1985).  As long as the amended complaint is based on the same operative facts as

15   the original complaint, it may include a new theory of liability and new damages.  *Amaral v. Cintas*

16   *Corp.*, 163 Cal. App. 4th 1157, 1199-1200 (2008) ("it is the sameness of the facts rather than the

17   rights or obligations arising from those facts that is determinative") (citation omitted).

18        The same is true under Federal Rule of Civil Procedure 15(c)(1)(B), which allows for

19   relation back where the new claim arises "out of the conduct, transaction, or occurrence set out – or

20   attempted to be set out – in the original pleading."  *See also, Martell v. Trilogy, Ltd.*, 872 F.2d 322,

21   327 (9th Cir. 1989) (even a new theory of liability will relate back where the original and amended

22   complaints "share a common core of operative facts sufficient to impart fair notice of the

23   transaction, occurrence, or conduct called into question").

24        Relation back applies where both pleadings refer to the same incident and the same injury

25   *Grudt v. City of Los Angeles*, 2 Cal. 3d 575, 581-85 (1970).  As in *Grudt*, Plaintiffs' original

26   complaint, First Amended Complaint, and Second Amended Complaint refer to the same incidents

27   (Defendants' denial of necessary medical care for Mr. Harrison's serious medical needs and use of

28   excessive force against him) and the same injury (Mr. Harrison's death).  These incidents and

injuries rest on the same general set of facts.  Only after an opportunity to complete some discovery

1    were Plaintiffs able to plead the facts in greater detail.  *See Barnes v. Wilson*, 40 Cal. App. 3d 199,

2    205 (1974) (plaintiff's addition in amended pleading of "an incidental fact reasonably inferable

3    from the facts alleged in the original complaint" did not defeat relation back).

4          Justice Holmes explained the purpose of statutes of limitations:

5          Statutes of limitation, like the equitable doctrine of laches, in their conclusive effects are
6          designed to promote justice by preventing surprises through the revival of claims that have
           been allowed to slumber until evidence has been lost, memories have faded, and witnesses
7          have disappeared.

8    *Order of R. Telegraphers v. Railway Express Agency, Inc.,* 321 U.S. 342, 348-349 (1944).  This

9    principle purpose was further explained in *Sierra Club v. Chevron U.S.A., Inc.*, 834 F.2d 1517 (9th

10   Cir. Cal. 1987) as being "to provide notice of claims and to prevent plaintiffs from 'sleeping on their

11   rights.'"  *Sierra Club*, 834 F.2d at 1523, *citing Order of R. Telegraphers*, 321 U.S. at 348-349.  In

12   *Washington v. United States*, 769 F.2d 1436 (9th Cir. Cal. 1985), the Court noted that the plaintiffs

13   should not have been prevented from maintaining their action when the defendant was responsible

14   for the delay.  *Washington*, 769 F.2d at 1439, *citing In re Swine Flu*, 764 F.2d 637 (1985).

15         As set forth in Plaintiffs' response to Zelda Sancho's motion for summary judgment, pp. 11-

16   14, in October 2010, Lenore Gilbert responded to Plaintiffs' request for Mr. Harrison's jail medical

17   records, and never revealed that "PHS Correctional Healthcare" was a separate entity from Alameda

18   County.  The records were sent by "Health information Services, Alameda County Jails, Santa Rita

19   Jail."  (Ex. 19, PLF 293).  Alameda County also never revealed that it had contracted out its health

20   care to PHS/Corizon, even in its answer to the complaint.   Corizon only had contracts within

21   California in Alameda and Santa Barbara Counties, where Plaintiffs' counsel had not handled jail

22   medical cases.  (Sherwin Decl., ¶24).  It was not until June 1, 2012, that Alameda County informed

23   Plaintiffs' counsel that its jail medical staff were actually Corizon employees.  (Altomare Decl., ¶¶

24   19-20, Ex. D). Plaintiffs did not even learn of the existence of Dr. Orr until Dr. Magat's July 27,

25   2012, deposition.

26         At the time of these Plaintiffs' first complaint, the First Amended Complaint (September 20,

27   2011), they did not know of the involvement and liability of Defendants Corizon and Orr, who was

28   substituted for previously named Doe Defendants in the SAC.  "Under § 474, '[i]f the identity of the

     Doe defendant is known but, at the time of the filing of the complaint the plaintiff did not know

facts that would cause a reasonable person to believe that liability is probable, the requirements of section 474 are met.'"  *Bolbol v. City of Daly City*, 2011 U.S. Dist. LEXIS 81228, at *11 (N.D. Cal. July 11, 2011) (*citing McOwen*, 153 Cal. App. 4th at 943).

The issue is whether Plaintiffs had actual knowledge of these Defendants' liability.  *Bolbol* at *12 (*citing McOwen*, 153 Cal. App. 4th at 943-44 ("California case law indicates that actual knowledge is the relevant standard, not constructive knowledge.")).  Plaintiffs did not even have actual knowledge of the existence of Corizon as an entity involved in the medical care at the jail until June 1, 2012, and did not have actual knowledge of Dr. Orr's existence or involvement here until July 27, 2012.

Furthermore, Plaintiffs did not know Sancho's employer was not Alameda County, and had no information who her supervisors and employer's policy makers were.  Two Judges of this Court have already determined that Plaintiffs were ignorant of the facts demonstrating Defendants Corizon and Orr were liable, that their claims relate back, and that their claims against Defendants Corizon and Orr were timely pled.

Plaintiffs were not in a position to name Defendants Corizon and Orr as defendants in this action until Dr. Magat revealed on July 27, 2012, the nature of Defendant Sancho's involvement to Mr. Harrison's death, that Dr. Orr was the Medical Director, and that the failure to address Mr. Harrison's medical needs began as early as his intake at Glenn Dyer Jail.

Furthermore, Plaintiffs' negligence claims against Defendants Orr and Corizon concern Corizon and Dr. Orr's breach of their duties to refrain from making, enforcing, and/or tolerating the wrongful policies and customs at issue in this case.  These are claims of general negligence, not medical negligence.  Defendants' Code of Civil Procedure §340.5 argument is erroneous.

### D.  Defendants Corizon, Sancho, and Orr Violated the Bane Act, California Civil Code § 52.1.

In denying Defendants Sancho, Orr, and Corizon's Motion to Dismiss, this Court has already addressed and rejected Defendants' argument that they cannot be liable for a violation of the Bane Act, California Civil Code §52.1.  *See* Doc. 76, pp. 7-12.  This ruling is the law of the case. *Milgard, supra, Thomas, supra,* and *Funai Electric Company, supra.*

Furthermore, this Court's opinion in this case has since been found persuasive by other courts.  *See, e.g., Little v. City of Richmond*, 2013 U.S. Dist. LEXIS 149804 (N. D. Cal. 2013) *12-13 (§ 52.1 does not necessarily require threats, intimidation, or coercion independent from violation of a constitutional right, especially where conduct was intentional, i.e. volitional); *Mateos-Sandoval v. County of Sonoma*, 2013 U.S. Dist. LEXIS 103549, (N.D. Cal. 2013) *26-27; *Rodriguez v. City of Modesto*, 2013 U.S. Dist. LEXIS 172958, (E.D. Cal. 2013) *35-36; *Dillman v. Tuolumne County*, 2013 U.S. Dist. LEXIS 65206 (E.D. Cal. May 7, 2013), *54-58; *Sanchez v. City of Fresno* 2013 U.S. Dist. LEXIS 68561 (E. D. Cal. May 14, 2013) *34-38 (quoting from *M.H.* at length); *Bender v. County of Los Angeles*, 217 Cal.App.4th 968 (2013).

Based on this Court's reasoning in *M.H.*, an Eastern District court has rethought its analysis of § 52.1, twice recently holding that for Fourth Amendment claims, "there is no need for a plaintiff to allege a showing of coercion independent from the coercion inherent in the seizure or use of force."  *Rodriquez v. City of Modesto, supra.; Dillman v. Tuolomne County, supra.*

This Court has already held the burden of showing "threats, intimidation, or coercion" under the Bane Act is minimal: "it should not prove difficult to frame many, if not most, asserted violations of any state or federal statutory constitutional right, including mere technical statutory violations, as incorporating a threatening, coercive, or intimidating verbal or written component." (Doc. 76, p. 9)(*quoting Venegas v. County of Los Angeles*, 32 Cal.4th 820, 850-851 (2004).  Section 52.1 simply requires "an attempted or completed act of interference with a legal right, accompanied by a form of coercion."  *Jones v. Kmart Corp.*, 17 Cal. 4th 329, 334 (1998).

"[B]ecause deliberate indifference claims necessarily require more than 'mere negligence,' a prisoner who successfully proves that prison officials acted or failed to act with deliberate indifference to his medical needs in violation of his constitutional rights. . .adequately states a claim for relief under the Bane Act." (Doc. 76, pp. 11-12).

The facts that establish Defendants Sancho and Orr's deliberate indifference necessarily prove a violation of rights by "threats, intimidation, or coercion."  What can be more coercive than denying a jail inmate, powerless to care for his own medical needs, essential medical care to prevent him from going into a life-threatening medical emergency?  Defendants Sancho and Orr violated the Bane Act.

1    Both Defendant Sancho's and Defendant Orr's liability would "also give[ ] rise to respondeat

2 superior liability with respect to Defendant Corizon Health under traditional California common

3 law principles."  (Doc. 76, p. 9).  Corizon is therefore also liable for violation of the Bane Act.

### V.    CONCLUSION

For the reasons stated herein, Defendants' motion should be denied in its entirety.

Respectfully Submitted,

Dated:  December 20, 2013                    HADDAD & SHERWIN


/s/  Genevieve K. Guertin
_____
GENEVIEVE K. GUERTIN
Attorneys for Plaintiffs
JOSEPH HARRISON, KRYSTLE HARRISON,
MARTIN HARRISON, JR., and TIFFANY
HARRISON