# EXHIBIT 30

# M.H., a minor v. COUNTY OF ALAMEDA

## DEPOSITION OF

## DEPUTY MATTHEW AHLF

## CONDENSED TRANSCRIPT

June 6, 2012

CRANGLE REPORTING SERVICES
(510) 653-1312
cranglereporting.com

DEPOSITION OF DEPUTY MATTHEW AHLF

**Page 1**

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

M.H., a minor, through his
Guardian Ad Litem, Michelle
Henshaw, JOSEPH HARRISON, KRYSTLE
HARRISON, MARTIN HARRISON, JR.,
and TIFFANY HARRISON, all          CASE NO. C11-2868
Individually and as Co-Successors   CW
in Interest of Decedent MARTIN
HARRISON,

    Plaintiffs,

-vs-

COUNTY OF ALAMEDA, a municipal
corporation; SHERIFF GREGORY J.
AHERN, in his individual and
official capacities; DEPUTIES
MATTHEW AHLF, ALEJANDRO VAL VERDE,
JOSHUA SWETNAM, ROBERTO MARTINEZ,
ZACHARY LITVINCHUK, RYAN MADIGAN,
MICHAEL BARENO, FERNANDO
ROJAS-CASTANEDA, SHAWN SOBRERO,
SOLOMON UNUBUN, and DOES 1-20,
individually, jointly and
severally,

    Defendants.
_____/

DEPOSITION OF DEPUTY MATTHEW AHLF

Taken before JOAN GRIER
Certified Shorthand Reporter
State of California
C.S.R. License No. 8958

June 6, 2012

**Page 2**

I N D E X

Deposition of DEPUTY MATTHEW AHLF

                     Page

Examination by:

MR. HADDAD                    5
MR. BURRIS                  162
MR. HADDAD                  194

Plaintiffs' Exhibits

1   Alameda County Sheriff's Office General       21
    Order No. 1.05; 14 pages

2   Alameda County Sheriff's Office Intensive     64
    Observation Log, 8/16/10; 1 page

3   Alameda County Sheriff's Office Personnel    156
    Performance Evaluation Report, 11/4/09 to
    1/22/12; 4 pages

4   Alameda County Sheriff's Office Field        159
    Training Program Performance Assessment,
    8/23/09 to 11/3/09; 5 pages

---oOo---

**Page 3**

DEPOSITION OF DEPUTY MATTHEW AHLF

    Pursuant to Notice of Taking Deposition, and on
Wednesday, June 6, 2012, at the hour of 1:07 p.m., at LAW
OFFICES OF HADDAD & SHERWIN, 505 Seventeenth Street,
Oakland, California, before me, JOAN GRIER, Certified
Shorthand Reporter, personally appeared DEPUTY MATTHEW
AHLF, produced as a witness in the above-entitled action,
who, having been first duly sworn, was thereupon examined
as a witness to said action.

APPEARANCES

    Michael J. Haddad, Attorney at Law, HADDAD &
SHERWIN, 505 17th Street, Oakland, California 94612, was
present on behalf of the plaintiffs.

    John L. Burris, Attorney at Law, LAW OFFICES OF
JOHN L. BURRIS, 7677 Oakport Street, Suite 1120, Oakland,
California 94621, was present on behalf of the plaintiffs.

**Page 4**

    J. Randall Andrada, Attorney at Law, and Valerie
Ly, Attorney at Law (as indicated), ANDRADA & ASSOCIATES,
180 Grand Avenue, Suite 225, Oakland, California 94612,
was present on behalf of the defendants.

DEPOSITION OF DEPUTY MATTHEW AHLF

---

**5**

1           DEPUTY MATTHEW AHLF,
2      sworn as a witness by the Court Reporter,
3           testified as follows:
4           EXAMINATION BY MR. HADDAD
5      MR. HADDAD:  Q.  Good afternoon, Deputy Ahlf.
6      **A. Good afternoon.**
7      Q.  This is the time for your deposition, so I'll
8  start by just explaining what the process will be a little
9  bit.
10     Have you been deposed before?
11     **A. No.**
12     Q.  Okay.  I'm going to ask you some questions.
13 When my co-counsel arrives, he'll probably have some
14 questions too.  I'll try to make my questions clear, but
15 if you don't understand one of them, please let me know
16 and I'll rephrase it for you.  Okay?
17     **A. Yes.**
18     Q.  When this is all over, you'll have an
19 opportunity to review a transcript of everything that was
20 said verbatim.  And you're allowed to make any changes you
21 want to the transcript if you find things that are
22 incorrect in it.  Sometimes there's just typographical
23 errors or the reporter hears a word you said and types
24 something that sounds similar to it.  Those are no big
25 deal.  If you make a change that's substantive that

---

**6**

1  changes the meaning of an answer, you can change it, but
2  it doesn't really go away.  It's still -- the original
3  answer is still there and we can comment about that at
4  trial.  Okay?
5      **A. Yes.**
6      Q.  So it's important to make sure that you've
7  given your best testimony today, and do your best not to
8  speculate or guess but actually testify based on what you
9  can remember or what you know in some way.  Okay?
10     **A. Yes.**
11     Q.  How long have you been employed by the Alameda
12 County Sheriff's Department?
13     **A. Since January of 2005.**
14     Q.  Is that when you began some sort of police
15 academy, or is that when you ended it?
16     **A. I actually started as what they call a**
17 **sheriff's safety aide at the Oakland Airport, so it's a**
18 **nonsworn position, and then in June of that year is when I**
19 **went to the police academy.**
20     Q.  And did you go in the Alameda County Police
21 Academy?
22     **A. Yes.**
23     Q.  And that was POST-certified, right?
24     **A. Yes.**
25     Q.  When did you graduate from that academy?

---

**7**

1      **A. December 28th, 2005.**
2      Q.  Did you immediately start working for the
3  Sheriff's Department then?
4      **A. Yes, I did.**
5      Q.  Can you briefly take me through your different
6  assignments and posts or locations with the Alameda
7  County, please.
8      **A. Sure.  As a deputy or as total?**
9      Q.  Let's start at the beginning --
10     **A. Sure.**
11     Q.  -- at the airport.
12     **A. At the airport, I was what they call a**
13 **sheriff's safety aide.  Job descriptions there were to**
14 **monitor traffic coming in and out of the airport, man the**
15 **security posts and -- very much guard those posts and make**
16 **sure only authorized personnel would go through.  I did**
17 **that from January to June.  And then I was accepted into**
18 **the police academy, the 130th academy, and...**
19     MR. ANDRADA:  If you need to, because of the
20 traffic noise outside --
21     THE WITNESS:  I apologize.
22     MR. ANDRADA:  No, no, no, no.  If you need to talk
23 directly at the reporter, that -- that's okay.
24     THE WITNESS:  Oh, okay.  Okay.  I apologize.
25     MR. ANDRADA:  Yeah.

---

**8**

1      THE WITNESS:  So January -- I mean June -- forgive
2  me, June 230th, 2005, I started in the police academy and
3  graduated December 28th, and I started the jail
4  January 3rd of 2006.
5      MR. HADDAD:  Q.  And I know you had some different
6  assignments after that.
7      At one point you worked as a bailiff, right?
8      **A. Yes, I did.**
9      Q.  So -- so take me through, if you can,
10 starting -- excuse me.
11     For now, just take me through the dates of your
12 different assignments, please, and then I'll follow up.
13     **A. Okay.  So assigned to Santa Rita Jail from**
14 **January of 2006 to -- I'm trying to remember the exact --**
15     MR. ANDRADA:  I don't think he needs the exact
16 day --
17     THE WITNESS:  Oh, okay.  All right --
18     MR. ANDRADA:  Stop.  Stop.  Stop.  If you can give
19 him a month and, of course, a year, that's really what I
20 think he's interested in.
21     THE WITNESS:  Okay.
22     MR. ANDRADA:  So go ahead.
23     THE WITNESS:  I believe it was April or May of 2009
24 I was transferred to the Rene C. Davidson Courthouse here
25 in Oakland as a bailiff, and I was there for approximately

---

DEPOSITION OF DEPUTY MATTHEW AHLF

9

1 four months when I was transferred to the Field Training
2 Program at the Township Substation for patrol training,
3 and it was either August or September of that year that I
4 was transferred out there. And I did not complete the
5 Field Training Program. I left the program in November
6 and was transferred back to Rene C. Davidson Courthouse
7 where I worked until April of 2010 when I was transferred
8 back to Santa Rita Jail. And I was at Santa Rita Jail
9 January of 2010.
10    MR. ANDRADA: Do you mean -- I'm sorry.
11    MR. HADDAD: Let me just stop you.
12    Q. You had recalled just now that you went back to
13 the court to work as a bailiff from November '09 to
14 April 2010. Does that sound right?
15    A. Actually, forgive me, because I've been at the
16 coroner's now -- got transferred there -- yeah, that is
17 correct.
18    Q. Okay.
19    A. Yes.
20    Q. So then after April 2010, you left the court
21 and where did you go?
22    A. I went to Santa Rita Jail.
23    (Mr. Burris enters deposition room.)
24    MR. HADDAD: Q. How long did you stay at
25 Santa Rita for that stint?

10

1    A. Until January of 2011. Yes.
2    Q. And then where did you go?
3    A. Currently, still presently assigned to -- I'm
4 sorry. January 2011 I was transferred to the Coroner's
5 Bureau.
6    Q. Are you still there?
7    A. Yes, sir.
8    Q. What do you do for the Coroner's Bureau?
9    A. I'm a deputy sheriff's investigator for unknown
10 death investigations.
11    Q. Why did you leave your assignment at Santa Rita
12 Jail to go work at the Coroner's Bureau in early 2011?
13    A. A position had opened up. I thought that would
14 be a good -- I've always been kind of interested in that,
15 so I thought that might be a good challenge, something
16 new.
17    MR. HADDAD: Off the record for a second.
18    (Discussion off the record.)
19    MR. HADDAD: Back on the record.
20    Q. Now, your first assignment after completing the
21 police academy was at the jail, and you spent a little
22 over four years there. Is that right?
23    A. Yes, sir.
24    Q. Did you also receive corrections training?
25    A. Went through an 80-hour jail ops training that

11

1 they offer, and then I went through a jail training
2 officer -- jail training -- on-the-job training for -- I
3 think it was four weeks.
4    Q. Okay. And did you complete any sort of
5 State-certified corrections officer training?
6    A. I didn't -- I haven't -- haven't got -- I
7 didn't get any kind of certificate for it, if that's what
8 you're asking. I went through the mandated standard
9 trainings of corrections. I went through that.
10    Q. You know how -- how California POST regulates
11 the training of law enforcement officers, right?
12    A. Well --
13    MR. ANDRADA: Objection. Vague and ambiguous,
14 overly broad.
15    But you can go ahead and answer the question if you
16 can.
17    MR. HADDAD: Q. Right?
18    A. Yes. I went through a POST academy.
19    Q. There is a similar state organization that
20 oversees training of corrections officers, correct?
21    A. Yes.
22    Q. Do you recall what that's called?
23    A. I believe it's called the standard trainings
24 for corrections.
25    Q. Did you receive that training?

12

1    A. That's part of the 80-hour training course that
2 we had. I don't know if that's in connection. I'm not --
3 that I can't answer.
4    Q. All right. So what assignments did you have
5 when you worked at the jail for that first three years?
6    A. First, I was assigned to the housing unit to
7 oversee the security of several inmates in my housing
8 unit. I worked as a -- worked in booking where I
9 processed new and incoming -- inmates coming in, newly
10 arrested inmates. I worked in the classification
11 department where I would interview each inmate that would
12 come in and place them in the -- in the right housing unit
13 based off their classification. And then I worked -- I
14 became a jail training officer at that point where I
15 actually trained all the new deputies that were graduating
16 from the academy. And that's about what I did. I mean, I
17 worked in every -- I worked pretty much every
18 classification.
19    Q. What did you train the new deputies in?
20    A. I taught them in the 80-hour course. They
21 would be assigned to me, and I would teach them on the
22 daily operations, their roles, responsibilities as a
23 deputy; security precautions. Teach them on -- basically
24 how to manage and how to work effectively as a new deputy.
25 Basically get them up to speed in that short period of

3 (Pages 9 to 12)

DEPOSITION OF DEPUTY MATTHEW AHLF

13

1  time that I would have.
2      Q. When did you begin teaching deputies that
3  80-hour class at corrections?
4      A. I don't recall the exact month or date. I
5  believe that was in late 2006. I believe so. I don't
6  recall the exact month or year. It was about close to my
7  probationary period of time.
8      Q. Shortly after you finished your probation, you
9  were actually teaching the class, the 80-hour class. Is
10 that right?
11     A. I was teaching -- there was two subjects that I
12 would teach at that point.
13     Q. What were those?
14     A. It was commissary, and it was distribution of
15 mail.
16     Q. All right. So you didn't actually teach all
17 80 hours --
18     A. No.
19     Q. -- just little bit of it?
20     A. Yeah.
21     MR. ANDRADA: It's important for everybody if you
22 just wait until he finishes asking his question --
23     THE WITNESS: Okay.
24     MR. ANDRADA: -- before you start to answer. So
25 even though we have a very good court reporter here, it's

14

1  difficult to take down two people talking at once. Okay?
2      THE WITNESS: Yes, sir.
3      MR. HADDAD: Q. What other parts of that 80-hour
4  corrections officers course did you eventually teach?
5      A. I taught, obviously, the distribution of mail.
6  I taught commissary. I taught handling disruptive
7  inmates. I taught the cell extraction portion. I taught
8  restraints, the proper application of restraints. I can't
9  think of anything else I taught for that.
10     Q. All right. So when you taught about handling
11 disruptive inmates and cell extraction and use of
12 restraints, were there any written materials?
13     A. That I would teach off of?
14     Q. Yes.
15     A. Yes. I taught off of our policy and procedure.
16     Q. So you used the general orders of your
17 department?
18     A. Yes.
19     Q. Did you use any other sort of training
20 materials or bulletins?
21     A. I used applications of restraints, actively
22 showing how to properly apply with chains, leg irons, and
23 proper -- depending on the classification of the inmate
24 that you're dealing with, proper application of handcuffs
25     Q. Did you use any other written materials besides

15

1  your department's policies when you were teaching those
2  subjects?
3      A. I would -- I created my own PowerPoint for
4  that. That was based off of the general order.
5      Q. For which subject did you create the
6  PowerPoint?
7      A. Cell extractions. I think it was cell
8  extractions. I don't recall if I made one for restraints.
9      Q. Do you still have those PowerPoint
10 presentations somewhere?
11     A. I'm sure I do.
12     Q. Where do you think you probably have them?
13     A. Might be on my thumb drive. I had several
14 thumb drives. Could be on that. It might be at one of
15 the computers at Santa Rita.
16     Q. I'm just going to ask that you preserve those,
17 please, and provide them to your attorney, and then we'll
18 make a formal request for those. Okay?
19     A. Sure.
20     Q. After your first three years or so at the jail,
21 you went to go work as a bailiff for about four months,
22 and then you entered a Field Training Program, right?
23     A. Yes.
24     Q. Why did you enter field training at that point
25 in your tenure with the Sheriff's Department?

16

1      A. I put in -- well, years prior, I put in a
2  request to go to patrol, and at that point when I went to
3  the bailiff's, a spot came up for me to be able to go.
4      Q. So that was field training so you could switch
5  to patrol from the other assignments you had been doing,
6  correct?
7      A. Correct.
8      Q. And you told me that you did not complete that
9  field training. Is that right?
10     A. Yes.
11     Q. Why did you fail to complete the field training
12 at that time?
13     A. I had a family emergency that I had to withdraw
14 from the program.
15     Q. Did it have anything to do with the fact that
16 your evaluations in that Field Training Program were below
17 standard?
18     A. No.
19     Q. Is it true that you were receiving below
20 standard evaluations in the Field Training Program?
21     A. Some, yes.
22     Q. But it's your testimony that the only reason
23 you left the Field Training Program was because of a
24 family issue. Is that right?
25     A. I had a family emergency that occurred during

DEPOSITION OF DEPUTY MATTHEW AHLF

17

1  my Field Training Program that caused me to make the
2  decision to leave.
3        Q. So then you went to go work as a bailiff then,
4  and when you returned to Santa Rita Jail, that was in
5  April 2010, correct?
6        A. Yes.
7        Q. Now, the incident with Martin Harrison happened
8  in August of 2010.  Do you recall that?
9        A. Yes.
10       Q. So you'd been back at the jail for about four
11  months by that time, right?
12       A. Yes.
13       Q. What was your assignment during that four
14  months?
15       A. I was a jail training officer.
16       Q. What does that mean?
17       A. Basically, again, as a training officer, you
18  handle training of new deputies graduating the academy.
19  You train them in the daily operations of how to run a
20  housing unit.  You teach them on the safety precaution
21  dealing with inmates.  You get them ready to be able to
22  handle a housing unit solely by themselves.
23       Q. So who gave you that responsibility of being a
24  trainer?
25       A. The department did.

18

1        Q. And in order to do that, you had to be
2  knowledgeable of all the general orders that were
3  applicable to that work at the jail, right?
4        MR. ANDRADA:  Objection.  Vague and ambiguous,
5  overly broad.
6        But you can go ahead and answer it.
7        THE WITNESS:  I had to be competent of most general
8  orders, yes.  Being able to teach and equip deputies with
9  the way the sheriff -- the guidelines that the Sheriff's
10  Office provides.
11       MR. HADDAD:  Q.  Basically, any general order that
12  would pertain to the work you were teaching or doing at
13  the jail, you were required to know, right?
14       MR. ANDRADA:  Objection.  Vague and ambiguous,
15  overly broad.
16       Go ahead and answer it if you can.
17       THE WITNESS:  I won't say that you were mandated to
18  know every single one of them, because there was a ton of
19  them.  You were mandated to follow the -- so you sign off
20  a statement saying that you have read the general order.
21  You sign off and follow that, so, yes.
22       MR. HADDAD:  Q.  You're required to follow all of
23  the general orders, right?
24       A. Yes.
25       Q. Are there any general orders where you've ever

19

1  learned that those are optional; you don't really have to
2  obey them?
3        MR. ANDRADA:  Objection.  Vague and ambiguous,
4  overly broad.
5        Go ahead.
6        THE WITNESS:  No.
7        MR. HADDAD:  Q.  So all of them are mandatory,
8  right?
9        A. Yes.
10       Q. So in order to obey the general orders, you
11  have to know what they are, right?
12       A. Essentially, yes.
13       Q. Now, prior to starting your work with the
14  Sheriff's Department in 2005, what other jobs did you do?
15  What other kind of work did you do?
16       A. I was in retail for a long time.  Basically,
17  it's all sales.  Most of my career prior to doing law
18  enforcement was in retail sales.  Basically, it's all
19  sales work.
20       Q. Do you have any experience dealing with the
21  mentally ill?
22       A. No.
23       Q. Or developmentally disabled people?
24       A. No, sir.
25       Q. Because I thought I saw in one of your

20

1  statements that was related to this particular incident
2  where you mentioned that based on your background in
3  dealing with the mentally ill, you had some sort of
4  understanding.
5        Am I incorrect; you never had any connect- --
6  experience with mentally ill people other than from the
7  jail?
8        MR. ANDRADA:  Okay.  Listen to his question and
9  answer the question.
10       THE WITNESS:  I'm not quite sure what you're
11  getting at.
12       MR. HADDAD:  Q.  Do you have any experience working
13  with or working around mentally ill people other than from
14  your law enforcement work?
15       A. Not that I can recall.
16       Q. Do you have any training in how to handle or --
17  or be around mentally ill people other than your law
18  enforcement training?
19       A. I don't recall getting any training, no.
20       Q. Did you graduate from high school?
21       A. Yes, I do.
22       Q. What year?
23       A. 1993.
24       Q. Do you have any post-high-school education?
25       A. A little bit.  Not a lot.

DEPOSITION OF DEPUTY MATTHEW AHLF

21

1    Q. Just, generally, do you have any degrees or
2  classes?
3    **A. I have classes.  I do not have any degrees.**
4    MR. HADDAD:  Would you mark this, please.
5    (Plaintiffs' Exhibit 1 was marked for
6  identification.)
7    MR. HADDAD:  I marked, as Exhibit 1, a copy of the
8  Alameda County Sheriff's Department General Order on use
9  of force.
10   Q. You've seen that before, right?
11   **A. Yes, sir.**
12   Q. That's one of those policies that you're
13 required to know and follow at all times, right?
14   **A. Yes, sir.**
15   Q. In fact, did you use this policy in any of the
16 training that you provided for other deputies?
17   **A. Yes, I did.**
18   Q. And this particular policy, which was revised
19 on August 5th, 2010, was the one that was in effect at the
20 time of the Harrison incident, right?
21   **A. Yes.**
22   Q. Now, you've received a lot of training about
23 how to make decisions concerning use of force, right?
24   MR. ANDRADA:  Objection.  Overly broad, vague and
25 ambiguous.

22

1    But you can go ahead and answer it.
2    THE WITNESS:  We had training in the academy.  You
3  get trained a certain amount in the jail, in the 80-hour
4  core course, and then in your -- on your training -- your
5  training phase with a jail training officer, that's about
6  it.
7    MR. HADDAD.  Q.  And the jail provides you ongoing
8  training on certain topics, right?
9    **A. Certain ones, yes.**
10   Q. And use of force was one of those topics, yes?
11   **A. Yes.**
12   Q. And, in fact, in the training that you provided
13 as a trainer handling disruptive inmates, cell extraction,
14 and restraints, all of those touch on use of force in some
15 respects, right?
16   **A. Yes.**
17   Q. Take a look at the first page.  Do you see the
18 very bottom where it says "Order"?  The last two lines
19 say, "Order," quote, "When the use of force is necessary
20 and appropriate, members shall be guided by the options
21 set forth in this order," unquote.
22   Do you see that?
23   **A. Yes, I do.**
24   Q. All right.  And you have been trained that any
25 use of force you decide to use has to be necessary and

23

1  appropriate under the circumstances?
2    **A. Yes, sir.**
3    Q. You're not allowed to use force that's
4  unnecessary, are you?
5    **A. Correct.**
6    Q. And you've also been trained that when you do
7  use force, after the fact, you're expected to be able to
8  articulate the relevant factual circumstances that you
9  confronted into which a forcible response was given,
10 right?
11   **A. Right.**
12   Q. You're supposed to be able to articulate,
13 clearly explain what force you used and why you used it,
14 right?
15   **A. Correct.**
16   Q. And that's true for every time you use force,
17 even if you use multiple applications of force in a single
18 incident, right?
19   **A. Correct.**
20   Q. So, for instance, if you have an incident with
21 an inmate and you need to punch that inmate ten times,
22 you're supposed to explain the reason for every one of
23 those punches, correct?
24   **A. Correct.**
25   Q. And every one of those have to be justified

24

1  under your training and the standards that you've been
2  taught, right?
3    **A. Correct.**
4    Q. And you had been trained that your decisions
5  about use of force can have life and death implications,
6  right?
7    **A. Yes, sir.**
8    Q. And that those decisions can be difficult to
9  make in your job, right?
10   **A. At times, yes, sir.**
11   Q. Sometimes you need to make those decisions very
12 quickly, within seconds or even split seconds, correct?
13   **A. It's safe to say, yes.**
14   Q. Yeah.
15   And you've been taught about that and how to make
16 those decisions in a way that are reasonable and lawful,
17 even in a very short amount of time, right?
18   MR. ANDRADA:  Objection.  Vague and ambiguous,
19 overly broad.
20   But you can go ahead.
21   THE WITNESS:  Yes, we're taught -- yes.
22   MR. HADDAD:  Q.  Even if you need to make a
23 split-second decision about the type or level of force to
24 use, your department expects that you will make a lawful
25 decision, right?

DEPOSITION OF DEPUTY MATTHEW AHLF

25

1    **A. Yes.**
2    Q. And do you think that you have been prepared in
3    order to make those decisions lawfully?
4    **A. Yes.**
5    Q. And you've been trained that there's a number
6    of factors that you should take into account when deciding
7    what kind or how much force to use against a person such
8    as an inmate, right?
9    **A. Yes.**
10   Q. And I'm looking now on Page 3 of this policy,
11   which is Exhibit 1. And under Subsection B-2, it lists a
12   number of considerations that you should consider in
13   deciding what kind of force to use, right?
14   **A. Yes, sir.**
15   Q. And some of the things you've been trained to
16   consider that should affect your decision about force are
17   the age, size, relative strength, skill level, injury or
18   exhaustion, or the number of deputies versus the number of
19   subjects, right?
20   **A. Yes, sir.**
21   Q. Generally in a situation where you have many
22   deputies versus one inmate, that would count in favor of a
23   lower level of force, right?
24   MR. ANDRADA: Objection. Vague and ambiguous,
25   overly broad.

26

1    THE WITNESS: Not all the time, no.
2    MR. HADDAD: Q. But in general --
3    **A. No.**
4    Q. -- when you've got more manpower versus one
5    inmate, doesn't that mean that you may not need to use as
6    much force as if you were just one on one?
7    MR. ANDRADA: Objection. Vague and ambiguous,
8    overbroad, calls for speculation as phrased.
9    THE WITNESS: Not necessarily.
10   MR. HADDAD: Q. And if the inmate is smaller than
11   you or less muscular than you, does that suggest that that
12   might be a reason why you should consider a less forceful
13   option?
14   **A. No.**
15   Q. Now, you've been taught to consider the -- the
16   actions of the inmate when deciding what level of force to
17   use, right?
18   **A. Yes.**
19   Q. And you've been taught to consider whether the
20   inmate is cooperative or whether they're using passive or
21   low-level resistance or whether they're actually using
22   active resistance or being assaultive, right?
23   **A. Right.**
24   Q. And you've been taught in those different
25   levels of conduct by the inmate so that you can make a

27

1    lawful decision about force, right?
2    MR. ANDRADA: Objection. Vague and ambiguous,
3    overly broad.
4    Go ahead.
5    THE WITNESS: Yes.
6    MR. HADDAD: Q. And so you understand what the
7    concept, as your department uses it, of passive or low
8    level of resistance is, right?
9    **A. Say that one more time.**
10   Q. You understand the term, as your department
11   uses it, "passive or low-level resistance"?
12   **A. Yes.**
13   Q. So let's take a look at the bottom of Page 3,
14   Section C-2. There's a definition there for those terms.
15   Do you see that?
16   **A. Yes.**
17   Q. And your department defines passive or
18   low-level resistance as where, quote, "The subject is
19   passive or defensively resists a deputy's authority and
20   direction. This includes verbal and physical cues of
21   noncompliance," unquote, right?
22   **A. Yes.**
23   Q. So there can be situations where an inmate is
24   physically noncompliant, and that would translate into
25   passive or low-level resistance, right?

28

1    MR. ANDRADA: Objection. Vague and ambiguous,
2    overbroad broad.
3    THE WITNESS: State that -- state that one more
4    time. I'm sorry.
5    MR. HADDAD: Please read that back.
6    (Record read as follows:
7        "QUESTION: So there can be
8        situations where an inmate is physically
9        noncompliant, and that would translate into
10       passive or low-level resistance, right?")
11   MR. ANDRADA: Same objections --
12   THE WITNESS: I would say --
13   MR. ANDRADA: -- but go ahead.
14   THE WITNESS: -- there are certain situations, yes,
15   but not all the time.
16   MR. HADDAD: Q. Okay. Now, in response to passive
17   or low-level resistance, your department sometimes uses a
18   use-of-force continuum, and I'm just going to show you
19   mine.
20   Do you see that?
21   **A. Yes.**
22   Q. You've seen that before, right?
23   **A. Yes, sir.**
24   Q. And when you're facing passive or low-level
25   resistance from an inmate, you're allowed to use any of

7 (Pages 25 to 28)

DEPOSITION OF DEPUTY MATTHEW AHLF

29

1  the following techniques, including joint manipulation,
2  pressure-point application, unarmed strikes, and takedown
3  techniques.  Is that right?
4      **A. Correct.**
5      Q. That's in addition to your professional
6  presence or verbalization or restraints or handcuffs,
7  right?
8      **A. Correct.**
9      MR. ANDRADA: I just want to indicate for the
10  record, the document counsel showed the witness, counsel's
11  copy, which is in the binder, which is in the binder of
12  counsel, but the document is, in fact, part of Exhibit 1.
13      MR. HADDAD: Oh, good.  Okay.  I didn't notice
14  that.  Good.  So that's Bates No. 243.
15      MR. BURRIS: 243.
16      MR. HADDAD: Q.  Now, the next level of force up
17  from the force you're allowed to use for passive or
18  low-level resistance is called "intermediate force,"
19  right?
20      **A. Yes, sir.**
21      Q. And that includes things like Tasers, right?
22      **A. Yes, sir.**
23      Q. Or carotid restraints, right?
24      **A. Yes, sir.**
25      Q. And in order to permissibly use intermediate

30

1  force, you need to be facing active resistance or actual
2  assaultive behavior, right?
3      **A. Yes.  Usually, yes.**
4      Q. Is there any exception where you're -- for
5  instance, are you allowed to use a Taser in response to
6  mere passive or low-level resistance?
7      MR. ANDRADA: Objection.  Vague and ambiguous,
8  overly broad.
9      Go ahead if you can.
10      THE WITNESS: Typically, no.  What I've -- my
11  experience is there's a lot of factors with that.  We look
12  at size of the person, compliance of that person if you're
13  by yourself.  And trying to get voluntary compliance from
14  somebody, you look at if he's 100 pounds heavier than me,
15  a lot bigger than me.  When I look at compliance
16  techniques, those might not be effective.  I mean, if I'm
17  by myself, I may not be able to effectively handle
18  somebody.  So depending on the situation, typically, I'll
19  say no.  Active resistance is where you're going to need
20  immediate action.  However, there are times when you need
21  to take the totalities of the situation and make a
22  judgment call.
23      MR. HADDAD: Q.  Okay.  I think I understand what
24  you're saying, but let me make sure.
25      So it's your testimony that, in certain situations

31

1  where you might be one on one with an inmate, the inmate
2  may be larger than you, or there could be other factors
3  where it's your belief that a Taser would be an
4  appropriate and lawful use of force in response to passive
5  or low-level resistance.  Is that right?
6      **A. Passive, low-level, no.  I'll just say it's**
7  **safe to say that some immediate force should have some**
8  **sort of active resistance.**
9      Q. And that's what your department's policy says,
10  right?
11      **A. Yes, sir.**
12      Q. Have you been trained in carotid restraints?
13      **A. Yes, sir.**
14      Q. Sometimes your department refers to those as
15  "bilateral vascular neck restraint," right?
16      **A. The term I'm familiar with is "carotid."**
17      Q. Okay.  Can you describe for us what is a
18  carotid restraint?
19      **A. It's where you've -- you're cutting off the**
20  **oxygen of the carotid arteries.  Basically, it causes the**
21  **oxygen level to cease to go to the brain, which causes the**
22  **person to become unconscious for a brief period of time.**
23      Q. How do you do a carotid restraint?
24      **A. I've never done one.  We practice it.  You**
25  **go -- you put your arm around somebody's neck, get the**

32

1  **crux of your arm into their carotid area and wrap that arm**
2  **around, your biceps area, and hold it in place and apply**
3  **minimal pressure until that person becomes non- --**
4  **becomes -- I guess you want to call it not a threat**
5  **anymore.  He basically loses consciousness.**
6      Q. Have you been trained that if you were to do a
7  carotid restraint on somebody, that that could cause
8  bruising on the neck?
9      **A. Yes.**
10      Q. Have you been trained that if you do an
11  improper carotid restraint, it can cause serious injury to
12  the person?
13      **A. Yes.**
14      Q. And if you do do a carotid restraint, you're
15  required to document that and explain it for your
16  department, right?
17      **A. Yes.**
18      Q. Your department considers that to be a serious
19  use of force, correct?
20      MR. ANDRADA: Objection.  Vague and ambiguous,
21  overly broad.
22      Go ahead.
23      THE WITNESS: Due to the factors listed underneath
24  the intermediate force level, yes, I would assume that
25  they would deem that serious.

DEPOSITION OF DEPUTY MATTHEW AHLF

---

33

1    MR. HADDAD:  Q.  All right.  Now, you've also been
2    trained in the use of the Taser X26, right?
3    **A. Yes.**
4    Q. When did you get that training?
5    **A. I don't recall the first time I received that.**
6    **I don't recall the year that happened.  Approximate --**
7    **maybe 2008?  I don't know.  It's been a while.**
8    Q. Before the Harrison incident, how many times
9    had you used a Taser against an inmate?
10   **A. Once.**
11   Q. When was that?
12   MR. ANDRADA:  And I think he just wants
13   approximate.
14   THE WITNESS:  Approximate 2008, 2009, sometime
15   around that area.
16   MR. HADDAD:  Q.  And on that occasion, how many
17   discharges of the Taser did you do?
18   **A. One.**
19   Q. Did your department find that to be an
20   appropriate use of force at that time?
21   **A. Yes.**
22   Q. Now, your department has a policy about Taser,
23   right?
24   **A. Yes.**
25   Q. Just for the record, I'm looking at Bates

---

34

1    No. 253, the Taser policy.  It's not part of that exhibit
2    that I gave you.
3    **A. Okay.**
4    Q. But basically you're required to know and
5    follow the Taser policy whenever you use a Taser, right?
6    **A. Yes, sir.**
7    Q. And you're only allowed to use a Taser without
8    prior approval in cases where you're facing a threat that
9    is imminent.  Is that right?
10   MR. ANDRADA:  Objection.  Vague and ambiguous,
11   overly broad.
12   THE WITNESS:  Can you rephrase that question?
13   MR. HADDAD:  Q.  Your department says you're only
14   allowed to use a Taser in a situation where you're facing
15   an imminent threat, right?
16   **A. Yes.**
17   Q. And what's your understanding of the word
18   "imminent" in that context?
19   **A. "Imminent" meaning I have to wait for an**
20   **active -- I have to wait for an active either movement or**
21   **I have to wait for an active actual threat.**
22   Q. Not a potential threat, right?
23   **A. Correct.**
24   Q. You have to be facing an actual threat at that
25   moment, correct?

---

35

1    **A. Correct.**
2    Q. And you're required to give a warning to the
3    person before tasing them, right?
4    **A. Correct.**
5    Q. And one of the reasons you're required to give
6    a warning is because that gives the person reasonable
7    opportunity to voluntarily comply, correct?
8    **A. Yes.**
9    **Can I interrupt real quick?**
10   MR. ANDRADA:  Sure.
11   THE WITNESS:  Going back to the last question -- a
12   couple of questions prior when you asked about only using
13   Taser on actively, there are situations where there's a
14   potential of somebody possibly -- whether or not they're
15   concealing their hands, you don't know what they have;
16   they're noncompliant; they're actively resisting, you
17   know, showing you your hands where you may need to use a
18   Taser.  So I would say that, you know, mostly, yeah, it's
19   active, when someone is actively resisting, but also, at
20   times, it does -- you -- you -- there is a time when
21   there's a potential of injury to himself or people
22   around --
23   MR. HADDAD:  Okay.
24   THE WITNESS:  -- so I wanted to just clarify.
25   MR. HADDAD:  Q.  That's the way you've been

---

36

1    trained?
2    **A. Yes.**
3    Q. And that's the way you've trained other
4    deputies, too?
5    **A. Yes.**
6    Q. So sometimes a person may not show their hands
7    to you when you order them to show their hands, and that
8    could be a situation where you believe you would be
9    justified in using a Taser on them.  Is that right?
10   MR. ANDRADA:  Objection.  Vague and ambiguous,
11   overly broad.
12   THE WITNESS:  I'm not saying that.  I'm saying
13   there are times when you may be in a struggle with
14   somebody and you can't get their hands, so they're not an
15   active threat to you, but because you don't know what they
16   may or may not have, may not -- if you can't get
17   compliance from that person and you followed -- you can't
18   get joint manipulations, you followed the use-of-force
19   matrix to the point of where you have -- where you have an
20   option to -- tasing them would be if he's resisting to the
21   point -- I mean, he's not actively hitting you.  He's not
22   actively, you know, pointing a gun at you or anything like
23   that, but there are times when it may not be -- you know,
24   he running at you, him swinging at you, or pointing a gun
25   at you, but there are times when the situation deems where

---

DEPOSITION OF DEPUTY MATTHEW AHLF

37

1  a Taser is justified.
2      MR. HADDAD:  Q.  Like a situation where they're
3  actively combative and refusing to be handcuffed, right.
4      **A. Correct.**
5      Q. Is that what you're talking about?
6      **A. Yes, sir.**
7      Q. All right.  Have you been trained that one of
8  the factors that you should consider before using a Taser
9  on someone is whether or not you believe they're mentally
10  ill at the time?
11      **A. Yes.**
12      Q. How does that factor in?
13      MR. ANDRADA:  Again, vague and ambiguous.
14  But go ahead.
15      THE WITNESS:  Again, you're noting -- you're --
16  you're taking into consideration when you're in a
17  situation -- you're dealing with that situation the
18  person's capacity to be able to follow the directions,
19  their -- their movements, their gestures, signs and
20  symptoms of just that, you know, the totality of the
21  situation.
22      MR. HADDAD:  Q.  How does a mentally ill person's
23  capacity to follow your directions affect the decisions
24  you make about use of force?
25      MR. ANDRADA:  Again, vague and ambiguous, overly

38

1  broad.
2      But go ahead.
3      THE WITNESS:  For me, it causes me to look at the
4  safety of that person, look at the safety of myself
5  dealing with this person.  I don't have a lot of
6  experience with -- I deal with -- I've dealt with mental
7  health people in the jail.  But, again, I'm looking at the
8  totalities of the situation, so it's hard to say on that.
9      MR. HADDAD:  Q.  If you're dealing with an inmate
10  in the jail who you -- whom you believe to be mentally ill
11  and you question whether they can understand and follow
12  your commands because of their mental illness, does that
13  make you more likely or less likely to use a Taser on them
14  if they're noncompliant?
15      MR. ANDRADA:  Objection.  Vague and ambiguous,
16  overly broad, calls for speculation.
17      THE WITNESS:  Depends on the situation that you're
18  dealing with.
19      MR. HADDAD:  Q.  Going back to the warnings, your
20  department requires you to document in writing whether or
21  not you gave a warning before you tase a person, right?
22      **A. Yes.**
23      Q. And you're supposed to explain why you gave a
24  warning or why you didn't give a warning, right?
25      **A. Yeah.**

39

1      Q. You've been trained that when you use a Taser,
2  you're only supposed to use it for one standard
3  five-second cycle, right?
4      MR. ANDRADA:  Objection.  Vague and ambiguous,
5  overly broad.
6      Go ahead.
7      THE WITNESS:  Not necessarily.
8      MR. HADDAD:  Q.  Can you explain that, what you've
9  been trained about how many cycles of a Taser you're
10  allowed to do?
11      MR. ANDRADA:  Objection.  Vague and ambiguous as to
12  what you mean by "allowed."
13      But go ahead.
14      THE WITNESS:  Trained that, typically, what they
15  recommend is no more than three, unless exigent
16  circumstances.
17      MR. HADDAD:  Q.  And who trained you that?
18      **A. Department.**
19      Q. What's the reason that was explained to you in
20  your training about why you should avoid more than three
21  Taser cycles unless exigent circumstances?
22      **A. I don't recall on that.  It's been a while.**
23      Q. Haven't you been trained that subjecting a
24  person to multiple Taser cycles could be dangerous to the
25  person?

40

1      MR. ANDRADA:  Objection.  Vague and ambiguous,
2  overly broad.
3      But go ahead.
4      THE WITNESS:  It could, but not in normal
5  situations.
6      MR. HADDAD:  Q.  But there's a risk to a person the
7  more cycles of a Taser that they endure, correct?
8      MR. ANDRADA:  Objection.  Vague and ambiguous,
9  overly broad.
10      THE WITNESS:  I don't have an answer for that.
11      MR. HADDAD:  Q.  Have you been trained that,
12  whenever possible, you should avoid using a Taser to
13  subdue a person who has been subjected to a Taser within
14  the last 24 hours?
15      **A. That -- I don't recall that.**
16      MR. HADDAD:  Is this a good time for five minutes?
17  We've been going for about an hour.
18      MR. HADDAD:  Okay.  Sure.
19      (Recess taken from 1:56 p.m. to 2:06 p.m.)
20      (Ms. Ly does not return.)
21      MR. HADDAD:  Back on the record.
22      Q. Let me just show you something.  This was
23  produced by the County in this case, and it's Bates
24  No. 503, and I'll just show it to you.  It's some
25  guidelines and warnings from the Taser company.

10  (Pages 37 to 40)

DEPOSITION OF DEPUTY MATTHEW AHLF

---

41

1      Have you ever seen those kinds of things in
2   connection with any training that you've gotten about
3   Taser?
4      MR. ANDRADA: Objection. Vague and ambiguous,
5   overly broad.
6      But go ahead.
7      THE WITNESS: No, sir. I don't recall seeing it.
8      MR. HADDAD: Q. Now, one of the things Taser
9   company warns is that you should minimize repeated,
10  continuous, or simultaneous Taser exposures.
11     Have you ever been trained about that?
12     **A. As far as -- rephrase that question for me.**
13     Q. Have you ever been trained in connection with
14  Taser that you should minimize repeated, continuous, or
15  simultaneous Taser exposures on another person?
16     **A. We train that that's the goal, to use it only**
17  **once.**
18     Q. Okay. And have you been trained that if you
19  use repeated, continuous, or simultaneous exposures, it
20  can present a health risk for the person being tased?
21     **A. Yes.**
22     Q. And what have you been trained can be health
23  risks to a person if you use the Taser repeatedly,
24  continuously, or simultaneously with another Taser?
25     MR. ANDRADA: Objection. Vague and ambiguous,

---

42

1   overly broad.
2      Go ahead if you can.
3      THE WITNESS: It's been a long time. I don't
4   recall specific things, specific conditions that can
5   happen.
6      MR. HADDAD: Q. Okay. Have you been trained that
7   using the Taser on somebody who is having the effects of
8   drug or alcohol withdrawal or is in an agitated or excited
9   psychiatric state can cause problems for a person like
10  that?
11     MR. ANDRADA: Objection. Vague and ambiguous,
12  overly broad.
13     THE WITNESS: I don't recall.
14     MR. HADDAD: Q. When you went through Taser
15  training, did you have the option to get tased yourself?
16     **A. No.**
17     Q. They didn't allow deputies to experience what a
18  Taser was like?
19     **A. No, sir.**
20     Q. Have you ever experienced being tased?
21     **A. No, sir.**
22     Q. Have you ever wanted to?
23     MR. ANDRADA: Objection. Vague and ambiguous,
24  overly broad.
25     THE WITNESS: I don't think anybody ever wants to.

---

43

1      MR. HADDAD: Q. It's meant to be extremely
2   painful, right?
3      MR. ANDRADA: Objection -- excuse me.
4      Objection. Vague and ambiguous, overly broad.
5      THE WITNESS: Yes, I guess.
6      MR. HADDAD: Q. That's what you've been trained,
7   right?
8      **A. It's -- in terms of being painful? Not that --**
9   **we haven't been trained, "Oh, it's absolutely painful." I**
10  **can't say that because I don't know anybody that's told**
11  **me, "Oh, I've been tased, and, yeah, it hurts." I can't**
12  **answer that.**
13     Q. You've been trained that tasing a person can
14  cause them to become really escalated in their actions
15  and -- and agitated, right?
16     MR. ANDRADA: Objection. Vague and ambiguous,
17  overly broad.
18     Go ahead.
19     THE WITNESS: Clarify what you're asking.
20     MR. HADDAD: Q. Have you been trained that if you
21  were to use a Taser on a person who is mentally ill, it
22  can cause them to become very aggravated and aggressive?
23     MR. ANDRADA: Same objections.
24     But go ahead.
25     THE WITNESS: No, not at all times. No, not

---

44

1   necessarily.
2      MR. HADDAD: Q. Is it a person's -- isn't the fact
3   that a person is mentally ill -- doesn't that increase the
4   chances that tasing will cause them to be aggressive?
5      MR. ANDRADA: Objection. Vague and ambiguous,
6   overly broad.
7      THE WITNESS: I can't answer that.
8      MR. HADDAD: Q. You don't know?
9      **A. I don't know.**
10     Q. Now, the Taser X26 that you were using in the
11  Harrison incident, if you just pull the trigger once and
12  let go, it cycles for five seconds, right?
13     **A. Yes.**
14     Q. Every time you pull the trigger and release it,
15  you get another five-second cycle, correct?
16     **A. Correct.**
17     Q. Your department has policies about how to
18  respond to persons with mental disorders, right?
19     MR. ANDRADA: Objection. Vague and ambiguous.
20     Go ahead.
21     THE WITNESS: Yes.
22     MR. HADDAD: Q. And you understood, before the
23  Harrison incident, that persons affected by mental
24  disorder can be unpredictable and sometimes violent?
25     **A. Yes.**

---

Crangle Reporting Services (510) 653-1312

DEPOSITION OF DEPUTY MATTHEW AHLF

45

1    Q. And that when dealing with someone with a
2  mental disorder, you've been trained that you should
3  attempt to communicate with the person and avoid
4  aggravating the situation, right?
5    **A. Yeah.**
6    Q. And one of the things that you should do
7  because of the unpredictable nature of a person with a
8  mental disorder is have backup available if you need to go
9  hands-on with them, right?
10    MR. ANDRADA:  Objection.  Vague and ambiguous --
11    THE WITNESS:  Not always.
12    MR. ANDRADA:  -- overly broad.
13    Go ahead.
14    THE WITNESS:  Not always.
15    MR. HADDAD:  Q.  Do you recall your POST training
16  about persons with disabilities?
17    **A. I recall having training.  Do I recall**
18  **everything that was taught?  That was almost six and a**
19  **half years ago, so I don't remember everything.**
20    Q. All right.  Well, let me just show you this.  I
21  only have one copy, but I'll show it to you.  This is a
22  copy of a portion of a POST Learning Domain, No. 37,
23  dealing with persons with disabilities.
24    Do you see what I'm showing you?
25    **A. Yes.**

46

1    Q. You were given learning domains just like this
2  one when you went through your POST training, right?
3    **A. Correct.**
4    Q. In fact, you received Learning Domain 37 in
5  your training, didn't you?
6    **A. Yes, I did.**
7    Q. And that learning domain deals with how you
8  should handle contacts and interactions with someone who
9  has mental illness, right?
10    **A. Yes.  We went over that.**
11    Q. Okay.  Let me just show you pages 4-12 of this
12  learning domain.  And this is a page where POST describes
13  field contacts with persons with mental illness, and it
14  says, "The following table identifies appropriate tactical
15  actions officers should be aware of," and the first action
16  it says is "Request backup."
17    Do you see that?
18    **A. Okay.  Yes.**
19    Q. Do you recall being trained in that, now that
20  I've shown you this?
21    **A. Vaguely, yes.**
22    Q. And the reason that POST trained you that you
23  should request backup when dealing with a mentally ill
24  person is that the situation can be unpredictable and
25  escalate quickly, right?

47

1    **A. Right.**
2    Q. And you've always been taught repeatedly
3  throughout your enforcement career that when dealing with
4  a mentally ill person, it's very important to calm the
5  situation, right?
6    MR. ANDRADA:  Objection.  Vague and ambiguous,
7  overly broad again.
8    Go ahead.
9    THE WITNESS:  Yes.  It's safe to say that you want
10  to try to calm that person down.
11    MR. HADDAD:  Q.  And you want to prevent them from
12  getting aggravated and aggressive, right?
13    MR. ANDRADA:  Objection.  Again, vague and
14  ambiguous.
15    Go ahead.
16    THE WITNESS:  Yeah.  You want to try to keep them
17  calm as much as possible.
18    MR. HADDAD:  Q.  You want to avoid conduct on your
19  part that will escalate the situation and lead to a use of
20  force that might otherwise not be necessary, right?
21    MR. ANDRADA:  Again, vague and ambiguous, overly
22  broad.
23    THE WITNESS:  Can you rephrase that, please, one
24  more time.
25    MR. HADDAD:  Could you read that back.

48

1    (Record read as follows:
2      "QUESTION:  You want to avoid
3      conduct on your part that will escalate the
4      situation and lead to a use of force that
5      might otherwise not be necessary, right?")
6    THE WITNESS:  Yeah, I guess you can say that.
7  You're not trying to escalate the situation.
8    MR. HADDAD:  Q.  If you escalate a situation with a
9  mentally ill person and then they get aggravated and lash
10  out at you and you have to go hands on and use force, that
11  creates a risk for both officer and the mentally ill
12  person, right?
13    **A. I think it's safe to say.**
14    Q. That's not safe for either of you, is it?
15    **A. No, sir.**
16    Q. Now, when you're working in the jail and you
17  determine that an inmate is mentally disordered because
18  they're acting in a bizarre manner or saying things that
19  don't make any sense, what are you supposed to do?
20    MR. ANDRADA:  Objection.  Vague and ambiguous,
21  overly broad, calls for a narrative.
22    Go ahead and answer it if you can.
23    THE WITNESS:  Can you repeat that question one more
24  time.
25    MR. HADDAD:  Q.  In the jail when you're dealing

DEPOSITION OF DEPUTY MATTHEW AHLF

49

1  with an inmate that you decide is mentally disordered
2  because they're acting bizarrely or saying things that
3  just make no sense at all, what are you supposed to do?
4      MR. ANDRADA:  Again, vague and ambiguous, overly
5  broad, call -- may call for a narrative.
6      THE WITNESS:  Ultimately, you want to look at the
7  totality of what -- what's going on, such as where he's
8  placed, what part of the jail he's placed in.  You want to
9  try to isolate that person.  You want to definitely note
10  his -- your observations of that person.  And you're going
11  to want to try to get some sort of mental health worker
12  there to evaluate.
13      MR. HADDAD:  Q.  And, in fact, your department's
14  policy is that when a mentally disordered inmate is
15  identified, he shall be immediately segregated from the
16  rest of the inmate population if needed, right?
17  **A. Yes.**
18      Q.  And that that inmate must be followed up by
19  Criminal Justice Mental Health and/or Prison Health
20  Services, right?
21  **A. Yes, sir.**
22      Q.  And it's the responsibility of staff who
23  suspect a disorder to complete and submit the Mental
24  Health Referral Form, correct?
25  **A. Clarify what you mean by "staff."**

50

1      Q.  Just going by the policy.  Let me show it to
2  you.  This is Bates No. 283.
3      If you identify a person as mentally disordered,
4  it's your responsibility to make sure that you fill out a
5  mental health referral form, right?
6      MR. ANDRADA:  Objection.  Vague and ambiguous,
7  overly broad.
8      Go ahead.
9      THE WITNESS:  I don't recall the deputy in the
10  housing unit having to do that.  I recall a notification,
11  either a call to the CJMH with a verbal referral --
12  typically, in my experience, I didn't have referral forms.
13      MR. HADDAD:  Q.  Was this policy called Mental
14  Health Referral Form, Policy No. 13.12, one of those
15  policies you were required to follow?
16  **A. Yeah, I mean, it's...**
17      Q.  And if this policy says you were required to
18  fill out a Mental Health Referral Form, then you were
19  required to fill it out, right?
20      MR. ANDRADA:  Assumes facts not in evidence.
21      But go ahead.
22      THE WITNESS:  I didn't fill one out.  I let my
23  sergeant know of the referral that needed to be done.
24      MR. HADDAD:  Q.  Let's talk about Martin Harrison.
25  When did you first have any sort of contact or

51

1  information about Martin Harrison?
2  **A. My first contact with Mr. Harrison was the**
3  **night of the 15th, when I arrived to my house.**
4      Q.  And what happened?
5  **A. First time I met him was during pill call,**
6  **evening pill call, and Mr. Harrison came up asking for**
7  **medications.**
8      Q.  About what time was that?
9  **A. Approximately 1800 or so.**
10      Q.  1800, you say?
11  **A. Yes, approximate.**
12      Q.  And that was the first time that you had ever
13  encountered him?
14  **A. Yes.**
15      Q.  Now, when you encounter an inmate for the first
16  time, do you have his intake information available to you
17  so you can find out about any special needs or medical
18  issues that the inmate has?
19      MR. ANDRADA:  Vague and ambiguous as to what you
20  mean by -- I think you used the phrase "intake
21  information."
22      Go ahead.
23      THE WITNESS:  If you can clarify what kind of
24  information you're talking about.
25      MR. HADDAD:  Q.  Well, let me ask you:  What kind

52

1  of information do you have available to you when you first
2  encounter an inmate like Martin Harrison who says he has
3  some sort of medical issue?
4  **A. I have a custody card.  I have -- he's logged**
5  **in the computer as being in custody, and I have his**
6  **classification detail; that when he came in, they**
7  **classified him to be classified minimum, or wherever he**
8  **was at this point.  He was minimum security.**
9      Q.  So when you first encountered Martin Harrison,
10  or shortly thereafter, were you aware that he's an
11  alcoholic?
12  **A. No.**
13      Q.  Did you know that he was an alcohol-dependant
14  person when he came into the jail?
15  **A. No, sir.**
16      Q.  Did you ever learn that while he was still
17  alive?
18  **A. No, sir.**
19      Q.  Was that information available to you?
20      MR. ANDRADA:  Objection.  Vague and ambiguous as to
21  what is meant by "available."
22      But go ahead.
23      THE WITNESS:  The only way, typically, that I could
24  find out medical information is by calling the charge
25  nurse and having his file pulled.

13 (Pages 49 to 52)

DEPOSITION OF DEPUTY MATTHEW AHLF

53

1    MR. HADDAD:  Q.  When you first encountered Martin
2  Harrison, or shortly thereafter, did you have any
3  information that he had any special medical or psychiatric
4  needs?
5    **A. No, sir.**
6    Q.  So tell me the rest of the -- the rest of this
7  interaction that you had with him.  Anything else?
8    **A. He asked for medications.  The nurse went**
9  **through her book.  Didn't find any medications that were**
10 **prescribed for him.  There was no chart for him, nothing,**
11 **and I issued him a sit call slip.**
12   Q.  What did you tell him?
13   **A. I said, "Fill out this and you can turn it back**
14 **in and I can give it -- provide it to the nurse for**
15 **follow-up."**
16   Q.  How was his demeanor at that time?
17   **A. He said, "Okay."**
18   Q.  Did there seem like anything off or unusual
19 about him?
20   **A. His demeanor was, I would describe, as somebody**
21 **who may have been first time in jail, kind of maybe lost a**
22 **little bit.  Didn't know where he kind of fit in.  Wasn't,**
23 **you know, hanging around any other inmates.  He stood in**
24 **line, asked for medications, and there wasn't any, and I**
25 **handed him a referral form or sit call slip, asked him to**

54

1  **fill it out and went on to the next person.**
2    Q.  Did he say anything about what medication he
3  wanted or why he wanted it?
4    **A. I don't recall.**
5    Q.  Did you write anything down about that?
6    **A. No, I did not.**
7    Q.  So what's the next information or interaction
8  that you had with him?
9    **A. Next interaction with him was the following**
10 **morning.**
11   Q.  About when was that?
12   **A. Approximately 3:30.**
13   Q.  So that would have been about 3:30 a.m. of
14 August 16th?
15   **A. Yes, sir.**
16   Q.  And what happened then?
17   **A. During --**
18   MR. ANDRADA:  Well, calls for a narrative.
19   But tell him a little bit, but then we got to have
20 the question and answer.  So give him a little bit of
21 information and he can follow-up.
22   THE WITNESS:  I conducted the morning pill call
23 for --
24   MR. BURRIS:  I'm sorry.  What?
25   THE WITNESS:  Morning pill call for inmates going

55

1  to court that day.
2    And Mr. Harrison came out asking for his medication
3  again.
4    MR. HADDAD:  Q.  So this was the second time he'd
5  asked you for medication, right?
6    **A. Yes, sir.**
7    Q.  And the first time you were aware that the
8  nurse looked into it and didn't find any medication,
9  right?
10   **A. Yes.**
11   Q.  What happened this next time he asked you for
12 medication?
13   **A. I asked the nurse who was there, "Is he on your**
14 **list?"  Typically the list nurse in the 3:30 in the**
15 **morning have the list of people that are going to court,**
16 **so they are doing insulin checks; they are doing the**
17 **medication, so they are getting them before they go to**
18 **court.  And usually it's a much smaller list than what we**
19 **have in the housing unit.  I don't recall how many people**
20 **are on the list, but, typically, it could be up to 10, 15**
21 **people.**
22   **And I told Mr. Harrison that -- that -- I asked if**
23 **he turned in his medical slip.  I don't recall his answer,**
24 **but I told him that I still didn't have any medication for**
25 **him because these are medication for people going to the**

56

1  **court, and we're doing checks and making sure everybody**
2  **was okay.**
3    Q.  Did you ask him what kind of medication he
4  thought he needed?
5    **A. No.**
6    Q.  And how was his demeanor at that time?
7    **A. Again, kind of still remained -- seemed a**
8  **little lost.  I recall there wasn't much change in his**
9  **mannerism.  Again, he -- my observation of him would have**
10 **been the act of somebody that had -- again, new in jail,**
11 **doesn't know what to expect, is kind of lost.**
12   Q.  Can you recall anything else about your
13 interaction with him at 3:30 in the morning?
14   **A. No.  I told him to go ahead and go back to his**
15 **pod and we're going to start eating breakfast soon.**
16   Q.  So what's your next interaction with him?
17   **A. That would be approximately -- it was after**
18 **I -- actually, the pill call, that 3:30 pill call.  I**
19 **don't know exact what time, but I was advised by my**
20 **technician to respond to Lower D Pod for an inmate who --**
21 **to check on an inmate.**
22   Q.  Then what happened?
23   **A. I responded to Lower D Pod to check on the**
24 **inmate.**
25   Q.  Which inmate?  Was it Harrison or someone else?

DEPOSITION OF DEPUTY MATTHEW AHLF

57

1    A. It ended up -- well, by the time I got there
2 and found out what was going on, I found it to be
3 Harrison.
4    Q. What did you find there?
5    A. I had several inmates that told me that
6 Mr. Harrison was acting bizarrely; that he needed to be
7 moved out of the pod.
8    Q. Specifically, what did you learn from them?
9    A. Mr. Harrison asked me why there was a bunch of
10 women in his house.
11    Q. What else can you recall?
12    A. I recall the inmates asking me if he could --
13 to take him out of the pod, which I deemed that was an
14 appropriate action.
15    Q. Okay. So at that time, you determined that he
16 didn't even know where he was, right?
17    MR. ANDRADA: Well, objection. Vague and
18 ambiguous. I think it misstates his testimony. You can
19 ask him that question.
20    THE WITNESS: I'm not going to -- I can't say that
21 he absolutely didn't know where he was. He just -- the
22 statements he was making, I felt, was not -- were not
23 statements of somebody that needed to be in -- that --
24 that should be in minimum security at that point with
25 multiple other people.

58

1    MR. HADDAD: Q. So why did you remove him from the
2 pod?
3    A. For his safety and the safety of the other
4 inmates.
5    Q. Specifically, what was your concern about
6 Martin Harrison's safety at that time?
7    A. He was displaying actions that were bizarre.
8 Verbal -- I'm sorry, not actions, but he was -- made
9 verbal statements that were bizarre, out of the ordinary.
10    At this time, I didn't know what to think of that.
11 I just knew that it wasn't -- past practices also have led
12 me to -- if I do nothing, then is there -- is there a
13 chance that, because of his actions or because of the
14 things he says, is he in danger of himself or is he in
15 danger of somebody else.
16    Q. Yeah, but, specifically, what were you
17 concerned about? How could he be in danger?
18    A. Well, when you're in -- making bizarre
19 statements around 28 other gentlemen from different walks
20 of life, you know, asking why there's women, that's not
21 normal, causing me to believe that, okay, at that point,
22 there's something going on.
23    Q. So you also determined that he could be a
24 danger to the other guys, right?
25    A. Working in a minimum house, yes.

59

1    Q. So you determined, at that point, that he was a
2 danger to himself or others, correct?
3    A. Potentially, yes.
4    Q. Do you remember giving an interview to
5 Sergeant Dudek about four or five hours after this
6 incident happened? Not this incident, but the altercation
7 with Mr. Harrison?
8    A. Yes.
9    Q. And that was tape-recorded. Do you remember
10 that?
11    A. Yes.
12    Q. Have you had a chance to listen to that
13 recording?
14    A. I have not listened to it, no.
15    Q. Do you have a transcript of it?
16    A. I have a transcript, I think, in the report,
17 and I briefly went over that.
18    Q. So I also -- I listened to it and I -- and I
19 had a transcript made for me to help me follow it. So let
20 me just ask you about what I heard and see if you recall
21 that or if it sounds accurate to you.
22    So tell me if this is accurate. What I heard you
23 say was, "I was supervising the insulin checks, and he,
24 Harrison, told me, 'It's kind of weird. It's kind of
25 weird how you guys brought me here to my apartment, and

60

1 when I got here, I was greeted by a bunch of females with
2 wristbands on.'"
3    Do you recall him saying something like that to
4 you?
5    A. I remember him saying vaguely something like
6 that, but I don't recall if it was in the nurse's room or
7 if it was in the pod. That sounds familiar from what he
8 told me in the pod.
9    Q. Okay. And in your interview with
10 Sergeant Dudek, you explained -- I heard you say, "And at
11 that point, it really caught me off guard. I was like,
12 okay, something is with this guy. And I asked him, you
13 know, 'Hey, when did you come in?' And he says, 'Well,
14 you guys brought me to my house. You guys -- you guys
15 came here, brought me to my house, and I was greeted by
16 all these ladies.'"
17    Does that sound accurate?
18    A. Vaguely.
19    Q. You summed it up for Sergeant Dudek that, at
20 that point, it was your conclusion that he didn't know
21 where he was. He thought he was at his apartment.
22    Does that sound accurate?
23    A. Yes.
24    Q. So he didn't even know he was in jail at the
25 time, according to your perception of things, right?

DEPOSITION OF DEPUTY MATTHEW AHLF

61

1    A. Yeah, I think it's safe to say that.
2    Q. So when you removed him from the D pod, where
3    did you take him?
4    A. I took him to the East Isolation Center.
5    Q. And then what happened?
6    MR. ANDRADA:  Well, okay.  You can tell him
7    briefly, but, again, I don't want a long narrative.
8    He's -- it's appropriate to ask questions and give
9    answers, so give him -- give him an answer.
10    THE WITNESS:  I walked him to the East Isolation
11    Cell and I placed him in there.
12    MR. HADDAD:  Q.  And did you stop and take him to a
13    nurse or anything along the way?
14    A. No, I did not.
15    Q. You mentioned that he might have said some
16    irrational or bizarre things to you at the nurses'
17    station.
18    At what point in time are you talking about being
19    at the nurses' station with him?
20    A. That would have been during the pill call.
21    Q. The 3:30 a.m. pill call or after?
22    A. The 3:30, because I wasn't there for the a.m.,
23    for the one after.
24    Q. So, previously, I asked you about the 3:30 a.m.
25    pill call, and you didn't mention that he was saying

62

1    anything bizarre at that time.
2    A. The only thing bizarre he told me was in the
3    pod.  I don't recall anything inside the -- I don't recall
4    him saying anything like that.  I recall him saying that
5    in the pod.
6    Q. All right.  All right.  So when you took him to
7    the isolation cell shortly after 3:30 a.m., after you had
8    encountered him in the pod again, by then you had
9    determined that he was an inmate with a mental disorder,
10    correct?
11    MR. ANDRADA:  Objection.  Vague and ambiguous,
12    assumes facts not in evidence.
13    But go ahead.
14    THE WITNESS:  I can't say mental disorder.  I would
15    say that there was definitely something off with him.  I'm
16    not a clinician.  I can't say, yeah, he had a mental
17    disorder.
18    MR. HADDAD:  Q.  You're trained to make that
19    determination, aren't you?
20    A. I'm trained to note observations and remove
21    somebody if there is a -- somebody that's displaying that,
22    but I'm not a clinician.  I can't diagnose somebody.
23    Q. You don't have to diagnose the cause of his
24    mental disorder, but you are supposed to be able to
25    recognize if he has some sort of disorder, right?

63

1    MR. ANDRADA:  The question is compound.  It's vague
2    and ambiguous, argumentative as phrased.
3    Go ahead if you can.
4    THE WITNESS:  I'm trained to note observations, and
5    if I feel that he is -- if the person that I'm dealing
6    with is in a position where he could either be harmed or
7    harm other people, then I determine whether or not to
8    remove somebody from that situation.  At that point I did.
9    MR. HADDAD:  Q.  And did that trigger certain
10    obligations on your part?
11    MR. ANDRADA:  Objection.  Vague and ambiguous.
12    THE WITNESS:  As far as putting him in the
13    isolation cell?
14    MR. HADDAD:  Yes.
15    THE WITNESS:  Yes.
16    MR. HADDAD:  Q.  What?
17    A. Notified my supervisor and placed an entry in
18    the observation log, stating his log-in times of him being
19    there and what he's doing in there.  And, if feasible,
20    notify a mental health worker.
21    Q. Okay.  So did you start a mental health
22    observation log?
23    A. Yes, I did.
24    Q. In fact, you've trained other deputies about
25    such logs, right?

64

1    A. Yes, sir.
2    MR. HADDAD:  Next exhibit.
3    (Plaintiffs' Exhibit 2 was marked for
4    identification.)
5    MR. HADDAD:  I've marked, as Exhibit 2, the mental
6    health observation log that you started for Mr. Harrison?
7    A. Yes.
8    Q. And the first entry in the far left is at
9    4:20 a.m.
10    Are those your initials?
11    A. Yes, it is.
12    Q. So there's a space for remark codes next to it.
13    Do you see?
14    A. Yes.
15    Q. And you're supposed to put one of those numbers
16    in that's defined in the -- just above the double line
17    near the top, right?
18    A. Yes.
19    Q. And those kind of describe what the inmate is
20    doing when you look in there, right?
21    A. Yes.
22    Q. So have you been trained about why you're
23    supposed to fill in the remark codes to describe the
24    inmate's behavior when you observe them?
25    A. Yes.

16 (Pages 61 to 64)

DEPOSITION OF DEPUTY MATTHEW AHLF

65

1    Q. And why?

2    **A. For anybody else that comes up from mental**

3    **health that may come in.  Anybody that looks at this, they**

4    **can see what the person is doing in the course of the day,**

5    **in the course of the hours, minutes.**

6    Q. And all of this is -- all of these observations

7    listed on here are while Martin Harrison was in that

8    isolation cell by himself, correct?

9    **A. Yes.**

10    Q. So when -- when someone listed code -- Remark

11    Code No. 3, that refers to talking, right?

12    **A. Correct.**

13    Q. So he'd be talking to himself, right?

14    MR. ANDRADA:  That misstates the document, assumes

15    facts not in evidence, calls for this witness to

16    speculate.

17    So I'm not going to let him answer that question.

18    You can rephrase it.

19    MR. HADDAD:  Q.  Who would he be talking to in an

20    isolation cell?

21    **A. Possibly another deputy.**

22    Q. Now, your initials are by the first three

23    entries, from 4:20, 4:38, and 4:45 on August 16th, yet

24    there's no remark code.

25    Why is that?

66

1    **A. I can't answer that because I don't know why**

2    **there's none.**

3    Q. You're supposed to have filled it in, right?

4    **A. Yes.**

5    Q. Now, your initials are also on the last entries

6    on this page, starting from time 1715 through 1848.

7    Do you see that?

8    **A. Yesterday.**

9    Q. I count seven entries with your initials, and

10    all of them have the remark code 8 next to them, which

11    means awake in bed, correct?

12    **A. Yes.**

13    Q. Did you fill out all of those remark codes by

14    that series of observations?

15    **A. Yes.**

16    Q. As you made the observations?

17    **A. Yes.**

18    Q. Did Sergeant Dudek present this to you in the

19    hospital about five hours after the altercation and point

20    out to you that you had failed to fill in a number of

21    entries and had you fill them in after the fact?

22    **A. That I don't recall.**

23    Q. Would that have been proper procedure?

24    **A. Filling in after the fact?**

25    Q. Right.

67

1    **A. No.  You're supposed to fill them in as you do**

2    **it.**

3    Q. That's how someone can -- some supervisor can

4    tell that you're actually making the observation that you

5    say you're making, right?

6    **A. Yes.**

7    Q. Now, for the times starting at 1803, you listed

8    four different times when you observed Martin Harrison in

9    the isolation cell, right?

10    **A. Yes.**

11    Q. How did you observe him those times?  Open the

12    door? through a window?

13    **A. Through a window.**

14    Q. And is the window big enough to see pretty much

15    the whole cell?

16    **A. Yeah. I mean, it's a small window.  It's**

17    **narrow.**

18    Q. So for the exact times that you wrote 1803,

19    1816, 1832, and 1848, are those all the exact times that

20    you made the observation of Martin Harrison?

21    **A. Yes.  To the best of my recollection, yes.**

22    Q. And if he had been screaming for assistance, is

23    that something that you should have noted in the remark

24    code?

25    **A. Yeah, I mean, I could.  I didn't.  But, yeah, I**

68

1    would assume that you put that.

2    Q. And if he had been flooding his cell, is that

3    something that you should note in the remark code or

4    somewhere -- somewhere else?

5    **A. Yeah.  You can use -- yeah, you could say that.**

6    Q. Let me put it this way:  If at 1848, when you

7    looked in and observed him, you saw that he was in the

8    process of flooding his cell, is that something that you

9    should have noted at that time?

10    **A. If he was in the act of doing it, yeah.**

11    Q. That would require some sort of action on your

12    part, right?

13    **A. Yeah.  I mean, not necessarily -- I mean, yeah,**

14    **you would take notice of that.  But you can -- yeah, I**

15    **guess you would say you would want to at least note it.**

16    Q. Have you had inmates flood their cells before?

17    **A. Yes.**

18    Q. And, typically, what has been your response

19    when you found that an inmate was flooding his cell?

20    MR. ANDRADA:  Objection.  Vague and ambiguous,

21    overly broad.

22    Go ahead if you can.

23    THE WITNESS:  It depends on the situation.  It

24    depends on whether or not they are posing a threat to

25    themselves.  I mean, just because somebody is flooding a

17 (Pages 65 to 68)

69

1  cell doesn't mean I'm going to go in there and get them.
2  So I can't say that.  It depends on the situation.
3      MR. HADDAD:  Q.  Have there been incidents in the
4  past when an inmate has flooded his cell and you've
5  allowed them to just continue flooding?
6      **A. Yeah, until I can -- I have maybe our**
7  **maintenance turn off the water.**
8      Q. At the top of this observation log, someone has
9  filled out the reason that he's there, and it says,
10 "Bizarre behavior, CJMH referral."
11     Do you see that?
12     **A. Yes.**
13     Q. Did you write that?
14     **A. Yes, I did.**
15     Q. It says that this observation was approved by
16 Sergeant Shepard.
17     Do you see that?
18     **A. Yes, I do.**
19     Q. Is that your handwriting too?
20     **A. Yes, it is.**
21     Q. When did Sergeant Shepard approve placing
22 Harrison in his observation cell?
23     **A. When I called him and let him know that I have**
24 **one in a isolation cell due to bizarre behavior, and then**
25 **just letting him know that he was in there, and he said**

70

1  **okay.**
2      Q. Okay.  So what did you do to inform CJMH about
3  Harrison's condition?
4      **A. There was nobody in the mental health office at**
5  **that time, so I notified Sergeant Shepard, who was the**
6  **nighttime sergeant and who was going to be getting off**
7  **shift.  I then called -- shortly after that, I called**
8  **Sergeant Camara, who is the daytime sergeant, and I let**
9  **him know, and he told me he would be following up with**
10 **CJMH.**
11     Q. And just to be clear, you never filled out a
12 Mental Health Referral Form on Mr. Harrison, did you?
13     **A. I don't recall filling one out, no.**
14     Q. So what do you recall observing about Martin
15 Harrison for the rest of your shift when you had first
16 placed him in that observation cell?  So that would be
17 from 4:20 through 4:45.
18     **A. He was --**
19     MR. ANDRADA:  I'm sorry.  Can I have that question
20 back again?
21     MR. HADDAD:  I'll say it again.
22     Mr. Andrada, I'm talking about the first night when
23 he placed him in that cell.
24     MR. ANDRADA:  Got it.  Thank you.  Thank you.
25     MR. HADDAD:  Q.  So what did you observe of

71

1  Mr. Harrison during those first three entries?
2      **A. He was quiet.  He was laying down.  That was**
3  **it.**
4      Q. Is that based on your memory?
5      **A. What I can recall.**
6      Q. Okay.  Did you have any other interaction with
7  Harrison other than what you described at that time when
8  you first put him in the cell?
9      **A. Not that I can recall.**
10     Q. Did you have any other -- strike that.
11     Did you do anything else -- anything else in terms
12 of contacting other people concerning Mr. Harrison around
13 the time that you placed him in the observation cell?
14     MR. ANDRADA:  Other than what he's already told
15 you?
16     MR. HADDAD:  Yeah.
17     MR. ANDRADA:  Okay.  Go ahead.
18     THE WITNESS:  I may have called our classification
19 and let them know that I may have one that -- depending on
20 if they have a room in Housing 9, I may have asked if
21 there was anybody there from CJMH.  I can't recall
22 exactly.  I don't recall if I did that or not.
23     MR. HADDAD:  Q.  Did you do anything else with
24 respect to Harrison before you left your shift for that --
25 that shift?

72

1      **A. Not that I can recall.**
2      Q. While you were off duty, did you do anything in
3  connection with Harrison?
4      **A. No, I did not.**
5      Q. So when you came back on shift, what time was
6  that?
7      **A. It would be 1700 shift.**
8      **Can I take a bathroom break?**
9      MR. HADDAD:  Sure.  Let's take a break.
10     (Recess taken from 2:49 p.m. to 2:57 p.m.)
11     MR. HADDAD:  Q.  So you left your shift, and Martin
12 Harrison was in the isolation cell, and you returned for
13 your next shift on August 16th at about 1700 hours, right?
14     **A. Correct.**
15     Q. So your first entry of observing Martin
16 Harrison was at 1715, and you saw he was awake in bed,
17 correct?
18     **A. Correct.**
19     Q. For those next seven entries that you have on
20 the 16th, can you recall looking in and seeing him doing
21 anything other than just sitting in his bed?
22     **A. Yes.**
23     Q. What else?
24     **A. At one point he was acting really bizarre.**
25     Q. What was he doing?

DEPOSITION OF DEPUTY MATTHEW AHLF

73

1    A. He was yelling.  He was yelling and screaming.
2 He claimed that somebody had a gun and was pointing it at
3 him and he was shooting at him.
4    MR. BURRIS:  He was shooting at him?
5    THE WITNESS:  That -- that the person who had the
6 gun was shooting at him.  And he asked for -- he was just
7 screaming.  He had a mattress over his head.  I could see
8 that -- at that point, that was the first time I noticed
9 that the cell was flooded and there were broken shards of
10 food tray on the floor.
11    MR. HADDAD:  Q.  Did he actually have a shard of
12 the food tray in his hand at that time when you first
13 observed?
14    A. To be honest with you, I can't recall.
15    Q. Okay.  Sometimes inmates break food trays and
16 they can use the sharp pieces as a weapon, right?
17    A. Yes, sir.
18    Q. How was he flooding his cell?
19    A. The cell was already flooded.  I recall he
20 didn't have a blue jail-issued shirt on him.  I wasn't
21 exactly sure how he flooded it.  My guess is -- I'll just
22 stick with that.  I don't know -- I don't recall exactly
23 because he wasn't in the active mode of trying to flood
24 his cell.
25    Q. After the fact, did you learn how he had

74

1 flooded his cell?  What means he had used to do it?
2    A. I don't recall the exact -- I don't recall the
3 exact way or mode that he did that.  My thought was that
4 he used his jail-issued shirt.  But I don't know that
5 100 percent, so.
6    Q. What source of water did he have in there?
7    A. Toilet water.
8    Q. Sink, or anything, too?
9    A. There's a sink.
10    Q. Was the sink running when you looked in there?
11    A. I don't think so.  I don't recall that.
12    Q. All right.  Now, going back to your statement
13 that you gave to Sergeant Dudek after the incident, when I
14 listened to it, I heard you say the following:  "He had
15 his pants on and he had sandals on.  He was standing in
16 about roughly -- I would say about an inch to an inch and
17 a half deep water."
18    Does that sound accurate?
19    A. Yes.
20    Q. You went on in your interview:  "He had
21 shattered his food trays in the cell which caused me some
22 concern because, at that time, I actually -- previously,
23 when I first saw him when he was screaming, I went just to
24 kind of see what was going on.  He actually -- when he was
25 yelling that 'They're coming to get me.  They're going to

75

1 kill me,' he had his mattress over his head, and he was
2 holding, actually, a piece of shattered food tray."
3    Do you recall that now?
4    A. That was two years ago.  I don't recall saying
5 that specifically, but if that's what was recorded, I
6 guess I said that.  I don't recall that.
7    Q. If you said that, you were being truthful at
8 the time, right?
9    A. Yes.
10    Q. You were trying to give an accurate description
11 of what had just happened to your sergeant, right?
12    A. Yes, sir.
13    Q. And so encountering Harrison in that way where
14 he was screaming things, saying people were trying to kill
15 him, flooding his cell, had taken his shirt off, had a
16 mattress over his head, and had broken a food tray that
17 could have been used as a weapon, all of those were things
18 that were a possible threat either to you or to him,
19 right?
20    A. Yeah.  It's safe to say, yes.
21    Q. So what did you do after you looked in the
22 window and observed that scene?
23    MR. ANDRADA:  Arguably calls for a narrative.
24    But go ahead.  Give him a specific answer to the
25 question and he'll follow up.

76

1    THE WITNESS:  I vaguely remember -- I think I asked
2 Mr. Harrison what he was doing.
3    MR. HADDAD:  Q.  How did you speak to him?  Through
4 a door? through a mailbox? or what?
5    A. Through the door.
6    Q. Did you open the door?
7    A. No.
8    Q. What do you mean "through the door"?
9    A. There's a window, long narrow window.  Below
10 the window is a small box that has little vent holes in it
11 that you can talk through to people.
12    Q. There's also a slot in the door that you can
13 handcuff a person through, right?
14    A. Yes, sir.
15    Q. And in order to safely handcuff an inmate who
16 is potentially combative, you can ask him to put their
17 hands through the slot and you can handcuff them while
18 you're safely outside the cell, right?
19    A. Yes, sir.
20    Q. That's the purpose of that thing in the door,
21 right?
22    A. Yes.
23    Q. Can you recall anything else that you or he
24 said to each other at that time?
25    A. I recall asking why he was doing that.  Why he

19 (Pages 73 to 76)

DEPOSITION OF DEPUTY MATTHEW AHLF

77

1  flooded the cell and broke the food tray.  And I recall
2  him saying something to the effect of, "I've been in here
3  all day.  You guys put me here.  What's going on?"
4      Q. How long would it have taken him to flood his
5  cell to a level of an inch to an inch and a half of water?
6      A. Once you get -- I mean, it can take minutes.
7  It doesn't take long.  The space isn't that large.  I
8  don't have an exact answer for you on that.
9      Q. So what happened next?
10      A. After I noted that he had flooded his cell and
11  I asked him why he did that, I asked him, you know, had he
12  been seen yet that day.
13      Q. Meaning by mental health?
14      A. By anybody regarding why he was in there.  And
15  he stated no.  Nobody has come to see him.
16      Q. Did you expect that somebody should have come
17  to see him by then?
18      A. Absolutely.
19      Q. Why?
20      A. Because when I, you know, place a -- when I
21  place somebody in isolation cell due to bizarre behavior
22  and I let my sergeant know that a referral needs to be
23  made, I expect that a referral be made and that person be
24  seen.
25      Q. Okay.  And does the jail have a rule that the

78

1  person is supposed to be seen very shortly after the
2  placement in the observation cell?
3      MR. ANDRADA:  Objection.  Vague and ambiguous as to
4  what is meant by "very shortly."
5      Go ahead.
6      THE WITNESS:  I don't recall.  I don't know of a
7  specific time limit.
8      MR. HADDAD:  Q.  So why did you have the
9  expectation that he should have been seen by someone by
10  the time you came back on shift at 1700 hours?
11      A. We're talking over 12 hours of someone sitting
12  in one cell and him being monitored by several other
13  deputies.  At some point I would have expected that a
14  mental health worker would have been called out.
15      Q. And that's based on your training and
16  experience in the jail, right?
17      A. Yeah.  Yes.
18      Q. And typically in that situation, would a mental
19  health worker have come out sooner to talk to the person
20  in that situation --
21      MR. ANDRADA:  Objection.  Vague and ambiguous --
22      MR. HADDAD:  Q.  -- based on your experience?
23      MR. ANDRADA:  -- as to what is meant by
24  "typically."  There's no foundation that this is a typical
25  situation.

79

1      THE WITNESS:  Depending on severity of the
2  situation, depending on what happens throughout the day
3  for the mental health workers, they have clients that they
4  have to -- inmates that they have to screen and do that
5  also.
6      Can we get that -- repeat that one question,
7  because I lost the train of thought on that one question.
8      MR. HADDAD:  Yeah.
9      Q. Typically in your experience, does mental
10  health come in and check out the prisoner and talk to them
11  within a few hours of their placement in an isolation
12  cell?
13      MR. ANDRADA:  Objection.  Vague and ambiguous,
14  overly broad, "typical" and "a few hours."
15      Go ahead.
16      THE WITNESS:  It would depend on the situation and
17  demeanor of that inmate.
18      MR. HADDAD:  Q.  What usually happens in the jail,
19  based on your experience?
20      MR. ANDRADA:  Objection.  Vague and ambiguous.
21  Why don't you rephrase the question.
22      MR. HADDAD:  I don't want to rephrase the question.
23  I'd like an answer to this one.
24      Q. What usually happens in the jail when a person
25  is placed in an observation cell?  How long does it

80

1  usually take mental health to come check on the person?
2      MR. ANDRADA:  Listen to the question and answer the
3  question if you can.
4      THE WITNESS:  One more time again, please.
5      MR. HADDAD:  Q.  Based on your experience, how long
6  does it usually take mental health to come check on a
7  prisoner after the prisoner is placed in
8  isolation/observation cell?
9      MR. ANDRADA:  Okay.  Same objections.  Vague and
10  ambiguous, overly broad, no foundation.
11      Go ahead.
12      THE WITNESS:  Again, like I said prior, it depends
13  on the severity of the situation.  It depends on the
14  availability of a mental health worker.
15      MR. HADDAD:  Q.  So you're not able to give me
16  any -- any typical time?
17      A. I don't have any -- I don't know of any set
18  time that they are absolutely required to be seen.
19      Q. That wasn't the question.
20      The question was:  In your experience, how long
21  does it usually take?  It's a very simple question.
22      A. I --
23      MR. ANDRADA:  You're arguing with him --
24      Hang on.  Hang on.  Stop.
25      You're arguing with him.  He's answered the

20 (Pages 77 to 80)

DEPOSITION OF DEPUTY MATTHEW AHLF

81

1 question, so I'm going to instruct him not to answer
2 because he's already provided you an answer.
3        MR. HADDAD:  All right.  I've refrained from --
4 from pointing this out to you, but you're coaching the
5 witness and you're making improper objections, and you
6 know better, Randy.  And, furthermore, "calls for a
7 narrative" is not a proper deposition objection, so I want
8 you to stop obstructing the deposition, and if you
9 continue, we're going to call a magistrate.
10        MR. ANDRADA:  May I respond?
11        MR. HADDAD:  Sure.
12        MR. ANDRADA:  In my experience, it is an
13 appropriate objection, and I believe I've only instructed
14 him to not answer one question, even though we've been
15 here for three hours or so, and the questions are
16 remarkably broad and vague and ambiguous.  So if we can
17 get some specific questions, I would be most appreciative.
18        MR. BURRIS:  I think we always bicker on this point
19 here.  Those questions have not been vague and ambiguous.
20 That's your objection, but they haven't been, and I think
21 the objection you just made about don't answer the
22 question on that last question, that's not a proper
23 objection basis to tell a person not to answer the
24 question, because it was not about privilege.  It may have
25 been an objection that it was asked and answered, but

82

1 that's not a basis to tell a person not to answer a
2 question.
3        MR. ANDRADA:  Well, he's answered the question, so
4 let's have another question.
5        MR. HADDAD:  Q.  How long does it usually take a
6 person from mental health to come see an inmate after the
7 inmate is placed in an isolation cell --
8        MR. ANDRADA:  Okay.
9        MR. HADDAD:  Q.  -- based on your experience?
10        MR. ANDRADA:  Objection.  Vague and ambiguous,
11 overly broad, no foundation, asked and answered,
12 argumentative, and harassing.
13        But in the interest of time here, Deputy Ahlf, if
14 you can give him an answer, go ahead.
15        THE WITNESS:  Okay.  In my experience, time frame
16 or how long it takes somebody to respond from mental
17 health, it varies on the situation.  It varies on the
18 availability, and it varies on the severity of what you're
19 dealing with.
20        MR. HADDAD:  Q.  All right.  And in the Harrison
21 situation when you came back on shift at 1700 hours, you
22 were surprised that nobody from mental health had come to
23 see Martin Harrison by then, correct?
24        **A. Yes.**
25        Q. Because based on the severity of his situation,

83

1 you expected that to have been done already, correct?
2        **A. Yes.**
3        Q. All right.  So after asking him whether he'd
4 been seen by anybody and he told you no, what happened
5 next?
6        **A. I think I told him something to the effect of,**
7 **"Let me try to call mental health and see if there's**
8 **anybody in the office to try to find out why."**
9        Q. Did you do that?
10        **A. I recall calling CJMH, yes.**
11        Q. What did you -- what was your interaction with
12 CJMH at that point?
13        **A. I spoke to a Megan Hast, who was working at**
14 **that time, and I asked her if she had any reason why he**
15 **had not been seen.**
16        Q. What did she say?
17        **A. She told me something to the effect of that**
18 **she hadn't -- they hadn't gotten to Mr. Harrison because**
19 **with all the other people -- the inmates that they had to**
20 **see and the max then, the mental health inmates, and**
21 **Ad-Seg inmates, that they just hadn't gotten around to it.**
22        Q. Did you make that call to Megan Hast after you
23 had seen his cell flooded and the other scene that you've
24 described?
25        **A. I don't recall if it was before or after.  I**

84

1 **know I made a phone call to her.  I don't recall if it**
2 **was -- because it would strike me as if he had done that**
3 **and then I made a phone call, I would have noted that to**
4 **her also, to say that the situation was more severe than**
5 **what we originally anticipated.**
6        Q. So it's possible that you talked with her
7 before you noticed he flooded his cell, right?
8        **A. It's possible.**
9        Q. What else happened after you noticed he flooded
10 his cell?
11        MR. ANDRADA:  Well, calls for a narrative, vague
12 and ambiguous, overly broad.
13        Can you be more specific?
14        MR. HADDAD:  No.  I want to find out the story for
15 the first time.
16        Q. Go ahead.
17        MR. ANDRADA:  All right.  Answer -- give him --
18 tell him what happened next and let him follow up.
19 Narrative is not an appropriate question.
20        MR. BURRIS:  "What happened next?" is an
21 appropriate question, and I think that's all he's ever
22 said.
23        MR. ANDRADA:  I'm not quite sure that's what he
24 said, so...
25        THE WITNESS:  When I found out -- when I saw that

21 (Pages 81 to 84)

DEPOSITION OF DEPUTY MATTHEW AHLF

85

1  he had flooded his cell -- you're talking about when he
2  flooded and --
3       MR. HADDAD:  Yes.
4       THE WITNESS:  When I saw that he had flooded his
5  cell, again, I asked him why he had done that.  He
6  responded by saying he'd been in there all day.  This was
7  after he was yelling, screaming with the mattress on his
8  head.  And at that point I recall -- or I vaguely remember
9  telling him, you know, "Let me try to get -- find out why
10 you haven't been seen."  But from there, my concern -- I'd
11 already spoken to -- I want to say I had already spoken to
12 Ms. Hast prior to that.
13      MR. HADDAD:  Q.  So did you try to recontact her?
14      **A.  I don't think so, because I recall Ms. Hast**
15 **saying that she was finishing up with her client and that**
16 **she would be out to the housing unit as soon as she can.**
17      Q.  How many other deputies or jail staff were
18 working in that housing unit or near that housing unit at
19 that time?
20      MR. ANDRADA:  Vague and ambiguous as to what you
21 mean by "near that housing unit."
22      Go ahead.
23      THE WITNESS:  At that time -- at that time, I
24 thought I was the only one on the minimum side.
25      MR. HADDAD:  Q.  So that was at about 6:30 p.m. or

86

1  even 7:00 p.m., right?
2       MR. ANDRADA:  Objection.  Vague and ambiguous,
3  compound.
4       MR. BURRIS:  He hadn't even finished his question
5  yet.
6       MR. ANDRADA:  Well, then, we can -- all right.  As
7  a courtesy, we'll back up.  I'll wait for the whole
8  question --
9       MR. HADDAD:  What a waste of time this is.  Let me
10 ask a different question.
11      MR. ANDRADA:  Good.
12      MR. HADDAD:  Q.  What time did you notice that he
13 flooded his cell?
14      **A.  I don't recall an accurate time, to be honest**
15 **with you.**
16      Q.  If you refer to the log, does it help you
17 estimate the time?
18      **A.  Approximately between -- approximately the**
19 **1832-ish, somewhere around there.**
20      Q.  All right.
21      **A.  Approximate.**
22      Q.  All right.  So if you needed help or backup at
23 that point, was there someone you could ask?
24      **A.  I could call for an additional deputy.**
25      Q.  That was available to you in the jail, right?

87

1       **A.  Yes.**
2       Q.  In fact, based on your training and experience,
3  the jail encouraged you to ask for assistance if you were
4  having to deal with a potentially dangerous situation with
5  an inmate alone in a cell, right?
6       **A.  For a noncompliant person, yes.**
7       Q.  Okay.  Now, once you found out from him that he
8  hadn't been seen by mental health, what's the next thing
9  that happened in your interaction with Mr. Harrison?
10      **A.  I recall telling him that there was going to be**
11 **somebody coming out to -- to see him and that I wanted to**
12 **move him because of the situation in the cell.**
13      Q.  You explained to him that you wanted to move
14 him, right?
15      **A.  Yes, and my reasons for moving him.**
16      Q.  What's the next thing you did?
17      **A.  I explained the reason why I wanted to move**
18 **him.**
19      Q.  What was his response?
20      **A.  He said, "Okay, Deputy Ahlf."**
21      Q.  Then what happened?
22      **A.  At that point, I opened the door.  He was**
23 **compliant.  I asked him to turn around, put his hands on**
24 **top of his head and walk towards my voice.**
25      Q.  And what was your plan at that point?  What was

88

1  your -- what were you trying to do?
2       **A.  My goal was to move him.  My objective was to**
3  **move him to the other isolation cell because I wanted to**
4  **get him away from the water, the shards of tray, and put**
5  **him in a dry room -- or a cell that would be more feasible**
6  **for a proper evaluation from a mental health staff worker.**
7       Q.  And first you needed to handcuff him in order
8  to move him, right?
9       **A.  You don't have to.  It's your option, depending**
10 **on his -- depending on the mannerisms and depending on**
11 **the -- what you feel is -- what I felt was either a**
12 **threat, nonthreat, a precaution.**
13      Q.  All right.  On this occasion, did you decide
14 whether to handcuff him or not when you were going to move
15 him?
16      **A.  Yes.**
17      Q.  What was your decision?
18      **A.  When he got to the doorway, I was going to**
19 **handcuff him.**
20      Q.  Why did you decide that you were going to
21 handcuff him?
22      **A.  Due to his behavior.  You know, he was just --**
23 **when I'm moving an inmate, typically, depending on --**
24 **again, you're looking at the totality of everything.  I'll**
25 **move and put handcuffs on him for security reasons to**

22 (Pages 85 to 88)

DEPOSITION OF DEPUTY MATTHEW AHLF

89

1   properly move him from one area to another area.
2       Q. Given the way he'd been acting, did you decide
3   he could be dangerous and, therefore, you needed to
4   handcuff him?
5       A. At that point, no. Yeah, I mean, he was acting
6   bizarre, but as I talked with him, he was completely
7   coherent, compliant, not a threat at that point.
8       Q. But for your safety and his, you decided to
9   handcuff him. Is that correct?
10      A. Once he got to the doorway, yes.
11      Q. And you did so by opening the door, right?
12      A. Yes.
13      Q. Did you have a Taser in one hand?
14      A. After I opened the door, yes, I did.
15      Q. Why did you have a Taser in one hand?
16      A. Just in case something were to happen.
17      Q. Again, you're anticipating the possibility that
18  there could be a threat inside that cell, right?
19      A. You always anticipate, yeah. You always
20  anticipate the possibility.
21      Q. Do you always have a Taser in one hand when you
22  open a cell door to move somebody?
23      A. Not always.
24      Q. This time you decided that would be prudent,
25  right?

90

1       A. Yes.
2       Q. Why didn't you ask Martin Harrison to put his
3   hands through the slot in the door and handcuff him while
4   you were safely outside the door?
5       A. Usually being in a -- when I can get voluntary
6   compliance from somebody; the fact that I was talking to
7   him cordially; he was talking back to me cordially; he was
8   coherent; he was not a threat; he agreed to be moved.
9   When I explained the situation, why I wanted to move him
10  and the reason why he was moving, he agreed. At that
11  point, I didn't see there being a threat, if -- if that
12  answers your question.
13      Q. So, instead, you decided to open the door and
14  handcuff him through an open door with a Taser in one
15  hand, correct?
16      A. Once I got him into the doorway with his hand
17  on top of his head, I put away my Taser.
18      Q. Okay. Why didn't you ask for backup or
19  assistance of another deputy who could cover him with a
20  Taser while you are handcuffing him?
21      A. Because, at the time, he was not a threat to
22  me.
23      Q. That would have been available to you as an
24  option if you had requested it, to have a deputy come and
25  assist you, right?

91

1       MR. ANDRADA: Asked and answered.
2       But go ahead again.
3       THE WITNESS: Yes. It would be available.
4       MR. HADDAD: Q. So can you please describe what
5   happened when you opened the door with the Taser in one
6   hand, preparing to handcuff Mr. Harrison.
7       A. I specifically asked Harrison to face away from
8   me, because he was near the bench at the far end of the
9   cell, turn away from me and put his hands on top of his
10  head and walk back towards my voice. Once he got to the
11  doorway, I told him to stop, and I told him I was going to
12  handcuff him, and I was going move him to the East
13  Isolation Cell; because, at this time, he had been moved
14  already in the course of the day. Everything was -- I
15  mean, he was fine. He agreed okay.
16      At that time, my conversation with him throughout
17  the whole entire -- I didn't see there being a threat. He
18  seemed to be cooperative. He seemed to be compliant with
19  my -- my verbal orders and my request. And I asked him to
20  put one hand, the right hand, behind his back, and I put
21  away my Taser, and I was proceeding to put a handcuff on
22  him. And, at that point, he proceeded to turn his head
23  towards me and just give me an unsettling, just blank
24  stare. And it wasn't until that point that I felt that --
25  not that he was going to do something, but something just

92

1   wasn't right.
2       Q. So the moment that he turns back -- turns to
3   you and gives you that unsettling stare, his back was to
4   you, right?
5       A. Right.
6       Q. And you had one of your hands on one of his
7   wrists preparing to handcuff him, right?
8       A. His right wrist.
9       Q. Did you still have the Taser in your hand?
10      A. No, I did not.
11      Q. And when you gave a second statement on
12  August 24th to Sergeant -- is it Kyle Perry? Is that the
13  sergeant?
14      A. Ritter? It might have been Sergeant Ritter.
15      Q. Yeah, I think it might have been
16  Sergeant Ritter. I might have transcribed it wrong.
17      You recall giving an interview on about August 24th
18  to Sergeant Ritter about the incident?
19      A. Yes.
20      Q. And that was taped as well, right?
21      A. Yes.
22      Q. Here's what I -- what I heard you tell
23  Sergeant Ritter, and let me know if this still sounds
24  accurate to you. You said to him, "I grabbed his right
25  wrist with my left arm and I was putting my Taser away.

23 (Pages 89 to 92)

DEPOSITION OF DEPUTY MATTHEW AHLF

93

1  At that point, I felt him tense up."
2       Do you recall that?
3       **A. I recall having my left hand -- I recall -- I**
4  **believe that my Taser was already in the holster, but, you**
5  **know, as I grabbed hold -- I know -- I can say for sure I**
6  **grabbed hold of his -- my left hand on his right wrist.**
7       Q. Okay.
8       **A. And proceeding to -- I can't recall at this**
9  **point -- I can't recall -- I thought my Taser was already**
10 **put away at that point.**
11      Q. So you're not sure one way or the other if you
12 had your Taser out still or you had already put it away,
13 correct?
14      **A. I just can't recall that particular.**
15      Q. Okay.  All right.  So then I heard you say,
16 "Once I felt him tense up, I just kind of had this eery
17 feeling at this point.  He kind of gave me a look.  I
18 can't really describe the look.  It just looked like -- it
19 was like that thousand-yard stare that went right through
20 you, and at that point I got that sixth sense that
21 something is about to happen."
22      Is that accurate still?
23      **A. Yes.**
24      Q. So what happened next?
25      **A. I decided not to handcuff him because, at that**

94

1  **point, again, I felt that there was something strange**
2  **about his -- just that blank stare he gave me.**
3       Q. So what did you do?
4       **A. I put my cuffs away and I kind of just gently**
5  **nudged him back into the cell.  I told him to please have**
6  **a seat on the bench.**
7       Q. Was it a gentle nudge or was it a hard shove?
8       **A. I don't recall shoving him.  I believe it was a**
9  **nudge.  He didn't go very far.**
10      Q. And did he move, then, all the way to the back
11 of the cell?
12      **A. I don't recall exactly how far back he went.**
13 **He was -- maybe -- I mean, he was approximately -- maybe**
14 **4, 5 feet away from me.**
15      Q. Now, there's a bench at the back of the cell,
16 right?
17      **A. Yes, sir.**
18      Q. How far -- what's the distance from the back
19 wall of the cell to the door where you were standing?
20      **A. Frankly, I don't have that measurement.**
21      Q. Can you estimate?
22      **A. Approximately 7 to 9 feet maybe.**
23      Q. And there's a toilet somewhere along the side
24 wall, right?
25      **A. On the left, yeah.**

95

1       Q. And is it closer to the back wall or closer to
2  the front wall or about in the middle?
3       **A. Closer to the front.**
4       Q. So you push him back in the direction of the
5  back wall, right?
6       **A. Correct.**
7       Q. Then what happened?
8       **A. He turned around and I told him to please sit**
9  **on the bench.**
10      Q. And then what?
11      **A. Then he proceeded to just stand there.  And at**
12 **this point I told him to sit down on the bench again, and**
13 **he took one step towards me.  So, at that point, I took**
14 **out my Taser.**
15      Q. Then what happened?
16      **A. Told him to "Have a seat.  I'm not going to**
17 **tell you again.  If you come any further towards me,**
18 **you're going to get tased."  And at this point I had my**
19 **Taser.  He proceeded to take a -- I don't want to call it**
20 **running towards me, but he proceeded to take a couple of**
21 **steps towards me in which I took that as a direct threat**
22 **and I deployed my Taser.**
23      Q. All right.  So starting from the back wall, he
24 took one step towards you, right?
25      **A. Took one -- yeah, one step.**

96

1       Q. And you told him, again, to sit down.
2       **A. Right.**
3       Q. And you were pointing the Taser at him, right?
4       **A. Yes.**
5       Q. And then he took two more steps towards you,
6  right?
7       **A. He took one more step.  At that second time he**
8  **stepped, I told him, "Sit down.  I'm not going to tell you**
9  **again."**
10      Q. And then what happened?
11      **A. He took a fast motion towards me --**
12      Q. Uh-huh.
13      **A. -- in an aggressive manner --**
14      Q. Uh-huh.
15      **A. -- and I deployed my Taser.**
16      Q. And it was because of that fast motion towards
17 you in an aggressive manner that caused you to decide to
18 deploy your Taser.  Is that right?
19      **A. Yes, it was.**
20      Q. Was he running towards you?
21      **A. I wouldn't -- I can't say that he was**
22 **sprinting, running.  I mean, it happened so fast.  I mean,**
23 **he took -- I mean, it was a lot faster than just taking a**
24 **step.**
25      Q. Okay.

24 (Pages 93 to 96)

DEPOSITION OF DEPUTY MATTHEW AHLF

97

1    A. It was an active motion, more than one step
2 towards me.
3    Q. Okay. But you wouldn't describe it as running
4 at you, would you?
5    A. I can't say "yea" or "nay" on that -- "yes" or
6 "no" on that. I may have said, yeah, he ran at me, but at
7 the time, it seemed like he was running at me because it
8 was fast.
9    Q. Well, I'm asking you what you remember, not
10 what you said.
11    Did he run at you or not?
12    A. I can't recall if he ran at me. He took -- let
13 me ask you a question. What do you call "running"?
14    MR. BURRIS: We don't answer questions.
15    THE WITNESS: My apologies.
16    MR. BURRIS: And that's fine. That's fine. I
17 don't mean any disrespect.
18    THE WITNESS: And I --
19    MR. ANDRADA: Stop.
20    THE WITNESS: I apologize.
21    MR. ANDRADA: Stop.
22    Objection to "running," vague and ambiguous.
23    As you understand "running," you can answer the
24 question.
25    THE WITNESS: My understanding of running, it's a

98

1 fast motion. He took a fast motion. So I would say, in
2 context to that, he moved in a very fast motion towards
3 me.
4    MR. HADDAD: Q. But as you sit here today, you
5 wouldn't describe it as run, would you?
6    MR. ANDRADA: Asked and answered.
7    But go ahead again.
8    THE WITNESS: I can describe it as a fast motion.
9 Running is more than two, three steps. It's actually a
10 motion. It's more like sprinting, running. I wouldn't
11 describe it as running. I would describe it as came at
12 me in a fast motion.
13    MR. HADDAD: Q. All right. Now, Sergeant Ritter
14 asked you about this too.
15    Do you remember that?
16    A. I don't recall him asking me, but I'm sure he
17 did if you're asking that.
18    Q. This is another one of those transcripts that
19 you had available to you to review before your deposition,
20 right?
21    A. Um-hmm.
22    Q. "Yes"?
23    A. Yes.
24    Q. Had you taken the time to read the transcript
25 of the Ritter interview and the Dudek interview of you?

99

1    A. I think I have his report. I don't know if I
2 have the transcript.
3    Q. All right. Well, here's -- here's what I heard
4 you say to Sergeant Ritter. "He basically took two steps
5 towed me. I told him to stop, have a seat, you know,
6 don't advance anymore. He took two more steps toward me.
7 I told -- I said, 'Hey, do not make any more steps or else
8 I'm going to tase you. All right?"
9    Do you remember that?
10    A. I remember vaguely the confrontation. I can't
11 remember exactly. I mean, if that's what is written on
12 his -- transcribed, I would assume that I probably said
13 that.
14    Q. And then you told Sergeant Ritter, "I can't
15 recall seeing his fists clenched any like that,
16 but when I told him to sit down, he kind of looked --
17 looked my way, took two real quick steps toward me, and at
18 that point I was afraid he was going to be rushing me, so
19 I deployed my Taser." Is that accurate?
20    A. Yeah, based off of what I can recall.
21    Q. And what happened after you deployed your
22 Taser?
23    A. Mr. Harrison kind of stepped backwards a little
24 bit and ended up falling down onto the corner of the bench
25 and got right back up and proceeded to run out the door.

100

1    Q. Okay. Now, when you fired the Taser, where was
2 he in the cell?
3    A. Within approximately 4 feet of me.
4    Q. Do you recall that he was close to the toilet?
5    A. I don't recall him being particularly close to
6 the toilet, no.
7    Q. And by deploying the Taser, as you're
8 describing, you pulled the trigger and it fired the Taser
9 darts in his direction, right?
10    A. Yes.
11    Q. And did those Taser darts connect with him?
12    A. They seemed to be, yes.
13    Q. Because the next thing you observed was that
14 the Taser appeared to be sending electricity into him,
15 right?
16    A. Correct.
17    Q. What did that look like?
18    MR. ANDRADA: Objection. Vague and ambiguous.
19    Go ahead if you can.
20    THE WITNESS: Can you --
21    MR. HADDAD: Q. What did you see when you saw him
22 getting tased?
23    MR. ANDRADA: Okay.
24    THE WITNESS: He -- he fell down onto the -- kind
25 of backed up, went onto the bench, immediately got right

25 (Pages 97 to 100)

DEPOSITION OF DEPUTY MATTHEW AHLF

---

101

1 back up and began saying something to the effect of, "I'm
2 going to kick your ass," and began running at me.
3      MR. HADDAD:  Q.  How many Taser cycles did you
4 deploy at that time?
5      **A. I deployed one.  Once, just that time, and one**
6 **more later on.**
7      Q. Okay.  But right at that time when you had
8 fired the darts at him, did you pull the trigger to the
9 Taser almost immediately after the first cycle was done
10 for a second activation?
11      MR. ANDRADA:  Go ahead.
12      THE WITNESS:  No, I don't recall doing that.
13      MR. HADDAD:  Q.  Now, you're aware -- strike that.
14      You're aware that the Taser actually maintains a
15 log of deployment, right?
16      **A. Yes.**
17      Q. Have you reviewed that --
18      **A. Yes.**
19      Q. -- for this?
20      And are you aware that the Taser that you were
21 using shows that it was activated for a second five-second
22 cycle, starting about two seconds after the first one
23 ended?
24      **A. I recall there being a record of it.**
25      Q. Do you have any explanation for why the Taser

---

102

1 would show it was activated two seconds after the first
2 cycle ended for another four- or five-second cycle?
3      **A. I can't give you an explanation of that.**
4      Q. Have you ever known a Taser to activate without
5 someone pulling the trigger?
6      **A. Once.**
7      Q. Did that happen to you?
8      **A. No.**
9      Q. Were you there when it happened?
10      **A. No.**
11      Q. You heard about it?
12      **A. Yes.**
13      Q. Who did you hear about it from?
14      **A. It was another deputy.**
15      Q. Now, you still had the Taser in your hand after
16 you tased him, right?
17      MR. ANDRADA:  Objection.  Vague and ambiguous as to
18 time.
19      But go ahead.
20      THE WITNESS:  During the time that I tased him,
21 yes.  Right after I tased him, yes.
22      MR. HADDAD:  Q.  Now, you said that right after the
23 first cycle of the Taser, he threatened you and said he's
24 going to kick your ass.  Is that right?
25      **A. Right.**

---

103

1      Q. And is --
2      **A. I'm sorry.  Something -- I can't remember**
3 **exactly what I said, but something in that realm,**
4 **something like that.  It wasn't like, "Hey, how you**
5 **doing?"  It was, "I'm going to kick your ass."  I can't**
6 **remember exactly what he said.**
7      Q. Okay.  He could have said something different,
8 but you're not sure, right?
9      **A. Correct.**
10      Q. He might not have threatened you actually with
11 kicking your ass.  Is that accurate?
12      MR. ANDRADA:  Objection.  Vague and ambiguous.
13      THE WITNESS:  I recall there being a threat.
14      MR. ANDRADA:  Okay.
15      MR. HADDAD:  Q.  Do you recall telling either
16 Sergeant Ritter or Sergeant Dudek that while you were
17 tasing him, he was saying something like, "Oh you
18 motherfucker," as he was screaming in pain?
19      **A. I don't recall exactly saying that.  I'm not**
20 **saying that I didn't, but I don't recall that**
21 **specifically.**
22      Q. Here's what I heard you tell Sergeant Dudek
23 shortly after the incident.  I heard you say, "He fell
24 backwards onto the bench, and as he's falling backwards
25 and he's going through the five-second -- what we call

---

104

1 'the ride,' in a sense, the five seconds that the Taser is
2 actually used, he's still speaking coherently.  He's
3 not -- he's, like, yelling, like, 'Ah,' like it kind of
4 hurts, but he's, like, 'You motherfucker, you
5 motherfucker.'  I mean, I can understand everything that
6 he says, which is different than anyone else I've ever
7 tased before.  Usually when you tase somebody, you know,
8 it's hard for them to speak."
9      Does that sound accurate?
10      **A. Yes.**
11      Q. So after you finished tasing him, what happened
12 next?
13      **A. During the five seconds' deployment of that, he**
14 **immediately got right back up and charged at me.**
15      Q. And then what happened?
16      **A. As he came out, I stepped to the side.**
17 **Mr. Harrison slipped on the water, did something, but he**
18 **ended up slipping down and sliding out of the cell, and as**
19 **he was sliding out, he grabbed a hold of my leg which**
20 **caused me to fall down.**
21      Q. When you said he started charging towards you,
22 you were still at the door, right?
23      **A. Yes.**
24      Q. Okay.  Do you know whether he was trying to get
25 to you or trying to get out the door?

---

26 (Pages 101 to 104)

DEPOSITION OF DEPUTY MATTHEW AHLF

105

1    A. I -- I don't know.
2    Q. Okay. And as he fell down, how did he fall?
3    A. From what I can recall, his -- as he came out,
4  it seemed like he slipped and kind of fell feet first and
5  slid out of the cell so his head was facing isolation
6  cell.
7    Q. Okay. So it looked like he slipped and fell
8  backwards onto his buttocks?
9    A. Yeah. I guess you could safely say that, yeah.
10   Q. So -- so what was his position on the floor
11 when he grabbed you?
12   A. He was still sliding as he grabbed me.
13   Q. And where did he grab you?
14   A. He just held on to my -- my leg. I'm not sure
15 which one. But held on to it, which, as I tried to move,
16 caused me to slip and fall, because now the floor became
17 wet.
18   Q. And when you fell, where did you fall?
19   A. Fell on my left side, on my left shoulder.
20   Q. Did you fall right on top of him?
21   A. No, I did not.
22   Q. So you fell onto the floor?
23   A. Yes, I did.
24   Q. All right. Now, if someone else were to say
25 that they saw this happened and what they saw was that

106

1  Harrison slid out the door and you pounced on top of him,
2  would that be wrong?
3    A. After I slid down, it would be -- I got on top
4  of him after I got up from falling down.
5    Q. So you're saying that after you fell down on
6  the floor, you got up and then got on top of him. Is that
7  right?
8    A. Correct. My Taser got dislodged.
9    Q. What happened next?
10   A. I got on top of him and I struggled with him.
11   Q. So, specifically, what happened between the two
12 of you?
13   A. I -- he held his arms inside, wasn't giving me
14 his arms. I was actively telling him to "Stop resisting,
15 give me your hand. Stop resisting, give me your hand."
16 He was actively resisting, trying to kick, trying to get
17 his arms free.
18   Q. Let me stop you here --
19   A. Okay.
20   Q. -- so that you don't give a long narrative, and
21 I'll ask a couple of questions.
22   MR. ANDRADA: I appreciate it.
23   MR. HADDAD: Q. You just made a motion, showing
24 both of your forearms up close against your chest bent at
25 the elbow. Is that right?

107

1    A. Yes.
2    Q. And is that the position that Mr. Harrison was
3  in on the floor?
4    A. Yes. He was kind of on his right -- kind of on
5  his right -- kind of on his right side. He was -- at this
6  point, he had turned around and he was more so on his
7  right side. I was on top of him, meaning his left side.
8  So asking to give me his hands. I couldn't see his hands
9  at that point. He was trying to free his hands -- all
10 right? -- of what I thought was to possibly try to hit me,
11 try to strike me. He was thrashing his legs around to --
12 what I thought to possibly either gain -- gain stability
13 on his legs and/or try to kick me. He was grimacing. He
14 was threatening to spit. He had his mouth open, which I
15 thought he may try to bite me. I was actively telling
16 him to stop resisting.
17   Q. What were you doing physically to him?
18   A. When he refused to comply with my verbal
19 orders, I gave two open strike -- two open-palm strikes to
20 the back of the head.
21   Q. Let me stop you there.
22   So what was his body position when you struck him
23 in the back of the head with your open palm?
24   A. At this time, he's face down.
25   Q. So he was face down on the floor.

108

1    Where were his arms and hands?
2    A. I can't recall exactly. It was -- I was -- he
3  was in a position where I couldn't get compliance with his
4  hands at all.
5    Q. So you're on top of him and he's face down, and
6  that's when you hit him twice on the back of the head?
7    A. Correct.
8    Q. Did you hit him anywhere else?
9    A. I delivered strikes to his back, and I
10 delivered knee strikes to his torso area.
11   Q. Okay. How did you deliver the strikes to his
12 back? With a closed fist?
13   A. Yes, sir.
14   Q. How many strikes?
15   A. I don't recall exactly how many.
16   Q. Can you give us an estimate?
17   A. Three, four maybe. Not all at once.
18   Q. Where on his back?
19   A. Approximately maybe in his -- on his left side.
20   Q. Left side of his back?
21   A. On his -- I'm trying to recall. I can't recall
22 exactly where.
23   Q. Where did you deliver the knee strikes?
24   A. Knee strikes would have been to the torso area.
25 I think that was more on his left side.

DEPOSITION OF DEPUTY MATTHEW AHLF

109

1    Q. Like his left ribs area?
2    A. I don't know if it was his rib area or his
3    stomach area, but it was in the vicinity of the area.
4    Q. So on his left side, either at the ribs or
5    lower by the stomach.  Is that right?
6    A. Yes, sir.
7    Q. And how many knee strikes did you deliver
8    there?
9    A. I don't recall.  Maybe one or two.
10   Q. What was your body position as you were
11   striking him with your knee?
12   A. I was on top of Mr. Harrison.
13   Q. Which knee?
14   A. I don't recall.  I don't recall.
15   Q. Have you had any training in knee strikes?
16   A. Yes.
17   Q. Where?
18   A. Academy.
19   Q. Do you have any martial arts training in your
20   background?
21   A. No, I do not.
22   Q. What's your height?
23   A. Five foot six.
24   Q. How much did you weigh at the time?
25   A. Maybe 185, 190.

110

1    Q. What do you weigh now?
2    A. About 185.
3    Q. Did you strike Mr. Harrison anywhere else on
4    his body?
5    A. No, I did not.
6    Q. Did you deliver any closed-fist strikes to his
7    ribs?
8    A. I don't recall ever hitting him in his ribs.
9    MR. BURRIS:  You want to take a quick break?
10   MR. HADDAD:  Let's take a break.
11   (Recess taken from 3:49 p.m. to 3:56 p.m.)
12   MR. HADDAD:  Q.  So your department investigated
13   your uses of force against Mr. Harrison and other
14   deputies' uses of force after this incident, right?
15   A. Yes.
16   Q. And given that Mr. Harrison ultimately died a
17   couple of days after this altercation, you understood that
18   that investigation by your department was a very serious
19   investigation?
20   A. Yes, sir.
21   Q. And when you were interviewed by Sergeant Dudek
22   several hours after the incident, he asked you
23   specifically about your uses of force against
24   Mr. Harrison.  Do you recall that?
25   A. I do not recall that.

111

1    Q. Have you had a chance to review your statement
2    to him or a summary of it?
3    A. I haven't really gone over in detail.
4    Q. But the forces you've described for us today
5    all happened while he was face down and you were
6    essentially on his back.  Is that right?
7    A. Yes.  With him thrashing around, yes.
8    Q. And what was the purpose of the punches to his
9    back area?
10   A. Trying to gain compliance to have him give me
11   his arms.
12   Q. And how did you believe that punching him in
13   his back would allow you to gain compliance of his arms?
14   A. Again, he was thrashing about.  He wasn't just
15   sitting plainly with me on top of him.  He was still
16   thrashing around, trying to break free of -- trying to --
17   what I think, what I observed was trying to assault me.
18   Q. What did he do to try to assault you?
19   A. Trying to break his arms free.
20   Q. Did he take a punch at you?
21   MR. ANDRADA:  Well, let him finish.  I'm not sure
22   if the witness --
23   MR. HADDAD:  Okay.
24   MR. ANDRADA:  -- finished his answer.
25   MR. BURRIS:  Relax.

112

1    MR. ANDRADA:  Thank you.
2    MR. HADDAD:  Q.  Sorry.  Go ahead.
3    A. Fearing that he may try to strike me and try to
4    gain compliance over me or try to gain -- trying to gain,
5    I guess, compliance over me.  I continually gave him
6    verbal orders, which he refused to comply with.  You know,
7    I striked (sic) him on his back in an intent for him to
8    break his arms free.
9    Q. He never tried to strike you, did he?
10   A. I never gave him the chance to try to strike
11   me.
12   Q. The answer is he never tried to strike you,
13   correct?
14   A. Correct.
15   Q. He never tried to kick you, did he?
16   A. Let me back up.  I can't say he never tried.  I
17   never gave him the option to be able to do it.  I can't
18   say he never tried.  I assumed he would have tried.
19   Q. You don't know if he was trying to get away or
20   trying to fight with you because you don't know what he
21   was thinking, right?
22   A. Well --
23   MR. ANDRADA:  Vague and ambiguous, compound.
24   Go ahead.
25   THE WITNESS:  At that time, I don't know what he

DEPOSITION OF DEPUTY MATTHEW AHLF

---

113

1  was thinking.
2      MR. HADDAD:  Q.  Okay.  You didn't know if he was
3  just trying to get you off of his back, literally, right?
4      **A. No.  I knew that he was trying to break free.**
5      Q. He never kicked you, did he?
6      **A. Never gave him the opportunity to.**
7      Q. And what was your reason for the knee strikes
8  to his side?
9      **A. Trying to gain compliance over his left arm.**
10     Q. And how did you think that striking him with
11 your knee would allow you to gain compliance over his arm?
12     **A. Possibly get him to lean up his body where I**
13 **could have some sort of opportunity to grab his arm.**
14     Q. And other than the punches to the back, the
15 knee strikes, and the open-palm strikes to the head, which
16 you've just described in this deposition today, did you
17 strike him anywhere else?
18     **A. I don't recall ever striking him.  I mean, it**
19 **happened -- in all actuality, it happened so fast.  I**
20 **don't believe -- I recall striking him what I've already**
21 **explained, but I don't recall striking him anywhere else**
22 **or any other time.**
23     Q. But the ones you've described today are what
24 you can remember as you sit here today, right?
25     **A. Correct.**

---

114

1      Q. When you were interviewed by Sergeant Dudek a
2  few hours after the accident, here's what I heard you say.
3  You describe you were on the ground with him and you said,
4  "At that point, he grabbed on to my hand with his -- I
5  don't know if it was his -- I think it was his right hand.
6  I told him to 'Stop resisting.  Let it go.  Stop
7  resisting.'"  Is that accurate?
8      **A. Yes.**
9      Q. Do you remember that happening?
10     **A. I remember as the struggle ensued that he**
11 **eventually got his arms free and was trying to break free.**
12 **He was holding my hand.**
13     Q. Okay.  And then you told Sergeant Dudek, "After
14 telling him to stop resisting" -- you said he didn't -- "I
15 gave two punches to the mid-torso."  Is that accurate?
16     **A. Two punches to -- it was -- my punches were to**
17 **his back.  It wasn't to his stomach area.**
18     Q. So when you told Sergeant Dudek that you gave
19 him two punches to the mid-torso, was that true or not
20 true?
21     **A. I don't recall ever hitting him there.**
22     Q. And were you aware that you never described
23 anything other than those two punches to the mid-torso and
24 two open-palm strikes to Sergeant Dudek when he
25 interviewed you?

---

115

1      **A. Say that one more time.  I'm sorry.**
2      Q. When Sergeant Dudek interviewed you --
3      **A. Mm-hmm.**
4      Q. -- were you aware that the only strikes you
5  told Sergeant Dudek about was two punches to the
6  mid-torso, which you say now did not happen, and two
7  open-palm strikes to the head?
8      MR. ANDRADA:  That misstates the testimony.
9      But go ahead and answer the question.
10     THE WITNESS:  I don't recall telling him that, and
11 I'll go back and say I don't recall hitting him in the
12 torso area.
13     MR. HADDAD:  Q.  Do you recall Sergeant Ritter
14 asking you about the force you used against Mr. Harrison
15 about a week later?
16     **A. I recall having an interview with him, yes.**
17     Q. And do you recall telling Sergeant Ritter that
18 you delivered a few strikes to his torso area?
19     **A. I don't recall saying that.**
20     Q. Do you recall telling Sergeant Ritter that you
21 delivered strikes to his left ribcage and left side, in
22 addition to a couple times to his back?
23     **A. I don't recall to the mid-side.  I recall what**
24 **I've already stated.**
25     Q. Now, when you gave those statements to

---

116

1  Sergeant Dudek and Sergeant Ritter, were you being honest
2  with them?
3      **A. Yeah.**
4      Q. Were you trying to give them complete accounts
5  of what happened?
6      **A. As much as I could.**
7      Q. And at least when Sergeant Ritter was
8  interviewing you, you knew that Harrison had already died,
9  right?
10     **A. Yes, at that point.**
11     Q. Now, going on with your recollection today
12 about what happened with Harrison, did you deliver the
13 back strikes first or the knee strikes first?
14     **A. To be honest with you, I can't recall the**
15 **sequence.  To be honest with you, it happened so fast I**
16 **don't have recollection of exactly which sequence it**
17 **happened in.**
18     Q. What's the next thing that you can recall after
19 those strikes?
20     **A. I can recall him still actively resisting and**
21 **my radio coming off and me getting on my radio as I'm on**
22 **top of him calling for cover.**
23     Q. And what else do you remember?
24     **A. I remember that -- I remember accidentally**
25 **saying I needed cover in Housing Unit 34, and then I**

---

29 (Pages 113 to 116)

DEPOSITION OF DEPUTY MATTHEW AHLF

117

1 corrected myself and said Housing Unit 33.
2    Q. And has that been a recurring problem with you
3 in your law enforcement career, is that when you're in a
4 tense situation, you'll forget where you are or make a
5 mistake about a location on the radio?
6    MR. ANDRADA: Objection. Vague and ambiguous.
7    Go ahead.
8    THE WITNESS: No.
9    MR. HADDAD: Q. So you've never been counseled
10 about that by any superior officer, that you need work on
11 your ability to be accurate with your location when you're
12 radioing your location during a tense situation?
13    A. Well, there's a difference in working in the
14 jail in a confined space when you're in a housing unit
15 when there's not -- compared to where you know the layout
16 compared to where I think you're going with is -- is on
17 patrol and not knowing the area because you're -- you're
18 not -- you haven't been exposed to that area that much,
19 so...
20    Q. So during patrol, you had been counseled about
21 giving wrong information about your location during tense
22 situations, right?
23    A. Not wrong information. I don't recall there
24 ever being a time where they said -- I mean, there were
25 times I didn't know where the location was where I was

118

1 going because I wasn't familiar with the area. I was
2 learning the area as I was going.
3    Q. So after you radioed for assistance, what
4 happened next?
5    A. I corrected myself and said Housing Unit 33 and
6 a struggle ensued. I'm still actively telling
7 Mr. Harrison "Stop resisting." At that time, I started to
8 get fatigued.
9    Q. Mm-hmm.
10    A. About this time, it seemed like a while
11 since -- it seemed like a long time that I was struggling
12 with him. At that point, I recall hearing my technician
13 call out that there was a 243 in Housing Unit 33 and that
14 we need cover.
15    Q. What's the next thing you remember?
16    A. Getting tired and just putting him in a --
17 holding his arms securely and just trying to -- to hold
18 down his body with my body weight until cover came,
19 because at that point I got tired.
20    Q. Did you put him in some sort of a headlock?
21    A. No.
22    Q. Did you have one or both of your arms around
23 his neck?
24    A. I had -- I don't recall exactly where my arm
25 was. All I know is I had him in a position where I had

119

1 his arms locked. He wasn't able -- I used my body weight.
2 I wasn't giving his arms free motion to be able to strike
3 me or get free. I was just using my body weight to hold
4 him down until...
5    Q. Did you ever put him in a carotid hold?
6    A. No.
7    Q. Did you ever try to?
8    A. No.
9    Q. Do you recall at one point having your right
10 arm underneath his neck and your left forearm across his
11 head holding his head in that position?
12    A. No, I do not.
13    Q. If you had told that to Sergeant Ritter, that
14 that was a position you were in for some period, would
15 that be correct or incorrect?
16    A. If that's what I told him at the time. I'm
17 going off of the recollection I can recall now.
18    Q. Do you recall Sergeant Ritter asking you a lot
19 of questions about how Martin Harrison could have
20 sustained severe bruising all around his neck?
21    A. Vaguely.
22    Q. And do you recall him asking you, "Can you
23 think of any way that you or any of the other deputies
24 that you witnessed could have caused severe bruising to
25 Mr. Harrison's neck?"

120

1    Do you recall him asking you that?
2    A. No, I do not.
3    Q. Do you recall telling Sergeant Ritter that you
4 could have caused bruising to Mr. Harrison's neck when you
5 were using your body weight to hold him?
6    A. I don't recall specifically telling him that,
7 but I assume since you're reading that, that it may be in
8 there. I -- I don't -- don't recall it at this point.
9    Q. Let me ask you based on what you know now.
10    A. Okay.
11    Q. Is it possible that you could have caused
12 bruising to Mr. Harrison's neck by anything that you did?
13    MR. ANDRADA: Calls for speculation.
14    But go ahead.
15    THE WITNESS: I don't -- I don't recall ever having
16 my arms around his neck, so I can't answer "yes" or "no."
17 I -- I don't know.
18    MR. HADDAD: Q. Did you ever put body weight in
19 the area of his neck?
20    A. No, I don't recall doing that.
21    Q. Did you ever strike him anywhere around his
22 neck?
23    A. No.
24    Q. Does your department prevent you to forcefully
25 strike a person in the neck?

DEPOSITION OF DEPUTY MATTHEW AHLF

121

1 A. No.
2 Q. Only for deadly force, right?
3 A. Correct.
4 Q. At some point backup arrived, right?
5 A. Yes, sir.
6 Q. What was your position, your body position,
7 with Mr. Harrison when backup came?
8 A. Mr. Harrison's head was facing towards the
9 isolation cell. His feet were facing towards the opposite
10 wall, so he was kind of sideways from the -- and I was --
11 I don't know my exact positioning. I was still on top of
12 him -- sort of on top of him. I had him in a hold, and I
13 can't explain what the hold -- I had his arms on a -- in a
14 hold, and I was using my body weight to kind of hold him
15 down to prevent him from trying to break free when cover
16 came.
17 Q. So you were holding his arms somehow, right?
18 A. Somehow I had him in a hold, and I -- to this
19 day, I can't -- I don't recall exactly -- and I can't
20 explain how that hold was put in. I just -- I tried to
21 use whatever mode I could to try to keep his arms from
22 being able to get free.
23 Q. Okay. Was he still pretty much on his belly?
24 MR. ANDRADA: Vague -- vague and ambiguous.
25 But go ahead.

122

1 THE WITNESS: You know what? Due to the point --
2 because I'm so close proximity, I can't recall if his body
3 was strictly on -- I remember -- I wasn't -- I can't say
4 100 percent yes, it was all on the floor.
5 MR. HADDAD: Q. So what happened when the other
6 officers arrived?
7 A. All I saw were boots. That's -- that's all I
8 could say I saw. I remember, you know, one person --
9 because I'm facing -- his legs are over here to my right.
10 I remember seeing boots near that right, trying to control
11 his legs, and the -- another person came around him to try
12 and secure his arms.
13 Q. Did you ever see Martin Harrison strike any
14 officer?
15 A. No.
16 Q. Do you know the names of the deputies who
17 arrived first?
18 A. Based off just what the police report said.
19 Q. Okay. So considering that you know this from
20 the police reports, who do you believe arrived first?
21 A. I believe it to be Deputy Valverde and I think
22 possibly Deputy Swetnam.
23 Q. And can you describe anything that either of
24 them did?
25 A. I cannot, to be honest with you. Sorry.

123

1 Q. What's the next thing that you can remember
2 after they had arrived?
3 A. More deputies arriving.
4 Q. What were they doing?
5 A. Trying to gain compliance, trying to get
6 compliance of Harrison, because he's still actively
7 resisting, thrashing about at this point.
8 Q. What were you doing while the other deputies
9 were there?
10 A. Trying -- at this point, I'm exhausted. I'm
11 trying to just hold him in place so they can get control
12 of his hands and legs.
13 Q. So you're still holding him while the other
14 deputies are there also trying to gain compliance, right?
15 A. Correct.
16 Q. And by trying to gain compliance, you mean they
17 were trying to get his arms so they could handcuff him,
18 right?
19 A. Right.
20 Q. Were you still holding his arms?
21 A. I don't know if I was still holding them at
22 that point. I can't recall exactly what happened at that
23 point. I recall just multiple people came in, trying --
24 deputies, and I don't know exactly -- again, I'm going off
25 the police report --

124

1 Q. Mm-hmm.
2 A. -- and they tried to secure -- tried to get
3 compliance from -- I was exhausted at that point. I was
4 just trying to lay there and make sure that he wasn't
5 trying to strike anybody.
6 Q. Do you think that your trying to hold him and
7 prevent him from striking anybody interfered with other
8 officers' attempts to gain control of his arms and
9 handcuff him?
10 A. No.
11 Q. At some point other officers had to drag you
12 off of him. Is that right?
13 A. Yes, sir.
14 Q. What was going on at that point?
15 A. I got taken off of -- I don't know who it was
16 that took me off, but I got lifted off -- kind of picked
17 up off of the floor and Mr. Harrison. And from what I was
18 told, the reason I was picked up is because I had my
19 cord -- my radio cord wrapped around my neck at that
20 point.
21 Q. Who told you that?
22 A. I don't know. I can't recall who it was.
23 Q. Who picked you up?
24 A. I can't recall. It was from behind me.
25 Q. Were you delivering any blows to him around the

DEPOSITION OF DEPUTY MATTHEW AHLF

125

1 time that you were picked up off of him?
2     A. No.
3     Q. And what's the next thing you can remember?
4     A. The next thing I can remember was them asking
5 me if I'm okay, and I told him my left shoulder was sore,
6 kind of hurt.  And then shortly after that, I heard
7 something to the effect of, "He's got the Taser."
8     Q. That was your Taser, right?
9     A. I assumed it was.
10     Q. So after you were pulled off of him and there
11 were other deputies on him, your Taser was still laying on
12 the floor somewhere?
13     A. Yes.
14     Q. As soon as you were pulled off of him, why
15 didn't you go secure your own Taser and pick it up off the
16 floor?
17     A. Because, at that point, I had -- I was being
18 controlled by other deputies, asking whether or not I was
19 okay.
20     Q. Did you consider it to be dangerous that your
21 Taser was laying on the floor?
22     A. Absolutely.
23     Q. Why didn't you go get it right away?
24     MR. ANDRADA:  Well --
25     THE WITNESS:  I don't have an answer.

126

1     MR. ANDRADA:  Hang on.
2     It's asked and answered.  It's argumentative as
3 phrased.
4     But go ahead again.
5     THE WITNESS:  Prior to them -- prior to somebody
6 saying, "He's got the Taser," I wasn't -- I had no
7 recollection of whether or not the Taser -- I didn't even
8 know where the Taser was.
9     MR. HADDAD:  Q.  Okay.  So it wasn't in the front
10 of your mind at that time, right?
11     A. No.
12     Q. So when you heard an officer yell something
13 like, "He's got a Taser," then what happened?
14     A. At that point, I remember just trying -- just
15 hold his arms so that -- that -- when I went around -- I
16 walked around to the -- well, I can say I actually
17 walked -- I don't want to say ran, but I walked swiftly
18 around everybody to where his arms were, and I saw that
19 his hand was on the Taser -- the Taser was on the floor.
20 His hands was on top of the Taser.  And, at that point, I
21 used my foot to -- somebody had a hold of his hand.  I
22 used my foot to grab hold of the Taser and slide it out
23 from -- from his vicinity of the area.
24     Q. So his open palm was laying on top of the Taser
25 so that you could kind of kick it out from underneath his

127

1 hand?
2     A. From what I can recollect is that it was -- his
3 hand was on top of the Taser.  Whether or not he had a
4 grasp of it, I don't know.  I can't say "yes" or "no" to
5 that.  What I can recall is that somebody having a hold of
6 his arm and me taking my foot and actually moving it to
7 the side to get it away from his grasp.
8     Q. Did you -- did you deliver any blows to his
9 hand or his arm at that time?
10     A. No, I did not.
11     Q. Did you see any officer punch him on the hand
12 to -- while he was holding the Taser?
13     A. I don't recall ever seeing anybody hit him on
14 the hand.
15     Q. Did you see any officer stomp on his hand while
16 he was holding the Taser?
17     A. No.
18     Q. Did he ever raise the Taser off the floor?
19     A. Not that I can see.
20     Q. In what position was his arm while he had his
21 hand on the Taser?  Was it straight out, or was it bent at
22 the elbow?
23     A. What I can recall, it was kind of -- as such
24 where it was kind of cruxed, bent.
25     Q. That seemed like a good opportunity for

128

1 officers to grab his wrist and turn his arm around and
2 handcuff him.  Would you agree?
3     MR. ANDRADA:  Well -- so what -- I'm sorry.  Vague
4 and ambiguous, overly broad.
5     Go ahead.
6     THE WITNESS:  I mean, throughout the whole entire
7 struggle, he is tense.  His body is tense and he is -- I
8 can't -- I was -- I can't say "yea" or "nay" on that.  I
9 don't know, because I wasn't -- I didn't feel his arm at
10 that point.  I don't know if it was still tense.  I know
11 throughout the struggle that we had, his body and his leg,
12 even though he was thrashing, he was still putting up a
13 lot of -- he was tense and still struggling with me.
14     MR. HADDAD:  Q.  Now, in the academy and on other
15 occasions afterward, you've been taught about how to
16 handcuff a person, right?
17     A. Yes.
18     Q. It's pretty typical training that all deputies
19 receive, right?
20     A. Yes.
21     Q. You practice it in defensive tactics classes,
22 right?
23     A. Yes.
24     Q. In fact, have you been a trainer to train other
25 deputies in how to handcuff a person when you taught the

DEPOSITION OF DEPUTY MATTHEW AHLF

129

1  restraints class?
2      **A. Yes.**
3      Q. And part of that training includes control
4  holds to manipulate a person's joints so that you can get
5  them into a position to be handcuffed, right?
6      **A. Correct.**
7      Q. So these are the training that you're provided
8  to deal with the situation where a person tenses up and
9  won't allow themselves to be handcuffed, right?
10     **A. Correct.**
11     Q. Can you explain to me why all of the officers
12 that were involved in this situation with Mr. Harrison at
13 that point were not able to simply get the job done and
14 handcuff him without further uses of force against him?
15     MR. ANDRADA: Argumentative as phrased.
16     But go ahead.
17     THE WITNESS: I can't speak to other officers'
18 actions or why they did or did not do a certain compliance
19 hold or anything.
20     MR. HADDAD: Q. Did you ever try to get back in
21 there and grab his wrists when you saw it was something
22 you could hold on to and use a control hold to handcuff
23 him?
24     **A. No. I grabbed a hold of my Taser once I got it**
25 **away from him. At that point when he was still thrashing,**

130

1  **I instructed him to stop resisting or I'm going to**
2  **drive-stun him in which if he continued to disregard**
3  **corporal orders, and that's when I delivered my second**
4  **Taser application.**
5      Q. Where did you drive-stun him?
6      **A. On the back.**
7      Q. Where on the back?
8      **A. I don't recall. I believe it to be -- I recall**
9  **it kind of on the upper portion of the back. I don't**
10 **recall it ever being towards the lower end of his back.**
11     Q. He wasn't wearing a shirt, right?
12     **A. At this point, I don't recall if he was or not.**
13     Q. Previously, you had described him as just
14 wearing pants and sandals.
15     **A. He had a tan shirt. He didn't have his blue --**
16 **before all this stuff happened, all he had was a -- he had**
17 **his blue pants on, sandals, and he had a tan shirt. He**
18 **didn't have his blue-covered shirt on; he had his tan**
19 **shirt on.**
20     Q. Were you able to apply both prongs of the Taser
21 to his back for the entire five-second cycle?
22     **A. At that point, the probes had already been**
23 **delivered through the first Taser strike, and so I put the**
24 **Taser up to his skin and actually delivered a drive-stun.**
25     Q. And you were able to deliver a five-second

131

1  drive-stun?
2      **A. It had no effect on him. So I don't know if**
3  **the probes were not connected at that point. I mean, I**
4  **remember him kind of tensing for a brief moment, but it**
5  **didn't seem to have any effect on him.**
6      Q. When you were interviewed by Sergeant Ritter, I
7  heard you tell him that when you drive-stunned him, it was
8  your belief that the Taser was still working and it
9  affected him.
10     Does that sound accurate?
11     **A. His body became tense. His legs kind of**
12 **straightened out, so I would assume that it worked for**
13 **him, but it had no effect on him in the sense that he**
14 **continued to thrash while that was being done.**
15     Q. Okay. So just to be clear, then, that it
16 appeared to you that the Taser cycle had sent electricity
17 into him, but you're describing that he continued to
18 resist. Is that right?
19     **A. Yes.**
20     Q. How exactly was he resisting at that time?
21     **A. He was still thrashing about.**
22     Q. What do you mean by "thrashing"?
23     **A. His arms were still -- still trying to get his**
24 **arms free and still -- I mean, his legs tensed out, but he**
25 **was still trying to move his legs.**

132

1      Q. He was trying to move?
2      **A. Yes.**
3      Q. While multiple officers were on him while
4  twisting him or delivering forceful blows to his body,
5  correct?
6      **A. I can't say that they were delivering forceful**
7  **blows. I don't know quite what they were doing, to be**
8  **honest with you.**
9      Q. Did you see any officer deliver any blow to
10 him?
11     **A. I don't recall seeing -- I don't recall seeing**
12 **anybody specifically delivering -- I know that there were**
13 **some strikes. I don't know who. But at that point after**
14 **I drive-stunned him, I don't recall seeing anybody strike**
15 **him.**
16     Q. At any time did you see any other officer
17 strike him?
18     **A. I saw other officers throughout this struggle,**
19 **total struggle, strike him, yes.**
20     Q. You saw a number of officers deliver a number
21 of blows to him, correct?
22     **A. I won't say a number of officers. I just**
23 **saw -- I saw Mr. Harrison get struck.**
24     Q. How many officers do you think you saw?
25     **A. Two maybe. I don't quite know. I don't have a**

Crangle Reporting Services (510) 653-1312

133

1    specific number for you.
2        Q. How many blows did you see other officers
3    inflict on him?
4        A. I don't know.
5        Q. Are you able to estimate?
6        A. My recollection was two, three maybe.
7        Q. Did you see any officer ever strike
8    Mr. Harrison anywhere near his neck?
9        A. No, I did not.
10       Q. Did you see any officer put Harrison in some
11   sort of headlock or neck lock?
12       A. No, I didn't.
13       Q. Did you see any officer use or attempt to use a
14   carotid hold on him?
15       A. No, I did not.
16       Q. If, in fact, the medical examiner on the
17   autopsy found extensive bruising all around Mr. Harrison's
18   neck, including in the front, would you have any
19   explanation for how that happened?
20       A. No, I do not.
21       Q. What happened after you drive-stunned him?
22       A. At that time, the first sergeants started to
23   arrive.
24       Q. Then what?
25       A. At that point I went and talked to the

134

1    sergeant.
2        MR. BURRIS:  What was that?
3        THE WITNESS:  Sorry.  I went to go talk to the
4    sergeant.
5        MR. HADDAD:  Q.  Who was that?
6        A. I believe it was Antriago.
7        Q. What did you and Sergeant Antriago say to each
8    other?
9        A. Asked him what happened, and I told him what
10   happened.
11       Q. While this is still going on?
12       A. At this time, I'm exhausted to the point where
13   I have no more -- I'm -- I'm spent.
14       Q. And did you hear other officers say that the
15   scene was Code 4 by then?
16       A. I don't recall ever hearing Code 4. I know I
17   read it in the report, but I don't recall ever hearing
18   that term being used.
19       Q. What does Code 4 mean?
20       A. No other assistance needed.
21       Q. Means -- basically, it's a term that's used
22   when the situation is under control, right?
23       A. Or the scene is safe, yes.
24       Q. Or the scene is safe?
25       A. Under control or safe, yes.

135

1        Q. Did you see Harrison get handcuffed?
2        A. I didn't specifically see him get handcuffed.
3    I remember somebody -- and I don't know who it was --
4    having handcuffs in their hand, but I didn't actually
5    watch him physically get handcuffed.  Not that I can
6    recall.
7        Q. Let me just go back.
8        The blows that you did see other officers deliver,
9    how did they deliver them?  Were they with fists or other
10   things?
11       A. I know that there was a couple of knee strikes.
12   I believe maybe a couple of fist strikes to the back and
13   stuff is all I can recall.
14       Q. Did you see any officer use a baton or any
15   instrument to inflict the blow?
16       A. No, I did not.
17       Q. Did you see any officer with a baton out during
18   this altercation?
19       A. No, not that I can recall at all.
20       Q. At that time, did you carry a baton on your
21   person while you worked in the jail?
22       A. No, I did not.
23       Q. Was it permitted for deputies to carry batons
24   or blunt-force instruments?
25       A. No, it was not.

136

1        Q. After he was handcuffed, what happened?
2        A. He was handcuffed and then leg restraints were
3    placed on him.
4        Q. Was that in the same location, or was he moved
5    first?
6        A. I believe that was in the same location,
7    because I remember they called for leg irons.  I think it
8    was in the same location.
9        Q. Did you observe the leg irons being placed on
10   him?
11       A. No, I did not.  Not that I recall.
12       Q. So tell me what you saw or heard and not
13   something that you just only learned from the police
14   report, please.  Okay?
15       What else are you aware of observing after he was
16   handcuffed?
17       A. I remember seeing them pick him up onto his
18   feet and escort him to the other isolation cell.
19       Q. And they got him to the other isolation cell?
20       A. Yes.
21       Q. Did anything happen along the way that stood
22   out?
23       A. They placed him on his stomach.
24       Q. Where?
25       A. In the isolation cell.

34 (Pages 133 to 136)

DEPOSITION OF DEPUTY MATTHEW AHLF

---

137

1    Q. And so he's handcuffed at this time, right?
2    **A. Yes, he is.**
3    Q. And then what happened?
4    **A. I recall somebody saying, "Get a spit mask.**
5    **He's trying to spit," and a spit mask -- I can't remember**
6    **if one got put on Mr. Harrison. I remember a request to**
7    **get one was made.**
8    Q. Did Harrison actually spit on any officer or
9    did he just threaten to spit?
10   MR. ANDRADA: If you know.
11   THE WITNESS: I don't recall him ever spitting. I
12   know that he had made verbal threats to spit and to bite.
13   MR. HADDAD: Q. Well, what, specifically, can you
14   remember him saying about either spitting or biting?
15   **A. Actually, I remember deputy saying that he was**
16   **trying to spit. I can't recall everything. I don't**
17   **recall him actually saying that he's trying to spit. He**
18   **was trying to spit based off what the deputies were**
19   **saying.**
20   Q. Do you recall that he would go from cursing at
21   the deputies to then saying things like "I love you guys"?
22   **A. No.**
23   Q. You didn't hear anything like that?
24   **A. No. I was not -- when he was in the isolation**
25   **cell, I was not right there at the isolation cell.**

---

138

1    Q. Did you see them put the spit mask on him?
2    **A. I don't know if it was applied or not. I know**
3    **the request was made to get one, but I can't recall**
4    **whether one was placed on him or not.**
5    Q. What did you see Harrison doing while he was
6    face down on the floor in the isolation cell while they
7    were waiting for the leg restraints and the spit mask?
8    **A. I was actually talking -- I was still with my**
9    **sergeant at that point. I wasn't really over in that**
10   **vicinity of the area. There was a lot of deputies over**
11   **there, so it was hard for me to see what was going on.**
12   Q. Once you did see him face down on the floor, as
13   you've described, what was he doing?
14   **A. Still struggling, still trying to -- he was**
15   **grimacing. I can't recall exactly what he was saying, but**
16   **he wasn't -- wouldn't call it being passive.**
17   Q. If he was handcuffed on his belly on the floor,
18   how was he struggling?
19   **A. He's still trying to -- thrashing his legs**
20   **around.**
21   Q. Why couldn't the deputies just leave him like
22   that in the new observation cell and walk out and close
23   the door?
24   **A. Well --**
25   MR. ANDRADA: Wait a minute.

---

139

1    Vague and ambiguous --
2    MR. HADDAD: I'll rephrase the question.
3    Q. Rather than asking for leg irons and a spit
4    mask when he was on his belly, still moving around, what
5    would have been wrong with simply walking out, leaving him
6    alone in the isolation cell, still handcuffed, and just
7    closing the door --
8    MR. ANDRADA: Well --
9    MR. HADDAD: Q. -- until he calmed down?
10   MR. ANDRADA: All right. Vague, ambiguous, overly
11   broad, calls for an expert opinion. It's argumentative as
12   phrased.
13   But go ahead.
14   THE WITNESS: I don't have an answer. I don't
15   know.
16   MR. HADDAD: Q. Did you see anybody else tase him?
17   **A. I remember seeing somebody else, I think,**
18   **drive-stun him. At the time, I didn't know who it was**
19   **until I read the police report. But I didn't recall. I**
20   **remember someone -- I remember hearing a Taser go off and**
21   **it wasn't mine, so...**
22   Q. Did that other person tase him before or after
23   you drive-stunned him?
24   **A. That I don't recall.**
25   Q. Did you ever let other deputies know that you

---

140

1    had already tased him in this incident so that they'd be
2    aware that he'd been tased before?
3    **A. There was evidence of him being tased. The**
4    **probe lines were already laying on the ground and...**
5    Q. You didn't tell anybody about how many times
6    you tased him, had you?
7    **A. I don't recall ever saying anything.**
8    Q. Is there anything else you can recall happening
9    with him while he was on the floor in the second isolation
10   cell?
11   **A. No. I remember the deputies -- we had called**
12   **for a nurse at that point, and deputies were right there**
13   **with him until the nurse arrived.**
14   Q. Did you see any deputy strike him either with a
15   fist or knee or any other part of their body while he was
16   on the floor in the second isolation cell?
17   **A. No, I did not, sir.**
18   Q. Given that he was already handcuffed at that
19   point, based on your training and experience, would it
20   have been appropriate for deputies to continue striking
21   him?
22   MR. ANDRADA: Calls for expert opinion, no
23   foundation as to this witness, vague and ambiguous.
24   But go ahead if you can answer it.
25   THE WITNESS: If a person is secure in handcuffs

---

35 (Pages 137 to 140)

DEPOSITION OF DEPUTY MATTHEW AHLF

141

1 and they're not -- there's no more -- a threat, then I
2 would not strike somebody.
3 MR. HADDAD: Q. And you're -- you've been a
4 trainer in terms of force for your department, right?
5 A. Not a trainer in force, a trainer in -- I used
6 to train people in -- I used to work in an ancillary
7 housing unit, so how to properly place handcuffs on an
8 individual so that when you -- you have to, one, take them
9 off or readjust, you're not putting yourself in a position
10 of disadvantage.
11 Q. What did you train other deputies about whether
12 or not it was proper to strike a person after they have
13 already been handcuffed and are face down on the ground?
14 MR. ANDRADA: Again --
15 THE WITNESS: That --
16 MR. ANDRADA: Hang on.
17 Vague and ambiguous, overly broad.
18 Go ahead.
19 THE WITNESS: I didn't instruct people on that.
20 When -- are you talking about when I teach something in,
21 like, a core class or when I had the training?
22 MR. HADDAD: Q. Either way. Anytime as a trainer.
23 A. As a trainer, at no time did I ever tell
24 anybody or would I tell anybody that if a person is secure
25 with handcuffs that they have the authorization and the

142

1 need to strike somebody.
2 Q. Once the person is handcuffed, deputies should
3 no longer strike the person, correct?
4 MR. ANDRADA: Objection. Vague and ambiguous,
5 overly broad.
6 Go ahead.
7 THE WITNESS: I'm not saying that. It depends on
8 the situation, and it depends on the position of where
9 you're at compared to where that -- there's a lot of
10 things that go to it. Typically, no, but I'm not saying
11 that's 100 percent all the time.
12 MR. HADDAD: Q. Is there anything else that
13 happened at that location that you were present for other
14 than what you've described?
15 A. When the nurse came.
16 Q. Did you see what happened then?
17 A. The nurse asked for him to be brought out into
18 the hallway, because she didn't feel comfortable in a
19 closed, confined space; taking out and checking to see if
20 the probes were still attached, and in which they moved
21 him to the hallway.
22 Q. Did he have any Taser probes still attached to
23 his body?
24 A. He had one.
25 Q. Where was it attached?

143

1 A. I believe it was his thigh.
2 Q. So one of those Taser probes with the barb in
3 it had -- it was still attached to his thigh after all
4 that. Is that right?
5 A. I think it was either -- I know there was one
6 attached. I can't remember if it was his thigh or
7 possibly one in his shirt. I can't remember. I think it
8 was his thigh. I don't know 100 percent on that, but as I
9 recall, I think it was his thigh.
10 Q. At some point, did you notice that he had
11 stopped moving?
12 A. I noticed that he became calm. He wasn't
13 thrashing around anymore.
14 Q. What point was that?
15 A. While the nurse was there.
16 Q. Which nurse?
17 A. I don't recall her name.
18 Q. At some point there were two nurses, right?
19 A. Yes, sir.
20 Q. Was it before the second nurse arrived?
21 A. Yes, sir.
22 Q. Okay. And was there any discussion that you
23 overheard about the fact that he was calm now?
24 A. No. There was just my observation. Went from
25 a point of thrashing to a point of being calm.

144

1 Q. What's the next thing that you can remember?
2 A. The second nurse coming in.
3 Q. And then what?
4 A. I recall her going Mr. Harrison and checking
5 for vitals; that finding out that he had a staggered
6 pulse.
7 Q. A what?
8 A. Staggered. At first she said -- her initial
9 reaction was something in terms of is he even breathing.
10 And, at that point, they -- I think they found a real
11 faint, staggered pulse. I think.
12 Q. What went through your head at that moment when
13 you learned he may not even be breathing and he has a very
14 faint, staggered pulse?
15 A. I can't even recall what I was thinking, to be
16 honest with you.
17 Q. What's the next thing you can remember?
18 A. I can remember them requesting Code 3 medical
19 and some -- have somebody bring a gurney.
20 Q. Then what happened?
21 A. Mr. Harrison was taken from housing unit to the
22 infirmary.
23 Q. Did you go with him?
24 A. No, I didn't.
25 Q. Then what did you do?

DEPOSITION OF DEPUTY MATTHEW AHLF

145

1       A. From there I -- the other sergeants came in.
2   My direct supervisor came in, and we kind of briefly went
3   over kind of what happened.  And from there it was making
4   sure that I was okay and making sure that we started
5   documenting and taking photographs and start sealing off
6   the scene.
7       Q. And then what?
8       A. At that point, I went up in housing control,
9   and I can't even recall what I was thinking at that point.
10  Nothing like this had ever happened to me before.
11      Q. Did you discuss with anybody else that day what
12  had happened?
13      A. Just deputies that were arriving.
14      Q. At some point you went to the hospital for
15  yourself?
16      A. Yes.
17      Q. How did you do that?
18      A. I was transported -- driven by
19  Sergeant Antriago.
20      Q. Why was that?
21      A. My left shoulder was really sore.  I didn't
22  know if something had happened to it.  It was just really
23  sore.
24      Q. So did you get that checked out at the
25  hospital?

146

1       A. Yes, I did.
2       Q. And did you have a serious injury?
3       A. No, I did not.
4       Q. How long did it take you to recover from that
5   shoulder injury?
6       A. Couple days maybe.  It wasn't anything really
7   severe.
8       Q. Did you file a workers' comp claim for it?
9       A. I don't think I -- actually, I think the
10  department did.  I think the department -- because I had
11  to go get checked out and cleared.
12      Q. Did you miss any work because of it?
13      A. I was placed on a -- let me back up.  When I
14  got back to the jail and after being released from the
15  hospital, I finished out my shift.  Basically, my shift
16  consisted of -- from that point, of typing a red book,
17  which is basically a summary to let other people know what
18  happened.  And then I was off when my shift was over.
19      Q. Do you know how you sustained that shoulder
20  injury?
21      A. The only thing I can think of is that it was
22  during when I fell.
23      Q. Did you write a report about this incident?
24      A. No, I did not.
25      Q. How come?

147

1       A. I was instructed -- because I was the victim of
2   an assault and because it was classified as a critical
3   incident, that there would be different primary officer.
4       Q. Who instructed you not to write any report?
5       A. Originally, Agent Bricker.  When he first came
6   in, he told me that I was going to be primary and I was
7   going to write the report, and if you need anything, to
8   let him know.  And it was later, from my understanding --
9   I wasn't there when this happened, but it was later told
10  by, I think, Deputy Havens, who was the evidence
11  technician, that because I was involved in the critical
12  incident, that I would not be the one writing the report;
13  that they would have to find a different primary report
14  writer.
15      Q. I understand they found someone other than you
16  to write the primary report, but other involved officers
17  wrote supplemental reports.
18      A. Yes, sir.
19      Q. Why didn't you write a supplemental report?
20      MR. ANDRADA:  Again, it's argumentative.  I think
21  it's essentially been asked and answered.
22      But go ahead again.
23      THE WITNESS:  Again, I was told there was going to
24  be a primary, and I was questioned about that.  I was
25  questioned about the incident from the primary officer

148

1   who -- I told him kind of what happened.
2       MR. HADDAD:  Q.  Who was that?
3       A. Deputy Bareno.
4       Q. So you gave a verbal description of what
5   happened to Deputy Bareno, right?
6       A. The following day.
7       Q. And same day at the hospital when you were
8   still there, you were interviewed by Sergeant Dudek,
9   right?
10      A. Correct.
11      Q. Then you were interviewed again by
12  Sergeant Ritter on August 24th, correct?
13      A. Yes, sir.
14      Q. Now, each time you gave information to anybody
15  from your department about this incident, were you
16  truthful?
17      A. To the best of my knowledge.
18      Q. Okay.  And you understood how important it was
19  for all of those interviews to be totally complete and
20  thorough in all of your answers, right?
21      A. Yes, sir.
22      THE WITNESS:  Can I use the restroom again?
23      MR. HADDAD:  Let's take a break.
24      (Recess taken from 4:48 p.m. to 5:06 p.m.)
25      MR. HADDAD:  Q.  So other than giving interviews to

37 (Pages 145 to 148)

DEPOSITION OF DEPUTY MATTHEW AHLF

149

1  Sergeant Dudek and Sergeant Ritter, did you have any other
2  involvement in the investigation of this?
3      A. The next day, Deputy Bareno asked me what had
4  happened, because he ended up being given the primary role
5  of the report writing.
6      Q. Deputy Bareno?
7      A. Bareno.
8      Q. And where did you discuss this with him?
9      A. In the clinic.
10     Q. What clinic?
11     A. The jail clinic.
12     Q. And why did that discussion take place there?
13     A. Because that's where he was assigned at the
14 time.
15     Q. So you told him what happened?
16     A. Yeah.
17     Q. Did you have any other involvement in the
18 investigation?
19     A. Not that I could recall.
20     Q. Did you collect any evidence or anything like
21 that?
22     A. No.  My recollection is that there was another
23 deputy who collected that.
24     Q. Were you talked to or counseled by any superior
25 officer about your conduct in this incident?

150

1      A. Yes.
2      Q. Who was that?
3      A. Sergeant Bricker.
4      Q. When did that take place?
5      A. I think it was the first or second day I came
6  back.
7      Q. Okay.  And what did Sergeant Bricker say to
8  you?
9      A. That I -- that I was complacent.
10     Q. In what way?
11     A. Making a bad decision.
12     Q. What was the bad decision he said you made?
13     A. Trying to move Mr. Harrison.
14     Q. Specifically, what did he explain to you was
15 bad about that decision?
16     A. I don't recall everything.  It was a little
17 over a year ago.  I remember him saying that I was
18 complacent.
19     MR. BURRIS:  I'm sorry, "complacent"?  Is that the
20 term you used, "complacent"?
21     THE WITNESS:  Yes, that's what he mentioned and
22 that he didn't think that moving him at that time was the
23 right thing to do.
24     MR. HADDAD:  Q.  Did he explain to you that he
25 thought you should have gotten backup if you wanted to do

151

1  that at that time?
2      A. I don't recall him actually saying that.  I
3  don't recall him saying that.
4      Q. Did he explain to you that if you had decided
5  to move Harrison, you should have handcuffed him through
6  the slot in the door instead of opening the door and
7  putting yourself in danger?
8      A. I don't recall him saying anything about the
9  slot in the door.
10     Q. So what else did Sergeant Bricker say about
11 that decision and any complacency on your part?
12     A. I don't recall the conversation.  I remember
13 him saying specifically those two things, but I don't
14 remember much of the conversation.  He basically came in
15 to do his walk-through and to see how we were doing.
16     Q. Did he tell you that this whole incident could
17 have been avoided and Martin Harrison could have still
18 been alive if you had made a better decision than the one
19 that you had made?
20     A. I don't recall him saying anything like that.
21     Q. Did anybody else -- strike that.
22     So where did this conversation with
23 Sergeant Bricker happen?
24     A. It happened in Housing Unit 33 on the east
25 side.

152

1      Q. Was anybody else present for that?
2      A. Deputy -- I believe it was deputy -- there was
3  not -- Deputy Mills, I think that was who...
4      Q. And why was Deputy Mills there?
5      A. He was just -- at that particular night, he was
6  a second deputy that was assigned to the house.
7      Q. And how long had you known Sergeant Bricker at
8  that time?
9      A. I've known of Sergeant Bricker.  I haven't had
10 a lot of run-ins with him.  So I would say my direct
11 contact was when I came to the jail in April.
12     Q. Was he ever one of your supervising sergeants?
13     A. Not prior to that.
14     Q. But at some point was he?
15     A. Yes, he was one of my supervisors.
16     Q. So at the time that the Harrison incident
17 happened, he was your supervising sergeant, correct?
18     A. Correct.
19     Q. So it was -- part of his job was to supervise
20 you, right?
21     A. Yeah.  There's three sergeants assigned to the
22 team.
23     Q. All right.  And part of his job was to make a
24 determination if he thought that your conduct was poor in
25 any particular incident, right?

38 (Pages 149 to 152)

DEPOSITION OF DEPUTY MATTHEW AHLF

153

1    MR. ANDRADA:  Objection.  Vague and ambiguous as to
2  what you mean by "poor."
3    Go ahead.
4    THE WITNESS:  Yes.  His job is to supervise and
5  counsel people, I guess you can say.
6    MR. HADDAD:  Q.  Did he give you anything in
7  writing about that?
8    **A. I don't recall ever getting anything -- well,**
9  **I'm sorry, not specifically towards that.  I got an**
10 **evaluation when I got transferred to the Coroner's Bureau.**
11   Q.  Okay.  That evaluation mentioned this incident,
12 right?
13   **A. It didn't say specifically -- I mean, I knew**
14 **what he was talking about, but he -- yeah, he referred to**
15 **it.**
16   Q.  Did you ever try to contest his evaluation of
17 you or his criticism of you with anybody?
18   **A. Yes.**
19   Q.  And what did you do?
20   **A. I basically -- I was already at the Coroner's**
21 **Bureau at the time when I got the evaluation, and I didn't**
22 **agree with what Sergeant Bricker had said.**
23   Q.  So what did you do about that?
24   **A. I couldn't believe that this was written.  I**
25 **went to my supervisor at the time and I said, "I can't**

154

1  **believe this was written."**
2    Q.  What was it about the fact that he put it in
3  writing that -- that made you feel like you just couldn't
4  believe it?
5    **A. Well, because he gives me a rating of needs**
6  **improvement off of one judgment call that he wasn't even**
7  **there.**
8    Q.  So did you do anything to formally contest his
9  evaluation of you?
10   **A. I was going to, but I opted not to.**
11   Q.  What were you considering doing?
12   **A. After -- when I got the evaluation, I was going**
13 **to write a rebuttal to that evaluation stating that I felt**
14 **it was unfair due to my track record of previous**
15 **evaluations to -- to narrow down to this decision off of**
16 **one incident.**
17   Q.  Had you ever been criticized in any other
18 performance evaluation for that type of decision-making?
19   MR. ANDRADA:  Objection.  Vague and ambiguous.
20   THE WITNESS:  I don't recall --
21   MR. ANDRADA:  Go ahead.
22   THE WITNESS:  -- any evaluations.  I know I had a
23 patrol evaluation when I left the program.  But, I mean,
24 that wasn't -- it wasn't all negative.  It was
25 constructive criticism.

155

1    MR. HADDAD:  Q.  Okay.  So you've had an
2  opportunity to reflect on the incident and what you did in
3  the incident and leading up to it.
4    So knowing what you know now, would you do anything
5  different?
6    MR. ANDRADA:  It's not relevant or reasonably
7  calculated.
8    But go ahead and answer the question.
9    THE WITNESS:  Looking how the situation happened,
10 looking at the totality of everything and the results of
11 this, if I were put into the same -- are you asking if I
12 were put in the same -- I'm confused maybe.
13   MR. HADDAD:  Q.  If you could go back and do this
14 over again, knowing what you know now, would you do
15 anything different?
16   **A. I can't say "yes" or "no" on that.  I can't say**
17 **"yes" or "no" on that.  I don't know.  What I could say is**
18 **the result of this is it's a tragedy, and I don't feel**
19 **good about what happened.  I can't change what happened,**
20 **but I can't say that, well, if I was in the same situation**
21 **again, would I do the same thing.  I don't know.  But I**
22 **don't -- I'll just leave it at that.**
23   Q.  Are you critical of any of your own conduct in
24 this incident?
25   MR. ANDRADA:  Again, relevance, not reasonably

156

1  calculated.
2    But go ahead.
3    THE WITNESS:  No, I'm not.
4    MR. HADDAD:  Mark this, please.
5    (Plaintiffs' Exhibit 3 was marked for
6  identification.)
7    MR. HADDAD:  Q.  So I marked one of your
8  performance evaluations as Exhibit 3.
9    Is that the one that we've just been talking about?
10   **A. Yes, sir.**
11   Q.  So just for the record, this is during the
12 review period November 4th, 2009 to January 22nd, 2011,
13 and this was the performance evaluation that was done by
14 Sergeant Bricker, right?
15   **A. Yes, sir.**
16   Q.  And if you turn to Page 3, under Section 7,
17 this is entitled "Leadership/Decision Making."  And on the
18 form it explains that, under the section, what they're
19 looking at is the extent to which the employee is
20 effective in motivating and developing other employees,
21 delegating assignments, controlling work, and supporting
22 other employee suggestions.  And the extent to which the
23 employee's decisions are within policy and are clearly
24 explained.
25   For that one he checked the box "Improvement

DEPOSITION OF DEPUTY MATTHEW AHLF

157

1  Needed," right?
2      A. Yes, sir.
3      Q. And Sergeant Bricker wrote, quote,
4  "Deputy Sheriff Ahlf does demonstrate good, sound judgment
5  when confronted with the nuances of his assignment.
6  However, there are a few instances where Deputy
7  Sheriff Ahlf had a lapse in judgment.  One incident
8  involved opening a door without additional assistance
9  where a combative inmate was contained."  I'll just stop
10  there.
11      That -- that, you believe, refers to this incident,
12  right?
13      A. Yes.
14      Q. Okay.  So he characterized that you had a lapse
15  of judgment in opening Harrison's door to his cell without
16  additional assistance, correct?
17      A. Correct.  That's what I'm reading into it,
18  yeah.
19      Q. And then he went on in the evaluation.  He
20  says, quote, "The other instance involved a hospital
21  security detail.  After both instances, Deputy
22  Sheriff Ahlf concurred he should have sought the advice of
23  a supervisor or consult Agency policy and procedure.
24  Deputy Ahlf believes in hard work and dedication to the
25  Agency."

158

1      Did you tell Sergeant Bricker that --
2      A. I'm sorry.  Where do you see that, the second
3  portion?
4      Q. Still the comment in Section 7.
5      A. Okay.
6      Q. So did you tell Sergeant Bricker that you
7  agreed that you should have sought the advice of a
8  supervisor or consult agency policy and procedure about
9  what to do with Harrison?
10      A. I don't recall saying anything about Harrison.
11  I know of a time where we transported somebody back from a
12  hospital and took that person to John George where there
13  was miscommunication between the head technician and
14  Sergeant, and it wasn't clearly communicated to the
15  sergeant.  So I don't know whether or not that's -- I
16  don't recall saying that specifically.
17      Q. Okay.  Well, whether or not you said it, did
18  you agree with Sergeant Ritter (sic) that you should have
19  sought the advice of a supervisor or consult agency policy
20  and procedure before going in by yourself to extract
21  Martin Harrison from the flooded cell?
22      A. Are you saying Ritter are you saying Bricker?
23      Q. Bricker.
24      A. I don't recall saying that to him, no.
25      Q. As you sit here today, do you agree with

159

1  Bricker's assessment that you should have sought the
2  advice of a supervisor or consult agency policy and
3  procedure before deciding to single-handedly extract
4  Harrison from the flooded cell?
5      A. At that time, no, because he wasn't aggressive
6  towards me, and he was compliant to everything I said.
7      MR. HADDAD:  Okay.  Would you please mark this.
8      (Plaintiffs' Exhibit 4 was marked for
9  identification.)
10      MR. HADDAD:  Q.  So we've marked, as Exhibit 4,
11  your previous evaluation that goes from the period of
12  August 23, 2009 to November 3rd, 2009.
13      And can you tell which supervisor evaluated you
14  during that period?
15      A. Yes.
16      Q. Who is that?
17      A. At that time, it was Sergeant Toms.
18      MR. BURRIS:  Thomas?
19      THE WITNESS:  "Toms."
20      MR. HADDAD:  Q.  There's a section there, Section
21  No. 9 on Page 4, pertaining to e- -- evaluating you for
22  controlled conflict, voice command, physical skills,
23  problem solving, and decision-making, and that was an
24  area, during that period of time, that you were judged
25  improvement needed.

160

1      Do you see that?
2      A. Yes, I do.
3      Q. And did any supervisor counsel you at that
4  point about what you can do to improve in those areas?
5      A. At the -- during -- given this evaluation?
6      Q. Yeah.
7      A. I don't recall us going over this.  I knew that
8  I was getting an evaluation, and I knew it was -- probably
9  was because I voluntarily took myself out of the program.
10  I don't recall going over every single little bit of this.
11      Q. So was this evaluation that we're looking at
12  now in connection with the Field Training Program?
13      A. The one -- yes, it was.
14      Q. In this Field Training Program evaluation, you
15  were marked as "Needs Improvement" in ten areas and "Meets
16  Standard" in three areas, right?
17      A. Yes, sir.
18      Q. And is it still your testimony that your
19  performance in the Field Training Program had nothing to
20  do with your decision to leave that program?
21      A. Not directly, no.
22      Q. Did it indirectly have some connection with
23  your decision to leave?
24      A. Some.
25      Q. In what way?

DEPOSITION OF DEPUTY MATTHEW AHLF

161

1    A. I was dealing with a family situation where --
2        MR. ANDRADA:  You don't to have go into the
3    specifics of a family private matter.
4        MR. HADDAD:  That's right.
5        THE WITNESS:  I had a family situation prior to me
6    going through the program, and, unfortunately, it went
7    downhill from there while I was in the program, and I knew
8    I was having problems.  I wanted to continue to keep
9    going.  I spoke with my training officers and let them
10   know about situations that were going on.  And I even let
11   them know that if I ever got to a point where I was either
12   unsafe to myself or unsafe to them, that I would put
13   myself out.
14       So I knew that I was not -- on a lot of portions, I
15   knew I was not up to par on a patrol aspect because I was
16   dealing with other things that, unfortunately -- I was
17   just dealing with other things on the outside that
18   mattered.
19       MR. HADDAD:  Q.  At the time of the Harrison
20   incident, were you dealing with any personal matters or
21   family matters that you believe affected your judgment or
22   conduct in any way in the Harrison situation?
23       A. No.
24       MR. HADDAD:  That's all I have right now.
25       MR. BURRIS:  I have a few.

162

1        EXAMINATION BY MR. BURRIS
2        MR. BURRIS:  Q.  Looking at -- Deputy, looking at
3    Plaintiffs' 2 -- and just for clarity, if I call you
4    "officer," you know I mean no disrespect.  I work with so
5    many different agencies.
6        So, Deputy, looking at Plaintiffs' 2 and you
7    indicated, at some point in time, I believe, that
8    Mr. Harrison was talking gibberish or acting in a bizarre
9    manner, correct?
10       A. Yes, sir.
11       Q. Now, is that -- would you identify the part
12   that is here at 0420 to 0445 as that period of time, or
13   was that before?
14       A. That was before, sir.
15       Q. You also indicate there was a time, when you
16   were walking, he had a mattress on his head?
17       A. Yes, sir.
18       Q. Okay.  And when was that?
19       A. That was somewhere in the range of,
20   approximate, between 1816 and possibly around 1832,
21   somewhere around there.
22       Q. Between 1816 and 1832?
23       A. Roughly.
24       Q. Roughly?  I'm not trying to pin you down.
25       A. Yes, sir.

163

1        Q. During that period of time, 1816 and 1832, you
2    would consider that as bizarre behavior, correct?
3        A. Yes, that is.
4        Q. So I'm just curious, as you have "8" here, and
5    Mike asked you earlier whether or not you completed these
6    notations here contemporaneously or later.
7        And do you recall that you said that you did it
8    contemporaneously?
9        A. I did it -- when I came in, I would check as
10   often as I could.  Approximately, they always want you to
11   check close to 15 minutes.  Those notations on there were
12   when I checked.
13       Q. So you see him in the period of time that you
14   described with his mattress on his head, and you consider
15   that bizarre behavior?
16       MR. ANDRADA:  Asked and answered.
17       Go ahead again.
18       MR. BURRIS:  Foundation.
19       THE WITNESS:  Yes, along with the other
20   observations.
21       MR. BURRIS:  That's not my question.
22       Q. What were the other observation you were making
23   about him during that period of time, other than the
24   mattress?
25       A. I didn't note on him, but he had -- he was

164

1    pointing at the wall saying that somebody had a gun.
2    Somebody was going to get him; they were shooting at him.
3        Q. So he was talking about being threatened in
4    some way?
5        A. Yes, sir.
6        Q. And that was pretty clear that wasn't true,
7    correct?
8        A. Yes, sir.
9        Q. So, in many ways, his conversation and his
10   conduct that he was exhibiting at the time certainly was a
11   person who was not in touch with reality, seemingly, from
12   your point of view?
13       MR. ANDRADA:  Objection.  Vague and ambiguous as to
14   what you mean by "in touch with reality."
15       But go ahead.
16       THE WITNESS:  I --
17       MR. BURRIS:  Q.  Well, let's put it this way --
18       A. It was definitely an odd -- I mean, it was not
19   a normal state.
20       Q. Right.  The guy was talking about someone -- a
21   gun coming after him.
22       You knew that wasn't true, right?
23       A. Right.
24       Q. So that wasn't a reality-based statement he was
25   making, right?

Crangle Reporting Services (510) 653-1312

DEPOSITION OF DEPUTY MATTHEW AHLF

165

1    A. Correct.
2        Q. He was making other statements that were not
3    reality-based, given what he was and your observation of
4    him, correct?
5        A. Yes.
6        Q. So from your point of view, this was a person
7    who appeared to be having some kind of mental problem,
8    fair?
9        MR. ANDRADA: Objection. Vague and ambiguous.
10       MR. BURRIS: Q. Well, from your observation.
11       MR. ANDRADA: You know what?
12       MR. BURRIS: I don't want to argue
13       MR. ANDRADA: I know.
14       Objection. Vague and ambiguous as to what is meant
15   by "mental problem."
16       Go ahead, Deputy.
17       THE WITNESS: What I can answer to that is it was
18   not of normal conduct of somebody that would be in a
19   minimum-setting security.
20       MR. BURRIS: Q. So -- and that conduct that he was
21   engaged in terms of verbally was consistent with the
22   conduct that you had heard him engaged in earlier when you
23   first put him in the cell, correct?
24       A. Yes. Yes.
25       Q. So what I'm curious about is you have this --

166

1    observations here, and certainly from 1816 on, you just
2    indicate that he's awake in bed.
3        But is there any reason why you don't explain
4    further that -- about the conduct you described?
5        A. No, sir.
6        Q. Now, this particular document, is it a running
7    tab, so to speak, that is located in a place that anyone
8    could see?
9        A. Yes. It's located outside the door.
10       Q. Outside the door. Okay.
11       And so, now, after you start making physical
12   contact with Mr. Harrison, at any point in time did his
13   communication with you continue to be of this -- of the
14   nature that someone was attacking him or he was sort of
15   disoriented as it relates to reality?
16       A. No.
17       Q. When you started attacking, he became very
18   clear in terms of his state.
19       Is that what you're telling us?
20       MR. ANDRADA: I'm sorry. Could I have that read
21   back. Excuse me.
22       (Record read as follows:
23       "QUESTION: When you started
24       attacking, he became very clear in terms of
25       his state.

167

1        Is that what you're telling us?")
2        MR. BURRIS: "Attacking" is the wrong word.
3        Q. When you initially made contact with him, you
4    pushed him first, correct?
5        A. After -- yes.
6        Q. You pushed -- you pushed him first. He had not
7    pushed you. He had not attacked you. He, in fact,
8    appeared to be cooperating with you, correct?
9        MR. ANDRADA: That misstates the testimony.
10       Go ahead. Listen to the question and answer the
11   question.
12       THE WITNESS: The term "pushed" -- I nudged him --
13   I mean, I --
14       MR. BURRIS: I'm going to use your term.
15       Q. He's walking. You pushed him away from you,
16   right?
17       A. When he was in between the doorway.
18       Q. Yeah, you push him. Okay?
19       A. To go back in.
20       Q. That's the first physical contact that occurred
21   between you or he, correct?
22       A. Correct.
23       Q. Now, up until that moment, had he been -- he
24   had been talking in a way that would -- was not really in
25   touch with reality, correct?

168

1        A. Not all the time, no.
2        Q. So you didn't have any sense that he, all of a
3    sudden, was a person that was speaking and so clearly in
4    touch with reality that he could move back to the pod,
5    correct?
6        A. I knew he couldn't go back to the pod.
7        Q. He could not.
8        A. I was not comfortable with having him in a
9    mainline population based on his prior actions.
10       Q. And he hadn't said anything to you that
11   suggested in any way that he should go back to the
12   mainline population, correct?
13       A. Correct.
14       MR. BURRIS: Do you want to take a break?
15       MR. ANDRADA: No, that's fine.
16       MR. BURRIS: Q. Now, after this physical contact
17   that you had with him and up until the time that he
18   essentially was removed and placed in the other cell,
19   did -- at any point in time, did he speak continually in
20   this disoriented reality-based way?
21       A. No.
22       Q. So you had a sense, of course, then, it seems
23   to me, that when you were dealing with him, you knew you
24   were dealing with a person at all times who may not have
25   been in touch with reality, correct?

Crangle Reporting Services (510) 653-1312

DEPOSITION OF DEPUTY MATTHEW AHLF

169

1    MR. ANDRADA: Objection. Vague and ambiguous,
2  misstates his earlier testimony.
3    MR. BURRIS: Q. You can answer the question.
4    MR. ANDRADA: Go ahead.
5    THE WITNESS: I'm not sure exactly what you're
6  asking.
7    MR. BURRIS: Q. At any point in time, did you have
8  any real view that he was not in touch with reality?
9    MR. ANDRADA: I'm sorry. Not in touch.
10    MR. BURRIS: Not in touch.
11    MR. ANDRADA: Not in touch. All right.
12  Listen to the question. Answer the question.
13    THE WITNESS: While -- I mean, it was evident that
14  while he had that mattress over his head and he was
15  claiming somebody had a gun and shooting at him and
16  wanting to get him, that it was clear that he was
17  hallucinating and he was going through something. There
18  was something not right about him.
19    MR. BURRIS: Q. Now, what equipment did you have
20  on your duty belt?
21    **A. I had pepper spray. I had -- I think I had**
22  **pepper spray. I think -- actually, yeah, pepper spray. I**
23  **had handcuffs. I had Taser.**
24    Q. Did you -- what kind of shoes were you wearing?
25    **A. Normal -- they were my normal boots that I**

170

1  **would wear.**
2    Q. I don't know what normal boots are.
3    **A. I'm sorry. They were rocky style.**
4    Q. Are they like what you have on now?
5    **A. Similar.**
6    Q. Are those steel-toed?
7    **A. No, sir.**
8    Q. Just rubber-based toes?
9    **A. Yes, sir.**
10    Q. Those shoes that you had on were similar?
11    **A. They are similar. Yeah, these are a little**
12  **bit --**
13    Q. Not bigger? wider? less?
14    **A. No.**
15    Q. But it was similar.
16    **A. It was a different brand.**
17    Q. Okay. Now, as part of your -- did you have a
18  baton of any kind?
19    **A. No, sir.**
20    Q. Okay. Do you have batons?
21    **A. In the housing controls we do.**
22    Q. Okay. And who has access to those?
23    **A. The technicians.**
24    Q. So deputies like yourself do not have access to
25  them?

171

1    **A. If we request one, we can have the technician**
2  **get one for us.**
3    Q. So when you're in a situation where there's a
4  confrontation taking place and occurring between deputies
5  and inmates, is there a call for batons?
6    MR. ANDRADA: Vague and ambiguous.
7    But go ahead if you understand what he's asking
8  you.
9    THE WITNESS: There's been times when I'll --
10    MR. ANDRADA: Finish your answer and then we'll
11  take a break. Finish your answer.
12    THE WITNESS: Yes, people can grab batons upon
13  request.
14    MR. ANDRADA: Okay. Hang on. Let's take
15  30 seconds.
16    (Recess taken from 5:37 p.m. to 5:37 p.m.)
17    MR. ANDRADA: Thank you.
18    MR. BURRIS: Q. So when you were with
19  Mr. Harrison, no batons were present. Is that right?
20    **A. They were up in the housing control.**
21    Q. Were any batons present --
22    **A. No.**
23    Q. -- when -- when you and the other officers were
24  in contact with Mr. Harrison?
25    **A. I don't recall anybody carrying a baton.**

172

1    Q. Okay. Does that mean you do not know whether
2  or not any other officer had a baton?
3    **A. Correct.**
4    Q. Now, there was a period of time, or was there,
5  when you were removed from Mr. Harrison, correct?
6    **A. Yes, sir.**
7    Q. And when you were removed from Mr. Harrison,
8  where were you taken?
9    **A. Just up a few feet.**
10    Q. A few feet away.
11    You were not removed from the scene, correct?
12    **A. No, sir.**
13    Q. Now -- and the other officers, were they still
14  with Mr. -- deputies still with Mr. Harrison?
15    **A. Yes, sir.**
16    Q. Did you see any one of them use their knees
17  against Mr. Harrison while you were standing there?
18    **A. I don't know if -- I mean, I saw -- I don't**
19  **recall seeing knees. I recall seeing...**
20    Q. You saw punches?
21    **A. I saw maybe one or two punches --**
22    Q. Okay.
23    **A. -- but my back was towards them at that time.**
24    Q. Okay. So you get pulled off, and your back is
25  then turned to Mr. Harrison and the other officers?

DEPOSITION OF DEPUTY MATTHEW AHLF

173

1    A. I get pulled off, and I'm, like, kind of canted
2 a little bit, but I'm continuing to kind of look.
3    Q. You see one or two punches, you said?
4    A. Yeah.  I don't recall exactly who and how many.
5    Q. Did the people -- the person -- the punches --
6 did those individuals have gloves on?
7    A. I don't recall.
8    Q. Did you have gloves on?
9    A. I believe so.
10    Q. So when you were punching Mr. Harrison, you had
11 your gloves on?
12    A. I believe so.  I can't recall if I had them on.
13 I know that I had them on my body.  Whether or not I had
14 them on, I don't recall.
15    Q. And did you see anyone kick Mr. Harrison with
16 their feet?
17    A. No, I did not.
18    Q. Did you?
19    A. No, I did not.
20    Q. You did not?
21    A. No, I did not.
22    Q. And you did not see anyone kick?
23    A. No, I did not.
24    Q. Did you see any officer -- strike that.
25    Did you in any way strike Mr. Harrison on his legs

174

1 with any item?
2    A. No, sir.
3    Q. You didn't punch him?  You didn't knee him on
4 his legs?
5    A. No, sir.
6    Q. Did you see anybody else punch him on his legs?
7    A. No, sir.
8    Q. Did you see anyone else knee him on his legs?
9    A. No, sir.
10    Q. And you didn't see anyone kick him on his legs?
11    A. No, sir.
12    Q. Now, you had your arms around him, right, when
13 he was on the floor?
14    MR. ANDRADA:  Objection.  Vague and ambiguous as to
15 time.
16    But go ahead.
17    MR. BURRIS:  You're right about that.
18    Q. At one point in time, you were on --
19 Mr. Harrison is on the floor, right?
20    A. Yes, sir.
21    Q. And you're on top of him, correct?
22    A. Yes, sir.
23    Q. And you have your arms around him?
24    A. I had my arms controlling his arm --
25 controlling his arms.

175

1    Q. That's what I'm trying to find out.
2    When you say "controlling his arms," does that mean
3 you have your hands gripping his arms, or do you have him
4 in a bear hug or some other method?
5    A. I know it wasn't a bear hug.
6    Q. It's not a bear hug.
7    A. I had his arms -- I --
8    Q. You're controlling his arms.  I don't want to
9 miss anything.
10    MR. ANDRADA:  Let him finish.
11    Go ahead.
12    THE WITNESS:  I --
13    MR. ANDRADA:  Finish your answer.
14    THE WITNESS:  Really, to be honest with you, so
15 close to proximity, all I can tell you is I had him in a
16 controlling hold where his arms were not able to swing at
17 me.  That's all I can recall.  I don't --
18    MR. BURRIS:  Q.  Did you -- and I'm just trying to
19 find out -- just probing this to be clear.  I want the
20 record to be clear.
21    When you're doing this, are you using your hands to
22 grip his arms and control him?
23    A. I -- no.  I don't recall ever, like, holding
24 him and holding his arms.  I recall just using my body
25 weight and holding his arms in a position where he wasn't

176

1 able to move.
2    Q. So you are, essentially, smothering him, then,
3 in a sense?
4    MR. ANDRADA:  Well --
5    MR. BURRIS:  And I don't mean choking him where he
6 can't breath.  Let me finish the point without having a
7 fit.
8    Q. You -- he's on the floor.  Okay?  You're on top
9 of him, right?  Correct?
10    A. Yes.
11    Q. And you're on top of him for the purpose of
12 preventing him from moving, correct?
13    A. Correct.
14    Q. I'm not saying you're trying to keep him from
15 breathing, but you're trying to keep him from moving.
16    A. Well, can I answer that real quick?
17    Q. Yeah.  That's why we're here.
18    A. His body is laying right here --
19    Q. Yeah.
20    A. -- I'm laying, like, right here.
21    Q. Across his body.
22    A. Across his body.  I'm not, like, laying
23 directly right on top of him.
24    Q. All right.
25    A. Okay?  And I have his arms somewhere in the

44 (Pages 173 to 176)

DEPOSITION OF DEPUTY MATTHEW AHLF

177

1  range of something like this. So I have no -- nothing
2  towards his legs controlling -- trying to control his arms
3  and his hands.
4      Q. So he's -- his arms are underneath him?
5      A. His arms, at that point -- because he was
6  starting -- originally, yes. As we -- as the struggle
7  came about, he ended up bringing his arms -- I can't tell
8  you --
9      Q. Did his arms come out from under his body?
10     A. They -- they -- the whole reason for me holding
11 his arms down is because I'm thinking -- I'm anticipating
12 him trying to strike me.
13     Q. I've heard you say that, but at no point in
14 time did he ever try to strike you, correct?
15     A. Correct.
16     Q. So this is your anticipating in your own mind's
17 eye that he might be trying to strike you, correct?
18     A. Correct. I wasn't going to give him the
19 opportunity to.
20     Q. He hadn't done anything indicating that he was
21 trying to strike you, right?
22     A. Well, the fact that he's thrashing and being
23 aggressive towards --
24     Q. Isn't it really true?
25     MR. ANDRADA: Let him finish.

178

1  Go ahead, Officer.
2      MR. BURRIS: Q. You're the one that pushed him
3  initially that started this whole thing, correct?
4      MR. ANDRADA: It's argumentative.
5      MR. BURRIS: It's not argumentative. It's a direct
6  question.
7      Q. It's true, is it not, you're the one that
8  pushed him initially before there was any physical contact
9  between either one of you? Correct?
10     MR. ANDRADA: First of all, the question has been
11 asked and answered. Mr. Haddad essentially asked it.
12 You've asked it. It's been answered. You're -- the
13 record should reflect that you've leaned across the table.
14 You're pointing your finger at the witness. That is
15 argument and argumentative, and I'm not going to let him
16 answer that question.
17     If you have another question --
18     MR. BURRIS: My question --
19     MR. ANDRADA: Let me finish. Let me finish, and
20 then I will listen to you.
21     The question -- given the fact that it's already
22 been asked and answered several times and given the tone
23 and demeanor of counsel, I'm going to instruct the witness
24 not to answer the question.
25     If you have another question --

179

1      MR. BURRIS: It's inappropriate for you to suggest
2  that the question should not be answered because it's not
3  a privacy question, and the fact that a subject matter may
4  have been asked by Mr. Haddad does not mean I cannot
5  explore it, and I wasn't clear about the answer that was
6  given before.
7      And the fact that my tone is not something that you
8  find appropriate is not meant to be intimidating. It is
9  meant to be firm, and I want to find out, and I wanted to
10 find out, whether or not it happened the way he said it
11 did.
12     If I offended you, I'm sorry. I don't want to
13 offend you. I'm trying to get to the end of this. We
14 have a dead man here. We're trying to find out about what
15 happened to him. Okay?
16     THE WITNESS: Yes, sir.
17     MR. BURRIS: I understand counsel's position.
18     Q. Have you had a chance to see any of the -- you
19 work in the coroner's office, right?
20     A. Yes, sir.
21     Q. What do you do for the coroner's office?
22     A. I handle death calls. I investigate the manner
23 of death and determine mode and manner.
24     Q. Okay. So when we -- this report that we have
25 here was that -- is -- essentially has a coroner's

180

1  investigative report attached to it.
2      Is this the kind of thing you do now?
3      A. Yes, sir.
4      Q. And so when people get killed in Alameda
5  County, you're one of the groups that goes out and meets
6  with the police and finds out the story, essentially, of
7  what happened. Is that correct?
8      A. Yes, sir.
9      Q. And -- and then you write the report that we
10 have that -- you would write this type of a report?
11     A. Yes, sir.
12     Q. Okay.
13     A. That is the -- I just want to clarify, because
14 I don't have that report. Can I see it?
15     Q. Yes, sir.
16     A. Yes. It would be something very similar to
17 that, yes.
18     Q. Have you had a chance to see this particular
19 report related to Mr. Harrison?
20     A. I have not read that report, no.
21     Q. Have you seen it?
22     A. No, I don't recall seeing that.
23     Q. Have there been any discussions with you about
24 its contents?
25     MR. ANDRADA: Other than what you might have

DEPOSITION OF DEPUTY MATTHEW AHLF

181

1   discussed with counsel.
2       MR. BURRIS: Of course.
3       Q. Other than counsel.
4       **A. I know the deputy who wrote that report, but I**
5   **specifically did not go verbatim and read the reports.**
6       Q. You had some discussion with the deputy who
7   wrote the report?
8       **A. I knew the deputy who was in charge of that**
9   **report. I didn't ask specific questions regarding this**
10  **report.**
11      Q. Did he have -- did the deputy share with you
12  the scope of injuries that were reflected on
13  Mr. Harrison's body?
14      **A. No.**
15      Q. Now, is it fair to say that when you saw
16  Mr. Harrison before this incident, that he did not show
17  any visible injuries around his neck or his body that you
18  could see?
19      **A. Correct.**
20      Q. So did you have discussions -- or strike that.
21      In terms of the -- has anyone shared with you the
22  types of injuries that were on the legs of Mr. Harrison?
23      **A. No, sir.**
24      Q. Do you know of anything you did that would have
25  caused contusions to the legs of Mr. Harrison?

182

1       **A. Not directly, no.**
2       Q. In terms of his arms, did you punch his arms at
3   all?
4       **A. No, sir.**
5       Q. Did you squeeze his arms?
6       **A. I don't recall ever squeezing his arms.**
7       Q. To the extent there were injuries reflected on
8   his arms, there was nothing you did that would have caused
9   those injuries. Is that fair?
10      **A. Yes, sir.**
11      Q. And I think Mike has covered this, but in terms
12  of -- to the extent that the autopsy reflects that there's
13  trauma around the neck of Mr. Harrison, there's nothing
14  you did, from your point of view, that would cause those
15  injuries. Is that fair?
16      **A. Nothing I can recall that would cause anything**
17  **like that, no.**
18      Q. Okay. Because -- is it fair to say you never
19  had your hands around his neck?
20      **A. I don't recall ever having my arms around his**
21  **neck?**
22      Q. I said hands. I'll ask about arms too.
23      Did you ever have any portion of an arm around his
24  neck.
25      **A. No, not that I can recall.**

183

1       Q. And you did not strike his neck in any way?
2       **A. No, sir.**
3       Q. And you did not see anyone else strike his
4   neck. Is that correct?
5       **A. Yes, sir.**
6       Q. Now, in terms of the injuries that are
7   reflected on his arms, did you see anyone -- you said you
8   had not done it, but did you see any other officers,
9   deputies, if you will, engage any physical contact with
10  Mr. Harrison that would have caused any significant injuries
11  to his arms?
12      **A. No, sir.**
13      Q. Is that also true with respect to his torso?
14      **A. As far as directly, yeah. Yes, sir.**
15      Q. You did -- as I recall, did strike him with
16  your knees on his torso. Is that correct?
17      **A. Yeah. Yes, sir.**
18      Q. Now, in the sequence of that, was Mr. -- when
19  you used your -- when you -- when you punched
20  Mr. Harrison -- and I don't recall this -- did you punch
21  him on the side of the face or on the head?
22      **A. It was open palm to the back of the head.**
23      Q. Back of the head.
24      Now, that's -- do you make a distinction in your
25  own mind's eye between a -- an open-handed slap and a

184

1   punch?
2       **A. It's an open -- I know for a fact that it was**
3   **an open palm.**
4       Q. That's in the back of the head?
5       **A. Yes, sir.**
6       Q. Now, the question -- the question is: Did you
7   make a distinction between an open-handed hit and a punch?
8   Do you make a physical distinction in your own mind's eye?
9       MR. ANDRADA: He's not asking whether you punched
10  him --
11      MR. BURRIS: Q. I'm not asking if you actually
12  punched him. I said, Do you make a distinction between
13  the physical striking of someone with an open hand versus
14  punching them?
15      **A. I --**
16      Q. Do you know what a punch is?
17      **A. I know what a punch is. It's closed fist.**
18      Q. An open-handed hit is your hand open.
19      **A. Yes.**
20      Q. Now, you did punch him, or did you not? I'm
21  asking the question.
22      **A. I strike him with an open palm.**
23      Q. You never punched him?
24      **A. Not in the head.**
25      Q. You punched him where?

Crangle Reporting Services (510) 653-1312

DEPOSITION OF DEPUTY MATTHEW AHLF

185

1   A. In the back.
2   Q. In the back, and where in the back?
3   A. I don't --
4   Q. Shoulder? mid-back?
5   A. It was probably mid-back.
6   Q. And you did that more than once?  And I don't
7   know the answer to that.  I mean, did you?
8   A. Possibly two times.  I don't recall doing it
9   in -- several, and I -- I know it wasn't just once.  I
10   would say maybe two or three times.
11   Q. What was the surface that you guys were on?
12   Was that a wood surface? metal surface? cement surface?
13   What kind of surface was in that cell?
14   A. It was actually outside the cell.  It was tile.
15   Q. Tile.  Okay.
16   Did you know whether there was any blood on the
17   tile afterwards?
18   A. I don't recall seeing any blood.
19   Q. You used a term -- I think Mr. Haddad asked you
20   a question about when the -- when Mr. Bricker raised
21   questions with you, and did you use the term "complicit,"
22   or not?
23   A. "Complacent."
24   Q. Was it "complacent"?
25   A. Yes, sir.

186

1   Q. He said you were too complacent or complicit?
2   A. Complacent.
3   Q. Meaning you were not aggressive enough?
4   A. My understanding of what he was telling me is
5   that I was just -- I didn't -- from what I can understand
6   what he was kind of telling me or trying to say was that I
7   had gotten in this mode of just everyday motions of in and
8   out of the housing unit, doing the same thing over and
9   over again, getting to a mode of complacency.
10   Q. Okay.  And the officers that you had mentioned
11   as the two you remember being there, one starts with a "V"
12   and the other one was Swetnam?
13   A. Swetnam, yes, sir.
14   Q. What was the other officer's name?
15   A. I believe it was Valverde.
16   Q. Did you see either one of them strike
17   Mr. Harrison?
18   A. No, sir.
19   Q. They were the first officers there?
20   A. From what I read.  Unfortunately, because of my
21   position, all I saw were boots.
22   Q. Did you see those boots moving in a striking
23   fashion on Mr. Harrison?
24   A. No, sir.
25   Q. So who were the other officers who were

187

1   present?
2   A. I know that Deputy Livenchuk.  I think Deputy
3   Madigan arrived.  Deputy Sobrero.  Deputy Will Haas
4   (phonetic) I, think, came.
5   Q. Did you see any one of these officers strike
6   Mr. Harrison?
7   A. No, I did not, sir.
8   Q. When you were -- so, essentially, you saw
9   officers striking Mr. Harrison, but you don't know who
10   they were?
11   A. Correct.
12   Q. Now, when you were laying across the body of
13   Mr. Harrison and the other officers arrived before you
14   were removed from the body, did you see any of these --
15   any officers strike Mr. Harrison?
16   A. No, sir, I did not.
17   Q. So when you were laying across him, you were
18   then -- you were striking -- when you had struck him for
19   whatever period of time you did, you then get removed and
20   then the other officers started to strike?
21   A. I got removed --
22   Q. Right.
23   A. -- and I recall -- because he was thrashing
24   around, I recall verbal words communicating he was not
25   following verbal orders, and they had gave him -- I recall

188

1   specifically there was a strike to the back.
2   Q. When you said that he was not following verbal
3   orders, haven't you been trained that when you're dealing
4   with a person who is emotionally or mentally in trouble or
5   out of touch with reality, if you will, that they don't
6   often follow instructions?
7   MR. ANDRADA:  Objection.  Vague and ambiguous,
8   overly broad.
9   But go ahead and answer the question.
10   THE WITNESS:  At times.
11   MR. BURRIS:  Q.  You're taught that, right?
12   A. At times it can escalate to that.
13   Q. Well, aren't you taught that you are supposed
14   to deescalate the situation?
15   MR. ANDRADA:  Vague and ambiguous, overly broad.
16   MR. BURRIS:  Q.  Even when you're dealing with a
17   person who is emotionally and mentally in trouble?
18   MR. ANDRADA:  Still vague and ambiguous.
19   But go ahead.
20   THE WITNESS:  We're taught to mitigate the -- any
21   kind of aggressive manner and a threat, try to get them
22   secured.  Once that person is secured, at that point it
23   would -- it would be assumed that he's in handcuffs; he's
24   secured.
25   MR. BURRIS:  Q.  When you were in contact,

47 (Pages 185 to 188)

DEPOSITION OF DEPUTY MATTHEW AHLF

189

1  physically aggressively punching, slapping Mr. Harrison
2  while he was on the ground on the floor and you're on top
3  of him, what was he saying to you, if anything?
4      A. I don't even recall. I don't recall because
5  everything was going around so fast. I just know that he
6  was trying to -- he was thrashing around. He was trying
7  to -- I recall him kind of grimacing, like he was trying
8  to tense up, what I would call break free from my -- my --
9  my hold on him.
10     Q. This is a person who you have -- now know is
11 having emotional problems. You are now on top of him and
12 you're punching him and slapping him.
13     Did it dawn on you that maybe he was not -- maybe
14 he thought you were the people with the gun? Never
15 thought about it?
16     MR. ANDRADA: Argumentative.
17     MR. BURRIS: I'll withdraw the question. It's
18 argumentative.
19     MR. ANDRADA: Thank you.
20     MR. BURRIS: Q. Is it your testimony that while
21 you were on top of Mr. Harrison and he was grimacing, that
22 he said, "I'll kick your ass," or words to that effect?
23     A. He said something. He said something to me.
24     Q. Is it fair to say you didn't tell anybody
25 that -- when you had your two interviews, that he said,

190

1  I'll -- Mr. Harrison said, "I'll kick your ass"?
2      A. I don't really recall --
3      Q. Reading that, do you?
4      A. I don't recall.
5      Q. All right. Before -- when you pushed
6  Mr. Harrison away and back towards the wall there, you
7  were in the doorway?
8      A. I was just outside the doorway.
9      Q. Now, were you in the position to close that
10 door?
11     A. Not in particular, no.
12     Q. Why?
13     A. The door was swung all the way open when I
14 had --
15     Q. Pushed him in?
16     A. Well, nudged him in, tried to gain some
17 distance at that point. My goal was to keep an eye on him
18 at that point.
19     Q. So --
20     MR. ANDRADA: Wait a minute. Excuse me.
21     Did you finish your answer?
22     THE WITNESS: Yes.
23     MR. ANDRADA: All right.
24     MR. BURRIS: Q. All right. So you could have --
25 are you saying that when you nudged him, to use your

191

1  term -- but he went back toward the wall, correct?
2      A. Yeah. I mean...
3      Q. Couldn't you have not closed the door at that
4  time?
5      A. Not and keep an eye on him at the same time,
6  no.
7      Q. Because you couldn't look through the door, the
8  window there? You couldn't see him?
9      A. It wasn't that. I couldn't reach through under
10 the door at that time.
11     Q. Could you have called -- do you guys have radio
12 communication?
13     A. Yes, sir.
14     Q. And that's, like, on your shoulder or
15 somewhere?
16     A. Yes, sir.
17     Q. In order to communicate, what do you have to
18 do? How do you -- if you want to communicate for
19 assistance, what do you do?
20     A. Press the button and request --
21     Q. So that's something you could have done as
22 well?
23     A. Yes.
24     Q. When you used your Taser, the first time you
25 used it, the prong goes out, correct?

192

1      A. Yes, sir.
2      Q. And it goes for five seconds' application,
3  right?
4      A. Yes, sir.
5      Q. Now, the records reflect -- now, can you do
6  another application while it's still connected?
7      A. After the five seconds?
8      Q. Yes.
9      A. Yes, you can.
10     Q. If you then want to do a drive-stun, if you
11 will, what do you have to do differently?
12     A. Put the Taser -- connect it right against the
13 skin.
14     Q. Can you do that even if the prong is still out?
15     A. That I don't know.
16     Q. Did the prongs come back?
17     A. The prongs did not come back. At the time when
18 I drive-stunned him --
19     Q. Yeah.
20     A. -- I wasn't 100 percent sure whether or not
21 both prongs were still attached to him, because we were on
22 the ground at that time, and I don't know if -- I couldn't
23 see, because of his body position, where those prongs
24 were.
25     Q. So when you drive-stun, does the prongs -- do

DEPOSITION OF DEPUTY MATTHEW AHLF

193

1  you have to drive-stun at the location where the prongs
2  are or can you just take the Taser and stick it next to a
3  person's body?
4      **A. I believe you can take it -- I think you can**
5  **take it right up to the body and be able to do it.**
6      Q. And it registers as well?
7      **A. Yes.**
8      Q. Okay.  Did you know how many times the other
9  officers, in fact, had used the applications that they
10  used?
11     **A. Are you referring to the Taser, sir?**
12     Q. Yes.
13     **A. I know of hearing a Taser go off once, and it**
14  **was somebody else.**
15     Q. Did you say to anyone to use the Taser?  When
16  you stood up, now you're standing to the side, does that
17  occur before or after you hear this other Taser going off?
18     **A. I want to say it's after.  I'm not 100 percent**
19  **sure on that, to be honest with you.**
20     Q. In any event, there wasn't any discussion
21  amongst any of you or a discussion you had with anyone
22  that you had used the Taser on at least once, maybe twice
23  before this Taser is used by another person, correct?
24     **A. I don't recall.  I told my sergeant that I had**
25  **tased him, but I don't recall saying anything to anybody**

194

1  **else, because they -- they saw the probe wires.**
2      Q. Was your sergeant present when these other
3  officers were there?
4      **A. He came shortly after -- shortly after, about**
5  **three or four of them showed up.**
6      Q. Did they come before or after the officers were
7  still striking Mr. Harrison?
8      **A. I believe he was there during the -- while they**
9  **were trying to...**
10     Q. Who was the sergeant?
11     **A. It was Sergeant Antriago.**
12     Q. Did he give any instructions to anyone while he
13  was there?
14     **A. I don't recall that, sir.**
15     MR. BURRIS:  Thank you.  I have no further
16  questions.
17     MR. HADDAD:  Just a couple more.
18     FURTHER EXAMINATION BY MR. HADDAD
19  MR. HADDAD:  Q.  Can you describe the gloves that
20  you had with you at that time?
21     **A. Yeah.  There a thin mesh 511 glove.**
22     Q. What material are they made of?  Leather?
23     **A. No.  Part of it is leather.  The part on the**
24  **top here is more nylon.  The bottom half is leather.  The**
25  **top was more nylon.**

195

1      Q. Do they have the fingers cut off, or do they go
2  all the way down?
3      **A. They go all the way down, sir.**
4      Q. Do you use those gloves in your work?
5      **A. Now or?**
6      Q. Did you at the time?
7      **A. Certain things I would deal with, yeah.**
8      Q. Like what?  What did you have the gloves for?
9      **A. If I had to go search somebody's cell or when**
10  **we were doing a shakedown or if I was dealing with anybody**
11  **that had blood all over them, kind of something that I**
12  **could use as some sort of barrier.  If I couldn't get**
13  **proper gloves, I had my own.**
14     Q. Why not just carry some disposable latex gloves
15  with you for that purpose?
16     **A. Latex gloves don't always -- I mean, they're**
17  **available.  I usually always have my own set of -- I have**
18  **my own pair of gloves I use for searches and that kind of**
19  **stuff.**
20     Q. Have you ever had to clean those gloves from
21  blood or something that got on them?
22     **A. Yes.**
23     Q. And what did you do, just put them in the
24  faucet and clean them?
25     **A. No.  PHS has a spray that they use, like a**

196

1  disinfectant spray I would spray down.
2      Q. Have you ever punched anybody while wearing
3  those gloves?
4      **A. I don't recall -- I don't think so, and I can't**
5  **recall whether or not I had those gloves on during this**
6  **incident.**
7      Q. Did you see any deputies during this incident
8  wearing any type of glove?
9      **A. I wasn't paying attention to that.**
10     Q. Now, I think you've already estimated that the
11  length of the cell from the back wall to the door is about
12  8 or 9 feet.  Is that right?
13     **A. Roughly, yes, sir.**
14     Q. And the length of Taser wires, I believe, is 12
15  and a half feet, right?
16     **A. They'll shoot up to 21 feet.**
17     Q. 21 feet?
18     **A. Yes, sir.**
19     Q. So when you're initially tasing Martin Harrison
20  and he falls back on that bench along the back wall,
21  you're still standing just outside the door, right?
22     **A. Yes, sir.**
23     Q. And so, at most, that's about 10 feet, right?
24     **A. Give or take, yes.**
25     Q. You had at least 10 feet of slack in those

197

1    wires.
2        Why -- when you were initially tasing him for five
3    seconds, why didn't you just step back and shut the door
4    at that point and then get some backup?
5        **A. Because, at that point, I didn't want to take**
6    **my eyes off of him.**
7        Q. But he's being tased on the back wall.
8        Was there something you thought he would be able to
9    do in the second or split second it would take you to grab
10   the door and slam it shut?
11       MR. ANDRADA:  It's argumentative as phrased.
12       But go ahead.
13       THE WITNESS:  Absolutely.  Because as he's getting
14   tased, right after I tased him, he gets right back up and
15   charges me.  Me, personally, I focused on him.  Within --
16   I would say within 15 seconds of being tased, he got right
17   back up and started charging at me.
18       MR. HADDAD:  Q.  So the initial tasing cycle was
19   five seconds, right?
20       **A. That's correct.**
21       Q. You're saying that he charged at you after only
22   two seconds of the tasing had happened?
23       **A. While that tasing was going on, yes, sir.**
24       Q. And he just charged at you from the back of the
25   wall all the way to where you were?

198

1        **A. Yes, sir.**
2        Q. And it's your testimony that you did not deploy
3    a second five-second discharge of the Taser almost
4    immediately after the first one?
5        **A. My testimony is that I don't recall that.  I**
6    **don't recall ever doing that.**
7        Q. So because he charged at you after the first
8    two seconds of the Taser deployment, you had no other
9    option other than what you ultimately ended up doing.  Is
10   that correct?
11       **A. Split decision, yes.**
12       Q. That was because he charged you even before the
13   first Taser application was finished, correct?
14       **A. Correct.**
15       MR. HADDAD:  That's all I've got.  Thank you.
16       MR. ANDRADA:  Okay.  Thank you very much.
17       (Deposition concluded at 6:10 p.m.)
18            ---oOo---
19
20
21       _____
22            DEPUTY MATTHEW AHLF
23
24
25

199

1        STATE OF CALIFORNIA  )
                              )  ss
2        COUNTY OF ALAMEDA    )
3
4
5        I, Joan Grier, hereby certify that the witness in the
6    foregoing deposition named
7
8            DEPUTY MATTHEW AHLF
9
10   was by me duly sworn to testify to the truth, the whole
11   truth, and nothing but the truth in the within-entitled
12   cause; that said deposition was taken at the time and
13   place herein named; that the testimony of said witness
14   was reported by me, a certified shorthand reporter and a
15   disinterested person, and thereafter transcribed into
16   typewriting.
17
18       And I further certify that I am not of counsel or
19   attorney for either or any of the parties to said
20   deposition, nor in any way interested in the outcome of
21   the cause named in said caption.
22
23   Date_____        _____
24                          Joan Grier, C.S.R.
25

200

1                June 20, 2012
2
3
4    DEPUTY MATTHEW AHLF
     c/o J. RANDALL ANDRADA
5    ANDRADA & ASSOCIATES
     180 Grand Avenue, Suite 225
6    Oakland, California 94612
7
8    RE:  Harrison vs. County of Alameda
9
10   Dear Deputy Ahlf:
11   Your deposition transcript has been prepared and is
     available at our office for reading, correcting and
12   signing, and shall remain so available for 35 days.
13   Should you wish to review your deposition transcript,
     please contact our office for an appointment.
14
15   Sincerely,
16
17
18   Joan Grier, C.S.R.
19
20
21
22
23   cc:  All counsel
24
25

**A**

**ability** 117:11
**able** 16:3 17:21
18:8 23:7,12
30:17 37:18
62:24 80:15
112:17 119:1,2
121:22 129:13
130:20,25
133:5 175:16
176:1 193:5
197:8
**aboveentitled** 3:8
**absolutely** 43:9
57:21 77:18
80:18 125:22
197:13
**academy** 6:15,19
6:21,25 7:18,18
8:2 10:21 11:18
12:16 17:18
22:2 109:18
128:14
**accepted** 7:17
**access** 170:22,24
**accident** 114:2
**accidentally**
116:24
**account** 25:6
**accounts** 116:4
**accurate** 59:21
59:22 60:17,22
74:18 75:10
86:14 92:24
93:22 99:19
103:11 104:9
114:7,15
117:11 131:10
**act** 56:10 68:10
**acting** 48:18 49:2
57:6 72:24 89:2
89:5 162:8
**action** 3:8,10
30:20 46:15
57:14 68:11
**actions** 26:16
43:14 46:15

58:7,8,13
129:18 168:9
**activate** 102:4
**activated** 101:21
102:1
**activation** 101:10
**active** 26:22 30:1
30:19 31:8
34:20,20,21
35:19 36:15
73:23 97:1
**actively** 14:21
35:13,16,19
36:21,22 37:3
106:14,16
107:15 116:20
118:6 123:6
**actual** 30:1 34:21
34:24
**actuality** 113:19
**ad** 1:5
**addition** 29:5
115:22
**additional** 86:24
157:8,16
**adseg** 83:21
**advance** 99:6
**advice** 157:22
158:7,19 159:2
**advised** 56:19
**affect** 25:16
37:23
**afraid** 99:18
**afternoon** 5:5,6
**afterward** 128:15
**age** 25:17
**agencies** 162:5
**agency** 157:23,25
158:8,19 159:2
**agent** 147:5
**aggravated** 43:22
47:12 48:9
**aggravating** 45:4
**aggressive** 43:22
44:4 47:12
96:13,17 159:5
177:23 186:3

188:21
**aggressively**
189:1
**agitated** 42:8
43:15
**ago** 45:19 75:4
150:17
**agree** 128:2
153:22 158:18
158:25
**agreed** 90:8,10
91:15 158:7
**ah** 104:3
**ahead** 8:22 11:15
18:6,16 19:5
22:1 24:20 27:4
28:13 30:9
32:22 37:14
38:2 39:6,13
40:3 41:6 42:2
43:18,24 44:20
45:13 47:8,15
48:22 50:8,21
51:22 52:22
56:14 62:13
63:3 68:22
71:17 75:24
78:5 79:15
80:11 82:14
84:16 85:22
91:2 98:7
100:19 101:11
102:19 112:2
112:24 115:9
117:7 120:14
121:25 126:4
128:5 129:16
139:13 140:24
141:18 142:6
147:22 153:3
154:21 155:8
156:2 163:17
164:15 165:16
167:10 169:4
171:7 174:16
175:11 178:1
188:9,19

197:12
**ahern** 1:12
**ahlf** 1:13,20 2:4
3:1,8 5:1,5
82:13 87:20
157:4,7,22,24
198:21 199:8
200:4,10
**aide** 6:17 7:13
**airport** 6:17 7:11
7:12,14
**alameda** 1:11
2:17,18,20,22
6:11,20 7:6
21:8 180:4
199:2 200:8
**alcohol** 42:8
**alcoholdepend...**
52:13
**alcoholic** 52:11
**alejandro** 1:13
**alive** 52:17
151:18
**allow** 42:17
111:13 113:11
129:9
**allowed** 5:20
23:3 28:25
29:17 30:5 34:7
34:14 39:10,12
69:5
**altercation** 59:6
66:19 110:17
135:18
**ambiguous** 11:13
18:4,14 19:3
21:25 24:18
25:24 26:7 27:2
28:1 30:7 32:20
34:10 36:10
37:13,25 38:15
39:4,11 40:1,8
41:4,25 42:11
42:23 43:4,16
44:5,19 45:10
47:6,14,21
48:20 49:4 50:6

51:19 52:20
57:18 62:11
63:2,11 68:20
78:3,21 79:13
79:20 80:10
81:16,19 82:10
84:12 85:20
86:2 97:22
100:18 102:17
103:12 112:23
117:6 121:24
128:4 139:1,10
140:23 141:17
142:4 153:1
154:19 164:13
165:9,14 169:1
171:6 174:14
188:7,15,18
**amount** 22:3
24:17
**ancillary** 141:6
**andrada** 4:1,2
7:19,22,25 8:15
8:18,22 9:10
11:13 13:21,24
18:4,14 19:3
20:8 21:24
24:18 25:24
26:7 27:2 28:1
28:11,13 29:9
30:7 32:20
33:12 34:10
35:10 36:10
37:13,25 38:15
39:4,11 40:1,8
40:16 41:4,25
42:11,23 43:3
43:16,23 44:5
44:19 45:10,12
47:6,13,21
48:20 49:4 50:6
50:20 51:19
52:20 54:18
57:17 61:6
62:11 63:1,11
65:14 68:20
70:19,22,24

71:14,17 75:23
78:3,21,23
79:13,20 80:2,9
80:23 81:10,12
82:3,8,10 84:11
84:17,23 85:20
86:2,6,11 91:1
97:19,21 98:6
100:18,23
101:11 102:17
103:12,14
106:22 111:21
111:24 112:1
112:23 115:8
117:6 120:13
121:24 125:24
126:1 128:3
129:15 137:10
138:25 139:8
139:10 140:22
141:14,16
142:4 147:20
153:1 154:19
154:21 155:6
155:25 161:2
163:16 164:13
165:9,11,13
166:20 167:9
168:15 169:1,4
169:9,11 171:6
171:10,14,17
174:14 175:10
175:13 176:4
177:25 178:4
178:10,19
180:25 184:9
188:7,15,18
189:16,19
190:20,23
197:11 198:16
200:4,5
**answer** 6:1,3
11:15 12:3
13:24 18:6,16
20:9 22:1 40:10
43:12 44:7
48:22 54:20

55:23 61:9
65:17 66:1
75:24 77:8
79:23 80:2 81:1
81:2,14,21,23
82:1,14 84:17
97:14,23
111:24 112:12
115:9 120:16
125:25 139:14
140:24 155:8
165:17 167:10
169:3,12
171:10,11
175:13 176:16
178:16,24
179:5 185:7
188:9 190:21
**answered** 80:25
81:25 82:3,11
91:1 98:6 126:2
147:21 163:16
178:11,12,22
179:2
**answers** 61:9
90:12 148:20
**anticipate** 89:19
89:20
**anticipated** 84:5
**anticipating**
89:17 177:11
177:16
**antriago** 134:6,7
145:19 194:11
**anybody** 42:25
43:10 65:2,3
71:21 77:14
83:4,8 124:5,7
127:13 132:12
132:14 139:16
140:5 141:24
141:24 145:11
148:14 151:21
152:1 153:17
171:25 174:6
189:24 193:25
195:10 196:2

**anymore** 32:5
99:6 143:13
**anytime** 141:22
**apartment** 59:25
60:21
**apologies** 97:15
**apologize** 7:21,24
97:20
**appearances**
3:13
**appeared** 3:7
100:14 131:16
165:7 167:8
**applicable** 18:3
**application** 14:8
14:24 29:2
130:4 192:2,6
198:13
**applications**
14:21 23:17
193:9
**applied** 138:2
**apply** 14:22 32:2
130:20
**appointment**
200:13
**appreciate**
106:22
**appreciative**
81:17
**appropriate**
22:20 23:1 31:4
33:20 46:14
57:14 61:8
81:13 84:19,21
140:20 179:8
**approval** 34:8
**approve** 69:21
**approved** 69:15
**approximate**
33:6,13,14
51:11 86:21
162:20
**approximately**
8:25 51:9 54:12
56:17 86:18,18
94:13,22 100:3

108:19 163:10
**april** 8:23 9:7,14
9:20 17:5
152:11
**area** 32:1,2 33:15
89:1,1 108:10
108:24 109:1,2
109:3,3 111:9
114:17 115:12
115:18 117:17
117:18 118:1,2
120:19 126:23
138:10 159:24
**areas** 160:4,15,16
**arent** 62:19
188:13
**arguably** 75:23
**argue** 165:12
**arguing** 80:23,25
**argument** 178:15
**argumentative**
63:2 82:12
126:2 129:15
139:11 147:20
178:4,5 189:16
189:18 197:11
**argumentive**
178:15
**arm** 31:25 32:1,1
92:25 113:9,11
113:13 118:24
119:10 127:6,9
127:20 128:1,9
174:24 182:23
**arms** 106:13,14
106:17 108:1
111:11,13,19
112:8 114:11
118:17,22
119:1,2 120:16
121:13,17,21
122:12 123:17
123:20 124:8
126:15,18
131:23,24
174:12,23,24
174:25 175:2,3

175:7,8,16,22
175:24,25
176:25 177:2,4
177:5,7,9,11
182:2,2,5,6,8
182:20,22
183:7,11
**arrested** 12:10
**arrive** 133:23
**arrived** 51:3
121:4 122:6,17
122:20 123:2
140:13 143:20
187:3,13
**arrives** 5:13
**arriving** 123:3
145:13
**arteries** 31:20
**articulate** 23:8
23:12
**arts** 109:19
**asked** 35:12 53:8
53:24,25 55:5
55:11,13,22
57:9 60:12
61:24 71:20
73:6 76:1 77:11
77:11 81:25
82:11 83:14
85:5 87:23 91:1
91:7,19 98:6,14
110:22 126:2
134:9 142:17
147:21 149:3
163:5,16
178:11,11,12
178:22 179:4
185:19
**asking** 11:8
13:22 43:19
51:6 55:2 57:12
58:20 76:25
83:3 97:9 98:16
98:17 107:8
115:14 119:18
119:22 120:1
125:4,18 139:3

155:11 169:6
171:7 184:9,11
184:21
**aspect** 161:15
**ass** 101:2 102:24
103:5,11
189:22 190:1
**assault** 111:17,18
147:2
**assaultive** 26:22
30:2
**assessment** 2:22
159:1
**assigned** 8:13
10:3 12:6,21
149:13 152:6
152:21
**assignment** 10:11
10:20 17:13
157:5
**assignments** 7:6
8:6,12 12:4
16:5 156:21
**assist** 90:25
**assistance** 67:22
87:3 90:19
118:3 134:20
157:8,16
191:19
**associates** 4:2
200:5
**assume** 32:24
68:1 99:12
120:7 131:12
**assumed** 112:18
125:9 188:23
**assumes** 50:20
62:12 65:14
**attached** 142:20
142:22,25
143:3,6 180:1
192:21
**attacked** 167:7
**attacking** 166:14
166:17,24
167:2
**attempt** 45:3

133:13
**attempts** 124:8
**attention** 196:9
**attorney** 3:15,19
4:1,2 15:17
199:19
**august** 9:3 17:8
21:19 54:14
65:23 72:13
92:12,17
148:12 159:12
**authority** 27:19
**authorization**
141:25
**authorized** 7:16
**autopsy** 133:17
182:12
**availability**
80:14 82:18
**available** 45:8
51:16 52:1,19
52:21 86:25
90:23 91:3
98:19 195:17
200:11,12
**avenue** 4:3 200:5
**avoid** 39:20
40:12 45:3
47:18 48:2
**avoided** 151:17
**awake** 66:11
72:16 166:2
**aware** 46:15
52:10 55:7
101:13,14,20
114:22 115:4
136:15 140:2

─────── **B** ───────
**b2** 25:11
**back** 9:6,8,12
10:19 17:10
28:5 35:11
38:19 40:21
47:25 53:13
56:14 70:20
72:5 74:12

78:10 82:21
86:7 90:7 91:10
91:20 92:2,3
94:5,10,12,15
94:18 95:1,4,5
95:23 99:25
101:1 104:14
107:20,23
108:6,9,12,18
108:20 111:6,9
111:13 112:7
112:16 113:3
113:14 114:17
115:11,22
116:13 129:20
130:6,7,9,10,21
135:7,12
146:13,14
150:6 155:13
158:11 166:21
167:19 168:4,6
168:11 172:23
172:24 183:22
183:23 184:4
185:1,2,2 188:1
190:6 191:1
192:16,17
196:11,20,20
197:3,7,14,17
197:24
**backed** 100:25
**background** 20:2
109:20
**backup** 45:8
46:16,23 86:22
90:18 121:4,7
150:25 197:4
**backwards** 99:23
103:24,24
105:8
**bad** 150:11,12,15
**bailiff** 8:7,25
9:13 15:21 17:3
**bailiffs** 16:3
**barb** 143:2
**bareno** 1:14
148:3,5 149:3,6

149:7
**barrier** 195:12
**based** 6:8 12:13
15:4 20:2 71:4
78:15,22 79:19
80:5 82:9,25
87:2 99:20
120:9 122:18
137:18 140:19
168:9
**basically** 12:23
12:25 17:17
18:11 19:16,18
31:20 32:5 34:4
99:4 134:21
146:15,17
151:14 153:20
**basis** 81:23 82:1
**bates** 29:14 33:25
40:23 50:2
**bathroom** 72:8
**baton** 135:14,17
135:20 170:18
171:25 172:2
**batons** 135:23
170:20 171:5
171:12,19,21
**bear** 175:4,5,6
**bed** 66:11 72:16
72:21 166:2
**began** 6:14 101:1
101:2
**beginning** 7:9
**behalf** 3:17,21
4:4
**behavior** 30:2
64:24 69:10,24
77:21 88:22
163:2,15
**belief** 31:3 131:8
**believe** 8:23
11:23 13:5,5
36:8 37:9 38:10
58:21 81:13
93:4 94:8
111:12 113:20
122:20,21

130:8 134:6
135:12 136:6
143:1 152:2
153:24 154:1,4
157:11 161:21
162:7 173:9,12
186:15 193:4
194:8 196:14
**believes** 157:24
**belly** 121:23
138:17 139:4
**belt** 169:20
**bench** 91:8 94:6
94:15 95:9,12
99:24 100:25
103:24 196:20
**bent** 106:24
127:21,24
**best** 6:7,7 67:21
148:17
**better** 81:6
151:18
**biceps** 32:2
**bicker** 81:18
**big** 5:24 67:14
**bigger** 30:15
170:13
**bilateral** 31:15
**binder** 29:11,11
**bit** 5:9 13:19
20:25 53:22
54:19,20 99:24
160:10 170:12
173:2
**bite** 107:15
137:12
**biting** 137:14
**bizarre** 48:18
58:7,9,18 61:16
62:1,2 69:10,24
72:24 77:21
89:6 162:8
163:2,15
**bizarrely** 49:2
57:6
**blank** 91:23 94:2
**blood** 185:16,18

195:11,21
**blow** 132:9
135:15
**blows** 124:25
127:8 132:4,7
132:21 133:2
135:8
**blue** 73:20
130:15,17
**bluecovered**
130:18
**bluntforce**
135:24
**body** 107:22
109:10 110:4
113:12 118:18
118:18 119:1,3
120:5,18 121:6
121:14 122:2
128:7,11
131:11 132:4
140:15 142:23
173:13 175:24
176:18,21,22
177:9 181:13
181:17 187:12
187:14 192:23
193:3,5
**book** 53:9 146:16
**booking** 12:8
**boots** 122:7,10
169:25 170:2
186:21,22
**bottom** 22:18
27:13 194:24
**box** 76:10 156:25
**brain** 31:21
**brand** 170:16
**break** 72:8,9
73:15 110:9,10
111:16,19
112:8 113:4
114:11 121:15
148:23 168:14
171:11 189:8
**breakfast** 56:15
**breath** 176:6

**breathing** 144:9
144:13 176:15
**bricker** 147:5
150:3,7 151:10
151:23 152:7,9
153:22 156:14
157:3 158:1,6
158:22,23
185:20
**brickers** 159:1
**brief** 31:22 131:4
**briefly** 7:5 59:17
61:7 145:2
**bring** 144:19
**bringing** 177:7
**broad** 11:14 18:5
18:15 19:4
21:24 24:19
25:25 27:3 28:2
30:8 32:21
34:11 36:11
38:1,16 39:5
40:2,9 41:5
42:1,12,24 43:4
43:17 44:6
45:12 47:7,22
48:21 49:5 50:7
68:21 79:14
80:10 81:16
82:11 84:12
128:4 139:11
141:17 142:5
188:8,15
**broke** 77:1
**broken** 73:9
75:16
**brought** 59:25
60:14,15
142:17
**bruising** 32:8
119:20,24
120:4,12
133:17
**bulletins** 14:20
**bunch** 57:9 60:1
**bureau** 10:5,8,12
153:10,21

**burris** 2:11 3:19
3:20 9:23 29:15
54:24 73:4
81:18 84:20
86:4 97:14,16
110:9 111:25
134:2 150:19
159:18 161:25
162:1,2 163:18
163:21 164:17
165:10,12,20
167:2,14
168:14,16
169:3,7,10,19
171:18 174:17
175:18 176:5
178:2,5,18
179:1,17 181:2
184:11 188:11
188:16,25
189:17,20
190:24 194:15
**buttocks** 105:8
**button** 191:20

---
## C
**c** 1:23 8:24 9:6
199:23 200:4
200:18
**c112868** 1:6
**c2** 27:14
**calculated** 155:7
156:1
**california** 1:2,23
3:6,16,21 4:3
11:10 199:1
200:6
**call** 6:16 7:12
30:22 32:4 49:5
49:5 50:11 51:5
51:6 53:11,25
54:22,25 56:18
56:18 61:20,21
61:25 81:9 83:7
83:22 84:1,3
86:24 95:19
97:13 103:25

118:13 138:16
154:6 162:3
171:5 189:8
**called** 11:22,23
29:18 50:13
69:23 70:7,7
71:18 78:14
136:7 140:11
191:11
**calling** 52:24
83:10 116:22
**calls** 26:8 38:16
48:21 54:18
65:15 75:23
81:6 84:11
120:13 139:11
140:22 179:22
**calm** 47:4,10,17
143:12,23,25
**calmed** 139:9
**camara** 70:8
**cant** 12:3 14:8
36:14,16,17
43:10,11 44:7
57:20 62:14,16
62:22 66:1 69:2
71:21 73:14
93:8,9,14,18
96:21 97:5,12
99:10,14 102:3
103:2,5 108:2
108:21 112:16
112:17 116:14
120:16 121:13
121:19,19
122:2,3 123:22
124:22,24
127:4 128:8,8
129:17 132:6
137:5,16 138:3
138:15 143:6,7
144:15 145:9
153:25 155:16
155:16,19,20
173:12 176:6
177:7 196:4
**canted** 173:1

**capacities** 1:12
**capacity** 37:18
37:23
**caption** 199:21
**card** 52:4
**career** 19:17 47:3
117:3
**carotid** 29:23
31:12,16,18,20
31:23 32:1,7,11
32:14 119:5
133:14
**carry** 135:20,23
195:14
**carrying** 171:25
**case** 1:6 40:23
89:16
**cases** 34:8
**caught** 60:11
**cause** 32:7,11
42:9 43:14,22
44:4 62:23
182:14,16
199:12,21
**caused** 17:1
74:21 96:17
104:20 105:16
119:24 120:4
120:11 181:25
182:8 183:10
**causes** 31:20,21
38:3
**causing** 58:21
**cc** 200:23
**cease** 31:21
**cell** 14:7,11 15:7
15:7 22:13
61:11 62:7
63:13 65:8,20
67:9,15 68:2,8
68:19 69:1,4,22
69:24 70:16,23
71:8,13 72:12
73:9,18,19,24
74:1,21 75:15
76:18 77:1,5,10
77:21 78:2,12

79:12,25 80:8
82:7 83:23 84:7
84:10 85:1,5
86:13 87:5,12
88:3,5 89:18,22
91:9,13 94:5,11
94:15,19 100:2
104:18 105:5,6
121:9 136:18
136:19,25
137:25,25
138:6,22 139:6
140:10,16
157:15 158:21
159:4 165:23
168:18 185:13
185:14 195:9
196:11
**cells** 68:16
**cement** 185:12
**center** 61:4
**certain** 22:3,8,9
28:14 30:25
63:9 129:18
195:7
**certainly** 164:10
166:1
**certificate** 11:7
**certified** 1:22 3:6
199:14
**certify** 199:5,18
**chains** 14:22
**challenge** 10:15
**chance** 58:13
59:12 111:1
112:10 179:18
180:18
**chances** 44:4
**change** 5:25 6:1
56:8 155:19
**changes** 5:20 6:1
**characterized**
157:14
**charge** 52:24
181:8
**charged** 104:14
197:21,24

198:7,12
**charges** 197:15
**charging** 104:21
197:17
**chart** 53:10
**check** 56:21,23
79:10 80:1,6
163:9,11
**checked** 145:24
146:11 156:25
163:12
**checking** 142:19
144:4
**checks** 55:16
56:1 59:23
**chest** 106:24
**choking** 176:5
**circumstances**
23:1,8 39:16,21
**cjmh** 50:11 69:10
70:2,10 71:21
83:10,12
**claim** 146:8
**claimed** 73:2
**claiming** 169:15
**clarify** 35:24
43:19 49:25
51:23 180:13
**clarity** 162:3
**class** 13:3,9,9
129:1 141:21
**classes** 21:2,3
128:21
**classification**
12:10,13,18
14:23 52:6
71:18
**classified** 52:7,7
147:2
**clean** 195:20,24
**clear** 5:14 70:11
131:15 164:6
166:18,24
169:16 175:19
175:20 179:5
**cleared** 146:11
**clearly** 23:13

156:23 158:14
168:3
**clenched** 99:15
**client** 85:15
**clients** 79:3
**clinic** 149:9,10,11
**clinician** 62:16
62:22
**close** 13:6 100:4
100:5 106:24
122:2 138:22
163:11 175:15
190:9
**closed** 108:12
142:19 184:17
191:3
**closedfist** 110:6
**closer** 95:1,1,3
**closing** 139:7
**coaching** 81:4
**cocounsel** 5:13
**code** 65:10,11,24
66:10 67:24
68:3 134:15,16
134:19 144:18
**codes** 64:12,23
66:13
**coherent** 89:7
90:8
**coherently** 104:2
**collect** 149:20
**collected** 149:23
**combative** 37:3
76:16 157:9
**come** 12:12 60:13
65:3 77:15,16
78:19 79:10
80:1,6 82:6,22
90:24 95:17
146:25 177:9
192:16,17
194:6
**comes** 65:2
**comfortable**
142:18 168:8
**coming** 7:14 12:9
74:25 87:11

116:21 144:2
164:21
**command** 159:22
**commands** 38:12
**comment** 6:3
158:4
**commissary**
13:14 14:6
**communicate**
45:3 191:17,18
**communicated**
158:14
**communicating**
187:24
**communication**
166:13 191:12
**comp** 146:8
**company** 40:25
41:9
**compared** 117:15
117:16 142:9
**competent** 18:7
**complacency**
151:11 186:9
**complacent**
150:9,18,19,20
185:23,24
186:1,2
**complete** 9:4
11:4 16:8,11
49:23 116:4
148:19
**completed** 163:5
**completely** 89:6
**completing** 10:20
**compliance**
30:12,13,15
36:17 90:6
108:3 111:10
111:13 112:4,5
113:9,11 123:5
123:6,14,16
124:3 129:18
**compliant** 87:23
89:7 91:18
159:6
**complicit** 185:21

186:1
**comply** 35:7
107:18 112:6
**compound** 63:1
86:3 112:23
**computer** 52:5
**computers** 15:15
**concealing** 35:15
**concept** 27:7
**concern** 58:5
74:22 85:10
**concerned** 58:17
**concerning** 21:23
71:12
**concluded**
198:17
**conclusion** 60:20
**concurred**
157:22
**condition** 70:3
**conditions** 42:4
**conduct** 26:25
47:18 48:3
149:25 152:24
155:23 161:22
164:10 165:18
165:20,22
166:4
**conducted** 54:22
**confined** 117:14
142:19
**conflict** 159:22
**confrontation**
99:10 171:14
**confronted** 23:9
157:5
**confused** 155:12
**connect** 20:5
100:11 192:12
**connected** 131:3
192:6
**connection** 12:2
41:2,13 72:3
160:12,22
**consciousness**
32:5
**consider** 25:12

25:16 26:12,15
26:19 37:8
125:20 163:2
163:14
**consideration**
37:16
**considerations**
25:12
**considering**
122:19 154:11
**considers** 32:18
**consisted** 146:16
**consistent** 165:21
**constructive**
154:25
**consult** 157:23
158:8,19 159:2
**contact** 50:25
51:2 152:11
166:12 167:3
167:20 168:16
171:24 178:8
183:9 188:25
200:13
**contacting** 71:12
**contacts** 46:8,13
**contained** 157:9
**contemporane...**
163:6,8
**contents** 180:24
**contest** 153:16
154:8
**context** 34:18
98:2
**continually** 112:5
168:19
**continue** 69:5
81:9 140:20
161:8 166:13
**continued** 130:2
131:14,17
**continuing** 173:2
**continuous** 41:10
41:14,19
**continuously**
41:24
**continuum** 28:18

**control** 122:10
123:11 124:8
129:3,22
134:22,25
145:8 171:20
175:22 177:2
**controlled**
125:18 159:22
**controlling**
156:21 174:24
174:25 175:2,8
175:16 177:2
**controls** 170:21
**contusions**
181:25
**conversation**
91:16 151:12
151:14,22
164:9
**cooperating**
167:8
**cooperative**
26:20 91:18
**copy** 21:7 29:11
45:21,22
**cord** 124:19,19
**cordially** 90:7,7
**core** 22:4 141:21
**corner** 99:24
**coroners** 9:16
10:4,8,12
153:10,20
179:19,21,25
**corporal** 130:3
**corporation** 1:11
**correct** 9:17
11:20 16:6,7
17:5 23:5,15,19
23:23,24 24:3
24:12 29:4,8
32:19 34:23,25
35:1,4,7 37:4
40:7 44:15,16
46:3 49:24 59:2
62:10 65:8,12
66:11 72:14,17
72:18 82:23

83:1 89:9 90:15
93:13 95:6
100:16 103:9
106:8 108:7
112:13,14
113:25 119:15
121:3 123:15
129:6,10 132:5
132:21 142:3
148:10,12
152:17,18
157:16,17
162:9 163:2
164:7 165:1,4
165:23 167:4,8
167:21,22,25
168:5,12,13,25
172:3,5,11
174:21 176:9
176:12,13
177:14,15,17
177:18 178:3,9
180:7 181:19
183:4,16
187:11 191:1
191:25 193:23
197:20 198:10
198:13,14
**corrected** 117:1
118:5
**correcting**
200:11
**corrections** 10:24
11:5,9,20,24
13:3 14:4
**cosuccessors** 1:7
**couldnt** 107:8
108:3 138:21
153:24 154:3
168:6 191:3,7,8
191:9 192:22
195:12
**counsel** 29:10,12
153:5 160:3
178:23 181:1,3
199:18 200:23
**counseled** 117:9

117:20 149:24
**counsels** 29:10
179:17
**count** 25:22 66:9
**county** 1:11 2:17
2:18,20,22 6:12
6:20 7:7 21:8
40:23 180:5
199:2 200:8
**couple** 35:12
95:20 106:21
110:17 115:22
135:11,12
146:6 194:17
**course** 8:19 12:1
12:20 14:4 22:4
65:4,5 91:14
168:22 181:2
**court** 1:1 5:2
9:13,20 13:25
55:1,15,18 56:1
**courtesy** 86:7
**courthouse** 8:24
9:6
**cover** 90:19
116:22,25
118:14,18
121:15
**covered** 182:11
**create** 15:5
**created** 15:3
**creates** 48:11
**criminal** 49:19
**critical** 147:2,11
155:23
**criticism** 153:17
154:25
**criticized** 154:17
**crux** 32:1
**cruxed** 127:24
**cues** 27:20
**cuffs** 94:4
**curious** 163:4
165:25
**currently** 10:3
**cursing** 137:20
**custody** 52:4,5

**cut** 195:1
**cutting** 31:19
**cw** 1:7
**cycle** 39:3 44:15
101:9,22 102:2
102:2,23
130:21 131:16
197:18
**cycles** 39:9,21,24
40:7 44:12
101:3

**D**

**d** 2:1 56:20,23
61:2
**daily** 12:22 17:19
**danger** 58:14,15
58:17,24 59:2
151:7
**dangerous** 39:24
87:4 89:3
125:20
**darts** 100:9,11
101:8
**date** 13:4 199:23
**dates** 8:11
**davidson** 8:24
9:6
**dawn** 189:13
**day** 8:16 55:1
65:4 77:3,12
79:2 85:6 91:14
121:19 145:11
148:6,7 149:3
150:5
**days** 110:17
146:6 200:12
**daytime** 70:8
**dead** 179:14
**deadly** 121:2
**deal** 5:25 38:6
87:4 129:8
195:7
**dealing** 14:24
17:21 19:20
20:3 37:17 38:5
38:9,18 45:1,23

46:23 47:3
48:25 63:5
82:19 161:1,16
161:17,20
168:23,24
188:3,16
195:10
**deals** 46:7
**dealt** 38:6
**dear** 200:10
**death** 10:10 24:5
179:22,23
**decedent** 1:7
**december** 7:1 8:3
**decide** 22:25 49:1
88:13,20 89:2
96:17
**decided** 89:8,24
90:13 93:25
151:4
**deciding** 25:6,13
26:16 159:3
**decision** 17:2
24:23,25 25:16
27:1 88:17
150:11,12,15
151:11,18
154:15 156:17
160:20,23
198:11
**decisionmaking**
154:18 159:23
**decisions** 21:23
24:4,8,11,16
25:3 37:23
156:23
**dedication**
157:24
**deem** 32:25
**deemed** 57:13
**deems** 36:25
**deep** 74:17
**deescalate**
188:14
**defendants** 1:17
4:4
**defensive** 128:21

**defensively** 27:19
**defined** 64:16
**defines** 27:17
**definitely** 49:9
62:15 164:18
**definition** 27:14
**degrees** 21:1,3
**delegating**
156:21
**deliver** 108:11,23
109:7 110:6
116:12 127:8
130:25 132:9
132:20 135:8,9
**delivered** 108:9
108:10 115:18
115:21 130:3
130:23,24
**delivering** 124:25
132:4,6,12
**demeanor** 53:16
53:20 56:6
79:17 178:23
**demonstrate**
157:4
**department** 6:12
7:3 12:11 14:17
15:25 17:25
19:14 21:8
24:24 27:7,10
27:17 28:17
31:14 32:16,18
33:19,22 34:13
38:20 39:18
44:17 110:12
110:18 120:24
141:4 146:10
146:10 148:15
**departments**
15:1 31:9 49:13
**depend** 79:16
**depending** 14:23
30:18 71:19
79:1,2 88:9,10
88:10,23
**depends** 38:17
68:23,24 69:2

80:12,13 142:7
142:8
**deploy** 96:18
101:4 198:2
**deployed** 95:22
96:15 99:19,21
101:5
**deploying** 100:7
**deployment**
101:15 104:13
198:8
**deposed** 5:10
**deposition** 1:20
2:4 3:1,3 5:7
9:23 81:7,8
98:19 113:16
198:17 199:6
199:12,20
200:11,13
**deputies** 1:12
12:15,19 13:2
17:18 18:8
21:16 25:18,22
36:4 42:17
63:24 78:13
85:17 110:14
119:23 122:16
123:3,8,14,24
125:11,18
128:18,25
135:23 137:18
137:21 138:10
138:21 139:25
140:11,12,20
141:11 142:2
145:13 170:24
171:4 172:14
183:9 196:7
**deputy** 1:20 2:4
3:1,7 5:1,5 7:8
10:9 12:23,24
50:9 65:21
82:13 86:24
87:20 90:19,24
102:14 122:21
122:22 137:15
140:14 147:10

148:3,5 149:3,6
149:23 152:2,2
152:3,4,6 157:4
157:6,21,24
162:2,6 165:16
181:4,6,8,11
187:2,2,3,3
198:21 199:8
200:4,10
**deputys** 27:19
**describe** 31:17
53:20 64:19,23
91:4 93:18 97:3
98:5,8,11,11
114:3 122:23
194:19
**described** 71:7
83:24 111:4
113:16,23
114:22 130:13
138:13 142:14
163:14 166:4
**describes** 46:12
**describing** 100:8
131:17
**description** 75:10
148:4
**descriptions** 7:13
**detail** 52:6 111:3
157:21
**determination**
62:19 152:24
**determine** 48:17
63:7 179:23
**determined**
57:15 58:23
59:1 62:9
**developing**
156:20
**developmentally**
19:23
**diagnose** 62:22
62:23
**didnt** 11:6,7
13:16 29:13
38:24 42:17
46:5 50:12,22

53:9,22 55:8,24
57:16,21 58:10
60:20,24 61:25
67:25 73:20
90:2,11,18
91:17 94:9
103:20 113:2
114:14 117:25
125:15,23
126:7 128:9
130:15,18
131:5 133:12
135:2,4 137:23
139:18,19
140:5 141:19
142:18 144:24
145:21 147:19
150:22 153:13
153:21 163:25
168:2 174:3,3
174:10 181:9
186:5 189:24
197:3,5
**died** 110:16
116:8
**difference** 117:13
**different** 7:5 8:5
8:12 26:24
58:19 67:8
86:10 103:7
104:6 147:3,13
155:5,15 162:5
170:16
**differently**
192:11
**difficult** 14:1
24:8
**direct** 95:21
145:2 152:10
178:5
**direction** 27:20
95:4 100:9
**directions** 37:18
37:23
**directly** 7:23
160:21 176:23
182:1 183:14

DEPOSITION OF DEPUTY MATTHEW AHLF

**disabilities** 45:16
  45:23
**disabled** 19:23
**disadvantage**
  141:10
**discharge** 198:3
**discharges** 33:17
**discuss** 145:11
  149:8
**discussed** 181:1
**discussion** 10:18
  143:22 149:12
  181:6 193:20
  193:21
**discussions**
  180:23 181:20
**disinfectant**
  196:1
**disinterested**
  199:15
**dislodged** 106:8
**disorder** 44:24
  45:2,8 49:23
  62:9,14,17,24
  62:25
**disordered** 48:17
  49:1,14 50:3
**disorders** 44:18
**disoriented**
  166:15 168:20
**displaying** 58:7
  62:21
**disposable**
  195:14
**disregard** 130:2
**disrespect** 97:17
  162:4
**disruptive** 14:6
  14:11 22:13
**distance** 94:18
  190:17
**distinction**
  183:24 184:7,8
  184:12
**distribution**
  13:14 14:5
**district** 1:1,2

**document** 29:10
  29:12 32:15
  38:20 65:14
  166:6
**documenting**
  145:5
**doesnt** 6:2 26:5
  44:3 56:11 69:1
  77:7
**doing** 16:5 18:12
  19:17 55:16,16
  56:1 63:19
  64:20 65:4
  68:10 72:20,25
  76:2,25 101:12
  103:5 107:17
  120:20 123:4,8
  132:7 138:5,13
  151:15 154:11
  175:21 185:8
  186:8 195:10
  198:6,9
**domain** 45:22
  46:4,7,12
**domains** 46:1
**dont** 5:15 8:15
  12:2 13:4,5
  15:8 19:1 20:19
  33:5,6,7 35:15
  36:15 38:5
  39:22 40:10,15
  41:7 42:3,13,25
  43:10 44:8,9
  45:19 48:19
  50:9 54:4 55:19
  55:23 56:19
  60:6 61:7 62:3
  62:3,23 66:1,22
  70:13 71:22
  73:22,22 74:2,2
  74:4,11,11 75:4
  75:6 77:8 78:6
  78:6 79:21,22
  80:17,17 81:21
  83:25 84:1
  85:14 86:14
  88:9 94:8,12,20

95:19 97:14,17
  98:16 99:1,6
  100:5 101:12
  103:19,20
  105:1 106:20
  108:15 109:2,9
  109:14,14
  110:8 112:19
  112:20,25
  113:18,20,21
  114:5,21
  115:10,11,19
  115:23 116:16
  117:23 118:24
  120:6,8,8,15,15
  120:17,20
  121:11,19
  123:21,24
  124:15,22
  125:25 126:17
  127:4,13 128:9
  128:10 130:8,9
  130:12 131:2
  132:7,11,11,13
  132:14,25,25
  133:4 134:16
  134:17 135:3
  137:11,16
  138:2 139:14
  139:14,24
  140:7 143:8,17
  146:9 150:16
  151:2,3,8,12,13
  151:20 153:8
  154:20 155:17
  155:18,21,22
  158:10,15,16
  158:24 160:7
  160:10 161:2
  165:12 166:3
  170:2 171:25
  172:18,18
  173:4,7,14
  175:8,17,23
  176:5 179:12
  180:14,22
  182:6,20

183:20 185:3,6
  185:8,18 187:9
  188:5 189:4,4
  190:2,4 192:15
  192:22 193:24
  193:25 194:14
  195:16 196:4,4
  198:5,6
**door** 67:12 76:4,5
  76:6,8,12,20
  87:22 89:11,14
  89:22 90:3,4,13
  90:14 91:5
  94:19 99:25
  104:22,25
  106:1 138:23
  139:7 151:6,6,9
  157:8,15 166:9
  166:10 190:10
  190:13 191:3,7
  191:10 196:11
  196:21 197:3
  197:10
**doorway** 88:18
  89:10 90:16
  91:11 167:17
  190:7,8
**double** 64:16
**downhill** 161:7
**drag** 124:11
**drive** 15:13
**driven** 145:18
**drives** 15:14
**drivestun** 130:2
  130:5,24 131:1
  139:18 192:10
  192:25 193:1
**drivestunned**
  131:7 132:14
  133:21 139:23
  192:18
**drug** 42:8
**dry** 88:5
**dudek** 59:5 60:10
  60:19 66:18
  74:13 98:25
  103:16,22

110:21 114:1
  114:13,18,24
  115:2,5 116:1
  148:8 149:1
**due** 32:23 69:24
  77:21 88:22
  122:1 154:14
**duly** 3:9 199:10
**duty** 72:2 169:20

**E**

**e** 2:1 159:21
**earlier** 163:5
  165:22 169:2
**early** 10:12
**east** 61:4,10
  91:12 151:24
**eating** 56:15
**education** 20:24
**eery** 93:16
**effect** 21:19 77:2
  83:6,17 101:1
  125:7 131:2,5
  131:13 189:22
**effective** 30:16
  156:20
**effectively** 12:24
  30:17
**effects** 42:7
**either** 9:3 34:20
  48:14 50:11
  63:6 75:18
  88:11 103:15
  107:12 109:4
  122:23 137:14
  140:14 141:22
  143:5 161:11
  178:9 186:16
  199:19
**elbow** 106:25
  127:22
**electricity** 100:14
  131:16
**emergency** 16:13
  16:25
**emotional** 189:11
**emotionally**

188:4,17
**employed** 6:11
**employee** 156:19
156:22
**employees**
156:20,23
**encounter** 51:15
52:2
**encountered**
51:13 52:9 53:1
62:8
**encountering**
75:13
**encouraged** 87:3
**ended** 6:15 57:1
99:24 101:23
102:2 104:18
149:4 177:7
198:9
**endure** 40:7
**enforcement**
11:11 19:18
20:14,18 47:3
117:3
**engage** 183:9
**engaged** 165:21
165:22
**ensued** 114:10
118:6
**enter** 15:24
**entered** 15:22
**enters** 9:23
**entire** 91:17
128:6 130:21
**entitled** 156:17
**entries** 65:23
66:5,9,21 71:1
72:19
**entry** 63:17 64:8
72:15
**equip** 18:8
**equipment**
169:19
**errors** 5:23
**escalate** 46:25
47:19 48:3,7,8
188:12

**escalated** 43:14
**escort** 136:18
**essentially** 19:12
111:6 147:21
168:18 176:2
178:11 179:25
180:6 187:8
**estimate** 86:17
94:21 108:16
133:5
**estimated** 196:10
**evaluate** 49:12
**evaluated** 159:13
**evaluating**
159:21
**evaluation** 2:20
88:6 153:10,11
153:16,21
154:9,12,13,18
154:23 156:13
157:19 159:11
160:5,8,11,14
**evaluations**
16:16,20
154:15,22
156:8
**evening** 51:6
**event** 193:20
**eventually** 14:4
114:11
**everybody** 13:21
56:1 126:18
**everyday** 186:7
**evidence** 50:20
62:12 65:15
140:3 147:10
149:20
**evident** 169:13
**exact** 8:14,15
13:4,6 56:19
67:18,19 74:2,3
77:8 121:11
**exactly** 71:22
73:21,22 94:12
99:11 103:3,6
103:19 108:2
108:15,22

116:16 118:24
121:19 123:22
123:24 131:20
138:15 169:5
173:4
**examination** 2:8
5:4 162:1
194:18
**examined** 3:9
**examiner** 133:16
**exception** 30:4
**excited** 42:8
**excuse** 8:10 43:3
166:21 190:20
**exhausted** 123:10
124:3 134:12
**exhaustion** 25:18
**exhibit** 21:5,7
25:11 29:12
34:1 64:2,3,5
156:5,8 159:8
159:10
**exhibiting** 164:10
**exhibits** 2:15
**exigent** 39:15,21
**expect** 56:11
77:16,23
**expectation** 78:9
**expected** 23:7
78:13 83:1
**expects** 24:24
**experience** 19:20
20:6,12 30:11
38:6 42:17
50:12 78:16,22
79:9,19 80:5,20
81:12 82:9,15
87:2 140:19
**experienced**
42:20
**expert** 139:11
140:22
**explain** 23:13,22
32:15 38:23
39:8 121:13,20
129:11 150:14
150:24 151:4

166:3
**explained** 39:19
60:10 87:13,17
90:9 113:21
156:24
**explaining** 5:8
**explains** 156:18
**explanation**
101:25 102:3
133:19
**explore** 179:5
**exposed** 117:18
**exposures** 41:10
41:15,19
**extensive** 133:17
**extent** 156:19,22
182:7,12
**extract** 158:20
159:3
**extraction** 14:7
14:11 22:13
**extractions** 15:7
15:8
**extremely** 43:1
**eye** 177:17
183:25 184:8
190:17 191:5
**eyes** 197:6

**F**
**face** 91:7 107:24
107:25 108:5
111:5 138:6,12
141:13 183:21
**facing** 28:24 30:1
34:8,14,24
105:5 121:8,9
122:9
**fact** 16:15 21:15
22:12 23:7
29:12 44:2 46:4
49:13 63:24
66:21,24 73:25
87:2 90:6
128:24 133:16
143:23 154:2
167:7 177:22

178:21 179:3,7
184:2 193:9
**factor** 37:12
**factors** 25:6
30:11 31:2
32:23 37:8
**facts** 50:20 62:12
65:15
**factual** 23:8
**fail** 16:11
**failed** 66:20
**faint** 144:11,14
**fair** 165:8 181:15
182:9,15,18
189:24
**fall** 104:20 105:2
105:16,18,20
**falling** 99:24
103:24 106:4
**falls** 196:20
**familiar** 31:16
60:7 118:1
**family** 16:13,24
16:25 161:1,3,5
161:21
**far** 41:12 63:12
64:8 91:8 94:9
94:12,18
183:14
**fashion** 186:23
**fast** 96:11,16,22
97:8 98:1,1,2,8
98:12 113:19
116:15 189:5
**faster** 96:23
**fatigued** 118:8
**faucet** 195:24
**favor** 25:22
**fearing** 112:3
**feasible** 63:19
88:5
**feel** 63:5 88:11
128:9 142:18
154:3 155:18
**feeling** 93:17
**feet** 94:14,22
100:3 105:4

121:9 136:18
172:9,10
173:16 196:12
196:15,16,17
196:23,25
**fell** 100:24
103:23 105:2,4
105:7,18,19,22
106:5 146:22
**felt** 57:22 88:11
91:24 93:1,16
94:1 154:13
**females** 60:1
**fernando** 1:14
**field** 2:22 9:1,5
15:22,24 16:4,9
16:11,16,20,23
17:1 46:13
160:12,14,19
**fight** 112:20
**file** 52:25 146:8
**fill** 50:4,18,19,22
53:13 54:1
64:23 66:13,20
66:21 67:1
**filled** 66:3 69:9
70:11
**filling** 66:24
70:13
**find** 5:21 33:19
51:17 52:24
53:9 55:8 57:4
83:8 84:14 85:9
147:13 175:1
175:19 179:8,9
179:10,14
**finding** 144:5
**finds** 180:6
**fine** 91:15 97:16
97:16 168:15
**finger** 178:14
**fingers** 195:1
**finish** 111:21
171:10,11
175:10,13
176:6 177:25
178:19,19

190:21
**finished** 13:8
86:4 104:11
111:24 146:15
198:13
**finishes** 13:22
**finishing** 85:15
**fired** 100:1,8
101:8
**firm** 179:9
**first** 3:9 10:20
12:5,6 15:20
22:17 33:5
46:15 50:25
51:2,5,12,15
52:1,9 53:1,21
55:7 64:8 65:22
70:15,22 71:1,8
72:15 73:8,12
74:23 84:15
88:7 101:9,22
102:1,23 105:4
116:13,13
122:17,20
130:23 133:22
136:5 144:8
147:5 150:5
165:23 167:4,6
167:20 178:10
186:19 191:24
198:4,7,13
**fist** 108:12
135:12 140:15
184:17
**fists** 99:15 135:9
**fit** 53:22 176:7
**five** 40:16 44:12
59:5 66:19
104:1,13
109:23 192:2,7
197:2,19
**fivesecond** 39:3
44:15 101:21
102:2 103:25
130:21,25
198:3
**flood** 68:16 73:23

77:4
**flooded** 69:4 73:9
73:19,21 74:1
77:1,10 83:23
84:7,9 85:1,2,4
86:13 158:21
159:4
**flooding** 68:2,8
68:19,25 69:5
73:18 75:15
**floor** 73:10
105:10,16,22
106:6 107:3,25
122:4 124:17
125:12,16,21
126:19 127:18
138:6,12,17
140:9,16
174:13,19
176:8 189:2
**focused** 197:15
**follow** 8:12 18:19
18:21,22 21:13
34:5 37:18,23
38:11 50:15
59:19 75:25
84:18 188:6
**followed** 36:17
36:18 49:18
**following** 29:1
46:14 54:9 70:9
74:14 148:6
187:25 188:2
**follows** 5:3 28:6
48:1 166:22
**followup** 53:15
54:21
**food** 73:10,12,15
74:21 75:2,16
77:1
**foot** 109:23
126:21,22
127:6
**force** 21:9,23
22:10,14,19,25
23:3,7,13,16,17
24:5,23 25:7,13

25:16,23 26:6
26:16 27:1
29:16,17,18
30:1 31:4,7
32:19,24 33:20
37:24 47:20
48:4,10 110:13
110:14,23
115:14 121:2
129:14 141:4,5
**forceful** 26:12
132:4,6
**forcefully** 120:24
**forces** 111:4
**forcible** 23:9
**forearm** 119:10
**forearms** 106:24
**foregoing** 199:6
**forget** 117:4
**forgive** 8:1 9:15
**form** 49:24 50:5
50:14,18 53:25
70:12 156:18
**formal** 15:18
**formally** 154:8
**forms** 50:12
**forth** 22:21
**found** 57:2,2
68:19 84:25
87:7 133:17
144:10 147:15
**foundation** 78:24
80:10 82:11
140:23 163:18
**four** 9:1 10:22
11:3 15:21
17:10,13 59:5
67:8 102:2
108:17 194:5
**frame** 82:15
**frankly** 94:20
**free** 106:17 107:9
111:16,19
112:8 113:4
114:11,11
119:2,3 121:15
121:22 131:24

189:8
**front** 95:2,3
126:9 133:18
**further** 95:17
129:14 166:4
194:15,18
199:18
**furthermore**
81:6

_____

### G

**gain** 107:12,12
111:10,13
112:4,4,4 113:9
113:11 123:5
123:14,16
124:8 190:16
**general** 2:17
14:16 15:4 18:2
18:7,11,20,23
18:25 19:10
21:8 26:2
**generally** 21:1
25:21
**gentle** 94:7
**gentlemen** 58:19
**gently** 94:4
**george** 158:12
**gestures** 37:19
**getting** 20:11,19
47:12 55:17
70:6 100:22
116:21 118:16
153:8 160:8
186:9 197:13
**gibberish** 162:8
**give** 8:18 35:2,5
38:24 53:14
54:20 61:8,9,9
75:10,24 80:15
82:14 84:17
91:23 102:3
106:15,15,20
107:8 108:16
111:10 116:4
153:6 177:18
194:12 196:24

**given** 6:7 23:9
46:1 89:2
110:16 140:18
149:4 160:5
165:3 178:21
178:22 179:6
**gives** 35:6 92:3
154:5
**giving** 59:4 92:17
106:13 117:21
119:2 148:25
**glove** 194:21
196:8
**gloves** 173:6,8,11
194:19 195:4,8
195:13,14,16
195:18,20
196:3,5
**go** 6:2,20 7:16
8:22 9:21 10:2
10:12 11:15
15:21 16:2,3
17:3 18:6,16
19:5 22:1 24:20
27:4 28:13 30:9
31:21,25 32:22
37:14 38:2 39:6
39:13 40:3 41:6
42:2 43:18,24
44:12,20 45:8
45:13 47:8,15
48:10,22 50:8
50:21 51:22
52:22 55:17
56:14,14 62:13
63:3 68:22 69:1
71:17 75:24
78:5 79:15
80:11 82:14
84:16 85:22
91:2 94:9 98:7
100:19 101:11
102:19 112:2
112:24 114:6
115:9,11 117:7
120:14 121:25
125:15,23

126:4 128:5
129:16 134:3
135:7 137:20
139:13,20
140:24 141:18
142:6,10
144:23 146:11
147:22 153:3
154:21 155:8
155:13 156:2
161:2 163:17
164:15 165:16
167:10,19
168:6,11 169:4
171:7 174:16
175:11 178:1
181:5 188:9,19
193:13 195:1,3
195:9 197:12
**goal** 41:16 88:2
190:17
**goes** 159:11
180:5 191:25
192:2
**going** 5:12 15:16
28:18 30:19
35:11 38:19
40:17 49:7,10
50:1 54:25
55:15,25 56:15
57:2,20 58:22
65:17 69:1 70:6
74:12,24,25
77:3 81:1,9
87:10 88:14,18
88:20 91:11,12
91:25 95:16,18
96:8 99:8,18
101:2 102:24
103:5,25
116:11 117:16
118:1,2 119:17
123:24 124:14
130:1 134:11
138:11 144:4
147:6,7,23
154:10,12

158:20 160:7
160:10 161:6,9
161:10 164:2
167:14 169:17
177:18 178:15
178:23 189:5
193:17 197:23
**good** 5:5,6 10:14
10:15 13:25
29:13,14 40:16
86:11 127:25
155:19 157:4
**gotten** 41:2 83:18
83:21 150:25
186:7
**grab** 105:13
113:13 126:22
128:1 129:21
171:12 197:9
**grabbed** 92:24
93:5,6 104:19
105:11,12
114:4 129:24
**graduate** 6:25
20:20
**graduated** 8:3
**graduating** 12:15
17:18
**grand** 4:3 200:5
**grasp** 127:4,7
**greeted** 60:1,15
**gregory** 1:11
**grier** 1:22 3:6
199:5,23
200:18
**grimacing**
107:13 138:15
189:7,21
**grip** 175:22
**gripping** 175:3
**ground** 114:3
140:4 141:13
189:2 192:22
**groups** 180:5
**guard** 7:15 60:11
**guardian** 1:5
**guess** 6:8 32:4

43:5 48:6 68:15
73:21 75:6
105:9 112:5
153:5
**guided** 22:20
**guidelines** 18:9
40:25
**gun** 36:22,24
73:2,6 164:1,21
169:15 189:14
**gurney** 144:19
**guy** 60:12 164:20
**guys** 58:24 59:25
60:14,14,14
77:3 137:21
185:11 191:11

_____

**H**

**h** 1:4
**haas** 187:3
**haddad** 2:10,12
3:5,15,15 5:4,5
8:5 9:11,24
10:17,19 11:17
14:3 18:11,22
19:7 20:12 21:4
21:7 22:7 24:22
26:2,10 27:6
28:5,16 29:13
29:16 30:23
33:1,16 34:13
35:23,25 37:2
37:22 38:9,19
39:8,17 40:6,11
40:18,21 41:8
42:6,14 43:1,6
43:20 44:2,8,22
45:15 47:11,18
47:25 48:8,25
49:13 50:13,24
51:25 53:1 55:4
58:1 61:12
62:18 63:9,14
63:16 64:2,5
65:19 69:3
70:21,25 71:16
71:23 72:9,11

73:11 76:3 78:8
78:22 79:8,18
79:22 80:5,15
81:3,11 82:5,9
82:20 84:14
85:3,13,25 86:9
86:12 91:4 98:4
98:13 100:21
101:3,13
102:22 103:15
106:23 110:10
110:12 111:23
112:2 113:2
115:13 117:9
120:18 122:5
126:9 128:14
129:20 134:5
137:13 139:2,9
139:16 141:3
141:22 142:12
148:2,23,25
150:24 153:6
155:1,13 156:4
156:7 159:7,10
159:20 161:4
161:19,24
178:11 179:4
185:19 194:17
194:18,19
197:18 198:15
**hadnt** 83:18,18
83:21 86:4 87:8
168:10 177:20
**half** 45:19 74:17
77:5 194:24
196:15
**hallucinating**
169:17
**hallway** 142:18
142:21
**hand** 73:12 89:13
89:15,21 90:15
90:16 91:6,20
91:20 92:9 93:3
93:6 102:15
106:15,15
114:4,5,12

126:19,21
127:1,3,9,11,14
127:15,21
135:4 184:13
184:18
**handcuff** 76:13
76:15,17 88:7
88:14,19,21
89:4,9 90:3,14
91:6,12,21 92:7
93:25 123:17
124:9 128:2,16
128:25 129:14
129:22
**handcuffed** 37:3
129:5,9 135:1,2
135:5 136:1,2
136:16 137:1
138:17 139:6
140:18 141:13
142:2 151:5
**handcuffing**
90:20
**handcuffs** 14:24
29:6 88:25
135:4 140:25
141:7,25
169:23 188:23
**handed** 53:25
**handle** 17:18,22
20:16 30:17
46:8 179:22
**handling** 14:6,10
22:13
**hands** 35:15,17
36:6,7,14 48:10
76:17 87:23
90:3 91:9 92:6
107:8,8,9 108:1
108:4 123:12
126:20 175:3
175:21 177:3
182:19,22
**handson** 45:9
**handwriting**
69:19
**hang** 80:24,24

126:1 141:16
171:14
**hanging** 53:23
**happen** 42:5
89:16 93:21
102:7 115:6
136:21 151:23
**happened** 17:7
33:6 51:4 54:16
55:11 56:22
59:6 61:5 75:11
77:9 83:4 84:9
84:18,20 87:9
87:21 91:5
93:24 95:7,15
96:10,22 99:21
102:9 104:11
104:15 105:25
106:9,11 111:5
113:19,19
116:5,12,15,17
118:4 122:5
123:22 126:13
130:16 133:19
133:21 134:9
134:10 136:1
137:3 142:13
142:16 144:20
145:3,10,12,22
146:18 147:9
148:1,5 149:4
149:15 151:24
152:17 155:9
155:19,19
179:10,15
180:7 197:22
**happening** 114:9
140:8
**happens** 79:2,18
79:24
**harassing** 82:12
**hard** 38:8 94:7
104:8 138:11
157:24
**harm** 63:7
**harmed** 63:6
**harrison** 1:5,6,6

1:6,8 17:7
21:20 33:8
44:11,23 50:24
51:1,2,6 52:2,9
53:2 55:2,22
56:25 57:3,6,9
59:7,24 64:6
65:7 67:8,20
69:22 70:12,15
71:1,7,12,24
72:3,12,16
75:13 76:2
82:20,23 83:18
87:9 90:2 91:6
91:7 99:23
104:17 106:1
107:2 109:12
110:3,13,16,24
115:14 116:8
116:12 118:7
119:19 121:7
122:13 123:6
124:17 129:12
132:23 133:8
133:10 135:1
137:6,8 138:5
144:4,21
150:13 151:5
151:17 152:16
158:9,10,21
159:4 161:19
161:22 162:8
166:12 171:19
171:24 172:5,7
172:14,17,25
173:10,15,25
174:19 180:19
181:16,22,25
182:13 183:10
183:20 186:17
186:23 187:6,9
187:13,15
189:1,21 190:1
190:6 194:7
196:19 200:8
**harrisons** 58:6
70:3 119:25

120:4,12 121:8
133:17 157:15
181:13
**hast** 83:13,22
85:12,14
**havens** 147:10
**havent** 11:6,6
39:23 43:9
81:20 85:10
111:3 117:18
152:9 188:3
**head** 73:7 75:1
75:16 85:8
87:24 90:17
91:10,22 105:5
107:20,23
108:6 113:15
115:7 119:11
119:11 121:8
144:12 158:13
162:16 163:14
169:14 183:21
183:22,23
184:4,24
**headlock** 118:20
133:11
**health** 38:7 41:20
41:22 49:11,19
49:19,24 50:5
50:14,18 63:20
63:21 64:6 65:3
70:4,12 77:13
78:14,19 79:3
79:10 80:1,6,14
82:6,17,22 83:7
83:20 87:8 88:6
**hear** 102:13
134:14 137:23
193:17
**heard** 59:20,22
60:10 74:14
92:22 93:15
99:3 102:11
103:22,23
114:2 125:6
126:12 131:7
136:12 165:22

177:13
**hearing** 118:12
134:16,17
139:20 193:13
**hears** 5:23
**heavier** 30:14
**hed** 55:4 65:13
83:3 85:6 89:2
140:2
**height** 109:22
**held** 105:14,15
106:13
**hell** 5:13 75:25
**help** 59:19 86:16
86:22
**henshaw** 1:5
**heres** 92:22 99:3
99:3 103:22
114:2
**hes** 8:20 30:14
36:20,21,21
49:7,8 52:4,10
61:8 63:19 69:9
71:14 80:25
81:2 82:3 84:21
102:23 103:24
103:25 104:2,2
104:3,4 107:24
108:5 123:6
125:7 126:6,13
137:1,5,17
138:19 166:2
167:15 171:7
176:8 177:4,22
184:9 188:23
188:23 197:7
197:13
**hey** 60:13 99:7
103:4
**high** 20:20
**hit** 107:10 108:6
108:8 127:13
184:7,18
**hitting** 36:21
110:8 114:21
115:11
**hold** 32:2 93:5,6

104:19 118:17
119:3,5 120:5
121:12,13,14
121:14,18,20
123:11 124:6
126:15,21,22
127:5 129:19
129:22,22,24
133:14 175:16
189:9
**holding** 75:2
114:12 118:17
119:11 121:17
123:13,20,21
127:12,16
175:23,24,25
177:10
**holds** 129:4
**holes** 76:10
**holster** 93:4
**honest** 73:14
86:14 116:1,14
116:15 122:25
132:8 144:16
175:14 193:19
**hospital** 66:19
145:14,25
146:15 148:7
157:20 158:12
**hour** 3:4 40:17
**hours** 13:17
40:14 59:5 65:5
66:19 72:13
78:10,11 79:11
79:14 81:15
82:21 110:22
114:2
**house** 51:3 57:10
58:25 60:14,15
152:6
**housing** 12:6,7
12:12 17:20,22
50:10 55:19
71:20 85:16,18
85:18,21
116:25 117:1
117:14 118:5

118:13 141:7
144:21 145:8
151:24 170:21
171:20 186:8
**hug** 175:4,5,6
**hurt** 125:6
**hurts** 43:11
104:4

_____
**I**
**id** 79:23 85:10
**identification**
21:6 64:4 156:6
159:9
**identified** 49:15
**identifies** 46:14
**identify** 50:3
162:11
**ill** 5:7,14,16 8:12
19:21 20:3,6,13
20:17 30:18
31:6 37:10,22
38:10 40:24
43:21 44:3
45:21 46:23
47:4 48:9,11
70:21 73:21
86:7 88:24
106:21 115:11
139:2 155:22
157:9 171:9
182:22 189:17
189:22 190:1,1
**illness** 38:12 46:9
46:13
**im** 5:12 8:14 9:10
10:3,9 12:2
15:11,16 20:10
25:10 28:4,18
30:16 31:16
33:25 36:12,12
38:7 45:24
54:24 57:20
58:8 62:15,20
62:22 63:4,5
65:17 69:1
70:19,22 81:1

84:23 88:23
95:16 96:8 97:9
98:16 99:8
101:1 103:2,5
103:19 105:14
108:21 111:21
115:1 116:21
118:6 119:16
122:2,9 123:10
123:10,24
125:5 128:3
130:1 134:12
134:13,13
142:7,10
150:19 153:9
155:12 156:3
157:17 158:2
162:24 163:4
165:25 166:20
167:14 169:5,9
170:3 173:1,2
175:1,18
176:14,20,22
177:11,11
178:15,23
179:12,13
184:11,20
193:18
**immediate** 30:20
31:7
**immediately** 7:2
49:15 100:25
101:9 104:14
198:4
**imminent** 34:9
34:15,18,19
**implications** 24:5
**important** 6:6
13:21 47:4
148:18
**improper** 32:11
81:5
**improve** 160:4
**improvement**
154:6 156:25
159:25 160:15
**inappropriate**

179:1
**inch** 74:16,16
77:5,5
**incident** 17:7
20:1 21:20
23:18,20 33:8
44:11,23 59:6,6
74:13 92:18
103:23 110:14
110:22 140:1
146:23 147:3
147:12,25
148:15 149:25
151:16 152:16
152:25 153:11
154:16 155:2,3
155:24 157:7
157:11 161:20
181:16 196:6,7
**incidents** 69:3
**includes** 27:20
29:21 129:3
**including** 29:1
133:18
**incoming** 12:9
**incorrect** 5:22
20:5 119:15
**increase** 44:3
**indicate** 29:9
162:15 166:2
**indicated** 4:2
162:7
**indicating** 177:20
**indirectly** 160:22
**individual** 1:12
141:8
**individually** 1:7
1:16
**individuals** 173:6
**infirmary** 144:22
**inflict** 133:3
135:15
**inform** 70:2
**information** 51:1
51:16,21,24
52:1,19,24 53:3
54:7,21 117:21

117:23 148:14
**initial** 144:8
197:18
**initially** 167:3
178:3,8 196:19
197:2
**initials** 64:10
65:22 66:5,9
**injuries** 181:12
181:17,22
182:7,9,15
183:6,10
**injury** 25:17
32:11 35:21
146:2,5,20
**inmate** 12:11
14:23 23:21,21
25:8,22 26:5,10
26:16,20,25
27:23 28:8,25
31:1,1 33:9
38:9 48:17 49:1
49:14,16,18
51:15,18 52:2
56:20,21,24,25
62:9 64:19
68:19 69:4
76:15 79:17
82:6,7 87:5
88:23 157:9
**inmates** 12:7,9
12:10 14:7,11
17:21 22:13
53:23 54:25
57:5,12 58:4
64:24 68:16
73:15 79:4
83:19,20,21
171:5
**inside** 62:3 89:18
106:13
**instance** 23:20
30:5 157:20
**instances** 157:6
157:21
**instruct** 81:1
141:19 178:23

instructed 81:13
130:1 147:1,4
instructions
188:6 194:12
instrument
135:15
instruments
135:24
insulin 55:16
59:23
intake 51:16,20
intensive 2:18
intent 112:7
interaction 53:7
54:7,9 56:13,16
71:6 83:11 87:9
interactions 46:8
interest 1:7 82:13
interested 8:20
10:14 199:20
interfered 124:7
intermediate
29:18,25 32:24
interrupt 35:9
interview 12:11
59:4 60:9 74:20
92:17 98:25,25
115:16
interviewed
110:21 114:1
114:25 115:2
131:6 148:8,11
interviewing
116:8
interviews
148:19,25
189:25
intimidating
179:8
investigate
179:22
investigated
110:12
investigation
110:18,19
149:2,18
investigations

10:10
investigative
180:1
investigator 10:9
involved 129:12
147:11,16
157:8,20
involvement
149:2,17
irons 14:22 136:7
136:9 139:3
irrational 61:16
isnt 44:2 77:7
177:24
isolate 49:9
isolation 61:4,10
62:7 63:13 65:8
65:20 67:9
69:24 72:12
77:21 79:11
80:8 82:7 88:3
91:13 105:5
121:9 136:18
136:19,25
137:24,25
138:6 139:6
140:9,16
issue 16:24 52:3
issued 53:11
issues 51:18
item 174:1
ive 9:15 10:14
30:10 31:24
38:6 43:11
46:20 64:5 77:2
81:3,13 104:6
113:20 115:24
152:9 177:13
198:15

―――――――――
J
―――――――――
j 1:11 3:15 4:1
200:4
jail 8:3,13 9:8,8
9:22 10:12,21
10:25 11:1,2
12:5,14 15:20

17:4,10,15 18:3
18:13 20:7 22:3
22:5,7 38:7,10
48:16,25 49:8
52:14 53:21
56:10 60:24
77:25 78:16
79:18,24 85:17
86:25 87:3
117:14 135:21
146:14 149:11
152:11
jailissued 73:20
74:4
january 6:13
7:17 8:1,4,14
9:9 10:1,4
156:12
joan 1:22 3:6
199:5,23
200:18
job 7:13 24:9
129:13 152:19
152:23 153:4
jobs 19:14
john 3:19,20
158:12
joint 29:1 36:18
jointly 1:16
joints 129:4
joseph 1:5
joshua 1:13
jr 1:6
judged 159:24
judgment 30:22
154:6 157:4,7
157:15 161:21
june 1:25 3:4
6:18 7:17 8:1,2
200:1
justice 49:19
justified 23:25
36:9 37:1

―――――――――
K
―――――――――
keep 47:16
121:21 161:8

176:14,15
190:17 191:5
kick 101:2
102:24 103:5
106:16 107:13
112:15 126:25
173:15,22
174:10 189:22
190:1
kicked 113:5
kicking 103:11
kill 75:1,14
killed 180:4
kind 10:14 11:7
19:15 25:7,13
51:23,25 53:21
53:22 56:3,7,11
59:24,24 64:19
74:24 93:16,17
94:4 99:16,23
100:24 104:3
105:4 107:4,4,5
121:10,14
124:16 125:6
126:25 127:23
127:24 130:9
131:4,11 145:2
145:3 148:1
165:7 169:24
170:18 173:1,2
180:2 185:13
186:6 188:21
189:7 195:11
195:18
kinds 41:1
knee 108:10,23
108:24 109:7
109:11,13,15
113:7,11,15
116:13 135:11
140:15 174:3,8
knees 172:16,19
183:16
knew 58:11
113:4 116:8
153:13 160:7,8
161:7,14,15

164:22 168:6
168:23 181:8
know 5:15 6:9
8:5 11:10 12:2
18:13,18 19:11
21:13 33:7 34:4
35:15,17,18
36:15,22,23
37:20 43:10
44:8,9 50:23
52:13 53:22,23
56:11,19 57:16
57:21 58:10,20
60:13,20,24
66:1 69:23,25
70:9 71:19
73:22 74:4
77:11,20,22
78:6 80:17 81:6
84:1 85:9 88:22
92:23 93:5,5
99:1,5 104:7,24
105:1 109:2
112:6,19,20,25
113:2 114:5
117:15,25
118:25 120:9
120:17 121:11
122:1,8,16,19
123:21,24
124:15,22
126:8 127:4
128:9,10,10
131:2 132:7,12
132:13,25
133:4 134:16
135:3,11
137:10,12
138:2,2 139:15
139:18,25
143:5,8 145:22
146:17,19
147:8 154:22
155:4,14,17,21
158:11,15
161:10,11
162:4 165:11

165:13 170:2
172:1,18
173:13 175:5
181:4,24 184:2
184:16,17
185:7,9,16
187:2,9 189:5
189:10 192:15
192:22 193:8
193:13
**knowing** 117:17
155:4,14
**knowledge**
148:17
**knowledgeable**
18:2
**known** 102:4
152:7,9
**krystle** 1:5
**kyle** 92:12

**L**

**l** 3:19,20
**ladies** 60:16
**lapse** 157:7,14
**large** 77:7
**larger** 31:2
**lash** 48:9
**late** 13:5
**latex** 195:14,16
**law** 3:4,15,19,19
4:1,2 11:11
19:17 20:14,17
117:3
**lawful** 24:16,24
27:1 31:4
**lawfully** 25:3
**lay** 124:4
**laying** 71:2
125:11,21
126:24 140:4
176:18,20,22
187:12,17
**layout** 117:15
**lead** 47:19 48:4
**leadership**
156:17

**leading** 155:3
**lean** 113:12
**leaned** 178:13
**learn** 52:16 57:8
73:25
**learned** 19:1
136:13 144:13
**learning** 45:22
46:1,4,7,12
118:2
**leather** 194:22,23
194:24
**leave** 10:11 17:2
138:21 155:22
160:20,23
**leaving** 139:5
**led** 58:11
**left** 9:5,20 16:23
64:8 71:24
72:11 92:25
93:3,6 94:25
105:19,19
107:7 108:19
108:20,25
109:1,4 113:9
115:21,21
119:10 125:5
145:21 154:23
**leg** 14:22 104:19
105:14 128:11
136:2,7,9 138:7
139:3
**legs** 107:11,13
122:9,11
123:12 131:11
131:24,25
138:19 173:25
174:4,6,8,10
177:2 181:22
181:25
**length** 196:11,14
**letting** 69:25
**level** 24:23 25:17
25:23 26:16
27:8 29:16
31:21 32:24
77:5

**levels** 26:25
**license** 1:23
**life** 24:5 58:20
**lifted** 124:16
**limit** 78:7
**line** 53:24 64:16
**lines** 22:18 140:4
**list** 55:14,14,15
55:18,20
**listed** 32:23 65:7
65:10 67:7
**listen** 20:8 59:12
80:2 167:10
169:12 178:20
**listened** 59:14,18
74:14
**lists** 25:11
**litem** 1:5
**literally** 113:3
**little** 5:8 10:21
13:19 20:25
53:22 54:19,20
56:8 76:10
99:23 150:16
160:10 170:11
173:2
**litvinchuk** 1:14
**livenchuk** 187:2
**located** 166:7,9
**location** 117:5,11
117:12,21,25
136:4,6,8
142:13 193:1
**locations** 7:6
**lock** 133:11
**locked** 119:1
**log** 2:19 63:18,22
64:6 69:8 86:16
101:15
**logged** 52:4
**login** 63:18
**logs** 63:25
**long** 6:11 9:24
19:16 42:3 61:7
76:9 77:4,7
79:25 80:5,20
82:5,16 106:20

118:11 146:4
152:7
**longer** 142:3
**look** 22:17 27:13
30:11,14,15
38:3,4 49:6
64:20 93:17,18
100:17 173:2
191:7
**looked** 55:8 68:7
74:10 75:21
93:18 99:16,17
105:7
**looking** 25:10
33:25 38:7
72:20 88:24
155:9,10
156:19 160:11
162:2,2,6
**looks** 65:3
**loses** 32:5
**lost** 53:21 56:8,11
79:7
**lot** 20:25 21:22
30:11,15 38:5
96:23 119:18
128:13 138:10
142:9 152:10
161:14
**love** 137:21
**low** 27:7
**lower** 25:23
56:20,23 109:5
130:10
**lowlevel** 26:21
27:11,18,25
28:10,17,24
29:18 30:6 31:5
31:6
**ly** 4:2 40:20

**M**

**m** 1:4 3:4 40:19
40:19 54:13
61:21,22,24
62:7 64:9 72:10
72:10 85:25

86:1 110:11,11
148:24,24
171:16,16
198:17
**madigan** 1:14
187:3
**magistrate** 81:9
**mail** 13:15 14:5
**mailbox** 76:4
**mainline** 168:9
168:12
**maintains** 101:14
**maintenance**
69:7
**making** 56:1
57:22 58:18
67:4,5 81:5
145:3,4 150:11
156:17 163:22
164:25 165:2
166:11
**man** 7:14 179:14
**manage** 12:24
**mandated** 11:8
18:17,19
**mandatory** 19:7
**manipulate**
129:4
**manipulation**
29:1
**manipulations**
36:18
**manner** 48:18
96:13,17 162:9
179:22,23
188:21
**mannerism** 56:9
**mannerisms**
88:10
**manpower** 26:4
**mark** 21:4 156:4
159:7
**marked** 21:5,7
64:3,5 156:5,7
159:8,10
160:15
**martial** 109:19

**martin** 1:6,7 17:7
50:24 51:1 52:2
52:9 53:1 58:6
65:7 67:8,20
70:14 72:11,15
82:23 90:2
119:19 122:13
151:17 158:21
196:19
**martinez** 1:13
**mask** 137:4,5
138:1,7 139:4
**material** 194:22
**materials** 14:12
14:20,25
**matrix** 36:19
**matter** 161:3
179:3
**mattered** 161:18
**matters** 161:20
161:21
**matthew** 1:13,20
2:4 3:1,7 5:1
198:21 199:8
200:4
**mattress** 73:7
75:1,16 85:7
162:16 163:14
163:24 169:14
**max** 83:20
**mean** 8:1 9:10
12:16 17:16
26:5 30:16
36:21 39:12
49:25 50:16
51:20 67:16,25
68:13,13,25
69:1 76:8 77:6
85:21 89:5
91:15 94:13
96:22,22,23
97:17 99:11
104:5 113:18
117:24 123:16
128:6 131:3,22
131:24 134:19
153:2,13

154:23 162:4
164:14,18
167:13 169:13
172:1,18 175:2
176:5 179:4
185:7 191:2
195:16
**meaning** 6:1
34:19 77:13
107:7 186:3
**means** 66:11 74:1
134:21
**meant** 43:1 52:21
78:4,23 165:14
179:8,9
**measurement**
94:20
**medical** 51:17
52:3,24 53:3
55:23 133:16
144:18
**medication** 54:2
55:2,5,8,12,17
55:24,25 56:3
**medications** 51:7
53:8,9,24
**meets** 160:15
180:5
**megan** 83:13,22
**members** 22:20
**memory** 71:4
**mental** 38:6,12
44:18,23 45:2,8
46:9,13 49:11
49:19,23 50:5
50:13,18 62:9
62:14,16,24
63:20,21 64:5
65:2 70:4,12
77:13 78:14,18
79:3,9 80:1,6
80:14 82:6,16
82:22 83:7,20
87:8 88:6 165:7
165:15
**mentally** 19:21
20:3,6,13,17

37:9,22 38:10
43:21 44:3
46:23 47:4 48:9
48:11,17 49:1
49:14 50:3
188:4,17
**mention** 61:25
**mentioned** 20:2
61:15 150:21
153:11 186:10
**mere** 30:6
**mesh** 194:21
**met** 51:5
**metal** 185:12
**method** 175:4
**michael** 1:14
3:15
**michelle** 1:5
**midback** 185:4,5
**middle** 95:2
**midside** 115:23
**midtorso** 114:15
114:19,23
115:6
**mike** 163:5
182:11
**mills** 152:3,4
**mind** 126:10
**minds** 177:16
183:25 184:8
**mine** 28:19
139:21
**minimal** 32:3
**minimize** 41:9,14
**minimum** 52:7,8
57:24 58:25
85:24
**minimumsetting**
165:19
**minor** 1:4
**minute** 138:25
190:20
**minutes** 40:16
65:7 75:6
163:11
**miscommunica...**
158:13

**misstates** 57:18
65:14 115:8
167:9 169:2
**mistake** 117:5
**mitigate** 188:20
**mmhmm** 115:3
118:9 124:1
**mode** 73:23 74:3
121:21 179:23
186:7,9
**moment** 34:25
92:2 131:4
144:12 167:23
**monitor** 7:14
**monitored** 78:12
**month** 8:19 13:4
13:6
**months** 9:1 15:21
17:11,14
**morning** 54:10
54:22,25 55:15
56:13
**motherfucker**
103:18 104:4,5
**motion** 96:11,16
97:1 98:1,1,2,8
98:10,12
106:23 119:2
**motions** 186:7
**motivating**
156:20
**mouth** 107:14
**move** 87:12,13,17
88:2,3,8,14,25
89:1,22 90:9
91:12 94:10
105:15 131:25
132:1 150:13
151:5 168:4
176:1
**moved** 57:7 90:8
91:13 98:2
136:4 142:20
**movement** 34:20
**movements**
37:19
**moving** 87:15

88:23 90:10
127:6 139:4
143:11 150:22
176:12,15
186:22
**multiple** 23:17
39:24 57:25
123:23 132:3
**municipal** 1:11
**muscular** 26:11

---
**N**
---

**n** 2:1
**name** 143:17
186:14
**named** 199:6,13
199:21
**names** 122:16
**narrative** 48:21
49:5 54:18 61:7
75:23 81:7
84:11,19
106:20
**narrow** 67:17
76:9 154:15
**nature** 45:7
166:14
**nay** 97:5 128:8
**near** 64:17 85:18
85:21 91:8
122:10 133:8
**necessarily** 26:9
39:7 44:1 68:13
**necessary** 22:19
22:25 47:20
48:5
**neck** 31:15,25
32:8 118:23
119:10,20,25
120:4,12,16,19
120:22,25
124:19 133:8
133:11,18
181:17 182:13
182:19,21,24
183:1,4
**need** 7:19,22

23:21 24:11,22
26:5 30:1,19,20
35:17 45:8
117:10 118:14
142:1 147:7
**needed** 49:16
50:23 56:4 57:6
57:23 86:22
88:7 89:3
116:25 134:20
157:1 159:25
**needs** 8:15 51:17
53:4 77:22
154:5 160:15
**negative** 154:24
**never** 20:5 31:24
70:11 112:9,10
112:12,15,16
112:17,18
113:5,6 114:22
117:9 182:18
184:23 189:14
**new** 10:16 12:9
12:15,19,24
17:18 56:10
138:22
**newly** 12:9
**night** 51:3 70:22
152:5
**nighttime** 70:6
**noise** 7:20
**non** 32:3
**noncompliance**
27:21
**noncompliant**
27:24 28:9
35:16 38:14
87:6
**nonsworn** 6:18
**nonthreat** 88:12
**normal** 40:4
58:21 164:19
165:18 169:25
169:25 170:2
**northern** 1:2
**notations** 163:6
163:11

**note** 49:9 62:20
63:4 68:3,15
163:25
**noted** 67:23 68:9
77:10 84:3
**notice** 3:3 29:13
68:14 86:12
143:10
**noticed** 73:8 84:7
84:9 143:12
**notification**
50:10
**notified** 63:17
70:5
**notify** 63:20
**noting** 37:15
**november** 9:5,13
156:12 159:12
**nuances** 157:5
**nudge** 94:7,9
**nudged** 94:5
167:12 190:16
190:25
**number** 25:5,12
25:18,18 66:20
132:20,20,22
133:1
**numbers** 64:15
**nurse** 52:25 53:8
53:14 55:8,13
55:14 61:13
140:12,13
142:15,17
143:15,16,20
144:2
**nurses** 60:6
61:16,19
143:18
**nylon** 194:24,25

———— **O** ————
**o** 200:4
**oakland** 3:6,16
3:20 4:3 6:17
8:25 200:6
**oakport** 3:20
**obey** 19:2,10

**objection** 11:13
18:4,14 19:3
21:24 24:18
25:24 26:7 27:2
28:1 30:7 32:20
34:10 36:10
38:15 39:4,11
40:1,8 41:4,25
42:11,23 43:3,4
43:16 44:5,19
45:10 47:6,13
48:20 50:6
52:20 57:17
62:11 63:11
68:20 78:3,21
79:13,20 81:7
81:13,20,21,23
81:25 82:10
86:2 97:22
100:18 102:17
103:12 117:6
142:4 153:1
154:19 164:13
165:9,14 169:1
174:14 188:7
**objections** 28:11
43:23 80:9 81:5
**objective** 88:2
**obligations** 63:10
**observation** 2:19
56:9 63:18,22
64:6 67:4,20
69:8,15,22
70:16 71:13
78:2 79:25 80:8
138:22 143:24
163:22 165:3
165:10
**observations**
49:10 62:20
63:4 65:6 66:14
66:16 163:20
166:1
**observe** 64:24
67:11 70:25
136:9
**observed** 67:8

68:7 73:13
75:22 100:13
111:17
**observing** 70:14
72:15 136:15
**obstructing** 81:8
**obviously** 14:5
**occasion** 33:16
88:13
**occasions** 128:15
**occur** 193:17
**occurred** 16:25
167:20
**occurring** 171:4
**odd** 164:18
**offend** 179:13
**offended** 179:12
**offer** 11:1
**office** 2:17,18,20
2:22 18:10 70:4
83:8 179:19,21
200:11,13
**officer** 11:2,5
12:14 17:15,17
22:5 48:11
117:10 122:14
126:12 127:11
127:15 132:9
132:16 133:7
133:10,13
135:14,17
137:8 147:3,25
149:25 162:4
172:2 173:24
178:1
**officers** 11:11,20
14:4 46:15
122:6 124:8,11
128:1 129:11
129:17 132:3
132:18,20,22
132:24 133:2
134:14 135:8
147:16 161:9
171:23 172:13
172:25 183:8
186:10,14,19

186:25 187:5,9
187:13,15,20
193:9 194:3,6
**offices** 3:5,19
**official** 1:12
**oh** 7:24 8:17
29:13 43:9,11
103:17
**okay** 5:12,16 6:4
6:9 7:23,24,24
8:13,17,21 9:18
11:4 13:23 14:1
15:18 20:8
28:16 29:13
30:23 31:17
34:3 35:23
40:18 41:18
42:6 46:11,18
53:17 56:2
57:15 58:21
60:9,12 61:6
63:21 70:1,2
71:6,17 73:15
77:25 80:9 82:8
82:15 87:7,20
90:18 91:15
93:7,15 96:25
97:3 100:1,23
101:7 103:7,14
104:24 105:2,7
106:19 108:11
111:23 113:2
114:13 120:10
121:23 122:19
125:5,19 126:9
131:15 136:14
143:22 145:4
148:18 150:7
153:11 155:1
157:14 158:5
158:17 159:7
162:18 166:10
167:18 170:17
170:20,22
171:14 172:1
172:22,24
176:8,25

179:15,24
180:12 182:18
185:15 186:10
193:8 198:16
**once** 14:1 33:10
41:17 44:11
77:6 87:7 89:10
90:16 91:10
93:16 101:5
102:6 108:17
129:24 138:12
142:2 185:6,9
188:22 193:13
193:22
**ones** 22:9 113:23
**ongoing** 22:7
**onthejob** 11:2
**ooo** 2:24 198:18
**open** 67:11 76:6
89:22 90:13,14
107:14,19,23
126:24 183:22
184:2,3,13,18
184:22 190:13
**opened** 10:13
87:22 89:14
91:5
**openhanded**
183:25 184:7
184:18
**opening** 89:11
151:6 157:8,15
**openpalm** 107:19
113:15 114:24
115:7
**operations** 12:22
17:19
**opinion** 139:11
140:22
**opportunity** 5:19
35:7 113:6,13
127:25 155:2
177:19
**opposite** 121:9
**ops** 10:25
**opted** 154:10
**option** 26:13

36:20 42:15
88:9 90:24
112:17 198:9
**optional** 19:1
**options** 22:20
**order** 2:17 15:4
18:1,11,20
19:10 21:8
22:18,19,21
25:3 29:25 36:7
76:15 88:7
191:17
**orders** 14:16
18:2,8,23,25
19:10 91:19
107:19 112:6
130:3 187:25
188:3
**ordinary** 58:9
**organization**
11:19
**original** 6:2
**originally** 84:5
147:5 177:6
**outcome** 199:20
**outside** 7:20
76:18 90:4
161:17 166:9
166:10 185:14
190:8 196:21
**overbroad** 26:8
28:2
**overheard**
143:23
**overly** 11:14 18:5
18:15 19:4
21:24 24:19
25:25 27:3 30:8
32:21 34:11
36:11 37:25
38:16 39:5 40:2
40:9 41:5 42:1
42:12,24 43:4
43:17 44:6
45:12 47:7,21
48:21 49:4 50:7
68:21 79:14

80:10 82:11
84:12 128:4
139:10 141:17
142:5 188:8,15
**oversee** 12:7
**oversees** 11:20
**oxygen** 31:20,21

---

## P

**p** 3:4 40:19,19
72:10,10 85:25
86:1 110:11,11
148:24,24
171:16,16
198:17
**page** 2:6,19 22:17
25:10 27:13
46:12 66:6
156:16 159:21
**pages** 2:17,21,23
46:11
**pain** 103:18
**painful** 43:2,8,9
**pair** 195:18
**palm** 107:23
126:24 183:22
184:3,22
**pants** 74:15
130:14,17
**par** 161:15
**part** 12:1 29:12
34:1 47:19 48:3
49:8 63:10
68:12 129:3
140:15 151:11
152:19,23
162:11 170:17
194:23,23
**particular** 20:1
21:18 93:14
152:5,25 166:6
180:18 190:11
**particularly**
100:5
**parties** 199:19
**parts** 14:3
**passive** 26:20

27:7,11,17,19
27:25 28:10,16
28:24 29:17
30:6 31:4,6
138:16
**patrol** 9:2 16:2,5
117:17,20
154:23 161:15
**paying** 196:9
**people** 14:1
19:23 20:6,13
20:17 35:21
38:7 55:15,19
55:21,25 57:25
63:7 71:12
75:14 76:11
83:19 123:23
141:6,19
146:17 153:5
171:12 173:5
180:4 189:14
**pepper** 169:21,22
169:22
**percent** 74:5
122:4 142:11
143:8 192:20
193:18
**perception** 60:25
**performance**
2:20,22 154:18
156:8,13
160:19
**period** 12:25
13:7 31:22
119:14 156:12
159:11,14,24
162:12 163:1
163:13,23
172:4 187:19
**permissibly**
29:25
**permitted** 135:23
**perry** 92:12
**person** 25:7
30:12,12 31:22
32:3,12 35:3,6
36:6,17 38:4,5

38:21 39:24,25
40:6,13 41:15
41:20,23 42:9
43:13,21 44:3
45:3,7 46:24
47:4,10 48:9,12
49:9,10 50:3
52:14 54:1 63:5
65:4 73:5 76:13
77:23 78:1,19
79:24 80:1
81:23 82:1,6
87:6 120:25
122:8,11
128:16,25
129:8 135:21
139:22 140:25
141:12,24
142:2,3 158:12
164:11 165:6
168:3,24 173:5
188:4,17,22
189:10 193:23
199:15
**personal** 161:20
**personally** 3:7
197:15
**personnel** 2:20
7:16
**persons** 37:18,22
44:2,18,23
45:16,23 46:13
129:4 193:3
**pertain** 18:12
**pertaining**
159:21
**phase** 22:5
**phone** 84:1,3
**phonetic** 187:4
**photographs**
145:5
**phrase** 51:20
**phrased** 26:8
63:2 126:3
129:15 139:12
197:11
**phs** 195:25

physical 27:20
159:22 166:11
167:20 168:16
178:8 183:9
184:8,13
physically 27:24
28:8 107:17
135:5 189:1
pick 125:15
136:17
picked 124:16,18
124:23 125:1
piece 75:2
pieces 73:16
pill 51:5,6 54:22
54:25 56:18,18
61:20,21,25
pin 162:24
place 12:12 32:2
77:20,21
123:11 141:7
149:12 150:4
166:7 171:4
199:13
placed 49:8,8
61:11 63:17
70:16,23 71:13
79:25 80:7 82:7
136:3,9,23
138:4 146:13
168:18
placement 78:2
79:11
placing 69:21
plainly 111:15
plaintiffs 1:9
2:15 3:17,21
21:5 64:3 156:5
159:8 162:3,6
plan 87:25
please 5:15 7:7
8:12 15:17 21:4
28:5 47:23 80:4
91:4 94:5 95:8
136:14 156:4
159:7 200:13
pod 56:15,20,23

57:7,13 58:2
60:7,8 61:2
62:3,5,8 168:4
168:6
point 8:7 12:14
13:12 15:24
16:2 36:19,21
52:8 57:24
58:21 59:1
60:11,20 61:18
63:8 66:19
72:24 73:8
78:13 81:18
83:12 85:8
86:23 87:22,25
89:5,7 90:11
91:22,24 93:1,9
93:10,17,20
94:1 95:12,13
95:18 99:18
107:6,9 114:4
116:10 118:12
118:19 119:9
120:8 121:4
122:1 123:7,10
123:22,23
124:3,11,14,20
125:17 126:14
126:20 128:10
129:13,25
130:12,22
131:3 132:13
133:25 134:12
138:9 140:12
140:19 143:10
143:14,18,25
143:25 144:10
145:8,9,14
146:16 152:14
160:4 161:11
162:7 164:12
165:6 166:12
168:19 169:7
174:18 176:6
177:5,13
182:14 188:22
190:17,18

197:4,5
pointing 36:22
36:24 73:2 81:4
96:3 164:1
178:14
police 6:14,19,20
7:18 8:2 10:21
122:18,20
123:25 136:13
139:19 180:6
policies 15:1
21:12 44:17
50:15
policy 14:15
21:15,18 25:10
31:9 33:22 34:1
34:5 49:14 50:1
50:13,14,17
156:23 157:23
158:8,19 159:2
poor 152:24
153:2
population 49:16
168:9,12
portion 14:7
45:22 130:9
158:3 182:23
portions 161:14
posing 68:24
position 6:18
10:13 63:6
105:10 107:2
107:22 108:3
109:10 118:25
119:11,14
121:6,6 127:20
129:5 141:9
142:8 175:25
179:17 186:21
190:9 192:23
positioning
121:11
possibility 89:17
89:20
possible 40:12
47:17 75:18
84:6,8 120:11

possibly 35:14
65:21 107:10
107:12 113:12
122:22 143:7
162:20 185:8
post 11:10,18
45:15,22 46:2
46:12,22
postcertified
6:23
posthighschool
20:24
posts 7:6,15,15
potential 34:22
35:14,21
potentially 59:3
76:16 87:4
pounced 106:1
pounds 30:14
powerpoint 15:3
15:6,9
practice 31:24
128:21
practices 58:11
precaution 17:20
88:12
precautions
12:23
prepared 25:2
200:11
preparing 91:6
92:7
prescribed 53:10
presence 29:6
present 3:17,21
4:4 41:20 66:18
142:13 152:1
171:19,21
187:1 194:2
presentations
15:10
presently 10:3
preserve 15:16
press 191:20
pressure 32:3
pressurepoint
29:2

pretty 12:17
67:14 121:23
128:18 164:6
prevent 47:11
120:24 121:15
124:7
preventing
176:12
previous 154:14
159:11
previously 61:24
74:22 130:13
primary 147:3,6
147:13,16,24
147:25 149:4
prior 16:1 19:13
19:17 34:8
35:12 80:12
85:12 126:5,5
152:13 161:5
168:9
prison 49:19
prisoner 79:10
80:7,7
privacy 179:3
private 161:3
privilege 81:24
probably 5:13
15:12 99:12
160:8 185:5
probation 13:8
probationary
13:7
probe 140:4
194:1
probes 130:22
131:3 142:20
142:22 143:2
probing 175:19
problem 117:2
159:23 165:7
165:15
problems 42:9
161:8 189:11
procedure 14:15
66:23 157:23
158:8,20 159:3

proceeded 91:22
  95:11,19,20
  99:25
proceeding 91:21
  93:8
process 5:8 68:8
processed 12:9
produced 3:8
  40:23
professional 29:5
program 2:22
  9:2,5,5 15:22
  16:14,16,20,23
  17:1 154:23
  160:9,12,14,19
  160:20 161:6,7
prong 191:25
  192:14
prongs 130:20
  192:16,17,21
  192:23,25
  193:1
proper 14:8,23
  14:24 66:23
  81:7,22 88:6
  141:12 195:13
properly 14:22
  89:1 141:7
provide 15:17
  53:14
provided 21:16
  22:12 81:2
  129:7
provides 18:10
  22:7
proximity 122:2
  175:15
prudent 89:24
psychiatric 42:9
  53:3
pull 44:11,14
  101:8
pulled 52:25
  100:8 125:10
  125:14 172:24
  173:1
pulling 102:5

pulse 144:6,11,14
punch 23:21
  111:20 127:11
  174:3,6 182:2
  183:20 184:1,7
  184:16,17,20
punched 183:19
  184:9,12,23,25
  196:2
punches 23:23
  111:8 113:14
  114:15,16,16
  114:19,23
  115:5 172:20
  172:21 173:3,5
punching 111:12
  173:10 184:14
  189:1,12
purpose 76:20
  111:8 176:11
  195:15
pursuant 3:3
push 95:4 167:18
pushed 167:4,6,6
  167:7,12,15
  178:2,8 190:5
  190:15
put 16:1,1 31:25
  64:15 68:1,6
  71:8 76:16 77:3
  87:23 88:4,25
  90:2,17 91:9,20
  91:20,21 93:10
  93:12 94:4
  118:20 119:5
  120:18 121:20
  130:23 133:10
  137:6 138:1
  154:2 155:11
  155:12 161:12
  164:17 165:23
  192:12 195:23
putting 63:12
  92:25 118:16
  128:12 141:9
  151:7

Q

question 11:15
  13:22 20:8,9
  28:7 34:12
  35:11 38:11
  41:12 48:2,23
  54:20 57:19
  63:1 65:17
  70:19 75:25
  79:6,7,21,22
  80:2,3,19,20,21
  81:1,14,22,22
  81:24 82:2,3,4
  84:19,21 86:4,8
  86:10 90:12
  97:13,24 115:9
  139:2 155:8
  163:21 166:23
  167:10,11
  169:3,12,12
  178:6,10,16,17
  178:18,21,24
  178:25 179:2,3
  184:6,6,21
  185:20 188:9
  189:17
questioned
  147:24,25
questions 5:12,14
  5:14 35:12 61:8
  81:15,17,19
  97:14 106:21
  119:19 181:9
  185:21 194:16
quick 35:9 99:17
  110:9 176:16
quickly 24:12
  46:25
quiet 71:2
quite 20:10 84:23
  132:7,25
quote 22:19
  27:18 157:3,20

R

r 1:23 199:23
  200:18

radio 116:21,21
  117:5 124:19
  191:11
radioed 118:3
radioing 117:12
raise 127:18
raised 185:20
ran 97:6,12
  126:17
randall 4:1 200:4
randy 81:6
range 162:19
  177:1
rating 154:5
reach 191:9
reaction 144:9
read 18:20 28:5,6
  47:25 48:1
  98:24 134:17
  139:19 166:20
  166:22 180:20
  181:5 186:20
reading 120:7
  157:17 190:3
  200:11
readjust 141:9
ready 17:21
real 35:9 99:17
  144:10 169:8
  176:16
reality 164:11,14
  166:15 167:25
  168:4,25 169:8
  188:5
realitybased
  164:24 165:3
  168:20
really 6:2 8:19
  19:1 43:14
  60:11 72:24
  93:18 111:3
  138:9 145:21
  145:22 146:6
  167:24 175:14
  177:24 190:2
realm 103:3
reason 16:22

23:22 26:12
  39:19 46:22
  69:9 83:14
  87:17 90:10
  113:7 124:18
  166:3 177:10
reasonable 24:16
  35:6
reasonably 155:6
  155:25
reasons 35:5
  87:15 88:25
rebuttal 154:13
recall 11:22 13:4
  13:6 15:8 17:8
  20:15,19 33:5,6
  39:22 40:15
  41:7 42:4,13
  45:15,17,17
  46:19 50:9,10
  54:4 55:19,23
  56:8,12 57:11
  57:12 59:20
  60:3,6 62:3,3,4
  66:22 70:13,14
  71:5,9,21,22
  72:1,20 73:14
  73:19,22 74:2,2
  74:11 75:3,4,6
  76:23,25 77:1
  78:6 83:10,25
  84:1 85:8,14
  86:14 87:10
  92:17 93:2,3,3
  93:8,9,14 94:8
  94:12 97:12
  98:16 99:15,20
  100:4,5 101:12
  101:24 103:13
  103:15,19,20
  105:3 108:2,15
  108:21,21
  109:9,14,14
  110:8,24,25
  113:18,20,21
  114:21 115:10
  115:11,13,16

115:17,19,20
115:23,23
116:14,18,20
117:23 118:12
118:24 119:9
119:17,18,22
120:1,3,6,8,15
120:20 121:19
122:2 123:22
123:23 124:22
124:24 127:5
127:13,23
130:8,8,10,12
132:11,11,14
134:16,17
135:6,13,19
136:11 137:4
137:11,16,17
137:20 138:3
138:15 139:19
139:24 140:7,8
143:9,17 144:4
144:15 145:9
149:19 150:16
151:2,3,8,12,20
153:8 154:20
158:10,16,24
160:7,10 163:7
171:25 172:19
172:19 173:4,7
173:12,14
175:17,23,24
180:22 182:6
182:16,20,25
183:15,20
185:8,18
187:23,24,25
189:4,4,7 190:2
190:4 193:24
193:25 194:14
196:4,5 198:5,6
**recalled** 9:12
**receive** 10:24
  11:25 128:19
**received** 21:22
  33:5 46:4
**receiving** 16:19

**recess** 40:19
  72:10 110:11
  148:24 171:16
**recognize** 62:25
**recollect** 127:2
**recollection**
  67:21 116:11
  116:16 119:17
  126:7 133:6
  149:22
**recommend**
  39:15
**recontact** 85:13
**record** 10:17,18
  10:19 28:6
  29:10 33:25
  40:21 48:1
  101:24 154:14
  156:11 166:22
  175:20 178:13
**recorded** 75:5
**recording** 59:13
**records** 192:5
**recover** 146:4
**recurring** 117:2
**red** 146:16
**refer** 86:16
**referral** 49:24
  50:5,11,12,14
  50:18,23 53:25
  69:10 70:12
  77:22,23
**referred** 153:14
**referring** 193:11
**refers** 31:14
  65:11 157:11
**reflect** 155:2
  178:13 192:5
**reflected** 181:12
  182:7 183:7
**reflects** 182:12
**refrained** 81:3
**refused** 107:18
  112:6
**refusing** 37:3
**regarding** 77:14
  181:9

**registers** 193:6
**regulates** 11:10
**related** 20:1
  180:19
**relates** 166:15
**relative** 25:17
**relax** 111:25
**release** 44:14
**released** 146:14
**relevance** 155:25
**relevant** 23:8
  155:6
**remain** 200:12
**remained** 56:7
**remark** 64:12,23
  65:10,24 66:10
  66:13 67:23
  68:3
**remarkably**
  81:16
**remember** 6:9
  8:14 45:19 59:4
  59:9 60:5 76:1
  85:8 97:9 98:15
  99:9,10,11
  103:2,6 113:24
  114:9,10
  116:23,24,24
  118:15 122:3,8
  122:10 123:1
  125:3,4 126:14
  131:4 135:3
  136:7,17 137:5
  137:6,14,15
  139:17,20,20
  140:11 143:6,7
  144:1,17,18
  150:17 151:12
  151:14 186:11
**remove** 58:1
  62:20 63:8
**removed** 61:2
  168:18 172:5,7
  172:11 187:14
  187:19,21
**rene** 8:24 9:6
**repeat** 48:23 79:6

**repeated** 41:9,14
  41:19
**repeatedly** 41:23
  47:2
**rephrase** 5:16
  34:12 41:12
  47:23 65:18
  79:21,22 139:2
**report** 2:20 59:16
  99:1 122:18
  123:25 134:17
  136:14 139:19
  146:23 147:4,7
  147:12,13,16
  147:19 149:5
  179:24 180:1,9
  180:10,14,19
  180:20 181:4,7
  181:9,10
**reported** 199:14
**reporter** 1:22 3:7
  5:2,23 7:23
  13:25 199:14
**reports** 122:20
  147:17 181:5
**request** 15:18
  16:2 46:16,23
  91:19 137:6
  138:3 171:1,13
  191:20
**requested** 90:24
**requesting**
  144:18
**require** 68:11
**required** 18:13
  18:22 21:13
  32:15 34:4 35:2
  35:5 50:15,17
  50:19 80:18
**requires** 38:20
**resist** 131:18
**resistance** 26:21
  26:22 27:8,11
  27:18,25 28:10
  28:17,25 29:18
  30:1,6,19 31:5
  31:8

**resisting** 35:16
  35:19 36:20
  106:14,15,16
  107:16 114:6,7
  114:14 116:20
  118:7 123:7
  130:1 131:20
**resists** 27:19
**respect** 71:24
  183:13
**respects** 22:15
**respond** 44:18
  56:20 81:10
  82:16
**responded** 56:23
  85:6
**response** 23:9
  28:16 30:5 31:4
  68:18 87:19
**responsibilities**
  12:22
**responsibility**
  17:23 49:22
  50:4
**rest** 49:16 53:6,6
  70:15
**restraint** 31:15
  31:18,23 32:7
  32:11,14
**restraints** 14:8,8
  14:12,21 15:8
  22:14 29:6,23
  31:12 129:1
  136:2 138:7
**restroom** 148:22
**result** 155:18
**results** 155:10
**retail** 19:16,18
**return** 40:20
**returned** 17:4
  72:12
**review** 5:19
  98:19 111:1
  156:12 200:13
**reviewed** 101:17
**revised** 21:18
**rib** 109:2

ribcage 115:21
ribs 109:1,4
  110:7,8
ride 104:1
right 6:23 8:7,17
  9:14 10:22
  11:11,17 12:4
  12:12 13:10,16
  14:10 15:22
  16:9,24 17:11
  18:3,13,23 19:8
  19:11 21:10,13
  21:20,23 22:8
  22:15,24 23:10
  23:11,14,18
  24:2,6,9,17,25
  25:8,13,19,23
  26:17,22,23
  27:1,8,21,25
  28:10,22 29:3,7
  29:19,21,23
  30:2 31:5,10,15
  32:16 33:1,2,23
  34:5,9,15,22
  35:3 36:9 37:3
  37:7 38:21,24
  39:3 43:2,7,15
  44:12,18 45:4,9
  45:20 46:2,9,25
  47:1,5,12,20
  48:5,12 49:16
  49:20 50:5,19
  55:5,9 57:16
  58:24 60:25
  62:6,6,25 63:25
  64:17,20 65:11
  65:13 66:3,25
  67:5,9 68:12
  72:13 73:16
  74:12 75:8,11
  75:19 76:13,18
  76:21 78:16
  81:3 82:20 83:3
  84:7,17 86:1,6
  86:20,22,25
  87:5,14 88:8,13
  89:11,18,25

90:25 91:20
92:1,4,5,7,8,20
92:24 93:6,15
93:19 94:16,24
95:5,23,24 96:2
96:3,6,18 98:13
98:20 99:3,8,25
100:9,15,25
101:7,15
102:16,21,22
102:24,25
103:8 104:14
104:22 105:20
105:24 106:7
106:25 107:4,5
107:5,7,10
109:5 110:14
111:6 112:21
113:3,24 114:5
116:9 117:22
119:9 121:2,4
121:17 122:9
122:10 123:14
123:18,19
124:12 125:8
125:23 126:10
128:16,19,22
129:5,9 130:11
131:18 134:22
137:1,25
139:10 140:12
141:4 143:4,18
148:5,9,20
150:23 152:20
152:23,25
153:12 156:14
157:1,12
160:16 161:4
161:24 164:20
164:22,23,25
167:16 169:11
169:18 171:19
174:12,17,19
176:9,18,20,23
176:24 177:21
179:19 187:22
188:11 190:5

190:23,24
192:3,12 193:5
196:12,15,21
196:23 197:14
197:14,16,19
risk 40:6 41:20
  48:11
risks 41:23
rita 8:13 9:8,8,22
  9:25 10:11
  15:15 17:4
ritter 92:14,14,16
  92:18,23 98:13
  98:25 99:4,14
  103:16 115:13
  115:17,20
  116:1,7 119:13
  119:18 120:3
  131:6 148:12
  149:1 158:18
  158:22
roberto 1:13
rocky 170:3
rojascastaneda
  1:15
role 149:4
roles 12:22
room 9:23 60:6
  71:20 88:5
roughly 74:16
  162:23,24
  196:13
rubberbased
  170:8
rule 77:25
run 17:19 97:11
  98:5 99:25
runins 152:10
running 36:24
  74:10 95:20
  96:20,22 97:3,7
  97:13,22,23,25
  98:9,10,11
  101:2 166:6
rushing 99:18
ryan 1:14

| S |
|---|
s 1:23 199:23
  200:18
safe 24:13 31:7
  47:9 48:13,14
  61:1 75:20
  134:23,24,25
safely 76:15,18
  90:4 105:9
safety 6:17 7:13
  17:20 38:4,4
  58:3,3,6 89:8
sales 19:17,18,19
sandals 74:15
  130:14,17
santa 8:13 9:8,8
  9:22,25 10:11
  15:15 17:4
saw 19:25 68:7
  72:16 74:23
  84:25 85:4
  100:21 105:25
  105:25 122:7,8
  126:18 129:21
  132:18,20,23
  132:23,24
  136:12 172:18
  172:20,21
  181:15 186:21
  187:8 194:1
saying 18:20
  30:24 36:12,12
  48:18 49:2 60:3
  60:5 61:25 62:4
  62:4 75:4,14
  77:2 85:6,15
  101:1 103:17
  103:19,20
  106:5 115:19
  116:25 126:6
  137:4,14,15,17
  137:19,21
  138:15 140:7
  142:7,10
  150:17 151:2,3
  151:8,13,20
  158:10,16,22

158:22,24
164:1 176:14
189:3 190:25
193:25 197:21
says 22:18 31:9
  34:13 46:14,16
  50:17 52:2
  58:14 60:13
  69:9,15 104:6
  157:20
scene 75:22
  83:23 134:15
  134:23,24
  145:6 172:11
school 20:20
scope 181:12
screaming 67:22
  73:1,7 74:23
  75:14 85:7
  103:18
screen 79:4
sealing 145:5
search 195:9
searches 195:18
seat 94:6 95:16
  99:5
second 10:17
  55:4 92:11 96:7
  101:10,21
  130:3 140:9,16
  143:20 144:2
  150:5 152:6
  158:2 197:9,9
  198:3
seconds 24:12,12
  44:12 101:22
  102:1 104:1,13
  171:15 192:2,7
  197:3,16,19,22
  198:8
section 27:14
  156:16,18
  158:4 159:20
  159:20
secure 122:12
  124:2 125:15
  140:25 141:24

secured 188:22
188:22,24
securely 118:17
security 7:15
12:7,23 52:8
57:24 88:25
157:21 165:19
see 22:17,22
27:15 28:20
45:24 46:17
59:20 64:13
65:4 66:7 67:14
69:11,17 73:7
74:24 77:15,17
82:6,23 83:7,20
87:11 90:11
91:17 100:21
107:8 122:13
127:11,15,19
132:9,16 133:2
133:7,10,13
135:1,2,8,14,17
138:1,5,11,12
139:16 140:14
142:16,19
151:15 158:2
160:1 163:13
166:8 172:16
173:3,15,22,24
174:6,8,10
179:18 180:14
180:18 181:18
183:3,7,8
186:16,22
187:5,14 191:8
192:23 196:7
seeing 41:7 72:20
99:15 122:10
127:13 132:11
132:11,14
136:17 139:17
172:19,19
180:22 185:18
seemingly 164:11
seen 21:10 28:22
41:1 77:12,24
78:1,9 80:18

83:4,15,23
85:10 87:8
180:21
segregated 49:15
sending 100:14
sense 48:19 49:3
93:20 104:1
131:13 168:2
168:22 176:3
sent 131:16
september 9:3
sequence 116:15
116:16 183:18
sergeant 50:23
59:5 60:10,19
66:18 69:16,21
70:5,6,8,8
74:13 75:11
77:22 92:12,13
92:14,16,18,23
98:13 99:4,14
103:16,16,22
110:21 114:1
114:13,18,24
115:2,5,13,17
115:20 116:1,1
116:7 119:13
119:18 120:3
131:6 134:1,4,7
138:9 145:19
148:8,12 149:1
149:1 150:3,7
151:10,23
152:7,9,17
153:22 156:14
157:3 158:1,6
158:14,15,18
159:17 193:24
194:2,10,11
sergeants 133:22
145:1 152:12
152:21
series 66:14
serious 32:11,18
32:25 110:18
146:2
services 49:20

set 22:21 80:17
195:17
seven 66:9 72:19
seventeenth 3:5
severally 1:16
severe 84:4
119:20,24
146:7
severity 79:1
80:13 82:18,25
shakedown
195:10
shard 73:11
shards 73:9 88:4
share 181:11
shared 181:21
sharp 73:16
shattered 74:21
75:2
shawn 1:15
shepard 69:16,21
70:5
sheriff 1:11 18:9
157:4,7,22
sheriffs 2:17,18
2:20,22 6:12,17
7:3,13 10:9
15:25 18:9
19:14 21:8
sherwin 3:5,16
shift 70:7,15
71:24,25 72:5,7
72:11,13 78:10
82:21 146:15
146:15,18
shirt 73:20 74:4
75:15 130:11
130:15,17,18
130:19 143:7
shoes 169:24
170:10
shoot 196:16
shooting 73:3,4,6
164:2 169:15
short 12:25 24:17
shorthand 1:22
3:7 199:14

shortly 13:8
52:10 53:2 62:7
70:7 78:1,4
103:23 125:6
194:4,4
shoulder 105:19
125:5 145:21
146:5,19 185:4
191:14
shove 94:7
shoving 94:8
show 28:18 36:6
36:7 40:22,24
45:20,21 46:11
50:1 102:1
181:16
showed 29:10
194:5
showing 14:22
35:17 45:24
106:23
shown 46:20
shows 101:21
shut 197:3,10
sic 112:7 158:18
side 85:24 94:23
104:16 105:19
107:5,7,7
108:19,20,25
109:4 113:8
115:21 127:7
151:25 183:21
193:16
sideways 121:10
sign 18:19,21
significant
183:10
signing 200:12
signs 37:19
similar 5:24
11:19 170:5,10
170:11,15
180:16
simple 80:21
simply 129:13
139:5
simultaneous

41:10,15,19
simultaneously
41:24
sincerely 200:15
single 18:18
23:17 160:10
singlehandedly
159:3
sink 74:8,9,10
sir 10:7,23 14:2
19:24 21:11,14
23:2 24:7,10
25:14,20 28:23
29:20,22,24
31:11,13 34:6
37:6 41:7 42:19
42:21 48:15
49:21 52:15,18
53:5 54:15 55:6
64:1 73:17
75:12 76:14,19
94:17 108:13
109:6 110:20
121:5 124:13
140:17 143:19
143:21 147:18
148:13,21
156:10,15
157:2 160:17
162:10,14,17
162:25 164:5,8
166:5 170:7,9
170:19 172:6
172:12,15
174:2,5,7,9,11
174:20,22
179:16,20
180:3,8,11,15
181:23 182:4
182:10 183:2,5
183:12,14,17
184:5 185:25
186:13,18,24
187:7,16
191:13,16
192:1,4 193:11
194:14 195:3

196:13,18,22
197:23 198:1
**sit** 53:11,25 95:8
95:12 96:1,8
98:4 99:16
113:24 158:25
**sitting** 72:21
78:11 111:15
**situation** 25:21
30:18,21 34:14
36:8,25 37:2,17
37:17,21 38:8
38:17 45:4
46:24 47:5,19
48:4,7,8 63:8
68:23 69:2
78:18,20,25
79:2,16 80:13
82:17,21,25
84:4 87:4,12
90:9 117:4,12
129:8,12
134:22 142:8
155:9,20 161:1
161:5,22 171:3
188:14
**situations** 27:23
28:8,14 30:25
35:13 40:5
117:22 161:10
**six** 45:18 109:23
**sixth** 93:20
**size** 25:17 30:12
**skill** 25:17
**skills** 159:22
**skin** 130:24
192:13
**slack** 196:25
**slam** 197:10
**slap** 183:25
**slapping** 189:1
189:12
**slid** 105:5 106:1,3
**slide** 126:22
**sliding** 104:18,19
105:12
**slip** 53:11,25

55:23 105:16
**slipped** 104:17
105:4,7
**slipping** 104:18
**slot** 76:12,17 90:3
151:6,9
**small** 67:16
76:10
**smaller** 26:10
55:18
**smothering**
176:2
**sobrero** 1:15
187:3
**solely** 17:22
**solomon** 1:15
**solving** 159:23
**somebody** 30:14
30:18 32:7
35:14 36:14
42:7 53:20
56:10 57:23
58:15 62:21,21
62:22 63:8
68:25 73:2
77:16,21 82:16
87:11 89:22
90:6 104:7
126:5,21 127:5
135:3 137:4
139:17 141:2
142:1 144:19
158:11 164:1,2
165:18 169:15
193:14
**somebodys** 31:25
195:9
**soon** 56:15 85:16
125:14
**sooner** 78:19
**sore** 125:5
145:21,23
**sorry** 9:10 10:4
28:4 54:24 58:8
70:19 103:2
112:2 115:1
122:25 128:3

134:3 150:19
153:9 158:2
166:20 169:9
170:3 179:12
**sort** 6:14 11:4
14:19 20:3 31:8
49:11 50:25
52:3 62:25
68:11 113:13
118:20 121:12
133:11 166:14
195:12
**sought** 157:22
158:7,19 159:1
**sound** 9:14 60:17
60:22 74:18
104:9 131:10
157:4
**sounds** 5:24
59:21 60:7
92:23
**source** 74:6
**space** 64:12 77:7
117:14 142:19
**speak** 76:3 104:8
129:17 166:7
168:19
**speaking** 104:2
168:3
**special** 51:17
53:3
**specific** 42:4,4
75:24 78:7
81:17 84:13
133:1 181:9
**specifically** 57:8
58:5,16 75:5
91:7 103:21
106:11 110:23
120:6 132:12
135:2 137:13
150:14 151:13
153:9,13
158:16 181:5
188:1
**specifics** 161:3
**speculate** 6:8

65:16
**speculation** 26:8
38:16 120:13
**speed** 12:25
**spent** 10:21
134:13
**spit** 107:14 137:4
137:5,5,8,9,12
137:16,17,18
138:1,7 139:3
**spitting** 137:11
137:14
**split** 24:12 197:9
198:11
**splitsecond** 24:23
**spoke** 83:13
161:9
**spoken** 85:11,11
**spot** 16:3
**spray** 169:21,22
169:22 195:25
196:1,1
**sprinting** 96:22
98:10
**squeeze** 182:5
**squeezing** 182:6
**ss** 199:1
**stability** 107:12
**staff** 49:22,25
85:17 88:6
**staggered** 144:5
144:8,11,14
**stand** 95:11
**standard** 11:8,23
16:17,20 39:2
160:16
**standards** 24:1
**standing** 74:15
94:19 172:17
193:16 196:21
**stare** 91:24 92:3
93:19 94:2
**start** 5:8 7:2,9
13:24 56:15
63:21 145:5
166:11
**started** 6:16 8:2,3

64:6 104:21
118:7 133:22
145:4 166:17
166:23 178:3
187:20 197:17
**starting** 8:10
19:13 66:6 67:7
95:23 101:22
177:6
**starts** 186:11
**state** 1:23 11:19
28:3,3 42:9
164:19 166:18
166:25 199:1
**statecertified**
11:5
**stated** 77:15
115:24
**statement** 18:20
74:12 92:11
111:1 164:24
**statements** 20:1
57:22,23 58:9
58:19 115:25
165:2
**states** 1:1
**stating** 63:18
154:13
**station** 61:17,19
**stay** 9:24
**steeltoed** 170:6
**step** 95:13,24,25
96:7,24 97:1
197:3
**stepped** 96:8
99:23 104:16
**steps** 95:21 96:5
98:9 99:4,6,7
99:17
**stick** 73:22 193:2
**stint** 9:25
**stomach** 109:3,5
114:17 136:23
**stomp** 127:15
**stood** 53:23
136:21 193:16
**stop** 8:18,18,18

9:11 61:12
80:24 81:8
91:11 97:19,21
99:5 106:14,15
106:18 107:16
107:21 114:6,6
114:14 118:7
130:1 157:9
**stopped** 143:11
**story** 84:14 180:6
**straight** 127:21
**straightened**
131:12
**strange** 94:1
**street** 3:5,16,20
**strength** 25:17
**strictly** 122:3
**strike** 71:10 84:2
101:13 107:11
107:19 110:3
112:3,9,10,12
113:17 119:2
120:21,25
122:13 124:5
130:23 132:14
132:17,19
133:7 140:14
141:2,12 142:1
142:3 151:21
173:24,25
177:12,14,17
177:21 181:20
183:1,3,15
184:22 186:16
187:5,15,20
188:1
**striked** 112:7
**strikes** 29:2
107:19 108:9
108:10,11,14
108:23,24
109:7,15 110:6
113:7,15,15
114:24 115:4,7
115:18,21
116:13,13,19
132:13 135:11

135:12
**striking** 109:11
113:10,18,20
113:21 124:7
140:20 184:13
186:22 187:9
187:18 194:7
**struck** 107:22
132:23 187:18
**struggle** 36:13
114:10 118:6
128:7,11
132:18,19
177:6
**struggled** 106:10
**struggling**
118:11 128:13
138:14,18
**stuff** 130:16
135:13 195:19
**style** 170:3
**subdue** 40:13
**subject** 15:5
27:18 179:3
**subjected** 40:13
**subjecting** 39:23
**subjects** 13:11
15:2 25:19
**submit** 49:23
**subsection** 25:11
**substantive** 5:25
**substation** 9:2
**sudden** 168:3
**suggest** 26:11
179:1
**suggested** 168:11
**suggestions**
156:22
**suite** 3:20 4:3
200:5
**summary** 111:2
146:17
**summed** 60:19
**superior** 117:10
149:24
**supervise** 152:19
153:4

**supervising**
59:23 152:12
152:17
**supervisor** 63:17
67:3 145:2
153:25 157:23
158:8,19 159:2
159:13 160:3
**supervisors**
152:15
**supplemental**
147:17,19
**supporting**
156:21
**supposed** 23:12
23:22 38:23
39:2 48:19 49:3
62:24 64:15,23
66:3 67:1 78:1
188:13
**sure** 6:6 7:8,10
7:16 15:11,19
20:10 30:24
35:10 40:18
50:4 56:1 72:9
73:21 81:11
84:23 93:5,11
98:16 103:8
105:14 111:21
124:4 145:4,4
169:5 192:20
193:19
**surface** 185:11
185:12,12,13
185:13
**surprised** 82:22
**suspect** 49:23
**sustained** 119:20
146:19
**swetnam** 1:13
122:22 186:12
186:13
**swiftly** 126:17
**swing** 175:16
**swinging** 36:24
**switch** 16:4
**sworn** 3:9 5:2

199:10
**swung** 190:13
**symptoms** 37:20

———————

**T**

**tab** 166:7
**table** 46:14
178:13
**tactical** 46:14
**tactics** 128:21
**take** 7:5 8:9,11
14:1 22:17 25:6
27:13 30:21
57:13 61:3,12
68:14 72:8,9
77:6,7 80:1,6
80:21 82:5
95:19,20 110:9
110:10 111:20
141:8 146:4
148:23 149:12
150:4 168:14
171:11,14
193:2,4,5
196:24 197:5,9
**takedown** 29:2
**taken** 1:22 40:19
72:10 75:15
77:4 98:24
110:11 124:15
144:21 148:24
171:16 172:8
199:12
**takes** 82:16
**talk** 7:22 50:24
76:11 78:19
79:10 134:3
**talked** 84:6 89:6
133:25 149:24
**talking** 14:1 37:5
51:24 61:18
65:11,13,19
70:22 78:11
85:1 90:6,7
138:8 141:20
153:14 156:9
162:8 164:3,20

167:24
**tan** 130:15,17,18
**taped** 92:20
**taperecorded**
59:9
**tase** 38:21 99:8
104:7 139:16
139:22
**tased** 41:20 42:15
42:20 43:11
95:18 100:22
102:16,20,21
104:7 140:1,2,3
140:6 193:25
197:7,14,14,16
**taser** 30:5 31:3
33:2,9,17,22
34:1,5,5,7,14
35:13,18 36:9
37:1,8 38:13
39:1,9,21,24
40:7,12,13,25
41:3,8,10,14,15
41:23,24 42:7
42:14,18 43:21
44:10 89:13,15
89:21 90:14,17
90:20 91:5,21
92:9,25 93:4,9
93:12 95:14,19
95:22 96:3,15
96:18 99:19,22
100:1,7,8,11,14
101:3,9,14,20
101:25 102:4
102:15,23
104:1 106:8
125:7,8,11,15
125:21 126:6,7
126:8,13,19,19
126:20,22,24
127:3,12,16,18
127:21 129:24
130:4,20,23,24
131:8,16
139:20 142:22
143:2 169:23

DEPOSITION OF DEPUTY MATTHEW AHLF

191:24 192:12
193:2,11,13,15
193:17,22,23
196:14 198:3,8
198:13
**tasers** 29:21
**tasing** 35:3 36:20
43:13 44:4
103:17 104:11
196:19 197:2
197:18,22,23
**taught** 12:20
14:5,6,6,7,7,9
14:10,15 24:2
24:15,21 26:15
26:19,24 45:18
47:2 128:15,25
188:11,13,20
**teach** 12:21,23
13:12,16 14:4
14:13 17:20
18:8 141:20
**teaching** 13:2,9
13:11 15:1
18:12
**team** 152:22
**technician** 56:20
118:12 147:11
158:13 171:1
**technicians**
170:23
**techniques** 29:1
29:3 30:16
**tell** 53:6,12 54:19
59:22 61:6 67:4
81:23 82:1
84:18 92:22
95:17 96:8
103:22 131:7
136:12 140:5
141:23,24
151:16 158:1,6
159:13 175:15
177:7 189:24
**telling** 85:9 87:10
103:15 106:14
107:15 114:14

115:10,17,20
118:6 120:3,6
166:19 167:1
186:4,6
**ten** 23:21 160:15
**tense** 93:1,16
117:4,12,21
128:7,7,10,13
131:11 189:8
**tensed** 131:24
**tenses** 129:8
**tensing** 131:4
**tenure** 15:25
**term** 27:10 31:16
134:18,21
150:20 167:12
167:14 185:19
185:21 191:1
**terms** 27:14 43:8
71:11 141:4
144:9 165:21
166:18,24
181:21 182:2
182:11 183:6
**testified** 5:3
**testify** 6:8 199:10
**testimony** 6:7
16:22 30:25
57:18 115:8
160:18 167:9
169:2 189:20
198:2,5 199:13
**thank** 70:24,24
112:1 171:17
189:19 194:15
198:15,16
**thats** 5:25 7:23
8:19 11:7,22
12:1,2,16 21:12
22:5 23:3,16
29:5,14 31:9
35:25 36:3
41:16 43:6,10
48:14 58:20
62:21 64:16
67:3 75:5 76:20
78:15 81:20,22

82:1 84:21,23
97:16,16 99:11
108:6 119:16
122:7,7 130:3
134:21 142:11
149:13 150:21
157:17 158:15
161:4,24
163:21 167:20
168:15 175:1
175:17 176:17
183:24 184:4
191:14,21
196:23 197:20
198:15
**theres** 5:22 25:5
27:14 30:11
35:13,21 40:6
58:20,22 64:12
65:24 66:2 74:9
76:9,12 78:24
83:7 94:15,23
117:13,15
141:1 142:9
152:21 159:20
171:3,9 182:12
182:13
**theyll** 196:16
**theyre** 26:20,21
35:14,16,16
36:14 37:2,9
38:14 48:18
49:2 74:25,25
141:1 156:18
195:16
**thigh** 143:1,3,6,8
143:9
**thin** 194:21
**thing** 62:2 76:20
87:8,16 100:13
116:18 118:15
123:1 125:3,4
144:1,17
146:21 150:23
155:21 178:3
180:2 186:8
**things** 5:21 25:15

29:21 41:1,8
42:4 45:6 48:18
49:2 58:14
60:25 61:16
75:14,17
135:10 137:21
142:10 151:13
161:16,17
195:7
**think** 8:15,20
11:3 14:9 15:7
15:12 25:2
30:23 33:12
42:25 48:13
51:20 57:18
58:10 59:16
61:1 74:11 76:1
81:18,20 83:6
84:21 85:14
92:15 99:1
108:25 111:17
113:10 114:5
117:16 119:23
122:21 124:6
132:24 136:7
139:17 143:5,7
143:9 144:10
144:11 146:9,9
146:10,21
147:10,20
150:5,22 152:3
169:21,22
182:11 185:19
187:2,4 193:4
196:4,10
**thinking** 112:21
113:1 144:15
145:9 177:11
**thomas** 159:18
**thorough** 148:20
**thought** 10:13,15
19:25 56:4
60:21 74:3 79:7
85:24 93:9
107:10,12,15
150:25 152:24
189:14,15

197:8
**thousandyard**
93:19
**thrash** 131:14
**thrashing** 107:11
111:7,14,16
123:7 128:12
129:25 131:21
131:22 138:19
143:13,25
177:22 187:23
189:6
**threat** 32:4 34:8
34:15,21,22,24
36:15 68:24
75:18 88:12
89:7,18 90:8,11
90:21 91:7
95:21 103:13
141:1 188:21
**threaten** 137:9
**threatened**
102:23 103:10
164:3
**threatening**
107:14
**threats** 137:12
**three** 12:5 15:20
39:15,20 65:22
71:1 81:15 98:9
108:17 133:6
152:21 160:16
185:10 194:5
**thumb** 15:13,14
**tiffany** 1:6
**tile** 185:14,15,17
**time** 5:7 13:1,7
16:12 17:11
19:16 21:20
23:16 24:17
26:1 27:9 28:4
28:15 31:22
33:5,20 35:20
37:10 40:16
42:3 44:14
47:24 48:24
51:5,8,12,16

53:16,21 55:4,7
55:11 56:6,19
57:1,15 58:6,10
60:25 61:18
62:1 66:6 68:9
70:5 71:7,13
72:5 73:8,12
74:22 75:8
76:24 78:7,10
80:4,16,18
82:13,15 83:14
84:15 85:19,23
85:23 86:9,12
86:14,17 89:24
90:21 91:13,16
96:7 97:7 98:24
101:4,5,7
102:18,20
107:24 109:24
112:25 113:22
115:1 117:24
118:7,10,11
119:16 125:1
126:10 127:9
131:20 132:16
133:22 134:12
135:20 137:1
139:18 141:23
142:11 148:14
149:14 150:22
151:1 152:8,16
153:21,25
158:11 159:5
159:17,24
161:19 162:7
162:12,15
163:1,13,23
164:10 166:12
168:1,17,19
169:7 172:4,23
174:15,18
177:14 187:19
191:4,5,10,24
192:17,22
194:20 195:6
199:12
**times** 21:13

23:21 24:10
30:20 33:8
35:20 36:13,23
36:25 43:25
63:18 67:7,8,11
67:18,19
115:22 117:25
140:5 168:24
171:9 178:22
185:8,10
188:10,12
193:8
**tired** 118:16,19
**today** 6:7 98:4
111:4 113:16
113:23,24
116:11 158:25
**toes** 170:8
**toilet** 74:7 94:23
100:4,6
**told** 16:8 43:10
55:22,24 56:14
57:5 59:24 60:8
62:2 70:7 71:14
83:4,6,17 91:11
91:11 94:5 95:8
95:12,16 96:1,8
99:5,7,14,16
114:6,13,18
115:5 119:13
119:16 124:18
124:21 125:5
134:9 147:6,9
147:23 148:1
149:15 193:24
**toms** 159:17,19
**ton** 18:18
**tone** 178:22
179:7
**top** 64:17 69:8
87:24 90:17
91:9 105:20
106:1,3,6,10
107:7 108:5
109:12 111:15
116:22 121:11
121:12 126:20

126:24 127:3
174:21 176:8
176:11,23
189:2,11,21
194:24,25
**topics** 22:8,10
**torso** 108:10,24
115:12,18
183:13,16
**total** 7:8 132:19
**totalities** 30:21
38:8
**totality** 37:20
49:7 88:24
155:10
**totally** 148:19
**touch** 22:14
164:11,14
167:25 168:4
168:25 169:8,9
169:10,11
188:5
**towed** 99:5
**township** 9:2
**track** 154:14
**traffic** 7:14,20
**tragedy** 155:18
**train** 12:19 17:19
41:16 79:7
128:24 141:6
141:11
**trained** 12:15
22:3,24 23:6
24:4 25:5,15
31:12 32:6,10
33:2 36:1,3
37:7 39:1,9,14
39:17,23 40:11
41:11,13,18,22
42:6 43:6,9,13
43:20 45:2
46:19,22 62:18
62:20 63:4,24
64:22 188:3
**trainer** 17:24
22:13 128:24
141:4,5,5,22,23

**training** 2:22 9:1
9:2,5 10:24,25
11:1,2,2,5,11
11:20,25 12:1
12:14 14:19
15:22,24 16:4,9
16:11,16,20,23
17:1,15,17,18
20:16,18,19
21:16,22 22:2,4
22:5,5,8,12
24:1 33:4 39:20
41:2 42:15
45:15,17 46:2,5
78:15 87:2
109:15,19
128:18 129:3,7
140:19 141:21
160:12,14,19
161:9
**trainings** 11:9,23
**transcribed**
92:16 99:12
199:15
**transcript** 5:19
5:21 59:15,16
59:19 98:24
99:2 200:11,13
**transcripts** 98:18
**transferred** 8:24
9:1,4,6,7,16
10:4 153:10
**translate** 27:24
28:9
**transported**
145:18 158:11
**trauma** 182:13
**tray** 73:10,12
75:2,16 77:1
88:4
**trays** 73:15 74:21
**trial** 6:4
**tried** 105:15
112:9,12,15,16
112:18,18
121:20 124:2,2
190:16

**trigger** 44:11,14
63:9 100:8
101:8 102:5
**trouble** 188:4,17
**true** 16:19 23:16
114:19,20
164:6,22
177:24 178:7
183:13
**truth** 199:10,11
199:11
**truthful** 75:7
148:16
**try** 5:14 47:10,16
49:9,11 83:7,8
85:9,13 107:10
107:11,13,15
111:18 112:3,3
112:4,10 119:7
121:21 122:11
129:20 153:16
177:14 188:21
**trying** 8:14 30:13
48:7 73:23
75:10,14 88:1
104:24,25
106:16,16
107:9 108:21
111:10,16,16
111:17,19
112:4,19,20
113:3,4,9
114:11 116:4
118:17 121:15
122:10 123:5,5
123:10,11,14
123:16,17,23
124:4,5,6
126:14 131:23
131:25 132:1
137:5,16,17,18
138:14,19
150:13 162:24
175:1,18
176:14,15
177:2,12,17,21
179:13,14

DEPOSITION OF DEPUTY MATTHEW AHLF

186:6 189:6,6,7
194:9
**turn** 53:13 69:7
87:23 91:9,22
128:1 156:16
**turned** 55:23
95:8 107:6
172:25
**turns** 92:2,2
**twice** 108:6
193:22
**twisting** 132:4
**two** 13:11 14:1
22:18 75:4 96:5
98:9 99:4,6,17
101:22 102:1
106:11 107:19
107:19 109:9
114:15,16,19
114:23,24
115:5,6 132:25
133:6 143:18
151:13 172:21
173:3 185:8,10
186:11 189:25
197:22 198:8
**type** 24:23
154:18 180:10
196:8
**types** 5:23 181:22
**typewriting**
199:16
**typical** 78:24
79:14 80:16
128:18
**typically** 30:10
30:18 39:14
50:12 52:23
55:14,20 68:18
78:18,24 79:9
88:23 142:10
**typing** 146:16
**typographical**
5:22

**U**
**uhhuh** 96:12,14

**ultimately** 49:6
110:16 198:9
**umhmm** 98:21
**unarmed** 29:2
**unconscious**
31:22
**underneath**
32:23 119:10
126:25 177:4
**understand** 5:15
27:6,10 30:23
38:11 97:23
104:5 147:15
171:7 179:17
186:5
**understanding**
20:4 34:17
97:25 147:8
186:4
**understood**
44:22 110:17
148:18
**unfair** 154:14
**unfortunately**
161:6,16
186:20
**unit** 12:6,8,12
17:20,22 50:10
55:19 85:16,18
85:18,21
116:25 117:1
117:14 118:5
118:13 141:7
144:21 151:24
186:8
**united** 1:1
**unknown** 10:9
**unnecessary** 23:4
**unpredictable**
44:24 45:7
46:24
**unquote** 22:21
27:21
**unsafe** 161:12,12
**unsettling** 91:23
92:3
**unubun** 1:15

**unusual** 53:18
**upper** 130:9
**use** 14:11,19,25
21:8,15,23
22:10,14,19,25
22:25 23:3,7,16
23:17 24:5,24
25:7,13 26:5,17
28:25 29:17,25
30:5 31:4 32:19
33:2,20 34:5,7
34:14 35:17
37:24 38:13
39:1,2 41:16,19
41:23 43:21
47:19 48:4,10
68:5 73:16
121:21 129:22
133:13,13
135:14 148:22
167:14 172:16
185:21 190:25
193:15 195:4
195:12,18,25
**useofforce** 28:18
36:18
**uses** 27:7,11
28:17 110:13
110:14,23
129:14
**usually** 30:3
55:18 79:18,24
80:1,6,21 82:5
90:5 104:7
195:17

**V**
**v** 186:11
**vague** 11:13 18:4
18:14 19:3
21:24 24:18
25:24 26:7 27:2
28:1 30:7 32:20
34:10 36:10
37:13,25 38:15
39:4,11 40:1,8
41:4,25 42:11

42:23 43:4,16
44:5,19 45:10
47:6,13,21
48:20 49:4 50:6
51:19 52:20
57:17 62:11
63:1,11 68:20
78:3,21 79:13
79:20 80:9
81:16,19 82:10
84:11 85:20
86:2 97:22
100:18 102:17
103:12 112:23
117:6 121:24
121:24 128:3
139:1,10
140:23 141:17
142:4 153:1
154:19 164:13
165:9,14 169:1
171:6 174:14
188:7,15,18
**vaguely** 46:21
60:5,18 76:1
85:8 99:10
119:21
**val** 1:13
**valerie** 4:1
**valverde** 122:21
186:15
**varies** 82:17,17
82:18
**vascular** 31:15
**vent** 76:10
**verbal** 27:20
50:11 58:8,9
91:19 107:18
112:6 137:12
148:4 187:24
187:25 188:2
**verbalization**
29:6
**verbally** 165:21
**verbatim** 5:20
181:5
**verde** 1:13

**versus** 25:18,22
26:4 184:13
**vicinity** 109:3
126:23 138:10
**victim** 147:1
**view** 164:12
165:6 169:8
182:14
**violent** 44:24
**visible** 181:17
**vitals** 144:5
**voice** 87:24 91:10
159:22
**voluntarily** 35:7
160:9
**voluntary** 30:13
90:5
**vs** 1:10 200:8

**W**
**wait** 13:22 34:19
34:20,21 86:7
138:25 190:20
**waiting** 138:7
**walk** 87:24 91:10
138:22
**walked** 61:10
126:16,17,17
**walking** 139:5
162:16 167:15
**walks** 58:19
**walkthrough**
151:15
**wall** 94:19,24
95:1,2,5,23
121:10 164:1
190:6 191:1
196:11,20
197:7,25
**want** 5:21 29:9
32:4 47:9,11,16
47:18 48:2 49:6
49:8,9,11 61:7
68:15 79:22
81:7 84:14
85:11 95:19
110:9 126:17

163:10 165:12
168:14 175:8
175:19 179:9
179:12 180:13
191:18 192:10
193:18 197:5
**wanted** 35:24
42:22 54:3,3
87:11,13,17
88:3 90:9
150:25 161:8
179:9
**wanting** 169:16
**wants** 33:12
42:25
**warning** 35:2,6
38:21,24,24
**warnings** 38:19
40:25
**warns** 41:9
**wasnt** 53:22,24
56:8 58:11
61:22 73:20,23
80:19 91:24
92:1 103:4
106:13 111:14
114:17 118:1
119:1,2 122:3
124:4 126:6,9
128:9 130:11
138:9,16
139:21 143:12
146:6 147:9
154:6,24,24
158:14 159:5
164:6,22,24
175:5,25
177:18 179:5
185:9 191:9
192:20 193:20
196:9
**waste** 86:9
**watch** 135:5
**water** 69:7 74:6,7
74:17 77:5 88:4
104:17
**way** 6:9 18:9

24:16 35:25
36:3 52:23
61:13 68:6 74:3
75:13 89:2
93:11 94:10
99:17 119:23
136:21 141:22
150:10 160:25
161:22 164:4
164:17 167:24
168:11,20
173:25 179:10
183:1 190:13
195:2,3 197:25
199:20
**ways** 164:9
**weapon** 73:16
75:17
**wear** 170:1
**wearing** 130:11
130:14 169:24
196:2,8
**wednesday** 3:4
**week** 115:15
**weeks** 11:3
**weigh** 109:24
110:1
**weight** 118:18
119:1,3 120:5
120:18 121:14
175:25
**weird** 59:24,25
**went** 6:19 9:12
9:22 10:25 11:1
11:8,9,18 15:21
16:2 17:3 42:14
46:2,10 53:8
54:1 59:17
74:20,23 93:19
94:12 100:25
126:15 133:25
134:3 143:24
144:12 145:2,8
145:14 153:25
157:19 161:6
191:1
**wet** 105:17

**weve** 40:17 81:14
156:9 159:10
**whats** 34:17
39:19 49:7 54:7
56:16 77:3 87:8
87:16 94:18
109:22 116:18
118:15 123:1
125:3 144:1,17
**wider** 170:13
**window** 67:12,13
67:14,16 75:22
76:9,9,10 191:8
**wires** 194:1
196:14 197:1
**wish** 200:13
**withdraw** 16:13
189:17
**withdrawal** 42:8
**withinentitled**
199:11
**witness** 3:8,10
5:2 7:21,24 8:1
8:17,21,23
13:23 14:2 18:7
18:17 19:6
20:10 22:2
24:21 26:1,9
27:5 28:3,12,14
29:10 30:10
32:23 33:14
34:12 35:11,24
36:12 37:15
38:3,17 39:7,14
40:4,10 41:7
42:3,13,25 43:5
43:19,25 44:7
44:21 45:11,14
47:9,16,23 48:6
48:23 49:6 50:9
50:22 51:23
52:23 54:22,25
57:20 61:10
62:14 63:4,12
63:15 65:15
68:23 71:18
73:5 76:1 78:6

79:1,16 80:4,12
81:5 82:15
84:25 85:4,23
91:3 97:15,18
97:20,25 98:8
100:20,24
101:12 102:20
103:13 111:22
112:25 115:10
117:8 120:15
122:1 125:25
126:5 128:6
129:17 134:3
137:11 139:14
140:23,25
141:15,19
142:7 147:23
148:22 150:21
153:4 154:20
154:22 155:9
156:3 159:19
161:5 163:19
164:16 165:17
167:12 169:5
169:13 171:9
171:12 175:12
175:14 178:14
178:23 179:16
188:10,20
190:22 197:13
199:5,13
**witnessed** 119:24
**women** 57:10
58:20
**wont** 18:17 129:9
132:22
**wood** 185:12
**word** 5:23 34:17
167:2
**words** 187:24
189:22
**work** 9:13 10:12
12:24 15:21
17:3 18:3,12
19:13,15,19
20:14 117:10
141:6 146:12

156:21 157:24
162:4 179:19
195:4
**worked** 8:7 9:7
12:5,8,8,10,13
12:17,17
131:12 135:21
**worker** 49:11
63:20 78:14,19
80:14 88:6
**workers** 79:3
146:8
**working** 7:2
20:12,13 48:16
58:25 83:13
85:18 117:13
131:8
**wouldnt** 96:21
97:3 98:5,10
138:16
**wrap** 32:1
**wrapped** 124:19
**wrist** 92:8,25
93:6 128:1
**wristbands** 60:2
**wrists** 92:7
129:21
**write** 54:5 69:13
146:23 147:4,7
147:16,19
154:13 180:9
180:10
**writer** 147:14
**writing** 38:20
147:12 149:5
153:7 154:3
**written** 14:12,25
99:11 153:24
154:1
**wrong** 92:16
106:2 117:21
117:23 139:5
167:2
**wrote** 67:18
147:17 157:3
181:4,7

| | | | | |
|---|---|---|---|---|
| **X** | 23:3,7,12,22 | 83:23 111:4 | **16th** 54:14 65:23 | **230th** 8:2 |
| **x** 2:1 | 28:24,25 29:17 | 113:16,23 | 72:13,20 | **24** 40:14 |
| **x26** 33:2 44:10 | 30:4,12,19,24 | 117:9 128:15 | **1700** 72:7,13 | **243** 29:14,15 |
| | 31:19 32:14 | 138:13 141:3 | 78:10 82:21 | 118:13 |
| **Y** | 34:4,7,8,13,14 | 142:14 155:1 | **1715** 66:6 72:16 | **24th** 92:12,17 |
| **yea** 97:5 128:8 | 35:2,5 37:5,15 | 178:12,13 | **17th** 3:16 | 148:12 |
| **yeah** 7:25 9:16 | 37:15,16,16,17 | 196:10 | **180** 4:3 200:5 | **253** 34:1 |
| 13:20 24:14 | 38:9,17,23 39:2 | | **1800** 51:9,10 | **28** 58:19 |
| 35:18 38:25 | 39:9 43:19 48:7 | **Z** | **1803** 67:7,18 | **283** 50:2 |
| 43:11 45:5 | 48:16,25 49:10 | **zachary** 1:14 | **1816** 67:19 | **28th** 7:1 8:3 |
| 47:16 48:6 | 51:24 58:18 | | 162:20,22 | |
| 50:16 58:16 | 62:18 64:15,22 | **0** | 163:1 166:1 | **3** |
| 61:1 62:16 | 66:3 67:1,4,5 | **00** 86:1 | **1832** 67:19 | **3** 2:20,23 25:10 |
| 67:16,25,25 | 76:18 80:15,23 | **0420** 162:12 | 162:20,22 | 27:13 54:12,13 |
| 68:5,5,10,13,13 | 80:25 81:4,5 | **0445** 162:12 | 163:1 | 55:14 56:13,18 |
| 68:14 69:6 | 82:18 85:1 | **05** 2:17 | **1832ish** 86:19 | 61:21,22,24 |
| 71:16 75:20 | 88:24 89:17 | **06** 40:19 148:24 | **1848** 66:6 67:19 | 62:7 65:11 |
| 78:17 79:8 89:5 | 93:11 95:18 | **07** 3:4 | 68:6 | 110:11,11 |
| 89:19 92:15 | 98:17 100:7 | **09** 2:20,23,23 | **185** 109:25 110:2 | 144:18 156:5,8 |
| 94:25 95:25 | 101:13,14 | 9:13 | **190** 109:25 | 156:16 |
| 97:6 99:20 | 103:8 106:5 | | **194** 2:12 | **30** 54:12,13 55:14 |
| 105:9,9 116:3 | 108:5 117:3,11 | **1** | **1993** 20:23 | 56:13,18 61:21 |
| 149:16 152:21 | 117:14,16,17 | **1** 2:17,17,19,21 | | 61:22,24 62:7 |
| 153:14 157:18 | 117:17 120:7 | 3:4 21:5,7 | **2** | 85:25 171:15 |
| 160:6 167:18 | 123:13 129:7 | 25:11 29:12 | **2** 2:18 40:19 64:3 | **33** 117:1 118:5,13 |
| 169:22 170:11 | 131:17 141:3,9 | 40:19 | 64:5 72:10,10 | 151:24 |
| 173:4 176:17 | 142:9 166:19 | **10** 2:19 55:20 | 162:3,6 | **34** 116:25 |
| 176:19 183:14 | 167:1 169:5 | 196:23,25 | **20** 64:9 65:23 | **35** 200:12 |
| 183:17 191:2 | 171:3 174:17 | 198:17 | 70:17 200:1 | **37** 45:22 46:4 |
| 192:19 194:21 | 174:21 175:8 | **100** 30:14 74:5 | **2005** 6:13 7:1 8:2 | 171:16,16 |
| 195:7 | 175:21 176:8 | 122:4 142:11 | 19:14 | **38** 65:23 |
| **year** 6:18 8:19 | 176:11,14,15 | 143:8 192:20 | **2006** 8:4,14 13:5 | **3rd** 8:4 159:12 |
| 9:3 13:6 20:22 | 178:2,7,12,14 | 193:18 | **2008** 33:7,14 | |
| 33:6 150:17 | 180:5 188:3,11 | **11** 2:20,23 | **2009** 8:23 33:14 | **4** |
| **years** 10:22 12:5 | 188:16 189:2 | **1120** 3:20 | 156:12 159:12 | **4** 2:20,21,22 64:9 |
| 15:20 16:1 | 189:12 193:16 | **12** 2:21 50:14 | 159:12 | 65:23,23,23 |
| 45:19 75:4 | 196:19,21 | 78:11 196:14 | **2010** 9:7,9,14,20 | 70:17,17 94:14 |
| **yell** 126:12 | 197:21 | **120** 1:15 | 17:5,8 21:19 | 100:3 134:15 |
| **yelling** 73:1,1 | **youve** 6:6 18:25 | **13** 50:14 | **2011** 10:1,4,12 | 134:16,19 |
| 74:25 85:7 | 21:10,22 23:6 | **130th** 7:18 | 156:12 | 148:24 159:8 |
| 104:3 | 24:1,15 25:5,15 | **14** 2:17 | **2012** 1:25 3:4 | 159:10,21 |
| **yesterday** 66:8 | 26:4,15,19,24 | **15** 55:20 163:11 | 200:1 | **412** 46:11 |
| **youd** 17:10 | 28:22 31:19 | 197:16 | **21** 2:17 196:16,17 | **45** 65:23 70:17 |
| **youll** 5:18 117:4 | 33:1 35:25 36:3 | **156** 2:20 | **22** 2:21 | **48** 148:24 |
| **youre** 5:20 11:8 | 39:1,8 41:2 | **159** 2:22 | **225** 4:3 200:5 | **49** 72:10 110:11 |
| 14:24 18:22 | 43:6,13 45:2 | **15th** 51:3 | **22nd** 156:12 | **4th** 156:12 |
| 20:10 21:12 | 47:2 63:24 69:4 | **16** 2:19 | **23** 2:23 159:12 | |
| | | **162** 2:11 | | **5** |

**5** 2:10,23 94:14
   148:24 171:16
   171:16
**503** 40:24
**505** 3:5,16
**511** 194:21
**56** 40:19 110:11
**57** 72:10
**5th** 21:19

―――――――――――――
**6**
**6** 1:25 3:4 85:25
   198:17
**64** 2:18

―――――――――――――
**7**
**7** 86:1 94:22
   156:16 158:4
**7677** 3:20

―――――――――――――
**8**
**8** 2:19,23 66:10
   163:4 196:12
**80** 13:17
**80hour** 10:25
   12:1,20 13:3,9
   14:3 22:3
**8958** 1:23

―――――――――――――
**9**
**9** 71:20 94:22
   159:21 196:12
**94612** 3:16 4:3
   200:6
**94621** 3:21