1

2

3

4                    UNITED STATES DISTRICT COURT

5                  NORTHERN DISTRICT OF CALIFORNIA

6

7    M.H., et al.,                              Case No.  11-cv-02868-JST

8                    Plaintiffs,                **AMENDED ORDER GRANTING
                                                IN PART, DENYING IN PART
9            v.                                 DEFENDANTS' MOTIONS FOR
                                                SUMMARY JUDGMENT**
10   COUNTY OF ALAMEDA, et al.,
                                                Re: ECF Nos. 121, 133, 134
11                   Defendants.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

Table of Contents

I. Introduction .................................................................................................. 1

II. Procedural History ....................................................................................... 1

III. Jurisdiction .................................................................................................. 1

IV. Facts ............................................................................................................ 2

    A. Arrest and Medical Screening ........................................................... 2

    B. Transfer to Santa Rita Jail ................................................................. 7

    C. Transfer to Isolation Cell ................................................................... 8

    D. Policies and Training Applicable to Deputy Ahlf Concerning Medical Care ........... 9

    E. Referral to CJMH ............................................................................. 11

    F. Altercation with Deputy Ahlf .......................................................... 14

    G. Arrival of the Remaining Sheriff's Deputies .................................. 17

    H. Transfer to Hospital and Death ....................................................... 21

    I. Coroner's Report .............................................................................. 22

    J. Expert Opinions ............................................................................... 23

V. Evidentiary Objections .............................................................................. 29

VI. Legal Standard ........................................................................................... 29

VII. Analysis ..................................................................................................... 30

    A. Deliberate Indifference to Serious Medical Needs — Individual Defendants ........ 30

    B. Monell Claims ................................................................................. 37

    C. Supervisory Liability — Dr. Orr ..................................................... 49

    D. Excessive Force ............................................................................... 50

    E. Loss of Familial Association ............................................................ 58

    F. Bane Act, California Civil Code Section 52.1 ................................. 60

    G. Negligence, Assault, and Battery as to the County Defendants ..... 61

    H. Negligence as to Nurse Sancho and the Corizon Defendants ........ 62

    I. California Government Code Section 845.6 ..................................... 63

VIII. Conclusion ................................................................................................. 65

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.      INTRODUCTION

This case arises out of the death of Martin Harrison while he was in the custody of the Alameda County Sheriff's Office.  Plaintiffs Joseph, Krystle, Martin, Jr., and Tiffany Harrison are Mr. Harrison's adult children.  They assert claims for violation of Mr. Harrison's civil rights pursuant to 42 U.S.C. § 1983 and California's Bane Act, Cal. Civ. Code § 52.1, as well as common law claims against: the County of Alameda; Sheriff Gregory J. Ahern in his official capacity; Sheriff's Deputies Matthew Ahlf, Alejandro Valverde, Joshua Swetnam, Roberto Martinez, Zachary Litvinchuk, Ryan Madigan, Michael Bareno, Fernando Rojas-Castaneda, Shawn Sobrero, and Solomon Unubun; Megan Hast, A.S.W., a social worker employed by Criminal Justice Mental Health ("CJMH"), an Alameda County employer; Corizon Health, Inc. (formerly Prison Health Services, Inc.); Corizon Health's Regional Medical Director Dr. Harold Orr; and Corizon Health employee Nurse Zelda Sancho.

Before the Court are motions for summary judgment filed by the County Defendants, County MSJ, ECF No. 121, Nurse Sancho, Sancho MSJ, ECF No. 133, and the remaining Corizon Health Defendants, Corizon MSJ, ECF No. 134.

## II.     PROCEDURAL HISTORY

Harrison's minor son, M.H., filed this action on June 10, 2011.  Through two amendments, M.H. added Harrison's two adult sons and two adult daughters as Plaintiffs, as well as Corizon Health, Dr. Orr, and Nurse Sancho as Defendants.  The operative Second Amended Complaint was filed November 19, 2012.  Second Am. Compl. ("SAC"), ECF No. 46.  M.H. settled his claims against all Defendants, and the Court approved the minor's compromise on October 4, 2013.  ECF No. 109.  On November 7, 2013, all remaining Plaintiffs voluntarily dismissed their claims against Sheriff Ahern in his individual capacity pursuant to Federal Rule of Civil Procedure 41(a)(1)(a)(ii).  ECF No. 117.

## III.    JURISDICTION

This Court has federal question jurisdiction over Plaintiffs' claims arising under 42 U.S.C. § 1983 and 1988, and supplemental jurisdiction over Plaintiffs' state law claims.

United States District Court
Northern District of California

1

## IV.    FACTS

Many of the facts in this case are disputed by the parties.  In reviewing the facts here, the Court will note where facts are disputed.  In all other instances, the facts contained herein are undisputed.

### A.    Arrest and Medical Screening

Decedent Martin Harrison was stopped on August 13, 2010, at 3:55 p.m. for jaywalking by the Oakland Police Department.  The officer arrested Harrison pursuant to a bench warrant for failure to appear at trial for violation of California Vehicular Code § 23152(a) (driving under the influence of alcohol).  Ly Decl. ISO County MSJ, ECF No. 125, Ex. A at 4.  The arrest report states Harrison weighed 140 pounds and was 6'0" tall.  Id.  He was one day shy of his fiftieth birthday.  Id.

#### 1.    Medical Screening by Nurse Sancho

Harrison was taken to the Glenn Dyer Detention Facility in Oakland, California. Defendant Sancho, a licensed vocational nurse employed by Defendant Corizon Health (then known as Prison Health Services, Inc.), performed a medical intake assessment, which she memorialized on a standardized intake assessment form.  Sherwin Decl. ISO County MSJ Opp., ECF No. 149, Ex. 9, Sancho Dep., 54:10–12; Ly Decl., Ex. A at 2.  The form was completed at 5:00 p.m. on August 13.  The form contained a standardized set of questions followed by space for a narrative description of the inmate's condition.  Harrison's form indicated that his weight was 142 pounds, and that he was between 5'4" and 5'6" tall.  Sancho recorded those measurements after weighing Harrison, although she did not measure his height.  Sancho Dep. 67:10–24.  Sancho described Harrison as a "medium-sized guy."  Id.  She recorded his vital signs as "within normal levels."  Sancho Dep. 66:7–11.

Sancho testified that when she examined Harrison, his demeanor and outward physical symptoms were unremarkable.  He walked with a "steady gait," stood straight, was coherent, alert, and oriented, and calm and quiet.  Id. 69:15–23.

Sancho testified that Harrison told her he had two bottles of beer that afternoon, and that Harrison told her "three to four times" that he did not have problems with alcohol withdrawal in

United States District Court
Northern District of California

the past. Id. 70:1–6. Sancho testified that she asked Harrison what size the bottles were, but forgot to record it on the form. Id. 71:5–7. She also testified that she understood Harrison to have told her he drank two bottles of beer every day. Id. 72:14–15. When she examined Harrison, he smelled of alcohol and his face was "maybe red, but not puffy." Id. 73:22–24.

Sancho wrote on the form that Harrison drinks every day, and that his last drink was on the day he was arrested. Id. 58:20–22. The form does not state that Harrison smelled of alcohol, what type of alcohol Harrison drank, the amount of daily consumption, the time or amount of Harrison's last drink, or how many years Harrison had been drinking. Id. 58:24–59:12.

Sancho also wrote on the form "w/hx of ETOH w/d," which means "with history of alcohol withdrawal." Id. 79:23–80:3. Finally, she wrote "CIWA," which stands for "Clinical Institute Withdrawal Assessment," a protocol used to evaluate and treat those at risk for severe alcohol withdrawal. Id. 79:23–80:3; 86:5–87:5. Sancho testified that she wrote both phrases in anticipation because Harrison told her he drank every day, and that she then crossed them out when he assured her he did not have a history of alcohol withdrawal. Id. 80:12–16. Above the CIWA notation is the word "error," which Sancho testified she wrote pursuant to Corizon Health training to indicate she crossed the notation out on purpose. Id. 82:13–83:17. Sancho testified that she did not alter the form after her initial screening. Id. 61:9–11.

Sancho spent "three to 10 minutes, or less than 10 minutes" with Harrison. Id. 60:14. She classified Harrison as medical level 3, which means he would not receive any medical follow-up because the nurse found "no medical problem." Id. 65:5–22. Harrison was assigned to the general jail population. Id. Had Sancho concluded instead that Harrison was at risk of alcohol withdrawal, she would have classified him as level 1, which would have resulted in "prompt attention within 24 hours." Id. 66:1–4. The CIWA protocol called for an examination by a physician within twenty-four hours, and examinations by nurses every eight hours. Id. 87:3–6. If a patient on CIWA protocol became symptomatic, the patient might also receive fluids and one or more medications as appropriate, including thiamine, benzodiazepines, opioids, and multivitamins as part of the treatment protocol. Sherwin Decl., Ex. 15, Orr. PMK Dep. 43:9–44:7; Sherwin Decl., Ex. 17 (CIWA Form and Orders).

3

In a declaration attached to her motion for summary judgment, Nurse Sancho states that she explained to Harrison that he could obtain a "slip/sick call form" and notify a deputy once transferred to general population if he needed any medical attention.  Sancho Decl. ISO Sancho MSJ, ECF No. 133-1 ¶ 4.  The declaration also states that Sancho had already crossed out the notations for "with history of alcohol withdrawal" and "CIWA," and written the word "error" above the notations at the time that Sancho and Harrison signed the intake form.  Id. ¶ 11.  Sancho declares that she communicated her crossing out of the notations orally to Harrison as well.  Id. Sancho also declares: "I have used a CIWA form for a number of arrestees, but they had exhibited many signs and symptoms of intoxication. Because Mr. Harrison was not intoxicated when I performed his intake and showed no indicators of being at risk of alcohol withdrawal, I did not initiate the CIWA protocol."  Id. ¶ 14.  In particular, Sancho declares that she believed Harrison was truthful with her when he told her he did not have a history of problems with alcohol withdrawal.  Id. ¶ 15.

### 2.    Alcohol Withdrawal Training

Sancho had been trained to identify the risk factors for alcohol withdrawal, including in January 2010.  Sancho Dep. 11:5–13:20.  The manual accompanying the January 2010 training, a one-hour continuing education program, states that Stage I of alcohol withdrawal begins six to eight hours after the last drink, with "tremulousness."  Sherwin Decl., Ex. 24 at COR 1967. Nausea, anxiety, and insomnia may also accompany Stage I.  Most inmates recover without additional incident within twenty-four to thirty-six hours.  Id. at COR 1968.  However, according to the training manual, approximately twenty-five percent of Stage I patients progress to more significant stages.  Stage II begins eight to forty-eight hours after the last drink.  Stage II involves hallucinations that may last one to six days.  Id.  Stage III begins twelve to forty-eight hours after the last drink, and involves seizures.  Stage IV begins forty-eight to seventy-two hours after the last drink.  Stage IV is the most serious manifestation of alcohol withdrawal, and is known as Delirium Tremens (DTs).  DTs "is a true medical emergency" that presents in one to five percent of patients.  Id.  The onset of DTs usually occurs three to ten days after the last drink.  Symptoms include hypertension, tachycardia, diaphoresis, fever, dilated pupils, and tremulousness.  Id.  The

4

"hallmark" of DTs is "profound confusion and disorientation." Id. at COR 1968–69.  The

hallucinations tend to be "persecutory," and patients "may think that members of the medical staff

are assailants." Id. at COR 1969.  The training goes on to explain how and why nurses should

institute a CIWA protocol.  The training document states:

> Inmate patients should be evaluated for use and/or dependence on
> alcohol and other drugs during the intake receiving screening
> process.  Inmate patients should be questioned on current use and
> problems associated with alcohol/drug abuse in the past.  Anyone
> with a previous history of serious complications from alcohol
> withdrawal . . . should have the withdrawal protocol initiated.
>
> *        *        *
>
> Specific information should be obtained regarding: Type of
> substance(s) used; Frequency and amount of usage; How long the
> inmate patient has been using; Time of last use; Side effects
> experienced when ceasing use in the past . . . .  If alcohol withdrawal
> or the potential for alcohol withdrawal is suspected, the CIWA-Ar
> form should be initiated to quantify symptoms . . . .

Id.  At her deposition, Nurse Sancho testified that she understood this training, including the fact

that Stage I symptoms do not present until six to eight hours after cessation.  Sancho Dep. 41:9–

43:24.

### 3.    Disciplinary Action

On August 17, 2010, at approximately 3:15 p.m., Corizon's Assistant Health Services

Administrator, Lenore Gilbert, interviewed Sancho regarding the Harrison case.  Gilbert

memorialized the meeting in a memorandum to Corizon's Bill Wilson.  Sherwin Decl., Ex. 14.

The document states Sancho was represented at the meeting by a licensed vocational nurse and

union representative, Barbara Ralls.

Gilbert noted that "the documentation on the inmate's screener was not satisfactory or

complete." Id. at 1.  In particular, Gilbert and Corizon's Joel Smith told Sancho that the intake

form "has very limited information regarding any drug/alcohol history.  The type and amount of

alcohol used was not documented.  The history of ETOH and CIWA statement was crossed out.

Why was that?" Id.  According to Gilbert, Sancho responded: "He denied having any drinking

problems.  He said over and over, 'No problems, no withdrawal.'  She stated that she asked him

this same question 4 times and his response was the same." Id.  Gilbert then told Sancho that she

5

United States District Court
Northern District of California

failed to document how much Harrison drank daily, and that she failed to document what type of alcohol Harrison drank.  Sancho told Gilbert that Harrison said he drank "2 bottles of beer."  Id. at 2.  Per the memorandum, Sancho said she forgot to document that information, and also volunteered that she forgot to document that Harrison smelled of alcohol, "a mild smell," and that he had a red, flushed face.  Id.  Gilbert noted that Sancho said she did not initiate a CIWA protocol because she "didn't think to.  He had no alcohol problems, he said."  Id.  Gilbert noted that she then told Sancho that her failures to document accurately and initiate a CIWA protocol constituted "unsatisfactory performance by you as the nurse . . . .  [D]ocumenting your complete observations, asking and documenting the screening questions in their entirety, and starting inmates who drink alcohol regularly on a CIWA is critical for the safety of the inmate."  Id.

According to another, similar memorandum prepared by Gilbert, Sancho also failed to document the amount and type of alcohol a different inmate consumed.  Sherwin Decl., Ex. 32 at 1–2.  At a counseling session with Sancho, Gilbert discussed the second inmate's case.  Sancho was represented by union representative and licensed vocational nurse Blaire Behrens.  Id. at 1.  According to the memorandum, in response to a question about incomplete documentation, Sancho indicated she had no reason for the failure to document.  Sancho stated that she referred the patient to "psych," but Gilbert did not find any such referral.  Id. at 2.  When asked why she didn't document completely, Sancho did not offer an explanation, but asked "Does this mean that I don't have to work there (ITR) anymore?," at which point Sancho's union representative "puts her hand out to stop Zelda from talking . . . ."  Id. at 2.  In the conclusions section of the memorandum, Gilbert wrote: "Zelda's question about working in booking leads me to believe that she may be looking for a way out of working where she is assigned.  Is that why she was doing an inadequate job?"  Id.

The second memorandum also discusses an altercation Sancho had with a physician, in which Sancho refused to comply with the physician's request that she put a Q-tip to the eye of the patient, forcing the physician to send the patient to the hospital for further testing.  Id.

At his deposition, Bill Wilson, Corizon's Health Services Administrator, confirmed that Corizon Health believed Sancho should have placed Harrison on CIWA.  Sherwin Decl., Ex. 11,

United States District Court
Northern District of California

Wilson Dep. 49:15–18.  He also testified that he determined Sancho should be terminated based on Sancho's intake of Harrison, the intake of the patient discussed in Gilbert's second memorandum, and Sancho's refusal to follow a physician's order in a third case.  Id. 59:1–5.  Wilson testified that in his forty years in the health care field, he had faced few disciplinary situations as serious as Sancho's.  Id. 60:10–15.  Wilson confirmed that he felt Sancho jeopardized patient safety.  Id. 60:20–22.

On September 15, 2010, Corizon Health reported Sancho to the Board of Vocational Nursing and Psychiatric Technicians.  Sherwin Decl., Ex. 33 at 1.  On the "Employer Mandatory Reporting Form," Corizon Health indicated Sancho was terminated for "Gross negligence or incompetence" and "Failure to follow procedure + policy."  Id. at 2.

### 4. Evidence Regarding "Mutilation" of the Intake Form

Plaintiffs maintain Nurse Sancho crossed out the alcohol withdrawal and CIWA notations on the intake form after the fact.  As discussed below, Megan Hast, a CJMH social worker, testified that she believed Harrison had been placed on CIWA, which Plaintiffs argue is evidence that, at the time Hast reviewed the intake form, the notations had not been crossed out and the word "error" had not yet been written.  In addition, Plaintiffs point to Corizon policy, which requires that an "error" notation be accompanied by an explanation in the margin.  Sherwin Decl., Ex. 35, Granlund PMK Dep. 40:7–11.  According to Corizon, the strike-out also constitutes impermissible "mutilation" of the medical record that contravenes Corizon policy and training.  Id. 40:12–19.

Plaintiffs also submit the report of a forensic document examiner, Patricia Fisher, who examined the original medical record and determined that the "cross-out was written at a later time and the word, 'error' was not written simultaneously with the paper in the same position as the 'CIWA' letters."  Fisher Decl., ECF No. 155, Ex. A at 2.  In her declaration, Sancho states: "When I was filling out the form on August 13, 2010, I moved the paper around a bit as I wrote and also when I turned the form over to Mr. Harrison for his signature."  Sancho Decl., ¶ 17.

### B. Transfer to Santa Rita Jail

Harrison was transported to Santa Rita Jail on the night of August 13, arriving at 11:51

p.m. Ly Decl., Ex A at 5.  On August 15, at approximately 6:00 p.m., Deputy Ahlf first

encountered Harrison in Housing Unit 33, during "evening pill call," when Harrison "came up

asking for medications."  Sherwin Decl., Ex. 30, Ahlf Dep. 51:5–7.  At that time, Deputy Ahlf did

not know Harrison was an alcoholic, nor did he learn that information prior to Harrison's death.

Id. 52:9–18.  Ahlf testified that he could typically find out about an inmate's medical history by

"calling the charge nurse and having his file pulled."  Id. 52:23–25.  During this encounter,

Harrison asked for medications, and the pill call nurse did not find that any were prescribed for

him.  Deputy Ahlf issued Harrison a sick call slip and told Harrison he could fill it out and provide

it to the nurse for follow-up.  Id. 53:8–15.  Harrison did so.  His sick call slip states only "I was

told to" as the reason for a visit.  Sherwin Decl., Ex. 19 at PLF 303.  His appointment arising out

of the sick call slip was set for August 17, two days later.  Id. at PLF 294.

Deputy Ahlf next encountered Harrison the following day, August 16, at 3:30 a.m, during

morning pill call.  Harrison again asked for medication.  Deputy Ahlf told him he would have to

fill out a slip.  Ahlf Dep. 54:9–56:2.  Deputy Ahlf did not ask him what type of medication he

needed.  Id. 56:3–5.  Sometime soon after the morning pill call, Deputy Ahlf was called to Lower

D Pod to check on an inmate.  Id. 56:17–21.  The inmate was Harrison; several inmates told

Deputy Ahlf that Harrison was "acting bizarrely; that he needed to be moved out of the pod."  Id.

57:1–7.  Harrison asked Deputy Ahlf "why there was a bunch of women in his house."  Id. 57:9–

10.  Deputy Ahlf determined that Harrison should be moved out of minimum security "[f]or his

safety and the safety of the other inmates" because "[h]e was displaying actions that were bizarre .

. . verbal statements that were bizarre, out of the ordinary."  Id. 58:7–15.  Later, Deputy Ahlf told

his supervisor that he had concluded Harrison did not know where he was.  Id. 60:19–23.

### C.    Transfer to Isolation Cell

Deputy Ahlf transferred Harrison to the East Isolation Center.  He began an "Intensive

Observation Log" which bears the date and time as August 16 at 4:15 a.m.  Sherwin Decl., Ex. 53.

Deputy Ahlf logged the reason for the transfer as "Bizarre Behavior / CJMH Referral."  Id.

Deputy Ahlf testified that he let his sergeant know that Harrison needed a mental health

referral, but he did not complete one himself because there was no one in the mental health office

United States District Court
Northern District of California

United States District Court
Northern District of California

at the time.  Ahlf Dep. 50:22–23; 70:4–10.  Deputy Ahlf also testified he called the daytime sergeant — Sergeant Camara — and told him Harrison needed a mental health referral, and that Sergeant Camara told him he would follow up with the mental health office.  Id. 70:4–10. Sergeant Shepard testified that he did not recall being notified of Harrison's need for a mental health referral.  Sherwin Decl., Ex. 60, Shepard Dep. 49:1–18.  Sergeant Camara has not been deposed in this case.  Deputy Ahlf did not notify a nurse or physician of Harrison's behavior, complete a mental health referral form, or notify CJMH that Harrison was in an isolation cell. Ahlf Dep. 50:22–23.

The Intensive Observation Log is a log used to document "direct visual observations" of an inmate every fifteen minutes.  Sherwin Decl., Ex. 60.  The purpose of the log is for use by mental health professionals and jail staff, so "they can see what the person is doing in the course of the day, in the course of the hours, minutes."  Ahlf Dep. 65:2–5.  Plaintiffs do not contend that the log lacks entries within the specified time limits.  However, the parties agree that Deputy Ahlf failed to make any observations accompanying the entries at 4:20 a.m., 4:38 a.m., and 4:45 a.m., prior to the end of his shift at 5:00 a.m. on the morning of August 16.  Sherwin Decl., Ex. 53.

Alameda County policy also requires that observations be recorded "only as they occur." Sherwin Decl., Ex. 60 at 5.  Sergeant Dudek interviewed Deputy Ahlf after Harrison was transferred to the hospital, and noted that the log lacked observations for the last two entries as well, at 6:32 p.m. and 6:48 p.m.  Sergeant Dudek ordered Deputy Ahlf to complete the log, which he admitted was contrary to County policy, of which he was unaware at the time.  Sherwin Decl., Ex. 62, Dudek Dep. 62–69.  The log entries Deputy Ahlf filled out after the fact indicate Harrison was awake in bed at those times, which contradicts the County Defendants' claims regarding when Deputy Ahlf observed that Harrison had flooded his cell and was screaming and standing with a mattress over his head, as discussed below.  Finally, the form contains space for entries regarding when medical and psychiatric staff are notified.  Those entries are blank.  Sherwin Decl., Ex. 53.

**D.    Policies and Training Applicable to Deputy Ahlf Concerning Medical Care**

Plaintiffs point to several Alameda County policies and procedures that Plaintiffs argue Deputy Ahlf violated with respect to Harrison's medical needs.

9

United States District Court
Northern District of California

1    Alameda County Sheriff's Office General Order 5.29 provides: "*Staff* must become

2   familiar with the causes and nature of mental disorders to determine if an individual is a danger to

3   him/herself, others, or is gravely disabled . . . .   *Staff* must be able to recognize general indicators

4   of mental disorders so that appropriate actions can be taken during contacts on the street, during

5   interviews and interrogations *or while interacting with the public*."  Sherwin Decl., Ex. 54 at

6   ACSO 463 (emphasis in original).  "Deputy Sheriffs should be aware that substance abuse (drugs

7   and/or alcohol) can also cause delusions, hallucinations, and violent mood swings in an

8   individual." Id. at ACSO 464.  General Order 5.29 requires: "Once the Deputy Sheriff has taken

9   control of a situation, he/she should assess the need for medical attention and summon medical

10  personnel if required." Id. at ACSO 466.  Policy and Procedure 9.04 states: "Inmates who have

11  mental/emotional disorders or psychotropic problems identified at receiving, screening, or after

12  admission, must be followed up by the medical staff."  Sherwin Decl., Ex. 55 at ACSO 459.  That

13  policy provides for the initiation of an observation log when an inmate is identified as "mentally

14  disordered." Id.  In addition, "[m]edical staff will be notified and perform an immediate initial

15  evaluation." Id.  Policy and Procedure 13.12 governs the referral of inmates to psychiatric

16  services.  Sherwin Decl., Ex. 56 at ACSO 454.  The policy provides that "[w]hen a deputy comes

17  into contact with an inmate they suspect is suffering from a mental disorder, PHS or CJMH will be

18  contacted to examine the inmate."  Id.  "It is the responsibility of staff who suspect a disorder to

19  complete and submit the Mental Health Referral Form."  Id.  "A nurse or physician must

20  immediately be notified of the inmate's behavior" through a referral made by the sheriff's deputy.

21  Id.

22      A bulletin distributed by CJMH to Alameda County and Corizon Health staff requires in

23  large lettering: "Whenever an inmate is placed in a Safety Cell or there is a possible WI 5150

24  situation, CJMH must be notified immediately.  CJMH is now on-site 7 days/wk, 15 hours/day.

25  From 0800–2300 contact the ITR Screener at x.46905.  From 2300–0800 contact the On-Call

26  Clinician at x.53200, enter pager #5098, followed by your full phone number with area code."

27  Sherwin Decl., Ex. 58.  Even though there were no CJMH personnel in the mental health office at

28  the time, it is undisputed that Deputy Ahlf could have called the on-call clinician at 4:00 a.m. on

10

August 16 when he transferred Harrison to the isolation cell.

The County's Rule 30(b)(6) person most knowledgeable regarding the handling of mentally disordered inmates confirmed that, absent an emergency, County policy required a "prompt referral" to CJMH.  Sherwin Decl., Ex. 57, Back PMK Dep. 21:6–9.  At the top of the referral form was the admonition: "Rule out drug toxicity, alcohol withdrawal, head injury, et cetera, before making a psych referral."  Id. 22:1–4; Sherwin Decl., Ex. 59.  Sergeant Back also testified that Deputy Ahlf was required by Policy and Procedure 13.12 to fill out a Mental Health Referral Form.  Back PMK Dep. 29:6–10.

### E.  Referral to CJMH

Defendant Hast, an Associate Social Worker with CJMH, began her shift in the CJMH Intake, Transfer, and Release office ("ITR") at 3:30 p.m.  Sherwin Decl., Ex. 31, Hast Dep. 13:1–14:2.  In ITR, Hast would see clients referred by the jail to do crisis interventions, brief therapy, and referrals for medication stabilization.  Id.

Hast was aware that Delirium Tremens "is a medical emergency when somebody is withdrawing from alcohol."  Id. at 14:24–15:6.  She was familiar with many or even most of the symptoms of alcohol withdrawal.  Id. at 17:22–20:10.  She testified that she knew that "when somebody is having alcohol withdrawal . . . it's important that medical personnel be dealing with it" because "it's a medical issue that needs to be addressed by medical personnel."  Id. at 20:11–19.

Twelve hours after Harrison was transferred to an isolation cell, at approximately 3:30 p.m. on August 16, the sheriff's deputy observing Harrison called CJMH and left a voicemail message requesting an evaluation.  The message indicated Harrison was mumbling incoherently, that he had seen a nurse but had no medications, and that he had been put on intensive observation in an isolation cell that morning.  Id. 35:18–25; 49:16–20.

Hast retrieved the message at 4:00 p.m.  Id. 49:16–20.  In addition to reviewing other referrals during the next thirty minutes, she reviewed Harrison's intake screening form — the form Nurse Sancho had filled out at Glenn Dyer — and noted on her own chart that Harrison reported alcohol use and that he was placed on CIWA.  Id. 35:18–36:11.  Plaintiffs point to Hast's chart

11

note as evidence that at the time she reviewed the intake form, the CIWA notation had not yet been crossed out, and that it was crossed out only after the events that led to this action took place. Hast testified that she understood the CIWA notation to mean that Harrison had been placed under the observation of Corizon Health nursing staff to monitor for alcohol withdrawal.  Id. 33:1–3. Hast testified that she did not have specific knowledge concerning how the CIWA protocol is implemented because it is undertaken by medical staff, not mental health professionals.  Id. 33:20– 34:6.

      At approximately 4:30 p.m., Hast called the housing unit, and she was informed the sheriff's deputy monitoring Harrison would be leaving in thirty minutes.  Id. 52:11–14.  Hast was aware that she might miss the deputy if she waited to visit Harrison.  She was also aware that the deputy's phone message, combined with the intake form Hast reviewed, indicated it was possible that Harrison was suffering from severe alcohol withdrawal, requiring immediate attention.  Hast testified that she did not go immediately because "I would imagine that I was looking at all of the referrals that I had and triaging.  And so in my process of triaging, I made that decision."  Id. 53:1–3.  At the time of her deposition, Hast testified that she could not recall whether any other inmate had a medical emergency at the same time that she called the housing unit.  Id. 54:4–9.

      Hast arrived at the housing unit an hour-and-a-half after the referral voicemail message had been left, and one hour after she retrieved the message, at 5:00 p.m.  By then, the deputy had left and she was not able to evaluate Harrison.  Id. 54:24–55:1.  Hast did not request another deputy to come to the housing unit, though she was aware that she could have done so.  Id. 55:2–18. Instead, she looked through the window of Harrison's cell, saw that Harrison was standing at the toilet, and left.  Id. 58:5–59:6.  Hast testified that, had she evaluated Harrison and concluded he exhibited signs of severe alcohol withdrawal, she "probably" would have contacted a nurse.  Id. 59:9–13.

      Hast called the housing unit at 6:00 p.m.  By then, Deputy Ahlf had just begun another shift and was once again monitoring Harrison.  Deputy Ahlf was surprised that no one from CJMH had evaluated Harrison by then, because he considered Harrison's situation severe enough to warrant attention sooner.  Ahlf Dep. 82:20–83:2.  Deputy Ahlf told Hast that he had placed

12

Harrison in the isolation cell at 4:00 a.m. that day due to bizarre behavior, disorientation to time and place, and incoherent mumbling, and that he was not receiving any medication.  Hast Dep. 60:1–12.  Hast testified that she knew at the time those symptoms were consistent with severe alcohol withdrawal.  Id. 60:13–16.  Hast was also aware that Harrison's medical records did not include any records indicating he had been placed on a treatment plan to manage his withdrawal.  Id. 62:18–63:5.  Hast did not notify a medical professional of Harrison's condition, or tell Deputy Ahlf to do so.

Hast did not go to the housing unit after speaking with Deputy Ahlf at 6:00 p.m. because "I would imagine I was triaging the — all of the people that I was seeing, which I do throughout my shift.  And seeing these people and then getting there as soon as I could."  Id. 65:7–10.  Deputy Ahlf testified that Hast told him she "hadn't gotten around to it" because she had to see other patients.  Ahlf Dep. 83:17–21.  Hast did not return to the housing unit until 7:00 p.m., after the events described below had already occurred.

Attached to the County Defendants' motion for summary judgment is the declaration of Megan Hast.  ECF No. 121-2.  In it, Hast provides a more detailed description of the time between 5:00 p.m. and 7:00 p.m. on the night of August 16.  She could not recall those details at the time of her deposition.  Hast states that when she returned to her office after visiting the housing unit at 5:00 p.m., she had three referral forms in her inbox for three different patients.  She states that she saw "Client 1" at 5:00 p.m., and spent forty-five minutes preparing for and evaluating Client 1; saw "Client 2" at 5:15 p.m., and spent a total of forty-five minutes on Client 2; and saw "Client 3" at 5:30 p.m., and spent a total of twenty minutes on Client 3.  She also states: "Thus, the meeting with Client 3 probably ended at about 5:35 p.m."  Hast Decl. ¶¶ 9–12.  Hast next states she: saw "Client 4" at 6:40 p.m., and spent a total of forty-five minutes with Client 4; and saw "Client 5" at 7:05 p.m., and spent a total of forty-five minutes with Client 5.  Id. ¶¶ 14–15.  The declaration also states that Hast returned to the housing unit "sometime after 7:00 p.m.," and that after returning from the housing unit, she wrote her progress note for Harrison and proceeded to "manage the remaining nine clients I had that evening."  Id. ¶ 16.  None of Clients 1–5 were experiencing a medical emergency.  Plaintiffs point out that Hast's declaration accounts for three hours and

1    twenty minutes of time spent either with patients or preparing to evaluate them in a space of just

2    over two hours.

3        **F.        Altercation with Deputy Ahlf**

4        At some point around 6:30 p.m. on August 16, Deputy Ahlf observed Harrison yelling and

5    screaming, claiming someone was pointing a gun at him and shooting him.  Ahlf Dep. 73:1–3.

6    Harrison had a mattress over his head, the cell was flooded, and there were broken shards of food

7    tray on the floor of the cell.  Id. 73:5–10.  Harrison was not actively flooding the cell; Deputy Ahlf

8    did not know how he had flooded it.  Id. 73:19–24.  Harrison was wearing pants and sandals, and a

9    tan shirt, but not his blue uniform shirt, so Deputy Ahlf suspected perhaps he had clogged the

10   toilet with his uniform shirt.  Id.

11       Harrison was standing in one to one-and-a-half inches of water.  Id. 74:12–19.  At the time

12   Deputy Ahlf was interviewed, after the incident, Deputy Ahlf claimed Harrison had been holding a

13   piece of food tray.  At the time of his deposition, Deputy Ahlf could not recall if that was the case.

14   Id. 74:20–75:6.  Deputy Ahlf asked Harrison why he had flooded his cell and broken his food tray.

15   According to Deputy Ahlf, Harrison responded "I've been in here all day.  You guys put me here.

16   What's going on?"  Id. 77:1–3.

17       Deputy Ahlf next asked if Harrison had been seen by anyone that day.  Harrison responded

18   no.  Id. 77:10–15.  Deputy Ahlf "absolutely" expected that someone should have gone to see

19   Harrison by then because a mental health referral should have been made.  Id. 77:16–24.  Deputy

20   Ahlf told Harrison "Let me try to call mental health and see if there's anybody in the office to try

21   to find out why."  Id. 83:6–8.  At that point, Deputy Ahlf had the conversation with Defendant

22   Hast described above.

23       Deputy Ahlf testified that he could have called an additional deputy for backup at this

24   time.  Id. 86:22–87:1.  Instead, he determined that he should move Harrison to the other isolation

25   cell since Harrison's cell was flooded and dangerous.  He told Harrison that he was going to move

26   him, and Deputy Ahlf testified that Harrison responded: "Okay, Deputy Ahlf."  Id. 87:7–89:6.

27   Although he had the option of handcuffing Harrison through the port on the cell door prior to

28   moving him, Deputy Ahlf decided to handcuff Harrison after opening the cell door because he did

14

not consider Harrison a threat.  He asked Harrison to turn around, put his hands on his head, and walk toward his voice.  Id. 87:21–89:1.  Deputy Ahlf testified that he did not consider Harrison dangerous at that moment because Harrison was compliant — "not a threat at that point."  Id. Nevertheless, Deputy Ahlf was holding a Taser in one hand "[j]ust in case something were to happen."  Id. 89:16.  Deputy Ahlf's supervisor at the time, Sergeant Joseph Bricker, wrote in Deputy Ahlf's performance review after the incident that Deputy Ahlf "had a lapse in judgment" when he opted to move Harrison without additional assistance.  Sherwin Decl., Ex. 66, Bricker Dep. 31:3–7.  At his deposition, Sergeant Bricker confirmed: "I believe Deputy Ahlf should have tried to get assistance in the event that something happened.  I think he should have waited for assistance, that was my opinion."  Id. 31:14–16.

Once Harrison reached the doorway, Deputy Ahlf asked Harrison to put his right hand behind his back.  As he was applying one handcuff, Deputy Ahlf testified, Harrison turned his head and gave him "an unsettling, just blank stare.  And it wasn't until that point that I felt that – not that he was going to do something, but something just wasn't right."  Ahlf Dep. 91:7–92:1. Deputy Ahlf cannot recall whether he had already put his Taser away at that point, but at his deposition, he believed that he had.  Id. 93:3–14.  Deputy Ahlf testified that he next put away the handcuffs and "gently nudged" Harrison back into his cell and instructed him to sit on the bench inside the cell.  Id. 94:4–6.  Harrison moved four to five feet as a result of the "nudge."  Id. 94:12–14.  Harrison did not sit, and Deputy Ahlf removed his Taser from its holster.  Id. 95:11–14. Harrison "proceed[ed] to take a — I don't want to call it running towards me, but he proceeded to take a couple of steps towards me in which I took that as a direct threat and I deployed my Taser." Id. 95:16–22.  Though Deputy Ahlf cannot be sure he would call it running or sprinting, he testified that Harrison was moving "a lot faster than just taking a step."  Id. 96:21–24.  Deputy Ahlf also told his sergeant at the time that Harrison said "I'm going to kick your ass," or something similar, as he was moving.  Id. 101:1–2; 103:2–9.  Sergeant Scott Dudek also testified that "obviously [Deputy Ahlf] made a mistake" in moving Harrison without assistance, though Dudek understood why, given Deputy Ahlf's prior contact with Harrison, Deputy Ahlf would have opted to proceed alone.  Sherwin Decl., Ex. 62, Dudek Dep. 45:20–46:9.

After Deputy Ahlf deployed his Taser, Harrison "kind of stepped backwards a little bit and ended up falling down onto the corner of the bench and got right back up and proceeded to run out the door." Id. 99:23–25. Deputy Ahlf testified that, at that moment, he deployed one dart-mode[1] Taser cycle. Id. 101:5–6. The Taser deployment log shows, however, that two seconds later, Deputy Ahlf deployed his Taser in dart-mode for a second five-second cycle. Deputy Ahlf does not have an explanation for this log record entry, and does not recall the second firing in dart mode. Id. 101:20–102:3.

After the tasing ended, Deputy Ahlf testified that Harrison stood up and charged him. Deputy Ahlf stepped to the side, Harrison slipped on the water, and slid out of his cell on his back, feet first. Id. 104:13–105:6. As Harrison slid, he grabbed hold of Deputy Ahlf's leg, and Deputy Ahlf slipped and fell as well. Id. 105:14–19. Deputy Ahlf got on top of Harrison and a struggle ensued. Deputy Ahlf told Harrison to stop resisting as Harrison thrashed, attempted to kick and free his arms, and spit. Id. 106:13–107:16. Deputy Ahlf testified that he next delivered two open-palm strikes to the back of Harrison's head. Id. 107:18–20. At some point, Harrison had switched from a supine position to a prone position. Id. 107:24–108:4. Deputy Ahlf also delivered closed-fist strikes to Harrison's back and knee strikes to his torso. Id. 108:9–10. Deputy Ahlf testified that Harrison never attempted to punch, kick, or strike him, because deputy Ahlf never gave him the opportunity to do so. Id. 112:9–18.

At some point during this struggle, Deputy Ahlf radioed for backup, and accidentally called backup to housing unit 34 before correcting it to 33. Id. 116:24–117:1. Deputy Ahlf began to become tired and backup did not come immediately, so he held Harrison's arms and held down Harrison's body with his body weight until backup came. Id. 118:16–19. Deputy Ahlf testified that he never held Harrison in a headlock, and that he never applied force to Harrison's neck. Id. 119–120. At this time, Deputy Ahlf testified, other officers first arrived.

---

[1] The parties explain that dart mode involves the deployment of two darts along wires. The Taser sends an electric signal between the probes, resulting in a loss of neuromuscular control. By contrast, drive stun mode is deployed with the Taser directly against the target's body. Two electrodes deliver an electric shock, which causes pain, but does not result in loss of neuromuscular control.

### G.     Arrival of the Remaining Sheriff's Deputies

The evidence in the record concerning what happened next is a mass of contradictory testimony and reflects, at a minimum, the chaotic nature of the events that ensued.[2]

Deputy Valverde arrived first. Id. 122:21–22; Sherwin Decl., Ex. 67, Valverde Dep. 26:10–12. Deputy Valverde testified that Harrison was thrashing about on his stomach, and that Deputy Ahlf was on top of him. Id. 26:10–27:13. When asked whether he saw Deputy Ahlf strike Harrison, Deputy Valverde testified "I do not know." Id. 28:14–18. Deputy Valverde did not provide any further detail concerning what Deputy Ahlf was doing to gain control of Harrison. Deputy Valverde testified that he went to Harrison and placed his knee on Harrison's upper back and tried to grab Harrison's right arm with his left hand. Id. 29:5–11. He testified also that he avoided putting pressure on Harrison's neck or head because it can "cause damage." Id. 29:19–30:3. He also testified that Harrison displayed "extreme strength," as he was able to lift Deputy Ahlf and Deputy Valverde from a prone position. Id. 32:12–14.

Deputy Swetnam arrived next, "just a step or two" behind Deputy Valverde. Sherwin Decl., Ex. 68, Swetnam Dep. 19:10–13. Deputy Swetnam testified that he thought Harrison was on his back, not his stomach. Id. 19:8–9. He recalled that Deputy Valverde took a position on Harrison's left side, and Deputy Swetnam went to Harrison's legs, to attempt to take control of them. He noticed Taser wires on the floor. Id. 20:16–20. Deputy Swetnam attempted to pick up Harrison's legs, but Harrison's left leg went stiff and he let out a groan. Id. 20–21:3. Deputy Swetnam believed that a Taser had just been deployed in dart mode. Id. 21:22–23:12.

Deputy Swetnam continued to grip Harrison's legs, but was unable to keep control of them. He then delivered a downward kick to Harrison's lower abdomen, just below the navel. Id. 25:7–20. Deputy Swetnam believed Harrison had just had the "wind knocked out of him." Id. 26:9–10. The three deputies then turned Harrison over, into a supine position. Id. 27:5–15. At some point during this maneuver, other deputies arrived. He does not recall who. Shortly

---

[2] As discussed more fully below, Plaintiffs also argue, through their police practices expert, that the Defendant Sheriff's Deputies in this case employed a "Code of Silence" in failing to recall any details concerning what they saw each other do during the struggle. See Blair v. City of Pomona, 223 F.3d 1074, 1081 (9th Cir. 2000).

United States District Court
Northern District of California

1    thereafter, Deputy Swetnam heard someone say "He's got the Taser." Id. 28:19–20.  Deputy

2    Swetnam took some weight off Harrison's legs and punched him three times in the lower

3    abdomen; he believes Harrison was on his side at this point.  Id. 29:1–7.  He never saw Harrison

4    with a Taser.  Shortly thereafter, Deputy Swetnam believes he saw another deputy — he does not

5    remember who — deliver further strikes to Harrison's torso.  Shortly thereafter, he heard someone

6    say: "Okay.  I've got it, I've got it" or "I've got the Taser." Id. 31:24–25.  Deputy Swetnam did

7    not witness Harrison strike anyone, though at his deposition he quibbled with the definition of

8    "strike," as Harrison was violently "thrashing," "wrestling," and attempting to free his legs.  Id.

9    42–49.

10    Deputy Valverde testified that he noticed the Taser for the first time when he saw Harrison

11    grab the Taser in his right hand.  Valverde Dep. 34:10–21.  Deputy Valverde attempted to "get it

12    out of his hand" by punching Harrison on the wrist repeatedly, but Harrison would not let go.  Id.

13    35:14–19.  Deputy Valverde testified that he "advised everybody that there was a Taser . . . ." Id.

14    36:2–4.  He could not recall whether there were any deputies there at that moment other than he

15    and Deputy Ahlf.  Id. 36:10–18.  He believes "somebody got control of the Taser" after that,

16    though he did not see it.  Id. 36:19–23.  Deputy Valverde testified that the deputies were then able

17    to handcuff Harrison.  Id. 37:14–15.  Deputy Valverde testified that he did not witness any other

18    deputy strike Harrison, that he did not see who handcuffed Harrison or how it was accomplished.

19    Id. 37:5–38:22.  The next thing Deputy Valverde remembered was the deputies moving Harrison

20    to an isolation cell.  Id. 39:2–6.  During that process, Harrison alternately threatened to kill the

21    deputies and yelled that he loved them.  Id. 40:1–5.

22    Deputy Ahlf testified that prior to Harrison's grabbing the Taser, a deputy lifted him off of

23    Harrison.  Ahlf Dep. 124:15–20.  Deputy Ahlf then heard someone say "He's got the Taser."  Id.

24    125:4–7.  Deputy Ahlf went to Harrison's arms and saw he was holding the Taser.  Deputy Ahlf

25    testified that he used his foot to grab hold of the Taser and slide it away from Harrison.  Id.

26    126:14–23.  Deputy Ahlf did not recall seeing anyone hit Harrison's hands.  Id. 127:13–14.

27    Deputy Ahlf next picked up the Taser and told Harrison to stop resisting; he then tased Harrison in

28    drive stun mode on the upper back.  Id. 129:24–130:19.  He is not sure whether the probes were

still attached to Harrison — he testified that the drive stun "didn't seem to have any effect on him," though Harrison tensed and his legs straightened. Id. 131:2–14. Deputy Ahlf testified that he did not recall seeing what precisely any other deputy was doing during this time, though he "saw Mr. Harrison get struck" by deputies. Id. 132:11–23.

Deputies Litvinchuk, Madigan, Martinez, Unubun, and Rojas arrived at some point around the time Harrison had picked up the Taser. Sherwin Decl., Ex. 70, Martinez Dep. 53:14–15; Ex. 71, Litvinchuk Dep. 25:16–17; Ex. 72, Madigan Dep. 22:1–2; Ex. 74, Rojas Dep. 31:18–21; Ex. 75, Unubun Dep. 30:2–2. Deputies Sobrero and Bareno arrived sometime after that. Sherwin Decl., Ex. 76, Sobrero Dep. 30–33; Ex. 77, Bareno Dep. 23:2–24:23.

Deputy Martinez heard someone say "He's got ahold of my Taser," so he pulled out his Taser, removed the frontal cartridge, and delivered a drive stun to Harrison's back, between the shoulder blades. Martinez Dep. 53:14–20. County-issued Tasers deliver a five-second cycle unless the trigger is depressed for longer. Deputy Martinez delivered a seven-second drive stun. Id. 56:12–57:7. Deputy Martinez determined that the Taser had not had an effect on Harrison, so he delivered a second drive stun to Harrison between the shoulder blades. He does not dispute that three seconds went by between stun cycles. Id. 57:15–59:3. The second time "seemed to be more effective because we were able to get his arms from underneath him and secure him in handcuffs." Id. 59:6–10. Deputy Martinez testified that he never struck Harrison, and he never saw Harrison strike a deputy. Id. 69–70. Prior to delivering the first stun, Deputy Martinez yelled "Taser, Taser, Taser," but otherwise did not warn Harrison prior to delivering the stuns. Id. 70:21–71:16.

The remaining deputies testified as to the use of force as follows.

Deputy Litvinchuk testified that he grabbed Harrison's right arm with his left hand and delivered "three or four closed fist strikes to the right upper torso." Litvinchuk Dep. 28:9–29:5. He testified that he did not see any other deputy strike Harrison. Id. 30:6–18.

Deputy Madigan testified that he stepped on Harrison's right hand, pinning the Taser to the ground for less than a minute. Madigan Dep. 24:6–18. He also placed his right knee on Harrison's back after the Taser was secured "to stop him from being able to get up" for

19

approximately three minutes.  Id. 26:17–28:15.  Deputy Madigan testified that the struggle "went on for a while."  Id. 28:14–15.  Deputy Madigan also placed Harrison's right arm in a wrist lock to handcuff him.  Id. 28:18–21.

Deputy Bareno testified that when he arrived, he determined that he did not need to intervene because Harrison was not trying to get up and was not trying to injure a deputy.  Bareno Dep. 23:25–24:12.  Deputy Bareno never saw Harrison strike, punch, or slap a deputy; he testified that Harrison did attempt to kick deputies several times.  Id. 27:4–22.  He also testified that he saw several deputies attempt to strike Harrison, but could not tell who attempted which strike.  Id. 29–30.

Deputy Sobrero testified that when he arrived there were "enough people to deal with the situation."  Sobrero Dep. 40:9–12.  He was going to leave, but the deputy with control of Harrison's left arm "gave up and got up and left Deputy Unubun by himself trying to control those arms, and so I took his place."  Id. 40:22–41:1.  Deputy Sobrero was otherwise unable to describe the other deputies' actions.  Id. 41:6–7.  Deputy Sobrero testified that he did not feel he needed to strike or kick Harrison, put him in a headlock, place his body weight on him, or deliver knee strikes because he was "able to overcome the resistance by using compliance techniques."  Id. 44:11–45:5.

Deputy Rojas testified that he never struck Harrison, and that he never saw another deputy strike him, either.  Rojas Dep. 27:14–15.  He also testified he never saw any deputy use a Taser on Harrison.  Id. 31:2–3.  He also testified that he took hold of Harrison's right wrist and brought his arm to the small of his back, "which kind of forced his body to lay flat on his stomach."  Id. 30:10–13.

Like Deputy Rojas, Deputy Unubun testified that he grabbed Harrison's right hand and used a joint manipulation technique to rotate Harrison's right wrist around to the small of Harrison's back.  Unubun Dep. 32:10–34:8.  The technique worked sufficiently that Deputy Unubun was able to handcuff Harrison.  Id.  Another deputy handed Deputy Unubun Harrison's left arm, and he handcuffed that wrist as well.  Id. 37:8–16.

Once the deputies gained control of Harrison, Deputies Rojas and Sobrero moved Harrison

United States District Court
Northern District of California

to the other isolation cell, fifty to sixty feet away, and placed him on the floor, handcuffed, face down.  Sobrero Dep., 59–61; Rojas Dep. 38–40.  Deputy Sobrero testified that Harrison remained on the floor of the isolation cell for eight to ten minutes, including the time the deputies spent waiting for a waist chain and leg shackles to be brought to the cell.  Sobrero Dep. 76:1–2.  Deputy Rojas had asked for a spit mask — a hood to prevent spitting.  Rojas Dep. 39:8–20.  Deputy Bareno knelt on Harrison's legs, locking them in a "figure four leg lock" for three minutes or "maybe a little longer."  Bareno Dep. 65–68.  Deputies Rojas and Litvinchuk then put the spit mask on Harrison.  Litvinchuk Dep. 44:14–21.  Deputy Sobrero and others also applied waist chains and leg irons.  Sobrero Dep. 73:16–23.

The County does not point to any evidence that Harrison struck or kicked any deputy throughout this encounter, although every deputy testified to Harrison's violent thrashing.

A nurse arrived after the chains, spit mask, and leg irons were applied.  The nurse asked the deputies to move Harrison into the hallway for evaluation.  Sobrero Dep. 76:3–20.  At some point when Harrison was moved into the hallway, Deputy Ahlf took a close-up photograph of Harrison wearing the spit mask.  Sherwin Decl., Ex. 87 (photo).  Sergeant Dudek testified that Deputy Ahlf told him "I got a great photo of him in the -- with his spit mask on."  Dudek Dep. 59:20–60:1.  Sergeant Dudek testified: "I didn't want to know what he meant by that" because "it just leaves too many doors open.  Was it a great photo because the light was good?  Was it a great photo for inappropriate purposes?  I didn't want to know."  Id. 60:2–8.

**H.     Transfer to Hospital and Death**

The nurse who examined Harrison in the hallway testified that Harrison's saturation rate was 97%, which indicated adequate oxygen levels, and that his pulse was 57 beats per minute.  Ly Decl., Ex. O, Imperio Dep. 16–17.  She recorded the time she examined Harrison as 7:10 p.m. on August 16.  Id.  She was unable, however, to measure Harrison's blood pressure, because he resisted.  Id.  At some point in the next three minutes, Harrison became unresponsive to verbal or tactile stimuli.  Id. 19:21–20:6.  Harrison was wheeled to the trauma room in the jail at around 7:13 p.m.  He arrived unresponsive, so the nurses there used an automatic external defibrillator ("AED") to get a reading on his heart rhythm.  Ly Decl., Ex. P, Blyakherova Dep. 28–29.  No

United States District Court
Northern District of California

21

1   reading was detected.  Nurse Blyakherova and Nurse Anderson performed chest compressions,

2   alternating thirty-two compressions and two blasts of air from an "ambu bag."  Id. 30.  Harrison

3   remained unresponsive.  He was transported to Valley Care Hospital.  He remained unresponsive,

4   and died two days later on August 18, 2010.

5       **I.       Coroner's Report**

6           County Coroner Thomas Wayne Rogers, M.D. performed the autopsy.  Sherwin Decl., Ex.

7   78 (autopsy report).  The coroner determined Harrison's cause of death as: "Anoxic

8   Encephalopathy due to cardiac arrest following excessive physical exertion, multiple blunt injuries

9   and Tasering."  Id. at 1.[3]

10          The coroner found blood on: the right and left sides of Harrison's head and neck that

11  appeared to have come from his nose and mouth; his right and left arms; his torso, in small

12  amounts; and a 6-inch streak over his left ribs.  The report describes the following blunt injuries: a

13  16x9-inch contusion over Harrison's right lateral neck extending down to the upper lumbar area;

14  two quarter-inch abrasions on the right side of his lower lip; a 3/8-inch contusion on the inner

15  surface of the left side of his upper lip; a 5/8-inch abrasion under his chin; and a 4x2.5-inch

16  contusion on the right side of his neck.

17          On the right arm, the coroner found: a 12x7-inch contusion on Harrison's arm; four

18  abrasions on his wrist; two half-inch contusions over his hand; a 1.75-inch contusion on the palm

19  of his hand; another 2.5xhalf-inch contusion on the palm of his hand; a half-inch contusion on the

20  front of his thumb; an eighth-inch abrasion on the tip of his third finger; a half-inch contusion on

21  his upper arm; and three other smaller contusions on his upper arm.  On the left arm, the coroner

22  found: a one-inch contusion on his upper arm; a 1.25-inch contusion on his upper arm; two small

23  abrasions on his upper arm; a 12x5-inch contusion over his upper arm and elbow; black abrading

24  over his elbow; a 10x4-inch contusion on his forearm; a small abrasion on the elbow; a small

25  abrasion on his wrist; a 3x1.5-inch contusion and a 2-inch contusion on the palm of his hand; and

26  another 2.25-inch contusion over his second metacarpal.

27  ————————————

28  [3] Strangely, the report begins by identifying the body as a white male, 6'3" long and weighing 199
    pounds.  Id. at 2.

United States District Court
Northern District of California

On Harrison's right leg, the coroner found: a 6x3.5-inch contusion on his thigh, a 1x1-inch contusion on his lower leg; two small open areas of skin on his thigh; and a small abrasion on his lower leg.  On Harrison's left leg, the coroner found: three to four contusions on his thigh, covering a 1.5-inch area; a 2-inch contusion on his thigh; a 5/8-inch contusion on his knee; a 1.5-inch abrasion on his lower leg; a small abrasion over his lower leg; a 1.5-inch contusion over his knee; abrading of the skin around his knee; a 2xhalf-inch contusion on his thigh; a small contusion on his thigh; a 1xquarter-inch contusion on his thigh; and a small contusion on his lower leg.

On Harrison' torso, the coroner found a 4x3.5-inch contusion on his right shoulder; a 5x4-inch contusion on his right side; abrading on the right side of his back; a 3-inch contusion on his right gluteal area; a 6x4-inch contusion on the left side of his back; a 5x4-inch contusion on the back of his left shoulder with hemorrhaging underneath; a 5-inch contusion over his right clavicle; a 2.25x3/16-inch abrasion over his right shoulder; and other abrasions.

The coroner also found: fluid in the space around the lungs and in the abdominal cavity; a two-inch hemorrhage in the left pleural cavity between ribs 4 and 5; a 6xhalf-inch hemorrhage over left rib 7; and hemorrhage in the right pleural cavity covering an interrupted 8x2-inch space, from ribs 5 to 12.  Harrison's heart was enlarged, weighing 470 grams.  His right and left knuckles and right wrist were incised and there was hemorrhage beneath some of the knuckles and in his wrist.  In the strap muscles of his neck, the coroner found several areas of hemorrhage as well. The coroner found further hemorrhaging in his cranium.

### J.      Expert Opinions

#### 1.      Police Practices Expert John J. Ryan

Plaintiffs' "police practices expert," John J. Ryan, was an active police officer for twenty years prior to retiring as a Captain of the Providence, Rhode Island Police Department in June of 2002.  Ryan Decl., ECF No. 156 ¶ 1.  He is now a consultant in police and law enforcement practices.  As part of his work, he has authored law enforcement guides; spoken numerous times to conferences on law enforcement practices; conducted training sessions for public employees, including law enforcement officers, attorneys, and judges; and taught courses on police policy and procedure, arrest, and the use of force.  Among the materials Ryan reviewed in preparing his

23

expert report are jail records, the deposition transcripts of jail personnel and sheriff's deputies, audio recordings of interviews with sheriff's deputies recorded by the County; transcripts of interviews with eyewitnesses, and the personnel files of the Sheriff's Deputies.

After carefully cataloguing the events of August 13–16, 2010, Ryan reached several conclusions concerning the adequacy of the jail staff's response to Harrison's condition.

First, Ryan states that he is familiar with the California POST Learning Domains with respect to officer training applicable to the Sheriff's Deputies in this case, and that it is his opinion that "the action of the deputies throughout this case was inconsistent with such training." Id. ¶ 94. In particular, Ryan states that Deputy Ahlf's decision to deal with Harrison without backup breached training "well known in law enforcement and emphasized in California Post training that when dealing with someone with a mental impairment, backup should [be] requested." Id.

Second, Ryan concludes, based on the record in this case, including the autopsy report, "that the use of force used by the deputies involved in the event with Mr. Harrison was inconsistent with generally accepted policies, practices, training, and legal mandates with respect to use of force." Id. ¶ 96. Ryan also concludes that any officer present "had a recognized obligation . . . to intervene in the force which was taking place." Id.

Ryan states that, in his opinion, Harrison's injuries "were not explained by the materials to include reports, interviews, or depositions of the officers." Id. ¶ 97. While Ryan explicitly avoids assessing the credibility of the officers, "it must be recognized that the varying descriptions provided by the deputies of both what each individual deputy did to control Harrison, as well as allegations that Harrison was in possession of the TASER are not consistent." Id. ¶ 97.

In discussing the excessive force analysis set forth by the Supreme Court in Graham v. Connor, 490 U.S. 386 (1989), Ryan states that "hard hand strikes such as punches and kicks are considered significant force options and TASER is considered a significant intermediate weapon." Id. ¶ 99. Ryan also confirms the Court's review of the facts above — "at no time did Mr. Harrison land a strike or kick on any involved officer. In fact, his actions were described as flailing; attempting to break free; and verbal threats." Id. ¶ 100. "It is noted that no deputy testified that Mr. Harrison's resistance ever placed a deputy at risk." Id. ¶ 108.

United States District Court
Northern District of California

Ryan also concludes that "[t]he seriousness of the event was largely the decision of Deputy Ahlf to move him to a different cell . . . .  Ahlf considered Harrison such an insignificant threat that he decided to open the cell without backup and move him to a different cell on his own."  Id.  Ryan states that, in reviewing the evidence, he concludes nine deputies used force to control Harrison, and that Deputy Bareno indicated there was no need for him to intervene to assist the other deputies.  Id. ¶ 102.  "Here the correctional officers used force that from a proportionality scale far outweighed the need which was simply to move Harrison to the other isolation cell.  It is of note that Deputy Ahlf testified that he was able to maintain control of Harrison by himself between the time he called for assistance and other deputies arrived."  Id. ¶ 105.

With respect to Harrison's possession of the Taser, Ryan's report states: "Even by a review of the contrasting testimony by the deputies with regard to Harrison's alleged possession of the TASER, it is clear that he was never in a position to use the TASER even if he was in purposeful possession of it."  Id. ¶ 109.

Finally, Ryan concludes: "It is my opinion . . . that the deposition testimony of the involved officers provides evidence of the Code of Silence among the involved deputies in this case."  Id. ¶ 117.  Ryan has written about and conducted trainings regarding the Code of Silence.  Ryan points to the "consistent inability to recall what other deputies were doing or a complete denial that actions of other deputies were witnessed" as evidence in this case of the Code of Silence.  Id. ¶ 122.  "The code of silence may also explain why not a single officer can offer any explanation for injuries to Mr. Harrison's neck and head."  Id.

### 2.   Plaintiffs' Medical Experts

### a.   Michael M. Baden, M.D.

Plaintiffs retained Dr. Michael Baden as an expert.  Dr. Baden is a board-certified forensic pathologist and the former Chief Medical Examiner of New York City.  He reviewed the autopsy report, coroner's report, death certificate, jail records, medical records, and several deposition transcripts in this case.  Dr. Baden concludes: "It is my opinion that Mr. Harrison died because prison personnel failed to properly diagnose and treat his severe alcohol withdrawal symptoms that developed into Delirium Tremens; because he was not properly examined by a physician for

United States District Court
Northern District of California

his obvious medical problems; and because he was struck many times by Sheriff's officers, Tasered multiple times, and physically restrained so that his breathing was compromised causing his brain to be deprived of oxygen with resulting anoxic encephalopathy." Baden Report, ECF No. 152-1.

### b.    Kathryn Burns, M.D.

Plaintiffs also retained Dr. Kathryn Burns. Dr. Burns is a board-certified psychiatrist. In preparing her expert report, Dr. Burns reviewed the medical records in this case and the Sancho, Ahlf, Hast, Orr, Granlund, Sass, and Magat deposition transcripts. Burns Report, ECF No. 154. Dr. Burns states that Harrison had a serious medical need that was increasingly apparent from the time of his arrest and booking to the altercation with the Sheriff's Deputies. Id. at 2. Dr. Burns concludes that Corizon and Dr. Orr failed to implement an appropriate screening procedure, leading to a "cursory, inaccurate, and incomplete" medical screening at the Glenn Dyer detention facility. Id. at 3. In addition, she concludes Corizon and Dr. Orr failed to ensure adequate supervision and oversight of the screening process. Id.

In addition, Dr. Burns concludes Deputy Ahlf's inadequate training at the jail resulted in his failure to summon medical or mental health staff, and that the County failed to train jail staff to detect the signs and symptoms of alcohol withdrawal. Id. Dr. Burns also concludes that the County failed adequately to train CJMH staff, including Hast, in triaging and responding to emergency referrals. Dr. Burns concludes Corizon Health was deliberately indifferent through its employees by allowing Nurse Sancho to screen Harrison without clinical supervision, failing to ensure accurate screening information, failing to ensure proper screening after Harrison was transferred to Santa Rita Jail, failing to train employees and/or to ensure compliance with alcohol withdrawal protocols, and failing to ensure Harrison was assessed and monitored for alcohol withdrawal. Id. at 4.

Finally, Dr. Burns concludes the substandard care provided by Corizon Health and Hast was a substantial and contributing cause of Harrison's death. Id.

/ / /

### 3.   Defendants' Medical Experts

#### a.   Robert Wetli, M.D.

Dr. Robert Wetli is a board-certified forensic pathologist.  He was retained by the County.  In preparing his expert report, Dr. Wetli reviewed Harrison's medical records and certain jail records.  Wetli Report, ECF No. 123.  Dr. Wetli concludes that "[t]he autopsy did not identify any injury or disease process that could account for [Harrison's] death."  Id., Ex. B at 2.  Dr. Wetli notes that Delirium Tremens has a mortality rate of approximately thirty percent.  Id.  Dr. Wetli states that, had the use of Tasers produced Harrison's cardiac arrest, he would have exhibited a fatal cardiac rhythm disturbance within fifteen seconds of the discharge, which did not occur.  Id. at 3.  He also notes that "the extensive bleeding into soft tissues and around the neck area are in large part markedly exaggerated" post-mortem.  Dr. Wetli further concludes that nothing suggests there was an asphyxia component to Harrison's death.  Instead, Dr. Wetli is of the opinion that Harrison died from "metabolic complications of agitated delirium due to Delirium Tremens that was a consequence of his alcoholism."  Id. at 4.

#### b.   Vincent J. M. Di Maio, M.D.

Dr. Vincent DiMaio is a board-certified forensic pathologist and was the Chief Medical Examiner of San Antonio, Texas until 2006, when he retired.  He was retained by the County.  Dr. DiMaio reviewed Harrison's medical records and relevant deposition transcripts in preparing his expert report.  DiMaio Report, ECF No. 122, Ex. B.  Dr. DiMaio broadly agrees with Dr. Wetli, and concludes that Harrison died of Delirium Tremens.  Id. at 5.  He also concludes the deputies' conduct did not contribute to Harrison's death.  Id.

#### c.   James A. Rael, M.D.

Dr. James Rael is a board-certified internist and was the Medical Director for the Contra Costa County detention facilities for ten years.  He was retained by the County.  He reviewed Harrison's medical records and certain deposition transcripts.  Rael Report, ECF No. 121-3, Ex. B.  He concludes Megan Hast's conduct was "well within the standard of care."  Id. at 1.  He states Hast's attempt to visit Harrison was timely.  Dr. Rael does not consider Hast's decision to return to the housing unit later after her initial visit a delay in care.  Id. at 2.  He also concludes Hast's

United States District Court
Northern District of California

1   conduct with respect to the remaining patients that day was within the standard of care.  Id.

2   ### d.      Robert Jones, M.D.

3       Dr. Robert Jones is a board-certified family practitioner with experience in correctional

4   healthcare.  He was retained by the County.  In his declaration, Dr. Jones expresses the following

5   opinions based on his expertise and his review of the medical records in this case: the healthcare

6   system in place at Glenn Dyer and Santa Rita Jail was "thoughtful, reasonable, and rational";

7   Corizon's policies and procedures were "thoughtful, reasonable and rational" and "[t]hey met or

8   exceeded the standard of care"; Corizon's training program for nurses met the standard of care;

9   Corizon's hiring and retention of Nurse Sancho, and its response to her handling of Harrison's

10  intake screening, were reasonable; Corizon met the standard of care in approving the medical

11  training of sheriff's deputies; Corizon's inmate transfer policy met the standard of care; and the

12  standard of care did not require that Harrison be re-screened at Santa Rita, nor that the initial

13  screening be audited for completeness or correctness.  In addition, Dr. Jones concluded that,

14  "[h]ad Mr. Harrison received medical treatment at any time up until the time he was tazed, he

15  would not have died from alcohol withdrawal in relation to his incarceration."

16  ### e.      Kathryn Wild, R.N.

17      Kathryn Wild is a registered nurse in the state of California and has worked in the

18  correctional healthcare field for the past twenty-eight years.  She was retained by Nurse Sancho.

19  Nurse Wild reviewed Harrison's jail records, medical records, and several deposition transcripts.

20  Wild Report, ECF No. 133-3.  Nurse Wild concludes that the care Nurse Sancho delivered to

21  Harrison during his screening at Glenn Dyer "was within the scope of her practice as a licensed

22  vocational nurse and met the established standard of care expected in an adult correctional facility

23  in California."  Id. at 2.  Nurse Wild takes the position that the screening performed by Nurse

24  Sancho was only meant to identify and meet urgent health needs, none of which Harrison

25  presented at the time.

26  ### f.      Eugene Schoenfeld, M.D.

27      Dr. Eugene Schoenfeld is a psychiatrist with a specialty in psychopharmacology.  He was

28  retained by Nurse Sancho.  Dr. Schoenfeld states that it was "highly unlikely" that Harrison would

United States District Court
Northern District of California

28

1    have consumed more than three ounces of alcohol if he had two beers on August 13, 2010.

2    **V.    EVIDENTIARY OBJECTIONS**

3         Civil Local Rules 7-3(a) and (c) prohibit the filing of separate evidentiary objections to a

4    motion or opposition to a motion filed pursuant to Civil Local Rule 7-1.  Accordingly, the Court

5    strikes as improper, and will not consider, the evidentiary objections filed by the parties at ECF

6    Nos. 161-1 (Sancho), 163-1 (Corizon Health & Dr. Orr), and 164 (Plaintiffs).

7         The County objects to the Plaintiffs' use of portions of their own depositions as

8    inadmissible hearsay.  County MSJ Reply, ECF No. 159 at 1.  That objection is overruled as moot,

9    as the Court does not rely on those portions of the depositions in its ruling.

10   **VI.   LEGAL STANDARD**

11        Summary judgment is proper when a "movant shows that there is no genuine dispute as to

12   any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

13   "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by"

14   citing to depositions, documents, affidavits, or other materials.  Fed. R. Civ. P. 56(c)(1)(A).  A

15   party also may show that such materials "do not establish the absence or presence of a genuine

16   dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R.

17   Civ. P. 56(c)(1)(B).  An issue is "genuine" only if there is sufficient evidence for a reasonable

18   fact-finder to find for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–

19   49 (1986).  A fact is "material" if the fact may affect the outcome of the case.  Id. at 248.  "In

20   considering a motion for summary judgment, the court may not weigh the evidence or make

21   credibility determinations, and is required to draw all inferences in a light most favorable to the

22   non-moving party."  Freeman v. Arpaio, 125 F.3d 732, 735 (9th Cir. 1997).

23        Where the party moving for summary judgment would bear the burden of proof at trial,

24   that party bears the initial burden of producing evidence that would entitle it to a directed verdict if

25   uncontroverted at trial.  See C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc., 213 F.3d 474,

26   480 (9th Cir. 2000).  Where the party moving for summary judgment would not bear the burden of

27   proof at trial, that party bears the initial burden of either producing evidence that negates an

28   essential element of the non-moving party's claim, or showing that the non-moving party does not

United States District Court
Northern District of California

29

United States District Court
Northern District of California

1   have enough evidence of an essential element to carry its ultimate burden of persuasion at trial.  If

2   the moving party satisfies its initial burden of production, then the non-moving party must produce

3   admissible evidence to show that a genuine issue of material fact exists.  See Nissan Fire &

4   Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102–03 (9th Cir. 2000).

5        The non-moving party must "identify with reasonable particularity the evidence that

6   precludes summary judgment." Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996).  Indeed, it is

7   not the duty of the district court to "to scour the record in search of a genuine issue of triable fact."

8   Id.  "A mere scintilla of evidence will not be sufficient to defeat a properly supported motion for

9   summary judgment; rather, the nonmoving party must introduce some significant probative

10  evidence tending to support the complaint." Summers v. Teichert & Son, Inc., 127 F.3d 1150,

11  1152 (9th Cir. 1997) (citation and internal quotation marks omitted).  If the non-moving party fails

12  to make this showing, the moving party is entitled to summary judgment.  Celotex Corp. v.

13  Catrett, 477 U.S. 317, 323 (1986).

14  **VII.   ANALYSIS**

15        Plaintiffs assert claims against Defendants for violation of Harrison's federal

16  constitutional rights; for the violation of Plaintiffs' rights to familial association guaranteed by the

17  Fourteenth Amendment; for violation of California's Bane Act, Cal. Civil Code § 52.1; and for

18  common law negligence, assault, and battery, and violation of California Government Code

19  section 845.6.  Defendants have moved for summary judgment on all of Plaintiffs' claims.

20        **A.     Deliberate Indifference to Serious Medical Needs — Individual Defendants**

21        As a pre-trial detainee, Harrison's rights while in custody of the County derived from the

22  Due Process clause rather than the Eight Amendment's protection against cruel and unusual

23  punishment.  Gibson v. Cnty. of Washoe, 290 F.3d 1175, 1187 (9th Cir. 2002).  "[T]he due

24  process clause imposes, at a minimum, the same duty the Eighth Amendment imposes: 'persons in

25  custody ha[ve] the established right to not have officials remain deliberately indifferent to their

26  serious medical needs.'"  Id. (quoting Carnell v. Grimm, 74 F.3d 977, 979 (9th Cir.1996)).

27        In order to establish a violation of that right, Plaintiffs must establish a "serious medical

28  need" such that "failure to treat a prisoner's condition could result in further significant injury or

the unnecessary and wanton infliction of pain." Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir.

2006). Next, Plaintiffs must show that Defendants' response to the serious medical need was

deliberately indifferent. Id. Deliberate indifference may be established by evidence of "(a) a

purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm

caused by the indifference." Id. Deliberate indifference may be shown where prison officials or

practitioners "deny, delay or intentionally interfere with medical treatment." Hutchinson v. United

States, 838 F.2d 390, 394 (9th Cir. 1988). In contrast, "mere negligence in diagnosing or treating

a medical condition, without more, does not violate a prisoner's Eighth Amendment rights." Id.

See Hunt v. Dental Dept., 865 F.2d 198, 200 (9th Cir. 1989) (prisoner's deliberate indifference

allegations were sufficient where he alleged "prison officials were aware of his bleeding gums,

breaking teeth, and his inability to eat properly, yet failed to take any action to relieve his pain or

to prescribe a soft food diet until new dentures could be fitted."); Baker v. County of Sonoma, No.

08-cv-03433-EDL, 2009 WL 330937, at *4 (N.D. Cal. Feb. 10, 2009) (allegations of prison

officials denying prisoner his pain medication were sufficient to state deliberate indifference

claim).

  "The state of mind for deliberate indifference is subjective recklessness." Snow v.

McDaniel, 681 F.3d 978, 985–86 (9th Cir. 2012). However, the standard is "less stringent in cases

involving a prisoner's medical needs . . . because 'the State's responsibility to provide inmates with

medical care ordinarily does not conflict with competing administrative concerns.'" McGuckin v.

Smith, 974 F.2d 1050, 1060 (9th Cir. 1992) (partially overruled on other grounds) (quoting

Hudson v. McMillian, 503 U.S. 1, 6 (1992)) (alterations omitted) (quoted approvingly in Snow,

681 F.3d at 985). "Similarly, '[i]n deciding whether there has been deliberate indifference to an

inmate's serious medical needs, [courts] need not defer to the judgment of prison doctors or

administrators.'" Snow, 681 F.3d at 985 (quoting Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th

Cir. 1989)). "Although the deliberate indifference doctrine contains a heightened foreseeability

requirement, this requirement differs from the traditional negligence foreseeability requirement

only insofar as deliberate indifference requires the defendant to be *subjectively* aware that *serious*

harm is likely to result from a failure to provide medical care." Gibson, 290 F.3d at 1193.

United States District Court
Northern District of California

The parties do not dispute that alcohol withdrawal and Delirium Tremens constitute a serious medical need.  Instead, Defendants address the second prong, and contend that the evidence taken as a whole and construed in the light most favorable to Plaintiffs does not constitute deliberate indifference to Harrison's serious medical needs.

### 1.      Nurse Sancho

The Ninth Circuit has held that failure to medically screen new inmates may constitute deliberate indifference to medical needs.  Gibson, 290 F.3d at 1189–93 (applying same deliberate indifference standard to municipality that applies to individuals under the Eight Amendment).

Nurse Sancho argues that she could not have been deliberately indifferent to Harrison's medical needs because there was no information from which she could have concluded that Harrison was at risk of alcohol withdrawal, and because Sancho never reached the subjective conclusion that Harrison, in fact, was at risk of alcohol withdrawal.

It is true that to be deliberately indifferent, a detention official must both be aware of the facts from which the inference of a serious medical need could be drawn, and must also draw that inference.  Farmer v. Brennan, 511 U.S. 825, 837 (1994).  However, "deliberate indifference to medical needs may be shown by circumstantial evidence when the facts are sufficient to demonstrate that a defendant actually knew of a risk of harm."  Lolli v. Cnty. of Orange, 351 F.3d 410, 421 (9th Cir. 2003).  "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."  Farmer, 511 U.S. at 842.

In Gibson, the Ninth Circuit held that the plaintiff had presented sufficient evidence for a jury to conclude that a nurse with appropriate medical training who knew an inmate was exhibiting signs of medical illness and possessed psychotropic medication that would have addressed the manic state that led to his heart attack had acted with deliberate indifference to the inmate's needs.  Gibson, 290 F.3d at 1194.  "If the nurse knew that a substantial risk to Gibson's health existed and she declined to act upon this knowledge, she was deliberately indifferent to Gibson's constitutional right to receive medical care."  Id.

United States District Court
Northern District of California

1    Likewise, here, the Court concludes that a reasonable jury could find Sancho was

2    deliberately indifferent to the risk of severe alcohol withdrawal when she failed to initiate a CIWA

3    protocol or otherwise ensure Harrison's medical needs would be addressed.  Sancho testified that

4    she knew Harrison was an alcoholic, that his last drink was earlier the day of his incarceration, that

5    he drank every day, that he smelled of alcohol, that his face was red, and that alcohol withdrawal

6    does not set in for six to eight hours after the patient's last drink.  Sancho also suspected a risk of

7    withdrawal, as she noted on the intake form "with history of alcohol withdrawal" and "CIWA."

8    The evidence is in dispute as to whether Sancho crossed out those notations contemporaneously,

9    or after Harrison actually suffered withdrawal, but even if the strike-out was contemporaneous, the

10   fact that Sancho wrote the notations at all could lead a reasonable jury to conclude that Sancho

11   was subjectively aware of the risk of withdrawal, and nevertheless did nothing.  Of course, there is

12   also sufficient evidence for a reasonably jury to conclude the strike-out was not contemporaneous.

13   Such a finding by the jury would mean that Sancho made a CIWA notation on Harrison's intake

14   form, but failed to initiate the protocol.

15       Sancho also argues that "an isolated incident of neglect does not rise to the level of

16   deliberate indifference," citing <u>Jett v. Penner</u>, 439 F.3d at 1096.  ECF No. 133 at 14-15.  What <u>Jett</u>

17   actually says is that "[i]f the harm is an 'isolated exception' to the defendant's 'overall treatment of

18   the prisoner [it] ordinarily militates against a finding of deliberate indifference.'"  439 F.3d 1091

19   at 1096 (quoting <u>McGuckin v. Smith</u>, 974 F.2d 1050, 1060 (9th Cir. 1991), <u>overruled</u> <u>on</u> <u>other</u>

20   <u>grounds</u> <u>by</u> <u>WMX Techs., Inc. v. Miller</u>, 104 F.3d 1133 (9th Cir. 1997).  Viewing the evidence in

21   the light most favorable to Plaintiffs, Sancho's conduct was not an "isolated exception" to an

22   overall course of treatment that was otherwise adequate, but rather the beginning of a lengthy

23   chain of medical indifference that culminated in Harrison's death.

24       Sancho relies on two decisions in arguing that her conduct does not rise to the level of

25   deliberate indifference.  In <u>Wereb v. Maui Cnty.</u>, 727 F. Supp. 2d 898, 915 (D. Haw. 2010), <u>on</u>

26   <u>reconsideration</u> <u>in</u> <u>part</u>, 830 F. Supp. 2d 1026 (D. Haw. 2011), the court held that prison officials'

27   complete lack of awareness of the inmate's alcoholism that led to his death while in custody

28   precluded a finding of deliberate indifference.  The <u>Wereb</u> case is inapposite because Sancho was

United States District Court
Northern District of California

33

1    aware of Harrison's alcoholism.

2        In Kellogg v. Kitsap Cnty., No. 12-cv-5717-RJB, 2013 WL 4507087, at *5–6 (W.D. Wash.

3    Aug. 22, 2013), a medical provider formed the subjective conclusion that an inmate was an

4    alcoholic at risk of withdrawal, and monitored him.  However, because the provider knew the

5    inmate was being transported to a detoxification facility before severe withdrawal would set in, the

6    provider did not initiate a detoxification protocol.  The inmate suffered a seizure, fell, and suffered

7    an injury to his shoulder.  Although there was evidence suggesting the provider's treatment plan

8    fell below the professional standard of care, the court nonetheless granted summary judgment to

9    the provider because his quality of care did not rise to the level of deliberate indifference.

10       Here, there is sufficient evidence for a jury to conclude that Sancho was subjectively aware

11   of the risk of alcohol withdrawal, but failed nevertheless to fill out a CIWA form, initiate the

12   CIWA protocol, or otherwise ensure Harrison would receive medical help.  Unlike the provider in

13   Kellogg, Sancho did nothing to address Harrison's apparent risk of alcohol withdrawal.  A

14   reasonable jury would be justified in finding that she was deliberately indifferent.

15             **2.    Deputy Ahlf**

16       Unlike Nurse Sancho, Deputy Ahlf was unaware that Harrison was an alcoholic, or that he

17   was at risk of alcohol withdrawal.  The County argues this lack of awareness precludes Plaintiffs'

18   deliberate indifference claim against Deputy Ahlf.

19       Although Deputy Ahlf was unaware of Harrison's specific medical condition, Harrison did

20   request medication from him twice, on two separate occasions.  Subsequently, based on Harrison's

21   bizarre behavior, Deputy Ahlf decided to move Harrison to an isolation cell for his safety and the

22   safety of others.  Although he started an intensive observation log, Deputy Ahlf admits he did not

23   notify any medical professional or CJMH concerning Harrison's behavior.  Instead, he testified

24   that he notified two of his supervisors that they needed to make the referral when someone

25   returned to the mental health office.  Sergeant Shepard does not recall being notified by Deputy

26   Ahlf, and Sergeant Camara has not been deposed in this case.

27       Deputy Ahlf's failure to refer Harrison to CJMH or Corizon Health appears to have

28   contravened several County policies and practices, and the County's Rule 30(b)(6) witness

United States District Court
Northern District of California

34

testified that Harrison's behavior should have led to a "prompt referral" to CJMH.  Had Deputy Ahlf filled out a mental health referral, he would have seen the admonition at the top of the form: "Rule out drug toxicity, alcohol withdrawal, head injury, et cetera, before making a psych referral."  The responsibility to fill out the form was his.  Nevertheless, Deputy Ahlf left his shift without having referred Harrison.  When Deputy Ahlf returned twelve hours later, Harrison still had not been seen by a medical professional or CJMH.

Although it appears that Deputy Ahlf violated a County policy that was in place to deal with Harrison's precise set of circumstances, Deputy Ahlf's failures cannot constitute deliberate indifference because he was not subjectively aware that Harrison's apparent mental illness constituted a serious medical need that could lead to substantial harm.  Notably, Harrison displayed only bizarre behavior, not other symptoms of alcohol withdrawal that could have put Deputy Ahlf on notice of the severity of his situation.

In <u>Gibson</u>, the Ninth Circuit held that a deputy's awareness of an inmate's mental condition based on observations of the inmate's behavior was insufficient to rise to the level of deliberate indifference where the deputy lacked the medical training to diagnose and treat the illness, even though the deputies remarked on the inmate's "peculiar mood swings" and "dramatic shifts from combativeness to compliance."  The Ninth Circuit noted: "The lapses in communication at the jail are hardly commendable, but the deputies who, because of these lapses, remained unaware of Gibson's mental condition cannot be held liable for having been 'deliberately indifferent' to it." <u>Gibson</u>, 290 F.3d at 1197.

The Court could say the same of Deputy Ahlf's conduct here.  After he was screened, Harrison fell through the cracks.  Even after he was transferred to an isolation cell, and subject to constant monitoring, no staff member ensured that Harrison had been referred for appropriate care. He remained in an isolation cell for twelve hours without the attention of a medical professional — medical attention he clearly needed.  The result of this failure in communication was tragic and unnecessary.  Nevertheless, Plaintiffs have failed to adduce sufficient evidence from which a reasonable jury could conclude that Deputy Ahlf himself was deliberately indifferent to a serious medical need of which he was subjectively aware.  Consequently, the Court will grant summary

judgment in favor of Deputy Ahlf with respect to Plaintiffs' deliberate indifference claim.

### 3.   Remaining Deputies

Plaintiffs no longer assert a deliberate indifference claim against the remaining deputies named in this suit.  Consequently, the Court grants summary judgment in their favor with respect to Plaintiffs' deliberate indifference claims.

### 4.   Megan Hast

The crux of Plaintiffs' claim against Hast is that her delay in evaluating Harrison despite knowing of his serious medical needs went beyond mere negligence.

Like Nurse Sancho, and unlike Deputy Ahlf, Megan Hast was aware of Harrison's risk of withdrawal.  Hast learned at 4:00 p.m. on August 16 that Harrison was acting bizarrely, and hallucinating.  She reviewed Harrison's intake form and learned that he was an alcoholic, and formed the subjective belief that Harrison had been initiated on a CIWA protocol.  She waited until 4:30 p.m. to call the housing unit, learned that the deputy was leaving at 5:00 p.m., and arrived at the unit after the deputy had left.  Instead of calling another deputy so she could examine Harrison, she decided Harrison was stable and returned to her office — a conclusion for which there appears to have been no objective basis.  She did not call the housing unit again until 6:00 p.m., at which time she learned in more detail the nature of Harrison's medical condition from Deputy Ahlf.  She did not notify any medical professional of Harrison's condition, and did not visit the housing unit again until after Harrison had been transferred to the hospital.

At the time of her deposition, Hast was unable to account for how she spent her time between 4:00 p.m. and 7:00 p.m., testifying that she "imagined" she was triaging other patients. Though she provides a more detailed account in her declaration in support of the County's motion for summary judgment, it is undisputed that no other patient presented an emergency in the hours between 4:00 p.m. and 7:00 p.m. other than Harrison.  Hast testified, however, that she believed Harrison was already subject to medical care due to the CIWA notation on his intake form, though she did not find any medical records associated with the protocol, as she would have expected to find had the protocol been initiated, and there is no other evidence in the record that would have made her belief objectively reasonable.

36

On this evidence, the Court concludes that a reasonable jury could find that Hast was deliberately indifferent to Harrison's medical needs.  She knew that Harrison was at risk for severe alcohol withdrawal, she knew that the condition requires immediate medical attention, and she knew that Harrison was displaying the symptoms of severe alcohol withdrawal.  Yet she did not notify a medical professional of Harrison's condition, or instruct a deputy to do so, or see him herself.  Moreover, Plaintiffs have identified inconsistencies in Hast's testimony, such as her claiming to have spent more time attending to other inmates than actually elapsed, such that a jury might discount or disregard Hast's explanation of events.  Even crediting her version, however, she purposefully chose to see other inmates instead of Harrison, even though she was aware of evidence that Harrison's situation had become emergent, and even though no other inmate Hast chose to see was at similar medical risk.  A reasonable jury would be entitled to conclude that Hast displayed a purposeful failure to respond to a prisoner's possible medical need, rising to the level of subjective recklessness.  Accordingly, the Court will deny summary judgment with regard to Plaintiffs' deliberate indifference claim against Defendant Hast.

### 5.    Qualified Immunity

Both Hast and Nurse Sancho argue that they are entitled to qualified immunity on Plaintiffs' deliberate indifference to medical needs claims.  However, neither defendant argues that Harrison's right to be free from deliberate indifference to his serious medical needs was not clearly established at the time of his death.  See Pearson v. Callahan, 555 U.S. 223, 244 (2009).  Rather, they argue that Harrison's constitutional rights were not violated in the first instance.  Because the Court has already concluded above that the question of whether there was a violation of Harrison's rights that that is a question of fact for the jury, the Court will deny Hast and Sancho's request for qualified immunity.

### B.    Monell Claims

A municipality may be held liable under a claim brought under § 1983 only when the municipality inflicts an injury; it may not be held liable under a respondeat superior theory.  Monell v. New York City Dept. of Social Services, 436 U.S. 658, 694 (1978).

There are two types of official policies, customs, or patterns that may lead to Monell

United States District Court
Northern District of California

liability: "policies of action and inaction." Tsao v. Desert Palace, Inc., 698 F.3d 1128, 1143 (9th Cir. 2012).  Policies of action are "those that result in the municipality itself violating someone's constitutional rights or instructing its employees to do so."  Id.  By contrast, policies of inaction are those that result, through omission, in the municipality's responsibility "for a constitutional violation committed by one of its employees, even though the municipality's policies were facially constitutional, the municipality did not direct the employee to take the unconstitutional action, and the municipality did not have the state of mind required to prove the underlying violation." Gibson, 290 F.3d at 1186 (emphasis omitted).

"To establish that there is a policy based on a failure to preserve constitutional rights, a plaintiff must show, in addition to a constitutional violation," that the policy amounts to deliberate indifference to the plaintiff's constitutional rights.  Tsao, 698 F.3d at 1143.  To prove deliberate indifference on the part of a municipality, the plaintiff must show that the municipality was on actual or constructive notice that its omission would likely result in a constitutional violation. Farmer, 511 U.S. at 841.

Finally, "[u]nder Monell, a plaintiff must also show that the policy at issue was the 'actionable cause' of the constitutional violation, which requires showing both but for and proximate causation." Tsao, 698 F.3d at 1146.  The "identified deficiency" in the municipality's policies must be "closely related to the ultimate injury." City of Canton v. Harris, 489 U.S. 378, 391 (1989).

### 1.    Alameda County

Plaintiffs assert a Monell claim against Alameda County on the basis of the County's alleged failure to train Deputy Ahlf and Megan Hast in detecting and treating alcohol withdrawal. To the extent Plaintiffs asserted a Monell claim against the County on the basis of the Sheriff's Deputies' use of force, Plaintiffs have abandoned that theory.

"In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983.  A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." Connick v. Thompson, 131 S. Ct.

38

1   1350, 1359 (2011).  Nevertheless, "[i]n order to comply with their duty not to engage in acts

2   evidencing deliberate indifference to inmates' medical and psychiatric needs, jails must provide

3   medical staff who are 'competent to deal with prisoners' problems.'"  Gibson, 290 F.3d 1175,

4   1187 (9th Cir. 2002) (quoting Hoptowit v. Ray, 682 F.2d 1237, 1253 (9th Cir. 1982)).  A failure to

5   train jail staff and police officers may serve as the basis for liability "where the failure to train

6   amounts to deliberate indifference to the rights of persons with whom the police come into

7   contact."  Id. (quotation omitted).  "The issue is whether the training program is adequate and, if it

8   is not, whether such inadequate training can justifiably be said to represent municipal policy."

9   Long v. Cnty. of Los Angeles, 442 F.3d 1178, 1186 (9th Cir. 2006).

10          "Without notice that a course of training is deficient in a particular respect, decisionmakers

11   can hardly be said to have deliberately chosen a training program that will cause violations of

12   constitutional rights."  Connick, 131 S. Ct. at 1360.  Consequently, "[a] pattern of similar

13   constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate

14   deliberate indifference for purposes of failure to train," id. (citation omitted), though "[a] plaintiff

15   also might succeed in proving a failure-to-train claim without showing a pattern of constitutional

16   violations where 'a violation of federal rights may be a highly predictable consequence of a failure

17   to equip law enforcement officers with specific tools to handle recurring situations,'"  Long, 442

18   F.3d at 1186 (quoting Board of County Commissioners v. Brown, 520 U.S. 397, 409 (1997)).  In

19   Long, the Ninth Circuit, quoting Brown, observed:

20               The likelihood that the situation will recur and the predictability that
             an officer lacking specific tools to handle that situation will violate
21           citizens' rights could justify a finding that policymakers' decision not
             to train the officer reflected "deliberate indifference" to the obvious
22           consequence of the policymakers' choice — namely, a violation of a
             specific constitutional or statutory right.
23

24   Id. (quoting Brown, 520 U.S. at 409).  More recently, the Supreme Court has observed that

25   "single-incident" liability will be appropriate only in "a narrow range of circumstances."  Connick,

26   131 S. Ct. at 1361.

27          The Court has already concluded Deputy Ahlf was not deliberately indifferent to

28   Harrison's serious medical needs.  However, that conclusion does not end the inquiry.  In Fairley

v. Luman, 281 F.3d 913, 915 (9th Cir. 2002), the plaintiff was detained for twelve days because he was mistaken for his twin brother.  The jury returned a verdict in favor of the officer defendants, but awarded damages to the plaintiff on his Monell claim against the City of Long Beach.  The Ninth Circuit affirmed the trial court's denial of the city's motion for a new trial because "a city could be liable under § 1983 for improper training or improper procedure even if the individual officer charged with violating the plaintiff's constitutional rights was exonerated."  Id. at 917 (citing Hopkins v. Andaya, 958 F.2d 881, 888 (9th Cir. 1992)).  "If a plaintiff establishes he suffered a constitutional injury *by the City*, the fact that individual officers are exonerated is immaterial to liability under § 1983."  Id. (emphasis in original).  The Ninth Circuit held that the plaintiff had suffered the requisite "constitutional injury" because he "had a liberty interest in being free from a twelve-day incarceration without any procedural safeguard in place to verify the warrant he was detained on was his and in the face of his repeated protests of innocence."  Id. at 918.  With respect to the city's culpability, the Ninth Circuit focused on the police chief's "decision not to instigate any procedures to alleviate the problem of detaining individuals on the wrong warrant," concluding that it "could constitute a policy in light of his testimony he knew it was 'not uncommon' that individuals were arrested on the wrong warrant, and that the problem was particularly acute where twins were involved."  Id. at 919.  See Ostling v. City of Bainbridge Island, No. 11-cv-5219-RBL, 2012 WL 4480550 (W.D. Wash. Sept. 28, 2012) (where officers were exonerated of excessive force claim after fatally shooting schizophrenic, municipality could be liable for failure to train officers in dealing with mentally ill suspects).

Alameda County's "Custody Staff Education" training states that "[a]t least 80% of inmates generally have problems with alcohol and/or other drugs."  Sherwin Decl., Ex. 83 at COR 3846.  Accordingly, the National Commission on Correctional Health Care's ("NCCHC") "Standards for Health Services in Jails" requires that correctional officers who work with inmates receive health-related training biennially, including training in recognizing the signs and symptoms of mental illness.  The correctional facility must keep a certificate or other evidence of attendance "on site for each employee."  Sherwin Decl., Ex. 43 at 37.  Standard J-G-06, regarding intoxication and withdrawal, outlines the dangers of alcohol withdrawal while in custody.  The

1   standard explains: "Deaths from acute intoxication or severe withdrawal have occurred in

2   correctional institutions . . . .  Training for correctional officers includes recognizing the signs and

3   symptoms of intoxication and withdrawal . . . ."  Id. at 105.

4          The County's policies appear to adopt some of these standards.  Corizon policy J-G-08,

5   which references NCCHC standard J-G-08 and other standards promulgated by the American

6   Correctional Association ("ACA"), discusses "Inmates with Alcohol and other Drug Problems."

7   Sherwin Decl., Ex. 45.  It states that "[t]he custody staff is trained in recognizing AOD problems

8   in inmates" and that "[t]here is communication and coordination between medical, mental health,

9   and opioid treatment program (NTP) staff regarding AOD care."  Id.  The County's Policy and

10  Procedure 13.01 likewise provides for the training of correctional officers by Corizon in

11  recognizing the signs and symptoms of emotional disturbances and chemical dependency.

12  Sherwin Decl., Ex. 46.

13         Plaintiffs argue that the County failed adequately to implement these training policies, and

14  they have submitted significant evidence supporting those claims.

15         Dr. Orr testified that "Corizon doesn't provide a direct training with the -- for the Alameda

16  County Sheriff's Office," and its Regional Medical Director is "not certain of what the content of

17  their health care instruction is for the custody staff."  Sherwin Decl., Ex. 15, Orr PMK Dep.

18  101:15–19.  Corizon's Nurse Terri Granlund, who has worked for Corizon for 24 years, testified

19  that she was not aware of any training provided to sheriff's deputies by Corizon concerning

20  alcohol withdrawal, mental illness, or alcohol dependency.  Sherwin Decl., Ex. 35, Granlund Dep.

21  10:2–12:18.

22         Sergeant Cynthia Sass was designated the County's person most knowledgeable

23  "regarding the training policies and procedures, from 2007 to the present, concerning assessing,

24  examining, treating, or providing care to inmates with possible alcohol withdrawal, detoxification

25  of inmates who are alcohol dependent, preventing alcohol withdrawal in inmates, and handling

26  inmates who are experiencing alcohol withdrawal."  Sherwin Decl., Ex. 48, Sass PMK Dep. 8:3–

27  13.  Sergeant Sass characterized the County's level of training of deputies regarding alcohol

28  withdrawal as "very little."  Id. 17:7.  According to Sergeant Sass, the "information is rather

United States District Court
Northern District of California

United States District Court
Northern District of California

cursory." Id. 17:18.  The training block dealing with chemical dependency "would last maybe 20 minutes," so Sergeant Sass had difficulty remembering the details of what is covered in the training.  Id. 22:14–15.  She could not, at her deposition, specifically recall any training deputies receive from Corizon that helps them recognize the signs and symptoms of chemical dependency.  Id. 22:20–21.  She testified that the County trains deputies in recognizing the signs and symptoms of alcohol withdrawal "cursorily."  Id. 28:20.  Sergeant Sass also testified that, though County policy states officers are trained to respond to health-related situations within four minutes, "I don't know that the four minutes is something that is a training point."  Id. 19:18–19.

At her deposition, Megan Hast, who is employed by the County's Criminal Justice Mental Health office, testified that, since graduate school, she had not received any training regarding recognizing the signs and symptoms of alcohol withdrawal.[4]  Hast Dep. 14:3–23.  Hast was able to recall what Delirium Tremens is from knowledge she gained in her graduate school classes.[5]  Id. 15:9–12.

Additionally, Sergeant Sass was unable to recall any policy, procedure, guideline, or training bulletin providing for medical or mental health staff to inform sheriff's deputies when a person is at risk of alcohol withdrawal.  Sass PMK Dep. 34:6–21.  Nurse Granlund also testified that there is no mechanism at Santa Rita Jail for informing custody staff that a particular inmate is at risk of going into alcohol withdrawal.  Granlund Dep. 21:2–18.

This testimony led Plaintiffs' expert, Dr. Burns, to conclude that Deputy Ahlf's inadequate training at the jail resulted in his failure to summon medical or mental health staff, and that the County failed to train jail staff to detect the signs and symptoms of alcohol withdrawal.  Dr. Burns

---

[4] At her deposition, Hast testified that the symptoms of alcohol withdrawal were discussed at staff meetings; she was equivocal about whether the meetings constituted "training."  Hast Depo. 17:1–21.  Viewing the facts in the light most favorable to Plaintiffs, a reasonable jury could find that these informal staff meetings did not constitute "training" in alcohol withdrawal.

[5] The Court previously described Hast's personal knowledge of the symptoms of alcohol withdrawal and the need for immediate medical attention.  The extent of Hast's personal knowledge, which came from a variety of sources, is a separate question from the adequacy of her training by the County.  Also, to the extent that either the facts or Plaintiffs' theories are in conflict, these conflicts are better resolved by a jury.

United States District Court
Northern District of California

1    also concluded that the County failed adequately to train CJMH staff, including Hast, in triaging

2    and responding to emergency referrals.

3           The County argues that Deputy Ahlf's training log demonstrates that he completed several

4    training courses, including an eighty-hour "Jail Operations Core Course" in 2006 and "Continued

5    Professional Training" courses in 2007 and 2009.  Deputy Ahlf's training log confirms that he

6    received these trainings, but does not describe their content.  Sherwin Decl., Ex. 44.  The outline

7    for the 2009 Continued Professional Training produced by the County includes a section regarding

8    the signs and symptoms of "medical emergencies / sudden illness."  It does not appear to discuss

9    alcohol withdrawal in particular.  Ly Decl. ISO County MSJ Reply, ECF No. 159, Ex. V at ACSO

10   1587.  A training outline for the "Emergency Action Plan" training Deputy Ahlf received in 2009

11   includes a section on "[s]igns and symptoms of mental illness, violent behavior, and acute

12   chemical intoxication and withdrawal."  Ly Decl., Ex. W at ACSO 1671.  Finally, an exam

13   Deputy Ahlf took as part of the eighty-hour course he took in 2006 includes questions about

14   substance abuse and withdrawal.  Ly Decl., Ex. X.[6]

15          The County also characterizes the same portions of Sergeant Sass' testimony as evidence

16   that the training she described as "cursory" occurred, but Plaintiffs do not dispute that these

17   trainings occurred; they argue the trainings were inadequate.

18          The only other evidence in the record the County points to regarding this issue is the

19   deposition transcript of Deputy Rojas, who testified that he was trained in recognizing the signs of

20   alcohol withdrawal prior to August 16, 2010.  Rojas Dep. 56–57.  His testimony on this point is

21   superficial.

22          Taking the evidence in the record as a whole, and construing all disputed facts in favor of

23   Plaintiffs, the Court finds that a triable issue remains with respect to the County's liability for

24

25   ---

[6] Plaintiffs object to the County's reliance on this evidence, submitted in conjunction with the

26   County's reply brief, because it was not submitted with the County's opening brief.  The Court
     overrules the objection; the evidence is within the scope of the issues raised by Plaintiffs'

27   opposition brief and was available to Plaintiffs prior to the filing of the brief.  In any case, because
     the Court will deny summary judgment with respect to Plaintiffs' <u>Monell</u> claims against the

28   County, the objection is moot.

failure adequately to train Deputy Ahlf and Megan Hast, and for failure to adopt or implement policies regarding the communication of medical information between medical and custodial staff.

As in Gibson, "a jury could conclude that County policymakers knew that inevitably some prisoners arrive at the jail with urgent health problems requiring hospitalization." Gibson, 290 F.3d at 1190. Here, the County was on notice of the dangers of alcohol withdrawal in inmates, a recurring problem in correctional facilities. Indeed, its own policies appear to provide for training that, a reasonable jury could find, was never provided, or was not provided adequately. See Long, 442 F.3d at 1186 ("The issue is whether the training program is adequate and, if it is not, whether such inadequate training can justifiably be said to represent municipal policy."); Munger v. City of Glasgow Police Dep't, 227 F.3d 1082, 1088 (9th Cir. 2000) (holding city may be liable for "the failure to train officers regarding appropriate assistance and treatment of intoxicated persons").

Plaintiffs may prevail at trial on their failure to train claim without showing a pattern of constitutional violations because a jury may find that the failure to provide Harrison adequate medical care — a constitutional right held by pre-trial detainees — was a "'highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations,'" Long, 442 F.3d at 1186 (quoting Board of County Commissioners v. Brown, 520 U.S. 397, 409 (1997)).

Finally, a reasonable jury could conclude that the County's policy and practice failures were the "actionable cause" of, or "moving force" behind, the County's failure to provide adequate medical care to Harrison. Tsao, 698 F.3d at 1146. As discussed above, there were several opportunities for County personnel to prevent the onset of Delirium Tremens, or, at a minimum, to detect its onset, provide adequate treatment, and transfer Harrison to a hospital in compliance with national and County standards.

For these reasons, the Court will deny the County's motion for summary judgment with respect to Plaintiffs' Monell claims against it arising out of its training concerning alcohol withdrawal. Because Plaintiffs have abandoned the theory, the Court will grant summary judgment to the extent Plaintiffs assert a Monell claim against the County premised on the use of force by the Sheriff's Deputies against Harrison.

### 2.   Corizon Health

A plaintiff may assert <u>Monell</u> claims against a private entity contracting with a municipality provided the private entity (1) "acted under color of state law, [] (2) [] a constitutional violation occurred, [and (3)] the violation was caused by an official policy or custom . . . ." <u>Tsao</u>, 698 F.3d 1128, 1139 (9th Cir. 2012).  Corizon Health does not dispute the first element, but argues that Plaintiffs have failed to adduce sufficient evidence concerning constitutional violations and policies or customs that led to the alleged violations.

Plaintiffs point to a number of national standards and Corizon policies that Plaintiffs maintain were not implemented, or were implemented in an unsatisfactory manner, by Corizon, as the basis of their <u>Monell</u> claim.

As discussed above, NCCHC and ACA standards require that correctional officers who work with inmates receive health-related training biennially, including training in recognizing the signs and symptoms of mental illness.  Sherwin Decl., Ex. 43 at 37.  The County appears to have attempted to implement some of these standards through the adoption of certain policies.  Corizon policy J-G-08, which references NCCHC standard J-G-08 and other standards promulgated by the American Correctional Association ("ACA"), discusses "Inmates with Alcohol and other Drug Problems."  Sherwin Decl., Ex. 45.  It states that "[t]he custody staff is trained in recognizing AOD problems in inmates" and that "[t]here is communication and coordination between medical, mental health, and opioid treatment program (NTP) staff regarding AOD care."  <u>Id.</u>  The County's Policy and Procedure 13.01 likewise provides for the training of correctional officers by Corizon in recognizing the signs and symptoms of emotional disturbances and chemical dependency. Sherwin Decl., Ex. 46.

As previously noted, Dr. Orr testified that "Corizon doesn't provide a direct training with the -- for the Alameda County Sheriff's Office" and is "not certain of what the content of their health care instruction is for the custody staff," and Nurse Granlund testified that she was not aware of any training provided to Sheriff's deputies by Corizon concerning alcohol withdrawal, mental illness, or alcohol dependency.  <u>See</u> Part VII.B.1., <u>supra</u>.  Nurse Granlund also testified that she was not aware of any Corizon policy or mechanism for informing custody staff to check

1   for signs and symptoms of alcohol withdrawal.  Id. 21:9–13.

2          The same NCCHC standards also require the screening of inmates on all intra-system

3   transfers by a qualified healthcare professional within twelve hours of arrival to ensure continuity

4   of care.  Sherwin Decl., Ex. 43 at 63 (Standard J-E-03).  The relevant standard states that it is

5   "intended to ensure that inmates continue to receive appropriate health services for health needs

6   already identified . . . ."  Id. at 64.  Corizon Policy J-E-03 implements this standard, though it

7   provides that if an inmate is transferred "within a short timeframe from the date of initial

8   screening" the initial screening will suffice.  Sherwin Decl., Ex. 50.  There is no evidence that

9   Harrison received such a screening after his transfer to Santa Rita Jail.  Nurse Sancho's supervisor,

10  Lenore Gilbert, testified that the exception in the Corizon policy for transfer shortly after initial

11  screening would have applied to Harrison.  Gilbert PMK Dep. 107:11–25.  She also testified that

12  post-transfer review is generally limited to a review for the physical presence of the required

13  forms in the medical file.  Id. 105:19–106:13.

14         NCCHC Standard J-G-06 sets out protocols for inmates undergoing alcohol withdrawal.  It

15  provides that detoxification is "done only under physician supervision . . . ."  There is no evidence

16  that Harrison's withdrawal was monitored by a physician.

17         The Standard further requires that "[i]nmates experiencing severe, life-threatening

18  intoxication (overdose) or withdrawal are transferred immediately to a licensed acute care

19  facility."  Inmates at risk for progression to more severe levels of withdrawal must be "kept under

20  constant observation by qualified health care professionals or health-trained correctional staff, and

21  whenever severe withdrawal symptoms are observed, a physician is consulted promptly."  In the

22  discussion section, Standard J-G-06 states: "As a precaution, severe withdrawal syndromes must

23  never be managed outside of a hospital."  Corizon Policy No. 153 provides that detoxification

24  shall be carried out on site, and that all inmates demonstrating signs and symptoms of alcohol

25  withdrawal be seen by a physician.  Sherwin Decl., Ex. 44.  The policy provides that patients with

26  severe, life-threatening alcohol withdrawal be transferred to a hospital immediately.  Id.

27         Dr. Orr's testimony on this point is contradictory.  He testified that severe alcohol

28  withdrawal is managed in the jail.  Orr PMK Dep. 70:15–19.  However, he also testified that

United States District Court
Northern District of California

1  Corizon would transfer an inmate with Delirium Tremens to a hospital, but that the management

2  would continue in the jail if the patient is eating and taking medication.  Id. 71–73.  Such an

3  inmate would be monitored for improvement.  Dr. Orr also testified that he may have transferred

4  Harrison to a hospital when he was exhibiting severe alcohol withdrawal, but that Corizon policy

5  does not require it.  Id. 74–75.  Nurse Granlund testified that an inmate in severe alcohol

6  withdrawal or Delirium Tremens would "not necessarily" be transferred to a hospital.  Granlund

7  Dep. 27:1–4.  She testified that inmates in the past suffering from severe alcohol withdrawal or

8  Delirium Tremens have not been transferred to a hospital.  Id. 27:10–13.

9  The Corizon policy also requires that inmates undergoing alcohol withdrawal be kept

10  under "constant observation."  Dr. Orr testified that Corizon complies with this policy because

11  inmates undergoing alcohol withdrawal are seen by a nurse once in every eight-hour shift, or three

12  times a day.  Orr PMK Dep. 162:9–15.

13  Finally, Corizon's contract with the County requires that screenings be performed for all

14  inmates "by a licensed registered nurse (RN) or a licensed vocational nurse under the supervision

15  of an RN . . . ."  Sherwin Decl., Ex. 39 (original emphasis).  The County's NCCHC accreditation

16  report from June 2008 states that "[t]rained registered nurses complete receiving screening."

17  Sherwin Decl., Ex. 41 at COR 4333.  Nurse Sancho is a licensed vocational nurse, but not a

18  registered nurse; she failed the registered nurse's examination twice.  Sancho Dep. 17:12–21:19.

19  Ms. Gilbert testified that "it could be possible that [at] Glenn Dyer an LVN would be working in

20  booking.  It could be possible on another Friday night that an RN is working.  It just depends on

21  the specific scheduling of the supervisor at that time."  Gilbert PMK Dep. 146:4–9.  However,

22  "there was an RN present in the facility that was available to work with that LVN as needed at all

23  times."  Id. 146:12–19.  That RN, the charge nurse, may be responsible for over a dozen staff in

24  the entire facility, and may never enter the booking area during a given shift.  Id. 147:11–148:21.

25  Corizon's responses to Plaintiffs' allegations provide merely a different gloss on the same

26  evidence.  For example, Corizon argues that the charge nurse supervision is medically adequate.

27  Corizon also argues that Plaintiffs cannot prove causation because, for example, had Sancho been

28  supervised directly by a registered nurse, Plaintiffs cannot prove that the screening would have

United States District Court
Northern District of California

47

1   resulted in a different outcome, and that Plaintiffs cannot prove that a chart review after Harrison

2   was transferred to Santa Rita Jail would have resulted in identification of Sancho's errors.

3          These arguments overstate Plaintiffs' burden on summary judgment, which Plaintiffs have

4   met.

5          First, it is not clear that any affirmative causation evidence is even required — in this case,

6   Corizon's own policies, as reflected in its contract with the County and the County's NCCHC

7   accreditation report, were obviously designed to guard against exactly the chain of events that

8   transpired here.  As the Ninth Circuit has said on similar facts, "[a]n evaluation by a trained

9   medical staff member surely would have revealed [the decedent's] condition."  Gibson, 290 F.3d

10  at 1189–90.

11         Second, Corizon's own witnesses have provided sufficient evidence from which a jury

12  could reasonably conclude that Corizon's failure to supervise Sancho was a substantial factor in

13  causing Harrison's death.  Bill Wilson, Corizon's Health Services Administrator, described

14  Sancho's intake as "an egregious breach of medical care," Sherwin Decl., Ex. 34 at 178, that "the

15  intake screening is a minimum data set of what every professional is expected to gather," id., and

16  that Sancho's failure to perform an adequate screening "without a doubt" jeopardized Harrison's

17  safety.  Id. at 181.  A reasonable jury could conclude that supervision by a properly trained

18  registered nurse would more probably than not have avoided the lack of diagnosis and failure to

19  provide medical care that Plaintiffs contend led to Harrison's death.

20         For these reasons, and construing the record in the light most favorable to Plaintiffs, the

21  Court will deny summary judgment on Plaintiffs' Monell claim against Corizon based on

22  Corizon's allegedly deliberately indifferent policies and practices.[7]

23  _____

24  [7] By contrast, Plaintiffs' Monell claim against Corizon for its hiring and retention of Nurse Sancho
    does not present a triable issue of fact for the jury.  A hiring and retention claim, or "inadequate
25  screening" claim, must be subjected to "rigorous standards of culpability and causation . . . to
    ensure that the municipality is not held liable solely for the actions of its employee."  Bd. of Cnty.
26  Comm'rs of Bryan Cnty., Okl. v. Brown, 520 U.S. 397, 405 (1997).  In Brown, the Supreme Court
    rejected the equivalent treatment of inadequate screening cases and failure to train cases.  There,
27  even a failure to inquire into the prior misdemeanor charges against an officer who ultimately used
    excessive force could not constitute deliberate indifference absent further facts linking the city's
28  inadequate screening to the injury.  A finding of deliberate indifference in an inadequate screening

United States District Court
Northern District of California

C.      Supervisory Liability — Dr. Orr

The Ninth Circuit has "long permitted plaintiffs to hold supervisors individually liable in § 1983 suits when culpable action, or inaction, is directly attributed to them." Starr v. Baca, 652 F.3d 1202, 1205 (9th Cir. 2011), cert. den'd, 132 S. Ct. 2102 (2012). The supervisor need not be "physically present when the injury occurred." Id. Supervisory liability may attach based on the supervisor's "'own culpable action or inaction in the training, supervision, or control of his subordinates,' 'his acquiescence in the constitutional deprivations of which the complaint is made,' or 'conduct that showed a reckless or callous indifference to the rights of others.'" Id. at 1205–06 (quoting Larez v. City of Los Angeles, 946 F.2d 630 (9th Cir. 1991)).

At the time of Harrison's death, Dr. Orr was Corizon's Regional Medical Director; he oversaw Corizon's operations at all Alameda County jails. Orr PMK Dep. 14:19–16:18. He was responsible for policymaking at Corizon. He testified that he was responsible for ensuring that Corizon's policies were followed, and making changes in Corizon policy. Id. at 21:11–21. Dr. Orr testified there is no Corizon Health employee more senior than he is with respect to policymaking in Alameda County jails, though the Alameda County Public Health Department has authority to implement policy changes as well, over his objections. Id. at 23.

In light of the factual basis for Plaintiffs' Monell claim against Corizon, discussed above, Dr. Orr seeks summary judgment for the same reasons Corizon does. Those arguments are unavailing. As Corizon's Regional Medical Director, and given his responsibilities to ensure that Corizon's existing policies were followed and that changes in those policies were made when necessary, Dr. Orr had ultimate responsibility for avoiding the failures which Plaintiffs allege occurred at Glenn Dyer Detention Facility and Santa Rita Jail. Dr. Orr was on actual notice of the

---

case "must depend on a finding that *this* officer was highly likely to inflict the *particular* injury suffered by the plaintiff." Id. at 412.

Here, Plaintiffs' inadequate screening claim is premised almost exclusively on Sancho's conduct toward Harrison and the fact that she had previously failed the registered nurse's exam twice. Pursuant to Brown, that evidence is insufficient to present the claim to a jury.

However, the Court must nevertheless deny summary judgment with respect to Plaintiffs' Monell claim against Corizon for the reasons stated above.

dangers associated with improper screening, lack of training, and lack of adequate medical care for inmates suffering from severe alcohol withdrawal, as the national standards and Corizon policies evidence.  And Corizon's alleged failures to alter the policies or their implementation are attributable to him.  A reasonable jury may find that Dr. Orr was aware of the failure to implement policies Corizon and the NCCHC adopted, that he ratified or caused the failure, and that his inaction and omissions amounted to deliberate indifference to the serious medical needs of inmates in Harrison's circumstances.  See, e.g., Clement v. Gomez, 298 F.3d 898, 905 (9th Cir. 2002) (denial of summary judgment on supervisory liability claim was appropriate where supervisors "failed to institute adequate prison policies for minimizing the effects of pepper spray on bystander inmates").

The Court will deny the motion to grant summary judgment in Dr. Orr's favor with respect to the supervisory liability claims.

### D.    Excessive Force

The Constitution protects pre-trial detainees from use of force that amounts to punishment. Gibson, 290 F.3d at 1197 (citing Graham v. Connor, 490 U.S. 386, 395 n.10 (1989)).  Determining whether an officer's use of force was reasonable "requires a careful balancing of the nature and quality of the intrusion on the individual's interests against the countervailing government interests at stake."  Id. (quoting Graham, 490 U.S. at 396).  The analysis requires "careful attention to the facts and circumstances in each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight."  Graham, 490 U.S. at 396.  In Graham, the Supreme Court advised courts to examine the circumstances underlying an excessive force claim from the viewpoint of a reasonable[8] officer on the scene "rather than with the 20/20 vision of hindsight."  Id.  Police officers "are not required to use the least intrusive

---

[8] At oral argument, the County urged the Court to take into account the Sheriff's Deputies' intent in this case with respect to Plaintiffs' excessive force claims, but "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  Lolli, 351 F.3d at 415 (citing Graham, 490 U.S. at 397).

degree of force possible." Rather, "the inquiry is whether the force that was used to effect a particular seizure was reasonable." Forrester v. City of San Diego, 25 F.3d 804, 807 (9th Cir. 1994).

Because it is so dependent on determinations of fact and credibility, whether excessive force has been used is ordinarily a question of fact reserved for the jury. Santos v. Gates, 287 F.3d 846, 853 (9th Cir. 2002) ("Because [the excessive force inquiry] nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly."); Smith v. City of Hemet, 394 F.3d 689, 701 (9th Cir. 2005) ("This is because such cases almost always turn on a jury's credibility determinations.")

### 1.   Deputy Ahlf

The County relies heavily on Gibson v. Cnty. of Washoe, supra, in arguing that the evidence in this case is insufficient to permit a reasonable jury to conclude that any deputy used excessive force. In Gibson, a manic inmate fought violently with officers as he was transferred to a special watch cell. "[O]nce the deputies began to restrain Gibson and move him to the special watch cell, he fought back vigorously. No more than three minutes passed from the time the deputies brought Gibson into the special watch cell and his death. During that time, Gibson was fighting hard against the deputies' efforts to restrain him, creating precisely the kind of situation in which officers must make split-second decisions." Gibson, 290 F.3d at 1198.

During the struggle, the inmate "assumed a fighting stance with his fists up and shouted obscenities" at the officers. Id. at 1182. The officers decided to move the inmate to the special watch cell. One officer pepper-sprayed the inmate while others attempted to control him and hold him down. In one officer's words:

> We put him on his stomach. And he was still at this point kicking and screaming and fighting and everything and yelling at us and he was, for being pepper sprayed twice . . . this guy had an incredible amount of fight in him. I mean just huge amount of fight 'cause here were are, at this time, I don't remember how many deputies were on him, but I was trying to control his head, his left shoulder blade, his left forearm, and I remember Deputy Cloud was right to my right on his back and he like jumped, I mean lifted himself off the bed . . . I mean, this guy was fighting.

Id. at 1183.  Although Gibson ultimately died of a heart attack related to this manic episode and struggle, the Ninth Circuit concluded that, "[u]nder all the circumstances, the deputies' decisions under these difficult circumstances resulted in restraining Gibson no more forcefully than was reasonably necessary."  Id. at 1198.

The present case is distinguishable from Gibson in several important respects.

First, "where there is no need for force, *any* force used is constitutionally unreasonable." Lolli v. Cnty. of Orange, 351 F.3d 410, 417 (9th Cir. 2003) (emphasis added) (quoting Headwaters Forest Def. v. County of Humboldt, 211 F.3d 1121, 1132 n.5 (9th Cir. 2000)).  "[I]t is the need for force which is at the heart of the consideration of the Graham factors."  Alexander v. City & Cnty. of San Francisco, 29 F.3d 1355, 1367 (9th Cir. 1994).  Here, Harrison was secure in his cell at the time Deputy Ahlf decided to move him.  Unlike the inmate in Gibson, Harrison was not attempting to harm an officer or otherwise committing a crime.  Though Harrison had flooded his cell and broken a food tray, he did not, at the time Deputy Ahlf opened the cell door, pose "an immediate threat to the safety of the officers or others."  Graham, 490 U.S. at 396.  Nor was he "actively resisting arrest or attempting to evade arrest by flight."  Id.

Given these facts, Deputy Ahlf's supervisors questioned his "lapse in judgment" in attempting to move Harrison, who was obviously mentally ill, without backup, and without handcuffing Harrison through the port in the cell door.  While attempting to handcuff Harrison, Deputy Ahlf pushed Harrison into the cell based on Harrison's "unsettling, blank stare."  As Harrison moved back toward Deputy Ahlf, the deputy discharged his Taser.  Viewed in the light most favorable to Plaintiffs, the evidence suggests that even then, Harrison may not have been attempting to hurt the deputy, but rather ran out of the cell and slipped, falling to the ground.  The evidence also suggests Deputy Ahlf deployed his Taser a second time.  Deputy Ahlf cannot account for the Taser log, and cannot explain what happened in the intervening seconds that caused him to fire his Taser a second time.  Plaintiffs' police practices expert concludes that Deputy Ahlf's conduct was the cause of the ensuing injuries Harrison suffered.

Taken as a whole, Plaintiffs' evidence undermines Deputy Ahlf's account of how the

altercation began.  Thus, unlike the inmate in <u>Gibson</u>, a jury could conclude Deputy Ahlf was at fault for the succeeding events, and that Harrison did not initiate the altercation.  In addition, Harrison had a second opportunity to avoid the encounter by closing the cell door after pushing Harrison into the cell and calling for backup.  No such opportunity presented itself in <u>Gibson</u>.

Second, unlike with the inmate in <u>Gibson</u>, no evidence in this case suggests that Harrison actually fought, though he apparently resisted vigorously.  Nor is there evidence of any harm to any of the officers caused by Harrison.  The need for force in such a situation is necessarily lower than the need in a situation where the inmate is actively and violently fighting an officer.

Third, "[t]he problems posed by, and thus the tactics to be employed against, an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal who has recently committed a serious offense.  In the former instance, increasing the use of force may, in some circumstances at least, exacerbate the situation; in the latter, a heightened use of less-than-lethal force will usually be helpful in bringing a dangerous situation to a swift end."  <u>Deorle v. Rutherford</u>, 272 F.3d 1272, 1282–83 (9th Cir. 2001).  For this reason, the Ninth Circuit "emphasize[s] that where it is or should be apparent to the officers that the individual involved is emotionally disturbed, that is a factor that must be considered in determining, under <u>Graham</u>, the reasonableness of the force employed."  <u>Id.</u>  Deputy Ahlf had already been acquainted with Harrison, knew he was mentally ill, and discussed his mental state with Hast prior to the altercation.[9]  These facts weigh against granting summary judgment.

Fourth, the quantum of force used was not at issue in <u>Gibson</u>.  The Ninth Circuit's <u>Gibson</u> decision does not indicate that any deputy struck the inmate, much less used the level of force at issue here.  In this case, there is significant contradictory evidence concerning which deputies

---

[9] Like Harrison, Gibson was also unarmed and mentally ill when he was taken into custody.  Unlike Harrison, however, he not only fought with officers both during and after his arrest, but he had been pointing a gun and twirling a large knife in the events before his arrest, and he had threatened his wife.  <u>Gibson</u>, 290 F.3d at 1180–81.

United States District Court
Northern District of California

United States District Court
Northern District of California

struck Harrison, how many times, and how hard.  Indeed, Plaintiffs maintain that the deputies' testimony does not account for all the injuries contained in Harrison's autopsy report.  Plaintiffs' expert, John Ryan, concluded that Deputy Ahlf used excessive force even before other deputies arrived because the use of the Taser and "hard hand" blows exceeded the amount of force Deputy Ahlf needed to use to control Harrison.

The County also argues that the deputies could not have caused Harrison's death, and therefore Harrison did not suffer damages from the deputies' use of force.  Force is not required to be lethal to qualify as excessive.  If Plaintiffs can establish at trial that the deputies used excessive force, the question of whether the force led to Harrison's death or merely to some of his injuries will be a question of fact for the jury.

For these reasons, the Court concludes that summary judgment must be denied with respect to Plaintiffs' excessive force claims against Deputy Ahlf.  A reasonable jury could conclude that the quantum of force used was objectively unreasonable and that the force was unnecessary, and therefore unconstitutional.

### 2.       The Remaining Deputies

The County argues that none of the remaining Sheriff's Deputies can be liable for excessive force because no deputy can be liable for the force used by another, and no single deputy employed objectively unreasonable force.  Taken to its logical conclusion, the County's argument suggests that, no matter the quantum of the total force used against Harrison, no single deputy could ever be liable for it.

It is true that an officer must be an "integral participant" in the violation.  Boyd v. Benton Cnty., 374 F.3d 773, 780 (9th Cir. 2004) (officers were integral participants in use of excessive force where they provided armed backup to officer who unconstitutionally deployed flash-bang, were "aware of the decision to use the flash-bang, did not object to it, and participated in the search operation knowing the flash-bang was to be deployed").  But Plaintiffs are not required to allocate evidence of each individual deputy's participation in the manner Defendants claim.

The Lolli decision, supra, is instructive.  In that case, the plaintiff was beaten by several officers.  The Ninth Circuit held that the plaintiff did not need to identify "precisely which officer

54

delivered which alleged blow or use of force" because the plaintiff had "developed and presented sufficient evidence from which a jury could infer that the individual officers who had physical contact with Lolli participated in the alleged beating." Lolli, 351 F.3d at 417.

The same rule applies here. As in Lolli, Plaintiffs have "developed and presented sufficient evidence from which a jury could infer that the individual officers who had physical contact with [Harrison] participated in the alleged beating." Id. Nothing more is required for summary judgment to be denied.

On this record, Plaintiffs are also entitled to argue that deputies who were present had a duty to intervene to prevent the use of excessive force against Harrison, even if not all of them integrally participated in the application of force. "[P]olice officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen." United States v. Koon, 34 F.3d 1416, 1447 n.25 (9th Cir. 1994), rev'd on other grounds, 518 U.S. 81 (1996). "[O]fficers can be held liable for failing to intercede only if they had an opportunity to intercede." Cunningham v. Gates, 229 F.3d 1271, 1289 (9th Cir. 2000) (holding officers did not have a "realistic opportunity" to intervene because they were not present at the time of the shooting). Liability for failure to intervene may extend to officers who did not take any affirmative action to contribute to the excessive force. See Robins v. Meecham, 60 F.3d 1436, 1442 (9th Cir. 1995). For example, in Lolli, a sergeant "admitted that he observed the deputies struggling with Lolli, but he did not become involved or give orders." 351 F.3d at 418. The Ninth Circuit held that the sergeant was not entitled to summary judgment because the evidence could support a claim that he failed to intervene.

Here, the County argues only that no deputy testified to seeing any force that was unreasonable or excessive, and that certain deputies used less force than could amount to excessive force; therefore, argues the County, a failure to intervene claim cannot survive. These arguments must be decided by a jury. Each deputy was present at some point during the altercation, and each deputy admits, at a minimum, to participating in the effort to control Harrison by touching him in some way, though with different amounts of force or compliance techniques. Thus, Plaintiffs' failure to intervene claim with respect to each deputy is sufficient to survive

summary judgment.  The questions of when each deputy arrived, what each deputy witnessed, whether there was a violation of Harrison's constitutional rights, and whether each deputy either failed to intervene in, or was an integral participant in the violation of Harrison's rights are questions for the trier of fact.

### 3.    Qualified Immunity

Qualified immunity is an affirmative defense that "shield[s] an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." Pearson v. Callahan, 555 U.S. 223, 244 (2009).  Courts utilize a two-step analysis to determine whether officers are entitled to qualified immunity.  "First, a court must decide whether the facts that a plaintiff has alleged . . . or shown . . . make out a violation of a constitutional right." Id. at 232.  The Court has already determined, as discussed above, that, taking Plaintiffs' allegations and facts in the light most favorable to Plaintiffs, they have established the violation of a constitutional right.

"Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." Id.  To be a clearly established constitutional right, a right must be sufficiently clear "that every reasonable official would [have understood] that what he is doing violates that right." Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012) (citation and internal quotation marks omitted).  Plaintiffs "bear[] the burden of proving that the right allegedly violated was clearly established at the time of the official's allegedly impermissible conduct." Camarillo v. McCarthy, 998 F.2d 638, 640 (9th Cir. 1993).

The Court finds that the Sheriff's Deputies are not entitled to qualified immunity in this case for their alleged use of excessive force.  The Ninth Circuit's decision in Lolli is again, instructive.  There, after concluding that the plaintiff had presented sufficient evidence to show that the extent of force used was excessive, the Ninth Circuit rejected the officers' qualified immunity argument "[b]ecause of the factual disputes that Lolli has identified." Lolli, 351 F.3d at 421.  Like in Lolli, the core issue for Plaintiffs' excessive force claim is a factual determination of the extent of force that was used, and whether that amount of force was excessive given the

United States District Court
Northern District of California

circumstances.  In such situations, a determination on qualified immunity will rarely be

appropriate at summary judgment, particularly where the force involved traditional forms of force,

*i.e.* striking and compliance techniques.  See Santos v. Gates, 287 F.3d 846, 855 (9th Cir. 2002)

(quoting Saucier v. Katz, 533 U.S. 194, 205 (2001)) ("[W]hether the officers may be said to have

made a 'reasonable mistake' of fact or law, may depend on the jury's resolution of disputed facts

and the inferences it draws therefrom.  Until the jury makes those decisions, we cannot know, for

example, how much force was used, and, thus, whether a reasonable officer could have mistakenly

believed that the use of that degree of force was lawful."); Walker v. Jones, No. 08-cv-0757-CRB,

2010 WL 3702659 (N.D. Cal. Sept. 16, 2010) ("Viewing the facts in the light most favorable to

plaintiff, it cannot be said that a reasonable officer in defendants' position would have believed

that hitting, kicking and stepping on plaintiff's face after he was handcuffed was reasonably

necessary to maintain discipline and order."); Rosenblatt v. City of Hillsborough, No. 12-cv-

05210-LB, 2013 WL 6001346, at *15 (N.D. Cal. Nov. 12, 2013) (officers were not entitled to

qualified immunity for use of excessive force because "the issues of disputed fact preclude a

determination at this point" on qualified immunity, and "Defendants' argument relies on their

version of the facts"); McCloskey v. Courtnier, No. 05-cv-4641-MMC, 2012 WL 646219, at *3

(N.D. Cal. Feb. 28, 2012) ("[B]ecause the facts relevant to the issue of qualified immunity are

inextricably intertwined with the disputed facts relevant to the issue of excessive force, defendants

are not entitled to summary adjudication on the issue of qualified immunity. ").

The County's reliance on Ninth Circuit decisions finding qualified immunity for the use of

a Taser is unavailing.  The County's argument depends on separating the use of Tasers from the

rest of the altercation.  But Plaintiffs premise their excessive force claim here on the combination

of the different types of force used in this case, not simply the use of Tasers, and it is the "totality

of force" that must be evaluated in an excessive force case.  Smith v. City of Hemet, 394 F.3d at

703.  The County's authorities are therefore inapposite.

For these reasons, the Court cannot conclude at this juncture that the Sheriff's Deputies are

entitled to qualified immunity on Plaintiffs' excessive force claim.

57

### E.  Loss of Familial Association

#### 1.  Excessive Force

Plaintiffs assert against each Sheriff's Deputy a claim for violation of their Fourteenth Amendment right to be free from interference with their relationship with their father.  That claim is premised on the same facts as Plaintiffs' excessive force claim.[10]  Despite the County's arguments to the contrary, "the law in this circuit is quite clear: a child has a substantive due process right in her relationship with her parents which may be vindicated through a Section 1983 action."  Ovando v. City of Los Angeles, 92 F. Supp. 2d 1011, 1018 (C.D. Cal. 2000) (citing Smith v. City of Fontana, 818 F.2d 1411, 1420 (9th Cir. 1987) overruled on other grounds by Hodgers-Durgin v. de la Vina, 199 F.3d 1037 (9th Cir. 1999)).

However, the Fourteenth Amendment inquiry is distinct from a Fourth Amendment excessive force claim.  Under the Fourteenth Amendment, "only official conduct that 'shocks the conscience' is cognizable as a due process violation."  Porter v. Osborn, 546 F.3d 1131, 1137 (9th Cir. 2008).  "Where actual deliberation is practical, then an officer's 'deliberate indifference' may suffice to shock the conscience."  Wilkinson v. Torres, 610 F.3d 546, 554 (9th Cir. 2010).  "On the other hand, where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives."  Id.

Here, the parties agree the "purpose to harm" standard applies with respect to the force used by the Sheriff's Deputies.  In an excessive force case, a purpose to harm is "'the intent to inflict force beyond that which is required by a legitimate law enforcement objective.'"  Porter, 546 F.3d at 1140.  Here, because the facts are in dispute regarding the events of August 16, 2013, the Court cannot conclude as a matter of law that the Sheriff's Deputies did not act with a "purpose to harm."  Based on the material disputes of fact concerning the extent of force used, the credibility of the Sheriff's Deputies' testimony, the nature of Harrison's injuries, the degree to

---

[10] The Court does not address Plaintiffs' deliberate indifference to serious medical needs claim against the Sheriff's Deputies as a basis for their Fourteenth Amendment familial association claim, as the Court has already concluded as a matter of law that judgment must enter in favor of Defendants on that claim.

1   which the force was necessary, and the degree to which Deputy Ahlf was responsible for the

2   unnecessary use of force, and construing the evidence in the light most favorable to Plaintiffs, the

3   Court concludes that a trier of fact could find that the use of force was both constitutionally

4   excessive and inflicted with a purpose to harm.  See, e.g., Dorger v. City of Napa, No. 12-cv-

5   00440-WHO, 2013 WL 5804544, at *9 (N.D. Cal. Oct. 24, 2013).

6        Further, the same disputes of material fact preclude the Court from finding that the

7   Sheriff's Deputies are entitled to qualified immunity, as the "intent to inflict force beyond that

8   which is required by a legitimate law enforcement objective" would constitute a clearly

9   established violation of Plaintiffs' constitutional rights.

10                    **2.        Deliberate Indifference**

11        The standard that applies to Plaintiffs' familial association claim against the Sheriff's

12   Deputies for their use of force is different than that which applies to Plaintiffs' claim against Hast

13   and Nurse Sancho premised on their alleged deliberate indifference to Harrison's serious medical

14   needs.  Unlike the "purpose to harm" standard that governs Fourteenth Amendment claims where

15   an official "makes a snap judgment because of an escalating situation," Wilkinson, 610 F.3d at

16   554, where "actual deliberation is practical," deliberate indifference is sufficient to support a

17   Fourteenth Amendment claim.  Id.  The Supreme Court has contrasted, for example, an officer's

18   decision to give chase to a fleeing suspect with "the luxury enjoyed by prison officials of having

19   time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated

20   by the pulls of competing obligations."  Cnty. of Sacramento v. Lewis, 523 U.S. 833, 853 (1998)

21   (holding "purpose to harm" standard applied to high-speed police chase); see also Porter, 546 F.3d

22   at 1139 (citing Lee v. City of Los Angeles, 250 F.3d 668, 684 (9th Cir. 2001) (noting "where

23   officers have ample time to correct their obviously mistaken detention of the wrong individual, but

24   nonetheless fail to do so, the suspect's family members need only plead deliberate indifference to

25   state a claim under the due process right to familial association").

26        The Court concludes that the "deliberate indifference" standard applies to Plaintiffs'

27   familial association claims against Defendants Hast and Sancho.  Because the Court has already

28   concluded that Plaintiffs have adduced sufficient evidence to deny summary judgment on their

United States District Court
Northern District of California

United States District Court
Northern District of California

1   deliberate indifference claims, the Court will deny summary judgment as to their familial

2   association claim as well.

3   **3. Qualified Immunity**

4   Defendants' arguments concerning qualified immunity on Plaintiffs' familial association

5   claim echo their arguments concerning the underlying conduct challenged by Plaintiffs. No

6   Defendant makes a distinct argument concerning whether the alleged violation of Plaintiffs' rights

7   was prohibited by clearly established law. For this reason, the Court will deny qualified immunity

8   with respect to Plaintiffs' familial association claims against the Sheriff's Deputies arising out of

9   the use of force and against Hast and Sancho arising out of deliberate indifference to Harrison's

10   serious medical needs.

11   **F. Bane Act, California Civil Code Section 52.1**

12   Each Defendant moves for summary judgment on Plaintiffs' claim for violation of

13   California's Bane Act, Cal. Civ. Code § 52.1. The Bane Act provides a private right of action for

14   damages against any person, whether acting under color of law or not, who interferes or attempts

15   to interfere "by threats, intimidation, or coercion, with the exercise or enjoyment by any individual

16   or individuals of rights secured by the Constitution or laws of the United States, or of the rights

17   secured by the Constitution or laws" of California.

18   The County argues that Plaintiffs have not adduced sufficient evidence to establish an

19   excessive force claim, and therefore no Bane Act violation may follow. As the Court has already

20   discussed, Plaintiffs have established a triable issue of fact with respect to the excessive force

21   claims against each of the Sheriff's Deputies. The Court will deny the County's motion for

22   summary judgment on that ground.[11]

23   _____

24   [11] The County also suggests that Plaintiffs lack standing to assert a Bane Act claim because the
     Bane Act "is simply not a wrongful death provision." County MSJ at 41(quoting Bay Area Rapid

25   Transit Dist. v.Super. Ct., 38 Cal. App. 4th 141 (1995)). The Court does not understand Plaintiffs
     to have asserted a Bane Act claim for injuries they sustained, but rather, for the injuries sustained

26   by the decedent Harrison as his heirs, pursuant to California's survival statute. See Cal. Code Civ.
     P. § 377.20. A survival Bane Act claim, unlike a wrongful death Bane Act claim, is permissible.

27   Dela Torre v. City of Salinas, No. 09-cv-00626-RMW, 2010 WL 3743762, at *7 (N.D. Cal. Sept.
     17, 2010); Medrano v. Kern Cnty. Sheriff's Officer, 921 F. Supp. 2d 1009, 1016 (E.D. Cal. 2013)

28   (citing cases).

United States District Court
Northern District of California

1   The Corizon Defendants and Sancho argue that none of them interfered or attempted to

2   interfere with Mr. Harrison's rights "by threats, intimidation or coercion" as required by the Bane

3   Act.[12]  Sancho's motion appears to disregard this Court's prior ruling that deliberate indifference

4   to an inmate's medical needs is adequate to satisfy the "threats, intimidation, or coercion"

5   requirement of the Bane Act.  ECF No. 76.  Corizon acknowledges the Court's prior ruling, ECF

6   No. 134 at 9, but argues that Plaintiffs have failed to introduce adequate evidence of deliberate

7   indifference.  Id.

8   Because the Court has already concluded that Plaintiffs are entitled to present their

9   deliberate indifference claims to a jury, and for the reasons set forth in its prior order, ECF No. 76,

10   the Court will deny the Corizon Defendants' and Sancho's motions for summary judgment as to

11   Plaintiffs' Bane Act claims.[13]  For the same reasons, the Court will deny summary judgment on

12   Plaintiffs' Bane Act claim against Defendant Hast.

13   **G.     Negligence, Assault, and Battery as to the County Defendants**

14   In their opposition to the County's motion for summary judgment, Plaintiffs premise their

15   negligence claim against the County Defendants solely on the allegedly excessive force used by

16   the Sheriff's Deputies.

17   To establish the negligence of a police officer under California law, a plaintiff must

18   demonstrate that (1) the officer owed the plaintiff a duty of care, (2) the officer breached the duty

19   by failing to use such skill, prudence, and diligence as other members of the profession commonly

---

21   [12] The Corizon Defendants make the additional argument that Plaintiffs' Bane Act claim is
22   untimely, because it was brought more than two years after Harrison's injury.  Judge Wilken
    rejected Defendants' arguments that Plaintiffs' claims are barred by the statute of limitations when she
23   granted Plaintiffs' Motion to Amend on November 12, 2012.  ECF No. 45.  The Court declines to
24   revisit its prior ruling on this point.

25   [13] Defendants point to the Court's order granting summary judgment on the plaintiff's Bane Act
    claim in Ashley v. Cnty. of San Francisco, No. 12-cv-00045-JST, 2013 WL 6185523, at *11 (N.D.
26   Cal. Nov. 26, 2013), as support for the proposition that deliberate indifference to serious medical
    needs does not constitute a violation of the Bane Act.  The portion of the decision Defendants rely
27   upon has been superseded.  See Ashley v. Cnty. of San Francisco, No. 12-cv-00045-JST, ECF No.
    132 (N.D. Cal. Feb. 4, 2014) (Amended Order Granting in Part and Denying in Part Motion for
28   Summary Judgment).

United States District Court
Northern District of California

1  possess and exercise, (3) there was a proximate causal connection between the officer's negligent

2  conduct and the resulting injury to the plaintiff, and (4) the officer's negligence resulted in actual

3  loss or damage to the plaintiff.  Harris v. Smith, 157 Cal. App. 3d 100, 104 (1984).  The question

4  of whether a duty has been breached is normally a question of fact.  Hernandez v. KWPH

5  Enterprises, 116 Cal. App. 4th 170, 175 (2004).

6       Here, the parties agree that the negligence and excessive force analyses merge.  Because

7  the Court denies summary judgment with respect to Plaintiffs' excessive force claim against the

8  Sheriff's Deputies, it will also deny summary judgment on Plaintiffs' negligence claim against the

9  officers.  See, e.g., Knapps v. City of Oakland, 647 F. Supp. 2d 1129, 1165 (N.D. Cal. 2009).

10      The parties also agree that a viable excessive force claim precludes summary judgment

11  with respect to Plaintiffs' assault and battery claims against the Sheriff's Deputies.  For the same

12  reason, the Court will deny summary judgment on those claims.  See, e.g., id. at 1166–67;

13      The County also argues that it is immune from vicarious liability for the Sheriff's

14  Deputies' conduct.  That is not the case.  Under the California Tort Claims Act, Cal. Gov't Code,

15  § 810 et seq., a public entity is not liable for injury arising from an act or omission except as

16  provided by statute.  Section 815.2(a) provides that "[a] public entity is liable for injury

17  proximately caused by an act or omission of an employee of the public entity within the scope of

18  his employment if the act or omission would, apart from this section, have given rise to a cause of

19  action against that employee[.]"  Cal. Gov't Code § 815.2.  "This provision clearly allows for

20  vicarious liability of a public entity when one of its police officers uses excessive force in making

21  an arrest."  Blankenhorn v. City of Orange, 485 F.3d 463, 488 (9th Cir. 2007).

22       Finally, the Court notes that Plaintiffs do not attempt to support their negligence claim

23  against Ms. Hast in opposition to the County's motion for summary judgment.  Accordingly, the

24  Court will enter summary judgment for defendant Hast on that claim.

25       **H.     Negligence as to Nurse Sancho and the Corizon Defendants**

26      In opposition to the motion for summary judgment filed by Nurse Sancho, Plaintiffs agreed

27  to dismiss their negligence claim against her.  Accordingly, the Court will grant summary

28  judgment in Nurse Sancho's favor on that claim.

In a letter brief concerning whether Plaintiffs' counsel will be required to testify at trial with respect to the statute of limitations, Plaintiffs agreed to dismiss their negligence claims against the Corizon Defendants as well.  ECF No. 290 at 3.  Accordingly, the Court will grant summary judgment in the Corizon Defendants' favor on that claim as well.

## I.    California Government Code Section 845.6

Plaintiffs assert a claim for violation of California Government Code section 845.6 against Deputy Ahlf, Defendant Hast, and the County.[14]  The statute provides in relevant part,

> Neither a public entity nor a public employee is liable for injury proximately caused by the failure of the employee to furnish or obtain medical care for a prisoner in his custody; but, except as otherwise provided by Sections 855.8 and 856, a public employee, and the public entity where the employee is acting within the scope of his employment, is liable if the employee knows or has reason to know that the prisoner is in need of immediate medical care and he fails to take reasonable action to summon such medical care.

Cal. Gov't Code § 845.6.  The County Defendants first argue that they are immune from liability for a violation of section 845.6 by virtue of the immunity provision at Government Code sections 855.6, which, *inter alia*, confers immunity on public employees and entities for injury caused by "the failure to make a physical or mental examination."  But on its face, section 855.6 does not apply to Plaintiffs' claims arising out of the failure to "summon medical care"; only to the failure to "make a physical or mental examination."  The statute is therefore inapplicable to Plaintiffs' section 845.6 claim.[15]  See, e.g., Lum v. Cnty. of San Joaquin, 756 F. Supp. 2d 1243, 1257 (E.D. Cal. 2010) (holding section 855.6 inapplicable where plaintiff alleged a "failure to refer decedent for evaluation rather than a failure as a result of diagnosis or treatment").

Turning to the merits of Plaintiffs' section 845.6 claim, "[i]n order to state a claim under §

---

[14] The Court previously dismissed Plaintiffs' claim against Corizon for violation of California Government Code section 845.6.  ECF No. 76 at 12.

[15] Moreover, the Law Revision Commission notes to section 855.6 state that the statute is meant to confer "immunity for failure to perform adequately public health examinations, such as public tuberculosis examinations, physical examinations to determine the qualifications of boxers and other athletes, and eye examinations for vehicle operator applicants.  It does not apply to examinations for the purpose of treatment such as are made in doctors' offices and public hospitals. In those situations, the ordinary rules of liability would apply."

United States District Court
Northern District of California

845.6, a prisoner must establish three elements: (1) the public employee knew or had reason to know of the need (2) for immediate medical care, and (3) failed to reasonably summon such care." Jett, 439 F.3d at 1099.  In this manner, section 845.6 imposes "a statutory duty to summon medical care."  Watson v. State of California, 21 Cal. App. 4th 836, 841 (1993).  However, liability is "limited" to the failure to summon care for "serious and obvious medical conditions requiring immediate care" of which the defendant has "actual or constructive knowledge."  Id. California courts consider section 845.6 "a broad general immunity," id., and the statute "does not impose a duty to monitor the quality of care provided," Jett, 439 F.3d at 1099.  Nor does the statute impose liability for any failure in diagnosis or treatment.  Watson, 21 Cal. App. 4th at 842.

In connection with Plaintiffs' deliberate indifference claim, the Court previously found that Deputy Ahlf's failure to summon medical care for Harrison may have violated several County policies and procedures, but that there is no evidence in the record that Deputy Ahlf was subjectively aware of Harrison's medical condition.  While Deputy Ahlf was aware that Harrison was acting bizarrely, he did not know that Harrison was an alcoholic, nor is there any evidence from which a jury could conclude that Deputy Ahlf knew Harrison was suffering from withdrawal. For these reasons, Deputy Ahlf is entitled to summary judgment on his deliberate indifference claim.  See Gibson, 290 F.3d at 1193 ("Although the deliberate indifference doctrine contains a heightened foreseeability requirement, this requirement differs from the traditional negligence foreseeability requirement only insofar as deliberate indifference requires the defendant to be *subjectively* aware that *serious* harm is likely to result from a failure to provide medical care.").

However, section 845.6 imposes liability for a failure to reasonably summon medical care for a serious medical need of which the defendant has actual *or constructive* knowledge.  See, e.g., Watson, 21 Cal. App. 4th at 841; Zeilman v. Cnty. of Kern, 168 Cal. App. 3d 1174, 1184 (1985) ("[Q]uestions about jail personnel's actual *or constructive* knowledge of a prisoner's need for immediate medical care as well as the reasonableness of actions taken to meet this need are factual questions.") (emphasis added); Johnson v. Cnty. of Los Angeles, 143 Cal. App. 3d 298, 317 (1983) ("[T]he questions of Sheriffs' actual or constructive knowledge of Decedent's need for immediate care, and of Sheriffs' reasonable action to summon or not to summon such care, are

questions of fact to be determined at trial."). The objective knowledge standard under the state law claim therefore reaches conduct that Plaintiffs' federal claim does not. See Lucas v. Cnty. of Los Angeles, 47 Cal. App. 4th 277, 288 (1996) (holding federal court's dismissal of deliberate indifference claim did not constitute res judicata for plaintiff's section 845.6 claim, in part, because of differing knowledge requirements).

The Court finds, viewing the evidence in the light most favorable to Plaintiffs, that a reasonable jury could conclude that Deputy Ahlf should have known that Harrison was suffering from a "serious and obvious medical condition[] requiring immediate care," Watson, 21 Cal. App. 4th at 841, both when he first placed Harrison in the isolation cell and when he failed to summon medical care rather than enter Harrison's cell twelve hours later. The Court also concludes that a reasonable jury could find that Deputy Ahlf's failure to do so was unreasonable, and, as the Court has already concluded, genuine issues of material fact remain with respect to Harrison's cause of death, rendering the question of causation appropriate for the jury.

With respect to Defendant Hast, however, summary judgment is appropriate. Section 845.6 simply does not extend to a failure to diagnose or treat, which is Plaintiffs' only complaint arising out of Hast's conduct.

## VIII.   CONCLUSION

For the foregoing reasons, the Court hereby GRANTS IN PART Defendants' motions for summary judgment. Judgment will be entered in Defendants' favor as to the following claims:

1.      Plaintiffs' First Cause of Action — 42 U.S.C. § 1983 — as against the Sheriff's Deputies for deliberate indifference to Harrison's serious medical needs and for loss of familial association stemming from deliberate indifference to Harrison's serious medical needs;

2.      Plaintiffs' Second Cause of Action — Monell liability — as against the County in connection with the use of force against Harrison, and as against Corizon and Dr. Orr in connection with the hiring and retention of Nurse Sancho;

3.      Plaintiffs' Third Cause of Action — Cal. Civil Code § 52.1 — as against the Sheriff's Deputies for violation of Harrison's civil rights concerning medical care;

4.      Plaintiffs' Fourth Cause of Action — Negligence — as against Defendants Hast,

United States District Court
Northern District of California

65

Sancho, Corizon Health, and Dr. Orr; and

     5.      Plaintiffs' Sixth Cause of Action — Cal. Gov't Code § 845.6 — as against Defendant Hast in connection with Harrison's medical care.

     In all other respects, the motions for summary judgment are hereby DENIED.

     **IT IS SO ORDERED.**

Dated: April 11, 2014

_____

JON S. TIGAR
United States District Judge