1   MICHAEL J. HADDAD/ State Bar #189114
    JULIA SHERWIN/State Bar #189268
2   GENEVIEVE K. GUERTIN/State Bar #262479
    T. KENNEDY HELM/State Bar #282319
3   HADDAD & SHERWIN
    505 Seventeenth Street
4   Oakland, CA 94612
    Telephone:    (510) 452-5500
5   Facsimile:    (510) 452-5510
6
7   Attorneys for Plaintiffs Joseph Harrison, Krystle
    Harrison, Martin Harrison, Jr., and Tiffany Harrison
8
9                 UNITED STATES DISTRICT COURT
10          FOR THE NORTHERN DISTRICT OF CALIFORNIA
11

| | |
|---|---|
| 12 M.H., a minor, through his Guardian Ad Litem, ) | |
| 13 Michelle Henshaw, JOSEPH HARRISON, KRYSTLE ) | Case No. C11-2868 JST (MEJ) |
| HARRISON, MARTIN HARRISON, JR., and ) | |
| 14 TIFFANY HARRISON, all Individually and as Co- ) | |
| Successors in Interest of Decedent MARTIN ) | |
| 15 HARRISON, ) | **PLAINTIFFS' MOTIONS IN LIMINE** |
| 16 ) | |
| Plaintiffs, ) | |
| 17 vs. ) | **Trial Date: January 20, 2015** |
| COUNTY OF ALAMEDA, a municipal corporation; ) | **Time: 8:30 a.m.** |
| 18 SHERIFF GREGORY J. AHERN, in his individual and ) | **Courtroom:  9** |
| official capacities; DEPUTIES MATTHEW AHLF, ) | **Judge:  Hon. Jon S. Tigar** |
| 19 ALEJANDRO VALVERDE, JOSHUA SWETNAM, ) | **Pretrial Conference:  January 5, 2015,** |
| 20 ROBERTO MARTINEZ, ZACHARY LITVINCHUK, ) | **9:30 a.m.** |
| RYAN MADIGAN, MICHAEL BARENO, ) | |
| 21 FERNANDO ROJAS-CASTANEDA, SHAWN ) | |
| 22 SOBRERO, SOLOMON UNUBUN; MEGAN HAST, ) | |
| A.S.W.; CORIZON HEALTH, INC., a Delaware ) | |
| 23 corporation; HAROLD ORR, M.D.; ZELDA ) | |
| SANCHO, L.V.N.; and DOES 5-20, individually, ) | |
| 24 jointly and severally, ) | |
| 25 ) | |
| Defendants. ) | |
| 26 _____ ) | |

27
28

Plaintiffs, by and through their attorneys, HADDAD & SHERWIN and FRIEDMAN RUBIN, hereby bring the following motions in limine, in omnibus form pursuant to this Court's Order of April 9, 2014 (Doc. 294):

**FIRST MOTION IN LIMINE FOR CORIZON FINANCIAL INFORMATION, F. RULE CIV. PROC. 30(B)(6) DEPOSITION AND PERMISSION TO NAME AN EXPERT WITNESS CONCERNING CORIZON'S FINANCIAL CONDITION**

Plaintiffs tried to raise this issue in a joint discovery letter, beginning in October 2014.  The Corizon Defendants have failed to provide their final section of the joint discovery letter.  Plaintiffs therefore submit this request as their First Motion in Limine.  Plaintiffs hereby request an Order from this Court requiring:  1) further financial information from the Corizon Defendants; 2) a F.R.Civ.P. 30(b)(6) deposition concerning the relationships between Corizon entities and their financial condition, and 3)  Plaintiffs' request to name an expert witness concerning Corizon's financial condition.  Given Corizon's designation of its financial information as "confidential" at this time, Plaintiffs will only email that information to the Court and not file it in the public court record.

On March 31, 2014, this Court ordered 1) Defendant Corizon to produce Corizon Health Inc.'s and/or Prison Health Service's annual balance sheets, annual statements of income, annual statements of cash flow, annual profit and loss statements, and annual shareholder reports for the two most recent available fiscal years, and 2) should such documents for a more recent fiscal year become available prior to the conclusion of trial, Corizon must produce those immediately.  (Doc. 291, p. 3).

Defendants produced a total of four pieces of paper, purporting to consist of unaudited "balance sheets" for December 31, 2012 and December 31, 2013, and unaudited "consolidated statements of operations" for the years ended 2012 and 2013.  Defendants designated these documents "confidential, pursuant to protective order."  (Sherwin Decl. Exhibit A, to be submitted to Chambers only given the "confidential" designation of the documents).  The financial information Corizon produced was part of the consolidated financial statements of its parent corporation, Valitas Health Services, Inc.

1    Defendants produced no statements of cash flow or shareholder reports, asserting they have

2    none.  Defendants' four sheets of paper grossly understate Corizon's revenues.

3    Plaintiffs have conducted an extensive investigation of publicly available information

4    concerning Corizon's revenues, and in 2013 alone, its revenues should have been far in excess of

5    $1.2 billion.  (*See*, Declaration of Breana Montgomery and Exhibits A through C thereto).

6    When Corizon formed in 2011, through the merger of Prison Health Services and

7    Correctional Medical Services, Inc., Corizon's parent company issued a press release announcing

8    that it expected annual revenues for 2011 alone to be approximately $1.4 billion.  (Sherwin Decl.

9    Exhibit B, trial exhibit 56, 3/3/11 Press Release).  In 2011, Corizon reported that it served 400

10   correctional facilities.  Today, it reports that it serves 114 public agencies with 534 correctional

11   facilities and 345,000 jail and prison inmates in 27 states.  (Montgomery Decl. Exhibit C).   Its

12   revenues should far exceed the $1.2 billion found online by Plaintiffs.

13   On October 22, 2014, Plaintiffs sent Defendants Plaintiffs' section of a joint letter

14   concerning Plaintiffs' request for further discovery concerning Corizon's financial condition.

15   (Sherwin Decl. Exhibit D, Emails re: Corizon financial information, p. 9).

16   Breana Montgomery, a paralegal with the office of Haddad & Sherwin, spent 140 hours

17   searching public records for Corizon's contracts and payment information nationally.  Corizon

18   states on its website (www.corizonhealth.com) that it has contracts with 114 clients.  Starting with

19   Corizon's website, Ms. Montgomery was able to find information in public records, Corizon news

20   releases, newspaper articles, Corizon contracts, and public entity vendor payment records for 36 of

21   Corizon's clients, which demonstrate that Corizon was paid by those clients alone in excess of $1.2

22   billion in 2013.  Ms. Montgomery initially learned that these 36 public agencies were Corizon's

23   clients by looking at Corizon's own website where it shows the locations of its contracts.

24   (Montgomery Decl. ¶¶ 4-7 and exhibits thereto).

25   On November 7, 2014, Corizon provided Plaintiffs with its section of the joint letter along

26   with a declaration of Jeff Sholey, the Corizon Health, Inc., Vice President, Corporate Controller and

27   interim Chief Financial Officer.  (Sherwin Decl. Exhibit C, Sholey Decl, and Exhibit D, p. 4).  Mr.

28   Sholey declares that Corizon Health, Inc., and Corizon, Inc., "were separate corporations" in 2012

     and 2013.  (Sherwin Decl. Ex. C).  Mr. Sholey further declares that both corporations were wholly

1    owned subsidiaries of "Valitas" and "were, in essence, sister corporations."  Mr. Sholey's

2    declaration states nothing about 2014 or the current corporate status of Corizon.  (Sherwin Decl. Ex.

3    C).

4           Since the Corizon Health, Inc., website, www.corizonhealth.com, listed contracts that

5    Defendants asserted were contracts with Corizon, Inc., Plaintiffs requested clarification from

6    Defendants.  On November 9, 2014, in response to Mr. Sholey's declaration, Plaintiffs requested

7    that Defendants provide the following information:

8

9        1)  a declaration setting forth the relationship between "Valitas," Valitas Health Services, Inc.,
            Corizon Health, Inc., Corizon, Inc., and a new corporation Plaintiffs' counsel found
10           Defendants had formed in December 2013, Corizon, LLC;
         2)  the complete annual financial statements of Valitas Health Services, Inc., from which the
11           four pages of Corizon Health, Inc., financial information were excerpted;
         3)  organizational charts showing the present relationships between the entities; and
12       4)  the updated financial information this Court ordered Defendants to provide.  (Sherwin Decl.
             Exhibit D, 11/9/14 Sherwin email to Hudgins).
13

14   (Sherwin Decl. Ex. D, pp. 3-4).  On November 10, 2014, Corizon's counsel responded, stating that

15   2014 financial information was unavailable, Plaintiffs had not requested discovery of the newly

16   disclosed corporate entities during discovery, and "I've got a busy practice and I don't have time or

17   the manpower to run down all the rest of this for you." (*Id*. at p. 4).

18          Plaintiffs' counsel researched the relationships between Corizon and its related entities, and

19   sent another joint letter, and a declaration of Julia Sherwin with exhibits showing the alter ego

20   relationships between the Corizon entities, to defense counsel on November 13, 2014.  Defense

21   counsel responded:  "Good grief.  About to get on a plane.  I'll take a look at this tomorrow."

22   (Sherwin Decl. Ex. D, p. 2).  On November 18, 2014, not having receive any response from the

23   Corizon Defendants, Plaintiffs' counsel sent a followup email asking when they could expect

24   Defendants' section of the joint letter.  (Sherwin Decl. Ex. D, p. 1).  As of this writing, Plaintiffs'

25   counsel have received no response.  Plaintiffs therefore file this Motion in Limine.

26          Both Corizon Health, Inc. and Corizon, Inc., use the same website without any discussion of

27   the existence of separate entities, www.corizonhealth.com.  That website lists contract locations

28   where both Corizon Health, Inc., and Corizon, Inc. have contracts, for its representation that

"Corizon Health" has 114 contracts around the country.  For example, the contract with Alameda

County is with "Corizon Health, Inc."  The contract with the Arizona Department of Corrections is nominally with "Corizon, Inc."  However, Corizon issued press releases from its www.corizonhealth.com website about both contracts, with the same language, same Chief Executive Officer, and same statement "About Corizon":  "Corizon Health provides quality healthcare services to 114 clients at 534 facilities across the country serving approximately 345,000 inmates in 27 states.  With its corporate headquarters in Brentwood, Tenn. and regional offices in St. Louis and Jefferson City, Mo., Corizon Health is the leading provider of correctional healthcare services in the United States.  For more information, please visit www.corizonhealth.com [http://www.corizonhealth.com]."  (Sherwin Decl. Exhibit E, Corizon website press releases).

Furthermore, in 2012 through 2014, Corizon Health, Inc. and Corizon, Inc. shared the same address (105 Westpark Drive, Suite 200, Brentwood TN), officers and directors:

| Year | Corizon Health, Inc. | Corizon, Inc. |
|------|----------------------|---------------|
| 2012 | Richard Hallworth, Chief Executive Officer, and also Director | Richard Hallworth, Chief Executive Officer, and also Director |
| 2012 | J. Scott King, Secretary | J. Scott King, Secretary |
| 2012 | James T. Sprouse, Treasurer | James T. Sprouse, Treasurer |
| 2012 | Stuart Campbell, "other" officer and also Director | Stuart Campbell, President and also Director |
| 2013 | Richard Hallworth, Chief Executive Officer, and also Director | Richard Hallworth, Chief Executive Officer, and also Director |
| 2013 | J. Scott King, Secretary | J. Scott King, Secretary |
| 2013 | Martin Moore, Treasurer | Martin Moore, Treasurer |
| 2013 | Stuart Campbell, "other" officer and also Director | Stuart Campbell, President and also Director |
| 2014 | Woodrow A. Myers, Jr., M.D., | Woodrow A. Myers, Jr., M.D., |

| | | |
|---|---|---|
| | Chief Executive Officer, and also Director | Chief Executive Officer, and also Director |
| 2014 | J. Scott King, Secretary | J. Scott King, Secretary |
| 2014 | Martin Moore, Treasurer, and also Director | Martin Moore, Treasurer |

(Sherwin Decl. Exhibit F, Corizon Health, Inc., and Corizon, Inc. 2012-2014 annual reports to the State of Arizona Corporation Commission).

While Corizon Health, Inc., owns the Word Mark for the Corizon logo, (Sherwin Decl. Exhibit G), both Corizon Health, Inc. and Corizon, Inc. use the same Word Mark.  For example, in its Executive Summary and all communications to the State of Arizona that Plaintiffs' counsel could find on that state's website, (https://procure.az.gov/bso/external/purchaseorder/poSummary.sdo?docId=ADOC13-041943&releaseNbr=0&parentUrl=contract), Corizon, Inc. used the Corizon Health, Inc.-owned company logo.

Indeed, in its January 3, 2012, Executive Summary of its proposal for the privatization of Arizona's prison healthcare, Corizon, Inc. told the Arizona Department of Corrections that Corizon Health, Inc. and Corizon, Inc. were one healthcare provider:

**Our Depth of Resources and Experience**

**Corizon, Inc. (f/k/a Correctional Medical Services, Inc.) and Corizon Health, Inc. (f/k/a PHS Correctional Healthcare), collectively referred to hereinafter as "Corizon"** unless specified otherwise, provides the ADC [Arizona Department of Corrections] with what we believe to be the best the private correctional field has to offer – the two (2) industry pioneers – combined into one, ***best-in-class healthcare provider***.  As the ADC is aware, Corizon is the result of the merger between the parent companies of Correctional Medical Services, Inc. (CMS) and PHS Correctional Healthcare (PHS).  Specifically, in June of 2011, the merger of the organizations was finalized bringing the two (2) sister companies, Corizon, Inc. and Corizon Health, Inc. together under common ownership.

. . . .**Because Corizon, Inc. and Corizon Health, Inc. share a common ownership, work under a central mission, maintain the same values and vision, and are**

**operated at the direction of the same executive leadership team, said reorganization has been seemless for all Corizon, Inc. and Corizon Health, Inc., partners.  In the interest of transparency, Corizon would like the ADC to understand that its intent is to combine Corizon, Inc. and Corizon Health, Inc. into one (1) legal operating entity as soon as practicable in 2012.**

The merger of the parent companies of CMS and PHS led to the creation of **the Corizon Brand,** a brand supported by some of the *most experienced* healthcare providers in the correctional healthcare industry today.  … **Throughout this proposal, Corizon, Inc., the legal entity making the within proposal submission, has included and/or referred to the valuable experience and resources Corizon Health, Inc., will bring to the ADC as part of the Corizon brand.**

(Sherwin Decl. Exhibit H, 1/3/12 Corizon Executive Summary pp. 2-3, emphasis in original and emphasis added).  Corizon then proceeded to list 14 of its "large correctional healthcare contracts," which included three contracts held by Corizon Health, Inc. and denominated by an asterisk.  (*Id.* pp. 3-4).

In his January 3, 2012, cover letter enclosed with the Corizon, Inc., Arizona contract proposal, Stuart Campbell, who was President and a Director of both Corizon Health, Inc., and Corizon, Inc., stated:  "When we formed Corizon, our goal was to bring together the best and brightest of the two organizations and to have unmatched bench strength to bring solutions to our clients to better meet your challenges."  (Sherwin Decl. Exhibit I, 1/3/12 Corizon cover letter to ADC).

On March 7, 2012, Corizon sent a letter to Arizona's Chief Procurement Officer stating that while Corizon, Inc., was the bidding entity, Corizon, Inc. "benefits from being a member of the Valitas Health Services, Inc. organization which allows it access to broader resources for both financial and operational needs."  Corizon also included the Valitas Health Services, Inc. financial statements for 2011 and 2012 in support of its proposal.  (Sherwin Decl. Exhibit J, 3/7/12 Corizon letter to Denel Pickering, p. 1).

This Court has found that Corizon's financial information is relevant and admissible for Plaintiffs' punitive damages claims.  (Doc. 291, pp.1-2).  Corizon has produced only part of the Valitas financial statements that show unaudited information for Corizon Health, Inc., which grossly understates Corizon's revenues and wealth.

1    Plaintiffs request the complete financial statements of Valitas, which should include all of

2    the Corizon entities that come within the self-identified "Corizon" enterprise or "brand."  In *Mihara*

3    *v. Dean Whitter*, 619 F.2d 814, 824 (9th Cir. 1980), the Ninth Circuit found that annual reports for a

4    parent corporation were properly admitted into evidence as "clearly relevant for the determination

5    of punitive damages."  In addition, in *White v. Ultramar, Inc.*, 62 Cal. App. 4th 939, 955 (1988),

6    *affirmed, superseded on other grounds*, 21 Cal. 4th 563 (1999), financial statements of a parent

7    corporation were properly admitted into evidence for punitive damages.

8    Other jurisdictions have also found the wealth of a parent corporation relevant in

9    determining what amount of punitive damages to assess against its subsidiary. *See*, *TXO Production*

10   *Corp. v. Alliance Resources Corp.*, 419 S.E.2d 870, 890 (W.Va. 1992) aff'd, 113 S.Ct. 2711 (1993);

11   *Riley v. Empire Airlines, Inc.*, 823 F.Supp. 1016, 1023 (N.D. N.Y. 1993) (if punitive damages

12   appropriate, fact finder should consider wealth of defendant including any parent or subsidiary);

13   *Dushaw v. Roadway Exp., Inc.*, 816 F.Supp. 1229, 1239 (N.D. Ohio 1992) (court takes judicial

14   notice of parent's wealth in awarding punitive damages).

15   In *TXO Production Corp. v. Alliance Resources Corp.*, 419 S.E.2d 870, 890 (W.Va. 1992)

16   *aff'd*, 113 S.Ct. 2711 (1993), the West Virginia Supreme Court explained the basis for allowing a

17   jury to consider the net worth of a parent corporation in a punitive damages case:

18

19   > If we did not allow trial judges in their sound discretion to admit evidence of the worth
20   > of parent corporations, corporations could escape liability simply by incorporating
     > separate departments as a number of undercapitalized subsidiaries.  It is the
21   > management of USX that must ultimately make the decision that its employees will
     > not engage in malicious and nefarious business activities, and, therefore, it is the
22   > pocketbook of USX that the jury verdict must reach.

23   *TXO*, 419 S.E.2d at 890.

24   In affirming the award of punitive damages, which was based in part on evidence of the defendant's

25   parent corporation's wealth, the United States Supreme Court noted that while TXO had objected to

26   the evidence the plaintiff had offered, TXO itself had not offered any evidence in rebuttal with

27   respect to whether some of the net wealth evidence presented included the wealth of affiliated

28   companies.  *TXO*, 113 S.Ct. at 2716 & n. 9.

1    Plaintiffs also request that Corizon be ordered to identify each of the currently contracting

2    Corizon entities for the 114 contracts listed on its website, as well as organizational charts showing

3    the relationships between each of the Corizon entities and their parent company Valitas.  Finally,

4    Plaintiffs request leave, after having an opportunity to review the information produced, to name an

5    expert in business evaluation should they deem one necessary after receiving the Corizon financial

6    information.

7    Corizon clearly represents to the public, and to the public agencies with which it contracts,

8    that Corizon Health, Inc. and Corizon, Inc. are "one, best-in-class healthcare provider" and that the

9    two entities are in reality one Corizon economic enterprise or "brand" sharing the same Word Mark

10   logo, address, officers and directors, website, and even resources when seeking contracts.  There is

11   strong evidence that the Corizon entities and their parent are alter egos of each other.

12   Courts in the Ninth Circuit apply the law of the forum state in determining whether an alter

13   ego relationship exists. *In re Schwarzkopf*, 626 F.3d 1032, 1037-1038 (9th Cir. 2010).  California

14   law recognizes an alter ego relationship when:  1) "there is such a unity of interest and ownership

15   that the individuality, or separateness" of the two corporations has ceased, and 2) "adherence to the

16   fiction of the separate existence of the corporation would, under the particular circumstances,

17   sanction a fraud or promote injustice."  *Wood v. Elling Corp.*, 20 Cal. 3d 353, 365 n 9 (1977).  If

18   both of these requirements exist, the separate corporate existence will be disregarded.  Whether an

19   alter ego relationship exists is a question for the trier of fact, which will not be disturbed if it is

20   supported by substantial evidence.  *Associated Vendors, Inc. v. Oakland Meat Co., Inc*., 210 Cal.

21   App. 2d 825, 837 (1962).

22   Many of the factors suggesting an alter ego relationship exist here, including: identical

23   ownership of the two entities, identical officers and directors responsible for supervision and

24   management; the use of the same office and business location; undercapitalization of the owned

25   corporation; "the use of a corporation as a mere shell, instrumentality, or conduit for a single

26   venture or the business of another corporation;" the concealment of the identity of the responsible

27   ownership, management, and financial interest; the disregard of legal formalities and failure to

28   maintain arm's length relationships among related entities; the use of the corporate entity to procure

     labor, services, or merchandise for another entity; and possibly the manipulation of assets and

1  liabilities between entities so as to concentrate the assets in one and the liabilities in another, which

2  will be revealed once Defendants produce the complete Valitas financial statements.  *Associated*

3  *Vendors, Inc. v. Oakland Meat Co., Inc.*, 210 Cal. App. 3d at 838-840.

4

5          In finding an alter-ego relationship in *Cali v. East Coast Aviation Services, Ltd.*, 178 F.Supp.

6  2d 276, 287-288 (E.D.N.Y., 2001), the district court observed the importance of the single internet

7  presence like that presented by Corizon here:

8

9              "[p]erhaps the most compelling evidence that the two Pennsylvania subsidiaries are
              the alter-ego of BAE systems is based on the fact that all of BAE Systems' websites

10             present a unified marketing image, including common design elements, logos, and
              language.  … Moreover, the subsidiary companies' websites refer to their places

11             within the larger dynamic global organization of BAE Systems.  Thus, it is clear
              from the webpages that BAE Systems operates as one global company with a

12             multitude of offices and stores around the world."

13

14  Here, there are not even separate websites with common design elements.  There is one

15  website, www.corizonhealth.com, used by all Corizon entities.  Corizon Health, Inc., and

16  Corizon, Inc., use the same website, marketing materials, and trademark-protected logo.

17  Corizon lists all of its entities' contracts around the country, regardless of which corporation

18  holds the contract, on www.corizonhealth.com.  Corizon represents to public agencies that it

19  is "one Brand" and that both Corizon companies have been "combined into one best-in-class

20  healthcare provider."  (Sherwin Decl. Ex. H, pp. 2-3).

21          Allowing Corizon to limit its punitive damages exposure by only producing

22  unaudited financial statements of "Corizon Health, Inc.," which are not even independent

23  documents but are contained within the broader financial statements of Valitas Health

24  Services, Inc., would be unfair to Plaintiffs.

25          "The essence of the alter ego doctrine is that justice be done.  'What the formula

26  comes down to, shorn of verbiage about control, instrumentality, agency, and corporate

27  entity, is that liability is imposed to reach an equitable result.'"  *Mesler v. Bragg*

28  *Management Company*, 39 Cal. 3d 290, 301 (1985)(*citation omitted*).  Valitas Health

Services, Inc., and Corizon, Inc. do not need to be defendants in this case for the complete Valitas Health Services financial statements to be produced, as Valitas' wealth is "clearly relevant for the determination of punitive damages." *Mihara*, *supra*, 619 F.2d at 824.  It would be unjust to Plaintiffs to allow Corizon to limit its punitive damages liability to one small segment of its economic enterprise.

## RELIEF REQUESTED

Plaintiffs request that this Court grant their First Motion in Limine and order:

1) That Corizon produce the complete annual financial statements of Valitas Health Services, Inc., from which the Corizon Health, Inc. statements were taken, which may be subject to the Protective Order until the punitive damages phase of trial begins;

2) That Corizon produce complete organizational charts showing the current relationships between Valitas Health Services, Inc., Corizon Health, Inc., Corizon, Inc., and Corizon, LLC;

3) That Corizon produce a list showing each of its 114 contracts referenced on its website, and state which Corizon entity is the contracting entity;

4) That Corizon produce for deposition pursuant to F.R.Civ.P. 30(b)(6), its Person Most Knowledgeable concerning the relationships between Valitas Health Services, Inc., Corizon Health, Inc., Corizon, Inc., and Corizon, LLC, as well as the Corizon entities' wealth, financial condition, assets, liabilities, income and expenses; and

5) That Plaintiffs be permitted to name an expert in business valuation should one be needed after reviewing the above discovery.

## SECOND MOTION IN LIMINE TO HOLD TRIAL IN
## THE OAKLAND COURTHOUSE

This is a civil rights wrongful death/survival action arising from Defendants' deliberate indifference to the serious medical needs of, and the use of excessive force against, Martin Harrison, a 50-year-old detainee in the Santa Rita Jail in Alameda County, California, who was suffering from severe untreated alcohol withdrawal after being denied appropriate medical care and treatment.

Defendant Alameda County contracts with Corizon Health, Inc. ("Corizon"), a foreign corporation, for the provision of comprehensive medical care for jail inmates. The contract provides that Corizon will provide medical services to all inmates of Alameda County's jails. Those jails include Santa Rita Jail and Glenn Dyer Detention Center, which is located in Oakland. (Trial Exhibit 53).

Martin Harrison was a resident of Oakland, California, and was arrested for jaywalking in Oakland on August 13, 2010. After a warrant check revealed an outstanding warrant for failure to appear on an earlier DUI charge, Mr. Harrison was taken to Defendant Alameda County's Glenn Dyer Detention Center (GDDC), in Oakland. At GDDC, Defendant Corizon allowed Defendant Zelda Sancho, L.V.N., to perform a nursing assessment on Mr. Harrison, which California law required a Registered Nurse to perform. California Nurse Practice Act, Cal. Bus. & Prof. Code §§ 2725, 2725.3, 2732, 2795, 2799.

Defendant Sancho performed an incompetent assessment on Mr. Harrison, and sent him into the general jail population with no medical follow-up, even though Ms. Sancho noted Mr. Harrison had a red face and smelled of alcohol, and Mr. Harrison informed Defendant Sancho that he drinks every day, his last drink was that day, and he had a history of alcohol withdrawal.

On August 13, 2010, Mr. Harrison was transferred to Alameda County's Santa Rita Jail. He went into severe alcohol withdrawal because he was not put on CIWA (Clinical Institute

Withdrawal Assessment) withdrawal protocols.  On August 16, 2010, while in Delirium Tremens at Santa Rita Jail, Mr. Harrison was severely beaten, repeatedly TASED, and subjected to restraint asphyxia at the hands of ten Defendant Alameda County Sheriff's Deputies.  He became unresponsive and was transferred to ValleyCare Medical Center in Pleasanton, Alameda County, California, where he died two days later.

With one exception -- the foreign corporation Corizon Health, Inc. -- every Defendant in this case is an Alameda County Defendant.  Both the formation of the contract at issue in this case and the events resulting in Mr. Harrison's death occurred in Alameda County.  The vast majority of witnesses will be coming from Alameda County to testify.  Plaintiffs' counsel's and the County Defendants' counsel's offices are in Oakland.

On September 11, 2014, Plaintiffs' counsel emailed defense counsel to ask if they would stipulate to this Court holding trial in the Oakland Division's courthouse, for the convenience of the parties and witnesses.  (Sherwin Decl. Exhibit K, emails p. 1, 9/11/14 Sherwin email to all counsel).

No defense counsel responded.  On October 8, 2014, Plaintiffs' counsel sent another email asking whether Defendants would stipulate to holding the trial in Oakland.  Martha Stringer, counsel for Ms. Sancho, stated "I'm amenable to either option and will defer to Nancy [Hudgins, counsel for the Corizon Defendants] and Randy [Andrada, counsel for the County Defendants]." (Sherwin Decl. Ex. K, p. 2).  On October 10, 2014, Mr. Andrada responded, stating he would reply to Plaintiffs' request later.  (*Id.*, p. 3).

On October 22, 2014, counsel for the Corizon Defendants responded, stating, "Corizon wishes to have the trial in SF.  It will be more inexpensive, more inconvenient and more burdensome for Corizon to move the venue to Oakland."  (Sherwin Decl. Ex. K, pp. 3-5).  Plaintiffs again requested that the County Defendants state whether they would oppose having the trial in Oakland, and the County Defendants never responded.  (*Id*. at pp. 3-4).

1    Martha Stringer counsel for Defendant Sancho, had no objection to having the trial in

2    Oakland.  Despite repeated requests, the County's counsel never responded.  The only objection to

3    having trial in the Oakland courthouse came from counsel for Corizon Health, Inc. – a foreign

4    corporation that has the Alameda County jail medical contract that gave rise to this action, and has

5    an office in Alameda, California.

6    This Court has discretion even to transfer the entire case to the Oakland Division.  28 U.S.C.

7    § 1404(b).  This Court is already well versed in the facts and issues of this complex case, and

8    Plaintiffs do not request a transfer to the Oakland Division and another judge.  Plaintiffs simply

9    request that the trial be held in Oakland, for the convenience of the parties and witnesses.  Plaintiffs

10   ask that this Court exercise its discretion to hold just the trial of this matter in the Oakland Division.

11   Nearly every witness will be coming from the East Bay:

12   •    Defendant Alameda County's Sheriff's Office administrative offices are in Oakland, and

13   their jails are in Oakland (GDDC) and Dublin, Alameda County, California.

14   •    Defendant Harold Orr, M.D., lists his address for purposes of his medical license as an

15   address in Oakland:

16   ([https://www.breeze.ca.gov/datamart/detailsCADCA.do?selector=false&selectorType=&selectorRe](https://www.breeze.ca.gov/datamart/detailsCADCA.do?selector=false&selectorType=&selectorReturnUrl=&anchor=a30312e.0.1)

17   [turnUrl=&anchor=a30312e.0.1](https://www.breeze.ca.gov/datamart/detailsCADCA.do?selector=false&selectorType=&selectorReturnUrl=&anchor=a30312e.0.1)).

18   •    Defendant Sancho resides in Alameda County.

19   •    Defendant Hast resided in Alameda County at the time of her deposition, and works at Santa

20   Rita Jail in Alameda County.

21   •    While Plaintiff does not know the residences of the ten Alameda County Sheriff's Deputy

22   Defendants here, all of those Defendants work at the Santa Rita Jail in Alameda County.

1   •       Corizon's designated Person Most Knowledgeable about its contract with Alameda County,

2   Lenore Gilbert, requested that one of her depositions take place at her home in Hayward, in

3   Alameda County.

4           The vast majority of witnesses will be coming from Alameda County to testify in this case.

5   Plaintiffs' counsel are in Oakland.  Counsel for the County Defendants are in Oakland.  Counsel for

6   Defendant Sancho has no objection to having the trial in Oakland.  This Court already has some of

7   its criminal docket in the Oakland courthouse.

8           Having this Court hear the trial of this matter in the Oakland courthouse would greatly

9   reduce attorneys' fees and costs for Plaintiffs and Defendants.  Plaintiffs estimate that the increased

10  attorneys' fees and costs for Plaintiffs' counsel of record alone simply to travel to and from San

11  Francisco each day for court will exceed $200,000, if the trial lasts eight weeks as Defendants

12  anticipate.

13          Two Plaintiffs and their mother live in Shasta County, and two Plaintiffs live in San

14  Francisco County, but Plaintiffs are willing to come to Oakland for the trial.

### RELIEF REQUESTED

            For the foregoing reasons, Plaintiffs respectfully request that this Court grant their Second

Motion in Limine and hold the trial of this matter in the courthouse of the Oakland Division of the

United States District Court for the Northern District of California.

**THIRD MOTION IN LIMINE FOR ATTORNEY-CONDUCTED VOIR DIRE AND EQUAL PEREMPTORY CHALLENGES PER SIDE (ALL PLAINTIFFS V. ALL DEFENDANTS)**

On April 9, 2014, this Court ordered the parties to submit a joint proposed jury questionnaire and supplemental questions per side. (Doc. 294). The final jury questionnaire is now under submission with this Court. Plaintiffs hereby also move this Court for attorney-conducted voir dire.

Plaintiffs seek three hours of attorney-conducted voir dire per side. Plaintiffs believe that this amount of time will be sufficient if the Court submits a jury questionnaire to the jury panel at least two days before voir dire, to allow counsel time to review and analyze the information contained in the completed questionnaires.

This civil rights wrongful death case involves claims against government actors and health care providers. Any case involving law enforcement brings the strong likelihood that jurors will have biases, often subtle and even unconscious, in favor of the police. Similarly, cases against health care providers carry with them a history of controversy and strongly held beliefs. This case also involves sensitive issues of the Decedent Martin C. Harrison's alcoholism and status as a jail inmate at the time of his death.

The Court's Standing Order for Civil Jury Trials states that voir dire by counsel will not be permitted without leave of court. For the reasons discussed below, Plaintiffs request leave of the Court for attorney-conducted voir dire.

**A.     Plaintiffs Request Attorney-Conducted Voir Dire to Ensure a Fair and Impartial Jury**

Trial by jury "has been the hallmark of even handed justice." *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473 (1962). The Seventh Amendment guarantees a fundamental right to trial by jury in civil cases. *Jacob v. City of New York*, 315 U.S. 752, 752-753 (1942); *Simler v. Conner*, 372 U.S. 221, 222 (1963); *Dimick v. Shiedt*, 293 U.S. 474, 486 (1935). That fundamental right "must be jealously guarded." *Jacob v. City of New York*, 315 U.S. at 752-

753.  Indeed, "the federal policy favoring jury trials is of historic and continuing strength."  *Simler v. Conner*, 372 U.S. at 222.

Courts are required to indulge "every reasonable presumption" against a waiver of the fundamental right to a jury trial.  *Aetna, Inc. v. Kennedy*, 301 U.S. 389, 393 (1937).  Indeed, "maintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care."  *Dimick v. Schiedt*, 293 U.S. at 486.

When a fundamental right is recognized, substantive due process forbids the infringement of that right "'at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest.'"  *Witt v. Dep't. of Air Force*, 527 F.3d 806, 817 (9th Cir. 2008)(*quoting Reno v. Flores*, 507 U.S. 292, 301-302 (1993)).

Lois P. Heaney, a trial consultant and President of NJP Litigation Consulting, Western Regional Office, declares:  "[T]he present case contains many hot button issues which make it challenging for jury selection, particularly at a time when much national and local attention has focused on allegations of police abuse []."  (Heaney Decl. p. 4, ¶ 7).  Ms. Heaney declares that this case "is replete with many sensitive and controversial issues which touch strongly held attitudes and deep personal experiences which require inquiry in voir dire []."  (Heaney Decl. ¶ 9).

Self-reports about bias are "highly unreliable," since "Jurors' natural desire to appear to be fair and impartial diminishes candor in open court when they suspect that the answer may disqualify them.  This tendency is heightened when the Court conducts the voir dire examination."  (Heaney Decl. pp. 5-6, ¶ 11).  Based on social science literature and several studies cited in her declaration, Ms. Heaney declares that "when voir dire questioning is conducted by the judge only, jurors increase efforts to please the interviewer or conform to what they believe the interviewer expects."  (Heaney Decl. pp. 7-9, ¶¶ 16-22).

Based on the social science literature, Ms. Heaney declares that attorney-conducted voir dire is a more effective tool for eliciting bias than questioning by the judge alone. (Heaney Decl. pp. 9-10, ¶¶ 23-26).

Attorney-conducted voir dire does not necessarily take more time than court-conducted voir dire, according to a report of the Federal Judicial Center cited in Ms. Heaney's declaration. (Heaney Decl. pp. 10-11, ¶ 27).

A fair and impartial jury is the bedrock of the fundamental right to trial by jury. Sufficient time for counsel, who best know the contours of this complicated case and potential areas of juror bias, to use and review jury questionnaires and to question the jurors themselves is necessary to guarantee the parties' right to a fair and impartial jury. Plaintiffs therefore request leave of the Court for three hours of attorney-conducted voir dire per side (a total of six hours of attorney-conducted voir dire), and for the use of a jury questionnaire in this trial.

### B.      The Defendants' Side Is Not Entitled to More Peremptory Challenges

Defense counsel has proposed to Plaintiffs' counsel that Defendants should be entitled to more collective peremptory challenges than Plaintiffs. Defendants contend that the County and Corizon are adverse to each other on the issue of what caused Martin Harrison's death: either Corizon's failure to provide for his serious medical needs, or the County deputies' use of excessive force, or both (as Plaintiffs contend).

Plaintiffs object to such an uneven allocation of peremptory challenges, particularly where Plaintiffs have the burden of proof on most issues, and where Corizon and the County have a united defense on almost all issues. Even if Corizon and the County *may* take adverse positions against each other on one issue, they are both 100% adverse to the Plaintiffs at all times.

This Court has discretion to apportion peremptory challenges evenly per side pursuant to 28 U.S.C. § 1870 (emphasis added):

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

In civil cases, each party shall be entitled to three peremptory challenges. **Several defendants or several plaintiffs may be considered as a single party for the purposes of making challenges**, or the court may allow additional peremptory challenges and permit them to be exercised separately or jointly.

In *Doralee Estates, Inc. v. City Service Oil Company*, 569 F.2d 716 (9th Cir. 1977), the Ninth Circuit held that a district court properly exercised its discretion to deny the defendants' request for three peremptory challenges per defendant, instead allotting three challenges to be shared between the defendants, and one more to each of the two defendants to be exercised independently.  569 F.2d at 723-24.  The *Doralee Estates* opinion does not say how many peremptory challenges were allotted to Plaintiffs, but the court relied on *Carey v. Lykes Brothers Steamship Company,* 455 F.2d 1192, 1194 (5th Cir. 1972), affirming the district court's allotment of an equal number of total peremptory challenges between the Plaintiff and the two adverse defendants.  *See also, Poche v. Joubran*, 389 Fed. Appx. 768, 771, 775 (10th Cir. 2010) (defendant was not denied a fair and impartial jury where district court allotted equal peremptory challenges between plaintiffs and collective, adverse defendants).

More recently, in *Mariolle v. Volvo Group of North America*, *Inc.*, (No. C 09-1209 MMC), 2012 U.S. Dist. LEXIS 125228 at *3-4 (N.D. Cal., Sept. 4, 2012), Judge Chesney "determined it appropriate to treat the [adverse] defendants as one party, but granted each side one additional challenge."  The Court therefore allotted the two adverse defendants four peremptory challenges and the married plaintiffs four peremptory challenges in that product liability case.  The Court denied the defendants' motion for a new trial finding no miscarriage of justice, and noting, "[t]he defendants were free, however, to allocate their challenges among themselves in whatever manner they deemed equitable."  *Id.*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## RELIEF REQUESTED

For all of the foregoing reasons, Plaintiffs respectfully request that this Court grant their Third Motion in Limine and allow for three hours per side of attorney-conducted voir dire and equal peremptory challenges per side.

## FOURTH MOTION IN LIMINE TO LIMIT THE TESTIMONY OF DEFENDANT COUNTY'S EXPERT RON MARTINELLI

**A. This Court should preclude Mr. Martinelli from testifying about opinions or facts that he omitted from his Rule 26 report.**

An expert witness's report must include "a complete statement of *all opinions* the witness will express and the basis and reasons for them."  Fed. R. Civ. P. 26(a)(2)(B)(i) (emphasis added). If an expert witness fails to comply with Rule 26, then Federal Rule of Civil Procedure 37(c)(1) "gives teeth to these requirements by forbidding the use at trial of *any information* required to be disclosed by Rule 26(a) that is not properly disclosed."  *Yeti by Molly LTD v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001) (footnote omitted) (emphasis added).  In *Yeti*, the defendant's expert witness failed to provide his expert report on time.  *Id*. at 1105.   The plaintiffs moved in limine, pursuant to Federal Rule of Civil Procedure 37, to exclude the expert witness from testifying as a sanction for the defendants' failure to comply with the discovery deadline.  *Id.*  The district court granted the motion.  *Id.*  The Ninth Circuit agreed that the district court acted within its discretion in granting the motion, concluding that "exclusion [wa]s an appropriate remedy for failing to fulfill the required disclosure requirements of Rule 26(a)."  *Id.* at 1106.  Here, Mr. Martinelli did not include in his report—as he himself acknowledged at his deposition—several opinions:

- **The jail's medical staff.**  When asked whether anything that Zelda Sancho did or did not do was deliberately indifferent to Martin Harrison's medical needs, he responded that he had "no opinions on any of the medical staff."  (Helm Declaration Exhibit A, Martinelli Dep., 111:22–112:1).[1]
- **The manner by which Deputy Ahlf's chose to move Martin Harrison from one cell to another.**  When asked if, in the report he "state[d] opinions concerning [Ahlf's] tactics in how he decided to move Harrison from the wet cell to a different cell[,]" Mr. Martinelli replied "[n]o."  (Helm Decl. Ex. A, Martinelli Dep., 194:16–19).

---

[1] All Exhibit references to the declaration of T. Kennedy Helm are to the declaration and exhibits filed on February 21, 2014, in support of Plaintiffs' earlier motions in limine, Court Docket No. 189.

1

2

- **Deputy Ahlf's Taser use.**  When asked if he "ha[d] an opinion about whether Ahlf's use of Taser was appropriate[,]" Mr. Martinelli replied "[n]o."  (Helm Decl. Ex. A, Martinelli Dep., 194:20–22).

3

4

- **The Alameda County Sheriff's deputies' use of force.**  When asked whether he was "prepared to offer opinions about use of force[,]" Mr. Martinelli answered "I am not." (Helm Decl. Ex. A, Martinelli Dep., 16: 1–3).

5

6

7

- **Whether Deputy Ahlf caused Martin Harrison's death.**  When asked if he had "opinions about causation in this case[,]" Mr. Martinelli replied that he had "an opinion that what Ahlf did not cause, ultimately cause, Mr. Harrison's death."  (Martinelli Dep., 188:17–20).  But Mr. Martinelli acknowledged that he did not include this opinion in his Rule 26 report. (Helm Decl. Ex. A, Martinelli Dep., 188:21–22).

8

9

- **The cause of Martin Harrison's death.**  When asked whether he intended to offer any opinion in his report concerning Mr. Harrison's cause of death, Mr. Martinelli replied "No." (Helm Decl. Ex. A, Martinelli Dep., 105:15–17).

10

- **Stress.**  When asked whether he included any opinions in his report related to anybody's stress, Mr. Martinelli admitted that he did not.  (Helm Decl. Ex. A, Martinelli Dep., 102:8–10).

11

12

- **Memory recall.**  When asked whether he included any opinions in his report about memory recall, Mr. Martinelli admitted he did not.  (Helm Decl. Ex. A, Martinelli Dep., 102:20–22).

13

14

Because Mr. Martinelli did not provide opinions on these topics in his report, under Rule 37 this Court should preclude him from testifying about them at trial.

15

16

17

18

19

20

21

22

23

24

25

In addition to the opinions that Mr. Martinelli acknowledged he did not include in his report, this Court should preclude Mr. Martinelli from testifying about facts that he omitted from his report. Rule 26 requires that the expert witness's report include "the facts or data considered by the witness in forming [the witness's opinions]."  Fed. R. Civ. P. 26(a)(2)(B)(ii).  If an expert witness fails to include the facts or data, then he or she may not testify about them at trial, because Federal Rule of Civil Procedure 37(c)(1) forbids the expert witness from using at trial "any information required to be disclosed by Rule 26(a) that he or she failed to disclose." *Yeti by Molly*, 259 F.3d at 1106.  Here, Mr. Martinelli acknowledged at his deposition that he read the following witnesses' depositions, and the facts they contain, *after* finishing his report:

26

27

- **Sheriff Deputies Swetnam, Unubun, Madigan, Valverde, Sobrero, Martinez, Litvinchuk, Rojas, Bareno and Sergeant Shepard.**  (Helm Decl. Ex. A, Martinelli Dep., 16:4–15).

28

1   Additionally, Mr. Martinelli acknowledged that he read **Plaintiff's Expert Jack Ryan's report**

2   after Mr. Martinelli finished his Rule 26 report, (Helm Decl. Ex. A, Martinelli Dep., 16: 16–25), so

3   this Court should preclude him from commenting on Mr. Ryan's opinions.

4       Furthermore, Mr. Martinelli admitted that he did not read depositions from the following

5   witnesses:

6   - **Deputy Kevin Lewis**, the County's Person Most Knowledgeable concerning Taser
7     usage and training (Helm Decl. Ex. A, Martinelli Dep., 17:24–18:3);
    - **Deputy Earl Back**, the County's Person Most Knowledgeable concerning the training
8     and handling of people with emotional or mental disturbances (Helm Decl. Ex. A,
      Martinelli Dep., 18: 4–8);
9   - **Sergeant Cynthia Sass**, the County's Person Most Knowledgeable concerning training,
10    policies and procedures for detoxification of inmates (Helm Decl. Ex. A, Martinelli
      Dep., 18:9–13);
11  - **Lieutenant Richard Carter**, the County's Person Most Knowledgeable concerning cell
      extractions (Helm Decl. Ex. A, Martinelli Dep., 18:14–17);
12  - **Zelda Sancho** (Helm Decl. Ex. A, Martinelli Dep., 19:20–25). At his deposition, Mr.
13    Martinelli admitted "I don't know anything about Nurse Sanchez or Sancho or anything
      about her termination hearing or anything like that." (Helm Decl. Ex. A, Martinelli
14    Dep., 126:21–23). Later, when asked whether he knew "what training Nurse Sancho
15    received about the severity of the risk of her failing to properly assess somebody who
      needed to be on CIWA[,]" he testified that he knew "absolutely nothing about the
16    nurse." (Helm Decl. Ex. A, Martinelli Dep., 127:24–128:3). But Mr. Martinelli also
17    testified that, in his opinion, Nurse Sancho completed Martin Harrison's intake form
      correctly. (Helm Decl. Ex. A, Martinelli Dep., 123:25–124:2).

18      Nor did Mr. Martinelli read any testimony from the transcript of Defendant Sancho's

19  arbitration hearing. (Helm Decl. Ex. A, Martinelli Dep., 20:1–5). Therefore, this Court should

20  prevent Mr. Martinelli from testifying about these matters.

21      Lastly, this Court should preclude Mr. Martinelli from testifying about his tour of Santa Rita

22  jail, given that he toured the jail's areas that pertain to this case *after* he wrote his Rule 26 report.

23  (Helm Decl. Ex. A, Martinelli Dep., 110:24–111:4). Likewise, this Court should preclude Mr.

24  Martinelli from testifying that Alameda County's Santa Rita jail complies with Title 15 of the

25  California Code of Regulations, because, as Mr. Martinelli admitted, he based this opinion on

26  "discussions with the [Santa Rita] watch commander this morning [that is, the morning of his

deposition] in regard to their training protocols."  (Helm Decl. Ex. A, Martinelli Dep., 172:24–

173:10).  This Court should therefore preclude Mr. Martinelli from testifying about this or any of

the above facts at trial.

   **B.  Federal Rule of Evidence 702 requires this Court to preclude Mr. Martinelli from
        testifying about the opinions—about the signs and symptoms of severe alcohol
        withdrawal and delirium tremens—contained in his Rule 26 report's paragraphs 2.3,
        2.4, 2.6 and 3.6 because he lacks expert qualification to testify about alcohol
        withdrawal.**

   If called to testify, Mr. Martinelli will come "before the jury cloaked with the mantle of an

expert."  *Jinro America, Inc. v. JR Int'l Corp.*, 266 F.3d 993, 1004 (9th Cir. 2001).  Mr. Martinelli's

status as an expert witness allows him "to couch his observations as generalized 'opinions' rather

than as first-hand knowledge[.]"  *Id.*  In addition, as an expert, his statements are "likely to carry

special weight with the jury."  *Id.*

   Therefore, this Court must take care "to assure that a proffered witness" like Mr. Martinelli

"truly qualifies as an expert[.]"  *Id.*  Rule 702 requires that the witness be "qualified as an expert by

knowledge, skill, experience, training, or education[.]"  Fed. R. Evid. 702.  This Court should

preclude Mr. Martinelli from testifying about his Rule 26 report's opinions contained in paragraphs

2.3, 2.4, 2.6 and 3.6 because he is not qualified as an expert either on alcohol withdrawal or

Delirium Tremens.

   It is undisputed in this case that Mr. Harrison showed the signs and symptoms of alcohol

withdrawal, and ultimately ended up in Delirium Tremens, or severe alcohol withdrawal.

   Mr. Martinelli repeatedly opines in his report that Mr. Harrison did not show any symptoms

of alcohol withdrawal while in jail.  In paragraph 2.3, Mr. Martinelli opines that the Sheriff's

deputies and the Corizon employees were not deliberately indifferent to Mr. Harrison's medical

needs because Mr. Harrison never showed any symptoms of Delirium Tremens.  (Helm Decl. Ex. B,

Martinelli Report, p. 15).  Specifically, Mr. Martinelli opines in paragraph 2.3 that "there is no

1   evidence" that Mr. Harrison "presented with any communication, physical, behavioral, and/or

2   psychological cues of delirium tremens at any time in the two and one-half days between the time

3   he was booked into the main and Santa Rita jail facilities."  (Helm Decl. Ex. B, Martinelli Report, p.

4   15).  Similarly, Opinion 3.6 asserts that the Sheriff's deputies and the Corizon employees could not

5   have been deliberately indifferent to Mr. Harrison's suffering from Delirium Tremens because Mr.

6   Harrison never showed any symptoms of Delirium Tremens.  (Helm Decl. Ex. B, Martinelli Report,

7   p. 16).  In paragraph 3.6, Mr. Martinelli reiterates that "there is no evidence" that Mr. Harrison

8   "presented with any communication, physical, behavioral and/or psychological cues of delirium

9   tremens at any time[.]"  (Helm Decl. Ex. B, Martinelli Report, p. 16).  And in Opinion 2.6, Mr.

10  Martinelli speculates that had Mr. Harrison shown signs of alcohol withdrawal, the Sheriff's

11  Department would not have accepted him for booking.  (Helm Decl. Ex. B, Martinelli Report, p.

12  16).

13          In paragraph 2.4, Mr. Martinelli summarizes his knowledge about Delirium Tremens

14  symptoms, an area outside his expertise.  The reason why Mr. Harrison did not show any symptoms

15  of delirium tremens, according to paragraph 2.4, is this: "[m]edical research and published articles

16  state that the symptoms of delirium tremens most often occur within 72 hours after the last drink."

17  (Helm Decl. Ex. B, Martinelli Report, p. 15).  But, Mr. Martinelli continued, "they may also occur

18  up to 7–10 days after the last drink."  (Helm Decl. Ex. B, Martinelli Report, p. 15).  So, Mr.

19  Martinelli concludes, Mr. Harrison did not present "DT type symptoms until nearly three days

20  following his incarceration.  Therefore it would not be reasonable for any corrections and/or

21  medical staff to have observed or treated Harrison for DT anytime prior to that absent any

22  presentations from Harrison."  (Helm Decl. Ex. B, Martinelli Report, p. 15).  Trying to bolster his

23  opinion, Mr. Martinelli follows this last sentence with a single footnote, which reads: "'Delirium

tremens,' U.S. Library of Medicine, Natl. Institute [sic] of Health, article, #0007666."  (Helm Decl. Ex. B, Martinelli Report, p. 15).

While citing a single medical article to support an expert opinion presents foundation problems, the much bigger problem with the opinion in paragraph 2.4 is that Mr. Martinelli lacks the medical expertise to opine on alcohol withdrawal or delirium tremens.  At his deposition, when asked whether he had "any medical training[,]" Mr. Martinelli replied "Yes."  (Helm Decl. Ex. A, Martinelli Dep., 99: 2–3).  Mr. Martinelli elaborated that he "was pre-med in undergraduate school[,]" and so had "taken all the standard pre-med courses: Anatomy, kinesiology, physiology, biology, psychology."  (Helm Decl. Ex. A, Martinelli Dep., 99:5–8).

But Mr. Martinelli bachelor's degree was not pre-med—it was "exercise physiology." (Helm Decl. Ex. A, Martinelli Dep., 107:2–3).  Moreover, he testified that: he has no medical licenses (Helm Decl. Ex. A, Martinelli Dep., 99: 19–20); he is not a psychologist (Helm Decl. Ex. A, Martinelli Dep., 100: 5–6); he has no degrees in medicine (Helm Decl. Ex. A, Martinelli Dep., 103:7–8); nor has he ever written any peer-reviewed medical articles (Helm Decl. Ex. A, Martinelli Dep., 103:9–14).  He also acknowledged that he has no expertise in nursing.  (Helm Decl. Ex. A, Martinelli Dep., 103: 15–16).  He stated that he had "continued to take medical classes" during his professional career, (Helm Decl. Ex. A, Martinelli Dep., 99:9–10), and he added that, at the time of his deposition, he was "currently taking medical classes to be certified as a medical investigator at the physician's level from the American College of Forensic Examiners Institute."  (Helm Decl. Ex. A, Martinelli Dep., 99:15–18).  He claimed to be a "drug recognition expert[,]" (Helm Decl. Ex. A, Martinelli Dep., 103:19–21), and someone who understood alcoholism and withdrawal, (Helm Decl. Ex. A, Martinelli Dep., 103:20–21), by virtue of his long ago as a police officer having "attend[ed] a 40-hour course on a variety of different types of drugs and alcohol," (Helm Decl. Ex. A, Martinelli Dep., 103:24–25), which required him to "learn the symptomatology of those drugs . .

. the history of those drugs . . . and test each other using devices to determine influence." (Helm Decl. Ex. A, Martinelli Dep., 103:25–104:3). None of this training qualifies him to give expert testimony on the signs and symptoms of severe alcohol withdrawal or delirium tremens.

In addition, this Court should prevent Mr. Martinelli from testifying about the opinion in paragraph 2.6, where he speculates that, had Mr. Harrison shown symptoms of alcohol withdrawal, the Sheriff's Department would not have accepted him for booking. (Helm Decl. Ex. B, Martinelli Report, p. 16). In paragraph 2.6, Mr. Martinelli asserts that, based upon his "education, training, experience and collective knowledge as a former peace officer, a corrections consultant and trainer and an *expert in mental health triage evaluation*," had Mr. Harrison "presented with verbal and/or physical cues of severe alcohol intoxication, acute, chronic alcoholism combined with influence; and or severe mental health problems prior to booking; he would not have been accepted for booking into any sheriff department jail facility." (Helm Decl. Ex. B, Martinelli Report, p.16) (emphasis added). But nowhere has Mr. Martinelli identified his mental-health expertise. Further, he simply speculates about what would have happened. Therefore, this Court should preclude Mr. Martinelli from testifying about the opinions contained in his report's paragraphs 2.3, 2.4, 2.6, and 3.6.

**C. Federal Rule of Evidence 702 requires this Court to exercise its discretion to preclude Mr. Martinelli from giving expert testimony about opinions that lack reliability because they lack adequate factual bases.**

A district court must also ensure the reliability of the expert's testimony. *Diviero v. Uniroyal Goodrich Tire Co.*, 114 F.3d 851, 853 (9th Cir. 1997). This "'basic gatekeeping obligation' applies with equal force in cases, such as this one, where 'non-scientific' experts wish to relate specialized observations derived from knowledge and experience that is foreign to most jurors." *United States v. Prime*, 431 F.3d 1147, 1152 (9th Cir. 2005) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148 (1999)).

1    Plaintiffs request that this Court, in its discretion, determine the reliability of Mr.

2    Martinelli's proposed expert-witness testimony without holding a hearing, given that "[t]he

3    reliability inquiry is 'a flexible one.'"  *Estate of Barabin v. AstenJohnson, Inc.*, No. 10-36142, No.

4    11-35020, 2014 U.S. App. LEXIS 774, at *13 (9th Cir. Jan. 15, 2014) (en banc) (citing *Kumho Tire*,

5    526 U.S. at 150).  This means that the trial judge "has broad latitude in determining the appropriate

6    form of the inquiry."  *Id.* (citing *United States v. Alatorre*, 222 F.3d 1098, 1102 (9th Cir. 2000)

7    ("Nowhere … does the Supreme Court mandate the form that the inquiry into relevance and

8    reliability must take.")).  While a district court may use a pretrial *Daubert* hearing to determine

9    whether a witness qualifies as an expert witness, it need not do so.  *Id.* (citations omitted).

10   **1. Under Federal Rule of Evidence 702, this Court should preclude Mr. Martinelli**
     **from testifying about Opinions No. 1.0, No. 5, and the opinions contained in**
     **paragraphs 2.4, 2.6, 4.11, and 5.1, because he has either based them on insufficient**
     **facts or has failed to explain how he arrived at this opinion.**

11   An expert witness "may provide opinion testimony if 'the testimony is based upon sufficient

12   facts or data' and 'is the product of reliable principles and methods,' which have been 'applied . . .

13   reliably to the facts of the case.'"  *United States v. W.R. Grace*, 504 F.3d 745, 759 (9th Cir. 2007)

14   (quoting Fed. R. Evid. 702).  Here, Mr. Martinelli fails to base opinions on sufficient facts, and this

15   Court should prevent him from testifying about them.

16   Opinion No. 1 concludes: "[t]he initial processing, classification and housing of decedent

17   Harrison by the Alameda County Sheriff's Department was conducted in an appropriate and

18   objectively reasonable manner."  (Helm Decl. Ex. B, Martinelli Report, p. 13).  Mr. Martinelli then

19   lists the "information, statements, facts and evidence" that support Opinion 1.

20   First, Mr. Martinelli claims, in paragraph 1.1, that Martin Harrison "was arrested by the

21   Oakland P.D. on an outstanding $10,000 misdemeanor warrant and was transported per policy and

22   procedure to the Alameda Co. Sheriff Department main jail facility."  (Helm Decl. Ex. B, Martinelli

23   Report, p. 13).  The only fact in this statement—that Martin Harrison was arrested—does not

support Opinion 1, and the rest of the statement is itself an opinion: that the jail staff conducted Mr. Harrison's transportation correctly, according to policy and procedure.

Mr. Martinelli then tries to support Opinion 1 with a purported fact.  In paragraph 1.2, he writes that before accepting Mr. Harrison for booking, "corrections and medical screening staff conducted standard medical and mental health screening protocols to assess Harrison's suitability for booking into the facility."  (Helm Decl. Ex. B, Martinelli Report, p. 13).

But Mr. Martinelli does not in fact know if the "medical screening staff" conducted screening protocols because the "medical screening staff" consisted of only one person: Defendant Zelda Sancho, L.V.N.  And Mr. Martinelli has testified—repeatedly— that he knows nothing about what Ms. Sancho did or did not do.  For example, when asked whether anything that Zelda Sancho did (or did not do) was deliberately indifferent to Martin Harrison's medical needs, he responded that he had "no opinions on any of the medical staff."  (Helm Decl. Ex. A, Martinelli Dep., 111:22–112:1).  Mr. Martinelli admitted that he didn't "know anything about Nurse Sanchez or Sancho or anything about her termination hearing or anything like that."  (Helm Decl. Ex. A, Martinelli Dep., 126:21–23).  Later, when asked whether he knew "what training Nurse Sancho received about the severity of the risk of her failing to properly assess somebody who needed to be on CIWA[,]" he testified that he knew "absolutely nothing about the nurse."  (Helm Decl. Ex. A, Martinelli Dep., 127:24–128:3).

Similarly, Mr. Martinelli has not identified a factual basis for the opinion contained in paragraph 2.6, the gist of which is that the Sheriff's Department would not have accepted Mr. Harrison for booking if he had shown symptoms of alcohol withdrawal.  (Helm Decl. Ex. B, Martinelli Report, p. 16).  The opinion contained in paragraph 2.6 states: "had Harrison presented with verbal and/or physical cues of severe alcohol intoxication, acute, chronic alcoholism combined with influence; and or severe mental health problems prior to booking; he would not have been

accepted for booking into any sheriff department jail facility."  (Helm Decl. Ex. B, Martinelli

Report, p. 16).  He testified that if Mr. Harrison had "presented with, you know, verbal or physical

cues of severe alcohol intoxication, right, or chronic alcoholism, combined with influence, with

symptoms of influence, and/or mental health problems, he wouldn't have been allowed inside the

jail.  They would not have accepted him.  They would have sent him to the hospital."  (Helm Decl.

Ex. A, Martinelli Dep., 153:22–154:3).  When asked how he knew this, Mr. Martinelli replied:

"[b]ecause that's the protocol."  (Helm Decl. Ex. A, Martinelli Dep., 154:4–5).  But when asked if

he could identify the specific protocol that said that, Mr. Martinelli said "Um, I would tell you that

I'm sure it would be in one of the policies."  (Helm Decl. Ex. A, Martinelli Dep., 154:6–9).

       Instead of identifying a specific protocol or policy, however, Mr. Martinelli stated that "the

protocol of jails, universally, is that they do not accept inmates under these conditions because they

don't have the hospital facilities and the emergency triage facilities and the detoxification facilities

to handle inmates like that."  (Helm Decl. Ex. A, Martinelli Dep., 154:10–14).  Instead of

identifying a specific protocol, Mr. Martinelli relied upon his own subjective knowledge—which he

calls his "collective knowledge"—which he described as his "education, training and experience in

law enforcement, both as an officer and as a law enforcement training consultant, and as an expert,

forensic expert witness."  (Helm Decl. Ex. A, Martinelli Dep., 156:21–157:1).  Mr. Martinelli said

that his "collective knowledge and experience with correctional facilities throughout the country

and especially in California is they will not accept pretrial detainees that have these problems."

(Helm Decl. Ex. A, Martinelli Dep., 156:11–15).

       But Mr. Martinelli cannot offer his own subjective knowledge instead of facts as the basis

for an opinion; "testimony that is unsubstantiated and subjective" is "unreliable and inadmissible."

*Diviero*, 114 F.3d at 853.

1    Moreover, the record in this case also shows the opinion contained in paragraph 2.6 lacks a

2    sufficient factual foundation.  For instance, the National Commission on Correctional Healthcare

3    (NCCHC) requires that jail personnel must ensure that alcohol "[d]etoxification is done only under

4    physician supervision." (Helm Decl. Ex. C, Plaintiffs' Response in Opposition to Defendant

5    Corizon's Motion for Summary Judgment, Ex. 43, NCCHC Standards, p. 103).  And Defendant

6    Harold Orr, M.D., the Medical Director for Alameda County jails and Corizon's Person Most

7    Knowledgeable about policies and procedures for handling inmates with alcohol issues has

8

9    confirmed that—contrary to national standards—jail personnel keep inmates who are suffering from

10   severe alcohol withdrawal in the jail, rather than transferring them to a hospital emergency room.

11   (Helm Decl. Ex. D, Orr PMK Dep., pp. 68:2–73:18). Therefore, this Court should preclude Mr.

12

13   Martinelli from testifying about the opinion contained in paragraph 2.6.

14          Similarly, Mr. Martinelli's Opinion No. 5 lacks any factual basis.  In it, Mr. Martinelli

15   opined that there was "[n]o evidence of any deliberate indifference to decedent Harrison's civil

16   rights" by the following deputies: Valverde, Swetnam, Martinez, Unubun, Sobrero, Bareno,

17   Litvinchuk, Madigan and Rojas.  (Helm Decl. Ex. B, Martinelli Report, p. 19).  He asserted that,

18

19   based on his "review of the discovery evidence," he found no evidence suggesting that these

20   deputies "acted in any manner that would be considered to be deliberately indifferent of Harrison's

21   civil rights."  (Helm Decl. Ex. B, Martinelli Report, p. 19).  But, as mentioned above, in Section

22

23   I.A., Mr. Martinelli did not read any of these deputies' depositions before writing his report.  Nor

24   did he state the evidence that he reviewed which led him to this conclusion.  Therefore, Opinion No.

25   5 lacks reliability, and this Court should prevent him from testifying about it.

26          Additionally, the opinion contained in paragraph 4.11, about Deputy Ahlf's training, lacks

27   any factual basis.  In it, he stated that he had "reviewed the circumstances, Deputy Ahlf's statements

28   and discovery regarding [his] actions in not notifying mental health services . . ."  (Helm Decl. Ex.

1    B, Martinelli Report, p. 19).  Mr. Martinelli opined that he found "no evidence based upon how

2    peace officers are trained in liability class as to the standard of 'deliberate indifference,'" that

3    deputy Ahlf's "actions constituted any deliberate indifference of Harrison's civil rights."  (Helm

4    Decl. Ex. B, Martinelli Report, p. 19).

5

6            But when asked at his deposition how he knew what training Deputy Ahlf specifically got

7    about the deliberate-indifference standard, Mr. Martinelli replied that training on deliberate

8    indifference is "covered in the police academy.  And if he—and I know he did—graduate from a

9    police academy, then he did receive some information on the concept of deliberate indifference."

10    (Helm Decl. Ex. A, Martinelli Dep., 189:22–190:2).  Mr. Martinelli added that training on

11    deliberate indifference is "covered in the POST Learning Domains and also separate during lecture

12    in Liability."  (Helm Decl. Ex. A, Martinelli Dep., 190:5–6).  Nevertheless, when counsel asked Mr.

13    Martinelli "[w]hich POST Learning Domain covers deliberate indiffierence[,]" he replied: "I can't

14

15    tell you that."  (Helm Decl. Ex. A, Martinelli Dep., 190:7–9).

16            Mr. Martinelli also lacks a factual basis for the opinion contained in paragraph 2.4, in which

17    he opined that "[m]edical research and published articles state that the symptoms of delirium

18    tremens most often occur within 72 hours after the last drink."  (Helm Decl. Ex. B, Martinelli

19    Report, p. 15).  He added that signs of DTs may also occur up to seven to ten days after the last

20    drink.  (Helm Decl. Ex. B, Martinelli Report, p. 15).  Therefore, he concluded, Mr. Harrison did not

21    present signs or symptoms of Delirium Tremens until nearly three days after he entered the jail, so

22

23    that it would "not be reasonable for any corrections and/or medical staff to have observed or treated

24    Harrison for DT anytime prior to that absent any presentations from Harrison."  (Helm Decl. Ex. B,

25    Martinelli Report, p. 15).

26

27            At his deposition, Mr. Martinelli adhered to this opinion; he stated that, based on what he

28    read, he would not expect Martin Harrison to be showing signs of Delirium Tremens in less than

1    seventy-two hours.  (Helm Decl. Ex. A, Martinelli Dep., 150: 15–18).  When asked if he cared to

2    disclose, as the basis for this opinion, "anything other than the one in the footnote" in his report, Mr.

3    Martinelli replied: "Nope.  That's good enough."  (Helm Decl. Ex. A, Martinelli Dep., 151:3–5).

4          This is hardly good enough; an opinion based on one article in an area outside the witness's

5    expertise is not based on sufficient facts.

6          Moreover, it is undisputed in this case that when Mr. Harrison was placed in the isolation

7    cell for bizarre behavior in the early morning hours of August 16, he was displaying the signs and

8    symptoms of severe alcohol withdrawal, or Delirium Tremens.  Because Mr. Martinelli's opinions

9    lack factual bases, this Court should preclude him from testifying about Opinions Nos. 1 and 5, and

10   the opinions contained in paragraphs 2.6 and 4.11 of his report.

11
          **2.  Federal Rule of Evidence 702 requires this Court to preclude Mr. Martinelli from
12             testifying about Opinion No. 3, and the opinions contained in paragraph 2.2,
               because he has failed to explain the reasoning underlying them.**

13
          A district court acts within its discretion in excluding an expert witness's testimony that

14   provides no explanation of precisely how the expert reached his or her conclusions.  *See Cabrera v.*

15   *Cordis Corp.*, 134 F.3d 1418, 1422–23 (9th Cir. 1998).  Stated differently, "[t]he *Daubert* duty is to

16   judge the reasoning used in forming an expert conclusion."  *Kennedy v. Collagen Corp.*, 161 F.3d

17   1226, 1230 (9th Cir. 1998).  An expert's opinion on causation lacks reliability if the opinion fails to

18   rule out other possible causes.  For example, in *Diviero*, an expert witness in car tires testified that

19   an adhesion defect caused a tire to disintegrate, which then caused the car crash that injured the

20   plaintiffs.  *Diviero*, 114 F.3d at 853.  But the expert could not "dismiss various other possible

21   causes" of the tire's disintegration.  *Id.*  The district court, applying Rule 702, found his opinions

22   were speculative, "would not assist the trier of fact," and the Ninth Circuit agreed.  *Id.*  *Diviero*

23   teaches that a district court acts within its discretion by excluding an expert witness's testimony that

fails to dismiss various other possible causes; such testimony is "unsubstantiated and subjective, and therefore unreliable and inadmissible." *Id.*

Here, like the expert in *Diviero*, Mr. Martinelli draws a conclusion about causation.  He opines at various points that Martin Harrison caused his own death by his own failure to tell any jail personnel about his health problems.  In Opinion No. 3, Mr. Martinelli wrote that "[d]ecedent Harrison's failure to notice housing corrections staff that he was experiencing or suffering from any medical or mental health problem[s] contributed to the worsening of his overall condition and may have affected his ultimate injuries and death."  (Helm Decl. Ex. B, Martinelli Report, p. 16).  He stood by this opinion at his deposition: when asked if he was saying that "Harrison's failure to let jail staff know that he was an alcoholic contributed to his own problems and possibly his death[,]" (Helm Decl.  Ex. A, Martinelli Dep., 157:12–14), Mr. Martinelli answered: "[a]bsolutely.  I don't think you can deny the issue of contribution here."  (Helm Decl. Ex. A, Martinelli Dep., 157:15–16).  Similarly, in paragraph 2.2, Mr. Martinelli asserted that "Harrison repeatedly responded that he had no medical or mental health problems; was not currently under the care of a physician of [sic] psychiatrist and was not currently taking any prescribed medications."  (Helm Decl. Ex. B, Martinelli Report, p. 14).  At his deposition, he claimed to know "for a fact" that Mr. Harrison "was not truthful in the answers he provided" during the booking process.  (Helm Decl. Ex. A, Martinelli Dep., 138:17–18).  For example, Mr. Martinelli claimed that Mr. Harrison answered "no" to inmate questionnaire number 11, which asked whether the inmate had high blood pressure.  (Helm Decl. Ex. A, Martinelli Dep., 139:17–20).  When asked "[w]ho circled 'no' in response to the question of: Do you have a history of high blood pressure[,]" Mr. Martinelli answered "Nurse Sancho."  (Helm Decl. Ex. A, Martinelli Dep., 140:17–20).

Mr. Martinelli's report did not rule out another equally plausible cause for Mr. Harrison's death: that Mr. Harrison told Nurse Sancho and Deputy Ahlf about his alcohol dependence and

health problems, and they failed to document them.  Indeed, when asked, about the blood pressure question, how he knew that Harrison didn't tell her "yes" and she circled "no," Mr. Martinelli admitted that he had "no independent knowledge of that."  (Helm Decl. Ex. A, Martinelli Dep., 140:21–23).

Similarly, Mr. Martinelli testified that "the way that these forms have been filled out in response to the responses by Mr. Harrison as per protocol, and the formal custom and practice of this department as I know it, is that Mr. Harrison did not tell the staff at the jail that he was a severe alcoholic."  (Helm Decl. Ex. A, Martinelli Dep., 143:7–11).  Referring both to the first form on p. 139, entitled Intake Receiving Screening Form, and also the Prison Health Services Receiving Screening Form  (Helm Decl. Ex. A, Martinelli Dep., 143:14–16), Mr. Martinelli testified that looking at "both of these forms, which constitute the majority of the triage process, outside of Classification, there is no indication that Mr. Harrison had any problems whatsoever, let alone being a severe alcoholic."  (Helm Decl. Ex. A, Martinelli Dep., 143:17–21).

But when confronted with the possibility that "there could be a number of reasons why the forms wouldn't show that he said he was an alcoholic other than the fact that he was dishonest[,]" Mr. Martinelli admitted that "[t]here could be other scenarios."  (Helm Decl. Ex. A, Martinelli Dep., 142:21–25).  Nevertheless, Mr. Martinelli concluded: "the only thing that I can say is that the way that these forms have been filled out in response to the responses by Mr. Harrison as per protocol, and the formal custom and practice of this department as I know it, is that Mr. Harrison did not tell the staff at the jail that he was a severe alcoholic."  (Helm Decl. Ex. A, Martinelli Dep., 143:6–11).  Yet Mr. Martinelli already had repeatedly admitted he did not read any testimony from Defendant Sancho, who completed that form, while later conceding she failed to write down pertinent information concerning his alcohol use.

Mr. Martinelli cannot opine that Mr. Harrison's failure to tell Ms. Sancho or Deputy Ahlf about his health problems caused his death because Mr. Martinelli, like the tire expert in *Diviero*, has failed to rule out another possible cause: that Mr. Harrison told them about his health problems, and they failed to record this information.  Therefore, this Court should exclude as unreliable any testimony on Opinion No. 3 or the opinion contained in paragraph 2.2.

**D.  Under Federal Rule of Evidence Rules 702 and 403, this Court should preclude Mr. Martinelli from testifying on matters that would either invade the jury's province or unfairly prejudice Mr. Harrison.**

At his deposition, Mr. Martinelli testified that, in connection with his work on this case, he did not "make any credibility determinations."  (Helm Decl. Ex. A, Martinelli Dep., 108:3–4).  But he has.  Repeatedly.  For example, Mr. Martinelli's repeated assertions that Martin Harrison "lied" to jail staff about his health problems improperly invades the jury's duty to find the facts and determine credibility, and is not a proper basis for expert testimony.  Federal Rule of Evidence 702 "in broad language requires that the testimony 'help the trier of fact to understand the evidence or to determine a fact in issue'[.]"  *United States v. Lukashov*, 694 F.3d 1107, 1116–17(9th Cir. 2012) (quoting Fed. R. Evid. 702; *Primiano v. Cook*, 598 F.3d 558, 563 (9th Cir. 2010)).  But opinion testimony that resolves a factual matter for the jury does not help the jury.  This Circuit "continues to guard—perhaps too jealously—from expert elucidation, areas believed to be within the jurors' common understanding."  *United States v. Rahm*, 993 F.2d 1405, 1413 (9th Cir. 1993).

**"Credibility is a matter to be decided by the jury."**  *United States v. Binder*, 769 F.2d 595, 602 (9th Cir. 1985) (emphasis added) (citing *United States v. Barnard*, 490 F.2d 907, 912–13 (9th Cir. 1973), *overruled on other grounds by United States v. Morales*, 108 F.3d 1031 (9th Cir. 1997) (en banc)).  *Binder* reversed the district court's erroneous admission of expert testimony that impermissibly asked the jury "to accept an expert's determination that . . . particular witnesses were truthful."  *Binder*, 769 F.2d at 602.  Therefore, a district court should exercise its discretion to

1    exclude an expert witness's testimony "'if it concerns a subject improper for expert testimony, for

2    example, one that invades the province of the jury.'"  *United States v. Lukashov*, 694 F.3d 1107 (9th

3    Cir. 2012) (quoting *Binder*, 769 F.2d at 602 (9th Cir. 1985).

4         Here, this Court should preclude Mr. Martinelli from expert testimony that makes credibility

5    determinations about Mr. Harrison.  Instead of finding that Mr. Harrison lied to the jail staff, the

6    jury could find that the jail staff lied.  For example, the jury could find that Ms. Sancho's assertion

7    that Mr. Harrison 'only had two beers' was a false statement she concocted during an investigatory

8    meeting following Mr. Harrison's beating.

9         Additionally, allowing an expert to opine that Mr. Harrison lied to jail medical staff would

10   be highly inflammatory and more prejudicial than probative of any fact in issue.  Therefore, the

11   district court should preclude Mr. Martinelli's testimony that Mr. Harrison was untruthful because

12   the probative value of such testimony "'is substantially outweighed by the danger of unfair

13   prejudice[.]'"  *United States v. W.R. Grace* 504 F.3d 745, 759 (9th Cir. 2007) (quoting Fed. R. Evid.

14   403).

15                                    **RELIEF REQUESTED**

16        For the foregoing reasons, Plaintiffs request that this Court grant their Fourth Motion in

17   Limine, to preclude Mr. Martinelli from testifying about both: (1) the opinions and facts he omitted

18   from his expert report; and (2) the opinions contained in his report that lack reliability: Opinions

19   Nos. 1, 3, 5, and the opinions contained in paragraphs 2.2, 2.3, 2.4, 2.6, 3.6, 4.11, 5.0 and 5.1.

1

2

3

## FIFTH MOTION IN LIMINE TO LIMIT THE TESTIMONY OF DEFENDANT COUNTY'S EXPERT ROBERT FONZI

4

5

**A. The Court should preclude Mr. Fonzi from testifying about opinions or facts that he omitted from his Rule 26 expert-witness report.**

6

This Court should preclude Mr. Fonzi from testifying about facts that he omitted from his

7

report.  Rule 26 requires that the expert witness's report include "the facts or data considered by the

8

witness in forming [the witness's opinions]."  Fed. R. Civ. P. 26(a)(2)(B)(ii).  If an expert witness

9

fails to include the facts or data, then he or she may not testify about them at trial, because Federal

10

Rule of Civil Procedure 37(c)(1) forbids the expert witness from using at trial "any information

11

required to be disclosed by Rule 26(a) that he or she failed to disclose."  *Yeti by Molly LTD v.*

12

*Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001).  Here, Mr. Fonzi testified that he

13

reviewed the following expert witness reports and depositions after completing his Rule 26 report:

14

15

16

- **Plaintiffs' Expert Jack Ryan.**  When asked if Mr. Fonzi had "reviewed Jack Ryan's report and possibly his deposition . . . after [his] own report in this case was completed[,]" Mr. Fonzi replied that he "believe[d] that's accurate[.]"  (Helm Decl. Exhibit E, Fonzi Dep., 30:22–31:1).

17

18

19

20

- **Defendant-County's Expert Ron Martinelli.**  When asked if Mr. Fonzi had "reviewed . . . the Martinelli report and/or deposition after [his] own report in this case was completed[,]" Mr. Fonzi replied that he "believe[d] that's accurate with the exception that [he] d[id]n't believe [he] had Martinelli's report."  (Helm Decl. Ex. E, Fonzi Dep., 30:22–31:2).

21

22

23

24

25

26

Therefore, this Court should preclude Mr. Fonzi from testifying about them.  In addition, Mr. Fonzi

27

also testified that he did not read depositions from the following witnesses:

28

- **Deputy Earl Back**, the County's Person Most Knowledgeable concerning the training and handling of people with emotional or mental disturbances (Helm Decl. Ex. E, Fonzi Dep., 37:24–38:3);

- **Sergeant Cynthia Sass**, the County's Person Most Knowledgeable concerning training, policies and procedures for detoxification of inmates (Helm Decl. Ex. E, Fonzi Dep., 38:4–7);

Because Mr. Fonzi did not read these depositions, this Court should preclude him from testifying about them at trial.  Further, Mr. Fonzi should not be permitted to offer his own opinions on any issue within the subject matter of these PMK witnesses, since not having read the testimony of the authoritative witnesses on those subjects, any opinion he might express would be speculative, lacking in foundation, and unreliable.

**B. Federal Rule of Evidence 702 requires this Court to exercise its discretion to preclude Mr. Fonzi from testifying about medical-screening procedures outside his scope of expertise, baseless and broad generalizations about the adequacy of Defendants' procedures, or speculation about what every other law enforcement agency would do.**

A district court must ensure the reliability of the expert's testimony.  *Diviero v. Uniroyal Goodrich Tire Co.*, 114 F.3d 851, 853 (9th Cir. 1997).  This "'basic gatekeeping obligation' applies with equal force in cases, such as this one, where 'non-scientific' experts wish to relate specialized observations derived from knowledge and experience that is foreign to most jurors." *United States v. Prime*, 431 F.3d 1147, 1152 (9th Cir. 2005) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148 (1999)).[2]

Mr. Fonzi states in "Opinion 3" in his report that "jail personnel assigned to the Santa Rita Jail Facility took appropriate steps in processing, evaluating, and housing Martin Harrison during his incarceration."  (Ex. F, Fonzi Report, p. 4).  At his deposition, Mr. Fonzi agreed that Opinion 3

---

[2] Plaintiffs request that this Court determine the reliability of Mr. Fonzi's proposed expert-witness testimony without holding a *Daubert* hearing.

encompassed Mr. Harrison's initial intake screening.  (Helm Decl. Ex. E, Fonzi Dep., 132:24–133:1).  When Plaintiffs' counsel asked Mr. Fonzi whether his opinion was that "there was a process to screen the new inmate for medical conditions and therefore . . . that it was appropriate[,]" (Helm Decl. Ex. E, Fonzi Dep., 134:2–4), Mr. Fonzi responded "[t]he process by which he was evaluated, yes, and the policies that require the process, yes."  (Helm Decl. Ex. E, Fonzi Dep., 134:6–7).

This Court should preclude Mr. Fonzi from testifying about Opinion 3 because it deals with subject matter beyond his expert qualifications.  Federal Rule of Evidence 702 "requires that a testifying expert be 'qualified as an expert by knowledge, skill, experience, training, or education.'" *Hangarter v. Provident Life and Accident Ins. Co.*, 373 F.3d 998, 1015 (9th Cir. 2004) (quoting Fed. R. Evid. 702).  District courts "exercise broad discretion in admitting and excluding expert testimony, and proffered testimony is properly excluded when foundational facts demonstrating qualification are absent."  *United States v. 99.66 Acres of Land*, 970 F.2d 651, 657 (9th Cir. 1992) (citing *LuMetta v. U.S. Robotics, Inc.*, 824 F.2d 768, 771 (9th Cir. 1987).  Accordingly, an expert's opinion on matters for which he or she is not qualified to opine should not be admitted.

Mr. Fonzi admits he has no expertise in the appropriateness of the County's initial medical screening of Mr. Harrison.  (Helm Decl. Ex. E, Fonzi Dep., 139:24–140:2).  He also has no expertise in national—or even regional—standards that Alameda County might have employed in its initial medical screening of Mr. Harrison.  When asked "whether national standards required Santa Rita Jail to have any RN review of the medical screening that happened at the different intake facility[,]" (Helm Decl. Ex. E, Fonzi Dep., 138:7–9), Mr. Fonzi replied: "What national standards are you talking about?"  (Helm Decl. Ex. E, Fonzi Dep., 138:10).  Nor could Mr. Fonzi identify any aspects of Alameda County's medical-screening policy for new inmates that would tend to make the policy appropriate.  When Plaintiffs' counsel asked Mr. Fonzi "what about that medical intake

1   screening process made it an appropriate process?[,]" (Helm Decl. Ex. E, Fonzi Dep., 134:8–9), he

2   replied "[t]he fact that they have one[.]"  (Ex. E, Fonz Dep., 134:10).  Mr. Fonzi has failed to

3   present "foundational facts," *99.66 Acres of Land*, 970 F.2d at 657, that show the requisite expertise

4   to allow this Court to admit his testimony on Opinion 3.

5          Moreover, the County's counsel even acknowledged that Mr. Fonzi lacks sufficient

6   expertise to offer an opinion, as he did in Opinion 3, about Alameda County's medical screening of

7   Mr. Harrison.  At Mr. Fonzi's deposition, the County's counsel agreed that Mr. Fonzi was not

8   "being offered to opine upon the quality of Ms. Sancho's evaluation, whether she asked all the right

9   questions and so forth."  (Helm Decl. Ex. E, Fonzi Dep., 137:9–12).  Yet, on its face and as

10  described by Mr. Fonzi at his deposition, Opinion 3 did encompass the intake assessment by Ms.

11  Sancho.  Therefore, this Court should preclude Mr. Fonzi from testifying about Opinion 3 in his

12  report.

13         This Court should also preclude Mr. Fonzi from testifying about "Opinion 2" because he has

14  not based this opinion on sufficient facts.  An expert witness "may provide opinion testimony if 'the

15  testimony is based upon sufficient facts or data' and 'is the product of reliable principles and

16  methods,' which have been 'applied . . . reliably to the facts of the case.'"  *United States v. W.R.*

17  *Grace*, 504 F.3d 745, 759 (9th Cir. 2007) (quoting Fed. R. Evid. 702).

18         Here, Mr. Fonzi's Opinion 2 concludes that "there is a clear custom and practice of ensuring

19  adequate supervision, training, and jail procedures involving several components dealing with jail

20  operations, inmate booking, classification, and investigating use of force incidents."  (Helm Decl.

21  Ex. E, Fonzi Report., p. 4).  When asked at his deposition about the basis for Opinion 2, Mr. Fonzi

22  testified that he based this opinion on the policies, practices, statements, and documents he

23  reviewed.  (Helm Decl. Ex. E, Fonzi Dep., 129:25–130:2).  When asked to explain how he could

24  make such a sweeping pronouncement based only on reading some policies and a few depositions

related to this specific case, Mr. Fonzi said his opinion was "[j]ust based on my review of the policies that I reviewed that I felt were well written and incorporate and encompass, you know, important areas." (Helm Decl. Ex. E, Fonzi Dep., 130:12-14).

Without foundation or basis, Mr. Fonzi jumps from an opinion that the County's policies are well written and cover certain topics to total speculation that "there is a clear custom and practice of ensuring adequate supervision, training, and jail procedures involving several components dealing with jail operations, inmate booking, classification, and investigating use of force incidents." (Helm Decl. Ex. F, Fonzi Report., p. 4). This Court, therefore, should preclude Mr. Fonzi from testifying about Opinion 2 from his report.

Also lacking reliability is the opinion on page 11 of Mr. Fonzi's report, where he states that "such circumstances, if repeated, would predictably cause trained law enforcement personnel to respond and act in the same manner regardless of jurisdiction or agency." (Helm Decl. Ex. F, Fonzi Report, p.11). Nowhere in his report does Mr. Fonzi explain the reasoning behind this obviously speculative conclusion.

A district court acts within its discretion in excluding an expert witness's testimony that provides no explanation of precisely how the expert reached his or her conclusions. *See Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1422–23 (9th Cir. 1998). Stated differently, "[t]he *Daubert* duty is to judge the reasoning used in forming an expert conclusion." *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1230 (9th Cir. 1998). Or, as another Ninth-Circuit panel more recently explained the *Daubert* duty: "[b]asically, the judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car, Inc. v. Avis Budget Group, Inc.*, 709 F.3d 872, 883 (9th Cir. 2013).

Mr. Fonzi's opinion on page 11 of his report is one such unreliable, nonsense opinion. When Plaintiffs' counsel asked him about whether, in the opinion on his report's page 11, he was

saying that he "would expect this incident, if repeated in any jail around the country, to have the same outcome[,]" (Helm Decl. Ex. E, Fonzi Dep., 197:13–15), Mr. Fonzi replied "[a]s far as the death that occurred . . . [n]ot necessarily, no."  (Helm Decl. Ex. E, Fonzi Dep., 197:16–17).  But, he continued, the deputies would "have used the same degree of force under the same circumstances . . . [d]ealing with an individual if the resistance and threat assessment was identical[.]"  (Helm Decl. Ex. E, Fonzi Dep., 197:18–20).  Nowhere in his report, nor at his deposition, could Mr .Fonzi explain the reasoning behind this opinion.  Therefore, it lacks reliability and this Court should exclude him from testifying about it.

### **RELIEF REQUESTED**

For the foregoing reasons, Plaintiffs request that this Court grant their Fifth motion in limine to preclude Mr. Fonzi from testifying about both: (1) the opinions and facts he omitted from his expert report; and (2) the opinions contained in his report that lack reliability: Opinion 3, Opinion 2, and the unnumbered opinion in bolded italics at the top of page 11 of his expert's report.

1
2

### SIXTH MOTION IN LIMINE TO LIMIT THE TESTIMONY OF DEFENDANT COUNTY'S FIRST FORENSIC PATHOLOGY EXPERT VINCENT J.M. DI MAIO, M.D.

3

**A. The Court should preclude Dr. Di Maio from testifying about opinions or facts that he omitted from his Rule 26 expert-witness report.**

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19

This Court should preclude Dr. Di Maio from testifying about facts and opinions that he omitted from his report. Rule 26 requires that the expert witness's report to include "the facts or data considered by the witness in forming [the witness's opinions]." Fed. R. Civ. P. 26(a)(2)(B)(ii). If an expert witness fails to include the facts or data, then he or she may not testify about them at trial, because Federal Rule of Civil Procedure 37(c)(1) forbids the expert witness from using at trial "any information required to be disclosed by Rule 26(a) that he or she failed to disclose." *Yeti by Molly LTD v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001). Here, Dr. Di Maio testified that he had not reviewed the depositions or recorded interviews of several witnesses, including for example: Defendant Megan Hast; the 9 deputies who responded to Defendant Deputy Ahlf's call for backup; nurses Anderson and Blyakherova; and Sgt. Bricker, who was critical of Defendant Ahlf. (Helm Decl. Exhibit G, Di Maio Dep. 7:21–9:25: 31:13–23). Because Dr. Di Maio did not read these depositions, this Court should preclude him from testifying about them at trial.

20
21
22
23
24
25
26
27

Moreover, this Court should preclude Dr. Di Maio from testifying about opinions not in his report. An expert witness's report must include "a complete statement of *all opinions* the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i) (emphasis added). If an expert witness fails to comply with all aspects of Rule 26, then Federal Rule of Civil Procedure 37(c)(1) "gives teeth to these requirements by forbidding the use at trial of *any information* required to be disclosed by Rule 26(a) that is not properly disclosed." *Yeti by Molly LTD*, 259 F.3d at 1106 (footnote omitted) (emphasis added).

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dr. Di Maio's report contains no reference whatsoever to the junk science "excited-delirium" theory often posited as a cause of death when law enforcement officers kill people in custody.

Yet at his deposition, Dr. Di Maio testified that Mr. Harrison's death could be "a pure excited delirium case[,]" given that "[a]lcohol withdrawal is one of the entities that makes up excited delirium." (Helm Decl. Ex. G, Di Maio Dep., 32:23–33:1). He asserted that Mr. Harrison's death was "a pure excited delirium syndrome, but the etiology is unknown. . . So this presentation is of somebody in excited delirium. The most logical condition to explain this is alcohol withdrawal, deteriorating into delirium tremens." (Helm Decl. Ex. G, Di Maio Dep., 33:1–8). Dr. Di Maio admitted at his deposition that he never mentioned excited delirium in his Rule 26 report. (Helm Decl. Ex. G, Di Maio Dep., 95:1–7). Therefore, this Court should preclude Dr. Di Maio from testifying about excited delirium.

**B. Federal Rule of Evidence 702 requires this Court to exercise its discretion to preclude Dr. Di Maio from testifying about 'excited-delirium syndrome' because such testimony would be unreliable.**

This Court may determine the reliability of Dr. Di Maio's testimony on excited delirium without a hearing, by applying the *Daubert* factors.

*Daubert* suggests a flexible, factor-based approach to analyzing the reliability of expert testimony. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593–95 (1993). The non-exhaustive list of factors includes whether: (1) the scientific theory or technique can be (and has been) tested; (2) the theory or technique has been subjected to peer review and publication, (3) there is a known or potential error rate, and (4) the theory or technique is generally accepted within the scientific community. *Mukhatar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1064 (9th Cir. 2002) (citing *Daubert*, 509 U.S. at 593–94) (rest of citation omitted), *amended by* 319 F.3d 1073 (9th Cir. 2003), *overruled on other grounds by Estate of Barabin,* U.S. App. LEXIS 774, at *23. The bottom

line is that "the trial judge must ensure that 'junk science' plays no part in the [jury's] decision."

*Mukhatar*, 299 F.3d at 1063.

Junk science aptly describes excited-delirium syndrome, a theory developed specifically for defending lawsuits such as this one.  Dr. Di Maio acknowledged that he and his wife invented the phrase 'excited-delirium syndrome.'  (Helm Decl. Ex. G, Di Maio Dep., 159:19–21).  In 2006, they published a book entitled "Excited Delirium Syndrome: Cause of Death and Prevention."  (Helm Decl. Ex. G, Di Maio Dep., 97:12–21).  Despite Dr. Di Maio's testimony that he considered the book a textbook for doctors to use, (Helm Decl. Ex. G, Di Maio Dep., 157:1–4), he and his wife dedicated the book to "all law enforcement and medical personnel who have been wrongfully accused of misconduct and deaths due to excited delirium syndrome."  (Helm Decl. Ex. G, Di Maio Dep., 169: 11–17).

Dr. Di Maio has repeatedly opined that Delirium Tremens caused Mr. Harrison's death.  In his report, Dr. Di Maio opined that "in all medical probability, Martin Harrison . . . died as a result of delirium tremens."  (Helm Decl. Ex. H, Di Maio Report, p. 5).  But at his deposition, Dr. Di Maio inserted his "excited-delirium," junk-science theory into this case for the first time, asserting that Delirium Tremens is a kind of excited delirium.  Dr. Di Maio testified that Mr. Harrison's death could be considered "a pure excited delirium case[,]" supposedly because "[a]lcohol withdrawal is one of the entities that makes up excited delirium."  (Helm Decl. Ex. G, Di Maio Dep., 32:23–33:1).  He testified that Mr. Harrison's death was "a pure excited delirium syndrome, but the etiology is unknown. . . So this presentation is of somebody in excited delirium.  The most logical condition to explain this is alcohol withdrawal, deteriorating into delirium tremens."  (Helm Decl. Ex. G, Di Maio Dep., 33:1–8).  Later at his deposition, Dr. Di Maio again characterized Mr. Harrison's cause of death as excited delirium, testifying that "the classical presentation in excited delirium—which, again, this is a variant—is that the patient goes from normal sinus rhythm, to bradycardia, to PEA,

1    to asystole."  (Helm Decl. Ex. G, Di Maio Dep., 86:19–23).  Indeed, Dr. Di Maio agreed that he had

2    testified earlier in his deposition that this case is a variant of excited delirium.  (Helm Decl. Ex. G,

3    Di Maio Dep., 94:23–5).  But applying the *Daubert* factors shows that excited delirium is junk

4    science.

5            First—as Dr. Di Maio admitted at his deposition—excited-delirium syndrome has not been

6    subjected to peer review.  When asked whether he had any idea whether, as of May 2007, "there

7

8    was any peer-reviewed article that acknowledge[d] excited delirium syndrome as a primary cause of

9    death[,]" Dr. Di Maio responded that he had "no idea."  (Helm Decl. Ex. G, Di Maio Dep., 157:5–

10   9).  Nor could Dr. Di Maio recall if any peer-reviewed articles on excited-delirium syndrome

11   existed even by the time of his deposition on January 24, 2014.  (Helm Decl. Ex. G, Di Maio Dep.,

12   157:10–22).

13

14           Even Dr. Di Maio himself—who has continuously served, since 1992, as the editor-in-chief

15   of the American Journal of Forensic Medicine and Pathology—has never once published any peer-

16   reviewed article on excited-delirium syndrome.  (Helm Decl. Ex. G, Di Maio Dep., 168:6–16).

17

18           Second, excited-delirium syndrome is not generally accepted within the medical community.

19   The International Classification of Diseases does not codify it.  As Dr. Di Maio acknowledged,

20   there are neither ICD-9 nor ICD-10 codes for "excited delirium" or "excited delirium syndrome."

21   (Helm Decl. Ex. G, Di Maio Dep., 163:8–13).  And, as Dr. Di Maio admitted, listing "excited-

22   delirium syndrome" or "excited delirium" on a death certificate means that "it cannot be coded or

23

24   classified for use by the government in collection of its mortality data."  (Helm Decl. Ex. G, Di Mao

25   Dep., 164:1–5).

26           Third, Dr. Di Maio and his wife admit that "excited delirium" only arises as a cause of death

27   when a person dies during restraint by police or mental health workers.  On the first page of their

28   book, they define excited-delirium syndrome as involving "the sudden death of an individual,

1   during or following an episode of excited delirium, in which an autopsy fails to reveal evidence of

2   sufficient trauma or natural disease to explain the death."  (Helm Decl. Ex. I, Theresa G. Di Maio

3   and Vincent J.M. Di Maio, *Excited Delirium Syndrome: Cause of Death and Prevention*, 1 (2006)).

4   They write that "[i]n virtually all such cases [of excited-delirium syndrome], the episode of excited

5   delirium is terminated by a struggle with police or medical personnel, and the use of physical

6   restraint."  *Id.*

7

8        Fourth, "excited delirium" is not recognized by either the American Medical Association

9   nor, as Dr. Di Maio admitted, by the American Psychiatric Association.  (Helm Decl. Ex. G, Di

10  Maio Dep., 162:18–21).  Dr. DiMaio would not admit that he was aware that the American Medical

11  Association does not recognize either "excited delirium" nor "excited-delrium syndrome" as either

12  medical or psychiatric conditions.  (Helm Decl. Ex. G, Di Maio Dep., 159:22–160:3).  Moreover,

13  neither "excited delirium nor "excited-delirium syndrome" appear in the Diagnostic and Statistical

14  Manual of Mental Disorders (DSM) V.

15

16       Fifth, 'excited delirium' has dubious beginnings at best.  Dr. Di Maio and his wife credit

17  Defendants' second forensic pathologist, Charles Wetli, M.D. – the subject of Plaintiffs' next

18  motion in limine – with resurrecting 'excited delirium' theory in the 1980's.  However, Dr. Di Maio

19  was unaware that in fact several of the deaths that Dr. Wetli classified as 'excited delirium' while he

20  was an assistant medical examiner in Dade County, Florida, in the 1980's were actually reclassified

21  as homicides by Dr. Wetli's boss, Chief Medical Examiner Joseph Davis, M.D.  (Ex. G, Di Maio

22  Dep. pp. 154:24-156:21).

23

24       The women Dr. Wetli asserted had died from 'excited delirium' had actually died from

25  homicide by asphyxia.  Dr. Davis, after he reclassified the autopsies as homicides, told the local

26  newspaper at the time, "You could stand 10 feet away, it's that clear" that the women had been

27  asphyxiated to death.  (Ex. J, Wetli Dep., p. 180:15-181:17).  Defendants should not be permitted to

28

1   inject a junk science theory, that was debunked nearly thirty years ago by the supervisor of its main

2   proponent Dr. Wetli, into this trial where Delirium Tremens, a recognized medical diagnosis, is the

3   real issue.

4          Unlike "excited delirium," the Delirium Tremens from which Martin Harrison indisputably

5   suffered is a legitimate diagnosis that has been recognized for decades by the medical and

6   psychiatric community.  This Court should not allow Dr. Di Maio to confuse the jury with his bogus

7   "excited-delirium" theories, especially when he completely omitted them from his report.

8                                   **RELIEF REQUESTED**

9          For the foregoing reasons, Plaintiffs request that this Court grant their Sixth Motion in

10  Limine to preclude Dr. Di Maio from testifying about both: (1) the opinions and facts he omitted

11  from his expert report; and (2) either excited delirium or excited-delirium syndrome.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

**SEVENTH MOTION IN LIMINE TO LIMIT THE TESTIMONY OF DEFENDANT COUNTY'S SECOND FORENSIC PATHOLOGY EXPERT EXPERT CHARLES V. WETLI, M.D.**

3

4

5

 **A.  The Court should preclude Dr. Wetli from testifying about opinions or facts that he omitted from his Rule 26 expert-witness report.**

6

7

8

9

  Defendant County has retained not one, but two forensic pathologists to testify in this case, over and above the County's official forensic pathologist, Thomas Rogers, M.D., who performed the autopsy on Martin Harrison.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

  This Court should preclude Dr. Wetli from testifying about facts and opinions that he omitted from his report.  Rule 26 requires that the expert witness's report include "the facts or data considered by the witness in forming [the witness's opinions]."  Fed. R. Civ. P. 26(a)(2)(B)(ii).  If an expert witness fails to include the facts or data, then he or she may not testify about them at trial, because Federal Rule of Civil Procedure 37(c)(1) forbids the expert witness from using at trial "any information required to be disclosed by Rule 26(a) that he or she failed to disclose." *Yeti by Molly LTD v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001).  Here, Dr. Wetli testified that he had not reviewed the depositions of any of the other defendant deputies—besides that of deputy Ahlf—before he formed his opinions in this case.  (**Helm Decl.** Exhibit J, Wetli Dep., 12:22–13:2; 25:6–13).  Dr. Wetli also did not review: Plaintiffs' expert Dr. Baden's supplemental report; Defendants' expert Dr. Klatsky's report (**Helm Decl.** Ex. J, Wetli Dep., 14:6–14); and Monica Anderson's deposition (**Helm Decl.** Ex. J, Wetli Dep., 36:17–21). Nor did Dr. Wetli read the depositions of: Megan Hast, Harold Orr, Dr. Maria Magat, Zelda Sancho, or Terry Granlund, R.N.. (**Helm Decl.** Ex. J, Wetli Dep., 37:4–15).  Dr. Wetli did not read the depositions of Sergeants Bricker or Dudek  (**Helm Decl.** Ex. J, Wetli Dep., 38:11–15).

28

  Finally, Dr. Wetli also omitted any discussion of "excited delirium" from his Rule 26 report, and so this Court should bar him from testifying about it at trial.

**B. Federal Rule of Evidence 702 requires this Court to exercise its discretion to preclude Dr. Wetli from testifying about excited-delirium syndrome because such testimony would be unreliable.**

In his report, Dr. Wetli opines that "Mr. Martin Harrison died from the metabolic complications of agitated delirium due to delirium tremens that was a consequence of his alcoholism."  (Helm Decl. Ex. K, Wetli report, p.3).  At his deposition, he claimed that agitated delirium is the same thing as 'excited delirium.'  (Helm Decl. Ex. J, Wetli Dep., 69:3–5).  He testified that Mr. Harrison's cause of death was "[d]elirium tremens manifested as excited delirium[.]"  (Helm Decl. Ex. J, Wetli Dep., 62:17–19).

Plaintiffs request that this Court, in its discretion, determine the reliability of Dr. Wetli's proposed expert-witness testimony on excited-delirium syndrome without holding a *Daubert* evidentiary hearing.

*Daubert* suggests a flexible, factor-based approach to analyzing the reliability of expert testimony.  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593–95 (1993).  The non-exhaustive list of factors includes whether: (1) the scientific theory or technique can be (and has been) tested; (2) the theory or technique has been subjected to peer review and publication, (3) there is a known or potential error rate, and (4) the theory or technique is generally accepted within the scientific community.  *Mukhatar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1064 (citing *Daubert*, 509 U.S. at 593–94) (rest of citation omitted), *amended by* 319 F.3d 1073 (9th Cir. 2003), *overruled on other grounds by Estate of Barabin*, U.S. App. LEXIS 774, at *23.  The bottom line is that "the trial judge must ensure that 'junk science' plays no part in the [jury's] decision."  *Mukhatar*, 299 F.3d at 1063.

Junk science aptly describes excited-delirium syndrome.  As to the first *Daubert* factor, Dr. Wetli testified at his deposition that the mortality rate for people who are supposedly in excited delirium is unknown because no studies have been performed.  (Helm Decl. Ex. J, Wetli Dep.,

87:18–88:2).  And as to the second *Daubert* factor, when asked to identify any specific peer-reviewed, medical-journal articles on excited-delirium syndrome, Dr. Wetli could only point to the one that he wrote in the Encyclopedia of Forensic and Legal Medicine.  (Helm Decl. Ex. J, Wetli Dep., 66:8–13).  Later at his deposition, he testified that he had never reviewed any peer-reviewed journal articles discussing the mortality rate of a person supposedly suffering from excited delirium. (Helm Decl. Ex. J, Wetli Dep., 88:3–9).

Moreover, even defense expert Di Maio, who co-invented (with his wife) the phrase "excited-delirium syndrome," has never published any peer-reviewed articles about it—despite serving continuously, since 1992, as the editor-in-chief of the American Journal of Forensic Medicine and Pathology.  (Helm Decl. Ex. G, Di Maio Dep., 168:6–16).  Dr. Wetli had not "the faintest idea" whether the American Medical Association recognized excited delirium.  (Helm Decl. Ex. J, Wetli Dep., 62:7–10).  Dr. DiMaio would not admit that he was aware of the American Medical Association's not recognizing either "excited delirium" nor "excited-delrium syndrome" as either medical or psychiatric conditions.  (Helm Decl. Ex. G, Di Maio Dep., 159:22–160:3).  The American Psychiatric Association does not accept "Excited delirium," as Dr. Di Maio admitted. (Helm Decl. Ex. G, Di Maio Dep., 162:18–21).  And, as Dr. Wetli admitted, the words "excited delirium" appear nowhere in the Diagnostic and Statistical Manual (DSM).  (Helm Decl. Ex. J, Wetli Dep., 62:4–6).  Moreover, there are no ICD-9 or ICD-10 codes for either 'excited delirium' or 'excited-delirium syndrome.  (Helm Decl. Ex. G, Di Maio Dep., 163:8–13).  So, if a physician or medical examiner attributed a person's death to 'excited delirium,' even the United States Government would not be able to record the cause of death—as Dr. Di Maio admitted.  (Helm Decl. Ex. G, Di Maio Dep., 164:1–5).

Dr. Di Maio and his wife wrote in their book, *Excited Delirium Syndrome* that Dr. Wetli put forth 'excited delirium' as the cause of death of 19 known or suspected prostitutes in the 1980's

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

when he was a deputy medical examiner in Dade County, Florida.  (Helm Decl. Exhibit I; Ex. G, Di Maio Dep. pp. 154:24-156:21).

Dr. Wetli classified all of those women, who had small amounts of cocaine in their systems at the time of their death, as deaths by 'excited delirium.'  He stated at the time, "for some reason, the male of the species [homo sapiens] becomes psychotic and the female of the species dies in relation to sex" when using cocaine.  (Helm Decl. Ex. J,  Wetli Dep., p. 177:20-24).  However, one of the "females" a fourteen-year-old girl, was found not to have cocaine in her system and Dr. Wetli still classified her death on autopsy as death by 'excited delirium.'  Dr. Wetli's boss, Chief Medical Examiner Joseph Davis, M.D. reexamined that girl, and found that she had actually died by asphyxiation.  Dr. Davis then reexamined the other 18 victims, and found that they all died by homicide from asphyxiation, not "excited delirium."  Dr. Davis told the press at the time, "You could stand 10 feet away, it's that clear" that the victim died by asphyxiation.  (Helm Decl. Ex. J, Wetli Dep. 180:15-17).  Dr. Davis reclassified all 19 of the women's deaths as homicides, and not the bogus 'excited delirium' that Dr. Wetli has posited.  (Helm Decl. Ex. J, Wetli Dep., pp. 175:5-181:17).

This Court should prevent the jury from being subjected to the dubious and unreliable 'excited delirium' theory defense experts posited for the first time in their depositions.  Unlike "excited delirium," the Delirium Tremens from which Martin Harrison indisputably suffered is a legitimate diagnosis that has been recognized for decades by the medical and psychiatric community.  This Court should not allow Dr. Wetli to confuse the jury with his bogus "excited-delirium" theories, especially when he completely omitted them from his report.

1

2
## **RELIEF REQUESTED**

3
      For the foregoing reasons, Plaintiffs request that this Court grant their Seventh Motion in

4
limine to preclude Dr. Wetli from testifying about both: (1) the facts he omitted from his expert

5

6
report; and (2) either agitated delirium, excited delirium, or excited-delirium syndrome.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## EIGHTH MOTION IN LIMINE TO LIMIT THE TESTIMONY OF CORIZON'S EXPERT ROBERT V. JONES, M.D.

**A. This Court should preclude Dr. Jones from testifying about facts that he did not include in his Rule 26 report.**

This Court should preclude Dr. Jones from testifying at trial about materials, such as deposition transcripts, that he himself testified that he either never read in preparing his report or read after he had submitted his report. An expert witness's Rule 26 report must contain "the facts or data considered by the witness in forming [his or her opinions]." Fed R. Civ. P. 26(a)(2)(B)(ii). Rule 37(c)(1) "gives teeth" to Rule 26's requirements "by forbidding the use at trial of any information required to be disclosed by Rule 26(a) that [wa]s not properly disclosed." *Yeti by Molly LTD v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001) (footnote omitted). Dr. Jones admitted at his deposition that he did not read (or could not remember reading, or read after finishing his report) the following documents:

- **Bill Wilson's testimony from Zelda Sancho's arbitration hearing.** Dr. Jones admitted not reading Mr. Wilson's testimony. (Helm Decl. Exhibit L, Jones Dep., 23:12–17);

- **Zelda Sancho's testimony from her arbitration hearing.** Dr. Jones admitted not reading Ms. Sancho's testimony. (Helm Decl. Ex. L, Jones Dep., 23:18–22);

- **Lenore Gilbert's testimony from Zelda Sancho's arbitration hearing.** Dr. Jones admitted not reading Ms. Gilbert's testimony. (Helm Decl. Ex. L, Jones Dep., 23:23–24:1);

- **The testimony of any other nurse who testified at Zelda Sancho's arbitration hearing.** Dr. Jones admitted that he had not seen the documents containing this testimony. (Helm Decl. Ex. L, Jones Dep., 24:2–7);

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

- **Corizon's Employer's Post-Hearing Brief filed in the Sancho arbitration.**  Dr. Jones admitted that he did not receive this document to review.  (**Helm Decl.** Ex. L, Jones Dep., 24:14–21);

- **The deposition of Corizon's Person Most Knowledgeable under Federal Rule of Civil Procedure 30(b)(6) concerning training provided to corrections officers, Terri Granlund, R.N.**  Dr. Jones admitted that he "d[id] not recall that deposition."  (**Helm Decl.** Ex. L, Jones Dep., 46:5–9);

- **The deposition of Alameda County's Person Most Knowledgeable under Federal Rule of Civil Procedure 30(b)(6) concerning training provided to corrections officers, Sergeant Cynthia Sass.**  Dr. Jones admitted that he "d[id] not recall that deposition."  (**Helm Decl.** Ex. L, Jones Dep., 46:10–15);

- **The depositions of all of the Sheriff's deputies involved in this case except Deputy Ahlf.**  Dr. Jones testified that Deputy Ahlf's deposition was the only one he had read.  (**Helm Decl.** Ex. L, Jones Dep., 56:1–10);

- **Bill Wilson's deposition.**   In addition to not reviewing Bill Wilson's arbitration testimony, Dr. Jones admitted to not reading Bill Wilson's deposition in this case until after he formulated his opinions in this case.  (**Helm Decl.** Ex. L, Jones Dep., 43:15–17; 101:1–4);

- **Megan Hast's deposition transcript.**  Dr. Jones admitted that he did not read, that he could recall, the transcript of Ms. Hast's July 2, 2012 deposition.  (**Helm Decl.** Ex. L, Jones Dep., 99:9–11)  Dr. Jones later admitted that he reviewed Ms. Hast's deposition after forming his opinions in this case (**Helm Decl.** Ex. L, Jones Dep., 101:1–4; 196:7–9);

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- **Lenore Gilbert's deposition transcripts.**  Dr. Jones admitted that he did not read the transcript of Ms. Gilbert's October 8, 2013 deposition before submitting his report. (Helm Decl. Ex. L, Jones Dep., 99:12–15).  Later at his deposition, Dr. Jones admitted that he did also not review the transcript from Ms. Gilbert's deposition in December 2013, as Corizon's person most knowledgeable about is contract with the County, until after he formed his opinions in this case (Helm Decl. Ex. L, Jones Dep., 101:5–10);

- **Dr. Kathryn Burns's report and second report.**  Dr. Jones admitted to reviewing these after he wrote his Rule 26 report.  (Helm Decl. Ex. L, Jones Dep., 100:5–9);

- **Plaintiff's expert Dr. Baden's report.**  Dr. Jones admitted to reviewing this after he wrote his Rule 26 report.  (Helm Decl. Ex. L, Jones Dep., 100:10–12);

- **The reports of Drs. Mooney, Wetli, Di Maio, Schoenfeld, and Nurse Wild.**  Dr. Jones admitted to reviewing these after he wrote his Rule 26 report.  (Helm Decl. Ex. L, Jones Dep., 100:13–16);

- **Dr. Burns's declaration in Opposition to the Defendant's Motions for Summary Judgment.**  Dr. Jones admitted to reviewing this after issuing his rule 26 report.  (Helm Decl. Ex. L, Jones Dep., 100:17–21);

- **Dr. Orr's Declaration in Support of Corizon's Motion for Summary Judgment.**  Dr. Jones admitted to reviewing this after issuing his rule 26 report.  (Helm Decl. Ex. L, Jones Dep., 100:22–25);

Because Dr. Jones did not list these documents in his Rule 26 report, this Court should preclude Dr. Jones from testifying about them at trial.

1

2        **B.    Federal Rule of Civil Procedure 37(c)(1) requires this Court to preclude Dr. Jones
                from testifying about whether or not Martin Harrison had a serious medical need
3               because Dr. Jones did not include this opinion in his report as Rule 26 requires.**

4            An expert witness's report must contain "a complete statement of all opinions the witness

5    will express[.]"  Fed. R. Civ. P. 26(a)(2)(B)(i).  As Dr. Jones admitted at his deposition, his report

6

7    did not include an opinion on whether or not Martin Harrison had a serious medical need.  (Helm

8    Decl. Ex. L, Jones Dep., 247:12–15).  Therefore, this Court should preclude him from testifying

9    about this opinion at trial.

10       **C.    This Court should preclude Dr. Jones from testifying about opinions 1 ("Overall
                System"), 2 ("Policies and Procedures"), 3 ("Training of Nurses") and 5 ("Medical
11              training of deputies") because he failed to comply with Federal Rule of Civil
                Procedure 26(a)(2)(B)(i)–(ii)**
12

13           This Court should preclude Dr. Jones from testifying about opinions 1, 2, 3, and 5 of his

14   report, because his report failed to include the factual bases for them.  Opinion 1, titled "Overall

15   System," alleged that the healthcare system at Alameda County's Dyer Detention Facility and the

16   Santa Rita Jail was, while Martin Harrison was incarcerated there, a "thoughtful, reasonable and

17

18   rational system, comparable to those in place in other correctional facilities that offer quality health

19   care systems."  (Helm Decl. Exhibit M, Jones Report, p. 2).  Opinion 2, labeled "Policies and

20   Procedures," claimed that the PHS/Corizon policies and procedures in effect during Mr. Harrison's

21   incarceration were "thoughtful, reasonable[,] and rational[,]" and "met or exceeded the standard of

22

23   care."  (Helm Decl. Ex. M, Jones Report, p. 2).  Opinion 3, called "Training of nurses," alleged that

24   "PHS/Corizon's training program for its nurses met the standard of care."  (Helm Decl. Ex. M,

25   Jones Report, p. 4).  Finally, Opinion 5, labelled "Medical training of deputies[,]" alleged that

26   "PHS/Corizon met the standard of care for approving medical training of deputies through ongoing

27   dialog and discussion with Sheriff's department supervisors."  (Helm Decl. Ex. M, Jones Report, p.

28   5).

An expert witness's report must contain "a complete statement of all opinions the witness will express *and the basis for them*[.]"  Fed R. Civ. P. 26(a)(2)(B)(i) (emphasis added).  To this end, Rule 26 requires that the expert witness's report include "the facts or data considered by the witness in forming [the witness's opinions]."  Fed. R. Civ. P. 26(a)(2)(B)(ii).  If an expert witness fails to include the facts or data upon which the expert witness relied in forming an opinion, then he or she may not testify about the opinion at trial—Federal Rule of Civil Procedure 37(c)(1) penalizes a party's failure to comply with Rule 26(a).  Rule 37(c)(1) provides that "a party that without substantial justification fails to disclose information required by Rule 26(a) . . . is not, unless such failure is harmless, permitted to use as evidence at a trial . . . any witness or information not so disclosed."  Fed. R. Civ. P. 37(c)(1).  Rule 37(c)(1) "is a recognized broadening of the sanctioning power" of district courts.  *Yeti by Molly*, 259 F.3d at 1106 (citing *Klonoski v. Mahlab*, 156 F.3d 255, 269 (1st Cir. 1998) (rest of citation omitted).  And "[t]he Advisory Committee Notes describe it as a 'self-executing,' 'automatic' sanction to 'provide[ ] a strong inducement for disclosure of material . . . .'"  *Yeti by Molly*, 259 F.3d at 1106 (quoting Fed. R. Civ. P. 37 advisory committee's note (1993)).  Dr. Jones failed to disclose in his expert witness report—or even at his deposition—the facts or data upon which he relied as the bases in forming opinions 1, 2, 3, and 5.

Consider Opinion 1, entitled "Overall System," in which Dr. Jones opined that "[t]he health care system in place in Alameda County's Glenn E. Dyer Detention Facility and Santa Rita Jail during the period of Martin Harrison's incarceration was a thoughtful, reasonable, and rational system, comparable to those in place in other correctional facilities that offer quality health care systems."  (Helm Decl. Ex. M, Jones Report, p. 2).  Nowhere in his report did Dr. Jones identify the information upon which he relied in reaching this conclusion.  He did not identify the other correctional facilities that offer "quality health care systems," similar to Defendants, nor ever identify any aspects of a 'quality health-care system."  Instead of listing the facts or data upon

which he based this opinion, he listed, as the "basis" for this opinion, "[s]ee Opinions 2–6." (**Helm Decl.** Ex. M, Jones Report, p. 2).   Listing opinions as the basis for an opinion does not comply with Rule 26.

Similarly, in Opinion 2, Dr. Jones claimed that "[t]he policies and procedures established by PHS/Corizon and approved by Harold Orr, M.D., which were in effect during Mr. Harrison's incarceration, were thoughtful, reasonable, and rational." (**Helm Decl.** Ex. M, Jones Report, p. 2). But Dr. Jones does not define these elastic terms.   He further asserted that these policies and procedures "met or exceeded the standard of care," but nowhere does his report identify specifically the standard of care that he applied.   (**Helm Decl.** Ex. M, Jones Report, p. 2).   He claimed that the PHS/Corizon policies and procedures "also met the national 'standards' for jails established by the National Commission on Correctional Health Care (NCCHC) and the American Correctional Association (ACA)." (**Helm Decl.** Ex. M, Jones Report, p. 2–3).   He did not, however, include in his report the specific NCCHC or ACA standards he consulted when forming this opinion.   Dr. Jones claimed that "the policies and procedures in effect at the time Mr. Harrison was incarcerated cross referenced to both the NCCHC and ACA standards for jails." (**Helm Decl.** Ex. M, Jones Report, p. 3).   He did not, however, identify the specific policies and procedures that he was referring to.

In Opinion 3, Dr. Jones wrote that "PHS/Corizon's training program for its nurses met the standard of care." (**Helm Decl.** Ex. M, Jones Report, p. 4).   But he did not define the standard of care.   He asserted that "PHS/Corizon also specifically stresses the importance of following its policies during its 40 hour new employee orientation training." (**Helm Decl.** Ex. M, Jones Report, p. 4).   He did not identify the documents he relied upon as a basis for this statement, and there is no evidence that the Corizon 40-hour, new-employee training is given to corrections officers who are employed by the County and not Corizon.   Dr. Jones claimed that "PHS/Corizon also provides

1   ongoing monthly in-service training programs." (**Helm Decl.** Ex. M, Jones Report, p. 4).  But he

2   did not identify the factual basis for this statement—by, for example, listing the specific documents

3   that he reviewed that were purportedly used in the training program.  Dr. Jones asserted that

4   "[t]hese processes were assessed during the NCCHC accreditation survey in 2008 and found to be

5   in compliance." (**Helm Decl.** Ex. M, Jones Report, p. 4).  But nowhere in his report does he include

6   the factual basis for this claim.  Moreover, it is undisputed that any 'monthly' training is only for

7   Corizon employees, and corrections officers do not attend such trainings.

8

9       Dr. Jones claimed that "[o]rientation materials stress the potential lethality of alcohol

10  withdrawal and the importance of identification of those at risk for alcohol withdrawal for

11  monitoring, and treatment as necessary." (**Helm Decl.** Ex. M, Jones Report, p. 4).  Presumably, it

12  would not have been difficult for Dr. Jones to list these "orientation materials," but he did not do so.

13  The orientation and training Corizon provided to its own employees are not in issue in this case, and

14  neither Dr. Jones nor any other witness provides admissible evidence that correctional officers

15  received the annual or biennial health related training mandated by national standards and Corizon's

16  and the County's own policies.

17

18      Dr. Jones never even read the depositions of the County's or Corizon's Persons Most

19  Knowledgeable about alcohol withdrawal training to deputies – Sgt. Cynthia Sass and Terri

20  Granlund, R.N. – both of whom confirm that deputies do not receive the required training.  He has

21  no foundation to comment on that training.

22

23      Dr. Jones also claimed that "[a]nnual training in 2009 and 2010, prior to Mr. Harrison's

24  incarceration, covered addiction to alcohol and other drugs and withdrawal treatment in depth and

25  was provided during all staff meetings." (**Helm Decl.** Ex. M, Jones Report, p. 4).  But nowhere does

26  Dr. Jones list the factual basis for this statement.  Furthermore, such training is only for Corizon

27  health care staff, which is not the issue in this case.  Dr. Jones claimed that "[a] handout was

28

provided and CEU credit was given[,]" but Dr. Jones did not list the handout's title, or summarize its content, in his report.  (Helm Decl. Ex. M, Jones Report, p. 4).

Lastly, Dr. Jones failed to provide the factual basis for Opinion 5.  Entitled "Medical training of deputies," Dr. Jones claimed in Opinion 5 that "PHS/Corizon met the standard of care for approving medical training of deputies through ongoing dialog and discussion with Sheriff's department supervisors."  (Helm Decl. Ex. M, Jones Report, p. 5).  Dr. Jones claimed in Opinion 5 that "[t]he medical training of deputies [wa]s demonstrated by the 4 minute training handouts, which review the important items for correctional staff to be aware of when dealing with inmates, as well as substance abuse handouts provided by PHS/Corizon to the Sheriff's Department."  (Helm Decl. Ex. M, Jones Report, p. 6).  But nowhere in his report did he specifically identify the 4-minute training handout, or even discuss its contents with any specificity.  Dr. Jones further claimed that "[t]he medical training of deputies was reviewed by the NCCHC Accreditation team, which found that the Santa Rita Jail was in compliance with NCCHC national standards for medical training of deputies."  (Helm Decl. Ex. M, Jones Report, p. 6).   Nowhere does he list the NCCHC's findings. Dr. Jones claimed, as the "basis" for his opinion, the "[t]raining records of deputies" that were "kept by the Sheriff's Department."  (Helm Decl. Ex. M, Jones Report, p. 5).  Nowhere in his report, however, did Dr. Jones identify the specific records upon which he relied to form Opinion 5. Indeed, at his deposition, Dr. Jones testified that he had not looked at any of the training records of the Sheriff's deputies involved in this case; specifically, he said that he "ha[d] not looked at specific officers' training records."  (Helm Decl. Ex. L, Jones Dep., 55:22–25).

After the section in his report containing his opinions, Dr. Jones again failed to list the facts and data upon which he relied in reaching his opinions.  Instead of listing the specific facts or data upon which he relied to form his opinions, as Rule 26 requires, Dr. Jones merely wrote, under the

heading "[i]nformation reviewed in forming opinions[,]" this vague phrase: "Medical records: PHS Policies and Procedures."  (**Helm Decl.** Ex. M, Jones Report, p. 6).

Indeed, at his deposition, Dr. Jones could not specify the documents he relied upon to form the opinions in his report.  When asked about which specific policies he reviewed to formulate his opinions, Dr. Jones testified: "What I remember?  Uh, intake screening, training, documentation, alcohol treatment.  I mean this has been a long time ago.  I simply don't remember all the policies. I reviewed all of them that I received and that were in effect at the time."  (**Helm Decl.** Ex. L, Jones Dep., 129:3–5).  When asked whether he understood that Rule 26 required him to state all the documents that he reviewed in forming his opinions, Dr. Jones replied that he "reviewed all the policies and procedures."  (**Helm Decl.** Ex. L, Jones Dep., 129:13–16).

Dr. Jones never provided anything but summary conclusions, and referred to his own opinions as the basis for his opinions.  Rule 26, and this Court's gatekeeping function, require more specificity.

Because Dr. Jones failed to provide the information upon which he relied in forming Opinions 1, 3 and 5, this Court should prevent him from testifying about them.

**D.  Under Federal Rule of Evidence 702, Opinions 1 ("Overall System"), 2 ("Policies and Procedures"), 3 ("Training of Nurses"), and 5 ("Medical training of deputies"), are unreliable because Dr. Jones based them on insufficient facts, and therefore this Court should preclude him from testifying about them.**

Rule 702 provides another basis for this Court to preclude Dr. Jones from testifying about Opinions 1, 2, 3 and 5.  A district court must ensure the reliability of the expert's testimony. *Diviero v. Uniroyal Goodrich Tire Co.*, 114 F.3d 851, 853 (9th Cir. 1997) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591 (1993)).  This "'basic gatekeeping obligation' applies with equal force in cases, such as this one, where 'non-scientific' experts wish to relate specialized observations derived from knowledge and experience that is foreign to most

1   jurors." *United States v. Prime*, 43 2 F.3d 1147, 1152 (9th Cir. 2005) (quoting *Kumho Tire Co. v.*

2   *Carmichael*, 526 U.S. 137, 148 (1999)).

3       Plaintiffs request that this Court determine the reliability of Dr. Jones's proposed expert-

4   witness opinion testimony without holding an evidentiary hearing.  Dr. Jones's report and

5   deposition transcript show that his proposed expert-witness opinion testimony lacks reliability

6   because he has failed to provide sufficient factual bases for his opinions.  An expert witness "may

7   provide opinion testimony if 'the testimony is based upon sufficient facts or data' and 'is the

8   product of reliable principles and methods,' which have been 'applied . . . reliably to the facts of the

9   case.'"  *United States v. W.R. Grace*, 504 F.3d 745, 759 (9th Cir. 2007) (quoting Fed. R. Evid. 702).

10  Dr. Jones's Opinions 1, 3 and 5 do not pass muster under Rule 702.

11      The purported "basis" of Opinion 1 is "Opinions 2–6."  (Helm Decl. Ex. M, Jones Report, p.

12

13  2).  Therefore, this Court should preclude Dr. Jones from testifying about Opinion 1 because he did

14  not base it on sufficient facts; rather, he based it on his own other opinions.

15      This Court should preclude Dr. Jones from testifying about Opinions 2 and 3 because of

16  their lack of factual bases as discussed in § C above.

17

18      This Court should preclude Dr. Jones from testifying about Opinion 5 because it lacks a

19  sufficient factual basis.  Dr. Jones based the on a single phone conversation with Bill Wilson. At his

20

21  deposition, Dr. Jones admitted that "Opinion 5, the training of deputies, is based on much of [Dr.

22  Jones's] dialogue with Mr. Wilson."  (Helm Decl. Ex. L, Jones Dep., 34:7–8).  In Opinion 5, Dr.

23  Jones wrote that "Bill Wilson, the PHS/Corizon health services administrator at the time Martin

24  Harrison was incarcerated, *said* that when he began working at the Alameda County Jail, it had

25  already been accredited by the NCCHC[,]" and "the Sheriff's department had medical training for

26  deputies in place, which had been approved by the NCCHC and was on-going."  (Helm Decl. Ex.

27  M, Jones Report, p. 5–6) (emphasis added).  Dr. Jones added in Opinion 5 that "Mr. Wilson offered

28

1   the Sheriff's Department the help of medical staff to assist in these trainings as needed."  (Helm

2   Decl. Ex. M, Jones Report, p. 6).  Dr. Jones further claimed in Opinion 5 that Bill Wilson "had

3   frequent contact with the Sheriff's Department sergeants and lieutenants who were assigned as

4   liaison to PHS/Corizon, including ongoing discussions with them about training."  (Helm Decl. Ex.

5   M, Jones Report, p. 6).  Dr. Jones's Opinion 5 is not his opinion at all, but an empty vessel for Bill

6   Wilson's inadmissible hearsay statements.

7            A district court may allow an expert witness "to state an opinion based on otherwise

8   inadmissible hearsay when the source of information is 'of a type reasonably relied upon by similar

9   experts in arriving at sound opinions on the subject.'"  *United States v. McCollum*, 732 F.2d 1419,

10  1422 (9th Cir. 1984) (quoting *United States v. Sims*, 514 F.2d 147, 149 (9th Cir. 1975), *cert. denied*,

11  423 U.S. 845 (1975); Fed R. Evid. 703).  But *Sims* contemplates that an expert witness relies on

12  hearsay to form his or her own independent opinion; there, the panel explained that an expert may

13  rely upon hearsay provided that "the expert synthesizes the primary source material—be it hearsay

14  or not—into properly admissible evidence in opinion form."  *Sims*, 514 F.2d at 149.

15           Dr. Jones has neither synthesized Bill Wilson's assertions nor used them to form his own

16  independent opinions.  Rather, he has simply spouted unsupported hearsay statements of Mr.

17  Wilson, given in an unspecified telephone conversation with Dr. Jones, and recast them as his

18  'opinions.'

19           Dr. Jones's purported Opinion 5 does not synthesize what Bill Wilson said so much as recite

20  what Bill Wilson said.  Indeed, the *Sims* panel warned that it did "not open the gates to a wholesale

21  use of all types of hearsay in formulating expert opinions."  *Id.*

22           Indeed, Dr. Jones's deposition testimony reveals that he did not synthesize what Bill Wilson

23  had told him.  Dr. Jones did not document his phone call with Mr. Wilson.  At his deposition, when

24  asked if he had brought his notes from his conversation with Mr. Wilson as the deposition notice

required, Dr. Jones replied "Uh, no[,]" that he did not bring any notes because "[t]here were no notes; it was a telephone conversation."  (Helm Decl. Ex. L, Jones Dep., 8:9–12).  Dr. Jones testified that he did not take any notes; he "primarily just asked him specific questions and he responded to them."  (Helm Decl. Ex. L, Jones Dep., 8:13–16).  Dr. Jones testified that he "basically asked him similar questions that [he] would [have asked] during an audit process[,]"  But Dr. Jones testified that, when doing an audit for the NCCHC or the ACA, he would "have forms" to "interview the individuals with."  (Helm Decl. Ex. L, Jones Dep., 9:2–14).  Nevertheless, Dr. Jones testified that he did not use any kind of form when he interviewed Bill Wilson.  (E Helm Decl. x. L, Jones Dep., 9:15–17).

Indeed, Dr. Jones could not—or would not—answer basic questions about his conversation with Mr. Wilson.  When asked when he spoke to Mr. Wilson, Dr. Jones testified that he "d[id]n't recall the specific date."  (Helm Decl. Ex. L, Jones Dep., 9:18–19).  When asked "[h]ow far in advance of your writing your original report in this case was [his] conversation" with Mr. Wilson, Dr. Jones testified that he "d[id] not specifically remember that information."  (Helm Decl. Ex. L, Jones Dep., 9:23–10:1).  Indeed, when asked whether Dr. Jones could "provide . . . an estimate of how far in advance of writing [his] report [he] spoke to Mr. Wilson[,]" Dr. Jones replied that he "d[id] not remember."  (Helm Decl. Ex. L, Jones Dep., 10:2–4).  Dr. Jones repeatedly could not say how long his telephone conversation with Mr. Wilson lasted.  (Helm Decl. Ex. L, Jones Dep., 28:2–4; 29:12–32:3).  The conversation lasted more than 5 minutes and less than two hours, and Dr. Jones was incapable of providing more definite information.  (Helm Decl. Ex. L, Jones Dep., 30:19–32:3).  Dr. Jones did not synthesize what he learned from Mr. Wilson into an independent opinion.  And, in any case, this purported phone conversation does not provide a sufficient factual basis for Opinion 5.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Moreover, Dr. Jones acknowledged Opinion 5's utter lack of factual support.  He admitted that he did not recall the deposition of Terri Granlund, Corizon's Person Most Knowledgeable about the training that the Sheriff's Deputies received on alcohol withdrawal.  (Ex. L, Jones Dep., 46:5– 9).  He also did not recall the deposition of Alameda County Sherrif's Sergeant Cynthia Sass, whom the County produced as its Person Most Knowledgeable on training that the County provided to the Sheriff's deputies on alcohol withdrawal.  (Ex. L Jones Dep., 46:10–15).

Both of these witnesses testified that corrections officers do not receive the required annual or biennial training on alcohol withdrawal.  Ms. Granlund testified that Corizon had provided *no* training to corrections officers in the 24 years she had worked for Corizon and its predecessor, Prison Health Services.  (Sherwin Declaration Exhibit L, Granlund Dep. pp. 7:14-8:8, 12:16-18; 10:2-11:25, 36:24-37:5).  Sergeant Sass similarly confirmed the County's lack of training for corrections officers.  (Sherwin Declaration Exhibit M, Sass Dep. pp. 8:3-9:11, 17:3-18, 18:25- 22:21, 21:16-21).

The testimony of Corizon's and the County's Persons Most Knowledgeable about training provided to corrections officers under Fed. Rule Civ. Proc. 30(b)(6) is binding on Corizon and the County.  The purpose of a 30(b)(6) deposition is to allow a Plaintiff not only to get information, but to get binding admissions.  *Lopez v. San Francisco Unified School Dist.*, No. C-99-3260 SI (EMC), 2004 U.S. Dist. LEXIS 31648, at *3 (N.D. Cal. Feb. 19, 2004); *see also Detoy v. City & County of San Francisco*, No. C 99-3072 CRB (JL), 196 F.R.D. 362, 365 (N.D. Cal. 2000) (a 30(b)(6) witness's testimony is "binding" on City); *Dynetix Design Solutions, Inc. v. Synopsys, Inc.*, C 11- 5973 PSG, 2013 U.S. Dist. LEXIS 120404, at *9 (N.D. Cal. Aug. 22, 2013) ("an admission by a 30(b)(6) witness is binding on the principal."); *Calpine Corp. v. Ace Am. Ins. Co.*, C 05-00984 SI, 2007 U.S. Dist. LEXIS 75985, at *24 (N.D. Cal. Oct. 12, 2007) (citation omitted) ("The answers given by the person designated by the corporation in a Rule 30(b)(6) deposition are binding on the

corporation."); *Mitchell Eng'g v. City & County of S.F.*, No. C 08-04022 SI, 2010 U.S. Dist. LEXIS 20782, at *1 (N.D. Cal. Feb 2, 2010) ("A 30(b)(6) witness testifies as a representative of the entity, his answers bind the entity and he is responsible for providing all the relevant information known or reasonably available to the entity.") (quotation marks and citation omitted); *San Francisco Bay Area Rapid Transit Dist. v. Spencer*, No. C 04-04632 SI, 2006 U.S. Dist. LEXIS 73135, at *2 (N.D. Cal. Sept. 25, 2006) (same).

Corizon should not now be permitted to contradict binding testimony under Rule 30(b)(6) with the baseless speculation of Dr. Jones.

## **RELIEF REQUESTED**

For the foregoing reasons, Plaintiffs request that the Court grant their Eighth Motion in Limine to preclude Dr. Jones from testifying about: (1) the facts he omitted from his expert report; (2) the opinions he omitted from his report; and (3) Opinions 1, 2, 3 and 5, both because he failed to comply with Rule 26, he failed to provide adequate factual bases as Rule 702 requires, and his speculative testimony blatantly contradicts the binding testimony of Corizon's and the County's Persons Most Knowledgeable about training provided to corrections officers.

**NINTH MOTION IN LIMINE TO LIMIT THE TESTIMONY OF THE COUNTY AND CORIZON'S JOINT EXPERT ARTHUR KLATSKY, M.D.**

    **A.**  **The Court should preclude Dr. Klatsky from testifying about opinions or facts that he omitted from his Rule 26 report.**

       This Court should preclude Dr. Klatsky from testifying about facts and opinions that he omitted from his Rule 26 report.  Rule 26 requires that the expert witness's report include "a complete statement of all opinions the witness will express and the basis and reasons for them," as well as "the facts or data considered by the witness in forming [the witness's opinions]."  Fed. R. Civ. P. 26(a)(2)(B)(i) and (ii).  If an expert witness fails to comply with all aspects of Rule 26, then Federal Rule of Civil Procedure 37(c)(1) "gives teeth to these requirements by forbidding the use at trial of *any information* required to be disclosed by Rule 26(a) that is not properly disclosed."  *Yeti by Molly LTD v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001) (footnote omitted) (emphasis added).

       Plaintiffs request that Defendants be precluded from eliciting any testimony from Dr. Klatsky concerning anything he omitted from his Rule 26 report.

    **B.**  **Federal Rules of Evidence 702 requires this Court to exercise its discretion to preclude Dr. Klatsky from testifying that Mr. Harrison would have died within ten years, because such testimony would be unreliable and rank speculation.**

       Plaintiffs request that this Court determine the reliability of Dr. Klatsky's proposed expert testimony concerning Martin Harrison's likelihood of dying within ten years without holding an evidentiary hearing.

       *Daubert* suggests a flexible, factor-based approach to analyzing the reliability of expert testimony.  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593–95 (1993).  The non-exhaustive list of factors includes whether: (1) the scientific theory or technique can be (and has been) tested; (2) the theory or technique has been subjected to peer review and publication, (3) there is a known or potential error rate, and (4) the theory or technique is generally accepted within the

scientific community.  *Mukhatar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1064 (citing

*Daubert*, 509 U.S. at 593–94) (rest of citation omitted), *amended by* 319 F.3d 1073 (9th Cir. 2003),

*overruled on other grounds by Estate of Barabin*, U.S. App. LEXIS 774, at *23.  The bottom line is

that "the trial judge must ensure that 'junk science' plays no part in the [jury's] decision."

*Mukhatar*, 299 F.3d at 1063.

Mr. Harrison died just four days after his 50th birthday.  Dr. Klatsky opined in his report, "In

my opinion, it is more likely than not that, had Martin Harrison not been incarcerated during August

13-16, 2010 and then died on August 18, 2010, he would have died sometime in the 10 years that

followed."  (Helm Decl. Exhibit N, Klatsky Report, p. 1).

When asked what peer reviewed literature Dr. Klatsky relied on to say that Martin Harrison

would have died before the age of 60, Dr. Klatsky answered:  **"It's impossible to find anything**

**that would show when somebody is going to die.**  So that's an unanswerable question."  (Helm

Decl. Ex. O, Klatsky Dep., p. 82:11-16, emphasis added).  And when asked whether Mr. Harrison

would die at the age of 60, Dr. Klatsky admitted, **"I can't predict what's going to happen to**

**anybody."**  (Helm Decl. Ex. O, Klatsky Dep. p. 82:17-21).

Dr. Klatsky further asserted that, according to World Health Organization ("WHO") data,

the life expectancy for males in the United States is 76 years, and is "approximately 4-6 years less

for African American men."  (Helm Decl. Ex. N, Klatsky Report p. 1).

However, Dr. Klatsky admitted during his deposition that the WHO life expectancy data he

cited in his report was the life expectancy of a *child who was less than one year old in 2011*.  (Helm

Decl. Ex. O, Klatsky Dep. pp. 42:22-43:6).  He conceded "it's plausible" that the same WHO report

also reported that the life expectancy of a male who is 50 to 54 years old is 29.5 more years of life

(or a life expectancy of 79.5 to 83.5 years).  (Helm Decl. Ex. O, Klatsky Dep. 43:13-43:20).

The United States National Center for Health Statistics December 2010 U.S. Life Tables reported that the life expectancy for 50-year-old Black males in the United States was 26 years (age at death of 76 years).  (Helm Decl. Ex. O, Klatsky Dep. 44:1-13; Exhibit P, U.S. Life Tables).

When asked whether he could say that Martin Harrison would not have lived to the age of 76, absent the events that caused his death in this case, Dr. Klatsky stated, **"I can't say anything about how long he would live with certainty."**  (Helm Decl. Ex. O, Klatsky Dep. pp. 86:23-87:6).

Even Dr. Klatsky's opinion concerning the life expectancy for Mr. Harrison, based on the life expectancy of a months-old baby in 2011, is unreliable and should be precluded under F.R.E. 702.

Dr. Klatsky assumed that Mr. Harrison must have started drinking excessively in 1993, because Mr. Harrison stood outside his ex-wife's (Plaintiffs' mother's) home with gifts and cried and yelled trying to reconcile with her.  (Helm Decl. Ex. O, Klatsky Dep. pp. 69:21-72:6). However, Dr. Klatsky admitted he had no evidence that Mr. Harrison was actually drunk instead of just crying outside his ex-wife's house and not intoxicated.  He admitted, **"It doesn't prove anything; you're right."**  (Helm Decl. Ex. O, Klatsky Dep. pp. 70:15-72:6).

Dr. Klatsky admitted that Mr. Harrison's children reported that Mr. Harrison did not begin to drink excessively until 2004 or 2008, when he was 44 or 46 years old.  (Helm Decl. Ex. O, Klatsky Dep. pp. 28:1-4, 28:22-29:3, 30:23-31:6, 32:6-17, 33:7-15, 33:22-34:2).  Dr. Klatsky admitted there was no testimony from any witness that Mr. Harrison was drinking heavily in the early 1990's.  (Helm Decl. Ex. O, Klatsky Dep. p. 35:5-9).

Dr. Klatsky opined that Mr. Harrison had early alcoholic cardiomyopathy.  However, Thomas Rogers, MD, who did the official autopsy on Mr. Harrison for the Alameda County Sheriff's Office Coroner's Bureau, testified that Mr. Harrison did not have alcoholic cardiomyopathy.  (Sherwin Declaration Exhibit N, Rogers Dep. p. 60:8-10).  Dr. Rogers found that

1   Mr. Harrison only had a mildly to moderately enlarged heart and that the valves and coronary

2   system were normal.  (Sherwin Declaration Exhibit N, Rogers Dep. pp. 57:15-58:7)

3          Defendant County's expert Charles Wetli, MD, also testified that he agreed that Mr.

4   Harrison had only a "slightly enlarged heart."  (Helm Decl. Ex. J, Wetli Dep. p. 77:16–18).

5          Moreover, Dr. Klatsky admitted that "even among very heavy drinkers the prevalence [of

6   alcoholic cardiomyopathy] is probably low, distinctly lower than the prevalence of liver damage."

7   (Helm Decl. Ex. O, Klatsky Dep. pp. 8-14).  The diagnosis of alcoholic cardiomyopathy requires

8   the exclusion of other types of heart disease first.  (Helm Decl. Ex. O, Klatsky Dep. p. 67:8-23).

9          An enlarged heart can be caused by hypertension, or a virus, and is reversible.  (Helm Decl.

10  Ex. O, Klatsky Dep. pp. 46:15-18, 60:17-20; Ex. Q, Supplemental/Rebuttal Report of Michael

11  Baden, MD).  Dr. Klatsky cannot rule out the possibility that Mr. Harrison's enlarged heart was

12  caused by a virus.  (Helm Decl. Ex. O, Klatsky Dep. p. 64:3-8).

13         Martin Harrison's children all confirmed that he told them he knew he would go to jail

14  because he did not have the money to pay the fines for his DUI charge, and he planned to use the

15  time in jail to detox and begin healing from his alcohol dependence.  If Mr. Harrison stopped

16  drinking as planned, Dr. Klatsky concedes Mr. Harrison would be unlikely to die within ten years.

17  (Helm Decl. Ex. O, Klatsky Dep. p. 80:20-25).  Even in patients with end-stage heart failure and a

18  heavy drinking history longer than ten years, there is still a good prognosis in most cases when the

19  patient abstains from alcohol.  (Helm Decl. Ex. O, Klatsky Dep. pp. 81:22-82:10).

20         The studies Dr. Klatsky cited in his report also rebut his assertion that Martin Harrison

21  would have died by the age of 60.  Dr. Klatsky cited a report by Christine Timko in which 74% of

22  alcoholics who were "untreated" for their alcohol use disorders lived longer than 15 years, and the

23  overall death rate for alcoholic men within 16 years was only 21.7%.  (Helm Decl. Ex. O, Klatsky

24  Dep. pp. 49:2-21).

And 51% of the study participants who sought alcohol treatment were either abstinent or non-abstinent but had no drinking-related problems at one year after seeking treatment.  (Helm Decl. Ex. O, Klatsky Dep. p. 52:10-13).  So if Martin Harrison sought treatment after detoxing in jail, he would more likely than not have had no drinking problems a year later.

In another study, 86% of alcohol abusers who sought treatment were still abstinent after three years.  (Helm Decl. Ex. O, Klatsky Dep. pp. 59:23-60:5).  If a person stops drinking, as Martin Harrison planned, his mortality risk is vastly improved.  (Helm Decl. Ex. O, Klatsky Dep. p. 57:22-24).  In fact, if Martin Harrison had stopped drinking, he could have an 'almost normal' life expectancy.  (Helm Decl. Ex. O, Klatsky Dep. pp. 57:22-58:58:8).

Dr. Klatsky also cited a study from Lundby, Sweden, in which the average age of alcoholics was 27.  A person who is 27 years old when he's an alcoholic is at a greater risk of mortality than someone like Martin Harrison, was who no younger than 44 when he became an alcoholic (at the earliest in 2004).  (Helm Decl. Ex. O, Klatsky Dep. pp. 54:16-55:10).  Even the 27-year-old alcoholics, who had a higher mortality risk than Martin Harrison, lived for another 29 years on average.  (Helm Decl. Ex. O, Klatsky Dep. pp. 55:2-10).  Of the men who became alcoholics between 1957 and 1972, 56% were still alive in 1993.  (Helm Decl. Ex. O, Klatksy Dep. 54:16-55:10).

Another study by Vaillant reported that only 28% of alcoholics had died by the age of 60.  (Helm Decl. Ex. O, Klatsky Dep. pp. 56:21-57:9).  72% of alcohol abusers were still alive at age of 60.  (*Id.*).

Given the above medical literature, Dr. Klatsky cannot testify that Mr. Harrison had even a 51% likelihood of dying within ten years, before he reached age 60.

Plaintiffs' expert addictionologist, Larissa Mooney, MD, and forensic pathologist, Michael Baden, MD, both confirm that Dr. Klatsky's assertion that Martin Harrison would die within ten

years is rank speculation.  (Helm Decl. Ex. R, Mooney Supplemental/Rebuttal Report; Ex. Q, Baden Supplemental/Rebuttal Report).  Defendants should be precluded from eliciting this unreliable, highly prejudicial testimony concerning Martin Harrison's mortality risk from Dr. Klatsky or any other witness.

### RELIEF REQUESTED

For the foregoing reasons, Plaintiffs request that this Court grant their Ninth Motion in Limine to preclude Dr. Klatsky from testifying about both: (1) the opinions and facts he omitted from his Rule 26 report; and (2) his opinion that Martin Harrison would have died within ten years if the Defendants here had not caused his death.

**TENTH MOTION IN LIMINE TO EXCLUDE EVIDENCE, TESTIMONY, OR COMMENT FROM DEFENDANTS OR THEIR EXPERTS CONCERNING ALLEGED MISCONDUCT BY PLAINTIFFS' EXPERT JACK RYAN WHILE HE WAS EMPLOYED BY THE PROVIDENCE, RHODE ISLAND, POLICE DEPARTMENT**

Plaintiffs hereby move this Court for an order excluding any and all evidence, references to evidence, testimony, comment, or argument from Defendants and their experts concerning alleged investigation of, or misconduct by, Plaintiffs' police practices expert, John "Jack" Ryan, while he was employed by the Providence, Rhode Island Police Department, from which he retired in 2002. Such evidence is improper character evidence (Federal Rules of Evidence 404, 405, 608), is improper impeachment evidence since he has not been convicted of any crime in any jurisdiction (FRE 609), is not relevant to any issue before the jury (FRE 401 & 402), and is unduly prejudicial (FRE 403).

Mr. Ryan worked for the Providence, Rhode Island, Police Department for approximately twenty years, from 1982 to 2002, rising in rank from patrol officer to Captain and Director of Administration.  (Helm Decl, Exhibit S, John Ryan Curriculum Vitae).  Mr. Ryan retired from the Providence Police Department in 2002.  *Id*.

Since 2002, Mr. Ryan has been employed as a police practices trainer, consultant and auditor.  *Id*.  Mr. Ryan regularly testifies as a police practices expert in civil cases in deposition and trial.  *Id*, at pp. 5-12.  He regularly testifies for both plaintiffs and defendants.  *Id*.

At Mr. Ryan's deposition in this case, Defendants' counsel raised allegations that Mr. Ryan was investigated, or interviewed in connection with investigations, concerning the Providence Police Department when he was employed there prior to 2002.  (Helm Decl. Exhibit T, Deposition of Jack Ryan, pp. 35:15 - 45:17).  Mr. Ryan acknowledged that he was interviewed in connection with investigations at the Providence Police Department following his retirement in 2002 and that he cooperated with investigators.  (Helm Decl. Ex. T, Ryan Dep., pp. 36:18 - 37:12, 39:1-16, 40:15

- 42:14).  Mr. Ryan was never the subject or target of any criminal investigation, was never determined to have engaged in misconduct, nor was he ever charged with or convicted of any crime. (Helm Decl. Ex. T, Ryan Dep., pp. 38:7-25, 41:3-15).   Furthermore, as Mr. Ryan's testimony confirms, any such allegations are stale, as the interviews and investigations they concern occurred before his retirement in 2002, over 10 years ago, and relate to events in 1997-1998.  (Helm Decl. Ex. T, Ryan Dep., pp. 42:15 - 44:2).

Mr. Ryan testified in about these issues at his deposition in this case.  (Helm Decl. Ex. T, Ryan Dep., pp. 35:15 - 45:17).  From this portion of the transcript, this Court can get of flavor of the baseless and improper insinuations of misconduct that defense counsel has suggested against Mr. Ryan.  *Id*.

For these reasons, any allegations concerning claimed investigations of, or misconduct by, Mr. Ryan while he was employed by the Providence Police Department would be improper to raise in any way at trial.  Such evidence is improper character evidence (Federal Rules of Evidence 404, 405, 608), is improper impeachment evidence since he has not been charged, let alone convicted, of any crime in any jurisdiction (FRE 609), is not relevant to any issue before the jury (FRE 401 & 402), and is unduly prejudicial, confusing, misleading, and would necessitate undue consumption of time at trial (FRE 403).

## RELIEF REQUESTED

For all of the foregoing reasons, Plaintiffs request that this Court grant their Tenth Motion in Limine and preclude Defendants from offering any evidence or testimony concerning alleged investigation of, or misconduct by, Plaintiff's police practices expert, John "Jack" Ryan, while he was employed by the Providence, Rhode Island, Police Department, from which he retired in 2002.

1
2
3

**ELEVENTH MOTION IN LIMINE TO EXCLUDE EVIDENCE, TESTIMONY OR COMMENT FROM DEFENDANTS OR THEIR EXPERTS CONCERNING PLAINTIFFS' EXPERT MICHAEL BADEN'S DEMOTION AND SUBSEQUENT REINSTATEMENT LITIGATION WHILE HE WAS EMPLOYED BY THE NEW YORK CITY MEDICAL EXAMINER'S OFFICE**

4
5
6
7
8
9
10
11
12
13

Plaintiffs hereby move this Court for an order excluding any and all evidence, references to evidence, testimony, comment, or argument from Defendants and their experts concerning the demotion of and subsequent reinstatement litigation by Plaintiffs' medical expert, Dr. Michael Baden, M.D., while he was employed by the New York City Medical Examiner's Office.  Such evidence is improper character evidence (Federal Rules of Evidence 404, 405, 608), is improper impeachment evidence since he has not been convicted, nor was he ever accused, of any crime in any jurisdiction (FRE 609), is not relevant to any issue before the jury (FRE 401 & 402), and is unduly prejudicial and likely to lead to confusion of the issues (FRE 403).

14
15
16
17
18

Dr. Baden worked for the Office of the Chief Medical Examiner in New York City for 24 years, serving as Chief Medical Examiner from 1978-1979.  Helm Decl., Exhibit U, Michael Baden, M.D. Curriculum Vitae).  In 1985, Dr. Baden went on to become the Director of the Medicolegal Investigations Unit for the New York State Police, from which position he retired in 2011.  *Id.*

19
20
21
22
23
24
25
26
27
28

In his more than 50 years of experience, Dr. Baden has served as Chairman of the Forensic Pathology Panel of the U.S. Congress Select Committee on Assassinations that re-investigated the deaths of President John F. Kennedy and Dr. Martin Luther King, Jr.  *Id.*  Dr. Baden was also the forensic pathologist member of a scientific team asked by the Russian government to examine the remains of Tsar Nicholas II, Alexandra and the Romanov family in the 1990s.  *Id.*  Dr. Baden has taught homicide courses for police, judges, attorneys and physicians across the United States and internationally.  *Id.*  Dr. Baden regularly testifies as a pathology expert in civil cases in deposition and trial. (Helm Decl. Ex. V, Deposition of Michael Baden, M.D., pp. 40:16 - 42:15).  He regularly testifies for both plaintiffs and defendants.  *Id.*

1
2
3
4
5
6
7
8
9
10
11
12
13

At Dr. Baden's deposition in this case, Defendants' counsel raised allegations that Dr. Baden was "fired" from his position as Chief Medical Examiner with the New York City Chief Medical Examiner's Office.  (Helm Decl. Ex. V, Baden Dep., pp. 27:22 - 31:7).  Dr. Baden acknowledged that he was demoted from that position in the early-1980s, and clarified that after some litigation he was reinstated, although an appeals court in a split decision later overturned the reinstatement.  (Helm Decl. Ex. V, Baden Dep., pp. 28:3 - 30:24).  Throughout that time, Dr. Baden continued working in the Medical Examiner's Office.  (Helm Decl. Ex. V, Baden Dep., pp. 30:9-24).  There is no evidence to suggest that Dr. Baden was ever accused of or investigated for any misconduct or any crimes.   Furthermore, as Dr. Baden's testimony confirms, allegations relating to his demotion in the early-1980s are stale, as the demotion and subsequent litigation were resolved more than *30 years ago* in 1982.  (Helm Decl. Ex.V, Baden Dep., pp. 30:9 - 31:7).

14
15
16
17
18

Dr. Baden testified about these issues at his deposition in this case.  (Helm Decl. Ex. V, pp. 27:22 - 31:7).  From this portion of the transcript, this Court can get a flavor of the improper and irrelevant insinuations of employment termination and failed litigation that defense counsel has suggested against Dr. Baden.  *Id*.

19
20
21
22
23
24
25
26

For these reasons, any allegations concerning an alleged employment termination of Dr. Baden while he was employed by the New York City Chief Medical Examiner's Office would be improper to raise in any way at trial.  Such evidence is improper character evidence (Federal Rules of Evidence 404, 405, 608), is improper impeachment evidence since he has not been charged, let alone convicted, of any crime in any jurisdiction (FRE 609), is not relevant to any issue before the jury (FRE 401 & 402), and is unduly prejudicial, confusing, misleading, and would necessitate undue consumption of time at trial (FRE 403).

27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **RELIEF REQUESTED**

For all of the foregoing reasons, Plaintiffs request that this Court grant their Eleventh Motion in Limine and preclude Defendants from offering any evidence, comment, or testimony concerning the demotion and subsequent reinstatement litigation of Plaintiff's pathology expert, Michael Baden, M.D., while he was employed by the New York City Chief Medical Examiner's Office, in the early 1980s.

1
2
### TWELFTH MOTION IN LIMINE TO EXCLUDE EVIDENCE, TESTIMONY, COMMENT, OR ARGUMENT CONCERNING ALLEGED DOMESTIC VIOLENCE BY DECEDENT MARTIN C. HARRISON AGAINST NON-PARTIES, AND OTHER PRIOR "BAD ACTS"

3
4
5
6
7
8
9
10
11
Plaintiffs hereby move this Court for an order excluding any and all evidence, references to evidence, testimony, comment, or argument concerning alleged domestic violence and other prior "bad acts" by Decedent Martin C. Harrison against persons who are not parties to this lawsuit.  Such evidence is improper character evidence (Federal Rules of Evidence 404, 405, 608), is not relevant to any issue before the jury (FRE 401 & 402), and is unduly prejudicial (FRE 403).  Furthermore, police reports and documentation concerning any such allegations against Mr. Harrison are inadmissible hearsay (FRE 801 & 802).

12
13
14
15
16
17
18
19
In 1993 and 2003 Martin Harrison was arrested for domestic violence related incidents that did not involve Plaintiffs and did not result in convictions.  Additionally, Mr. Harrison was convicted in 1993 of vandalism (Penal Code § 594(b)(3)) and was also convicted at a time unknown to Plaintiffs of disturbing the peace (PC §415). Additionally, the County Defendants listed as an exhibit a police report, *not previously disclosed to Plaintiffs*, concerning a 2003 domestic violence incident involving Michelle Henshaw, who is not a party at trial and whose son "M.H." has already settled his claims in this case.

20
21
22
**A.**	**Evidence of Alleged Domestic Violence, Martin Harrison's Prior Arrests/Convictions, Prior Police Contacts, and Other Alleged "Bad Acts" Is Irrelevant and Should Be Excluded Under Federal Rules of Evidence 401 and 402.**

23
24
25
26
27
28
Allegations that Martin Harrison may have been involved in domestic violence incidents, one in 1993 and one in 2003, have nothing to do with the subject of this litigation.  No incident involved Plaintiffs.  Likewise, evidence regarding Decedent's prior interactions with the police and convictions for the misdemeanor offenses of vandalism and disturbing the peace, at least one of which is more than 20 years old, are wholly irrelevant.  None of this evidence is probative of the primary issues in this case:  whether Defendants were deliberately indifferent to Decedent's serious

1   medical needs and whether Defendants' use of force against Decedent was excessive under federal

2   and California law, and Plaintiffs' loss of their relationship with their father.

3        Moreover, even if Mr. Harrison were alive, these old allegations of misdemeanors that do

4   not involve dishonesty would be inadmissible to impeach him under FRE 609.

5        Furthermore, ***there have been no allegations that Decedent abused any of the Plaintiffs at***

6   ***any time.***  Allegations of domestic violence against non-parties Michelle Henshaw (Decedent's

7   former romantic partner) and/or Rosemarie Wingate (Plaintiffs' mother and Decedent's ex-wife) are

8   not probative of Plaintiffs' damages claims.  This irrelevant and highly prejudicial and inflammatory

9   evidence must be excluded.  FRE 401- 402.

10

11        **B.      Evidence of Alleged Domestic Violence, Decedent's Prior Arrests/Convictions,**
              **Prior Police Contacts, and Other Alleged "Bad Acts" Is More Prejudicial Than**
12            **Probative, Confusing, Misleading, Would Waste Time, and Should Be Excluded**
              **Under Federal Rule of Evidence 403.**
13

14

15        Even if allegations of domestic violence against non-parties and evidence of Decedent's

16   prior law enforcement contacts and 20-year-old misdemeanor conviction were relevant, this

17   evidence should nevertheless be excluded on the grounds that its probative value is substantially

18   outweighed by the danger of undue prejudice, confusion of the issues, misleading the jury, undue

19   delay, and waste of time.  FRE 403.  *See also, Old Chief v. United States*, 519 U.S. 172, 180-92

20   (1997) (relevant evidence of past felony conviction excluded where its probative value was

21   substantially outweighed by the danger of undue prejudice).  "Where the evidence is of very slight

22   (if any) probative value, it's an abuse of discretion to admit it if there's even a modest likelihood of

23   unfair prejudice or a small risk of misleading the jury."  *United States v. Hitt*, 981 F.2d 422, 424 (9th

24   Cir. 1992).

25

26        Unproven allegations that Decedent was at any time physically violent toward a romantic

27   partner or toward Plaintiffs' mother are highly likely to inflame and prejudice the jury.  *See United*

28   *States v. Robertson*, 15 F.3d 862, 877, n.5 (9th Cir. 1994) ("**the admission of evidence of spousal**

1   **abuse will often be error.  Recent, entirely commendable, public awareness of the**

2   **wrongfulness of spousal abuse means that evidence of such acts may be extremely**

3   **prejudicial.**"); *United States v. Hands*, 184 F.3d 1322, 1325-29 (11th Cir. 1999) (trial court abused

4   its discretion by admitting evidence of spousal abuse by the defendant because it was irrelevant, and

5   even if it was somewhat probative, it should have nevertheless been excluded because it was

6   unfairly prejudicial, highly inflammatory, and cumulative).

7

8   Evidence that Plaintiff was convicted of vandalism and disturbing the peace, or had other

9   police contact, would similarly be highly prejudicial.

10   In addition, if the Court were to allow evidence at trial concerning Decedent's prior police

11   contacts and alleged prior bad acts – when Decedent is no longer able to defend against such

12   allegations due to his death – that would require a collateral inquiry into the circumstances of these

13   events and the merits of domestic violence allegations.  The trial court does not abuse its discretion

14   in excluding even relevant evidence if it goes to a collateral issue and would be complicated,

15   confusing, require additional trial days, and amount to a second trial on the collateral issue.  *City of*

16   *Long Beach v. Standard Oil Co.,* 46 F.3d 929, 938 (9th Cir. 1995).  *See also*, *Coursen v. A.H. Robins*

17   *Co., Inc.*, 764 F.2d 1329, 1333-35 (9th Cir. 1985), *opinion corrected*, 773 F.2d 1049 (9th Cir. 1985)

18   (trial court did not abuse its discretion by excluding collateral, confusing and prejudicial evidence).

19   The court has a "specific duty to prevent counsel from confusing the jury with a proliferation of

20   details on collateral matters."  *United States v. Weiner*, 578 F.2d 757, 766 (9th Cir. 1978).

21

22       **C.**    **Evidence of Domestic Violence Allegations, Prior Arrest/Convictions, Prior**
           **Police Contacts, and Other Alleged "Bad Acts" Is Not Admissible to Prove**
           **Conduct in Conformity Therewith and Should Be Excluded Under Federal**
           **Rules of Evidence 404(b) and 608(b).**

23

24

25

26   Evidence of other crimes, wrongs, or acts is not admissible to prove conduct in conformity

27   therewith.  FRE 404(b).  Specific instances of conduct of a witness, where used for impeachment

28   purposes, and other than conviction of a crime, may not be proved by extrinsic evidence.  FRE

608(b).

Any testimony, evidence, or comment regarding allegations of domestic violence against non-parties and evidence of Decedent's prior law enforcement contacts and 20-year-old misdemeanor conviction would be offered solely for the purpose of attempting to prejudice the jury against Decedent.

In the factually-similar *Lataille v. Ponte*, 754 F.2d 33 (1st Cir. 1985), the court of appeal held that the past disciplinary record of a prisoner was not admissible in a suit against corrections officers under 42 U.S.C. § 1983. The plaintiff in *Lataille* alleged that the corrections officers spit on him, punched him, and severely beat him, while the officers asserted that the plaintiff spit on them, punched an officer, ran out of his cell, and had to be restrained by several officers before he could be handcuffed. *Id.* at 34.

The First Circuit held that evidence of the plaintiff's discipline history was an inappropriate use of evidence of other crimes or wrongs to show conduct in conformity therewith and it was inadmissible under Federal Rule of Evidence 404. The court noted:

> **It is well settled that prior acts may not be admitted to prove that a person acted in a similar fashion in the case at hand**. That is the plain meaning of Federal Rule of Evidence 404: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." 404(b). This rule reflects the judgment of the Advisory Committee on the Federal Rule of Evidence that "character evidence is of slight probative value and may be very prejudicial. It tends to distract the trier of fact from the main question of what actually happened on the particular occasion. It subtly permits the trier of fact to regard the good man and to punish the bad man because of their respective characters despite what the evidence in the case shows actually happened."

*Id.* at 35 (citation omitted) (emphasis added).

The *Lataille* court found that: "It is abundantly clear that the evidence of Lataille's prior disciplinary offenses was offered by defendants and admitted by the district court for the purpose of showing that Lataille was a violent person and that he, therefore, must have been the aggressor and participated in the assault. This evidence was clearly inadmissible under Rule 404." *Id.* at 37.

Likewise, there is no evidentiary basis in the present case to admit testimony, evidence or attorney comment concerning any allegations of violence, arrests/convictions, police contact, or allegations of other prior bad acts by Decedent.  This evidence would be offered for the sole purpose of impugning Decedent's character and/or showing that Decedent was aggressive or dangerous on previous occasions and therefore he must have been aggressive or dangerous in his interactions with the Alameda County Sheriff's Deputies in this incident.  Rule 404 clearly prohibits this evidence.

**D.      The 2003 Berkeley Police Report and Any Documentation Related to Decedent's Divorce and Allegations of Spousal Abuse Are Inadmissible Hearsay Under Federal Rules of Evidence 801 and 802 and Are Not Subject to Any Exceptions to the Rule Against Hearsay.**

The 2003 Berkeley Police Report and any documentation concerning Decedent's divorce and allegations of spousal abuse is hearsay not within any recognized exception, and is therefore inadmissible.  FRE 801, 802.

Even a criminal *conviction* offered for purposes of impeachment is inadmissible if it is more than 10 years old.  FRE 609.  Defendants may seek to introduce stale hearsay allegations from 2003 and 1993 that never resulted in a conviction in an effort to unfairly discredit Decedent's character.[3]

Even when a police officer's statement in a report is admissible, statements made by "third persons under no business duty to report" are not.  *United States v. Pazsnit*, 703 F.2d 420, 424 (9th Cir. 1980).  In *Pazsnit*, the Ninth Circuit noted that the police officer who made the record was acting in the regular course of business, "but he had no knowledge of the truthfulness of the information being recorded, while the witness who gave the information which was recorded had personal knowledge but were under no business duty to report."  *Id.* at 425.  The Court refused to give the witness' statements the "presumption of reliability and regularity accorded a business

---

[3] Such evidence falls outside the requirements of FRE 609, though even if it was within that Rule's scope, it would be inadmissible for the reasons set forth in §E, *infra*.

record" and held the statements were inadmissible.  *Id.  See also*, *Colvin v. United States*, 479 F.2d 998, 999-1003 (9th Cir. 1973) (trial court should have excluded out of court third party statements that were part of a police report because the statements were hearsay).  The 2003 Berkeley Police report, that has never been disclosed to Plaintiffs, and the allegations of domestic violence against Decedent that may be contained in that report are inadmissible hearsay.

        **E.**      **Defendants May Not Offer Evidence Concerning Decedent's Prior Arrests, Convictions, Crimes, Incarcerations or "Bad Acts" for Impeachment Purposes.**

        Convictions for felonies or crimes requiring proof of an act of dishonesty or false statement by the witness, that are not more than 10 years old,  *may* be admissible *for impeachment only*, if relevant to the subject matter of the litigation.  FRE 609, 403.  Because Decedent is no longer living and thus cannot be called as a witness, there will be no basis to offer evidence of prior crimes, convictions or arrests for purposes of impeachment.  Additionally, the crimes of vandalism and disturbing the peace are not felonies, nor do they relate to an act of dishonesty or a false statement by Decedent.  Evidence of this nature should be excluded on this basis as well.


### RELIEF REQUESTED

        For all of the foregoing reasons, Plaintiffs request that this Court grant their Twelfth Motion in Limine and preclude Defendants from offering any evidence, testimony, comment, or argument concerning alleged domestic violence against non-parties, and other prior "bad acts" by Decedent.

**THIRTEENTH MOTION IN LIMINE TO EXCLUDE EVIDENCE, ARGUMENT OR COMMENT CONCERNING KRYSTLE HARRISON'S FORMER EMPLOYMENT AS A "GO-GO" DANCER WHO WORKED IN NIGHTCLUBS BEFORE HER SON WAS BORN.**

None of the Plaintiffs have a claim for wage loss as a result of their father's death.  At Plaintiff Krystle Harrison's deposition, Defense counsel presented her with pages from her Facebook page in which she discussed her work as a promotional model and as a "go-go" dancer, working in nightclubs before her son was born.  This evidence is irrelevant, more prejudicial than probative of any fact, and will only serve to waste time and mislead the jury.  It should be excluded under FRE 401-403.

Ms. Harrison's son was born on May 23, 2009, over five years ago.  (Sherwin Declaration Exhibit O, Krystle Harrison Dep. Vol I, p. 12:11-12).  Ms. Harrison explained her work as a "go-go dancer" prior to her son's birth:  "So, you don't take off your clothes or anything, you just hype up the crowd, and you have fluffy boots on."  (Sherwin Declaration Exhibit O, Krystle Harrison Dep. Vol. I, p. 18:8-14).  As Ms. Harrison's mother, Rosemarie Wingate testified, Ms. Harrison was embarrassed by being presented with an irrelevant photograph and personal questions in her deposition that have nothing to do with this case:  "I asked how the [deposition] day went, and, um, she said that it was very stressful, that it was a lot of person questions, and that you had a picture from Krystle Harrison half naked, and you asked about her modeling, and her promotional work and what the work pertains to."  (Sherwin Declaration Exhibit P, Wingate Dep. p. 8:15-25).

Ms. Harrison's case is not about dancing she did as a job before her son was born over five years ago, and Defendants should not be permitted to waste time and embarrass Ms. Harrison with irrelevant and prejudicial photographs and questions about her personal life that have nothing to do with her father's death.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **<u>RELIEF REQUESTED</u>**

For the foregoing reasons, Plaintiffs request that this Court grant their Thirteenth Motion in Limine to preclude Defendants from offering evidence, argument, or comment about Ms. Harrison's having worked as a "go-go dancer" over five years ago.

Respectfully submitted,

Dated:  November 19, 2014                     HADDAD & SHERWIN


_/s/  Julia Sherwin_____
Attorneys for Plaintiffs