EXHIBIT C

DEPOSITION OF ROBERT D. JONES, M.D.

**1**

(1)
(2)                  UNITED STATES DISTRICT COURT
(3)                  NORTHERN DISTRICT OF CALIFORNIA

M.H., a minor, through his
(4)   Guardian Ad Litem, Michelle
Henshaw, JOSEPH HARRISON, KRYSTLE
(5)   HARRISON, MARTIN HARRISON, JR.,
and TIFFANY HARRISON, all          CASE No. C11-2868
(6)   individually and as Co-Successors    JST (MEJ)
in Interest of Decedent MARTIN
(7)   HARRISON,
(8)              Plaintiffs,
(9)   -vs-
(10)  COUNTY OF ALAMEDA, a municipal
corporation; SHERIFF GREGORY J.
(11)  AHERN, in his individual and
official capacities; DEPUTIES
(12)  MATTHEW AHLF, ALEJANDRO VALVERDE,
JOSHUA SWETNAM, ROBERTO MARTINEZ,
(13)  ZACHARY LITVINCHUK, RYAN MADIGAN,
MICHAEL BARENO, FERNANDO
(14)  ROJAS-CASTANEDA, SHAWN SOBRERO,
SOLOMON UNUBUN, and DOES 1-20,
(15)  individually, jointly and
severally,
(16)
(17)             Defendants.
_____/
(18)
(19)          DEPOSITION OF ROBERT D. JONES, M.D.
(20)
(21)         Taken before KAREN A. CRANGLE
(22)         Certified Shorthand Reporter
State of California
(23)         C.S.R. License No. 3816
(24)
(25)             February 8, 2014

**2**

(1)           DEPOSITION OF ROBERT D. JONES, M.D.
(2)
(3)         Pursuant to Notice of Taking Deposition, and on
(4)   Saturday, February 8, 2014, at the hour of 10:12 a.m., at
(5)   HADDAD & SHERWIN, 505 17tth Street, Third Floor, Oakland,
(6)   California, 94612, California, before me, KAREN A.
(7)   CRANGLE, Certified Shorthand Reporter, personally appeared
(8)   ROBERT D. JONES, M.D., produced as a witness in the
(9)   above-entitled action, who, having been first duly sworn,
(10)  was thereupon examined as a witness to said action.
(11)
(12)
(13)
(14)             APPEARANCES
(15)
(16)      Julia Sherwin, Attorney at Law, HADDAD & SHERWIN,
(17)  505 Seventeenth Street, Oakland, California, 94612, was
(18)  present on behalf of the plaintiffs.
(19)
(20)
(21)      Nancy E. Hudgins, Attorney at Law, THE LAW
(22)  OFFICES OF NANCY E. HUDGINS, 711 Van Ness Avenue, Suite
(23)  450, San Francisco California 94102, was present on behalf
(24)  of the defendant Corizon.
(25)

**3**

(1)
(2)         J. Randall Andrada, Attorney at Law, ANDRADA &
(3)   ASSOCIATES, 180 Grand Avenue, Suite 225, Oakland,
(4)   California, 94612, was present on behalf of the defendant
(5)   County of Alameda.
(6)
(7)
(8)         Martha Stringer, Attorney at Law, WILLIAMS &
(9)   ASSOCIATES, 1250 Sutterville Road, Suite 290, Sacramento,
(10)  California, 95822, was present on behalf of the defendant
(11)  Zelda Sancho.
(12)
(13)
(14)         And there also being present Jeffrey S. Hunter,
(15)  Attorney at Law, RENAUD, COOK, DRURY, MESAROS, PA, One
(16)  North Central, Suite 500, Phoenix, Arizona, 85004.
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

**4**

(1)                 I N D E X
(2)
(3)
(4)   Deposition of ROBERT D. JONES, M.D.
(5)
(6)                              Page
(7)
(8)   Examination by:
(9)
(10)    MS. SHERWIN                      7
(11)
(12)
(13)  Plaintiff's Exhibits
(14)
(15)    1  33-page Employer's Post-Hearing Brief        24
Regarding Termination of Zelda Sancho Bates
(16)       stamped COR 1086 through COR 1118
(17)    2  One-page Invoice from Robert D. Jones, M.D.    24
to Nancy E. Hudgins dated 1/26/2014 in the
(18)       amount of $13,474
(19)    3  Nine-page Medical Defendants' Expert Witness   25
Disclosure, Robert D. Jones, M.D., M.H.
(20)       versus County of Alameda
(21)    4  Two-page e-mail from Nancy Hudgins dated       99
February 27, 2014 to Haddad & Sherwin
(22)
(23)    5  Four-page Plaintiff's Deposition Notice        129
Duces Tecum of Expert Witness Robert D.
Jones, M.D.
(24)
(25)

DEPOSITION OF ROBERT D. JONES, M.D.

**5**

(1)
(2)     6 Two-page California Nurses Association        156
(3)       Nursing Practice & Patient Advocacy Alert,
          Patient Assessment: Roles of RNs and LVNs
(4)     7 Six-page Prison Health Services, Inc.        184
(5)       Policy/Procedure, Title:  Intoxication and
          Withdrawal, Bates stamped COR 22 through COR
(6)       26
(7)     8 Four-page PHS Correctional Healthcare Nurse  190
          Assessment Protocol Standardized Procedures
(8)       entitled Alcohol and Drug Withdrawal Bates
          stamped COR 31 through COR 34
(9)     9 Three-page PHS, Inc. Policy/Procedure,       208
          Title: Access to Care Bates stamped COR 116
(10)      through COR 34
(11)   10 One-page PHS document Bates stamped COR 3765  210
(12)   11 Four-page Prison Health Services,             211
          Incorporated Policy, Intoxication and
(13)      Withdrawal Bates stamped COR 3885 through
          COR 3888
(14)
(15)   12 23-page Alameda County Sheriff's Office       215
          Individual Training Activity documents Bates
(16)      stamped ACSO 374 through ACSO 396
(17)   13 One-page Prison Health Services, Inc.         219
          Policy/Procedure, Title:  Inmates with
(18)      Alcohol and Other Drug Problems Bates
          stamped COR 3917
(19)   14  three-page Corizon General Health Services   219
          Policy & Procedure, Title:  Health Training
(20)      for Correctional Officers Bates stamped COR
          3852 through COR 3854
(21)
(22)   15  Two pages of inmate transfer documentation   229
          Bates stamped COR 3681 and COR 3682
(23)   16 Three-page PHS Health Services Orientation    231
          Manual for New Employees, Santa Rita Jail,
(24)      Glenn E. Dyer Detention Facility, Bates
          stamped COR 3608 through COR 3610
(25)

**6**

(1)
(2)    17  Three-page Prison Health Services, Inc.      232
          Policy/Procedure, Title:  Transfer
(3)       Screenings:  Intrasystem Transfers Bates
          stamped COR 111 through COR 113
(4)
(5)    18  Five-page LVN Scope of Practice Standards    270
          Health Care Services, Chapter 5 dated
          January 2002
(6)
(7)
                    ---oOo---
(8)
(9)
(10)
(11)
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

**7**

(1)                ROBERT D. JONES, M.D.,
(2)      sworn as a witness by the Court Reporter,
(3)      testified as follows:
(4)            EXAMINATION BY MS. SHERWIN
(5)      MS. SHERWIN:  Q.  Dr. Jones, we met briefly off the
(6)  record.  My name is Julia Sherwin and I'm one of the
(7)  lawyers who represents the adult children of
(8)  Martin Harrison.  And I understand from some of your
(9)  previous depositions that you have given deposition
(10)  testimony several times before.
(11)      Do you feel comfortable with the process or would
(12)  you like to go over the ground rules?
(13)      A.  I feel comfortable with the process.
(14)      Q.  Have you brought your file with you today?
(15)      A.  I brought my opinions, and my original opinion
(16)  and my supplemental opinion.
(17)      Q.  You've only brought your reports?
(18)      A.  Yes.
(19)      Q.  And did you receive the Deposition Notice that
(20)  required you to bring documents with you today?
(21)      A.  Uh, yes, I did.
(22)      MS. HUDGINS:  You reviewed everything
(23)  electronically?
(24)      THE WITNESS:  Yes, everything was viewed
(25)  electronically so I don't have any papers or anything to

**8**

(1)  bring with me.
(2)      MS. SHERWIN:  Q.  And you brought no exhibits with
(3)  you?  I take it that means you won't be offering any
(4)  exhibits at trial.  Is that right?
(5)      A.  That is correct.
(6)      Q.  And you won't be offering any demonstrative
(7)  aides at trial.  Is that right?
(8)      A.  That is correct.
(9)      Q.  Did you bring your notes from your conversation
(10)  with Bill Wilson?
(11)      A.  Uh, no, I did not bring any notes.  There were
(12)  no notes; it was a telephone conversation.
(13)      Q.  Did you take any notes during your conversation
(14)  with Mr. Wilson?
(15)      A.  No, I primarily just asked him specific
(16)  questions and he responded to them.
(17)      Q.  How many times did you have any contact with
(18)  Mr. Wilson?
(19)      A.  Simple phone call.
(20)      Q.  Whose idea was it for you to have a telephone
(21)  call with Mr. Wilson?
(22)      A.  It was my idea.  I wanted to question the
(23)  health authority as to some of the ways that things were
(24)  done in the facility.
(25)      Q.  Did you make notes of the questions that you

DEPOSITION OF ROBERT D. JONES, M.D.

**9**

(1) wanted to ask him?

(2) A. No, I basically asked him similar questions

(3) that I would during an audit process.

(4) Q. An audit process on behalf of whom?

(5) A. The NCCHC or the ACA.

(6) Q. And in doing an audit for the NCCHC or the ACA,

(7) you would not have any notes of any questions you wanted

(8) to ask. Is that correct?

(9) A. No, that's not correct.

(10) MS. HUDGINS: Assumes facts not in evidence.

(11) Argumentative.

(12) THE WITNESS: That's not correct. Their process,

(13) we actually have forms that we interview the individuals

(14) with.

(15) MS. SHERWIN: Q. Did you have any form that you

(16) interviewed Bill Wilson with?

(17) A. No.

(18) Q. When did you speak to Mr. Wilson?

(19) A. Oh, I don't recall the specific date.

(20) Q. How long ago was it in general?

(21) A. Let's see. February? Approximately two

(22) months, I believe.

(23) Q. How far in advance of your writing your

(24) original report in this case was your conversation?

(25) A. I do not specifically remember that

**10**

(1) information.

(2) Q. Can you provide me an estimate of how far in

(3) advance of your writing your report you spoke with Mr. Wilson?

(4) A. I do not remember.

(5) Q. Did you keep track of your time in this case?

(6) A. Yes, I did.

(7) Q. How did you do that?

(8) A. Basically time that I spent I would write it

(9) down -- not write it down but enter it into the computer

(10) which generates the bill.

(11) Q. Did you enter it into any particular program?

(12) A. No.

(13) Q. Where did you enter the time?

(14) A. Let me -- it's actually Access, something I

(15) created.

(16) Q. It's what? I'm sorry?

(17) A. Access. It's a program by Microsoft.

(18) Q. And you created the program Access by

(19) Microsoft?

(20) A. No, no. I created -- it's a program in which

(21) you can create your own contact lists -- all sorts of

(22) different things. And I just have used it for a number of

(23) years.

(24) Q. And you're able to print out the information

(25) that you create in that program. Right?

**11**

(1) A. It basically will, as I add additional time, I

(2) add that to the time in it and then it takes that and

(3) multiplies out by my hourly rate.

(4) Q. So if I wanted to ask you how much time you

(5) spent on this case on a particular day you could get that

(6) information from your Access program. Is that correct?

(7) A. No, I cannot.

(8) Q. Why not?

(9) A. Because every time I add another hour to it or

(10) two it increases that particular column. In other words,

(11) it's not a running tally in the sense by date; it's just

(12) simply a total through the time.

(13) Q. Okay. Last night, Ms. Hudgins produced your

(14) invoice in this case which is dated January 26, 2014, in

(15) the amount of $13,474. Right?

(16) A. Yes.

(17) Q. And in this invoice you said that you worked

(18) 28 hours at some point in the amount of $11,200. Correct?

(19) A. Correct.

(20) Q. And if Ms. Hudgins or her client wanted to know

(21) what you did during those 28 hours, how would you respond?

(22) MS. HUDGINS: Well, objection. It calls for

(23) speculation. And it lacks foundation.

(24) THE WITNESS: They would then have simply the total

(25) number of hours from the start and stop date.

**12**

(1) MS. SHERWIN: Q. Okay. But is there any

(2) documentation that you could provide to either Ms. Hudgins

(3) or Corizon to document what you did during those 28 hours?

(4) MS. HUDGINS: Same objections.

(5) THE WITNESS: I reviewed the records. That's

(6) basically -- I can answer the questions about the records

(7) which would be an example that I'd actually read the

(8) records.

(9) MS. SHERWIN: Q. Okay. And you would have no way

(10) of providing any documentation for how your work during

(11) those 28 hours was broken down. Is that right?

(12) A. No, I do not.

(13) Q. And you don't have any record whatsoever of

(14) what work you did on any specific date in this case. Is

(15) that correct?

(16) MS. HUDGINS: Objection. Argumentative. Lacks

(17) foundation.

(18) THE WITNESS: As far as breaking down by date, no,

(19) I do not.

(20) MS. SHERWIN: Q. No, you do not have any records.

(21) Is that right?

(22) A. I do not have any records. I have the total, a

(23) running total, and then I bill it.

(24) Q. When were you first retained in this case?

(25) A. Um, as I remember, it was mid October I

DEPOSITION OF ROBERT D. JONES, M.D.

---

## 13

(1) received a telephone call from Miss Hudgins.

(2) Q. Did you know Ms. Hudgins already?

(3) A. Yes, we've known each other for a number of

(4) years.

(5) Q. How have you known each other?

(6) A. We both served on a board of directors for the

(7) American Correctional Health Services Association, and

(8) then I've done some previous legal work with her.

(9) Q. Okay. What other legal work have you done with

(10) her?

(11) A. I believe there are one or two cases; it's been

(12) some time ago.

(13) Q. Okay. And what were those cases about?

(14) MS. HUDGINS: Well, objection. He said one or two

(15) and now you've made it plural, so --

(16) MS. SHERWIN: Q. Okay. What were those one or two

(17) cases about?

(18) A. As I recall, one of them was a MRSA infection,

(19) but that's about as much as I can remember.

(20) MS. SHERWIN: Q. A methicillin-resistant staph

(21) infection?

(22) A. Yes.

(23) Q. And did you testify in that case?

(24) A. Um, as I recall, I did a deposition but I don't

(25) recall testifying in that case.

## 14

(1) Q. Well, you understand when you testify in a

(2) deposition you're testifying under oath. Right?

(3) A. Yes, I do.

(4) Q. Just the same as when you appear in court.

(5) Correct?

(6) A. That is correct.

(7) Q. And you testified under oath in a deposition in

(8) that case?

(9) A. Yes, I did.

(10) Q. How long ago was that case?

(11) A. I have no idea.

(12) Q. Where did you give the deposition?

(13) A. Here in -- well, in San Francisco if I can

(14) remember right.

(15) Q. Was it in Ms. Hudgins office?

(16) A. I do not recall.

(17) Q. In general what were the facts of that case?

(18) A. Other than I remember something to do with

(19) MRSA, I don't remember anything.

(20) Q. And you were testifying on behalf of health

(21) care professionals in that case. Right?

(22) A. As I recall, but I don't really remember the

(23) specific details about the case other than just in general

(24) that it was MRSA.

(25) Q. Did the defendants in that case include Prison

## 15

(1) Health Services or Corizon Health, Inc.?

(2) A. I do not remember.

(3) Q. How long ago was that case?

(4) A. I do not recall.

(5) Q. Was it last year?

(6) A. No, no, if it had been last year, within the

(7) last four years, it would have been reported in my cases.

(8) It's been greater than four years.

(9) Q. Okay. More than five years?

(10) A. Don't really know.

(11) Q. More than ten years?

(12) A. Maybe somewhere between five and ten.

(13) Q. And you never testified in trial in that case?

(14) A. Not that I recall.

(15) Q. Do you have any records regarding your

(16) testimony in that case?

(17) A. I do not.

(18) Q. What other cases have you been retained by

(19) Ms. Hudgins on?

(20) A. As I said, I wasn't sure whether it was one or

(21) two. I don't recall any other case.

(22) Q. Okay. But there may have been another case;

(23) you just can't recall as you sit here today. Is that

(24) correct?

(25) A. That is correct.

## 16

(1) Q. Have you ever worked with Matthew Grigg before?

(2) A. Uh, I -- no. I don't recall ever working with

(3) Matthew Grigg before.

(4) Q. Have you ever been retained by Ms. Hudgins to

(5) review a case in which you did not testify?

(6) A. Not that I recall.

(7) Q. And you understand that in this case you are

(8) retained on behalf of Corizon Health, Inc. Right?

(9) A. Yes.

(10) Q. And at the time of the events giving rise to

(11) Martin Harrison's death Corizon was known as Prison Health

(12) Services. Right?

(13) A. Yes.

(14) Q. But it's the same corporate entity. You

(15) understand that, right?

(16) A. Yes.

(17) Q. How many other cases have you been retained by

(18) Prison Health Services, Corizon, or any of its employees?

(19) A. If I recall correctly from my opinion, there

(20) are two PHS cases. I would estimate somewhere around

(21) maybe ten other cases.

(22) I've been doing this for a long time so I don't

(23) recall exactly how many.

(24) Q. There were two other Prison Health Services

(25) cases that are on your list of cases. Right?

---

DEPOSITION OF ROBERT D. JONES, M.D.

17

(1)    A. Yes, if I remember correctly.
(2)    Q. And then maybe ten more cases.  Correct?
(3)    A. That would include those.
(4)    Q. Maybe ten Prison Health Services cases total?
(5)    A. Total.
(6)    Q. Have you testified in all of those cases?
(7)    A. Uh, no.
(8)    Q. Other than the two Prison Health Services
(9)  cases, on your case list, how many other cases involving
(10) PHS or Corizon have you testified in either a deposition
(11) or in trial?
(12)    A. I really have no specific recollection as to
(13) how many.
(14)    Q. Did you testify in more than five PHS cases?
(15)    A. Uh, I would say no.  In addition to the ones
(16) that we're talking about.  And were reported in the
(17) opinion.
(18)    Q. And how many depositions have you given in
(19) total?
(20)    A. For all reasons?
(21)    Q. Right.
(22)    A. Probably over -- I've been doing Corrections
(23) for a lone time, so probably somewhere around maybe 25 or
(24) 30?
(25)    Q. And how many depositions have you testified in

18

(1)  where you were retained as an expert witness?
(2)    A. Would you repeat the question?
(3)    (Record read.)
(4)    THE WITNESS:  And that's either depositions or
(5)  trial testimony?
(6)    MS. SHERWIN:  Q.  Well, sure, we can break it up
(7)  that way if that's easier for you.
(8)    A. I would say of the 25, probably no more than
(9)  20.
(10)    Q. And in every case in which you've testified as
(11) an expert witness, involving an inmate or detainee who was
(12) suing a correctional health care worker or entity, you've
(13) always testified on behalf of the defense.  Is that
(14) correct?
(15)    A. When I've actually testified?
(16)    Q. Right.
(17)    A. Um, I don't specifically recall.
(18)    Q. Well, you've always testified on behalf of the
(19) correctional health care industry in any dispute involving
(20) correctional health care; is that correct?
(21)    MS. HUDGINS:  I'll object.  Argumentative.  Has
(22) industry retained you to testify, the industry?
(23)    THE WITNESS:  No.
(24)    MS. SHERWIN:  Q.  You've always testified on behalf
(25) of somebody in the correctional health care industry when

19

(1)  there's a dispute involving correctional health care,
(2)  haven't you?
(3)    MS. HUDGINS:  Objection.  Argumentative.
(4)    THE WITNESS:  I have done both defense and
(5)  plaintiff work.
(6)    MS. SHERWIN:  Q.  But all of your testimony as an
(7)  expert witness has been in defense of correctional health
(8)  care workers.  Isn't that right?
(9)    A. I don't specifically recall whether I gave
(10) testimony in any of the plaintiff cases.
(11)    Q. Okay.  Have you testified on behalf of a
(12) plaintiff at any time since August 3rd, 2012?
(13)    A. No.
(14)    Q. Okay.  Now you testified in a case of Christie
(15) versus Prison Health Services, Inc.  Right?
(16)    A. Yes.
(17)    Q. And that testimony was given on August 3rd,
(18) 2012.  Correct?
(19)    A. You apparently have the document.  I don't
(20) remember the specific date.
(21)    Q. Sure.  I'll show you your deposition
(22) transcript.  What is the date of that testimony?
(23)    A. August 3rd, 2012.
(24)    Q. Now, in that case you testified on page 59,
(25) quote:

20

(1)    "Question:  But all of your testimony as a
(2)  purported expert has been in defense of correctional
(3)  health care workers.  Correct?
(4)    Answer:  Yes, it has."  End quote.
(5)    Do you have any reason to dispute that sworn
(6)  testimony that you gave under oath in the Christie case,
(7)  sir?
(8)    MS. HUDGINS:  I'll object as argumentative.
(9)    THE WITNESS:  The statements speak for themselves.
(10) I'm telling you what my best recollection is today.
(11)    MS. SHERWIN:  Q.  Okay.  And as you sit here today
(12) can you recall any case in which you've ever testified on
(13) behalf of a plaintiff in a case involving correctional
(14) health care?
(15)    A. Not that I can specifically name, no.
(16)    Q. So in the Christie case when you were asked,
(17) quote:
(18)    "Question:  You have always testified on behalf of
(19) the correctional health care industry?
(20)    Answer:  Yes, I have."  End quote.
(21)    That remains true as far as you can recall.  Is
(22) that right?
(23)    MS. HUDGINS:  I'll object as argumentative.  Lacks
(24) foundation.
(25)    THE WITNESS:  Um, that was the testimony I gave on

DEPOSITION OF ROBERT D. JONES, M.D.

---

**21**

(1) that day to my understanding.
(2)        MS. SHERWIN: Q. Okay. And that testimony that
(3) you gave on that day was truthful. Right?
(4)        A. Yes.
(5)        Q. And the testimony that you gave on that day
(6) remains true today. Isn't that right, Doctor?
(7)        A. Uh --
(8)        MS. HUDGINS: I'll object. Vague and ambiguous.
(9) Argumentative. Lacks foundation.
(10)        THE WITNESS: To the degree that I recall, yes.
(11)        MS. SHERWIN: Q. And your conversation with
(12) Bill Wilson, who called whom?
(13)        A. I called Bill.
(14)        Q. On what number?
(15)        A. I don't remember.
(16)        Q. Who gave you the number to call him on?
(17)        A. I got the number from Ms. Hudgins.
(18)        Q. Why did you want to speak to Bill Wilson?
(19)        A. Because he was the health authority.
(20)        Q. He was the responsible health authority.
(21) Correct?
(22)        A. That is correct.
(23)        Q. Did you know Mr. Wilson had already given
(24) testimony under oath in Zelda Sancho's arbitration?
(25)        A. No.

---

**22**

(1)        Q. If Bill Wilson had already given testimony
(2) under oath in Zelda Sancho's arbitration, is that
(3) something you would want to see before forming your
(4) opinions?
(5)        MS. HUDGINS: I would object. Lacks foundation.
(6) Calls for speculation.
(7)        MS. STRINGER: Join.
(8)        THE WITNESS: The question as I understood that I
(9) was answering was at the time that I called him did I know
(10) that he had been deposed? And the answer is no.
(11)        I always like to look at all of the information
(12) that I can in formulating my opinions.
(13)        MS. SHERWIN: Q. Okay. I see from your list of
(14) materials reviewed that you were not given any of the
(15) arbitration materials to review before forming your
(16) opinions. Is that correct?
(17)        A. Um, as far as the actual arbitration, no, it's
(18) referenced by several of the people, but not the specific
(19) arbitration.
(20)        Q. Okay. You did not read the arbitration
(21) testimony even before today of Bill Wilson. Is that
(22) correct?
(23)        A. Um --
(24)        MS. HUDGINS: Excuse me. Lacks foundation.
(25) Argumentative.

---

**23**

(1)        THE WITNESS: I'm aware of some of the dialogs from
(2) some of the other depositions. I have read Mr. Wilson's
(3) deposition since the opinions were rendered.
(4)        MS. SHERWIN: Q. Right. You read his deposition
(5) in this case. Right?
(6)        A. Yes.
(7)        Q. And you read in his deposition that he had
(8) actually testified under oath in an arbitration a while
(9) ago. Right?
(10)        A. Yes. I'm aware of the arbitration if that is
(11) your question.
(12)        Q. Okay. But you did not read his testimony from
(13) the arbitration. Is that correct, Doctor?
(14)        MS. HUDGINS: Same objections. Lacks foundation.
(15) Argumentative.
(16)        THE WITNESS: Um, the actual -- no, I do not recall
(17) reading specific arbitration.
(18)        MS. SHERWIN: Q. And you also did not read the
(19) arbitration testimony of Zelda Sancho. Is that correct?
(20)        MS. HUDGINS: Same objections.
(21)        THE WITNESS: I do not recall reading that specific
(22) document.
(23)        MS. SHERWIN: Q. You did not read the arbitration
(24) testimony of Lenore Gilbert. Is that correct?
(25)        MS. HUDGINS: Same objections.

---

**24**

(1)        THE WITNESS: Not the specific document, no.
(2)        MS. SHERWIN: Q. And you also did not read the
(3) arbitration testimony of any of the other nurses who
(4) testified in Miss Sancho's arbitration. Correct?
(5)        MS. HUDGINS: Same objections.
(6)        THE WITNESS: I have not seen that particular
(7) document.
(8)        MS. SHERWIN: Could you mark this as an exhibit?
(9)        (Plaintiff's Exhibit 1 was marked for
(10) identification.)
(11)        MS. SHERWIN: We'll mark the invoice as Exhibit 2.
(12)        (Plaintiff's Exhibit 2 was marked for
(13) identification.)
(14)        MS. SHERWIN: Q. Doctor, I'm going to hand you
(15) what's been marked as Exhibit 1 to your deposition which
(16) is Corizon's Employer's Post-Hearing Brief that was filed
(17) in the arbitration involving Zelda Sancho's termination.
(18) It bears Bates stamp Corizon 1086 through Corizon 1118.
(19)        You did not receive that document to review, did
(20) you, Doctor?
(21)        A. No.
(22)        Q. In fact, in your report you outline the
(23) materials that you received to review. Right?
(24)        A. Yes.
(25)        Q. And you understood that you were required to

---

DEPOSITION OF ROBERT D. JONES, M.D.

25

(1) set forth all materials that you received to review in
(2) your Rule 26 report.  Is that right, Doctor?
(3)         A. Yes.  Barring additional documents that I've
(4) seen since that time.
(5)         Q. Okay.  And even up until today you've never
(6) seen Corizon's Employer Post-Hearing Brief filed in the
(7) Zelda Sancho matter.  Is that correct, Doctor?
(8)         A. I do not recall seeing that document.
(9)         Q. And the Bates stamped pages on that document
(10) were omitted from the materials in your report that you
(11) listed as having received to review; that means at least
(12) as of the time of your report you also had not received
(13) the Corizon Post-Hearing Brief.  Right?
(14)         MS. HUDGINS: I'll object.  Unintelligible.
(15) Argumentative.
(16)         MS. SHERWIN: Well, okay.  Let's do this.
(17)         Q. Doctor, may I see your report, please?  We'll
(18) mark it as an exhibit.
(19)         THE WITNESS: This is my only copy, though.
(20)         MS. SHERWIN: That's fine.  We'll get a copy of it.
(21)         (Plaintiff's Exhibit 3 was marked for
(22) identification.)
(23)         MS. HUDGINS: So my objection was to the word
(24) "omitted".  If he didn't review it he didn't omit
(25) anything; in fact, he told you what he did review.

26

(1)         MS. SHERWIN: No, the documents were omitted by
(2) your office in the documents that were given to him to
(3) review.
(4)         MS. HUDGINS: A, that's argumentative; and B, that
(5) doesn't mean -- it's obviously unclear.  That's why I said
(6) unintelligible.
(7)         MS. SHERWIN: Q. Doctor, on pages 7 and 8 you list
(8) by Bates stamp number the Corizon documents that you
(9) received to review.  Is that correct?  Pages 7 and 8 of
(10) your report?
(11)         A. Yes.
(12)         Q. And in your rendition of the documents that you
(13) received to review, Corizon Bates stamped pages 1086
(14) through 1118, which are Corizon's Post-Hearing Brief, are
(15) not included.  Is that correct?
(16)         MS. HUDGINS: Document speaks for itself.
(17)         THE WITNESS: The numbers there?  No, I do not list
(18) those.
(19)         MS. SHERWIN: Q. And that means you did not
(20) receive those.  Right?
(21)         A. I don't -- if you look at the documents -- my
(22) opinion, there are a number of documents that are not
(23) there.  They're not all -- I didn't review the entire
(24) Bates stamped records.  I've never had a case where I did
(25) review them all.  I only review the parts that were

27

(1) necessary for forming my opinion.
(2)         Q. Well, is it your testimony that you received
(3) the Employer's Post-Hearing Brief and you did not review
(4) it?
(5)         A. Would you repeat that question?
(6)         Q. Yes.  Is it your testimony today that
(7) Miss Hudgins' office provided you with Corizon's
(8) Post Hearing Brief and you simply decided not to review
(9) it?
(10)         MS. HUDGINS: I'll object.  Argumentative.
(11)         THE WITNESS: That's not included in the numbers
(12) that I've reviewed.
(13)         MS. SHERWIN: Q. And you also had never seen this
(14) document, Exhibit 1 to your deposition, which is Corizon's
(15) Post Hearing Brief before today.  Is that correct, Doctor?
(16)         A. I have not seen that particular document, no.
(17)         Q. Now, Corizon filed a 32-page brief setting
(18) forth its position concerning Zelda Sancho's incompetent
(19) or grossly negligent performance.
(20)         Is that something you would have wanted to review
(21) before forming your opinions in this case?
(22)         MS. HUDGINS: Objection.  Calls for speculation.
(23)         THE WITNESS: Not necessarily.
(24)         MS. SHERWIN: Q. Okay.  Well, we'll ask you about
(25) Corizon's positions in that brief and whether you agree

28

(1) with them later in the deposition.
(2)         How long was your telephone conversation with
(3) Bill Wilson?
(4)         A. As I told you, I don't know.
(5)         Q. From what telephone did you call him?  What
(6) telephone number did you use to call him?
(7)         A. Um, which phone I used?
(8)         Q. Yes.
(9)         A. Probably my home phone.  I don't remember which
(10) one.  I was at home when I did it.  May have been my cell
(11) phone or may have been my home phone; I don't recall.
(12)         Q. What number is that that you used to call
(13) Mr. Wilson?
(14)         A. I don't -- I don't even know my home number for
(15) sure.  I never call it.  I can't give you -- I would have
(16) to look it up.
(17)         MS. HUDGINS: So we'll get it to her later.
(18)         THE WITNESS: We'll get it to her later.
(19)         And my cell phone number is (602) 770-1860.
(20)         MS. SHERWIN: Q. Who provides your cell phone
(21) service?
(22)         A. AT & T.
(23)         Q. And who provides your home phone service?
(24)         MR. ANDRADA: He's not my witness.  I'm going to
(25) object.  This constitutes an invasion of privacy.  It's

DEPOSITION OF ROBERT D. JONES, M.D.

---

29

(1)     not my witness, but...
(2)             THE WITNESS: And I'm uncomfortable with having
(3)     this as a part of a public record, quite frankly.
(4)             MS. SHERWIN: Q. Okay. Well, your home phone
(5)     number, you don't even remember your home phone number as
(6)     you sit here today. Right?
(7)     A. Not for certain.
(8)     Q. And who provides your home phone service?
(9)     A. It would probably be Cox.
(10)    Q. C-o-x?
(11)    A. C-o-x. Cox Communication.
(12)    Q. And as you sit here today you don't remember
(13)    how long your conversation was with Bill Wilson. Is that
(14)    right?
(15)    A. I do not specifically remember.
(16)    Q. Where was Mr. Wilson specifically as far as you
(17)    knew when you were talking to him?
(18)    A. I have no idea; I didn't ask.
(19)    Q. And you talked to him sometime after the first
(20)    of October 2013 and before you did your report. Correct?
(21)    A. Um, I believe I stated I wasn't quite sure when
(22)    I spoke to him.
(23)    Q. Okay. But you were retained in this case in
(24)    October of 2013. Right?
(25)    A. Yes.

---

30

(1)     Q. And you spoke to Mr. Wilson after you were
(2)     retained in this case. Right?
(3)     A. Yes.
(4)     Q. Okay. So sometime from the first of October of
(5)     2013 until the date that you wrote your report is when you
(6)     spoke to Mr. Wilson. Right?
(7)     A. And I don't remember whether it was before I
(8)     wrote the report or whether I wrote -- actually, let me --
(9)     excuse me. I can refresh my memory by looking at my
(10)    report.
(11)    Q. That's fine.
(12)    A. Yes, it was before I wrote the report.
(13)    Q. And what time of day was it when you spoke to
(14)    Mr. Wilson?
(15)    A. As I recall, evening.
(16)    Q. What time of the evening do you mean by that?
(17)    A. Evening to me is after work, which is usually
(18)    about 5:30, 6:00, between that and 8:00.
(19)    Q. Did you speak to Mr. Wilson for two hours?
(20)    A. I've already stated I don't remember how long
(21)    it lasted.
(22)    Q. So you may have spoken to him for two hours.
(23)    Right?
(24)    A. I don't specifically remember how long I spoke
(25)    with him.

---

31

(1)     Q. You may have spoken to him for five hours.
(2)     Is that right?
(3)     A. No. That wouldn't have been considered
(4)     evening. That would be late night.
(5)     Q. You may have spoken to him for three hours?
(6)     A. No, I don't think -- I would say some time less
(7)     than two hours.
(8)     Q. More than an hour but less than two hours?
(9)     A. I don't specifically remember.
(10)    Q. Did you speak with him for five minutes?
(11)    A. Longer -- much longer than five minutes.
(12)    Q. Okay. For more than 30 minutes?
(13)    A. You know, I really don't remember the length of
(14)    the phone call. I would be guessing and I'm not supposed
(15)    to do that under oath.
(16)    Q. Okay. So you may have spoken to him for more
(17)    than five minutes, but less than two hours, and as you sit
(18)    here today, you have absolutely no idea how long you spoke
(19)    with him. Is that correct?
(20)    MS. HUDGINS: Objection. It's argumentative.
(21)    THE WITNESS: I told you I'm not supposed to guess
(22)    and I do not recall.
(23)    MS. SHERWIN: Q. Okay. And you have no idea as
(24)    you sit here today whether or not the conversation lasted
(25)    ten minutes or two hours. Is that a fair statement,

---

32

(1)     Doctor?
(2)     MS. HUDGINS: Same objections.
(3)     THE WITNESS: I do not recall how long it lasted.
(4)     MS. SHERWIN: Q. And you took no notes whatsoever
(5)     during the conversation. Is that true, Doctor?
(6)     A. I --
(7)     MS. HUDGINS: Same objection.
(8)     THE WITNESS: I did not take notes.
(9)     MS. SHERWIN: Q. What questions did you ask
(10)    Mr. Wilson?
(11)    A. Um, basically what his responsibilities were in
(12)    the facility. Who -- what was the actual organization. I
(13)    asked him specifically about training and who was
(14)    responsible for training. I asked him who was responsible
(15)    for maintaining training records for health care staff.
(16)    And who was responsible for retaining records for the
(17)    correctional staff.
(18)    I specifically asked him how the training,
(19)    particularly for alcohol withdrawal, was conducted for the
(20)    officers when it had been established. And the nature of
(21)    what his relationship was with the correctional side of
(22)    the job.
(23)    Q. And you understood that your Rule 26 report
(24)    that you filed in this case was required to be a complete
(25)    statement of all of your opinions that you express and the

---

DEPOSITION OF ROBERT D. JONES, M.D.

---

33

(1) basis and reasons for them.  Right?
(2)       A. Yes, that's the process.
(3)       Q. And you also understood that your Rule 26
(4) report was required to state all facts and data considered
(5) by you in forming your opinions.  Correct?
(6)       A. Yes.
(7)       Q. Okay.  And what facts and data that Mr. Wilson
(8) gave you did you put in your Rule 26 report?
(9)       MS. HUDGINS:  Do you want to look at it?
(10)       THE WITNESS:  We discussed under Opinion 3 new
(11) employee orientation.
(12)       MS. SHERWIN:  Q.  What facts and data did
(13) Mr. Wilson give you that you wrote in your report?  That's
(14) the question.
(15)       A. Specific?  Is that what you're asking me?
(16)       Q. I'm asking you what are the facts and data --
(17)       A. We discussed -- we discussed that all
(18) employees, in fact, go through an initial 40-hour
(19) training.
(20)       Q. Corizon employees or deputies?
(21)       A. As I understood that to be was the health care
(22) individuals go through a 40-hour training.
(23)       Q. That was Corizon employees, right?
(24)       A. Yes.
(25)       Q. Okay.

---

34

(1)       A. And the all-staff meetings were, in fact, for
(2) the staff, the PHS staff, and included all the nurses and
(3) providers.
(4)       Q. And when you say PHS staff, you mean again
(5) Corizon staff.  Right?
(6)       A. Yes.
(7)       And Opinion 5, the training of deputies, is based
(8) on much of my dialogue with Mr. Wilson.
(9)       Q. All of the facts set forth as support for your
(10) opinion regarding the training of deputies you received
(11) during your telephone call with Mr. Wilson.  Right?
(12)       A. That is not correct.
(13)       Q. What facts did Mr. Wilson give you regarding
(14) the training of deputies?
(15)       A. Basically that the training program was
(16) actually already in force when he arrived there;
(17)       That he had an ongoing and continuous interaction
(18) with both the lieutenant and training sergeants;
(19)       That there was dialogue and supplementation as
(20) requested by them.
(21)       They worked closely not only with the deputies but
(22) also with the Criminal Justice Mental Health group.  And
(23) assisted in any of the training that was needed.
(24)       The organization of the training as far as the
(25) Sheriff's Department was clarified as to being maintained

---

35

(1) by the Sheriff's Department.
(2)       And that he was well aware of the fact that the
(3) training did, in fact, occur.
(4)       Q. And the training was done by the Sheriff's
(5) Department and not by Corizon.  Is that correct?
(6)       A. No, that's not correct.  They actually
(7) participated in helping with it.  There were four-minute
(8) trainings that were done; there were information sheets
(9) that were provided.
(10)       Q. Mr. Wilson gave you all this information during
(11) your telephone call with him?
(12)       A. I'd actually seen some of the information in my
(13) review as far as the information sheets.
(14)       He, in fact, clarified how that was utilized
(15) between the Sheriff's Department and PHS.
(16)       Q. Okay.  And what other facts did Mr. Wilson give
(17) you that you put into your report?
(18)       A. That Mr. Wilson gave?
(19)       Q. That's right.
(20)       A. In my opinion I actually look at not only what
(21) I see in one place, but I also like to find that that
(22) information is corroborated by the information in other
(23) places.
(24)       And so the information that was provided by
(25) Mr. Wilson helped to support the fact that the

---

36

(1) accreditation process was valid, that it was thorough, and
(2) that it had been ongoing.
(3)       Q. Okay.  That wasn't the question, actually.
(4)       The question was what other facts did Mr. Wilson
(5) give you that you put in your report other than what you
(6) testified to?
(7)       A. I couldn't parse out specifically because that
(8) was my answer and my answer was explaining that as a
(9) separate fact, the fact that he supports what I've read in
(10) this area or that area, then helps me to conclude my
(11) opinion or create my opinion.
(12)       Q. Okay, Doctor.  But you understand that Rule 26
(13) requires you to set forth the facts and data that you
(14) considered in forming your opinions, and some of those
(15) facts and data came from Bill Wilson in a telephone call
(16) with you that you have no idea how long it was, and you
(17) didn't keep notes of.
(18)       So now is your time to testify about what facts
(19) Mr. Wilson gave you that you relied on and put in your
(20) report.  And you've testified to some facts that
(21) Mr. Wilson gave you and you put in your report.
(22)       And my question now is what other facts beyond
(23) those that you've already testified to did Mr. Wilson give
(24) you that you've put in your report?
(25)       MS. HUDGINS:  I'll object.  Move to strike the

---

DEPOSITION OF ROBERT D. JONES, M.D.

---

**37**

(1) whole colloquy before the statement "and my question is"
(2) as being argumentative and irrelevant.
(3) So could you please read back starting with, "And
(4) my question is...", Madam Court Reporter.
(5) (Record read.)
(6) MR. ANDRADA:  Join in Ms. Hudgins' objection.
(7) MS. STRINGER:  Same.
(8) MR. ANDRADA:  Counsel is harassing the witness.
(9) MS. HUDGINS:  I agree you are harassing him, but
(10) the question is can you remember anything other than
(11) what's written down.
(12) MS. SHERWIN:  Q.  No, the question was not what's
(13) not written down.
(14) The question is what other facts did Mr. Wilson
(15) give you that you put in your report?
(16) MS. HUDGINS:  Same objection.
(17) THE WITNESS:  Well, we discussed his role as the
(18) responsible health authority.
(19) MS. SHERWIN:  Q.  Is that in your report?
(20) A.  It is in the regards that it supports that he
(21) understands what the accreditation process is and what his
(22) duties and responsibilities are so I am clear that since
(23) he's accredited by a the ACA and the NCCHC that he is
(24) aware of his responsibilities and duties which it was
(25) clear from my discussion with Mr. Wilson that he was aware

---

**38**

(1) of that.
(2) It's important for me to validate the accreditation
(3) process, specifically as an item in the opinion.  I don't
(4) recall that I used that verbiage.  But it supports all of
(5) my opinions as a separate and distinct fact I do not
(6) recall any others at this moment in time.
(7) Q.  Okay.  So the answer is that you don't recall
(8) any other facts that Mr. Wilson gave you that you put in
(9) your report.  Is that correct, Doctor?
(10) MS. HUDGINS:  That would be part of his answer.  So
(11) it therefore lacks foundation and it's argumentative.  It
(12) misstates his testimony.
(13) THE WITNESS:  As I said I talked with him about the
(14) duties of the director of nursing and how that
(15) organization was set up.
(16) I asked him about his relationship with the county,
(17) that it was amicable and that they worked well with each
(18) other.
(19) That there was an ongoing dialogue; that they, in
(20) fact, continue to hold meetings as outlined in the
(21) standards.
(22) That that was a process that had continued.
(23) Q.  And are any of those facts that Mr. Wilson gave
(24) you in your report?  Did you write any of those facts in
(25) your report?

---

**39**

(1) A.  As a separate and distinct fact, no, but as a
(2) general opinion, yes.
(3) MS. HUDGINS:  Well, I think the report speaks for
(4) itself, and some of those facts are actually in the
(5) report.
(6) MS. SHERWIN:  Q.  Now, you said that initially you
(7) asked Mr. Wilson what his responsibilities were.  Correct?
(8) A.  Yes.
(9) Q.  What did he tell you in that regard?
(10) A.  That he was the regional -- not regional --
(11) responsible health authority.
(12) Q.  What did that mean?
(13) A.  And that he had been there, I believe, since
(14) about 1999 until he left, if I'm recalling correctly,
(15) about 2012.
(16) Q.  And what did you understand Mr. Wilson's
(17) responsibility as the responsible health authority, what
(18) did you understand that meant?
(19) A.  Well, the responsible health authority is the
(20) individual excepting for actual clinical matters where the
(21) professional judgment makes the final decision.
(22) He oversees all staff; he coordinates all of the
(23) care that is rendered in the facility.  He is responsible
(24) for ensuring that the contract is executed.  He is the
(25) go-to person if there's deficiencies or concerns by the

---

**40**

(1) Sheriff's Department.  He is also a liaison between the
(2) rest of Corizon/PHS.
(3) He is responsible for the entire organization.
(4) It was also clear that he would supervise
(5) administratively Dr. Orr but Dr. Orr had the final
(6) clinical judgment.
(7) And in general terms that's the responsibility of
(8) the responsible health authority.
(9) Q.  And the responsible health authority is also
(10) required to approve training that Corrections officers
(11) receive.  Right?
(12) A.  He reviews and approves and assists in the
(13) creation of that training.
(14) Q.  Okay.  You understand that Alameda County Jail
(15) was accredited by NCCHC at the time of Martin Harrison's
(16) death, right?
(17) A.  Yes.
(18) Q.  And in order to maintain its accreditation it
(19) was required to comply with 100 percent of NCCH standards.
(20) Right?
(21) A.  All applicable standards, yes.
(22) Q.  And essential standard J-C-04 required a
(23) training program established or approved by the
(24) responsible health authority in cooperation with the
(25) facility administrator that guided the health-related

---

DEPOSITION OF ROBERT D. JONES, M.D.

41

(1)     training of Corrections officers.  Right?
(2)         A. That's what the standard says.
(3)         Q. And the standard required that Corrections
(4)     officers receive that training every two years.  Right?
(5)         A. That is what the standard expects.
(6)         Q. And that training includes a lot of medical
(7)     conditions including recognizing the signs and symptoms of
(8)     alcohol withdrawal.  Right?
(9)         MR. ANDRADA:  Objection.  Vague and ambiguous.
(10)    Overly broad.
(11)        MS. HUDGINS:  Join.
(12)        THE WITNESS:  There is an outline of the training
(13)    that is reviewed during the accreditation process, yes.
(14)        MS. SHERWIN:  Q.  And the required training that
(15)    must happen every two years of Corrections officers
(16)    includes recognizing the signs and symptoms of alcohol
(17)    withdrawal.  Right?
(18)        MS. HUDGINS:  Same objections.
(19)        MR. ANDRADA:  Same objections.
(20)        THE WITNESS:  It would be included, yes.
(21)        MS. SHERWIN:  Q.  And so you understood that it was
(22)    Bill Wilson's responsibility as the responsible health
(23)    authority to either establish or approve the mandatory
(24)    training of Corrections officers that happened every two
(25)    years.  Right?

42

(1)         MS. HUDGINS:  Same objections.
(2)         THE WITNESS:  Not him alone.  I mean I understand
(3)     the standard, but the way that that was created and
(4)     through my dialogue with Mr. Wilson, that training was
(5)     already in place and had become the responsibility of the
(6)     Sheriff's office, and that he supplemented and worked with
(7)     them as was needed.
(8)         MS. SHERWIN:  Q.  And were you aware that the
(9)     Sheriff's Office actually did not have a training program
(10)    for Corrections officers?
(11)        MS. HUDGINS:  So I'll have to object that that
(12)    actually mischaracterizes the testimony in the case.  And
(13)    it's argumentative.
(14)        MR. ANDRADA:  It is all of those things.  Assumes
(15)    facts not in evidence.
(16)        MS. HUDGINS:  Join.
(17)        MS. SHERWIN:  Go ahead, Doctor; you can answer.
(18)        THE WITNESS:  If they got it accredited, the
(19)    accrediting people would have had to have seen the
(20)    outline; they would have seen the training rosters.
(21)        And they would have also asked the officers
(22)    themselves when they interviewed them whether or not they
(23)    had received the training.
(24)        Q. Okay.  And you don't know whether or not NCCHC
(25)    asked any of the defendant deputies in this case whether

43

(1)     or not they had received the mandatory training, do you,
(2)     Doctor?
(3)         A. The answer is based on the report that was
(4)     supplied from NCCHC, it specifically lists that random
(5)     inmates were questioned and also officers were questioned.
(6)         Since that's an interview that asks specific
(7)     questions and has a form, at least it did when I last did
(8)     an NCCHC actual accreditation, there would have been
(9)     specific questions about training.
(10)        Q. Right.  But you have no information that any of
(11)    the defendant deputies in this case received the mandatory
(12)    training, do you, Doctor.
(13)        A. I have not seen the training rosters myself,
(14)    no, I have not.
(15)        Q. And you read Bill Wilson's deposition after you
(16)    formulated your opinions in this case.  Right?
(17)        A. Uh, yes, I did.
(18)        Q. And --
(19)        MS. HUDGINS:  Excuse me, just a minute.
(20)        MS. SHERWIN:  Q.  That while --
(21)        MS. HUDGINS:  Excuse me just a minute.  I'm going
(22)    to interpose an objection.
(23)        MS. SHERWIN:  Well, the objection is late.  The
(24)    question has been answered.
(25)        MS. HUDGINS:  It is late, but I'm still going to

44

(1)     interpose it.
(2)         I'm interposing a late objection.  And the
(3)     objection I think is that Mr. Wilson's deposition was
(4)     taken after November 15th so it's an argumentative
(5)     question.  And I don't know if you're going to continue to
(6)     ask questions like that but it seems a little unfair to
(7)     me.
(8)         MS. SHERWIN:  Well, the question is:  "You read
(9)     Bill Wilson's deposition after you formulated your
(10)    opinions in this case."
(11)        The answer was, "Uh, yes, I did."
(12)        There's nothing argumentative about it.
(13)        Q. And in Mr. Wilson's deposition, Doctor, you
(14)    recall Mr. Wilson testifying that Corizon provided no
(15)    training to Corrections officers on the signs and symptoms
(16)    of alcohol withdrawal at any time while he worked for
(17)    Corizon.  Right?
(18)        A. Repeat the question again?
(19)        (Record read.)
(20)        MS. HUDGINS:  I'll object.  It's overbroad.  You're
(21)    asking him about a whole deposition in one question.  If
(22)    you want to show him the deposition I'm sure he'll be
(23)    happy to answer.
(24)        MS. SHERWIN:  You can answer the question, Doctor.
(25)        MR. ANDRADA:  Join.

DEPOSITION OF ROBERT D. JONES, M.D.

---

**45**

(1)     THE WITNESS: The answer -- I can't answer your
(2) question the way it was asked because the deposition and
(3) my discussion with him was there was an ongoing dialogue.
(4) And while they didn't -- the Sheriff's Department had
(5) assumed the responsibility, there was still participation
(6) by PHS/Corizon during this time period.
(7)     MS. SHERWIN: Q. So as you sit here today you
(8) don't recall Bill Wilson's testimony from page 15, lines
(9) 20 through 24 of his deposition, where he testified as
(10) follows. Quote:
(11)     "Question. Do you recall, during any time that you
(12) worked for Corizon, Corizon providing training to
(13) Corrections officers on the topic of signs and symptoms of
(14) alcohol withdrawal?
(15)     Answer: No."
(16)     MS. HUDGINS: Same objections.
(17)     MS. SHERWIN: Q. You don't recall that testimony
(18) as you sit here today. Is that right, Doctor?
(19)     MR. ANDRADA: Same objections.
(20)     THE WITNESS: I would like to see the deposition if
(21) I may.
(22)     MS. SHERWIN: Q. Okay. But you don't recall it as
(23) you we sit here today?
(24)     MS. HUDGINS: Same objections.
(25)     THE WITNESS: It's -- it was a long deposition.

---

**46**

(1) I'm not sure what I recall and what I don't recall.
(2)     MS. SHERWIN: Okay. I'll go get his deposition
(3) transcript in a minute but first I want to ask about a
(4) couple of other depositions.
(5)     Q. You did not receive the deposition of
(6) Terri Granlund, RN who Corizon produced as its Person Most
(7) Knowledgeable about training Corrections officers received
(8) on alcohol withdrawal, did you, Doctor.
(9)     A. I do not recall that deposition.
(10)     Q. You also did not receive the deposition of
(11) Alameda County Sheriff's Sergeant Cynthia Sass whom the
(12) county produced as the county's Person Most Knowledgeable
(13) on training the county provided to Sheriff's deputies on
(14) the topic of alcohol withdrawal, did you, Doctor?
(15)     A. I do not recall that deposition.
(16)     Q. Okay. Has anyone informed you that Corizon's
(17) Person Most Knowledgeable about training provided to
(18) Alameda County Sheriff's Office employees on the issue of
(19) alcohol withdrawal did not know what training, if any,
(20) Alameda County Sheriff's deputies receive on that topic of
(21) alcohol withdrawal?
(22)     MS. HUDGINS: Objection. Lacks foundation.
(23) Argumentative.
(24)     MR. ANDRADA: Join.
(25)     THE WITNESS: I'm not sure there's a question or I

---

**47**

(1) understand the question you're asking.
(2)     MS. SHERWIN: Q. Sure. Has anyone informed you
(3) that Corizon's Person Most Knowledgeable about training
(4) provided to Alameda County Sheriff's Office employees on
(5) the issue of alcohol withdrawal did not know what
(6) training, if any, Alameda County Sheriff's deputies
(7) receive on the topic of alcohol withdrawal?
(8)     MS. HUDGINS: Same objections.
(9)     MR. ANDRADA: Same objections.
(10)     THE WITNESS: I don't recall that.
(11)     MS. SHERWIN: Q. And has anybody informed you that
(12) Corizon's Person Most Knowledgeable on training provided
(13) to Alameda County Sheriff's deputies on alcohol withdrawal
(14) said that Corizon and Prison Health Services had never
(15) provided such training in the 24 years that she had worked
(16) there?
(17)     MS. HUDGINS: Same objections.
(18)     THE WITNESS: I haven't read the deposition. I
(19) don't really know how to comment on that question. I
(20) don't have knowledge of the deposition.
(21)     MS. SHERWIN: Q. Okay. Did you ask for all of the
(22) relevant depositions in order to form your opinions in
(23) this case?
(24)     MS. HUDGINS: Objection. Argumentative. Lacks
(25) foundation.

---

**48**

(1)     MR. ANDRADA: It is argumentative. It's also vague
(2) and ambiguous with regard to what you mean by "relevant".
(3)     MS. HUDGINS: Join.
(4)     THE WITNESS: Based on the opinions that I rendered
(5) in this case, I feel comfortable in rendering those
(6) opinions based on the information that I reviewed.
(7)     MS. SHERWIN: Q. Okay. And if the Person Most
(8) Knowledgeable within the entire corporation of
(9) Corizon Health, Inc. about Alameda County Sheriff's
(10) deputies' training on alcohol withdrawal testified in the
(11) 24 years that she's worked at Corizon, they've never
(12) provided training to Sheriff's deputies on alcohol
(13) withdrawal, would that change your opinions, Doctor?
(14)     MS. STRINGER: Overly broad.
(15)     MS. HUDGINS: Yes, it's overly broad. It's
(16) argumentative. Lacks foundation.
(17)     MR. ANDRADA: Join.
(18)     THE WITNESS: And I would have to read the entire
(19) deposition to see what was actually the line of
(20) questioning. One single question doesn't always tell me
(21) what was the previous testimony nor the testimony after.
(22)     MS. SHERWIN: You can answer the question. Would
(23) it change your opinions if --
(24)     MS. HUDGINS: Well, I'm sorry; he just gave you his
(25) answer. You may not have liked it, but to ask the exact

---

DEPOSITION OF ROBERT D. JONES, M.D.

---

**49**

(1) same question again after he gave you an answer is
(2) argumentative and you're harassing him.
(3)         MR. ANDRADA:  Join.
(4)         THE WITNESS:  And my answer does not change.
(5)         MS. SHERWIN:  Q.  Well, if the Person Most
(6) Knowledgeable within Corizon Health, Inc. about Alameda
(7) County Sheriff's deputies' training on alcohol withdrawal
(8) testified under oath that in the 24 years she'd worked
(9) there Corizon had never provided training to Sheriff's
(10) deputies on alcohol withdrawal, that would be inconsistent
(11) with the information Mr. Wilson gave you during his
(12) telephone call.  Isn't that right, Doctor?
(13)         MS. HUDGINS:  Well, I'll object.  It's overly
(14) broad.  It lacks foundation.  It mischaracterizes his
(15) testimony.
(16)         MR. ANDRADA:  It's argumentative as phrased.
(17)         MS. HUDGINS:  Join.  Same objection.
(18)         THE WITNESS:  The statement in the deposition which
(19) I have not read is not supported by the documents I
(20) reviewed or the conversation that I had with Mr. Wilson.
(21)         MS. SHERWIN:  Q.  It's inconsistent with the
(22) conversation you had with Mr. Wilson, isn't it.
(23)         A.  And the documents I reviewed.
(24)         Q.  Well, you never saw any actual training
(25) documents, did you?

---

**50**

(1)         A.  I saw handouts that were created, I discussed
(2) the initial training, I saw the new employee training, so
(3) I'm not sure why that person would opine that.
(4)         Q.  Okay.  But you understand that the person --
(5) that Corizon Health got to choose who was its Person Most
(6) Knowledgeable about training to Alameda County Sheriff's
(7) deputies.  Do you understand that, Doctor?
(8)         MS. HUDGINS:  I'll object.  It's argumentative.
(9)         MS. STRINGER:  Calls for a legal condition
(10) conclusion.
(11)         MS. HUDGINS:  Join.
(12)         MR. ANDRADA:  Join as well.
(13)         THE WITNESS:  I'm not a lawyer.  Based on the
(14) documents that I reviewed, and based on my discussion with
(15) Mr. Wilson, and by the fact that they were accredited,
(16) continuously accredited, I see evidence of training.
(17)         MS. SHERWIN:  Q.  Okay.  But you don't know what
(18) representations Corizon made to NCCHC in order to get its
(19) accreditation, do you?
(20)         A.  Have I reviewed the documents with the -- of
(21) the actual accreditation process?  No, I have not.
(22)         Q.  And you don't know whether or not Corizon
(23) mislead NCCHC in order to obtain or maintain its
(24) accreditation, do you?
(25)         MS. HUDGINS:  Objection.  Argumentative.

---

**51**

(1)         THE WITNESS:  There's absolutely no reason for
(2) someone to mislead the accreditation process.  It's a
(3) voluntary process.  It's something that they pay for.
(4)         If they haven't met a standard, there is an
(5) opportunity for them to -- to supply additional
(6) documentation to support that.
(7)         There were multiple accreditations that went on;
(8) it's a three-year accreditation.  Multiple different
(9) examiners had spoken with them and looked at these
(10) specific issues as well as the American Correctional
(11) Association.
(12)         So I am certainly surprised that somebody who is,
(13) quote, most knowledgeable on training would make that
(14) statement.
(15)         MS. SHERWIN:  Q.  Do you understand that the
(16) testimony of Ms. Granlund who was Corizon's Person Most
(17) Knowledgeable on training deputies receive about alcohol
(18) withdrawal is binding on Corizon.  Do you have that
(19) understanding?
(20)         MS. HUDGINS:  So I think that would be a legal
(21) conclusion and argumentative.
(22)         MR. ANDRADA:  Join.
(23)         MS. STRINGER:  Join.
(24)         THE WITNESS:  And I'm not a lawyer.
(25)         MS. SHERWIN:  Q.  Okay.  I'm just asking; do you

---

**52**

(1) have that understanding
(2)         A.  No, I do not.
(3)         Q.  And you also did not read the deposition of
(4) Alameda County's Person Most Knowledgeable on alcohol
(5) withdrawal training provided to deputies who was Sergeant
(6) Cynthia Sass.
(7)         Do you know that Miss Sass, when asked what
(8) training is provided to Alameda County Sheriff's deputies
(9) concerning alcohol withdrawal, testified, quote:  "I would
(10) say very little," end quote.
(11)         And, quote:  "Our information is rather cursory,"
(12) end quote?
(13)         MS. HUDGINS:  Compound.  Argumentative.
(14)         MR. ANDRADA:  Join.
(15)         MS. STRINGER:  Join.
(16)         THE WITNESS:  If you're going to continue to ask me
(17) questions about a document that I have not read and
(18) statements that have been made and that are extracted from
(19) that I would like the ability to read the depositions.
(20)         MS. SHERWIN:  Okay.
(21)         THE WITNESS:  To take a quote out of them doesn't
(22) tell me everything.  Yes, there may be a statement, but I
(23) always look at things in context.
(24)         MS. SHERWIN:  Q.  Okay.  But has anyone informed
(25) you that Sergeant Sass, who was the county's Person Most

---

DEPOSITION OF ROBERT D. JONES, M.D.

---

53

(1)     Knowledgeable about its training of deputies in alcohol
(2)  withdrawal, said that the training was very little and
(3)  cursory?  Has anyone informed you of that fact?
(4)         MS. HUDGINS:  Same objections.
(5)         MR. ANDRADA:  Same objections.
(6)         THE WITNESS:  No, and it would be inconsistent with
(7)  the accreditation process and the other information and
(8)  the documents that I reviewed.
(9)         MS. SHERWIN:  Q.  Okay.  So you're assuming, since
(10)  Alameda County Jails were accredited, that they provided
(11)  the required training.  Is that right?
(12)         A.  That's part of the reason that I would make
(13)  that statement, yes.
(14)         Q.  Okay.  And has anyone informed you that
(15)  Sergeant Sass testified that there was no formal training
(16)  program to provide deputies training on alcohol
(17)  withdrawal?
(18)         MR. ANDRADA:  Go ahead, Nancy.
(19)         MS. HUDGINS:  I'll object.  It mischaracterizes
(20)  prior testimony.  It's argumentative.
(21)         MR. ANDRADA:  Join.
(22)         THE WITNESS:  I do not know why she came to that
(23)  conclusion.  It certainly is not supported by the
(24)  documents and the other information I obtained.
(25)         MS. SHERWIN:  Q.  Well, the documents you reviewed

---

54

(1)  were policies, right?
(2)         MR. ANDRADA:  Well --
(3)         MS. HUDGINS:  I'll --
(4)         MR. ANDRADA:  Go ahead, Nancy.
(5)         MS. HUDGINS:  I'll object.  It's argumentative.
(6)  It's compound.
(7)         MR. ANDRADA:  And if I may, it misstates the
(8)  testimony.  He clearly talked about looking at documents
(9)  that are well beyond what people would describe as
(10)  "policy".
(11)         MS. SHERWIN:  Your speaking objections are
(12)  inappropriate attempts to coach the witness and I ask you
(13)  to stop.
(14)         Doctor, you can answer the question.
(15)         MS. HUDGINS:  Okay.  So I'm joining in his
(16)  objections, and I don't think they're inappropriate.
(17)         I think maybe the question is inappropriate which
(18)  is why Alameda's counsel made the objections.
(19)         THE WITNESS:  The materials that I reviewed go well
(20)  beyond just policies.
(21)         MS. SHERWIN:  Q.  You never saw any documentation
(22)  that any of the deputies in this case received the
(23)  required training on alcohol withdrawal, did you, Doctor?
(24)         MS. HUDGINS:  Asked and answered.
(25)         MR. ANDRADA:  Asked and answered.  Argumentative as

---

55

(1)  phrased.  Assumes facts not in evidence as to this
(2)  witness.  Harassing the witness.
(3)         MS. HUDGINS:  Join.
(4)         MS. STRINGER:  Misstates his prior testimony.
(5)         MS. HUDGINS:  Join.
(6)         THE WITNESS:  And my answer is the same as I've
(7)  already given.
(8)         MS. SHERWIN:  Q.  You didn't see any documentation
(9)  that these deputies had received the required training.
(10)  That's the question I haven't gotten an answer to.
(11)         MS. HUDGINS:  Well, he believes he has, because he
(12)  said it's the same as my other answer, so he's given you
(13)  that answer.  And you're being argumentative and harassing
(14)  him.
(15)         MR. ANDRADA:  Join.
(16)         MS. SHERWIN:  Q.  Have you looked at the deputies'
(17)  training records?
(18)         MS. HUDGINS:  Asked and answered.
(19)         THE WITNESS:  As far as the actual trainers?  I've
(20)  told you how I came to the conclusion that they received
(21)  training.
(22)         MS. SHERWIN:  Q.  Okay.  And it's not based on
(23)  their training records, is it.
(24)         A.  I have not looked at specific officers'
(25)  training records.  I didn't say that.

---

56

(1)         Q.  And the only deposition of any defendant deputy
(2)  that you read in this case was the deposition of defendant
(3)  Deputy Ahlf.  Right?
(4)         A.  I believe that is the only one that I have
(5)  read.
(6)         Q.  You did not read the deposition transcripts of
(7)  the other nine deputies in this case.  Right?
(8)         MS. HUDGINS:  Objection.  Argumentative.  Lacks
(9)  foundation.
(10)         THE WITNESS:  I did not read their depositions.
(11)         MS. SHERWIN:  Q.  Did Bill Wilson tell you anything
(12)  else in your conversation with him that you haven't
(13)  testified about already?
(14)         MS. STRINGER:  Overly broad.
(15)         MS. HUDGINS:  Yes, I'll join.  I'm not sure I
(16)  remember what he's testified to already, much less whether
(17)  he would remember, so it's argumentative as well.
(18)         THE WITNESS:  To the best of my recollection I had
(19)  answered that question previously.
(20)         MS. SHERWIN:  Q.  Okay.  And I just want to make
(21)  sure I have the complete content of your conversation with
(22)  Mr. Wilson.
(23)         Is there anything else that you and he discussed
(24)  that you haven't already testified about?
(25)         MS. HUDGINS:  I think you just asked that question,

---

DEPOSITION OF ROBERT D. JONES, M.D.

**57**

(1)  so it's asked and answered, and same objections I'll
(2)  interpose.
(3)       THE WITNESS: And as I answered it before, my
(4)  answer does not change.
(5)       MS. SHERWIN: Q. Okay. You know what? This
(6)  particular question hasn't been asked and answered. I'm
(7)  just trying to make sure we have all of the comments and
(8)  facts that Mr. Wilson gave you.
(9)       Earlier we were discussing the facts that
(10)  Mr. Wilson gave you that you wrote into your report.
(11)  Okay?
(12)       This question now is asking was there anything else
(13)  that you and Mr. Wilson discussed that you haven't already
(14)  testified about? That's all.
(15)       MS. HUDGINS: Yeah, that's all. And that's been
(16)  asked and answered several times.
(17)       So you can answer it again. Same objections.
(18)       THE WITNESS: As I mentioned, my statements or my
(19)  opinions, I should say, are based on several different
(20)  sources, both the documents, my conversation with
(21)  Mr. Wilson, and to the degree that each one of those
(22)  contributes, I do not recall anything else at this
(23)  particular point in time.
(24)       MS. SHERWIN: Q. Okay. So it's fair to say you
(25)  don't recall anything else that you and Mr. Wilson

**58**

(1)  discussed. Is that right?
(2)       MS. HUDGINS: All right. Wait a minute. This has
(3)  got to be the eighth time -- I take that back. I'm
(4)  really -- I'm sorry; I'm being facetious.
(5)       This has got to be the fourth time you've asked
(6)  this question and now you're harassing.
(7)       MS. SHERWIN: No. You know what, Nancy, he hasn't
(8)  given me an answer.
(9)       I'm just trying to find out are there any facts
(10)  that he and Mr. Wilson discussed that he hasn't testified
(11)  about.
(12)       And his answer was: My statements and my opinions
(13)  are based on several sources, both the documents, and my
(14)  conversation with Mr. Wilson.
(15)       That's not an answer to the question. And the
(16)  earlier answers to the question were: I answered it
(17)  before; my answer does not change.
(18)       That's also not an answer to the question. And
(19)  that question actually was not asked before.
(20)       Q. I'm just trying to find out are there any other
(21)  facts that you and Mr. Wilson discussed that we haven't
(22)  already talked about today in your deposition. At all.
(23)       MS. HUDGINS: Asked and answered. Same objections,
(24)  including argumentative if I didn't make that one before.
(25)       THE WITNESS: Not that I recall.

**59**

(1)       MS. SHERWIN: Q. Okay. In your list of cases on
(2)  page 9 you list that you testified in a case of Lucero
(3)  versus California Department of Corrections. Right?
(4)       A. Yes.
(5)       Q. And in that case you testified that the
(6)  California Department of Corrections and its health staff
(7)  behaved reasonably. Right?
(8)       A. Uh, yes.
(9)       Q. And in that case, a man had a history of
(10)  glaucoma, repeatedly requested to see an ophthalmologist
(11)  for medication, but he never received an ophthalmology
(12)  appointment. Correct?
(13)       MS. HUDGINS: Objection. Overly broad.
(14)       MR. ANDRADA: Not relevant as well. Not reasonably
(15)  calculated.
(16)       MS. HUDGINS: Join.
(17)       MS. SHERWIN: Q. Is that right, Doctor?
(18)       A. The case was about an individual who had a
(19)  nonfunctioning eye who had -- actually did have some
(20)  glaucoma, but his other problem was that it was thisic,
(21)  meaning that it had deteriorated. It had a spontaneous
(22)  rupture.
(23)       Q. Right. His left eye burst from extreme
(24)  pressure caused by the glaucoma. Right?
(25)       A. Uh --

**60**

(1)       MS. HUDGINS: Vague and ambiguous. Objection.
(2)  Overbroad.
(3)       THE WITNESS: There are lots --
(4)       MS. HUDGINS: Irrelevant.
(5)       THE WITNESS: There are lots of different facts in
(6)  this case. I am not going to agree with that statement.
(7)  That case did not go to trial. I gave deposition in that
(8)  case.
(9)       And that to my opinion of the care that Mr. Lucero
(10)  received, he did have, as to specifically answer your
(11)  questions, he did have ophthalmology appointments; he had
(12)  one before he even left the prison while he was out on
(13)  parole.
(14)       He did not follow up with care. He did not
(15)  continue his medications. He came back in. There was an
(16)  assessment. He was eventually sent out to the same
(17)  ophthalmologist that he had seen with the previous
(18)  hospitalization -- excuse me -- incarceration and
(19)  evaluation at, if I remember, Riverside Medical Center.
(20)       And he was offered the exact same elective surgery
(21)  and received eventually the same elective surgery that had
(22)  been offered almost a year previously.
(23)       Q. And after his left eye burst his left eye was
(24)  removed while he was in prison. Right?
(25)       A. His -- he received the enucleation and the

DEPOSITION OF ROBERT D. JONES, M.D.

---

**61**

(1)    prosthetic eye.

(2)         Q. Well, he actually never received the prosthetic

(3)    eye before he was released from prison. Right?

(4)         MS. HUDGINS: Well, I'll object. This is way far

(5)    afield and --

(6)         MS. SHERWIN: It goes to the witness's bias.

(7)         MS. HUDGINS: I appreciate that. This is way far

(8)    afield. It's argumentative. It's irrelevant.

(9)         MR. ANDRADA: Join.

(10)         MS. STRINGER: Join.

(11)         MS. HUDGINS: It's overbroad.

(12)         THE WITNESS: And I've given you my best

(13)    recollection of this case.

(14)         MS. SHERWIN: Q. Okay. So you think that he

(15)    received a prosthesis before he was released from prison.

(16)    Right?

(17)         MS. STRINGER: Misstates his testimony.

(18)         THE WITNESS: I didn't say that.

(19)         MS. SHERWIN: Q. He received a prosthesis after he

(20)    was released from prison?

(21)         MS. STRINGER: He didn't say that, either.

(22)         MS. HUDGINS: Same objections.

(23)         THE WITNESS: I honestly don't -- I know he

(24)    received a prosthetic eye.

(25)         MS. SHERWIN: Q. You testified -- strike that.

---

**62**

(1)    That case settled for $585,000. Right?

(2)         MS. HUDGINS: I'll object. Argumentative. Lacks

(3)    foundation. Irrelevant.

(4)         MR. ANDRADA: Join.

(5)         THE WITNESS: And I knew that it didn't go to trial

(6)    but I did not know any of the details of the settlement.

(7)         MS. SHERWIN: Q. Okay. Then you testified -- when

(8)    did you testify in the Lucero case?

(9)         A. If my memory serves me correct, I think it was

(10)    last fall.

(11)         Q. Where did you testify?

(12)         A. In Los Angeles.

(13)         Q. Where in Los Angeles? At an office? At a

(14)    courthouse?

(15)         A. At an office if I'm remembering right, Manning

(16)    and Marder.

(17)         Q. And who retained you in that case?

(18)         A. Mr. Robert Murphy.

(19)         Q. And you also testified in a case of Jaquez

(20)    versus Prison Health Services. Right?

(21)         A. Yes.

(22)         Q. And that's the same entity that's a defendant

(23)    in this case. Right?

(24)         A. Yes, it is.

(25)         Q. And how long ago did you testify in the Jaquez

---

**63**

(1)    case?

(2)         A. I gave deposition testimony. And I don't

(3)    remember exactly when it was. I believe it was late

(4)    summer, early fall.

(5)         Q. Of 2013?

(6)         A. Of 2013.

(7)         Q. Where was your deposition?

(8)         A. In Phoenix, Arizona.

(9)         Q. Was it at a lawyer's office?

(10)         A. It was at a lawyer's office. It was a "tele"

(11)    deposition which the plaintiff's attorneys were, if I'm

(12)    remembering correctly, were in Denver.

(13)         Q. And who retained you in that case?

(14)         A. It's a Polish name and I honestly do not

(15)    remember.

(16)         Q. Was it a man or a woman?

(17)         A. I think it's -- it's a man. It's Perczak, I

(18)    believe.

(19)         Q. How is that spelled?

(20)         A. P-e-r-c-z-a-k.

(21)         Q. And in that case you testified that everything

(22)    Prison Health Services and its staff did was reasonable,

(23)    right?

(24)         MS. HUDGINS: Well, I'll object. That sounds kind

(25)    of overbroad to me. Lacks foundation. Irrelevant.

---

**64**

(1)    Argumentative.

(2)         MS. STRINGER: Join.

(3)         THE WITNESS: No, that would not be the correct

(4)    summation of my testimony.

(5)         MS. SHERWIN: Q. Okay. Was there anything that

(6)    you testified Prison Health Services or its staff did that

(7)    was unreasonable in that case?

(8)         MS. HUDGINS: Same objections.

(9)         THE WITNESS: Again, I testified based on my

(10)    opinion after reading the documents and the facts in that

(11)    case. If I correctly remember, this lawyer was censured

(12)    in that case and had to pay attorneys' fees to defendant's

(13)    counsel.

(14)         MS. SHERWIN: Q. For what?

(15)         A. Because the suit was brought in bad faith. I

(16)    don't know the legal terminology. I assume that's a

(17)    layman's legal term.

(18)         MS. SHERWIN: Q. And in that case Bernadette

(19)    Jaquez died of dehydration while she was untreated heroin

(20)    withdrawal. Right?

(21)         MS. HUDGINS: Same objections.

(22)         THE WITNESS: That's a mischaracterization of the

(23)    facts of the case.

(24)         MS. SHERWIN: Q. Well, the forensic pathologist

(25)    who did the autopsy said she died of dehydration. Right?

---

DEPOSITION OF ROBERT D. JONES, M.D.

---

**65**

(1)         A. Actually that was his original opinion but it
(2) changed -- that opinion was changed.
(3)         Q. When was the opinion changed?
(4)         A. Uh, I don't know because I didn't interview
(5) him. But her death was not due to that, dehydration.
(6)         Q. Was Miss Jaquez in untreated heroin withdrawal?
(7)         MS. HUDGINS: Same objections.
(8)         MR. ANDRADA: Yes, same objections. This is --
(9) same objections.
(10)         THE WITNESS: She was going through heroin
(11) withdrawal. She's been a long-time heroin user.
(12)         MS. SHERWIN: Q. And she was pushing her distress
(13) button on the day she died every five to 20 minutes.
(14) Right?
(15)         MS. HUDGINS: Same objections.
(16)         MR. ANDRADA: Same objections.
(17)         THE WITNESS: She had the -- I can answer the
(18) question that yes, she had been repeatedly pushing the
(19) button; however, she was admonished by the nurses that she
(20) shouldn't do that. She was faking, quote, unquote,
(21) according to the nurse. And was told to get up and go sit
(22) on her bed, which she did.
(23)         MS. SHERWIN: Q. Was there anything that any of
(24) the Prison Health Services employees did in the Jaquez
(25) case that you thought was unreasonable?

**66**

(1)         MS. HUDGINS: Same objections.
(2)         THE WITNESS: I don't remember specific details. I
(3) never made that opinion.
(4)         MS. SHERWIN: Q. And you also testified as we
(5) discussed earlier in the case of Nicholas -- or the Estate
(6) of Nicholas Christie versus Prison Health Services.
(7) Right?
(8)         A. Yes.
(9)         Q. And you gave your deposition in that case on
(10) August 3rd of 2012. Right?
(11)         A. I believe that's correct. I'll trust your
(12) memory or documentation.
(13)         Q. And you were retained on behalf of Prison
(14) Health Services which is the same corporate defendant in
(15) this case. Right?
(16)         A. It's one of a number of people who I have been
(17) retained by.
(18)         Q. And in the Nick Christie case, Mr. Christie was
(19) a mentally ill man who was strapped naked to a restraint
(20) chair and left covered in pepper spray for hours. Right?
(21)         MS. HUDGINS: Same objections. And this whole line
(22) of questioning, it's irrelevant, it's not reasonably
(23) calculated to the lead to the discovery of admissible
(24) evidence. It lacks foundation. It's overbroad.
(25)         MS. SHERWIN: It goes --

**67**

(1)         MR. ANDRADA: Join.
(2)         MS. STRINGER: Join.
(3)         MS. SHERWIN: It goes to the witness's bias.
(4) You can go ahead and answer, Doctor.
(5)         THE WITNESS: Are we going to discuss all the facts
(6) of the case? Because if we're going to discuss all the
(7) facts in the case I'll be happy to tell you what and why I
(8) came to the conclusions.
(9)         But for you to extract a small statement out of my
(10) opinion is unreasonable in my estimation.
(11)         MS. SHERWIN: Q. Okay. But Mr. Christie was a
(12) mentally ill man who was strapped naked to a restraint
(13) chair and left covered with pepper spray for hours.
(14) Right?
(15)         MS. HUDGINS: Same objections.
(16)         MR. ANDRADA: Same.
(17)         THE WITNESS: I -- if we're going to discuss the
(18) case we're going to discuss the complete case and I would
(19) want to have the documents and everything else available
(20) to me.
(21)         I -- you know, that's some of the information but
(22) he was not just left in that way and it does
(23) mischaracterize what else happened.
(24)         MS. SHERWIN: Q. And he was also denied any food
(25) or water during that time. Right?

**68**

(1)         MS. HUDGINS: Same objections.
(2)         MS. STRINGER: Vague and ambiguous as to "that
(3) time".
(4)         MR. ANDRADA: Join.
(5)         MS. HUDGINS: Join.
(6)         THE WITNESS: And the answer to that question is
(7) no, that's not true.
(8)         MS. SHERWIN: Q. Mr. Christie was denied access to
(9) a restroom and urinated on himself. Right?
(10)         MS. HUDGINS: Same objection. As all of the other
(11) ones.
(12)         MR. ANDRADA: Join.
(13)         MS. STRINGER: Join.
(14)         MR. ANDRADA: Can we take a break? We've been
(15) going an hour and 15 or 20 minutes.
(16)         THE WITNESS: I would appreciate that.
(17)         MS. SHERWIN: As soon as we finish this line of
(18) questioning right here we can take a break.
(19)         MS. HUDGINS: Okay. Let the record reflect the
(20) witness has said he would appreciate a break but
(21) Ms. Sherwin said she would like to continue on.
(22)         MS. SHERWIN: I have two questions on this topic
(23) that need to be answered plus this one and we can take a
(24) break.
(25)         THE WITNESS: What was the question?

---

DEPOSITION OF ROBERT D. JONES, M.D.

---

**69**

(1)         MS. SHERWIN:  Q.  He was denied access to a
(2)   restroom and urinated on himself.  Right?
(3)         MS. HUDGINS:  Same objections.
(4)         THE WITNESS:  That is not correct.
(5)         MS. SHERWIN:  Q.  He died.  Right?
(6)         MS. HUDGINS:  Same objections.
(7)         THE WITNESS:  He did die, yes.
(8)         MS. SHERWIN:  Q.  And you testified that everything
(9)   the Prison Health Services employees did was reasonable
(10)  and within the standard of care in that case, right?
(11)        MS. HUDGINS:  Same objections.
(12)        MR. ANDRADA:  Join.
(13)        THE WITNESS:  As I said --
(14)        MS. HUDGINS:  Overly broad.  I'm not sure if that's
(15)  part of the same objections, but I'm just making sure by
(16)  saying it again.  Go ahead.
(17)        THE WITNESS:  I based my opinions on the
(18)  information and the records that were there.  I came to my
(19)  conclusions based on that and made my opinions.
(20)        MS. SHERWIN:  Q.  And your opinion was that the
(21)  Prison Health Services employees acted reasonably and
(22)  within the standard of care.  Correct?
(23)        MS. HUDGINS:  Same objections.
(24)        THE WITNESS:  At which time and at what times?
(25)        MS. SHERWIN:  Q.  At all times.

---

**70**

(1)         A.  At all times?
(2)         MS. HUDGINS:  Same objections.
(3)         THE WITNESS:  To the extent -- yes.  I did not find
(4)   anything...
(5)         MS. SHERWIN:  We can take a break now.
(6)         (Recess.)
(7)         MS. SHERWIN:  Q.  You testified in the Christie
(8)   case that the documentation of a nurse who was reprimanded
(9)   for inadequate documentation was still reasonable and
(10)  within the standard of care.  Right?
(11)        MS. HUDGINS:  So we have taken a break but I liked
(12)  all of my objections before so the last group of
(13)  objections that I had to this same line of questioning
(14)  that's the most inclusive one is what I'm stating here.
(15)        MS. STRINGER:  And it's unintelligible.
(16)        MR. ANDRADA:  Join.
(17)        THE WITNESS:  Repeat the question, please.
(18)        MS. SHERWIN:  Q.  Would you read the question back,
(19)  please?
(20)        (Record read.)
(21)        MS. HUDGINS:  Same objections.  Overly broad.
(22)  Vague and ambiguous.
(23)        THE WITNESS:  I'd need to know which nurse and
(24)  which other information in order to answer that.
(25)        MS. SHERWIN:  Q.  On page 168 of your deposition

---

**71**

(1)   you were asked about Nurse Whinnie being reprimanded for
(2)   inadequate documentation, and you said yes.
(3)         And then you also testified that the documentation
(4)   was reasonable and within the standard of care, even
(5)   though it wasn't adequate.  Right?
(6)         MS. HUDGINS:  Same objections.  Also
(7)   unintelligible.  It feels like there was some stuff that's
(8)   not in there.
(9)         THE WITNESS:  I need to look at the document --
(10)        MS. SHERWIN:  Okay.  Sure.  I'm showing the witness
(11)  page 168 of his deposition in the case of Joyce Christie
(12)  versus Mike Scott and Prison Health Services,
(13)  Incorporated.
(14)        I've highlighted it for you, Doctor, so you can
(15)  find it easily.
(16)        MS. HUDGINS:  So for the record this is a 178-page
(17)  deposition.
(18)        MS. SHERWIN:  Q.  Looking at page 168, Doctor,
(19)  beginning at line 8.
(20)        A.  I --
(21)        MS. HUDGINS:  He gets it.  You've even highlighted
(22)  it for him.
(23)        THE WITNESS:  I'm reading my testimony before and
(24)  after.
(25)        MS. HUDGINS:  While he's reading I'll interpose the

---

**72**

(1)   same objections.
(2)         THE WITNESS:  And prior to that, my testimony was:
(3)   "And there were things that were not done but they
(4)   were not the proximate cause of his death," which is also
(5)   included in the same paragraph.
(6)         MS. SHERWIN:  Q.  I'm asking you about page 168 and
(7)   your testimony that the nurse who was reprimanded for
(8)   inadequate documentation was still acting reasonably and
(9)   within the standard of care even though her documentation
(10)  was inadequate.
(11)        A.  The --
(12)        MS. HUDGINS:  So looking at page 168, lines 8
(13)  through 15.  You've read them.
(14)        THE WITNESS:  Yes.
(15)        MS. HUDGINS:  Do you degree that they say what they
(16)  say?
(17)        THE WITNESS:  They say what they say.
(18)        MS. SHERWIN:  May I see that please, Doctor?
(19)        THE WITNESS:  (Indicating.)
(20)        MS. SHERWIN:  Thank you.
(21)        Q.  In the Christie case you testified on page 168,
(22)  beginning at line 8, quote, with the question:
(23)        "Nurse Whinnie was reprimanded for inadequate
(24)  documentation.  Were you aware of that?
(25)        Answer:  Yes.

---

DEPOSITION OF ROBERT D. JONES, M.D.

73

(1)      Question:  But is it your testimony that the
(2) documentation is reasonable and within the standard of
(3) care?
(4)      Answer:  Yes.
(5)      Question:  Even though it was inadequate?
(6)      Answer:  Yes." End quote.
(7)      Did I read that correctly, Doctor?
(8)      MS. HUDGINS:  Same objections.
(9)      THE WITNESS:  The document speaks for itself.
(10)      MS. SHERWIN:  Q.  Did I read it correctly, though,
(11) Doctor?  I want to have an adequate record.
(12)      A. Yes.
(13)      MS. HUDGINS:  Same objections.  It's argumentative.
(14)      MS. SHERWIN:  Q.  Greg Toomey, the defense lawyer
(15) who represented Prison Health Services in that case, also
(16) hired you on behalf of Prison Health Services to review
(17) another case.  Right?
(18)      A. I believe, yes, he did at one time.
(19)      Q. Has he hired you to review any more cases?
(20)      A. No.
(21)      Q. The Christie case was similar to a case
(22) involving an inmate named Michael Valent that occurred in
(23) Utah while you were the clinical director for the Utah
(24) Department of Corrections.  Right?
(25)      MS. HUDGINS:  Same objections.

74

(1)      MR. ANDRADA:  Vague and ambiguous.  Overly broad.
(2) Not relevant.
(3)      THE WITNESS:  And what do you mean by similar?
(4)      MS. SHERWIN:  Q.  Well, while you were the clinical
(5) director of the Utah Department of Corrections,
(6) Michael Valent was a 29-year-old mentally ill man who was
(7) stripped naked strapped to a restraint chair and left
(8) there for 16 hours and died.  Right?
(9)      MS. HUDGINS:  Same objections.
(10)      THE WITNESS:  During the time that Mr. Valent died,
(11) I was actually on active duty in San Antonio, Texas.
(12)      The individual had been petitioned to be taken back
(13) to the state hospital.  He had been assessed by both the
(14) psychiatrist and also was having problems with mental
(15) health.
(16)      Mr. Valent did die, but my involvement was to write
(17) the policy which meant, simply stated, that after 12 hours
(18) that the individual was to be seen by a psychiatrist.
(19)      It didn't happen.  Because when the psychiatrist
(20) arrived on site, Mr. Valent was agitated and angry.  And
(21) so he saw some of his other patients first and then went
(22) to see Mr. Valent.
(23)      MS. SHERWIN:  Q.  Okay.  And Mr. Valent was a
(24) 29-year-old mentally ill man who was stripped naked and
(25) strapped to a restraint chair for 16 hours and died.

75

(1) Right?
(2)      MS. HUDGINS:  Excuse me.  Was there some part of
(3) Dr. Jones saying that he was on active duty and not at the
(4) Utah Department of Corrections when this happened that you
(5) didn't hear?
(6)      MS. SHERWIN:  I wasn't asking where the doctor was.
(7)      MS. HUDGINS:  Well, then what is the relevance of
(8) this line of questioning if, as he's testified, he wasn't
(9) in Utah at the time that this happened?
(10)      MS. SHERWIN:  You were still the clinical
(11) director of the Utah Department of Corrections, right,
(12) Doctor, at the time of the Valent incident?
(13)      MS. HUDGINS:  Wait.  So that makes him responsible
(14) when he's on active --
(15)      Was it the Army?
(16)      THE WITNESS:  Yes.
(17)      MS. HUDGINS:  -- active duty in the Army, he's
(18) responsible for what happened back in Utah?
(19)      MS. SHERWIN:  Could you read the question back,
(20) please.
(21)      (Record read.)
(22)      THE WITNESS:  Technically I still had that position
(23) but I had a designee who was in charge because I was on
(24) active duty in San Antonio.
(25)      MS. SHERWIN:  Okay.

76

(1)      THE WITNESS:  So during the time it actually took
(2) place, while I held the title, I was actually working for
(3) the U.S. government at that point in time.
(4)      MS. SHERWIN:  Q.  Okay.  And while you were still
(5) holding the title of clinical director of the Utah
(6) Department of Corrections, is it correct that Mr. Valent
(7) was a 29-year-old mentally ill man who was stripped naked,
(8) strapped to a restraint chair for 16 hours, and died?
(9)      MS. HUDGINS:  I'll object.  It's irrelevant.
(10) Dr. Jones has already answered the question.  It's asked
(11) and answered.
(12)      It has nothing to do with bias; it has nothing to
(13) do with anything reasonably calculated to lead to the
(14) discovery of admissible evidence; it's overly broad; it
(15) lacks foundation; it's argumentative; it's asked and
(16) answered; it's harassing.
(17)      But you can answer.
(18)      THE WITNESS:  During the time I held the clinical
(19) title of clinical director of the prison, yes, but I was
(20) on active duty.
(21)      MS. SHERWIN:  Q.  Okay.  And during what period of
(22) time were you on active duty, you said in San Antonio,
(23) Texas?
(24)      A. I don't remember the exact dates.  I know I
(25) received a phone call while I was in San Antonio about the

DEPOSITION OF ROBERT D. JONES, M.D.

---

77

(1)  event.
(2)       MS. SHERWIN:  Q.  Were you sued in connection with
(3)  the Valent case?
(4)       A.  Was I named in a suit?
(5)       Q.  Were you a defendant in the Valent case?
(6)       A.  Yes, I was.
(7)       Q.  What was the outcome of that case?
(8)       A.  Um, I honestly don't remember.
(9)       Q.  How many other times have you been sued?
(10)      A.  In --
(11)      MS. HUDGINS:  Well, yes.  All of my objections to
(12)  this whole line of questioning.  It's irrelevant.
(13)      MR. ANDRADA:  Join.
(14)      THE WITNESS:  Having been the medical/mental health
(15)  or clinical director of three state systems, and also in
(16)  juvenile, two different juvenile systems, I've been named
(17)  in suits numerous times.  The majority of those are
(18)  without merit, are not supported, are brought and
(19)  dismissed.
(20)      I don't recall a specific number.  I couldn't
(21)  produce a number.  I simply don't remember.
(22)      I know that the very last suit from Arizona that
(23)  while I was the deputy director there, over all of the
(24)  health services, finally ran out with the statute of
(25)  limitations and was -- it was dismissed.

---

78

(1)       MS. SHERWIN:  Q.  How many times have you been sued
(2)  for malpractice?
(3)       A.  Never.
(4)       MS. HUDGINS:  Same objections.
(5)       THE WITNESS:  Not that I recall.
(6)       MS. SHERWIN:  Q.  Is it your testimony that as you
(7)  sit here today you have never once been sued for medical
(8)  malpractice?
(9)       MR. ANDRADA:  It's vague and ambiguous in light of
(10)  his professional experience.  Go ahead.
(11)      MS. HUDGINS:  Join.
(12)      THE WITNESS:  Let me --
(13)      MS. HUDGINS:  And all the other objections as well.
(14)      THE WITNESS:  Actually I may have been named in one
(15)  many, many, many years ago.  In regards to a fellow who
(16)  had a ruptured berry aneurysm.
(17)      Q.  A ruptured what?
(18)      A.  Berry aneurysm.
(19)      Q.  What is a berry aneurysm?
(20)      A.  It's an outpocketing of a blood vessel.
(21)      Q.  Where is the blood vessel?
(22)      A.  Usually it's in the Circle of Willis which is
(23)  in the base of the brain.
(24)      Q.  So you were sued for malpractice in that case
(25)  regarding intracranial bleeding.  Right?

---

79

(1)       A.  I think I was named.  I'm not sure how that was
(2)  settled.
(3)       Q.  Are there any other cases in which you've been
(4)  sued and accused of having engaged in malpractice?
(5)       MS. HUDGINS:  Same objections.
(6)       MR. ANDRADA:  Yes.  Same objections.
(7)       MS. HUDGINS:  The panoply of objections.
(8)       THE WITNESS:  I've answered that because that's
(9)  part of -- I mean I've been malpractice in 1983, all of
(10)  those, all of those cases all along were raising
(11)  malpractice issues.
(12)      MS. SHERWIN:  Q.  Okay.  But first when I asked you
(13)  if you'd ever been sued for malpractice you said, quote:
(14)  "Never."  End quote.
(15)      Now we've got one case involving intracranial
(16)  bleeding.  Are there any other --
(17)      MS. HUDGINS:  So is there a question?
(18)      MS. SHERWIN:  Yes.
(19)      Q.  Are there any other cases in which you have
(20)  been sued and specifically accused of malpractice?
(21)      MS. HUDGINS:  Well, I think he answered that.
(22)      MS. STRINGER:  It's argumentative as phrased.
(23)      MS. HUDGINS:  It is argumentative and all the other
(24)  objections.  And said:  I've been malpractice in 1983 and
(25)  all of those cases all along were raising malpractice

---

80

(1)  issues.  Asked and answered.
(2)       MS. SHERWIN:  You can answer the question.
(3)       THE WITNESS:  I have answered it.
(4)       MS. SHERWIN:  Q.  Okay.  You can't think of any
(5)  other cases?
(6)       A.  Not in my private practice of medicine, but
(7)  just as in my responsibility as the clinical director,
(8)  deputy director, or medical/mental health director of the
(9)  states that I practiced in.
(10)      MS. SHERWIN:  Q.  Okay.  You testified in a case of
(11)  Robinson versus Fulton-Dekalb Hospital Authority on
(12)  March 15th, 2001.
(13)      And you testified in that case that you had also
(14)  been sued for malpractice in a case involving treatment
(15)  for hepatitis C.
(16)      Does that refresh your recollection at all, Doctor?
(17)      A.  That would have been as a part of the prison
(18)  situation, but no, but it -- you know, I don't have any
(19)  other specific recollection of that case.
(20)      Q.  Okay.  In your testimony on page 29 in that
(21)  deposition, the question was, quote:
(22)  "I am taking it from the way you wrote this up that
(23)  you were actually a defendant who was accused of having
(24)  deviated from the standard of care.
(25)      Answer:  In the last one?  Which is the hepatitis C

---

DEPOSITION OF ROBERT D. JONES, M.D.

81

(1) case.
(2)      Question: Yes.
(3)      Answer: Yes." End quote.
(4)      So you were a defendant who was accused of
(5) deviating from the standard of care in a malpractice case
(6) involving treatment for hepatitis C.
(7)      Do you recall that, Doctor?
(8)      MS. HUDGINS: I'll object that it lacks relevance;
(9) it's asked and answered; it's overbroad. It's not
(10) reasonably calculated to lead to the discovery of
(11) admissible evidence. It actually has been answered, and
(12) it's argumentative.
(13)      MR. ANDRADA: Join.
(14)      THE WITNESS: My answer doesn't change. I answered
(15) your question the best I can.
(16)      MS. SHERWIN: Okay.
(17)      Q. You still don't recall that lawsuit; is that
(18) right? Even with me having read back a portion of your
(19) deposition from the Robinson case.
(20)      MS. HUDGINS: Argumentative.
(21)      MS. STRINGER: Join.
(22)      THE WITNESS: I don't remember the specifics of the
(23) case. It was 2001.
(24)      MS. SHERWIN: Q. Okay. Now you were also retained
(25) by the defense in the case of Craig Blumhagen,

82

(1) B-l-u-m-h-a-g-e-n, versus John Coyle, C-o-y-l-e, which was
(2) pending in the Federal District Court in Wyoming. Right?
(3)      MS. HUDGINS: Objection. Vague and ambiguous.
(4) Overly broad.
(5)      THE WITNESS: I seem -- I recall that that's
(6) correct.
(7)      MS. SHERWIN: Q. Okay. And the judge in that case
(8) in 2007 excluded you from testifying as an expert witness
(9) because your testimony violated the rules governing expert
(10) testimony. Right?
(11)      MS. HUDGINS: Well, all the same objections. It's
(12) argumentative. It's overly broad. I don't know if it
(13) lacks foundation or not because you haven't given us
(14) enough information to know whether it lacks foundation or
(15) if it mischaracterizes what was said because you haven't
(16) given us that information, either.
(17)      MS. STRINGER: Calls for a legal conclusion.
(18)      MS. HUDGINS: Calls for a legal conclusion and it's
(19) argumentative.
(20)      MR. ANDRADA: Sustained.
(21)      MS. SHERWIN: You guys can joke around as much as
(22) you want; you're just prolonging the deposition.
(23)      MR. ANDRADA: No, we're not prolonging the
(24) deposition. This ridiculous inquiry into cases 15 years
(25) old is what's prolonging the deposition.

83

(1)      MS. SHERWIN: A federal district judge in Wyoming
(2) excluding this witness's testimony because he violated the
(3) rules governing expert testimony is directly relevant.
(4)      Doctor, you can go ahead and answer.
(5)      MR. ANDRADA: That's crazy.
(6)      MS. HUDGINS: Same objections.
(7)      THE WITNESS: What was the actual question again?
(8)      MS. SHERWIN: Q. The judge in the Blumhagen vs.
(9) Coyle case in 2007 excluded you from testifying as an
(10) expert witness because your testimony violated the rules
(11) governing expert testimony.
(12)      Do you recall that, Doctor?
(13)      MS. HUDGINS: Same objections as the original time
(14) you asked this questioned.
(15)      THE WITNESS: I do not remember the specifics of
(16) that case nor the reasons why the judge felt that I had
(17) violated.
(18)      MS. SHERWIN: Q. Okay. But you recall that the
(19) judge excluded your testimony. Right?
(20)      A. I do recall that it was excluded, yes.
(21)      Q. Okay.
(22)      You also were retained on behalf of the
(23) Puerto Rico Department of Corrections and testified in the
(24) case of Feliciano versus Calderon in the District Court in
(25) Puerto Rico. Right?

84

(1)      A. Yes.
(2)      Q. And that case involved the Puerto Rico
(3) Department of Corrections' failure to comply with the
(4) consent decree to remedy substandard and chaotic
(5) conditions and denial of health care to Puerto Rico prison
(6) inmates. Right?
(7)      MS. HUDGINS: Well, I'll object to that
(8) characterization. I don't know that it's a
(9) mischaracterization, but it could be since I don't know
(10) the case.
(11)      It's also irrelevant. It lacks foundation. It's
(12) not reasonably calculated to lead to the discovery of
(13) admissible evidence.
(14)      You can answer.
(15)      MR. ANDRADA: Join.
(16)      THE WITNESS: The Puerto Rico case was actually a
(17) case in which the federal judge had fined the State of
(18) Puerto Rico, had created a fund somewhere in the
(19) neighborhood of about $200 million, had had a private
(20) entity which was going to take over the health care.
(21)      And at the time that I went and visited the free
(22) and independent Commonwealth of Puerto Rico, the health
(23) was being provided by the public health organization. I
(24) had the occasion of visiting all of the different prisons
(25) within Puerto Rico. I spoke to clinicians. I spoke to

DEPOSITION OF ROBERT D. JONES, M.D.

85

(1) inmates utilizing translators.  I selected the inmates at
(2) random.
(3)        And to a person, the inmates were pleased with the
(4) health care that they were receiving from the public
(5) health at the time that I visited and formulated my
(6) opinions.
(7)        MS. SHERWIN:  Q.  Well, I'm just asking about what
(8) the case involved.
(9)        MS. HUDGINS:  Well, I think he just told you.
(10)        MS. SHERWIN:  Q.  The case -- I'm looking at the
(11) reported case of Feliciano vs. Calderon in the United
(12) States District Court for the District of Puerto Rico,
(13) 300 F. Supp. 2nd page 321 issued on January 26, 2004.
(14)        And on page 323 of the opinion the District Court
(15) said that the case was involving a consent decree to
(16) remedy, quote, substandard and chaotic conditions or
(17) denial of health care throughout the administration of
(18) Corrections."  End quote.
(19)        Do you recall that generally being the topic of
(20) that case?
(21)        MS. HUDGINS:  Well, same objections.
(22)        THE WITNESS:  My involvement, when I joined the
(23) case, was simply to determine whether or not the health
(24) care had been remedied which I felt that it had.
(25)        MS. SHERWIN:  Q.  And you testified on behalf of

86

(1) the Puerto Rico Department of Corrections that the
(2) correctional health care that they were providing was
(3) reasonable and within the standard of care.  Right?
(4)        MS. HUDGINS:  Same objections.
(5)        THE WITNESS:  I do not believe it was the
(6) Department of -- I believe they were separate entities,
(7) this has been a while ago, but to my best recollection the
(8) health care was provided by the public health individuals
(9) within the walls of Puerto Rico.
(10)        The care, as I mentioned, as I spoke with different
(11) members of the class, they were very, very pleased with
(12) the care that they were receiving, and my testimony was
(13) these are conditions which had previously existed did not
(14) exist at that time.
(15)        MS. SHERWIN:  Q.  Okay.  So you testified in the
(16) Feliciano versus Calderon case that the correctional
(17) health care being provided to Puerto Rico prison inmates
(18) was reasonable and within the standard of care.  Right?
(19)        MS. HUDGINS:  Same objections.  Vague as to time.
(20)        MR. ANDRADA:  Join.
(21)        MS. SHERWIN:  Vague and ambiguous.
(22)        THE WITNESS:  And I've already stated what my
(23) findings were.  That the situation had been remedied by
(24) the individuals who were currently providing the services.
(25)        The issue was whether or not they were going to be

87

(1) forced to give up providing services and turn them over to
(2) a private entity.
(3)        MS. SHERWIN:  Q.  Okay.  And your testimony was
(4) that there were no problems with unconstitutional health
(5) care within the Puerto Rico correctional system at the
(6) time that you reviewed the care there.  Right?
(7)        MS. HUDGINS:  Same objections.  Overly broad.
(8)        THE WITNESS:  And I already stated I felt that the
(9) conditions had been remediated.
(10)        MS. SHERWIN:  Q.  And the federal judge in that
(11) case said that the Court, quote, "...gives very little
(12) credence," end quote, to your opinions.
(13)        Do you recall that?
(14)        MS. HUDGINS:  Well, I'll object.  I don't know if
(15) that mischaracterizes what the judge said or not or
(16) whether it's even relevant, and it's argumentative.  And
(17) he's not a legal scholar.
(18)        THE WITNESS:  And I don't have the expertise to
(19) comment on that.
(20)        MS. SHERWIN:  Q.  Okay.  I'm reading from the
(21) Court's opinion on page 323, note 2, where the judge
(22) discusses your expert testimony.
(23)        And he says, quote:  "The Court gives very little
(24) credence," end quote, to your opinions.
(25)        Do you recall that having happened in that case,

88

(1) Doctor?
(2)        MS. HUDGINS:  So it's vague and ambiguous.  All the
(3) other objections.  But it's vague and ambiguous.  Does he
(4) recall if the judge told him that or does he recall it by
(5) having read this opinion, or some other thing?
(6)        MS. SHERWIN:  Q.  Do you recall a Federal District
(7) Court in Puerto Rico finding your opinions should be given
(8) very little credence in the Feliciano versus Calderon
(9) case?
(10)        MS. HUDGINS:  Same objections.
(11)        THE WITNESS:  I came in, I gave my opinions, and
(12) supplemented them with my findings, and my interviews with
(13) the various inmates, and I have never read the opinion.
(14)        MS. SHERWIN:  Q.  Okay.  And in the Feliciano
(15) versus Calderon case, at the time that you were
(16) testifying, fully one-fourth of inmates who requested sick
(17) call did not get it.  Right?
(18)        MS. HUDGINS:  Same objections.
(19)        Overly broad.  All the same objections in this line
(20) of questioning.
(21)        THE WITNESS:  This case involved a battle between
(22) the judge, between the private entity, which I think had
(23) conflict of interest in my estimation.
(24)        The reason they weren't making it to their sick
(25) calls was the officers were sometimes not transporting

DEPOSITION OF ROBERT D. JONES, M.D.

**89**

(1)     him.  The people that I was working with was, in fact, the
(2)     health department with services that were there that was
(3)     not a problem.
(4)         I don't know what the other testimony was in that
(5)     case because I know what my testimony was and as I said,
(6)     I've never read the opinion.
(7)         MS. SHERWIN:  Q.  Okay.  So the federal judge in
(8)     the Feliciano versus Calderon case found, quote:  "Fully
(9)     one-fourth of inmates who request sick call do not get
(10)    it."
(11)        You have no reason to dispute his findings, do you,
(12)    Doctor?
(13)        MS. HUDGINS:  Well, I'll object.  It lacks
(14)    foundation, first of all, that he'd have to dispute his
(15)    findings.
(16)        And it's irrelevant for all the other reasons.
(17)        And I have no idea if those are his findings or
(18)    not.
(19)        And so what?  The "so what" objection.
(20)        THE WITNESS:  Repeat the question.
(21)        MS. SHERWIN:  Repeat the question, please.
(22)        (Record read.)
(23)        MS. HUDGINS:  And I'll object as calls for a legal
(24)    conclusion.  Whether they're findings or not.
(25)        THE WITNESS:  I've never read the report.  I -- my

**90**

(1)     questioning to all of the inmates was, "Were you pleased
(2)     with the health care that you were receiving?"
(3)         I asked them specifically if they were admitted to
(4)     health care.  Everyone who had been able to get to health
(5)     care was pleased with it.  That was my opinion.
(6)         Whether he discredited that opinion or took little
(7)     value, they were still my findings based on my knowledge
(8)     of correctional health care.
(9)         MS. SHERWIN:  Q.  Do you know that the federal
(10)    judge found that fully one-fourth of inmates who requested
(11)    sick call did not get it?
(12)        MS. HUDGINS:  Same objections.
(13)        MS. STRINGER:  And it's vague as to time.
(14)        MS. HUDGINS:  Join.
(15)        MR. ANDRADA:  Join.
(16)        THE WITNESS:  The document says that but that was
(17)    not my finding.
(18)        MS. HUDGINS:  Well, you assume the document says
(19)    it.  Have you read the document?
(20)        THE WITNESS:  No, I haven't read the document.
(21)    You're reading it as I can see it here, you're reading
(22)    from the document, so I assume you're reading it
(23)    correctly.
(24)        But for me to comment I would need to read the
(25)    entire document.

**91**

(1)         MS. SHERWIN:  Q.  Did anyone inform you that the
(2)     federal district judge presiding over the Feliciano case
(3)     found that fully one-fourth of inmates who requested sick
(4)     call did not get it?
(5)         MS. HUDGINS:  Same objections.  Vague as to time.
(6)         MS. STRINGER:  Vague as to time.
(7)         THE WITNESS:  I believe that's the same question
(8)     you asked me and I told you that was not my finding.
(9)         MS. SHERWIN:  Q.  Did anyone inform you that the
(10)    judge presiding over the Feliciano case found that
(11)    55 percent of the ambulatory care appointments occur?
(12)        MS. STRINGER:  Vague as to time.
(13)        MS. HUDGINS:  Join.  Same objections.
(14)        MS. SHERWIN:  The time of all of this is as of the
(15)    January 26th, 2004 reported opinion in 300 F. Supp 2nd at
(16)    321.
(17)        MS. STRINGER:  That's not the time objection.  We
(18)    don't know what the judge is talking about as to time.
(19)        MS. SHERWIN:  Q.  Doctor, did anyone inform you
(20)    that the federal judge presiding over the Feliciano case
(21)    found, quote:  "Only 55 percent of ambulatory care
(22)    appointments, in fact, occur."
(23)        MS. HUDGINS:  Same objections.  Asked and answered.
(24)        THE WITNESS:  I -- I have no knowledge as to why
(25)    that would be in the record.  I know that wasn't my

**92**

(1)     finding.
(2)         MS. SHERWIN:  Q.  Were you aware on page 23 of the
(3)     opinion that, quote:  "Only 49 percent of extramural
(4)     appointments are met," end quote?
(5)         MS. HUDGINS:  Same objections.
(6)         MS. STRINGER:  Vague as to time.
(7)         THE WITNESS:  I've never read the document as to
(8)     the decision or the opinion.  I don't have that
(9)     information or that knowledge.
(10)        MS. SHERWIN:  Q.  Were you aware that the federal
(11)    judge presiding over the Feliciano case found that there
(12)    is still a present and ongoing systematic and massive
(13)    denial of health care to the inmate population in the care
(14)    of the correctional health program?
(15)        MS. HUDGINS:  Same objections.
(16)        THE WITNESS:  It was not my finding.
(17)        MS. SHERWIN:  Q.  Were you aware that the judge
(18)    made that finding?
(19)        MS. HUDGINS:  Same objections.
(20)        MR. ANDRADA:  Same objections.
(21)        THE WITNESS:  I don't know what he based it on; I
(22)    don't have the information.
(23)        MS. SHERWIN:  Q.  Were you aware that the judge
(24)    presiding over the Feliciano case stated on page 323 of
(25)    his opinion, quote:  "The court cannot but underline that

DEPOSITION OF ROBERT D. JONES, M.D.

---

93

(1) denial of health services is massive and systematic." End
(2) quote.
(3)     MS. HUDGINS: Same objections.
(4)     THE WITNESS: As I've stated before, that was not
(5) my finding.
(6)     MS. SHERWIN: Q. Were you aware that insulin
(7) dependent inmates were required to be transported to a
(8) different facility every day in order to receive their
(9) required insulin shots?
(10)     MS. HUDGINS: Same objections.
(11)     THE WITNESS: I have already stated what I found,
(12) that I had visited all of the prisons.
(13)     I told you that the issue was whether or not they
(14) could justify turning the public health over to this
(15) private entity which had been created out of the money
(16) that had been collected by the judge.
(17)     And I am sure that that was what he wanted to have
(18) happen and I am sure that that's what did happen, in fact.
(19) I don't know for a fact that it did but I'm assuming that
(20) it did.
(21)     MS. SHERWIN: Q. Were you aware that insulin
(22) dependent inmates were required to be transported to a
(23) different facility every day in order to receive their
(24) required insulin shots?
(25)     MS. HUDGINS: Same objections.

---

94

(1)     THE WITNESS: The answer is I have not read that
(2) document. I will tell you that I spoke with many, many
(3) inmates at many, many institutions and that was never
(4) information that was provided by any inmate.
(5)     MS. SHERWIN: Q. Were you aware that the federal
(6) district judge presiding over the Feliciano case found
(7) that there were extended delays in obtaining medically
(8) ordered medical tests which was simply unacceptable under
(9) any set of circumstances?
(10)     MS. HUDGINS: Same objections.
(11)     MS. STRINGER: Vague as to time.
(12)     MS. HUDGINS: Join.
(13)     MR. ANDRADA: Join.
(14)     THE WITNESS: My answer is exactly the same. I
(15) have not read that opinion. I found what I found. I
(16) offered my opinion in the courtroom.
(17)     MS. SHERWIN: Q. Were you aware at the time of
(18) your review that while the correctional health care system
(19) was required to have 30 psychiatric intensive care unit
(20) beds, it only had 18 beds?
(21)     MS. HUDGINS: Same objections.
(22)     THE WITNESS: The answer is I don't remember the
(23) exact numbers. I don't -- I couldn't comment on that.
(24)     MS. SHERWIN: Q. Were you aware at the time you
(25) did your review that patients who were prescribed medical

---

95

(1) diets were not receiving those medical diets?
(2)     MS. HUDGINS: Same objections.
(3)     THE WITNESS: Those were not my findings.
(4)     MS. SHERWIN: Q. Were you aware at the time you
(5) did your review that there was no protocol in place to
(6) manage HIV positive patients in the Puerto Rico
(7) correctional health care system?
(8)     MS. HUDGINS: Same objections.
(9)     THE WITNESS: Not my findings.
(10)     MS. SHERWIN: Q. Were you aware that the federal
(11) judge presiding over the Feliciano case found that
(12) hepatitis C infections had reached epidemic proportions
(13) with close to a third of the entire inmate population
(14) being affected with hepatitis C?
(15)     MS. HUDGINS: Same objections.
(16)     THE WITNESS: That's not unique to Puerto Rico.
(17)     MS. SHERWIN: Q. Were you aware that there was a
(18) hepatitis C epidemic in the Puerto Rico correctional
(19) health care system at the time you did your review?
(20)     MS. HUDGINS: Same objections. Argumentative.
(21) Lacks foundation. Vague and ambiguous as to "epidemic".
(22)     THE WITNESS: The answer to that is if the inmates
(23) engage in risk behavior, they have a high percentage of
(24) hepatitis C, I would expect to find a high percentage of
(25) hepatitis C in the prison.

---

96

(1)     I've found a high percentage of hepatitis C in
(2) every prison that I've worked at.
(3)     MS. SHERWIN: Q. Were you aware that the federal
(4) judge presiding over the Feliciano case found, quote:
(5)     "Although Dr. Jones testified that he understood
(6) that the required close follow-up was being provided, he
(7) could not off offer a satisfactory explanation of why the
(8) most current data at the CHP concerning hepatitis C virus
(9) epidemic was more than six months old dating back to April
(10) of 2003." End quote.
(11)     MS. STRINGER: Compound.
(12)     MS. HUDGINS: There's a compound objection over
(13) there. I'll join in that. I have the same objections as
(14) to this one question.
(15)     THE WITNESS: What was the question again.
(16)     MS. SHERWIN: Could you read the question, back
(17) please?
(18)     (Record read.)
(19)     MS. HUDGINS: Same objections.
(20)     Question is were you aware that he made that quote
(21) in his decision.
(22)     THE WITNESS: I am not aware that he made that
(23) quote.
(24)     MS. SHERWIN: Q. Inmate deaths in the Puerto Rico
(25) correctional system went from 47 deaths in 2000 to 73

---

DEPOSITION OF ROBERT D. JONES, M.D.

97

(1) deaths in 2002.
(2)         Were you aware of that?
(3)         MS. HUDGINS:  Objection.  Lacks foundation and all
(4) the other objections.
(5)         THE WITNESS:  I haven't read that and I'm not aware
(6) of it.
(7)         MS. SHERWIN:  Q.  When did you do your review in
(8) Puerto Rico?
(9)         A.  Prior to my testifying in the case.
(10)         Q.  Did you do your review in 2002?
(11)         A.  I don't remember specifically when I did it.
(12) It would have been probably the fall of 2000 -- I just
(13) don't remember.  It would have been the fall is all I
(14) remember.
(15)         Q.  And you don't know whether it was 2002 or 2003?
(16)         A.  Most likely 2003.
(17)         Q.  By 2003 psychiatric and mental health services
(18) were only reaching 60 percent of the inmates who needed
(19) them.
(20)         Were you aware that the federal judge in Feliciano
(21) found that fact?
(22)         MS. HUDGINS:  Same objections going back to this
(23) whole line of questioning.
(24)         Were you aware that he found that fact?
(25)         THE WITNESS:  No, I'm not aware that he found that

98

(1) fact.
(2)         MS. SHERWIN:  Q.  And given all of these
(3) infirmities in the Puerto Rico correctional health care
(4) system, the judge found that they were continuing to
(5) violate the constitutional rights of the prisoners.
(6)         Were you aware of that?
(7)         MS. HUDGINS:  Vague and ambiguous.  All the other
(8) objections.
(9)         THE WITNESS:  I have not read the opinion.  I don't
(10) know that.
(11)         MS. SHERWIN:  Q.  Okay.  But you testified in
(12) defense of the correctional health care that was being
(13) provided to the prisoners of Puerto Rico in the Feliciano
(14) case.  Right?
(15)         MS. HUDGINS:  Overly broad.  Same objections.
(16)         MS. STRINGER:  Argumentative.
(17)         MS. HUDGINS:  Argumentative.
(18)         THE WITNESS:  I personally visited all of the
(19) facilities.  I spoke with staff.  I spoke with inmates.  I
(20) spoke with officers.  And the health care that I saw and
(21) the charts that I reviewed and the policies and procedures
(22) were acceptable and within the reasonable standard of
(23) care.
(24)         MS. SHERWIN:  Q.  And who retained you in that
(25) case?

99

(1)         A.  I believe I was retained by the Attorney
(2) General's office of the State of -- the Commonwealth of
(3) Puerto Rico.
(4)         Q.  At the time of your report in this case, the
(5) only depositions that you had read were the depositions of
(6) the defendants Harold Orr, Zelda Sancho, and Deputy Ahlf.
(7) Right?
(8)         A.  I believe that's correct.
(9)         Q.  You did not read the July 2nd, 2012 deposition
(10) transcript of defendant Megan Hast, did you?
(11)         A.  No, not that I recall.
(12)         Q.  You also did not read the October 8th, 2013
(13) deposition of Lenore Gilbert before you gave your opinions
(14) in this case, did you?
(15)         A.  No, I did not.
(16)         Q.  Last night Ms. Hudgins sent me an e-mail with a
(17) number of supplemental documents that you reviewed beyond
(18) those that are listed in your report.
(19)         Could you -- well, let's mark this.
(20)         (Plaintiff's Exhibit 4 was marked for
(21) identification.)
(22)         MS. SHERWIN:  Q.  Is Ms. Hudgins' rendition of the
(23) supplemental documents that you reviewed after you formed
(24) your opinions in this case complete and correct?
(25)         MS. HUDGINS:  I'll object.  It's vague and

100

(1) ambiguous.  Argumentative.
(2)         I don't know what you mean by "rendition".
(3)         THE WITNESS:  That would be a list of the documents
(4) that I've additionally reviewed, yes.
(5)         MS. SHERWIN:  Q.  So since you formed your opinions
(6) in this case, and wrote your Rule 26 report, you have
(7) reviewed Dr. Katherine Burns' report and second report.
(8) Correct?
(9)         A.  Uh, yes.
(10)         Q.  And you have reviewed Dr. Baden's report.
(11) Correct?
(12)         A.  Yes.
(13)         Q.  And you have reviewed the reports of
(14) Drs. Mooney, Wetli, Di Maio, Schoenfeld, and Nurse Wild.
(15) Correct?
(16)         A.  Um, yes.
(17)         Q.  And since you formed your opinions in this
(18) case, and issued your Rule 26 report, you've also reviewed
(19) Dr. Burns' Declaration in Opposition to the Defendant's
(20) Motions For Summary Judgment.  Right?
(21)         A.  Yes, I have.
(22)         Q.  And you've also reviewed Dr. Orr's Declaration
(23) in Support of Corizon's Motion for Summary Judgment.
(24) Correct?
(25)         A.  Yes.

DEPOSITION OF ROBERT D. JONES, M.D.

---

101

(1)      Q. Since you formed your opinions in this case,
(2) you reviewed the depositions of Megan Hast and
(3) Bill Wilson. Correct?
(4)      A. Yes.
(5)      Q. And since you formed your opinions in this case
(6) you also reviewed the deposition of Lenore Gilbert and her
(7) deposition given in December as Corizon's Person Most
(8) Knowledgeable in its contract with Alameda County.
(9) Correct?
(10)     A. Yes.
(11)     Q. When did you receive all of these supplemental
(12) materials that are outlined in Ms. Hudgins' e-mail to my
(13) office of February 7th, 2014?
(14)     A. The specific dates? I don't recall.
(15)     Q. Did you receive them all at once?
(16)     A. No.
(17)     Q. When did you receive them in general?
(18)     A. Um, in general after -- during the last part of
(19) December and January.
(20)     Q. Did you receive them by e-mail?
(21)     A. Yes, they were all sent electronically.
(22)     Q. You have never seen the contract between
(23) Corizon and Alameda County, have you.
(24)     MS. HUDGINS: Well, I object. That misstates his
(25) report.

---

102

(1)      THE WITNESS: I have reviewed the -- with all its
(2) amendments and everything? No. But I have reviewed parts
(3) of the contract, yes.
(4)      MS. SHERWIN: Q. What parts of the contract have
(5) you reviewed?
(6)      A. Let's see. I believe -- the reason -- I would
(7) say the original RFP.
(8)      And then I've looked at the documents which clarify
(9) if there are changes or rules which is the order of
(10) priority which is the first, the second and the third,
(11) whether it's an addendum, or whether it is the actual
(12) contract, or whether it's the RFP.
(13)     Q. And where is your review of those parts of the
(14) contract identified in your report?
(15)     A. Um, specifically, I don't think I put them as
(16) a -- the report was written before I actually reviewed
(17) some of the contract. So I would not say that it
(18) specifically was addressed. It was information that was
(19) obtained from the deposition of Dr. Orr. And from the
(20) conversation with Mr. Wilson.
(21)     Q. So you obtained information about the contract
(22) from your telephone conversation with Bill Wilson about
(23) which you have no notes. Is that correct?
(24)     MS. HUDGINS: Lacks foundation. Argumentative.
(25) Mischaracterizes his testimony.

---

103

(1)      THE WITNESS: I discussed the responsibilities and
(2) duties as to who was responsible for what.
(3)      MS. SHERWIN: Q. And what information did you
(4) receive about the contract from Bill Wilson?
(5)      A. That the final authority was the responsible
(6) health administrator which Mr. Wilson was;
(7)      That all administrative activities reported to him;
(8)      That he was the liaison with PHS -- excuse me --
(9) with Alameda County Sheriff's Department;
(10)     That he oversaw both the Glenn Dyer and also the
(11) Alameda -- excuse me -- Santa Rosa --
(12)     MS. HUDGINS: Santa Rita. That's what you're
(13) trying to think of.
(14)     THE WITNESS: Thank you.
(15)     -- Santa Rita facility;
(16)     That he was responsible for ensuring that there was
(17) adequate staffing;
(18)     That they were in compliance with the contract.
(19) His responsibility was to ensure that they dealt with and
(20) interacted with the county in the execution of the
(21) contract.
(22)     MS. SHERWIN: Q. Okay. So it was Mr. Wilson's
(23) responsibility to make sure that Alameda County Sheriff's
(24) deputies received the mandatory training about alcohol
(25) withdrawal. Is that correct?

---

104

(1)      MS. HUDGINS: I'll object. Vague and ambiguous.
(2)      THE WITNESS: And I've already stated that the -- I
(3) learned from the training materials and from Mr. Wilson
(4) that the program was already established when he arrived
(5) there; that it was ongoing; that it was interactive; that
(6) it was supplemented at various times; that nursing also
(7) participated at times with them.
(8)      But it was the responsibility of the Sheriff's
(9) office, and that was an agreed-upon situation between the
(10) Sheriff's Office and also PHS.
(11)     MS. SHERWIN: Q. From your conversation with
(12) Bill Wilson did you have the understanding that it was his
(13) responsibility to make sure that either registered nurses
(14) perform intake screenings, or if LVN's do it, they do it
(15) under a registered nurse's supervision?
(16)     MS. HUDGINS: Objection. Vague and ambiguous.
(17)     THE WITNESS: The -- my understanding, although the
(18) specific thing was RN's, that the agreement was that it
(19) would or could be LVN's as well.
(20)     MS. SHERWIN: Q. But if LVN's did intake screening
(21) it was required to be under the supervision of an R.N.
(22)     Is that right?
(23)     MS. HUDGINS: Objection. Vague and ambiguous.
(24)     MR. ANDRADA: Join.
(25)     THE WITNESS: I'm not sure what you mean by

---

DEPOSITION OF ROBERT D. JONES, M.D.

---

**105**

(1)   "supervision".

(2)        MS. SHERWIN:  Q.  Well, in your review of the

(3)   contract you saw where the contract provided that intake

(4)   screenings would be done by registered nurses or by

(5)   licensed vocational nurses under the supervision of

(6)   registered nurses.  Right?

(7)        A. I do recall that, yes.

(8)        Q. And it was Bill Wilson's responsibility to make

(9)   sure that if licensed vocational nurses did intake

(10)  screening, they did so under the supervision of registered

(11)  nurses.  Right?

(12)       MS. HUDGINS:  Vague and ambiguous.

(13)       THE WITNESS:  Again, I'm not sure what you mean by

(14)  "supervise" but the staffing was such that there were RN's

(15)  on site as well as LVN's.  I don't remember the exact

(16)  numbers but I think there were somewhere 40 of one and

(17)  30 -- 40 plus of one and 30 plus of another.

(18)       MS. SHERWIN:  Q.  Okay.  But who was responsible to

(19)  make sure that if licensed vocational nurses did intake

(20)  screenings, they did so under the supervision of

(21)  registered nurses?

(22)       MS. HUDGINS:  Vague and ambiguous.

(23)       THE WITNESS:  Ultimately Mr. Wilson.

(24)       MS. SHERWIN:  Q.  And that's because he's the

(25)  responsible health authority.  Right?

---

**106**

(1)        A. That is correct.  He is the responsible health

(2)   authority.

(3)        Q. You never saw the report that Corizon made to

(4)   the California Board of Licensed Vocational Nurses and

(5)   Psychiatric Technicians reporting Zelda Sancho as grossly

(6)   negligent or incompetent.  Did you?

(7)        MS. HUDGINS:  Vague as to time.

(8)        THE WITNESS:  I do not recall seeing that, no.

(9)        MS. SHERWIN:  Q.  Are you aware that Corizon

(10)  reported Miss Sancho to the California Board of Licensed

(11)  Vocational Nurses and Psychiatric Technicians as grossly

(12)  negligent or incompetent?

(13)       MS. HUDGINS:  Vague as to time.

(14)       THE WITNESS:  Am I aware was the question?

(15)       MS. SHERWIN:  Q.  Yes.

(16)       A. No, I am not.

(17)       Q. The first you heard of that was in your

(18)  deposition just now.  Is that right?

(19)       A. Um, I may have heard from Miss Hudgins that she

(20)  was referred, but I would think that would be a

(21)  responsible -- if you have someone who you feel is not

(22)  performing as they should, that you, in fact, do report

(23)  them to the board.

(24)       Q. Okay.  And did you understand that one of the

(25)  reasons Ms. Sancho was referred to the California Board of

---

**107**

(1)   Licensed Vocational Nurses and Psychiatric Technicians as

(2)   grossly negligent or incompetent was because of her

(3)   handling of Martin Harrison's intake?

(4)        MS. STRINGER:  Vague and ambiguous.  Incomplete

(5)   hypothetical.

(6)        MS. HUDGINS:  Join.

(7)        THE WITNESS:  I know that was part of that

(8)   determination.

(9)        MS. SHERWIN:  Q.  Now, I understand that you've

(10)  never seen Corizon's file from Zelda Sancho's arbitration

(11)  but I want to ask you some things that Corizon and its

(12)  managing agents said in connection with the arbitration.

(13)       A. May I take a break?

(14)       MS. SHERWIN:  Sure.  That's fine.

(15)       (Discussion off the record.)

(16)       MS. SHERWIN:  So counsel has had a discussion off

(17)  the record and we've agreed to take a lunch break so let's

(18)  come back at 1:00 p.m.

(19)       (Recess.)

(20)       MS. SHERWIN:  Q.  Before we took a break we were

(21)  going to go over some of the things that Corizon and its

(22)  managing agents said in connection with Ms. Sancho's

(23)  arbitration of her termination.

(24)       MS. HUDGINS:  So let me see if I can short circuit

(25)  this.

---

**108**

(1)        I'll stipulate that whatever is in that brief,

(2)   Corizon and its management, that it said that through its

(3)   attorney.  He hasn't read it.  I didn't show it to him.

(4)   You've already established that.

(5)        So you can go one by one and ask him every question

(6)   about did you know this, did you know this, did you know

(7)   this, but I'll stipulate that he hasn't read it and the

(8)   brief says what it says.

(9)        MS. SHERWIN:  Okay.  Well, I'm going to ask him if

(10)  he agrees with his client, Corizon, about the statements

(11)  Corizon made in arbitration.

(12)       MS. HUDGINS:  That would be argumentative since

(13)  Corizon is not his client.

(14)       MS. SHERWIN:  Who is his client?

(15)       MS. HUDGINS:  He doesn't have a client.  He's been

(16)  retained to give his opinions in this case.  He's given

(17)  his opinions.

(18)       MS. SHERWIN:  In defense of Corizon, right?

(19)       MS. HUDGINS:  He's given his opinions.  I'm calling

(20)  him as a witness.  He's giving his opinions.

(21)       MS. SHERWIN:  On behalf of Corizon.  Right?

(22)       MS. HUDGINS:  I guess that's right.

(23)       MS. SHERWIN:  That's right.

(24)       MS. HUDGINS:  But that's not his client.

(25)       MS. SHERWIN:  Q.  Okay, Doctor.  I'd like to know

---

DEPOSITION OF ROBERT D. JONES, M.D.

---

**109**

(1) if you agree with the following statements that Corizon or
(2) its managing agents made in Zelda Sancho's arbitration.
(3)     Do you agree that starting inmates who drink
(4) alcohol regularly on a CIWA is critical for the safety of
(5) the inmate?
(6)     MS. HUDGINS: So I'll object that that is an
(7) incomplete hypothetical, vague and ambiguous. There's not
(8) enough information.
(9)     MR. ANDRADA: Join.
(10)     MS. STRINGER: Join.
(11)     THE WITNESS: No, I don't -- with the amount of
(12) information that you gave me, no, I really can't comment.
(13)     MS. SHERWIN: Q. Okay. Did you read Lenore
(14) Gilbert's August 17th, 2010 memo to Bill Wilson?
(15)     A. Yes, I believe it was an exhibit in one of the
(16) depositions.
(17)     Q. Okay. So in that memo, Ms. Gilbert said on
(18) page 2, quote: "Starting inmates who drink alcohol
(19) regularly on a CIWA is critical for the safety of the
(20) inmate." End quote.
(21)     Is it correct to say that you disagree with
(22) Ms. Gilbert's statement?
(23)     MS. HUDGINS: Same objections.
(24)     MS. STRINGER: That's argumentative.
(25)     MS. HUDGINS: It's argumentative, but also taken in

---

**110**

(1) and of itself it's vague and ambiguous. And incomplete
(2) hypothetical.
(3)     MS. STRINGER: Join.
(4)     MR. ANDRADA: Join.
(5)     THE WITNESS: No, I don't disagree with her
(6) statement.
(7)     MS. SHERWIN: Q. Okay. Do you agree with
(8) Bill Wilson's testimony at page 49, line 22, to page 50,
(9) line 4 of his deposition, where he said that Miss Sancho
(10) should have put Mr. Harrison on a CIWA even if
(11) Mr. Harrison told her he only drank two beers a day?
(12)     MS. HUDGINS: Same objections. Incomplete
(13) hypothetical. Vague and ambiguous.
(14)     MS. STRINGER: Join.
(15)     THE WITNESS: And no, I don't disagree with
(16) Mr. Wilson.
(17)     MS. SHERWIN: Q. Dr. Orr testified at page 95,
(18) lines 10 through 19, that: Someone who drinks at least
(19) two beers every day, has a history of alcohol withdrawal,
(20) and comes into the jail smelling of alcohol with a red,
(21) puffy face should be provided medication and nutritional
(22) support in order to safely detox from alcohol.
(23)     Do you disagree with Dr. Orr?
(24)     MS. HUDGINS: Same objection. I believe it

---

**111**

(1) mischaracterizes his testimony.
(2)     MS. STRINGER: Join, and compound.
(3)     THE WITNESS: As it states in the record I don't
(4) disagree with what Dr. Orr said.
(5)     MS. HUDGINS: Also lacks foundation.
(6)     MS. SHERWIN: Q. Dr. Orr testified at pages 39
(7) line 20, to page 40 line 3 of his deposition, that:
(8) Mr. Harrison should have been placed on CIWA protocols.
(9)     Do you disagree with Dr. Orr?
(10)     A. Based on his testimony and the statement as
(11) you've read, no, I don't disagree.
(12)     MS. SHERWIN: Q. Dr. Orr also testified at
(13) page 95, lines 10 through 19, that Nurse Zelda Sancho's
(14) intake assessment of Mr. Harrison was deficient because
(15) she did not start Mr. Harrison on CIWA.
(16)     Do you disagree with Dr. Orr?
(17)     MS. HUDGINS: Same objections.
(18)     MS. STRINGER: Join.
(19)     THE WITNESS: To the extent that she considered it
(20) but then changed her mind, I do not disagree with Dr. Orr.
(21)     MS. SHERWIN: Q. Corizon, in its arbitration
(22) brief, pages 18 through 20, wrote that: Whenever there is
(23) any reason to believe that an inmate should be placed on CIWA
(24) withdrawal, the inmate should be placed on CIWA.
(25)     Do you disagree with Corizon?

---

**112**

(1)     MS. STRINGER: Objection. Lacks foundation. It's
(2) an arbitration brief. That's the conclusions of lawyers;
(3) it's an argument.
(4)     MS. SHERWIN: It's actually an admission of a
(5) party.
(6)     Q. Do you disagree with Corizon?
(7)     MS. HUDGINS: Excuse me. I think Miss Stringer has
(8) not finished her argument -- I mean her objection. So why
(9) don't you go ahead and then I have some, and then you can
(10) ask another question.
(11)     MS. STRINGER: Yes. And I disagree it is an
(12) admission.
(13)     MS. SHERWIN: Legally it is a judicial admission of
(14) a party.
(15)     MS. STRINGER: I disagree. It's not an admission;
(16) it's a legal brief.
(17)     MS. HUDGINS: So I'll join. Go ahead.
(18)     MS. SHERWIN: Could you read the question back,
(19) please?
(20)     THE REPORTER: "Corizon, in its arbitration brief,
(21) pages 18 through 20, wrote that: Whenever there is any
(22) reason to believe that an inmate is at risk of alcohol
(23) withdrawal, the inmate should be placed on CIWA.
(24)     Do you disagree with Corizon?"
(25)     MS. HUDGINS: It also calls for a legal conclusion.

---

DEPOSITION OF ROBERT D. JONES, M.D.

113

(1)  It's vague and ambiguous.  It lacks foundation.  It's
(2)  argumentative.
(3)       MS. STRINGER:  Join.
(4)       THE WITNESS:  If there's a clinical indication, I
(5)  think CIWA is appropriate.
(6)       MS. SHERWIN:  Q.  Do you disagree with Corizon that
(7)  whenever there's any reason to believe an inmate is at
(8)  risk of alcohol withdrawal, he should be placed on CIWA?
(9)       MS. STRINGER:  Same objections as to "legal brief".
(10)      MS. HUDGINS:  Yes.  It also lacks foundation.
(11) Incomplete hypothetical.
(12)      MS. STRINGER:  Join.
(13)      THE WITNESS:  Read the question again, please.
(14)      (Record read.)
(15)      THE WITNESS:  I have no reason to disagree.
(16)      MS. SHERWIN:  Q.  Defendant Sancho testified in her
(17) arbitration that an inmate stating that he drinks alcohol
(18) every day is probably enough to require that he be put on
(19) CIWA.  That's at Corizon, page 1842.
(20)      Do you disagree with Miss Sancho?
(21)      MS. STRINGER:  Misstates testimony and calls for
(22) legal conclusion.
(23)      MS. HUDGINS:  Same objections.  Lack of foundation.
(24) Incomplete hypothetical.
(25)      THE WITNESS:  Based on the statement as it's read I

114

(1)  don't disagree with it.
(2)       MS. SHERWIN:  Q.  Okay.  Corizon in its arbitration
(3)  brief, page COR 1105, stated that the nurse must use the
(4)  CIWA form, quote -- whenever, quote -- strike that.  I'm
(5)  sorry.
(6)       Corizon, in its arbitration brief, page 1105, wrote
(7)  that if a patient's answers during the initial screening
(8)  reveal, quote, "...that there might be some risk that the
(9)  individual could experience withdrawal symptoms," end
(10) quote, the nurse must use the CIWA form.
(11)      Do you disagree with Corizon?
(12)      MS. STRINGER:  Same objection.  That's a legal
(13) brief.
(14)      MS. HUDGINS:  Same objections as I made before.
(15) Also argumentative.
(16)      THE WITNESS:  And I don't disagree that you should
(17) use CIWA when it's clinically indicated.
(18)      MS. SHERWIN:  Q.  Did you disagree with Corizon in
(19) its arbitration brief at page 1111 that, quote:  "If a
(20) person states that they drink every day they should be put
(21) on a CIWA observation," unquote?
(22)      MS. HUDGINS:  Same objections.
(23)      MS. STRINGER:  Same objections as to legal brief.
(24)      THE WITNESS:  Based on the information with limited
(25) ability to -- I do not disagree with the use of CIWA when

115

(1)  it is clinically indicated.
(2)       MS. SHERWIN:  Q.  And you do not disagree with
(3)  Corizon's statement that if a person states that they
(4)  drink alcohol every day they should be put on CIWA.
(5)  Right, Doctor?
(6)       MS. HUDGINS:  Same objections.
(7)       MS. STRINGER:  Same objections.
(8)       THE WITNESS:  I will make the same statement.  If
(9)  it's clinically indicated it should be done.
(10)      MS. SHERWIN:  Q.  Okay.  I'm actually asking you a
(11) different question.
(12)      I'm asking you about whether you agree with
(13) Corizon's statement, looking at page 1111 of its
(14) arbitration brief, quote.  "...that if a person states
(15) that they drink every day, they should be put on a CIWA
(16) observation," end quote.
(17)      MS. STRINGER:  Same objections.
(18)      MS. HUDGINS:  Same objections.  Lacks foundation.
(19) Incomplete hypothetical.  Argumentative.
(20)      MS. SHERWIN:  Q.  Do you agree or disagree with
(21) Corizon's statement in that regard?
(22)      A.  I do not disagree.
(23)      Q.  Corizon on the same page said that Miss Sancho
(24) had, quote, "no justifiable defense," unquote, for her
(25) handling of Martin Harrison's intake.

116

(1)       Do you agree or disagree with Corizon?
(2)       MS. STRINGER:  Same objections.  It's a legal
(3)  brief.
(4)       MS. HUDGINS:  Same objections.  My same objections.
(5)       THE WITNESS:  To the extent that she considered
(6)  doing or placing him on the CIWA, and whatever dialogue as
(7)  her recollection was during her hearing, I think that
(8)  based on her interaction with Mr. Harrison, she felt that
(9)  it was not indicated.
(10)      MS. SHERWIN:  Q.  Do you agree or disagree with
(11) Corizon, stated on page 1111 of its brief, that, quote:
(12) "Grievant had no justifiable defense for the manner in
(13) which the intake screenings had been carried out with
(14) regard to Mr. X or Mr. Y," end quote.  Mr. X being
(15) Martin Harrison.
(16)      MS. HUDGINS:  Same objection as compound.
(17)      MS. STRINGER:  Same objection.  It's a legal brief.
(18)      THE WITNESS:  Which part of that would you like me
(19) to answer?
(20)      MS. SHERWIN:  Q.  Do you agree or disagree with
(21) Corizon that Zelda Sancho had no justifiable defense for
(22) the manner in which she carried out the intake screening
(23) on Martin Harrison?
(24)      MS. HUDGINS:  Same objections.
(25)      MS. STRINGER:  And misstates evidence.  It's not

DEPOSITION OF ROBERT D. JONES, M.D.

---

117

(1)     evidence but misstates parts of the evidence.
(2)             THE WITNESS: And I honestly don't know what was in
(3)     the mind of Mrs. Sancho. I don't know why she considered
(4)     it and changed her opinion other than what she offered.
(5)             MS. SHERWIN: Q. Do you agree or disagree with
(6)     Corizon that she has no justifiable defense?
(7)             MS. STRINGER: Same objections.
(8)             MS. HUDGINS: Same objections.
(9)             THE WITNESS: I disagree in part because of the --
(10)    she had considered and then changed her opinion based on
(11)    additional interaction.
(12)            MS. SHERWIN: Q. Do you agree or disagree with
(13)    Corizon as it states in its arbitration brief, pages 1113
(14)    to 1114, quote: "The evidence is undisputed that Sancho
(15)    failed to carry out the basic assessment procedures with
(16)    respect to Martin Harrison to determine whether he was at
(17)    risk for developing the progressive and potentially fatal
(18)    symptoms of alcohol withdrawal." End quote.
(19)            MS. STRINGER: Same objection. It's a legal brief.
(20)    It's also compound.
(21)            MS. HUDGINS: I'll join in that. My same
(22)    objections.
(23)            Also, I think it possibly mischaracterizes what the
(24)    brief is -- what the lawyers are talking about in the
(25)    brief.

---

118

(1)             THE WITNESS: And I don't know what the lawyers are
(2)     talking about so I really can't answer that question.
(3)             MS. SHERWIN: Q. Okay. Well, I'd like you to read
(4)     the arbitration brief, which has not been given to you
(5)     before today, because I'm going to ask you about pages
(6)     1113 and 1114.
(7)             And please read starting at 1113, at the top of the
(8)     last paragraph, going on to 1114 which is the end of that
(9)     paragraph, because I'm going to ask you whether you agree
(10)    or disagree with the statements made by Corizon
(11)            MS. HUDGINS: I'm sorry. Where do you want him to
(12)    start?
(13)            MS. SHERWIN: 1113 in the last paragraph --
(14)            MS. HUDGINS: Starting: As stated above --
(15)            MS. SHERWIN: Yes. Which runs over to 1114.
(16)            MS. STRINGER: And I'll agree I'm going to object
(17)    further that these are arguments of lawyers, not evidence.
(18)            MS. SHERWIN: They're judicial admissions of a
(19)    party.
(20)            MS. STRINGER: They're not judicial admissions.
(21)            MS. SHERWIN: Yes, they are.
(22)            MS. HUDGINS: I'll join.
(23)            MS. STRINGER: Julia, do you want to take briefs
(24)    and come out with the people they represent and say, look,
(25)    you wrote this for them; it must be an admission of a

---

119

(1)     party in your arguments? It's crazy. But crazy isn't a
(2)     good --
(3)             MS. SHERWIN: Well, you should do some research on
(4)     judicial admissions.
(5)             MS. STRINGER: Perhaps you should, too.
(6)             THE WITNESS: Okay. And your question again?
(7)             MS. SHERWIN: Q. Do you agree or disagree with
(8)     Corizon that the evidence is undisputed that Nurse Sancho
(9)     failed to carry out the basic assessment procedures with
(10)    respect to Martin Harrison to determine whether he was at
(11)    risk for developing the progressive and potentially fatal
(12)    symptoms of alcohol withdrawal?
(13)            MS. HUDGINS: Excuse me. Same objections. It's
(14)    also not agreeing with Corizon; it's agreeing with
(15)    Corizon's lawyers in an employment case.
(16)            THE WITNESS: The error made by Mrs. -- Miss Sancho
(17)    was that she did not fully document what she found. She
(18)    did consider the CIWA process. She then changed her mind.
(19)    Was that an error of judgment? I don't know specifically
(20)    what was in her mind so I can't answer that. But her
(21)    problem was a problem with the charting that she rendered.
(22)            MS. SHERWIN: Q. Do you agree or disagree with
(23)    Corizon's Employer Arbitration Brief that Miss Sancho
(24)    failed to carry out the basic assessment procedures with
(25)    respect to Martin Harrison?

---

120

(1)             MS. HUDGINS: Asked and answered. Same objection.
(2)             MS. SHERWIN: No, actually it wasn't answered;
(3)     that's why I'm asking it again.
(4)             MS. HUDGINS: Same objections.
(5)             MS. STRINGER: Same objections. Join.
(6)             THE WITNESS: What part --
(7)             MS. HUDGINS: I'm sorry. Just to be clear, because
(8)     I made a shorter, smaller objection in between.
(9)             My objections are that you're asking from a brief
(10)    written by Corizon's lawyers in an employment case; that
(11)    it lacks foundation; that it mischaracterizes testimony;
(12)    and it's an incomplete hypothetical.
(13)            THE WITNESS: And to the degree that her charting
(14)    was not complete she had not followed policy.
(15)            MS. SHERWIN: Q. And she failed to carry out the
(16)    basic assessment procedures. Right?
(17)            MS. HUDGINS: Same objections.
(18)            THE WITNESS: Actually I don't agree with that
(19)    because she answered almost every single one of the
(20)    questions. They were appropriately answered on the
(21)    screening form. She signed the screening form. The only
(22)    error that I can see that she made was they didn't say
(23)    which and how much.
(24)            And also she considered the CIWA, but then changed
(25)    her mind, by her testimony in other areas, that --

---

DEPOSITION OF ROBERT D. JONES, M.D.

---

**121**

(1)      MS. SHERWIN: Okay. Excuse me, Doctor --

(2)      MS. HUDGINS: Wait, wait.

(3)      MS. SHERWIN: I'm sorry.

(4)      MS. HUDGINS: Wait. He hasn't finished --

(5)      MS. SHERWIN: There's no need to yell at me, Nancy.

(6)      MS. HUDGINS: Because you're talking over me so I

(7)  had to be heard.

(8)      MS. SHERWIN: He's not answering the question.

(9)      I asked you to agree or disagree; he said he

(10)  disagrees; now we can move on to the next question.

(11)      MS. HUDGINS: No --

(12)      MS. SHERWIN: I didn't ask why he disagrees.

(13)      MS. HUDGINS: An expert is entitled to give his

(14)  full opinion.

(15)      MS. SHERWIN: Okay. You know what? All right. So

(16)  you wanted this deposition to end at 5:00 p.m. so he could

(17)  take a plain at 6:30. I told you we could do that if he

(18)  answers the questions and does not go beyond the

(19)  questions.

(20)      I'm entitled to seven hours of testimony under the

(21)  rules; I've reserved seven hours of testimony.

(22)      If he continues to not answer the question and goes

(23)  far beyond the question, this deposition is going to take

(24)  a lot longer than 5:00 p.m.

(25)      I'm just letting you know that on the record

---

**122**

(1)  because I let you know yesterday by e-mail and also during

(2)  a break today.

(3)      It's up to you, Ms. Hudgins, and Doctor. The

(4)  question has been asked and answered, but if you want to

(5)  expound on your answer, Doctor, by all means feel free.

(6)      MS. HUDGINS: Excuse me just a moment, if I can get

(7)  a word in edgewise.

(8)      In any legal proceeding an expert is allowed to

(9)  explain his answer. Dr. Jones is in the middle of

(10)  explaining his answer -- I don't know if he was in the

(11)  middle or towards the end -- but you interrupted him. And

(12)  so the reason I got involved is because you interrupted

(13)  him.

(14)      Now I'd like the court reporter to please read back

(15)  the question and the answer until you're interrupted, and

(16)  if there's anything you want to say, please do so.

(17)      MS. SHERWIN: That's fine, and we're reserving

(18)  seven hours of testimony with this witness regardless of

(19)  how long it takes.

(20)      THE REPORTER: "And she failed to carry out the

(21)  basic assessment procedures. Right?

(22)      Answer: Actually I don't agree with that because

(23)  she answered almost every single one of the questions.

(24)  They were appropriately answered on the screening form.

(25)  She signed the screening form. The only error that I can

---

**123**

(1)  see that she made was they didn't say which and how much.

(2)      And also she considered the CIWA, but then changed

(3)  her mind, by her testimony in other areas, that -- "

(4)      THE WITNESS: -- I had reviewed.

(5)      MS. SHERWIN: Q. Do you agree or disagree with

(6)  Corizon, which stated in its Employer Arbitration Brief

(7)  that Sancho, quote, "...gave no excuses other than she

(8)  forgot. She had no defenses." End quote.

(9)      MS. HUDGINS: So I'll object. It's argumentative.

(10)  It's taken from a legal brief written by Corizon attorneys

(11)  in a different context.

(12)      It is incomplete in the sense it doesn't say what

(13)  she said that she forgot or what excuses she gave as to

(14)  what question.

(15)      So it's vague and ambiguous as well. Incomplete

(16)  hypothetical.

(17)      MS. STRINGER: Join.

(18)      THE WITNESS: And read the question, please.

(19)      (Record read.)

(20)      MS. HUDGINS: Same objections.

(21)      THE WITNESS: And I do not know what was in

(22)  Miss Sancho's mind. I know that she made the errors as I

(23)  previously stated.

(24)      MS. SHERWIN: Q. Okay. You agree or disagree with

(25)  Corizon? That's the question.

---

**124**

(1)      MS. HUDGINS: Same objections.

(2)      THE WITNESS: I neither agree nor disagree, and the

(3)  reason I don't is for the reasons I gave.

(4)      MS. SHERWIN: Q. All right. Do you agree or

(5)  disagree with Corizon which stated in note 22 on page 1114

(6)  of its arbitration brief, quote: "For all practical

(7)  purposes -- " strike that.

(8)      Quote: "However, when preparing medical records,

(9)  if something is not written down, for all practical

(10)  purposes it did not happen because to allow otherwise

(11)  would be to allow a nurse to fabricate facts after the

(12)  fact when faced with discipline." End quote.

(13)      MS. HUDGINS: Well, same objections. And certainly

(14)  is argumentative.

(15)      MS. STRINGER: And compound.

(16)      MS. HUDGINS: And compound.

(17)      THE WITNESS: And it's a statement which I do not

(18)  agree with as far as if it wasn't written it wasn't done.

(19)      MS. SHERWIN: Q. Okay. In reviewing Prison Health

(20)  Services' policies, did you review its documentation

(21)  policy that says: "If it was not written it didn't

(22)  happen?"

(23)      MS. STRINGER: Misstates the documents.

(24)      MS. HUDGINS: It mischaracterizes evidence and the

(25)  document and is vague and ambiguous.

---

DEPOSITION OF ROBERT D. JONES, M.D.

---

**125**

(1)         THE WITNESS:  Can I see the document, please?
(2)         MS. SHERWIN:  Q.  Did you bring the document with
(3)  you as you were ordered to in the Deposition Notice?
(4)         MS. HUDGINS:  First of all, the Deposition Notice
(5)  doesn't order anything.  So it's argumentative.
(6)         And secondly, as you know, there are thousands of
(7)  pages that he reviewed, and to have him find it now would,
(8)  you know, breach your seven-hour rule.
(9)         MS. SHERWIN:  Q.  Well, Doctor, you didn't bring
(10)  your complete file to your deposition today, did you?
(11)         A.  As far as the documents, no, I assumed that you
(12)  would provide me a copy of if I needed them.
(13)         Q.  Okay.  But in your report you said you reviewed
(14)  Prison Health Services policies and procedures.  Right?
(15)         A.  Yes.
(16)         MS. HUDGINS:  The report he wrote four months ago?
(17)  Three months ago.
(18)         THE WITNESS:  Yes, I have, but I need something to
(19)  cause recollection.
(20)         MS. SHERWIN:  Okay.
(21)         THE WITNESS:  I want to see what the policy says so
(22)  I can offer an opinion.
(23)         MS. SHERWIN:  Well, unfortunately you did not tell
(24)  me in your report which Prison Health Services policies
(25)  and procedures you reviewed.  So I have no idea whether or

---

**126**

(1)  not you reviewed the Prison Health Services policy and
(2)  procedure on documentation; that's why I'm asking you.
(3)         Q.  What Prison Health Services policies and
(4)  procedures did you review, Doctor?
(5)         MS. HUDGINS:  Okay.  I'm sorry to interrupt here,
(6)  but your tone is getting a little bit uncivil.
(7)         MS. SHERWIN:  My tone is fine.
(8)         MS. HUDGINS:  And you're interrupting me.
(9)         -- and the Doctor told you exactly what pages he
(10)  reviewed.  So you have an opportunity to look at all those
(11)  pages and figure it out.  He doesn't have to say every
(12)  policy that he reviewed.  A thousand pages he looked at.
(13)         MS. SHERWIN:  Actually, the Doctor's report does
(14)  not say what pages he reviewed.  The Doctor's report
(15)  says --
(16)         MS. HUDGINS:  It gives pages.
(17)         MS. SHERWIN:  I actually am just noticing that the
(18)  Doctor's report that was produced to me is different than
(19)  the Doctor's report that was brought by the Doctor today.
(20)         THE WITNESS:  May I see it?  I may have...
(21)         MS. SHERWIN:  Q.  Doctor, you brought your complete
(22)  report in this case, right?
(23)         A.  I'm not sure.  I assumed I'd gotten the right
(24)  one.  I had a draft and it may be that I brought the
(25)  draft.

---

**127**

(1)         Q.  Okay.  I'll have you look at Exhibit 3 which is
(2)  what you brought with you today as your report
(3)  (indicating).
(4)         That's your report in this case, right, Doctor?
(5)         MS. HUDGINS:  Well, that's not what he said.  He
(6)  said he assumed it was but he may have brought a draft.
(7)         THE WITNESS:  I must apologize; I brought a draft.
(8)         MS. SHERWIN:  Q.  And you signed your draft report
(9)  that you produced that's Exhibit 3 to your deposition?
(10)         A.  I did sign it, yes.
(11)         Q.  All right.
(12)         A.  But it is still a draft.  I apologize.  I sign
(13)  all of them at the time that I do them.
(14)         Q.  Okay.
(15)         A.  I don't have an explanation on how I made that
(16)  mistake.
(17)         Q.  Okay.  The report that was produced to me in
(18)  connection with Rule 26 disclosures simply says that you
(19)  reviewed PHS policies and procedures and doesn't tell me
(20)  which ones you reviewed.  Okay?
(21)         So do you know whether or not you reviewed the
(22)  Corizon or PHS policies and procedures on documentation?
(23)         MS. HUDGINS:  So I'm going to object because the
(24)  report we produced says that document Bates stamped COR 1
(25)  to 1011, 1121 to 1218, 1964 to 1990, 2098 to 2199, 3324 to

---

**128**

(1)  3985, 4728 to 4339 were documents that he reviewed.
(2)         MS. SHERWIN:  Those were other documents.  In the
(3)  Doctor's report he identifies them on page 7 as, quote,
(4)  "other documents".
(5)         On page 6 he says he read, quote, "PHS policies and
(6)  procedures," end quote.
(7)         MS. HUDGINS:  So why don't you ask him what he
(8)  meant by that.
(9)         MS. SHERWIN:  Q.  Well, I'm asking whether or not
(10)  he reviewed the documentation policies.
(11)         A.  Yes, I did.
(12)         Q.  Okay.  And did you review both Prison Health
(13)  Services and Corizon's documentation policies?
(14)         A.  We've been using those terms interchangeably.
(15)         Q.  Did you review documentation policies that bore
(16)  the stamp of Prison Health Services, and separately,
(17)  policies that bore the stamp of Corizon?
(18)         A.  I looked at policies which were in effect at
(19)  the time of the event.
(20)         Q.  Okay.  So looking at page 6 on your report,
(21)  where you say you reviewed PHS policies and procedures,
(22)  which PHS policies and procedures do you recall as you sit
(23)  here today that you reviewed?
(24)         MS. HUDGINS:  Well, that's overbroad but go ahead.
(25)  What you remember.

---

DEPOSITION OF ROBERT D. JONES, M.D.

---

129

(1)         THE WITNESS: What I remember? Uh, intake
(2) screening, training, documentation, alcohol treatment.
(3)         I mean this has been a long time ago. I simply
(4) don't remember all the policies. I reviewed all of them
(5) that I received and that were in effect at the time.
(6)         MS. SHERWIN: Q. Okay. And your Rule 26 report
(7) was required to state all of the materials that you
(8) reviewed in forming your opinions. Right?
(9)         MS. HUDGINS: You're arguing with him now because
(10) he said he reviewed all those Corizon pages. So he's done
(11) what Rule 26 requires him to do.
(12)         MS. SHERWIN: Go ahead, Doctor. You can answer.
(13)         Q. You understood, right, that under Federal Rule
(14) of Civil Procedure 26 you were required to state all the
(15) documents that you reviewed in forming your opinions?
(16)         A. I reviewed all the policies and procedures.
(17)         MS. SHERWIN: Let's mark the Deposition Notice
(18) please as the next in line.
(19)         (Plaintiff's Exhibit 5 was marked for
(20) identification.)
(21)         MS. SHERWIN: Q. And the Deposition Notice which
(22) is Exhibit 5 asked you to produce your complete file in
(23) this matter including all documents, information and
(24) evidence reviewed in connection with your retention.
(25)         Do you see that, Doctor?

---

130

(1)         MS. HUDGINS: I'm sure that's what it says; in
(2) fact, I'll stipulate to that's what it says.
(3)         The fact is I sent you an e-mail stating he
(4) reviewed everything electronically, he reviewed everything
(5) that's in his report which includes all these COR
(6) documents, and I gave you all the additional stuff he
(7) reviewed, so he's complying.
(8)         MS. SHERWIN: Q. Can you answer the question,
(9) Doctor?
(10)         A. I reviewed all of them electronically. I don't
(11) have any files to bring to you. I've stated what I have
(12) reviewed.
(13)         MS. SHERWIN: Q. Okay. And why did you not bring
(14) your complete file?
(15)         MS. HUDGINS: Well, I'll object as argumentative
(16) and mischaracterizes what he said, and it mischaracterizes
(17) what I've said which is that I've told you what he had and
(18) you didn't write an e-mail back saying, "Oh, no, no, he
(19) has to download everything and bring it," so he didn't.
(20)         MS. SHERWIN: Well, he had a deposition notice
(21) requiring him to bring his file. My witnesses brought a
(22) thumb drive with their complete file on them or we
(23) e-mailed you the documents that we sent to the witnesses.
(24)         So I am asking this witness --
(25)         MS. HUDGINS: And that might be because everything

---

131

(1) wasn't Bates stamped. But everything he saw was Bates
(2) stamped if it wasn't a deposition or something else.
(3)         MS. SHERWIN: I'm asking this witness, Doctor, why
(4) did you not bring your complete file in response to the
(5) Deposition Notice?
(6)         MS. HUDGINS: Argumentative. Go ahead.
(7)         THE WITNESS: Because I had done it electronically
(8) and I assumed we would have that available here.
(9)         MS. SHERWIN: Q. And did you assume I would just
(10) be able to correctly guess which policies and procedures
(11) of PHS you reviewed?
(12)         MS. HUDGINS: That's argumentative. Now I'm sorry
(13) I didn't ask to have this videotaped because your antics
(14) are really going beyond the civility that one requires,
(15) one would hope, of the deposition.
(16)         MS. SHERWIN: There are no antics coming from me;
(17) it's simply a question.
(18)         Q. Did you expect me to guess which policies and
(19) procedures you reviewed, Doctor?
(20)         MS. HUDGINS: Argumentative. Argumentative and it
(21) mischaracterizes his testimony which is that all these COR
(22) documents are in his report.
(23)         THE WITNESS: If we had the electronic record we
(24) could look at it right now.
(25)         MS. SHERWIN: Q. Right. If you had downloaded the

---

132

(1) documents you were given onto a thumb drive we could look
(2) at it right now. Right?
(3)         MS. HUDGINS: Objection. Argumentative.
(4)         THE WITNESS: I assume we could.
(5)         MS. SHERWIN: Q. And as we sit here today, you
(6) don't know which -- other than the Prison Health Services
(7) policies and procedures on intake screening, training,
(8) documentation, and alcohol treatment, you don't know any
(9) other Prison Health Services policies and procedures you
(10) reviewed in order to prepare your opinions.
(11)         Is that correct, Doctor?
(12)         MS. HUDGINS: That mischaracterizes his testimony.
(13) What he said was that's all he could remember at the time
(14) but he reviewed everything that's in his report.
(15)         MS. SHERWIN: You can answer the question.
(16)         THE WITNESS: I reviewed what I've stated in the
(17) report. I don't -- it's been several months ago. I've
(18) had lots of things. I work full time. I don't remember
(19) specifically the names of them.
(20)         I looked at the ones in which they were referenced
(21) in the NCCHC. I looked at every policy and procedure that
(22) was in all of the depositions as exhibits.
(23)         MS. SHERWIN: Q. Okay. But as you sit here today
(24) you don't know which Prison Health Services' policies and
(25) procedures you reviewed except the ones that we've listed

---

DEPOSITION OF ROBERT D. JONES, M.D.

133

(1) on intake screening, documentation, and alcohol treatment.
(2) Right?
(3) MS. HUDGINS: So again, it mischaracterizes his
(4) testimony. You left out "training," for instance.
(5) He said that that's what he remembers.
(6) All of the documents he reviewed are in his report.
(7) MS. SHERWIN: Well, your speaking objections, as
(8) you know, are improper and an inappropriate attempt to
(9) coach the witness, and are also unnecessarily prolonging
(10) the deposition.
(11) MS. HUDGINS: One thing I'm really sure of is I
(12) don't need to coach this witness.
(13) MS. SHERWIN: Q. Are there any other policies and
(14) procedures of Prison Health Services that you reviewed,
(15) Doctor, that you can remember as you sit here today other
(16) than the ones you've listed?
(17) MS. HUDGINS: Compound. Argumentative. Asked and
(18) answered.
(19) THE WITNESS: I have read all of the policies and
(20) procedures that I outlined in those notes, in the
(21) documents.
(22) And I have read also ones that have been referred
(23) to in depositions.
(24) MS. SHERWIN: Q. Okay. And what policies --
(25) A. I just can't remember off the top of my head

134

(1) every single document or name of the document that I
(2) looked at.
(3) Q. Right. That's why Rule 26 requires you to
(4) state the documents that you reviewed.
(5) So --
(6) MS. HUDGINS: Which he did.
(7) MS. SHERWIN: Q. -- what policies and procedures
(8) did you outline in your report?
(9) What PHS policies and procedures did you outline in
(10) your report?
(11) MS. HUDGINS: Why don't you look at the reports.
(12) You look at that one and I'll look at this.
(13) Here's one (indicating).
(14) THE WITNESS: Okay.
(15) MS. HUDGINS: And the reports speak for themselves,
(16) but go ahead.
(17) THE WITNESS: On the policies and the procedures,
(18) the Interfacility Transfer Policy in place on August 2010
(19) was reasonable, rational, and followed.
(20) MS. SHERWIN: Q. Okay. You read the Interfacility
(21) Transfer Policy.
(22) A. Yes.
(23) Q. What other policies did you read and list in
(24) your report?
(25) I'm not asking about your opinions about the

135

(1) policies; I'm just asking for you to list for me what
(2) policies did you list in your report as policies you
(3) reviewed?
(4) MS. HUDGINS: The documents speak for themselves.
(5) If you're including the documents within the COR Bates
(6) stamp, I'm not sure if he remembers which Bates stamp
(7) number --
(8) MS. SHERWIN: The documents identified as Bates
(9) stamped COR documents are identified in the Doctor's
(10) report as, quote, "other documents", end quote.
(11) The documents that were PHS policies and procedures
(12) are identified on the previous page.
(13) I'm asking about PHS policies and procedures.
(14) MS. HUDGINS: So your position is that if policies
(15) and procedures are in the COR Bates stamped documents,
(16) that those don't count as policies and procedures he read?
(17) MS. SHERWIN: No, I'm just asking him to --
(18) MS. HUDGINS: Not subsumed by the other?
(19) MS. SHERWIN: I'm just asking him to please tell me
(20) which policies and procedures of Prison Health Services or
(21) Corizon he, as he put, outlined in his report. Just
(22) identify the policies.
(23) I don't need to know his opinion about the policies
(24) or what he thinks about the policies or how he feels about
(25) them; I just would like to know what policies and

136

(1) procedures of Prison Health Services or Corizon the Doctor
(2) outlined in his report.
(3) Right now we've got the Interfacility Transfer
(4) Policy.
(5) Q. What other policies are there, please?
(6) MS. HUDGINS: Objection. Compound. Argumentative.
(7) The document speaks for itself.
(8) THE WITNESS: And may I take a break?
(9) MS. HUDGINS: Yes, sure.
(10) (Recess.)
(11) MS. SHERWIN: Q. Okay, Doctor. You can go ahead
(12) and answer.
(13) MS. HUDGINS: I may have already said the document
(14) speaks for itself, but if I didn't, I'll say it again.
(15) Go ahead, Doctor.
(16) THE WITNESS: To make sure that I'm clear with the
(17) question is what other policies are referred to in my
(18) opinion.
(19) MS. SHERWIN: Q. Right. You can just list them,
(20) please.
(21) A. Okay. Basically -- I mean by the names, I've
(22) already told you I can't.
(23) But the policies and procedures in effect at the
(24) time Mr. Harrison was incarcerated are cross-referenced
(25) with both the NCCHC and ACA standards.

DEPOSITION OF ROBERT D. JONES, M.D.

---

**137**

(1)      And all of those polices and procedures basically
(2) were found in compliance and they actually -- the policies
(3) and the procedures are referenced in the standard.
(4)      So with every single standard that occurs in NCCHC,
(5) you're going to have a subsequent policy. I read through
(6) all of those policies.
(7)      Q. Okay. Could you please just tell me, list for
(8) me which policies you refer to in your report? It
(9) shouldn't take very long.
(10)      A. Receiving Health Screening policy.
(11)      Policy which was G -- J-G-06. They mention that
(12) specifically.
(13)      The policy and forms as found on Corrections -- or
(14) COR documents 22 through 27. And also marked as Exhibit 4
(15) in Dr. Orr's deposition.
(16)      The Medical Training of Deputies.
(17)      Q. Whose policy on Medical Training of Deputies?
(18) Was that Corizon's policy?
(19)      A. Corizon's.
(20)      MS. HUDGINS: Well, I'll object. You mean Corizon
(21) as opposed to PHS? Are you making a statement as to a
(22) period of time? It's vague and ambiguous.
(23)      Her question is vague and ambiguous. That's what
(24) I'm saying.
(25)      MS. SHERWIN: Q. Did you look at Prison Health

---

**138**

(1) Services policy on Medical Training of Deputies or
(2) Corizon's policy on Medical Training of Deputies, or both?
(3)      A. PHS/Corizon that were in effect at that time.
(4)      MS. HUDGINS: So is that it?
(5)      THE WITNESS: That's it.
(6)      MS. SHERWIN: Q. Okay.
(7)      A. To my best recollection.
(8)      Q. And you testified in the case of Lucero versus
(9) Dr. Do Nguyen, N-g-u-y-e-n, on March 22nd, 2013. That was
(10) one of the cases on your case list, right?
(11)      A. Yes, it is. I believe. Read the citing again.
(12)      Q. Lucero?
(13)      A. Yes, Lucero. Yes.
(14)      Q. And you testified at the time of the
(15) Michael Valent case your policy within the Utah Department
(16) of Corrections was that inmates could be held in a
(17) restraint chair as much as 12 hours. Right?
(18)      MS. HUDGINS: Okay. I'm going to object that we've
(19) gone a little far afield here. I'm being facetious; we've
(20) gone way far afield here.
(21)      It doesn't -- this will not lead to the
(22) discoverability of admissible evidence. It's irrelevant.
(23)      If you remember, Doctor.
(24)      THE WITNESS: The question was?
(25)      MS. SHERWIN: Q. When you were the clinical

---

**139**

(1) director of the Utah Department of Corrections your policy
(2) was that inmates could be held in a restraint chair up to
(3) 12 hours. Right?
(4)      MS. HUDGINS: Object. Incomplete hypothetical.
(5) Vague and ambiguous.
(6)      THE WITNESS: That was the maximum time before the
(7) psychiatrist or the physician had to actually see the
(8) patient.
(9)      MS. SHERWIN: Q. Okay. And in the course of your
(10) work doing correctional health care in Utah, Montana and
(11) Arizona, you've become very much aware of the Estelle
(12) versus Gamble deliberate indifference standard. Right?
(13)      A. Yes, I have familiarity with it, very much so.
(14)      Q. And in the Lucero case, when asked your
(15) definition of deliberate indifference, you testified,
(16) quote:
(17)      "Deliberate indifference, seen from a medical
(18) standpoint that we need to ensure, occurs as clinicians
(19) working in Corrections is one and first that the patient
(20) has access to care. That means that they can be able to
(21) be seen.
(22)      And that number two, that they can be seen by
(23) somebody who is qualified, who has a right to formulate a
(24) diagnosis, and that if that individual recommends a
(25) treatment, that they have a right to a treatment but not

---

**140**

(1) any and all treatments." End quote.
(2)      Do you stand by that testimony, Doctor?
(3)      MS. STRINGER: Compound. Which part of it?
(4)      MS. HUDGINS: Yes. I'll object. It's compound.
(5) It lacks foundation as to what the issues in the case was
(6) in which he was testifying. Which may be different than
(7) issues in this case.
(8)      It's vague and ambiguous. It lacks foundation.
(9)      THE WITNESS: That said, "deliberate indifference"
(10) is a legal term. It is something that -- and my comment
(11) that as clinicians, we need to ensure accessibility, that
(12) they have a right to a diagnosis, and if recommended, a
(13) treatment.
(14)      MS. SHERWIN: Q. Okay. And in your testimony in
(15) the Lucero case, you said there are basically three prongs
(16) that you've come to understand working in Corrections must
(17) be met to prevent deliberate indifference. Right?
(18)      A. Yes.
(19)      Q. Okay. And those three prongs mean first, that
(20) the patient has access to care, meaning that they are able
(21) to be seen. Right?
(22)      A. I just outlined those three points previously,
(23) but yes, access.
(24)      Q. Okay. And number two, that they can be seen by
(25) somebody who is qualified who has a right to formulate a

---

DEPOSITION OF ROBERT D. JONES, M.D.

141

(1) diagnosis. Right?
(2)       MS. HUDGINS: I'm sorry. First of all, I think you
(3) misstated the number one prong.
(4)       Secondly, I think you're asking him for a legal
(5) conclusion.
(6)       And it's vague and ambiguous. Go ahead.
(7)       THE WITNESS: Which is why I answered your question
(8) first that it's not a term that's a medical term.
(9) "Deliberate indifference" is a legal conclusion.
(10)       We, in Corrections, understand that that is the
(11) approach that we take. Access to care, a diagnosis by a
(12) qualified individual, and treatment.
(13)       MS. SHERWIN: Q. Okay. So number two, as you
(14) described in your Lucero testimony, is that from a medical
(15) standpoint, the inmate has a right to be seen by someone
(16) who is qualified and has the right -- the person who sees
(17) them has to have the right to formulate a diagnosis.
(18) Right?
(19)       MS. HUDGINS: So again, I'll object. It's an
(20) incomplete hypothetical. It's vague and ambiguous. It
(21) refers to a different case. You're taking it out of
(22) context from a different case.
(23)       It's argumentative. It calls for a legal
(24) conclusion.
(25)       MS. STRINGER: Join.

142

(1)       THE WITNESS: And I'm not qualified to render a
(2) legal conclusion.
(3)       MS. SHERWIN: Q. Right. I'm asking you from your
(4) medical standpoint, as you testified in the Lucero case.
(5)       A. From what that says, an individual can receive
(6) a diagnosis and also treatment if recommended.
(7)       Q. Right. And the diagnosis has to be from
(8) somebody who is qualified to render a diagnosis. Right?
(9)       MS. HUDGINS: Well, if there's a diagnosis to be
(10) had. So it's vague and ambiguous, it's an incomplete
(11) hypothetical, it's -- it lacks foundation. It's
(12) argumentative.
(13)       MS. STRINGER: Join.
(14)       MR. ANDRADA: Join.
(15)       THE WITNESS: And the person who is able to make a
(16) diagnosis is to be qualified to make that diagnosis.
(17)       MS. SHERWIN: Q. Right. The diagnosis can't be
(18) made by someone who is not qualified to make a diagnosis.
(19) Right?
(20)       MS. HUDGINS: Same objections.
(21)       MS. STRINGER: Join.
(22)       MR. ANDRADA: Yeah, join.
(23)       THE WITNESS: You should be licensed and qualified
(24) to make diagnoses.
(25)       MS. SHERWIN: Q. Now, you reviewed the Title 15

143

(1) California Code of Regulations. Correct, Doctor?
(2)       (Discussion off the record between Miss Hudgins and
(3) the witness.)
(4)       MS. STRINGER: Vague as to time.
(5)       THE WITNESS: I'm sorry.
(6)       MS. SHERWIN: Q. Did you not hear me while
(7) Ms. Hudgins was whispering in your ear? Sorry.
(8)       You reviewed Title 15 of the California Code of
(9) Regulations. Correct, Doctor?
(10)       MS. HUDGINS: Objection. The introductory
(11) statement is argumentative and superfluous and I move to
(12) strike.
(13)       MS. STRINGER: And I said vague as to time.
(14)       MS. HUDGINS: Join.
(15)       THE WITNESS: What was your question again?
(16)       MS. SHERWIN: Can you read the question back,
(17) please.
(18)       THE REPORTER: "You reviewed Title 15 of the
(19) California Code of Regulations. Correct, Doctor?"
(20)       THE WITNESS: Yes, some time ago.
(21)       MS. SHERWIN: Q. And nurses must practice within
(22) the scope of their licensure and training. Right?
(23)       MS. HUDGINS: Well, I'll object. I'm not sure
(24) that's in Title 15, so I'll object it's argumentative;
(25) it's an incomplete hypothetical; it's vague and ambiguous.

144

(1)       MS. STRINGER: Join.
(2)       THE WITNESS: Everyone should practice within their
(3) scope of practice.
(4)       MS. SHERWIN: Q. Right. Nurses are required to
(5) practice within their scope of practice, though. You're
(6) aware of that. Right, Doctor?
(7)       MS. HUDGINS: I'll object. Vague and ambiguous.
(8) Argumentative.
(9)       THE WITNESS: To the extent that a person is
(10) licensed by a state they should stay within the licensing
(11) requirements.
(12)       MS. SHERWIN: Q. And that includes licensed
(13) vocational nurses, right?
(14)       A. It includes all people licensed by the state.
(15)       Q. Because if medical personnel are not properly
(16) qualified and practice outside their scope of practice,
(17) that can jeopardize patient safety. Right?
(18)       MS. HUDGINS: Objection. Argumentative. Vague and
(19) ambiguous. Lacks foundation.
(20)       MS. STRINGER: Incomplete hypothetical. Sorry.
(21)       MS. HUDGINS: Incomplete hypothetical.
(22)       MR. ANDRADA: Join.
(23)       THE WITNESS: And I would have to have a lot more
(24) information to answer your question.
(25)       MS. SHERWIN: Q. Okay. If medical personnel are

DEPOSITION OF ROBERT D. JONES, M.D.

145

(1)    not qualified or properly trained, that can put patients
(2)    at risk of harm.  Right, Doctor?
(3)        MS. HUDGINS:  Same objections.
(4)        MS. STRINGER:  Same objections.
(5)        THE WITNESS:  What training are you referencing and
(6)    what persons?
(7)        MS. SHERWIN:  Q.  We'll go to your sworn deposition
(8)    testimony in the Christie case --
(9)        MS. HUDGINS:  Not just any deposition testimony but
(10)   your sworn deposition testimony.
(11)       MS. SHERWIN:  Excuse me.  I was in the middle of a
(12)   question --
(13)       MS. HUDGINS:  I'm sorry.
(14)       MS. SHERWIN:  -- and your joking and laughing is
(15)   just going to prolong the deposition.
(16)       MS. HUDGINS:  I'm not joking and laughing.
(17)       MS. SHERWIN:  Q.  We will go to your sworn
(18)   deposition testimony in the Christie case, page 67, lines
(19)   11 through 18.
(20)       "Question:  A jail medical person must be qualified
(21)   and trained to deliver prompt and adequate medical and
(22)   mental health care.  True?
(23)       Answer:  They must be practicing within the scope
(24)   of their licensure and training.
(25)       Question:  If personnel are not qualified or not

146

(1)    properly trained, patients can be put at the risk of harm.
(2)    Correct?
(3)        Answer:  Yes."
(4)        Is that still true, Doctor?
(5)        MS. HUDGINS:  Same objections.
(6)        THE WITNESS:  My testimony stands as it states in
(7)    that document.  I'm not changing my opinion.  You need to
(8)    stay within your -- I will amend that statement.  You need
(9)    to stay within your training and your licensure.
(10)       MS. SHERWIN:  Q.  And that includes Nurse Sancho.
(11)   Right?
(12)       A. Includes all health care providers.
(13)       Q. Now you have the opinion on page 3 of your
(14)   report that Nurse Sancho was qualified to perform the
(15)   Intake Medical Assessment on Martin Harrison.  Right?
(16)       MS. HUDGINS:  Let's see if that's what he says.
(17)       Document speaks for itself.
(18)       THE WITNESS:  The document says Mr. Harrison also
(19)   signed a screening form.  Mrs. Sancho was licensed, she
(20)   was an LVN, she'd been trained in how to complete the
(21)   screening form, and she was qualified to complete that
(22)   screening.
(23)       MS. SHERWIN:  Q.  Right.  And it's also your
(24)   opinion in your supplemental report that the standard of
(25)   care does not require registered nurses to perform Intake

147

(1)    Medical Assessments.  Right?
(2)        MS. HUDGINS:  Document speaks for itself.
(3)        THE WITNESS:  I disagreed with Dr. Burns' opinion
(4)    and stated that the standard of care does not require
(5)    registered nurses perform the intake screening.
(6)        MS. SHERWIN:  Q.  Nurse Sancho was a licensed
(7)    vocational nurse.  Right?
(8)        A. Yes, she was.
(9)        Q. And she had failed the examination to become a
(10)   registered nurse in California three times.  Right?
(11)       MS. STRINGER:  Objection.  Irrelevant.  Not likely
(12)   to lead to the discovery of admissible evidence.
(13)       MS. HUDGINS:  Join.
(14)       THE WITNESS:  And I know she was licensed as an
(15)   LVN.  I don't know the other information.
(16)       MS. SHERWIN:  Q.  Okay.  You read her deposition.
(17)   Right?
(18)       A. It's been some time.
(19)       Q. And do you recall reading in her deposition
(20)   that she failed to pass the registered nurse's exam in
(21)   California three times?
(22)       A. I read the -- I don't specifically recall but
(23)   if it says that in the document I will agree.
(24)       Q. Okay.  And NCCHC essential standard on
(25)   credentialing states that health professionals must not

148

(1)    perform tasks beyond those permitted by their credentials.
(2)    Right?
(3)        MS. HUDGINS:  Objection.  Vague and ambiguous.
(4)    Mischaracterizes.
(5)        THE WITNESS:  Which --
(6)        MS. SHERWIN:  I am looking at Essential
(7)    Standard JC 01 on page 33 of the NCCHC standards.
(8)        A. Yes, this is a credentialing standard.
(9)        Q. That's right.  And NCCHC has essential
(10)   standards and important standards.  Right?
(11)       A. That is correct.
(12)       Q. And if a standard is essential, then the
(13)   facility and medical care provided at the facility is
(14)   required to comply with that standard.  Right?
(15)       A. If it's essential, yes, unless -- the exception
(16)   would be if it doesn't apply.
(17)       Q. And NCCHC says that accredited jails are
(18)   expected to be in compliance with all of the applicable
(19)   essential standards and at least 85 percent of the
(20)   applicable important standards.  Right?
(21)       A. Yes, and that was their finding when they
(22)   conducted the audit.
(23)       Q. Okay.  And the requirement that health
(24)   professionals not perform tasks beyond those permitted by
(25)   their credentials includes limits on their credentials as

DEPOSITION OF ROBERT D. JONES, M.D.

---

**149**

(1)    set forth in state laws.  Right?
(2)         MS. HUDGINS:  Objection.  Calls for a legal
(3)    conclusion.
(4)         THE WITNESS:  Repeat the question, please.
(5)         MS. SHERWIN:  Could you repeat the question?
(6)         THE REPORTER:  "And the requirement that health
(7)    professionals not perform tasks beyond those permitted by
(8)    their credentials includes limits on their credentials as
(9)    set forth in state laws.  Right?"
(10)        THE WITNESS:  Those are the individuals who issue
(11)   the license and they would expect the person to stay
(12)   within their scope of practice.
(13)        MS. SHERWIN:  Q.  Did you review the Scope of
(14)   Practice for licensed vocational nurses in California?
(15)        A. In this -- for this -- no, I have earlier, but
(16)   not recently.
(17)        Q. Okay.  When is the last time you reviewed the
(18)   LVN Scope of Practice in California?
(19)        A. Um, I honestly do not recall.
(20)        Q. More than five years ago?
(21)        A. Less than five.
(22)        Q. Why did you review the LVN Scope of Practice in
(23)   California?
(24)        A. Because we had some discussion about nurses and
(25)   LVN's and I looked in several different states:  I looked

---

**150**

(1)    in Arizona, I looked at California, I looked at Texas.
(2)    Sometimes they're referred to as LVN's; sometimes they're
(3)    referred to LPN's.
(4)        Q. Licensed practical nurse.  Right?
(5)        A. Correct.
(6)        Q. You understand in California and Texas it's
(7)    called licensed vocational nurse but in other states it's
(8)    called licensed practical nurse?
(9)        A. Yes.
(10)        Q. And it's essentially referring to the same job?
(11)        A. Yes.
(12)        Q. With whom did you have discussions about the
(13)   LVN's scope of practice in California?
(14)        A. Um, I -- the issue as I said was an issue that
(15)   was brought up in -- by my nursing supervisor on scope of
(16)   practice and we looked to see what other states had said.
(17)        Q. Your nursing supervisor where?
(18)        A. In Arizona.
(19)        Q. And your nursing supervisor had a concern about
(20)   whether or not nurses in the Arizona Department of
(21)   Juvenile Corrections were exceeding their scope of
(22)   practice?
(23)        A. No, that's not correct.
(24)        Q. Okay.  What was the reason for that
(25)   conversation?

---

**151**

(1)        A. The reason that we were looking at them is that
(2)    we had gone down with a reduction in force.  All of my
(3)    LVN's were, in fact, let go because we had created all the
(4)    positions as RN's.
(5)         We looked to make sure that it was permissible to
(6)    have a certain percentage of LPN's or LVN's, nurses, RN's.
(7)    That was the nature of my review.
(8)         We have now since created positions for our LVN's
(9)    so that should we ever have another reduction in force, we
(10)   will not have to automatically terminate them as under
(11)   fills.
(12)        Q. But you did not review the California
(13)   Vocational Nursing Practice Act before forming your
(14)   opinion that Nurse Sancho was qualified to perform Intake
(15)   Medical Assessments.
(16)        MS. HUDGINS:  Well, he said they reviewed this some
(17)   time ago so it was before he came to that opinion.
(18)        THE WITNESS:  The answer -- the answer is I'm
(19)   familiar with it.  I just don't remember specifically when
(20)   we did it.
(21)        MS. SHERWIN:  Q.  Did you review the California
(22)   Nursing Practice Act before forming your opinions in this
(23)   case?
(24)        A. Uh, we briefly looked at the RN as well.  But
(25)   our question was dealing with the LVN.

---

**152**

(1)        Q. Okay.  And did you do any review of any limits
(2)    on Zelda Sancho's scope of practice before you formed your
(3)    opinions in this case?
(4)        MS. HUDGINS:  Objection.  Lacks foundation.
(5)    Argumentative.
(6)        THE WITNESS:  According to the standards of the
(7)    NCCHC and the ACA she was well qualified to perform the
(8)    initial screening.
(9)        MS. SHERWIN:  Q.  Okay.  Did you do any review of
(10)   limits on Zelda Sancho's scope of practice under
(11)   California law before you formed your opinions in this
(12)   case?
(13)        MS. HUDGINS:  Same question.  Same objections.
(14)        THE WITNESS:  She was a licensed vocational nurse.
(15)   Based on the fact that she was licensed she -- in my
(16)   understanding -- was qualified to do an assessment.
(17)   Excuse me.  I misspoke.  A screening.
(18)        MS. SHERWIN:  Q.  Okay.  And Business and
(19)   Professions Code 2859, which defines the practice of
(20)   vocational nursing, says that vocational nurses perform
(21)   services requiring technical manual skills.
(22)        Are you aware of that?
(23)        MS. HUDGINS:  Objection.  Vague and ambiguous.
(24)   Incomplete reading of the law.  Calls for a legal
(25)   conclusion.

---

DEPOSITION OF ROBERT D. JONES, M.D.

---

153

(1)          MS. STRINGER:  Join.
(2)          THE WITNESS:  The document speaks for itself.
(3)          MS. SHERWIN:  Q.  I'm asking if you're aware of the
(4)    facts.
(5)          Are you aware that California law in the Business
(6)    and Professions Code Section 2859 says that vocational
(7)    nurses perform services requiring technical manual skills?
(8)          MS. HUDGINS:  Same objections.  Same question.
(9)          THE WITNESS:  I answered that I looked at the LVN;
(10)   I've read that, but I just don't remember when.
(11)         MS. SHERWIN:  Q.  Okay.  And are you aware that in
(12)   California, a licensed vocational nurse, when directed by
(13)   a physician and surgeon, may administer medication by
(14)   hypodermic injection?
(15)         MS. HUDGINS:  Same objections.
(16)         MS. STRINGER:  Incomplete hypothetical.
(17)         MS. HUDGINS:  Join.
(18)         THE WITNESS:  Yes.
(19)         MS. SHERWIN:  Q.  And you're aware that the
(20)   California Vocational Nursing Practice Act sets forth the
(21)   permissible practice of licensed vocational nurses in
(22)   California.  Right?
(23)         MS. HUDGINS:  Same objections.  Calls for a legal
(24)   conclusion.
(25)         MS. STRINGER:  Join.

---

154

(1)          THE WITNESS:  And I'm not a legal, but based on my
(2)    understanding, it delineates the scope of practice.
(3)          MS. SHERWIN:  Q.  Okay.  And are you aware that the
(4)    Vocational Nursing Practice Act says when directed by a
(5)    physician and surgeon, a licensed vocational nurse may
(6)    withdraw blood from a patient?
(7)          MS. HUDGINS:  Same objections.
(8)          MS. STRINGER:  Join.
(9)          THE WITNESS:  That would be within the scope of an
(10)   LVN, yes.
(11)         MS. SHERWIN:  Q.  And the scope of an LVN in
(12)   California would also include, when directed by a
(13)   physician and surgeon, starting and superimposing
(14)   intravenous fluids.  Right?
(15)         MS. HUDGINS:  Same objections.
(16)         MS. STRINGER:  Join.
(17)         THE WITNESS:  Yes, as a part of the scope of
(18)   practice.
(19)         MS. SHERWIN:  Q.  And the scope of practice for an
(20)   LVN in California would include, when acting under the
(21)   direction of a physician, performing skin tests.  Right?
(22)         MS. HUDGINS:  Same objection.
(23)         MS. STRINGER:  Join.
(24)         THE WITNESS:  Yes, as a part of the scope of
(25)   practice.

---

155

(1)          MS. SHERWIN:  Q.  And the LVN's scope of practice
(2)    in California would include, when acting under the
(3)    direction of a physician, performing immunization
(4)    techniques.  Right?
(5)          MS. HUDGINS:  Same objections.
(6)          MS. STRINGER:  Join.
(7)          THE WITNESS:  Yes, to the extent it was included in
(8)    what an LVN does.
(9)          MS. SHERWIN:  Q.  And LVN's are allowed to perform
(10)   basic assessment which is defined as data collection.
(11)   Correct?
(12)         MS. HUDGINS:  Same objections.
(13)         MS. STRINGER:  Join.
(14)         THE WITNESS:  Yes, they are entitled to collect
(15)   data.
(16)         MS. SHERWIN:  Q.  But are you aware that under
(17)   California law, LVN's are not allowed to analyze the data
(18)   they collect?
(19)         MR. ANDRADA:  Objection.  Vague and ambiguous.
(20)         MS. STRINGER:  Join.
(21)         MS. HUDGINS:  Join.  Calls for a legal conclusion.
(22)   And incomplete hypothetical.
(23)         THE WITNESS:  Can you read the question again?
(24)         MS. SHERWIN:  Could you read the question, please?
(25)         (Record read.)

---

156

(1)          MS. HUDGINS:  Same objections.
(2)          THE WITNESS:  It depends on what the data is.
(3)    I'm not sure that it means any and all data.  I
(4)    don't know specifically that that is the case.
(5)          MS. SHERWIN:  Q.  Okay.  You don't know whether --
(6)    strike that.
(7)          You don't know one way or another whether or not
(8)    analyzing the data collected was something that was within
(9)    Zelda Sancho's scope of practice as a licensed vocational
(10)   nurse.  Is that right, Doctor?
(11)         MS. HUDGINS:  Objection.  Vague and ambiguous.
(12)   Incomplete hypothetical.  Calls for a legal conclusion.
(13)         THE WITNESS:  And without --
(14)         MS. STRINGER:  Argumentative.
(15)         MS. HUDGINS:  Argumentative.
(16)         THE WITNESS:  And without reading it, I'm not sure
(17)   what they mean by analyzed.
(18)         MS. SHERWIN:  Okay.  Well, we'll mark another
(19)   exhibit.  Could you mark this please.
(20)         (Plaintiff's Exhibit 6 was marked for
(21)   identification.)
(22)         MS. SHERWIN:  Q.  I'm going to hand you what's been
(23)   marked as Exhibit 6 to your deposition which is a Nursing
(24)   Practice and Patient Advocacy Alert from the California
(25)   Nurses Association and the National Nurses Organizing

---

DEPOSITION OF ROBERT D. JONES, M.D.

---

**157**

(1)   Committee on the topic of Patient Assessment:  Roles of
(2)   RNs and LVNs.
(3)        MS. HUDGINS:  So this is some union thing.
(4)        MS. SHERWIN:  This is a document that was marked in
(5)   Nurse Wild's deposition.  I have one more copy that you
(6)   two can share.
(7)        Q.  Doctor, you have no reason to dispute the
(8)   advice that the National Nurses Organizing Committee and
(9)   California Nurses Association gives to nurses in
(10)  California regarding the role of the RN and the LVN in
(11)  patient assessment, do you?
(12)       MS. HUDGINS:  Objection.  First of all, you haven't
(13)  given him a chance to read it.
(14)       Secondly, it's overly broad.
(15)       MR. ANDRADA:  Join.
(16)       MS. STRINGER:  Join.
(17)       MS. HUDGINS:  It lacks foundation.  It's compound.
(18)  It's argumentative.
(19)       MS. SHERWIN:  Well, Doctor, why don't you read that
(20)  two-page document and let me know when you're done so we
(21)  can proceed.
(22)       THE WITNESS:  I'm in the process of it now.
(23)       MS. SHERWIN:  Okay.
(24)       MS. STRINGER:  I have one more objection.  That
(25)  document is vague as to time.  It doesn't indicate when it

---

**158**

(1)   was written.
(2)        MS. HUDGINS:  I join.
(3)        THE WITNESS:  And I don't remember if I said,
(4)   "Lacks foundation," but if I didn't, I'd like to.
(5)        THE WITNESS:  I've finished reading it.
(6)        MS. SHERWIN:  Okay.  Could you read the question
(7)   back, please?
(8)        THE REPORTER:  "Doctor, you have no reason to
(9)   dispute the advice that the National Nurses Organizing
(10)  Committee and California Nurses Association gives to
(11)  nurses in California regarding the role of the RN and the
(12)  LVN in patient assessment, do you?"
(13)       MS. HUDGINS:  Same objections as before.  And also
(14)  vague as to time.
(15)       THE WITNESS:  Actually I do dispute part of this.
(16)  Under the Nursing Practice Act, only the RN can perform
(17)  assessments which include analysis and formulation of a
(18)  nursing diagnosis.
(19)       Nurses conduct assessments; physicians, nurse
(20)  practitioners, and PA's provide diagnoses.
(21)       MS. SHERWIN:  Q.  Okay.  Registered nurses conduct
(22)  assessments.  You understand that, right?
(23)       A.  Yes, it's called a nursing assessment.
(24)       Q.  Okay.  And do you agree that an assessment
(25)  consists of two parts:  Data collection being the first

---

**159**

(1)   part; and analysis, synthesis and evaluation of the data
(2)   being the second part?
(3)        MS. HUDGINS:  Objection.  Vague and ambiguous.
(4)   Incomplete hypothetical.  Lacks foundation.
(5)        THE WITNESS:  That's how they've defined it in the
(6)   paper and that's what the statement is made by the
(7)   document they've provided me.
(8)        MS. SHERWIN:  Q.  Okay.  And you don't disagree
(9)   with it, do you?
(10)       MR. ANDRADA:  Objection.  Vague and ambiguous.
(11)  Disagree as to what?
(12)       MS. HUDGINS:  Yes, I join.  And other objections.
(13)       THE WITNESS:  And that is my problem.  I don't know
(14)  what situation this is being applied.
(15)       MS. SHERWIN:  Q.  Okay.  In a situation where a
(16)  patient is being assessed, do you agree that the situation
(17)  includes two parts:  One being data collection; and the
(18)  second part being analysis, synthesis and evaluation of
(19)  the data?
(20)       MS. HUDGINS:  So I object.  I don't think your new
(21)  question cured the last vague and ambiguous part.  Lacking
(22)  foundation.  Out there with an incomplete hypothetical.
(23)       THE WITNESS:  And the question was?
(24)       MS. SHERWIN:  Please read the question back.
(25)       (Record read.)

---

**160**

(1)        MS. HUDGINS:  Same objections.
(2)        MS. STRINGER:  Join.
(3)        THE WITNESS:  Again, this is a very general
(4)   statement.  It does not apply in every and in each case.
(5)        That's my answer.
(6)        MS. SHERWIN:  Q.  Okay.  Do you have any basis to
(7)   disagree with the statement in this exhibit that the
(8)   registered nurse carries legal responsibility for
(9)   analysis, synthesis and evaluation of patient data?
(10)       MS. HUDGINS:  Calls for a legal conclusion.
(11)  Incomplete hypothetical.  Vague and ambiguous.
(12)       THE WITNESS:  And you're referencing the Nursing
(13)  Practice Alert clarifies the legal scopes.  So this is a
(14)  legal document, not a medical one.
(15)       MS. SHERWIN:  Q.  Okay.  Well, the law governs what
(16)  nurses and licensed vocational nurses are allowed to do
(17)  medically, right?  You understand that.
(18)       MS. HUDGINS:  I'll object.  It's argumentative.  I
(19)  wish your tone would just be a little more civil.
(20)       MS. SHERWIN:  My tone is fine.  The doctor told me
(21)  he can't hear out of one ear and I'm talking loudly so he
(22)  can hear me.  So I'm sorry that you object to my tone but
(23)  it's so that the doctor can hear my questions.
(24)       MS. HUDGINS:  I'm not at all objecting to the
(25)  decibel level; I'm objecting to the drenched in sarcasm

---

DEPOSITION OF ROBERT D. JONES, M.D.

161

(1)     level.
(2)         MS. SHERWIN:  Well, if that's your interpretation,
(3)     that's unfortunate.
(4)         MS. HUDGINS:  Because if this is just your regular
(5)     tone, then it is unfortunate.
(6)         THE WITNESS:  Again it specifically states that the
(7)     RN is legally responsible.  But LPN's, in fact,
(8)     participate in that process; they provide observations,
(9)     they provide data that is relied upon by their RN's.
(10)        MS. SHERWIN:  Q.  Okay.  So when the California
(11)    Nurses Association and the National Nurses Organizing
(12)    Committee advise their members that according to the
(13)    California Board of Vocational Nursing and Psychiatric
(14)    Technicians, the LVN cannot analyze, synthesize and
(15)    evaluate data, do you disagree?
(16)        MS. HUDGINS:  So again, I'm going to object.  It
(17)    lacks foundation.  You're asking whether a trade
(18)    association or union in interpreting a law is interpreting
(19)    it correctly to its employees.  So I think -- or its
(20)    members.
(21)        So it lacks foundation.  It's vague and ambiguous.
(22)        MS. STRINGER:  Join.
(23)        THE WITNESS:  And as I said, you know, if it's a
(24)    nursing assessment, the RN usually does that.  If it's an
(25)    LVN, they actually participate in a wide spectrum of care

162

(1)     with individuals.
(2)         MS. SHERWIN:  Q.  Do you have any understanding
(3)     that in California, the RN's legal responsibility for
(4)     interpreting and synthesizing data cannot be delegated or
(5)     assigned to an LVN?
(6)         MS. HUDGINS:  Objection.  Vague and ambiguous.
(7)     Incomplete hypothetical.  Lacks foundation.
(8)         THE WITNESS:  And I think you're asking me for a
(9)     legal interpretation and I'm not qualified to render a --
(10)        MS. HUDGINS:  Calls for a legal opinion.
(11)        MS. SHERWIN:  Q.  Well, okay.  But you did render
(12)    an opinion that Zelda Sancho was qualified to do the
(13)    intake assessment on Martin Harrison, so I'm just
(14)    exploring your basis for your opinion that she was
(15)    qualified, Doctor; that's all.
(16)        Do you have any understanding that a registered
(17)    nurse's legal responsibility in California for
(18)    interpreting and synthesizing data cannot be delegated or
(19)    assigned to an LVN?
(20)        MS. HUDGINS:  Same question.  Same objections.
(21)        MS. STRINGER:  Misstates his report.
(22)        MS. HUDGINS:  Join.
(23)        THE WITNESS:  You do not -- neither standard, the
(24)    ACA, nor the NCCHC, requires an LVN or an RN to conduct a
(25)    receiving screening.  It allows us to utilize officers who

163

(1)     have been trained to conduct a health screening, and the
(2)     statement that she was qualified is because she was an LVN
(3)     and she had been trained and she was licensed in the State
(4)     of California.
(5)         MS. SHERWIN:  Okay.
(6)         THE WITNESS:  And what she was doing constitutes
(7)     something that, according to national standards, was
(8)     within the scope of what she was permitted to do.
(9)         MS. SHERWIN:  Q.  And do you know as you sit here
(10)    today whether or not what she was doing was outside her
(11)    legal scope of practice as an LVN in California?
(12)        MS. HUDGINS:  Objection.  Calls for a legal
(13)    conclusion.  Incomplete hypothetical.  Vague and
(14)    ambiguous.
(15)        THE WITNESS:  And I won't rule on it.  I can tell
(16)    you that in almost every jail in this state that there are
(17)    probably LVN's or specially-trained officers who conduct
(18)    health care screenings.  I've been in those jails.
(19)        MS. SHERWIN:  Q.  Okay.  What jails in California
(20)    have you been in and observed LVN's conducting patient
(21)    assessments?
(22)        A.  That's a different question.  I said receiving
(23)    screenings.
(24)        Q.  Okay.  So is it your understanding that the
(25)    intake medical screening that was performed on

164

(1)     Martin Harrison was not a patient assessment?
(2)         A.  Is not a nursing assessment; it's a receiving
(3)     screening.
(4)         Q.  The LVN, in Mr. Harrison's case, made a
(5)     decision about whether or not his signs and symptoms
(6)     displayed were abnormal, didn't she.
(7)         MS. HUDGINS:  I'll -- well, first of all, that
(8)     lacks foundation.  And I don't think -- it
(9)     mischaracterizes -- I don't think there's any testimony to
(10)    that effect so it lacks foundation.
(11)        MS. STRINGER:  Join.
(12)        MS. HUDGINS:  And it mischaracterizes the evidence.
(13)        MR. ANDRADA:  Join.
(14)        MS. SHERWIN:  Go ahead.
(15)        THE WITNESS:  The question again?
(16)        (Record read.)
(17)        THE WITNESS:  She has a specific group of
(18)    questions; she asked Mr. Harrison those specific
(19)    questions; he answered yes and no; and if there were
(20)    additional information as outlined in that form, she
(21)    collected that data.
(22)        MS. SHERWIN:  Q.  Okay.  And she also interpreted
(23)    that data, didn't she.
(24)        MR. ANDRADA:  Objection.  Vague and ambiguous.
(25)        MS. STRINGER:  Yes.  Join.

DEPOSITION OF ROBERT D. JONES, M.D.

---

**165**

(1)         THE WITNESS:  I'm not sure what you mean by
(2)  "interpreted".
(3)         MS. SHERWIN:  Q.  Well, Ms. Sancho was allowed to
(4)  make the determination of whether the signs, symptoms,
(5)  behavior or general appearance of Martin Harrison
(6)  exhibited abnormal characteristics.  Right?
(7)         MS. HUDGINS:  Objection.  Argumentative.
(8)  Mischaracterizes the testimony.
(9)         MR. ANDRADA:  Vague and ambiguous.
(10)        MS. HUDGINS:  Vague and ambiguous.
(11)        THE WITNESS:  The purpose of a receiving screening
(12)  is to provide triage; it's not a nursing assessment.  It's
(13)  simply to prioritize an individual's need based on what
(14)  they present in the facility.
(15)        MS. SHERWIN:  Q.  Well, what -- I'm sorry.  Go
(16)  ahead.
(17)        A.  And as such, there's usually just a category of
(18)  whether they have ongoing care, whether they're going to
(19)  need something before the actual health assessment which
(20)  usually occurs at 14 days.
(21)        Q.  Okay.  So the purpose of doing an intake
(22)  medical screening on an inmate is to know whether or not
(23)  he has any medical conditions that might require medical
(24)  care before he receives his full physical assessment
(25)  14 days after he's brought into the jail.  Right?

---

**166**

(1)         A.  No.  Not right.  The purpose of the receiving
(2)  screening is just that, a -- simply it's not to collect
(3)  any analysis to determine those who will need to be seen
(4)  in the priority by which they will be seen.
(5)         Q.  Okay.  And one of the purposes of the receiving
(6)  screening is to determine whether or not the inmate has
(7)  any dependency on alcohol or other chemicals.  Right?
(8)         A.  Yes, that's part of the receiving screening.
(9)         Q.  Because if the inmate is dependent on alcohol,
(10)  and does not get put on alcohol withdrawal protocols, he
(11)  may go into life-threatening alcohol withdrawal before he
(12)  has an opportunity to receive the 14-day health appraisal.
(13)  Right?
(14)        MS. HUDGINS:  Question is he may go into --
(15)        MS. SHERWIN:  That's right.
(16)        MS. HUDGINS:  -- alcohol withdrawal?
(17)        THE WITNESS:  Yes, he may.
(18)        MS. SHERWIN:  Q.  And one of the purposes of doing
(19)  that, a receiving medical screening, is to find out
(20)  whether or not the patient has a dependency to alcohol so
(21)  that he can be put on withdrawal protocols and not go into
(22)  life-threatening severe alcohol withdrawal before he's
(23)  seen by a doctor.  Right?
(24)        MS. HUDGINS:  Well, that is argumentative.  And it
(25)  mischaracterizes the evidence and prior testimony.

---

**167**

(1)         MS. STRINGER:  Join.
(2)         THE WITNESS:  The actual referral to the CIWA would
(3)  only result in an evaluation at each shift with vital
(4)  signs and again specific questions and observations.
(5)         MS. SHERWIN:  Q.  And if Mr. Harrison were put on
(6)  CIWA he also would have received the next available
(7)  medical appointment.  Right?
(8)         MR. ANDRADA:  Objection.  Calls for speculation.
(9)  No foundation.
(10)        MS. STRINGER:  Join.
(11)        MR. ANDRADA:  Vague and ambiguous.
(12)        MS. HUDGINS:  Join.
(13)        THE WITNESS:  I do not know or have personal
(14)  knowledge as to when he would be seen.  He would be seen
(15)  whenever they felt that it was clinically indicated.
(16)        MS. SHERWIN:  Q.  Okay.  Did you see in Dr. Orr's
(17)  deposition that a patient on CIWA gets the next available
(18)  medical appointment?
(19)        A.  Yes, but there would be more than one person I
(20)  would imagine on CIWA at any given time so I'm not sure
(21)  how you would determine who got the first one.
(22)        Q.  The practice of registered nursing in
(23)  California is to observe signs and symptoms of illness,
(24)  general behavior, and general physical condition.  Right?
(25)        MS. HUDGINS:  Well, I'll object.  Vague and

---

**168**

(1)  ambiguous.  Incomplete hypothetical.  Lacks foundation.
(2)         MS. STRINGER:  Join.
(3)         THE WITNESS:  And you're reading from what?
(4)         MS. SHERWIN:  Q.  I'm reading from the California
(5)  Business and Profession Code Section 2725.
(6)         A.  That is what nurses do, yes.
(7)         Q.  And the practice of nursing in California also
(8)  includes the determination of whether the signs, symptoms,
(9)  reactions, behavior or general appearance of the patient
(10)  exhibit abnormal characteristics.  Right?
(11)        A.  Is this in regards to CIWA?
(12)        Q.  No, this is in regard to the practice of
(13)  nursing in California.  The scope of practice for a
(14)  registered nurse in California is to determine whether the
(15)  signs, symptoms, reactions, behavior or general appearance
(16)  of a patient exhibit abnormal characteristics.  Right?
(17)        MS. HUDGINS:  Same objections.  Vague and
(18)  ambiguous.  Incomplete hypothetical.  Lacks foundation.
(19)        THE WITNESS:  And --
(20)        MS. STRINGER:  Join.
(21)        THE WITNESS:  I assume you're reading that
(22)  correctly.
(23)        MS. SHERWIN:  Q.  And the practice of nursing in
(24)  California, registered nursing in California, includes
(25)  implementation based on observed abnormalities of

---

DEPOSITION OF ROBERT D. JONES, M.D.

---

169

(1)     appropriate reporting or referral or standardized
(2)     procedures or changes in treatment regimen in accordance
(3)     with standardized procedures or the initiation of
(4)     emergency procedures.  Right?
(5)         MS. HUDGINS:  Compound.
(6)         MS. STRINGER:  Compound.
(7)         MS. HUDGINS:  Lacks foundation.  Vague and
(8)     ambiguous.  Incomplete hypothetical.
(9)         THE WITNESS:  Again you're reading from a document.
(10)    I assume you're reading it correctly.
(11)        MS. SHERWIN:  Q.  And that's consistent with your
(12)    understanding of the practice of registered nursing.
(13)    Right?
(14)        MS. HUDGINS:  Same objections.  Compound, etcetera.
(15)        THE WITNESS:  In regards to which practice setting
(16)    and -- there's a lot of things that you'd need to clarify
(17)    for that one for me before I would say one way or the
(18)    other.
(19)        MS. SHERWIN:  Q.  Is it your understanding that the
(20)    scope of practice for a registered nurse changes if the
(21)    registered nurse is operating in a different setting?
(22)        MS. HUDGINS:  That's a different question.  It's
(23)    argumentative.
(24)        THE WITNESS:  It lacks foundation.  It's an
(25)    incomplete hypothetical.

---

170

(1)         THE WITNESS:  And I'm having difficulty answering
(2)     it because I don't have enough information to do that.
(3)         Nurses can do things by themselves under certain
(4)     scope of practice.  They can also do a lot more things
(5)     when I directly inform them and supervise them.
(6)         MS. SHERWIN:  Q.  Right.  And a registered nurse's
(7)     scope of practice does not change if the registered nurse
(8)     is working in a hospital as opposed to a jail, does it.
(9)     The legal scope of practice.
(10)        A.  They're two different clinical situations.
(11)        MS. HUDGINS:  Yes, I'll object as incomplete
(12)    hypothetical.  Vague and ambiguous.
(13)        MS. SHERWIN:  Q.  But the legal scope of practice
(14)    for a registered nurse does not change if the nurse is
(15)    working in a hospital as opposed to a jail.  Is that
(16)    right, Doctor?
(17)        MS. HUDGINS:  Well, same objection.  Because it's
(18)    the same question.
(19)        MS. STRINGER:  Join.
(20)        MS. HUDGINS:  Asked and answered.
(21)        THE WITNESS:  And you're asking me a legal question
(22)    and the answer is the practice settings are totally
(23)    different.
(24)        MS. SHERWIN:  Q.  Okay.  Did the limits on
(25)    Zelda Sancho's scope of practice as an LVN change because

---

171

(1)     she worked in a jail as opposed to a hospital?
(2)         A.  The legal scope of practice?
(3)         MS. HUDGINS:  I'll --
(4)         MS. STRINGER:  Vague and ambiguous.
(5)         MS. HUDGINS:  Yes, I'll object.  Vague and
(6)     ambiguous.  Incomplete hypothetical.  Lacks foundation.
(7)         THE WITNESS:  And --
(8)         MS. SHERWIN:  Q.  According to your understanding,
(9)     Doctor, did the limits on Zelda Sancho's -- were there
(10)    less limits on Zelda Sancho's scope of practice as an LVN
(11)    because she worked in a jail as opposed to a hospital?
(12)        MS. HUDGINS:  Same objections.
(13)        THE WITNESS:  Again, I need more information to say
(14)    yes or no, but the receiving screening is well within her
(15)    qualifications.
(16)        MS. SHERWIN:  Q.  And it's your understanding that
(17)    the Intake Medical Assessment is not a patient assessment.
(18)    Is that what you're saying?
(19)        MS. STRINGER:  Misstates the form, misstates the
(20)    testimony.  He's been talking about the screening.
(21)        MS. HUDGINS:  Yes.  It's argumentative as phrased.
(22)    It does mischaracterize the testimony.  Mischaracterizes
(23)    the evidence.
(24)        MS. SHERWIN:  Q.  Go ahead.
(25)        MS. HUDGINS:  Vague and ambiguous.

---

172

(1)         THE WITNESS:  The initial screen as I've mentioned
(2)     is for the purpose of triage and prioritization.
(3)         MS. SHERWIN:  Q.  And the initial screening is also
(4)     for the purpose of determining when, if at all, the inmate
(5)     will be followed up medically.  Right?
(6)         MS. HUDGINS:  Incomplete hypothetical.  Vague and
(7)     ambiguous.
(8)         THE WITNESS:  Can you read the question again
(9)     because of the sirens?
(10)        (Record read.)
(11)        THE WITNESS:  No, that's not correct.
(12)        MS. SHERWIN:  Q.  Zelda Sancho was allowed to
(13)    determine that Martin Harrison would receive no medical
(14)    follow-up and be placed in the general population.  Right?
(15)        MS. STRINGER:  Argumentative.
(16)        MS. HUDGINS:  I'll object to that as being
(17)    argumentative and it mischaracterizes the evidence and it
(18)    lacks foundation.
(19)        MR. ANDRADA:  Assumes facts not in evidence as
(20)    well, so join in the objections.
(21)        THE WITNESS:  And the question was again?
(22)        MS. SHERWIN:  Please read the question.
(23)        (Record read.)
(24)        MS. HUDGINS:  Also compound.  Join the other
(25)    objections.  Same objections.

---

DEPOSITION OF ROBERT D. JONES, M.D.

---

### 173

(1)     THE WITNESS:  No, that's not correct.
(2)     MS. SHERWIN:  Q.  You understood that Zelda Sancho
(3) was the person who decided that Martin Harrison would be
(4) placed in the general population and assigned a care level
(5) of III.  Right?
(6)     MS. HUDGINS:  Objection.  Vague and ambiguous.
(7) Compound.
(8)     THE WITNESS:  Based on the information that
(9) Mr. Harrison provided, and with her initial impression,
(10) she struck through the CIWA based on whatever dialogue
(11) continued.  She assigned him a Level III priority.
(12)     MS. SHERWIN:  Q.  Right.  And when she assigned him
(13) a Level III priority that meant that he would receive no
(14) medical follow-up unless he had some other medical
(15) problems that arose during the course of his jail time.
(16) Right?
(17)     A.  No --
(18)     MS. HUDGINS:  No, that's -- that mischaracterizes
(19) the evidence.  Go ahead.
(20)     THE WITNESS:  No, that's not correct.  Because part
(21) of the attestation that Mr. Harrison cited which is on
(22) that form is that he understands how to access the care if
(23) he has additional problems.
(24)     MS. SHERWIN:  Q.  Right.  But if Miss Sancho had
(25) put him on CIWA he would have been a Level I.  Right?  You

### 174

(1) understood that from the documents you reviewed.  Right?
(2)     A.  Uh, yes.
(3)     Q.  And a Level I meant he would receive a nursing
(4) assessment every eight hours and he would get the next
(5) medical visit available.  Right?
(6)     THE WITNESS:  Can you read the question, please?
(7) (Record read.)
(8)     THE WITNESS:  He would get the next medical visit
(9) according to Dr. Orr's testimony.
(10) He is observed every shift.  I'm not sure that it
(11) constitutes a nursing assessment.
(12)     MS. SHERWIN:  Q.  Well, every shift the nurse would
(13) be required to fill out the CIWA form during which she
(14) wrote not only the patient's symptoms but also her
(15) observations of the patient.  Right?
(16)     A.  She has specific things she is looking for and
(17) questions to ask.
(18)     Q.  Right.  And it was Nurse Sancho who made the
(19) determination that Mr. Harrison would not receive nursing
(20) assessments every eight hours and the next medical visit.
(21) Right?
(22)     MS. STRINGER:  Vague and ambiguous as to time.
(23)     THE WITNESS:  She considered CIWA; she then struck
(24) it through and that was based on the dialogue that both
(25) Mr. Harrison and Miss Sancho had.

### 175

(1)     MS. SHERWIN:  Q.  And she was allowed to make her
(2) own independent assessment of whether or not
(3) Martin Harrison needed medical follow-up.  Right?
(4)     MS. STRINGER:  Argumentative.
(5)     MS. HUDGINS:  Yes.  Objection.  Argumentative.
(6) Lacks foundation.  Mischaracterizes the testimony.
(7) Mischaracterizes the evidence.
(8)     THE WITNESS:  No, she did not make an independent
(9) assessment.
(10)     MS. SHERWIN:  Q.  Who supervised her assessment of
(11) Mr. Harrison?
(12)     MS. HUDGINS:  Well, that's the problem.  You're
(13) using the word "assessment".  That word mischaracterizes
(14) the evidence and it's argumentative.
(15)     MS. STRINGER:  Join.
(16)     THE WITNESS:  A nursing assessment usually goes
(17) something like this:  Alteration in comfort.  Alteration
(18) in pain.  You know.  It's not a diagnosis.  And that was
(19) not the process that was going on here.
(20) She was screening him based on a specific set of
(21) questions which she had been trained to ask, and receive
(22) answers for, and based on those, then categorized the
(23) individual to a priority, a triage priority.
(24) It was not an assessment; it is simply a priority
(25) of care.

### 176

(1) At any point in time that Mr. Harrison wanted or
(2) needed or felt that he required, he also attested that
(3) what he said was true, and that he knew how to obtain that
(4) care.
(5)     MS. SHERWIN:  Q.  Okay.  And no registered nurse
(6) supervised Zelda Sancho's intake screening on
(7) Mr. Harrison.  Isn't that right?
(8)     MR. ANDRADA:  Objection.  Vague and ambiguous as to
(9) "supervise".
(10)     MS. HUDGINS:  Join.
(11)     MS. STRINGER:  Join.
(12)     THE WITNESS:  And I would have to ask you what you
(13) mean by "supervise" because there are RN's available to
(14) Nurse Sancho.
(15)     MS. SHERWIN:  Q.  What RN's were available to
(16) Nurse Sancho?
(17)     A.  Based on the dialogue, there were nurses, RN's
(18) on each shift.
(19)     Q.  And no RN actually reviewed Nurse Sancho's
(20) intake screening form.  Isn't that right?
(21)     A.  I don't recall that anyone did, but that would
(22) not be the customary practice.  Nor is that how it's done
(23) with the receiving screening.
(24)     Q.  And you understood from Lenore Gilbert's
(25) testimony that Corizon allows LVN's to work independently

---

DEPOSITION OF ROBERT D. JONES, M.D.

---

**177**

(1)   with the RN charge nurse being a half mile away on the
(2)   other side of, for example, Santa Rita Jail. Right?
(3)         MS. HUDGINS: So I'll object that that
(4)   mischaracterizes Miss Gilbert's testimony and it's
(5)   argumentative.
(6)         MS. STRINGER: Join.
(7)         THE WITNESS: And that was not my conclusion.
(8)         MS. SHERWIN: Q. Okay. You read Lenore Gilbert's
(9)   deposition as the Person Most Knowledgeable about
(10)  Corizon's contract with the county. Right?
(11)        A. Yes, I did.
(12)        Q. And you saw that Ms. Gilbert said that RN
(13)  supervision could include the RN charge nurse being on the
(14)  other side of Santa Rita Jail a half mile away from the
(15)  LVN and never see the LVN the entire shift.
(16)        Do you recall that?
(17)        MS. HUDGINS: Same objections.
(18)        THE WITNESS: That is certainly a possibility.
(19)        MS. SHERWIN: Q. And when you read in the contract
(20)  that receiving screening would be done by registered
(21)  nurses, or by LVN's under registered nurse supervision,
(22)  what did you understand that to mean?
(23)        A. That the -- that the initial screening could be
(24)  conducted by an LVN and that if she had questions she
(25)  could then ask them of the RN.

---

**178**

(1)         Q. So if the LVN is incompetent and doesn't ask
(2)   any questions, then the RN won't get involved. Right?
(3)         MS. HUDGINS: Well, I'll object. It's an
(4)   incomplete hypothetical. Vague and ambiguous. But go
(5)   ahead.
(6)         MS. STRINGER: Argumentative.
(7)         MS. HUDGINS: Argumentative.
(8)         THE WITNESS: As phrased I can't answer that
(9)   question.
(10)        MS. SHERWIN: Q. Okay. If an LVN were incompetent
(11)  and did not ask an RN any questions, under your
(12)  interpretation of RN supervision, the RN would not get
(13)  involved in screening that particular patient. Right?
(14)        MS. STRINGER: Same objections.
(15)        MS. HUDGINS: Same objections.
(16)        THE WITNESS: No, that's not correct.
(17)        MS. SHERWIN: Q. Is it your understanding that an
(18)  RN was required to be involved in every intake medical
(19)  screening?
(20)        A. No.
(21)        Q. Okay. So --
(22)        MS. HUDGINS: I'll interpose an objection that it's
(23)  vague and ambiguous and incomplete hypothetical. But go
(24)  ahead.
(25)        MS. SHERWIN: Q. So if an LVN were incompetent and

---

**179**

(1)   never asked the RN any questions, how is it that the RN
(2)   would necessarily be involved in screening a particular
(3)   patient?
(4)         MS. HUDGINS: Same objections. And it lacks
(5)   foundation.
(6)         It's argumentative, also.
(7)         MS. STRINGER: It also assumes facts.
(8)         MS. HUDGINS: That's what I meant to say. Assumes
(9)   facts not in evidence that an RN would be involved in
(10)  every screening.
(11)        MS. STRINGER: And that only an incompetent nurse
(12)  would not ask questions.
(13)        MS. SHERWIN: Go ahead, Doctor.
(14)        THE WITNESS: I'm having difficulty answering it
(15)  because of the fact of the way the question is asked. I
(16)  need more questions.
(17)        I mean there are certainly nurses who are competent
(18)  who don't ask questions. And you don't have to be
(19)  incompetent not to ask questions.
(20)        MS. SHERWIN: Q. Right. But I'm asking about an
(21)  incompetent nurse. If an incompetent nurse doesn't know
(22)  what she's doing and she doesn't ask any questions, how
(23)  does the RN get involved? That's my question to you.
(24)        Because you said I'm wrong when I asked you if an
(25)  LVN is incompetent and doesn't ask the RN any questions,

---

**180**

(1)   the RN won't get involved in that patient's assessment.
(2)         So I want you to explain to me how am I wrong?
(3)   Where does the RN get involved if there's an RN who is
(4)   incompetent and doesn't ask the RN any questions?
(5)         MS. HUDGINS: I'll just object it's argumentative.
(6)   He doesn't have to explain to you why you're wrong, and I
(7)   don't think he said you were wrong; he just said he
(8)   disagreed with your conclusion.
(9)         So it's vague and ambiguous. Incomplete
(10)  hypothetical.
(11)        Lacks foundation. Assumes facts not in evidence.
(12)        THE WITNESS: What is the actual question at this
(13)  point?
(14)        MS. SHERWIN: Q. If an LVN were incompetent, and
(15)  did not ask the RN any questions, why do you say the RN
(16)  would still get involved in the patient's assessment?
(17)        MS. HUDGINS: I think that mischaracterizes his
(18)  testimony. I don't think he said that.
(19)        MS. SHERWIN: Q. Okay, Doctor. Maybe I
(20)  misunderstood you. Let's ask the original question first
(21)  again.
(22)        If an LVN is incompetent and does not ask a
(23)  registered nurse any questions, is it fair to say that the
(24)  registered nurse would not get involved in that particular
(25)  patient's assessment?

---

DEPOSITION OF ROBERT D. JONES, M.D.

---

**181**

(1)      A. She may or may not.

(2)      Q. Okay.  The registered nurse would also get

(3)  involved under what circumstances?

(4)      A. If the inmate requested additional screening or

(5)  questions; if they put in a sick call request; if there

(6)  was a change; if there was quality assurance review at

(7)  some point.

(8)      Q. Okay.

(9)      A. Those are some examples.

(10)      Q. So under your definition of RN supervision of

(11)  an LVN doing an intake screening, if an LVN is incompetent

(12)  and fails to ask the RN any questions, the RN may not get

(13)  involved in that patient's assessment.  Right?

(14)      MS. STRINGER:  It's compound, also.

(15)      MS. HUDGINS:  And I join.  And it's vague as to

(16)  time.  Do you mean as of the initial screening?  Is that

(17)  what you're asking him?

(18)      MS. SHERWIN:  That's right.

(19)      MS. HUDGINS:  So the question is if you have an

(20)  incompetent LVN, she does a screening, she doesn't

(21)  think -- because she's incompetent, I presume -- to ask

(22)  the RN any questions, would the RN get involved in that

(23)  screening?  Is that your question?

(24)      THE WITNESS:  She may or may not.

(25)      MS. SHERWIN:  Q.  Okay.  So the RN may never be

---

**182**

(1)  involved in the patient's intake screening.  Right?

(2)      A. That's a possibility.

(3)      Q. And no RN was involved in Martin Harrison's

(4)  intake screening.  Right?

(5)      A. During the screening process?  No.

(6)      Q. Is that correct?  No RN was involved in

(7)  Martin Harrison's intake screening.  Is that correct?

(8)      MS. HUDGINS:  Calls for speculation.

(9)      THE WITNESS:  Um, and to my knowledge, I don't know

(10)  that there was.  I don't know what was going on in the

(11)  facility that day or whether there was any discussion.

(12)      MS. SHERWIN:  Q.  Okay.  You saw no evidence that

(13)  any RN was involved in Martin Harrison's intake screening.

(14)  Is that correct?

(15)      A. I did not see any notation.

(16)      Q. And Ms. Sancho didn't testify that any RN was

(17)  involved in Martin Harrison's intake screening.  Is that

(18)  correct?

(19)      A. As I recall, no, she did not.

(20)      Q. Okay.  I want to ask you one more question

(21)  about your testimony in the Lucero case.

(22)      You testified that you left Utah and moved to

(23)  Montana and stated, quote:  "I don't feel I can be of any

(24)  value to the Department of Corrections because my

(25)  credibility with the legislature has been destroyed by the

---

**183**

(1)  media."  End quote.

(2)      What did you mean by that?

(3)      MS. HUDGINS:  Well, I'll object that it's not

(4)  likely to lead to the discovery of admissible evidence.

(5)      MR. ANDRADA:  Join.

(6)      MS. STRINGER:  Join.

(7)      MS. HUDGINS:  It's irrelevant.

(8)      THE WITNESS:  Basically my reasons for leaving is I

(9)  was asked by the court monitor in Utah if I would go to

(10)  Montana.  The accusations that had been made I felt had

(11)  affected my credibility with the legislature.

(12)      I was asked early in my career a number of

(13)  questions by one of the budget committees, and after

(14)  answering that, I found that I received support from the

(15)  legislature in funding initiatives.

(16)      And that was the reference that I was giving, is

(17)  that the statements and comments that had been made

(18)  affected that credibility.

(19)      MS. SHERWIN:  Q.  Okay.  And when you say the

(20)  accusations made in general, what were the accusations

(21)  that were made?

(22)      A. That I would --

(23)      MS. HUDGINS:  Same objections.

(24)      THE WITNESS:  That I'd been paid for work that I

(25)  hadn't done.

---

**184**

(1)      As long as you're looking I'm going to take a

(2)  break.

(3)      MS. HUDGINS:  I was going to take a break, too.

(4)  You beat me to it.

(5)      (Recess.)

(6)      (Plaintiff's Exhibit 7 was marked for

(7)  identification.)

(8)      MS. SHERWIN:  Q.  Now you opine in your report that

(9)  Nurse Sancho did not follow policy number J-G-06.  Right?

(10)      A. Yes.

(11)      Q. I'm going to hand you what's been marked as

(12)  Exhibit 7 to your deposition which is the policy J-G-06.

(13)  That's the policy that Nurse Sancho violated.  Right?

(14)      A. Yes, that is correct.

(15)      Q. And how did she violate that policy?

(16)      A. Under the Procedure part of the policy, item

(17)  number 1, she failed to record the amount -- actually the

(18)  policy just says the amount.  The frequency and duration

(19)  of last use will be determined.

(20)      Q. She also did not record the duration of

(21)  Mr. Harrison's alcohol consumption, did she.

(22)      A. No, she did not.

(23)      Q. And she also did not record the type of his

(24)  alcohol consumption.  Right?

(25)      A. No, she did not.

---

DEPOSITION OF ROBERT D. JONES, M.D.

185

(1)     Q. And you also found that Miss Sancho did not
(2) comply with the policy regarding the timing of follow-up
(3) for Mr. Harrison.  Right?
(4)     A. Which are you referring to?
(5)     Q. On page 5 of your report, you state, quote:
(6)     "Nurse Sancho inadequately documented her
(7) observations regarding Mr. Harrison and did not comply
(8) with PHS/Corizon policy regarding the timing of
(9) follow-up."  Unquote.
(10)     What did you mean by that?
(11)     A. Uh, as far as the follow-up?
(12)     Q. The timing of follow-up.
(13)     A. Let me just...
(14)     Uh, basically the follow-up of his condition had
(15) she elected to continue with the CIWA.
(16)     Q. And how did she violate PHS/Corizon policy
(17) regarding the timing of follow-up?
(18)     A. By the fact that he was not referred for a CIWA
(19) based on her error of judgment.
(20)     Q. Okay.  So she made an error of judgment in --
(21) strike that.
(22)     She should have put him on CIWA protocols.  Right?
(23)     A. It would have been reasonable to do, but she
(24) determined from speaking with Mr. Harrison that that was
(25) not indicated.

186

(1)     Q. And that was an error of judgment on her part.
(2)     A. Um, based on what was stated to her by
(3) Mr. Harrison, yes.
(4)     Q. And so her violation of PHS policy regarding
(5) the timing of follow up was her failure to put
(6) Mr. Harrison on CIWA protocols.  Right?
(7)     A. That was an error in judgment, yes.
(8)     Q. And it was a violation of PHS/Corizon policy.
(9) Right?
(10)     A. Because she had violated the one, she violated
(11) the other.
(12)     Q. Now, on this policy, which is Exhibit 7 to your
(13) deposition, tracks the NCCHC essential standard J-G-06 on
(14) Intoxication and Withdrawal, right?
(15)     A. The numbers are referenced.  PHS policy
(16) correspond to the standards of the NCCHC.
(17)     Q. Okay.  And according to this policy, if a
(18) patient is at risk for alcohol withdrawal symptoms, he
(19) should be observed by a licensed nurse within 24 hours of
(20) admission.  Right?
(21)     A. Uh, yes.  Under 4 (a).
(22)     Are you reading a policy or are you reading the
(23) national standard?
(24)     Q. I'm reading the policy.
(25)     A. Yes, under 4 (a).

187

(1)     Q. And also a physician or physician extender
(2) treatment plan should be established as soon as the
(3) potential for withdrawal is assessed according to policy
(4) J-G-06.  Right?
(5)     MS. HUDGINS: I'll object.  It mischaracterizes the
(6) evidence.
(7)     THE WITNESS:  The CIWA tool, basically if they
(8) score a certain number, will require that they refer them
(9) on to providers.
(10)     MS. SHERWIN: Q.  Okay.  But under policy J-G-06 on
(11) page 2, item 6, the policy provides that, quote: "A
(12) physician/physician extender treatment plan should be
(13) established as soon as the potential for withdrawal is
(14) assessed." End quote.
(15)     Right?
(16)     A. That's what the policy states.
(17)     Q. And NCCHC essential standard J-G-06 also
(18) provides that individuals at risk for progression to more
(19) severe levels of withdrawal are kept under constant
(20) observation by qualified health care professionals or
(21) health trained correctional staff.  Right?
(22)     MS. HUDGINS:  Objection.  Vague and ambiguous.
(23) Incomplete hypothetical.  Lacks foundation.
(24)     MS. STRINGER:  Join.
(25)     THE WITNESS:  What are you reading from, the

188

(1) document?
(2)     MS. SHERWIN:  I'm reading from the NCCHC standards,
(3) J-G-06, item number 5.
(4)     THE WITNESS:  I will trust that you've read it
(5) correctly.
(6)     MS. SHERWIN: Q.  And the NCCHC standard also
(7) provides, on page 105, that:  As a precaution, severe
(8) withdrawal syndromes must never be managed outside of a
(9) hospital.
(10)     Right?
(11)     MS. HUDGINS: I'll object.  Vague and ambiguous.
(12) Incomplete hypothetical.  Lacks foundation.  There's no
(13) definition of "severe withdrawal symptoms".  "Syndromes".
(14) Whichever it is.
(15)     THE WITNESS:  And while the statement is made by
(16) the standard, it depends on the clinical capacity and the
(17) level of care that can be provided on site.
(18)     MS. SHERWIN: Q.  Okay.  But NCCHC standard J-G-06,
(19) which is an essential standard, provides, quote, on
(20) page 105, quote: "As a precaution, severe withdrawal
(21) syndromes must never be managed outside of a hospital."
(22) End quote.
(23)     MS. HUDGINS:  Same objections.  Same question.
(24)     MS. STRINGER:  Argumentative.
(25)     MS. HUDGINS:  Join.

DEPOSITION OF ROBERT D. JONES, M.D.

---

**189**

(1)        THE WITNESS:  And again, it depends on the clinical
(2) abilities of the staff and how -- what they consider
(3) severe.
(4)        MS. SHERWIN:  Q.  So you disagree with that portion
(5) of the essential NCCHC standard J-G-06.  Is that what
(6) you're saying?
(7)        MS. HUDGINS:  Same objections.
(8)        THE WITNESS:  I didn't disagree; I qualified it.
(9)        MS. SHERWIN:  Q.  You disagree that as a
(10) precaution, severe withdrawal symptoms must never be
(11) managed outside of a hospital.  Is that what you're
(12) saying?
(13)        MS. HUDGINS:  Same objections.  Argumentative.
(14)        THE WITNESS:  I have answered your question.  I
(15) have clarified.  It depends on how you define "severe" and
(16) it also depends on the clinical ability of the facility,
(17) of the jail or the prison.
(18)        MS. SHERWIN:  Q.  Mr. Harrison was not kept under
(19) constant observation by qualified health care
(20) professionals, was he?
(21)        MS. HUDGINS:  Objection.  Lacks foundation.  It's
(22) argumentative.  There's no evidence that he was supposed
(23) to be.
(24)        MS. STRINGER:  And it calls for speculation.
(25)        MR. ANDRADA:  Join.

---

**190**

(1)        THE WITNESS:  There was never continuous
(2) observation ordered.
(3)        MS. SHERWIN:  Q.  Essential standard J-G-06 also
(4) provides that training for correctional officers including
(5) recognizing the signs and symptoms of intoxication and
(6) withdrawal.  Right?
(7)        A.  Uh, yes, I believe it does.
(8)        MS. SHERWIN:  Can you mark this as the next in
(9) line?
(10)        (Plaintiff's Exhibit 8 was marked for
(11) identification.)
(12)        MS. SHERWIN:  Q.  I'm going to hand you the PHS
(13) Correctional Health Care Nurse Assessment Protocol
(14) Standardized Procedures.
(15)        Was this a document that you were given to review
(16) in this case?
(17)        A.  Yes.
(18)        Q.  And on page 2, the standardized procedures
(19) provide for a nurse assessment of subjective matters.
(20)        Do you see in that box there on the left?
(21)        A.  Yes.
(22)        Q.  And those subjective matters include:  How many
(23) years have you been drinking?  Right?
(24)        A.  Yes, it does.
(25)        Q.  Nurse Sancho never asked Mr. Harrison how many

---

**191**

(1) years he had been drinking, did she?
(2)        MS. HUDGINS:  Calls for speculation.
(3)        MS. STRINGER:  Join.
(4)        THE WITNESS:  It's not documented on the form.  I
(5) don't know whether she asked or didn't.
(6)        MS. SHERWIN:  Q.  Well, she testified in her
(7) deposition, do you recall her saying she did not ask
(8) Mr. Harrison how many years he'd been drinking?
(9)        MS. HUDGINS:  Might mischaracterize her testimony.
(10)        THE WITNESS:  And I don't specifically recall her
(11) testimony on that item.
(12)        MS. SHERWIN:  Q.  And the assessment also required
(13) the nurse to document the patient's physical appearance.
(14) Right?
(15)        A.  Uh, yes, it does.
(16)        Q.  You saw in Nurse Sancho's deposition that
(17) Mr. Harrison smelled of alcohol and had a red, flushed
(18) face.  Right?
(19)        A.  Yes.  I do recall that.
(20)        Q.  She did not document those observations of his
(21) physical appearance on his intake form, did she?
(22)        A.  No, she did not.  I did not see any -- any
(23) notation to that effect.
(24)        MS. STRINGER:  I have a belated objection that
(25) smelling of alcohol is not a physical appearance.

---

**192**

(1)        MS. SHERWIN:  Q.  And I'm going to just show you
(2) Exhibit 7 to Dr. Orr's deposition because I don't have a
(3) copy here with me.
(4)        But it is Alameda County Sheriff's Office Detention
(5) and Correction Policy and Procedure number 9.04 on Special
(6) Management Inmates.
(7)        And I'm going to ask you about some of the
(8) highlighting in this document.
(9)        But before that, Doctor, have you seen that policy
(10) before today?
(11)        MR. ANDRADA:  Nancy, can I come over his shoulder?
(12)        Doctor, sorry.  I just want to refresh my memory.
(13)        THE WITNESS:  That's all right.
(14)        MS. HUDGINS:  Well, it was an exhibit to his depo.
(15)        THE WITNESS:  And the answer is yes, I looked at
(16) Dr. Orr's deposition, so yes, I have seen this particular
(17) document.
(18)        MS. SHERWIN:  Q.  You read all of the exhibits to
(19) Dr. Orr's deposition?  Is that correct?
(20)        A.  Yes, I did.
(21)        Q.  Okay.  Thank you.
(22)        And this policy requires that when an inmate is
(23) placed in an Observation Log for bizarre behavior, that
(24) medical staff will be notified and perform an immediate
(25) initial evaluation.  Right?

---

DEPOSITION OF ROBERT D. JONES, M.D.

193

(1)      A. That's what the policy states.
(2)      Q. And you saw in Deputy Ahlf's deposition that he
(3) did not notify Medical staff to perform an immediate
(4) evaluation.  Right?
(5)      A. Uh, I recall that he did not summon Medical
(6) immediately.
(7)      Q. And it's your opinion that if Mr. Harrison had
(8) received medical treatment at any time up until the time
(9) he was tased, he would have survived.  Right?
(10)      MR. ANDRADA:  Objection.  Vague and ambiguous.
(11) Overly broad.  Calls for speculation.  No foundation.
(12)      THE WITNESS:  Based up until the time that his --
(13) he was taken down, and restrained, I felt that medical
(14) treatment would reverse the process, yes.
(15)      MS. SHERWIN:  Q.  That's right.  And if he had
(16) received -- for example, if Deputy Ahlf had contacted
(17) Medical staff, to perform an immediate initial evaluation,
(18) Mr. Harrison would have lived.  Right?
(19)      MR. ANDRADA:  Objection.  Same objections as
(20) before.  In the interest of time I won't specify them.
(21)      THE WITNESS:  He may or may not have.
(22)      MS. SHERWIN:  Q.  If Mr. Harrison had received
(23) treatment at any time before he was tased, he would not
(24) have died of alcohol withdrawal.  Right?
(25)      MR. ANDRADA:  Objection.  Vague and ambiguous.

194

(1)      MS. HUDGINS:  You mean at that time?  During that
(2) incarceration?
(3)      MS. STRINGER:  Vague as to time.
(4)      MS. SHERWIN:  That's right.  During that
(5) incarceration.
(6)      MR. ANDRADA:  Still vague and ambiguous.
(7)      THE WITNESS:  Please read the question.
(8)      THE REPORTER:  "If Mr. Harrison had received
(9) treatment at any time before he was tased, he would not
(10) have died of alcohol withdrawal.  Right?"
(11)      MS. HUDGINS:  It is vague and ambiguous.
(12)      THE WITNESS:  The answer is I would presume that he
(13) would not die of alcohol withdrawal.
(14)      MS. SHERWIN:  Q.  Okay.
(15)      Opinion 6 on page 6 of your report states, quote:
(16)      "Had Mr. Harrison received medical treatment at any
(17) time up until the time he was tased, he would not have
(18) died from withdrawal from alcohol in relation to his
(19) incarceration."  End quote.
(20)      Is that still a correct statement, Doctor?
(21)      A. Yes, it is.
(22)      Q. Your opinion is also, quote:
(23)      "To a reasonable degree of medical probability his
(24) symptoms were reversible if he had received medical
(25) treatment prior to his being tased."  End quote.

195

(1)      Is that still your opinion, Doctor?
(2)      A. Yes, it is.
(3)      Q. And you also have the opinion that:
(4)      "Mr. Harrison's condition, up until the time he was
(5) tased, would have been treatable and he would have
(6) survived."
(7)      Right?
(8)      A. As far as the alcohol withdrawal, yes.
(9)      Q. So if Deputy Ahlf had summoned Medical staff,
(10) and they came to provide evaluation and treatment for
(11) Mr. Harrison as Deputy Ahlf was required to do,
(12) Mr. Harrison would have survived.  Right?
(13)      MR. ANDRADA:  Same objections as before.  It's
(14) overly broad.  Vague and ambiguous.  Calls for speculation
(15) as to what would have been done actually, in fact.  So...
(16)      MS. STRINGER:  Join.
(17)      THE WITNESS:  And it's my opinion that the degree
(18) of alcohol withdrawal that he was in at that time was
(19) treatable.
(20)      MS. SHERWIN:  Okay.
(21)      Q. So but getting to the more precise question,
(22) actually, if Medical staff were notified and came to
(23) perform an evaluation and treatment for Mr. Harrison, on
(24) August 16th, when he was first placed in an isolation
(25) cell, he would have survived.  Right?

196

(1)      MR. ANDRADA:  Same objections.
(2)      THE WITNESS:  As far as the alcohol withdrawal,
(3) most likely he would.
(4)      MS. SHERWIN:  Q.  And that's to a reasonable degree
(5) of medical probability.  Right?
(6)      A. Yes.
(7)      Q. Now, you read the deposition of Megan Hast
(8) after you formed your opinions in this case.  Right?
(9)      A. Uh, yes.
(10)      Q. And you understand Megan Hast was the
(11) psychiatric social worker who was requested to come and
(12) provide an assessment for Mr. Harrison.  Right?
(13)      A. That is correct.
(14)      Q. If Ms. Hast had actually come to assess
(15) Mr. Harrison, and recognized his symptoms as severe
(16) alcohol withdrawal and referred him for treatment, he
(17) would have survived.  Right?
(18)      MR. ANDRADA:  Objection.  Vague and ambiguous.
(19) Overly broad.  No foundation.
(20)      THE WITNESS:  Uh --
(21)      MR. ANDRADA:  Beyond the scope of his report as
(22) well.
(23)      THE WITNESS:  Based on the level of withdrawal that
(24) he was experiencing, had he been treated, he was likely to
(25) survive.

DEPOSITION OF ROBERT D. JONES, M.D.

197

(1)        MS. SHERWIN:  Okay.
(2)        Q. And that's to a reasonable degree of medical
(3)  probability.  Right?
(4)        A. Yes, it is.
(5)        Q. Now, you said if Zelda Sancho had not struck
(6)  the notations of 'with history of alcohol withdrawal' and
(7)  'CIWA,' the CIWA process would have commenced with
(8)  monitoring per shift."  Right?
(9)        A. Yes.
(10)       Q. And if Mr. Harrison received CIWA monitoring
(11)  per shift, he would not have been likely to go into the
(12)  severe alcohol withdrawal that he went into.  Right?
(13)       MS. STRINGER:  Calls for speculation.
(14)       MS. HUDGINS:  Join.
(15)       THE WITNESS:  To the degree that we utilize CIWA as
(16)  a clinical monitoring, have certain cut-offs where we
(17)  make interventions, it is medically probable that he would
(18)  have responded to that treatment.
(19)       MS. SHERWIN:  Q.  He would have survived is what
(20)  you're saying.  Right?
(21)       A. He would have responded to the treatment for
(22)  alcohol withdrawal.
(23)       Q. And he would not have gone into delirium
(24)  tremens.  Right?
(25)       MS. HUDGINS:  Well, that's a different question.  I

198

(1)  will object as vague and ambiguous.
(2)       MR. ANDRADE:  Join.
(3)       MS. STRINGER:  Join.
(4)       MS. HUDGINS:  Especially to the timing of all of
(5)  this.
(6)       THE WITNESS:  And I have a little problem in
(7)  answering that question "yes" because it does vary based
(8)  on where he was at, what his symptoms were, and how he was
(9)  presenting.
(10)       MS. SHERWIN:  Q.  Okay.  But delirium tremens
(11)  usually begins how long after a person's last drink?
(12)       A. Basically it can occur anywhere from 40 hours
(13)  to 72 hours.  It varies.  And the reason it varies is
(14)  their previous history and age.  There's a lot of
(15)  different factors as to how long before it appears.  Or if
(16)  even if it will appear.
(17)       Q. And if Mr. Harrison were on CIWA protocols he
(18)  would be monitored by a nurse every eight hours.  Right?
(19)       A. He should be monitored per shift, yes.
(20)       Q. And he would also receive the next available
(21)  medical appointment according to Dr. Orr.  Right?
(22)       A. That is correct.
(23)       Q. And so if Mr. Harrison had been monitored every
(24)  eight hours, and received the next available Medical
(25)  appointment for medical treatment, he would not have been

199

(1)  likely to go into delirium tremens.  Right?
(2)       MS. STRINGER:  Calls for speculation.
(3)       MS. HUDGINS:  Yeah, I agree that would call for
(4)  speculation as to what the timeline would be.
(5)       MR. ANDRADA:  Join.
(6)       THE WITNESS:  And it depends what was assessed and
(7)  what was found at the time they saw him.
(8)       MS. SHERWIN:  Q.  Okay.  But would he have been
(9)  likely to go into delirium tremens if he were on
(10)  withdrawal protocols or not?  That's the question.
(11)       MS. STRINGER:  Calls for speculation.
(12)       MR. ANDRADA:  It does.
(13)       MS. HUDGINS:  Incomplete hypothetical.  Vague and
(14)  ambiguous.  Calls for speculation.
(15)       THE WITNESS:  And yes, I would agree that I have to
(16)  have more information, what his assessment would be, what
(17)  was found.
(18)       Sometimes the only thing that's done with CIWA is
(19)  just observation; there's no other intervention of what
(20)  needs to be done.
(21)       MS. SHERWIN:  Q.  Well, you understand in this case
(22)  he went into delirium tremens.  Right?
(23)       MS. HUDGINS:  Objection.  Vague and ambiguous.
(24)       THE WITNESS:  He was having alcohol withdrawal.
(25)  I'm not sure that I would totally characterize it as DT's.

200

(1)       MS. SHERWIN:  Q.  Okay.  Well, you understood that
(2)  he was put into an isolation cell for bizarre behavior,
(3)  mumbling incoherently, and being disoriented to place
(4)  including thinking he was in his apartment with women
(5)  present.  Right?
(6)       A. Yes, but that's also a part of alcohol
(7)  withdrawal.
(8)       Q. Okay.  And then that was at about 3:30 in the
(9)  morning on August 16th, right, when he was put in the
(10)  isolation cell?
(11)       A. Yes, so it was early in the morning.
(12)       Q. Okay.  And then by 7:00 p.m. on August 16th,
(13)  Mr. Harrison was having paranoid delusions; he thought
(14)  people had a gun and were trying to shoot him; and he was
(15)  screaming and had his mattress over his head.  Right?
(16)       MS. HUDGINS:  Well, I'll object as argumentative.
(17)  As phrased.
(18)       THE WITNESS:  Can you reask the question?
(19)       MS. SHERWIN:  Could you reread the question,
(20)  please?
(21)       (Record read.)
(22)       MS. HUDGINS:  Yeah, I'll object as vague and
(23)  ambiguous as to time.  And mischaracterizes the testimony.
(24)       THE WITNESS:  And that information was provided by
(25)  Deputy Ahlf.  Who, based on some other things that he

DEPOSITION OF ROBERT D. JONES, M.D.

---

201

(1) observed, in Mr. Harrison, make me question whether he was
(2) actually having delirium tremors at that point in time.
(3) MS. SHERWIN: Q. What causes you to -- well,
(4) strike that.
(5) Are you aware that other experts in this case agree
(6) that Mr. Harrison was in delirium tremens?
(7) A. I know they have opined that.
(8) Q. And are you aware that Dr. Orr agrees that
(9) Mr. Harrison was in delirium tremens?
(10) A. Yes, I am.
(11) Q. What causes you to question whether
(12) Mr. Harrison was in delirium tremens?
(13) A. Deputy Ahlf's response to Mr. Harrison, that he
(14) had remembered from the day before Deputy Ahlf's name.
(15) He had flooded his cell and had broken his tray,
(16) but Deputy Ahlf felt that he was calm. He entered the
(17) cell alone. And was expecting a cooperative behavior on
(18) Mr. Harrison's part.
(19) And if he was in DT's it would be unlikely that he
(20) would be able to maintain that type of behavior.
(21) Q. Okay. And, in fact, Mr. Harrison could not
(22) maintain cooperative behavior once Deputy Ahlf entered the
(23) cell. Is that right?
(24) MS. HUDGINS: Well, I'll object to your
(25) characterization he did not maintain it; whether he could

---

202

(1) or not, I don't know. Calls for speculation.
(2) MR. ANDRADA: It does call for speculation. And I
(3) think you went well beyond the scope of this witness's
(4) expertise and well beyond the scope of his
(5) report.
(6) MS. STRINGER: Join.
(7) THE WITNESS: What was the last question?
(8) THE REPORTER: "Okay. And, in fact, Mr. Harrison
(9) could not maintain cooperative behavior once Deputy Ahlf
(10) entered the cell. Is that right?"
(11) MS. HUDGINS: Same objection.
(12) THE WITNESS: I don't know why he reacted in the
(13) way that he did.
(14) MS. SHERWIN: Q. But he was not cooperative once
(15) Deputy Ahlf entered the cell. Right?
(16) MR. ANDRADA: Well, I think that misstates the
(17) evidence.
(18) MS. HUDGINS: Yes, I agree.
(19) MR. ANDRADA: So --
(20) MS. STRINGER: I join.
(21) MR. ANDRADA: -- object.
(22) MS. SHERWIN: Excuse me, Doctor. I don't think
(23) that I'm going to pay any more for the realtime if you're
(24) looking at your prior testimony. It's really not fair to
(25) me. I'm entitled to your best testimony.

---

203

(1) THE WITNESS: Please read the question then.
(2) MS. HUDGINS: And before you do that, just if I can
(3) make an objection.
(4) I don't think you're characterizing correctly
(5) what's happening here. When you ask the question be read
(6) back, he's looking at it as she's reading it back.
(7) So he's not -- he's listening to you; he's
(8) answering your questions appropriately. I'm not quite
(9) sure what your colloquy for the record is about.
(10) MS. SHERWIN: Well, the realtime is being provided
(11) to you as a courtesy, not so you can show the witness his
(12) prior testimony.
(13) MS. HUDGINS: Well, then I'll move it. I had no
(14) idea. The court reporter said, here, you can look at it
(15) if you'd like. So I've never even seen it before. Don't
(16) be lookin' at me.
(17) THE WITNESS: Please read the question.
(18) THE REPORTER: "But he was not cooperative once
(19) Deputy Ahlf entered the cell. Right?"
(20) THE WITNESS: At some point he became
(21) uncooperative. I don't know why he did that.
(22) MS. SHERWIN: Q. And he may have become
(23) uncooperative if he were in delirium tremens. Right?
(24) A. That is a possibility.
(25) Q. Have you reviewed the depositions of the two

---

204

(1) sergeants of Deputy Ahlf who were critical of him for
(2) opening the cell door without previously having handcuffed
(3) Mr. Harrison or previously having called for backup?
(4) MR. ANDRADA: Not relevant as to this witness.
(5) Well beyond the scope of his expertise and his report.
(6) MS. HUDGINS: Join.
(7) MS. STRINGER: Join.
(8) THE WITNESS: And I have not read the depositions.
(9) MS. SHERWIN: Q. And you reviewed Exhibit 8 to
(10) Dr. Orr's deposition which is the Alameda County Sheriff's
(11) Office Detention and Correction Policy and Procedure on
(12) Medical and Health Care Services. Correct?
(13) A. Yes, I did.
(14) Q. Okay. And that policy says:
(15) "All correctional and other staff are trained to
(16) respond to health-related situations within four minutes.
(17) The training program is established by Prison Health
(18) Services in the cooperation with the facility commanding
(19) officer."
(20) Did you see that in that policy, Doctor?
(21) MS. HUDGINS: Well, I'll object that that's a
(22) portion of the policy and incorrectly states the full
(23) policy is argumentative.
(24) MS. SHERWIN: Would you like to see the policy
(25) again, Doctor?

---

DEPOSITION OF ROBERT D. JONES, M.D.

205

(1)     THE WITNESS:  Yes, I would, please.
(2)     MS. SHERWIN:  Q.  I've highlighted it in Section 2.
(3)     THE WITNESS:  Yes, I've read it.
(4)     MS. SHERWIN:  Q.  So you understood that this
(5) policy provided that Prison Health Services would
(6) establish the training program for correctional officers
(7) and other staff to respond to health-related situations
(8) within four minutes.  Right?
(9)     MS. HUDGINS:  So that mischaracterizes the policy.
(10) It mischaracterizes the evidence.  And it's argumentative.
(11)     MR. ANDRADA:  Join.
(12)     MS. STRINGER:  Join.
(13)     THE WITNESS:  And it was something that they did
(14) jointly.
(15)     MS. SHERWIN:  Q.  And this policy also provides
(16) that Prison Health Services and Alameda County Criminal
(17) Justice Mental Health will develop a training program in
(18) cooperation with the facility commanding officer to
(19) provide health-related instruction to Sheriff's office
(20) sworn and civilian staff.  Right?
(21)     A.  That is what the document says.
(22)     Q.  And the training program included training on
(23) the ability to respond to health-related situations within
(24) four minutes.  Right?
(25)     MS. HUDGINS:  Well, again, I think it misstates the

206

(1) document, but go ahead.
(2)     THE WITNESS:  If you're reading it correctly, yes.
(3)     MS. SHERWIN:  Q.  The training program states on
(4) page 3, paragraph L (1), quote:
(5)     "...the ability to respond to health-related
(6) situations within four minutes."  Unquote.
(7)     So the training program that PHS and CJMH were
(8) going to develop would have also been responding to
(9) health-related situations within four minutes.  Right?
(10)     MS. HUDGINS:  Objection.  Vague as to time.
(11) Argumentative.
(12)     MR. ANDRADA:  Join.
(13)     MS. STRINGER:  Join.
(14)     THE WITNESS:  The document states that.
(15)     MS. SHERWIN:  Q.  And the policy also says that the
(16) training program developed by PHS and CJMH to provide
(17) instruction to Sheriff's office sworn and civilian staff
(18) would provide training on recognition of signs and
(19) symptoms of chemical dependency.
(20)     Right?
(21)     A.  The document does say that, yes.
(22)     Q.  And are you aware that no such training program
(23) was ever formulated by either Corizon or Alameda County?
(24)     MS. HUDGINS:  Well, I'll have to say that
(25) mischaracterizes the testimony.  It mischaracterizes the

207

(1) evidence.  It's argumentative.
(2)     MR. ANDRADA:  Join.
(3)     MS. STRINGER:  Join.
(4)     THE WITNESS:  And --
(5)     MS. HUDGINS:  It mischaracterizes his testimony.
(6)     MR. ANDRADA:  Right.
(7)     THE WITNESS:  And I had previously answered a
(8) similar question.
(9)     And based on the audits, based on my discussion
(10) with Mr. Wilson, and the comments by other -- by Dr. Orr,
(11) I have always stated that there is evidence that that
(12) occurred.
(13)     MS. SHERWIN:  Q.  Okay.  And neither Corizon nor
(14) Alameda County have ever provided us any documents
(15) reflecting this training program developed by Prison
(16) Health Services and CJMH.
(17)     Did you see such documents in your review of this
(18) case, Doctor?
(19)     MS. HUDGINS:  So excuse me.  I'll object to the
(20) preamble and move to strike.
(21)     MR. ANDRADA:  Join.
(22)     MS. STRINGER:  Join.
(23)     MS. HUDGINS:  It's argumentative.  So the question
(24) is did you see any documents reflecting a training program
(25) developed by PHS and CJMH.  Did you see any?

208

(1)     THE WITNESS:  No, I did not.
(2)     MS. SHERWIN:  Q.  And as stated in the deposition
(3) earlier today, you asked to look at Mr. Wilson's
(4) testimony, and I'm going to show you page 15 of his
(5) testimony with highlighted lines 20 through 24.
(6)     Mr. Wilson also testified that Corizon had never
(7) provided training to Corrections officers on the signs and
(8) symptoms of alcohol withdrawal when he worked there.
(9) Right?
(10)     MS. HUDGINS:  So talking about Corizon employees
(11) providing the training.  Is that accurate?
(12)     MS. SHERWIN:  That's right.
(13)     THE WITNESS:  His testimony is that no, he did not
(14) recall.
(15)     MS. SHERWIN:  Please mark this as the next line.
(16)     (Plaintiff's Exhibit 9 was marked for
(17) identification.)
(18)     MS. SHERWIN:  Q.  I'm going to hand you what has
(19) been marked as Exhibit 9 to your deposition which is the
(20) Prison Health Services Policy and Procedure on Access to
(21) Care number J-A-01.
(22)     According to this policy, the Health Services
(23) Administrator and Medical Director are responsible for
(24) identifying and eliminating barriers to inmates receiving
(25) health care.  Right?

DEPOSITION OF ROBERT D. JONES, M.D.

---

**209**

(1)      MS. HUDGINS:  That's what it says.  Document speaks
(2) for itself.
(3)      THE WITNESS:  And I agree the document does state
(4) that.
(5)      MS. SHERWIN:  Q.  And that's according to NCCHC
(6) standards as well.  Right?
(7)      A.  Yes, they're referenced.
(8)      Q.  And the Health Services Administrator and
(9) Medical Director are also responsible for ensuring access
(10) to care in a timely manner whereby a patient can be seen
(11) by a clinician, be given a professional clinical judgment,
(12) and receive care that is reasonable and necessary.  Right?
(13)      A.  The document states that.
(14)      Q.  And that's according to NCCHC essential
(15) standards as well.  Right?
(16)      A.  Yes.
(17)      Q.  And in this case, the responsible Health
(18) Services Administrator was Bill Wilson.  Right?
(19)      A.  Yes.
(20)      Q.  And the Medical Director who was responsible
(21) was Dr. Orr.  Correct?
(22)      A.  Yes.
(23)      Q.  Delirium tremens left untreated has a mortality
(24) rate of up to 35 percent.  Right?
(25)      MS. HUDGINS:  I'll object.

---

**210**

(1)      MS. STRINGER:  Lacks foundation.
(2)      MS. HUDGINS:  Vague and ambiguous.
(3)      MR. ANDRADA:  Isn't this beyond the scope of his
(4) report also?
(5)      THE WITNESS:  And I would not know whether your
(6) number is correct or not.
(7)      MS. SHERWIN:  Q.  Okay.  We'll mark another exhibit
(8) for you then.
(9)      (Plaintiff's Exhibit 10 was marked for
(10) identification.)
(11)      MS. SHERWIN:  Q.  We've marked as Exhibit 10 to
(12) your deposition what was Exhibit 16 to Dr. Orr's
(13) deposition, so that would have been a document that you
(14) reviewed in this case.  Right?
(15)      A.  If it was a part of Dr. Orr's, yes, I would
(16) have seen it.
(17)      Q.  And this is a document that we received from
(18) Corizon and it says, quote:
(19)      "Delirium tremens left untreated has a mortality
(20) rate of up to 35 percent."  Unquote.
(21)      Do you see that?
(22)      A.  Yes, I do.
(23)      Q.  Do you have any reason to dispute Corizon's
(24) statement in that regard?
(25)      A.  Uh, no, I do not.

---

**211**

(1)      I'm not sure when that number was developed or
(2) created.  But I have no reason to question.
(3)      MS. SHERWIN:  I'd like you to look at another
(4) exhibit.
(5)      (Plaintiff's Exhibit 11 was marked for
(6) identification.)
(7)      MS. SHERWIN:  Q.  Exhibit 11 to your deposition is
(8) Prison Health Services' Policy on Intoxication and
(9) Withdrawal, number 153.
(10)      You've reviewed that before today, right?
(11)      MS. HUDGINS:  This is Exhibit 153 that was approved
(12) in 2004 and has been updated, I presume.
(13)      THE WITNESS:  (Indicating.)
(14)      MS. HUDGINS:  2007.  Whatever.
(15)      THE WITNESS:  Yes.
(16)      MS. SHERWIN:  Q.  And this policy requires that
(17) inmates experiencing severe life-threatening withdrawal
(18) are immediately transferred to Highland Hospital.  Right?
(19)      MS. HUDGINS:  Can you just show him where it says
(20) that so he can confirm where it says that?
(21)      MS. SHERWIN:  Fourth paragraph on the first page.
(22)      THE WITNESS:  Yes, the document says that.
(23)      MS. SHERWIN:  Q.  But you understand from Dr. Orr's
(24) testimony that, in fact, he keeps inmates who are
(25) experiencing severe withdrawal inhouse within the jail.

---

**212**

(1) Right?
(2)      MS. HUDGINS:  Okay.  So first of all, let me
(3) interpose an objection as to time.  It's argumentative.
(4) Looking at a policy that's been superceded by another
(5) policy which was in effect at the time.
(6)      So it's argumentative; it's vague and ambiguous.
(7) It lacks foundation.  And -- yeah.
(8)      MS. STRINGER:  Join.
(9)      MR. ANDRADA:  Join.
(10)      MS. SHERWIN:  Q.  Go ahead, Doctor.
(11)      A.  And while the document says that, I've
(12) previously stated that the ability of a clinician to treat
(13) is multi-factorial, and if the physician feels comfortable
(14) in treating it, it is certainly within his scope of
(15) practice.
(16)      Q.  The question was you understand from Dr. Orr's
(17) testimony that he keeps inmates who are experiencing
(18) severe withdrawal inhouse within the jail.  Right?
(19)      MS. HUDGINS:  So I will object that it's vague and
(20) ambiguous.  And that's my objection.
(21)      THE WITNESS:  And Dr. Orr treats individuals who
(22) have withdrawal symptoms.
(23)      MS. SHERWIN:  Q.  You understood that Dr. Orr keeps
(24) people who are suffering from severe alcohol withdrawal
(25) inhouse, at the jail.  You understand that, right?

---

DEPOSITION OF ROBERT D. JONES, M.D.

---

213

(1)        MS. HUDGINS:  Vague and ambiguous.  Incomplete
(2)  hypothetical.  Lacks foundation.
(3)        MS. STRINGER:  Argumentative.
(4)        MS. HUDGINS:  Argumentative.
(5)        THE WITNESS:  And I haven't seen the actual lists
(6)  of patients that are there, but I believe that he stated
(7)  in his testimony that he treats people who are
(8)  withdrawing.
(9)        MS. SHERWIN:  Q.  Who are in severe alcohol
(10)  withdrawal.
(11)        MS. HUDGINS:  Same objections.
(12)        THE WITNESS:  I need to review his deposition to
(13)  see whether he said "severe" or not.  I don't recall.
(14)        MS. HUDGINS:  And vague and ambiguous because
(15)  you're asking us to guess at what he meant by "severe".
(16)        MS. SHERWIN:  Q.  And you can't recall one way or
(17)  another.  Right?
(18)        A.  I just don't know how he characterized "severe"
(19)  or in what way he indicated that.
(20)        MS. SHERWIN:  Q.  Now, you understood from the
(21)  Alameda County Request For Proposals and Corizon's
(22)  Response to the Request For Proposals that Corizon was
(23)  going to have registered nurses do intake screenings.
(24)  Right?
(25)        MS. HUDGINS:  Well, I'll object.  It's vague as to

---

214

(1)  time.  You're asking him to analyze a contract.  Calls for
(2)  a legal conclusion.  Obviously that's not what happened in
(3)  the final contract so it seems to be irrelevant.
(4)        MS. SHERWIN:  I'm asking about the Request For
(5)  Proposal and Corizon's Response to the Request For
(6)  Proposal that the doctor reviewed.
(7)        Q.  Doctor, you understood that when Alameda County
(8)  sent out the Request For Proposal and Corizon responded,
(9)  the plan was that registered nurses would do intake
(10)  screenings.  Right?
(11)        A.  I believe the Request for Proposal did make
(12)  that statement.
(13)        Q.  And Corizon's Response to the Request for
(14)  Proposal also said that registered nurses would do intake
(15)  health screening.  Right?
(16)        A.  I don't specifically recall one way or the
(17)  other.
(18)        Q.  And then later in the final contract there was
(19)  an amendment providing that intake health screenings must
(20)  be performed for all inmates by a licensed registered
(21)  nurse or an LVN under the supervision of an RN.  Right?
(22)        MS. HUDGINS:  Well, I'll object to the
(23)  characterization as an amendment.  It actually is in the
(24)  contract so I don't think it's an amendment to the
(25)  contract.  It's what the contract says, the final

---

215

(1)  contract.  So it's argumentative.  Mischaracterizes the
(2)  evidence.
(3)        MS. SHERWIN:  Q.  Doctor, you understood under the
(4)  exhibits to the contract, there was a change so that now
(5)  intake health screening must be performed for all inmates
(6)  by a licensed registered nurse or an LVN under the
(7)  supervision of an RN.  Right?
(8)        MS. HUDGINS:  Same objections.
(9)        THE WITNESS:  And I presume you're reading from
(10)  that exhibit or that document, so yes.
(11)        MS. SHERWIN:  Could you mark this, please.
(12)        (Plaintiff's Exhibit 12 was marked for
(13)  identification.)
(14)        MS. SHERWIN:  Q.  I'm going to hand you what has
(15)  been marked as Exhibit 12 to your deposition which is the
(16)  Individual Training Activity logs that Alameda County
(17)  provided to us for each of the defendant deputies in this
(18)  case.
(19)        Have you seen that document before today?
(20)        A.  Uh, not that I recall.
(21)        Q.  Okay.  Looking -- may I see that for a moment?
(22)  I just need to get to the right deputy's training record.
(23)        Looking at the first page which is ACSO 374 and the
(24)  second page, ACSO 375, which is the training log for the
(25)  defendant Deputy Matthew Ahlf, do you see any evidence

---

216

(1)  that he received health-related training including
(2)  training in recognizing the signs and symptoms of alcohol
(3)  withdrawal?
(4)        MS. HUDGINS:  In other words, does it say it on
(5)  that page?
(6)        THE WITNESS:  I'm sorry.  I was looking for his
(7)  name and it's at the very top.
(8)        No, I do not.
(9)        MS. SHERWIN:  Q.  Okay.  Please take a look at the
(10)  other deputies' training logs and tell me whether you see
(11)  any evidence that they received health-related training
(12)  including training on recognizing the signs and symptoms
(13)  of alcohol withdrawal.
(14)        MS. HUDGINS:  I guess I'd have to say it lacks
(15)  foundation and it's argumentative that the
(16)  characterization of the training wouldn't subsume this
(17)  other stuff.
(18)        MR. ANDRADA:  Yes, it does call for speculations.
(19)        MS. SHERWIN:  Speaking objections as you know are
(20)  improper and an improper attempt to coach the witness
(21)  which I have objected to multiple times in this
(22)  deposition.
(23)        THE WITNESS:  Don't worry; he's uncoachable.
(24)        MR. ANDRADA:  The question calls for the witness to
(25)  speculate.

---

DEPOSITION OF ROBERT D. JONES, M.D.

---

**217**

(1)      MS. HUDGINS: Join.

(2)      THE WITNESS: And actually without knowing what's

(3)  contained in a basic instruction training officer course,

(4)  I honestly don't know what they received or what they did

(5)  not receive.

(6)      MS. SHERWIN: Q. Well, according to -- okay.

(7)      A. I would have to know what each one of these --

(8)  I mean there's a custodial staff course; there's basic;

(9)  there's a number of different things which may or may not

(10)  have components in regard to that. I don't know.

(11)      Q. Okay. Do you see any of the mandatory

(12)  documentation that NCCHC requires to be maintained

(13)  concerning custody staff training on health-related issues

(14)  including recognizing the signs and symptoms of alcohol

(15)  withdrawal?

(16)      MS. HUDGINS: Well, it lacks foundation and it's

(17)  argumentative that it would be in this document.

(18)      MR. ANDRADA: Correct.

(19)      MS. HUDGINS: Or spelled out in the document.

(20)      MR. ANDRADA: Join.

(21)      MS. STRINGER: Join.

(22)      THE WITNESS: And again, there's a supplemental

(23)  core course; there's a basic course; there's a custodial

(24)  course. I do not know what is in each of those courses.

(25)      MS. SHERWIN: Q. Well, under NCCHC standards,

---

**218**

(1)  deputies are required to receive health-related training

(2)  every two years. Right?

(3)      A. That is correct.

(4)      Q. And they are required to receive health-related

(5)  training that includes recognizing the signs and symptoms

(6)  of alcohol withdrawal every two years. Right?

(7)      A. And they may or may not be included in these

(8)  basic instruction training officer. I did not know what

(9)  was included in the training.

(10)      I do know that when they were audited, that they

(11)  were, in fact, accredited, and that they met the

(12)  standards, and that the standards look at the course

(13)  outline and they look at the training records.

(14)      Q. Okay. Doctor, do you have any explanation for

(15)  why the course outline and the NCCHC mandated training

(16)  records have never been produced in this case? Do you

(17)  know?

(18)      MS. HUDGINS: I don't think he has to have an

(19)  explanation. It lacks foundation. It's argumentative.

(20)      MS. STRINGER: And it calls for speculation on his

(21)  part.

(22)      MR. ANDRADA: Join.

(23)      THE WITNESS: And I don't know what records were

(24)  reviewed by the NCCHC accrediting team.

(25)      MS. SHERWIN: Q. That's right. You don't know

---

**219**

(1)  what representations Alameda County and Corizon made to

(2)  NCCHC in connection with the training of deputies on the

(3)  topic of alcohol withdrawal. Isn't that right, Doctor?

(4)      MS. HUDGINS: Objection. Compound.

(5)      Objection. Misstates his testimony.

(6)      Objection. Suggests that it's a representation as

(7)  opposed to documents.

(8)      MR. ANDRADA: Same objections.

(9)      MS. STRINGER: Join.

(10)      THE WITNESS: And I previously stated that it also

(11)  is an actual interview with officers.

(12)      MS. SHERWIN: Q. Well, you don't know whether any

(13)  of the defendant officers in this case were interviewed,

(14)  do you?

(15)      MR. ANDRADA: Asked and answered about four hours

(16)  ago.

(17)      MS. HUDGINS: You're right on top of things,

(18)  Mr. Andrada.

(19)      THE WITNESS: The answer is no, I don't know.

(20)      MS. SHERWIN: Please mark these next two in line.

(21)      THE WITNESS: And those are usually kept

(22)  confidential.

(23)      (Plaintiff's Exhibit 13 was marked for

(24)  identification.)

(25)      (Plaintiff's Exhibit 14 was marked for

---

**220**

(1)  identification.)

(2)      (Discussion off the record.)

(3)      (Recess.)

(4)      MS. SHERWIN: I'm going to hand you what's been

(5)  marked as Exhibit 13 to your deposition which is Prison

(6)  Health Services' Policy and Procedure on Inmates With

(7)  Alcohol and Other Drug Problems, number J-G-08.

(8)      Q. And that policy states that Corrections

(9)  officers are trained in recognizing the signs and symptoms

(10)  of alcohol or other drug problems. Right?

(11)      Do you see that notation, Doctor? Beginning with

(12)  item number 22, quote: "The Custody staff is trained and

(13)  recognizes -- "

(14)      MS. HUDGINS: Whoa, I don't see number 2.

(15)      MS. SHERWIN: Q. Item 2. Quote: "The Custody

(16)  staff is trained in recognizing AOD problems in inmates."

(17)  Unquote.

(18)      Do you see that?

(19)      A. Yes.

(20)      Q. AOD means Alcohol or Other Drug problems,

(21)  right?

(22)      A. Yes.

(23)      Q. That policy required that all Custody staff be

(24)  trained in recognizing alcohol or other drug problems.

(25)  Right?

---

DEPOSITION OF ROBERT D. JONES, M.D.

---

221

(1)      MS. HUDGINS:  Well, it doesn't actually state that.
(2)      MR. ANDRADA:  Objection.  Yes, misstates the
(3)  policy.
(4)      MS. HUDGINS:  Join.
(5)      THE WITNESS:  The policy says the Custody staff is
(6)  trained in recognizing AOD problems in inmates.
(7)      MS. HUDGINS:  Right.
(8)      MS. SHERWIN:  Q.  And you did not see any evidence,
(9)  any documents of that training in any of your review, did
(10)  you, Doctor?
(11)      MR. ANDRADA:  I think that misstates his testimony.
(12)      MS. HUDGINS:  Yeah, join.
(13)      MS. STRINGER:  Join.
(14)      THE WITNESS:  The evidence that I saw was the
(15)  findings of the accreditation process.
(16)      MS. SHERWIN:  Q.  Okay.  But leaving aside whatever
(17)  NCCHC found, you didn't find any documents that were
(18)  internal documents for PHS Corizon or Alameda County that
(19)  documented the training that Custody staff had, did you,
(20)  Doctor?
(21)      MR. ANDRADA:  Misstates his testimony.
(22)      MS. HUDGINS:  Yes.  Join.  Compound.
(23)      THE WITNESS:  And the answer is there was new
(24)  training that I actually saw which specifically talked
(25)  about drugs and other things.

---

222

(1)      So no, I actually have seen in the new employee
(2)  training.  There were also additional documents.  There
(3)  was some documents which were dated, if I remember right,
(4)  in 2010 that specifically covered as an instructional
(5)  document alcohol and other drugs.
(6)      MS. SHERWIN:  Q.  The new employee training was
(7)  training for Corizon employees.  Right?
(8)      A.  I believe that is correct.
(9)      Q.  Okay.  And the other training in 2010 was also
(10)  for Corizon employees.  Right?
(11)      A.  I don't know that.
(12)      MS. HUDGINS:  You mean the handouts for the jail
(13)  people?
(14)      MS. SHERWIN:  Q.  What documents did you see in
(15)  your review that documented that Custody staff within the
(16)  Alameda County Sheriff's Department receive training on
(17)  alcohol or other drug problems?
(18)      MR. ANDRADA:  It's been asked and answered.  He's
(19)  already testified to this.
(20)      MS. HUDGINS:  Join.
(21)      MS. SHERWIN:  Q.  Leaving aside the NCCHC standards
(22)  and accreditations.
(23)      A.  Correct.  There was a new employee, which I
(24)  assume was for PHS, but there were also documents, I
(25)  believe they were attached to Mr. Wilson's deposition,

---

223

(1)  which actually show documents which in his discussion with
(2)  me is that he would provide them various handouts through
(3)  his interaction with them.
(4)      MS. SHERWIN:  Q.  And the documents attached to
(5)  Mr. Wilson's deposition were not given to the Custody
(6)  staff before Martin Harrison died, were they?
(7)      A.  I don't know that.
(8)      Q.  You don't know one way or another?
(9)      A.  I don't know one way or another.
(10)      Q.  And as you sit here today you don't know one
(11)  way or another whether any Custody staff was specifically
(12)  trained in recognizing the signs and symptoms of alcohol
(13)  or other drug problems, leaving aside your assumption that
(14)  they were trained because they were in NCCHC accredited?
(15)      MR. ANDRADA:  Again, it misstates his testimony.
(16)      MS. HUDGINS:  Join.  It lacks foundation.
(17)      MR. ANDRADA:  It does.
(18)      THE WITNESS:  And I've also clarified that when I
(19)  looked at the training records which I have not seen
(20)  before that I do not know what is a part of that training.
(21)  I have not seen a course outline so I cannot tell you or
(22)  opine.
(23)      MS. SHERWIN:  Q.  We'll look at the next exhibit
(24)  then which is Exhibit 14 to your deposition.
(25)      And that document is Corizon's Policy and Procedure

---

224

(1)  on Health Training For Correctional Officers.  Right?
(2)      A.  It's dated 2-2-13.
(3)      Q.  The document was issued on October 29th, 2012.
(4)  Right?
(5)      A.  10-29-12.  Yes.
(6)      Q.  And that's policy number J-C-04.00.  Right?
(7)      A.  J-C-04.00.  Yes.
(8)      Q.  And this is a Corizon policy that says that
(9)  there is a training program established or approved by the
(10)  responsible health authority in cooperation with the
(11)  facility administrator that guides the health-related
(12)  training of correctional officers who work with inmates.
(13)  Right?
(14)      MS. HUDGINS:  Did she read that correctly?
(15)      THE WITNESS:  I believe that was read correctly.
(16)      MS. HUDGINS:  And I'll object that it's a post hoc
(17)  document; it's after the fact.
(18)      MS. SHERWIN:  Q.  So this policy provides that
(19)  there is a training program established or approved by the
(20)  Corizon responsible health authority in cooperation with
(21)  the jail administrator for health training of correction
(22)  officers.  Right?
(23)      MS. HUDGINS:  As of 2012.  Is that correct?
(24)      THE WITNESS:  As of 2012 it is correct.
(25)      MS. SHERWIN:  Q.  And you saw no Corizon or Prison

---

DEPOSITION OF ROBERT D. JONES, M.D.

225

(1)     Health Services documents prior to 2012 that confirmed
(2)     that there was any formal training in place to train
(3)     deputies on health-related matters for inmates.  Right?
(4)         A.  For inmates.  Uh, in my dialogue -- did I see
(5)     documents was the question?
(6)         Q.  That's right.
(7)         A.  No, I have not seen documents.
(8)         Q.  Okay.  And this policy from Corizon J-C-04.00
(9)     provides that correctional officers who work with inmates
(10)    receive health-related training including at a minimum
(11)    training in first aid.  Right?
(12)        MS. HUDGINS:  I'll object.  It's argumentative.
(13)    It's after the fact.  It lacks foundation.
(14)        MS. STRINGER:  Join.
(15)        THE WITNESS:  The document states that.
(16)        MS. SHERWIN:  Q.  And they also receive training in
(17)    recognizing the need for emergency care in
(18)    life-threatening situations.  Right?
(19)        MS. HUDGINS:  Same objection as it applies to
(20)    Exhibit 14.
(21)        THE WITNESS:  And you changed the word "order" but
(22)    that's essentially what it says.
(23)        MS. SHERWIN:  Q.  And they're also, according to
(24)    this policy, Corrections officers also receive training in
(25)    recognizing acute manifestations of intoxication and

226

(1)     withdrawal.  Right?
(2)         MS. HUDGINS:  Same objections as it applies to
(3)     Exhibit 14.
(4)         MS. STRINGER:  Join.
(5)         THE WITNESS:  Yes.
(6)         MS. SHERWIN:  Q.  And this policy says the
(7)     appropriateness of health-related training is verified by
(8)     outline and length of course presented and is maintained
(9)     by Custody.
(10)        Correct?
(11)        MS. HUDGINS:  Same objections as it applies to
(12)    Exhibit 14.
(13)        THE WITNESS:  That is what the document states.
(14)        MS. SHERWIN:  Q.  And this policy also requires
(15)    that health-related training be provided annually to
(16)    Custody staff to comply with ACA standards.  Right?
(17)        MS. HUDGINS:  Same objections as it applies to
(18)    Exhibit 14.
(19)        THE WITNESS:  Where are you reading?
(20)        MS. SHERWIN:  Q.  I'm reading on the second page,
(21)    item number 5.
(22)        MS. HUDGINS:  Same objections.
(23)        THE WITNESS:  Health-related training is provided
(24)    annually.  The document states that.
(25)        MS. SHERWIN:  Q.  And it also requires that

227

(1)     Custody, or the Sheriff's Department, maintain
(2)     documentation of training for correctional officers.
(3)     Right?
(4)         MS. HUDGINS:  Same objections as it applies to
(5)     Exhibit 14.
(6)         THE WITNESS:  Where are you reading that?
(7)         MS. SHERWIN:  Q.  Page 2, item number 1.
(8)         MS. HUDGINS:  Same objections.
(9)         THE WITNESS:  Yes, under the NCCHC standards it
(10)    states that.
(11)        MS. SHERWIN:  Q.  And under the NCCHC standards the
(12)    policy also requires that health-related training be
(13)    provided at least every two years.  Right?
(14)        MS. HUDGINS:  Same objections as it applies to
(15)    Exhibit 14.
(16)        THE WITNESS:  Item number 4 states that
(17)    health-related training be provided at least every two
(18)    years.
(19)        MS. SHERWIN:  Q.  And in your entire review of
(20)    anything you were given to review in this case, you never
(21)    saw any outline or course content for any training given
(22)    to Custody staff on health-related matters.  Is that
(23)    right, Doctor?
(24)        MS. HUDGINS:  Lacks foundation.  Argumentative.
(25)        THE WITNESS:  I saw new employee training; I don't

228

(1)     know who went to that training.  And it may or may not
(2)     have included officers.
(3)         MS. SHERWIN:  Q.  Okay.  And the new employee
(4)     training that I received was training that Corizon
(5)     employees received.
(6)         You did not specifically receive any new employee
(7)     training that Custody staff received, did you, Doctor?
(8)         MS. HUDGINS:  Well, I think he answered that
(9)     question.  He says he doesn't know if Custody was invited
(10)    or not.
(11)        MS. SHERWIN:  Q.  Did you see any documents showing
(12)    that Custody staff received training every year in
(13)    recognizing signs and symptoms of alcohol withdrawal?
(14)        MR. ANDRADA:  Every year?
(15)        THE WITNESS:  Every year?
(16)        MS. SHERWIN:  Q.  That's right.
(17)        A.  No specific document.
(18)        Q.  And did you see any documents showing that
(19)    Custody staff received training in recognizing the signs
(20)    and symptoms of alcohol withdrawal every other year?
(21)        A.  Based on my answer that I don't know what was
(22)    contained in those training courses, I don't know whether
(23)    they were or they were not.
(24)        Q.  Now, NCCHC has essential standards that govern
(25)    intra-system transfers.  Right?

DEPOSITION OF ROBERT D. JONES, M.D.

229

(1)     A. Yes, they do.
(2)     Q. And essential standard J-E-03 on Transfer
(3)  Screening says that:  A transfer screening is performed by
(4)  qualified health care professionals on all intra-system
(5)  transfers.  Right?
(6)     A. Uh, I assume you read that correctly.
(7)     Q. And NCCHC essential standard J-E-03 also says
(8)  that:  Qualified health care professionals review each
(9)  transferred inmate's health record or summary within
(10)  12 hours of arrival to ensure continuity of care.
(11)     Right?
(12)     A. Yes.
(13)     MS. SHERWIN:  Could you mark this, please.
(14)     (Plaintiff's Exhibit 15 was marked for
(15)  identification.)
(16)     MS. SHERWIN:  Q.  I'm going to hand you what's been
(17)  marked as Exhibit 15 to your deposition which I received
(18)  from Corizon's attorneys, it bears Bates stamped pages
(19)  3681 and 3682, on the topic of transfer screening.
(20)     Have you seen those two pages before, Doctor?
(21)     A. I'm not sure whether I have or not.
(22)     Q. Okay.  Well, this document from Corizon says
(23)  that intake transfer screening is performed on an inmate
(24)  who comes in to a new jail from an intra-system transfer.
(25)  Right?

230

(1)     MS. HUDGINS:  Objection.  Vague as to time.
(2)     MS. HUDGINS:  Lacks foundation.
(3)  If she read it correctly, just tell her.
(4)     THE WITNESS:  Which area are you reading?
(5)     MS. SHERWIN:  Q.  Okay.  Intake Transfer Screening
(6)  on the bottom left-hand corner.  Do you see that?
(7)     A. Okay.
(8)     Q. Okay.  And intake transfer screening is
(9)  performed on an inmate who comes into the new jail after
(10)  being transferred from the other jail.  Right?
(11)     MS. HUDGINS:  Same objections.  Vague as to time.
(12)  Lacks foundation.
(13)     THE WITNESS:  That is what it says.
(14)     MS. SHERWIN:  Q.  And that intra-transfer screening
(15)  from the receiving jail should be done within 12 hours of
(16)  arrival at the facility.  Right?
(17)     MS. HUDGINS:  Same objections.
(18)     THE WITNESS:  That's what the document states.
(19)     Q. And looking at page 2, Corizon states that the
(20)  bottom line is that all levels of health care providers
(21)  are responsible.  Right?
(22)     MS. HUDGINS:  Same objections.
(23)     THE WITNESS:  And the document states that.
(24)     MS. SHERWIN:  Q.  And the failure to recognize
(25)  issues on arrival and a lack of follow-through may result

231

(1)  in unnecessary life-threatening and emergent needs later.
(2)  Right?
(3)     MS. HUDGINS:  Same objections.
(4)     THE WITNESS:  The document states that.
(5)     MS. SHERWIN:  Q. I'm going to hand you the Corizon
(6)  Health Services orientation manual for new employees.
(7)  Well, let's have this marked as the next exhibit in line.
(8)     (Plaintiff's Exhibit 16 was marked for
(9)  identification.)
(10)     MS. SHERWIN:  Q.  This document is Corizon Bates
(11)  stamped page 3608, 3609 and 3610.
(12)     Have you seen that document before today?
(13)     A. Yes, I have.
(14)     Q. And that document provides that inmates who are
(15)  transferred from another institution within the same
(16)  correctional system accompanied by their initial health
(17)  screening forms and a copy or summary of their medical
(18)  record may not need a new initial screening.  Right?
(19)     A. Uh, yes.  That's paraphrasing but that's what
(20)  the document says.
(21)     Q. And that means they don't necessarily need a
(22)  new receiving screening like the one Zelda Sancho did on
(23)  Martin Harrison.  Right?
(24)     A. I would interpret it so.
(25)     Q. But the medical information must still be

232

(1)  reviewed and verified to ensure continuity of care.
(2)  Right?
(3)     MS. HUDGINS:  Objection.  Vague and ambiguous.
(4)     THE WITNESS:  That's what the document states.
(5)     MS. SHERWIN:  Let's look at the next policy from
(6)  Prison Health Services which is J-E-03.
(7)     (Plaintiff's Exhibit 17 was marked for
(8)  identification.)
(9)     MS. SHERWIN:  Q.  This policy, which has been
(10)  marked as Exhibit 17 to your deposition, is the policy on
(11)  transfer screening and intra-system transfers.
(12)     This policy requires that qualified health care
(13)  professionals review incoming inmate health records or
(14)  summary within 12 hours of arrival to ensure continuity of
(15)  care.  Right?
(16)     A. The document says:  Qualified health care
(17)  professionals review incoming inmate health records or
(18)  summary within 12, and in parentheses, numerical 12, hours
(19)  of arrival to ensure continuity of care.
(20)     MS. SHERWIN:  Q.  And that review of the medical
(21)  records within 12 hours of arrival is consistent with the
(22)  NCCHC essential standard J-E-03 on transfer screening.
(23)  Right?
(24)     A. Yes.  Whenever you see an "E" it usually means
(25)  essential.

DEPOSITION OF ROBERT D. JONES, M.D.

---

233

(1)         Q. And no nurse reviewed Martin Harrison's records
(2)  within 12 hours of his arrival to Santa Rita Jail.  Is
(3)  that right?
(4)         MS. HUDGINS:  Objection.  Lacks foundation.
(5)         THE WITNESS:  I don't know.  I didn't -- as I
(6)  answered earlier, I didn't see any signature, but I don't
(7)  know whether one did or did not.
(8)         MS. SHERWIN:  Q.  Okay.  You saw no evidence that
(9)  any nurse reviewed Mr. Harrison's medical records within
(10)  12 hours of his arrival to Santa Rita Jail.
(11)         Is that right, Doctor?
(12)         MS. HUDGINS:  Argumentative.  Lacks foundation.
(13)         THE WITNESS:  I saw no notation.
(14)         MS. SHERWIN:  Q.  Now, you understand that Corizon
(15)  fired Ms. Sancho in part for her incompetent handling of
(16)  Martin Harrison's intake and failure to put him on CIWA.
(17)  Is that right?
(18)         MS. HUDGINS:  Objection.  Mischaracterizes
(19)  testimony.  Argumentative.
(20)         MS. STRINGER:  Join.
(21)         THE WITNESS:  She was terminated because of
(22)  incomplete documentation in Mr. Harrison's intake
(23)  screening.  In part.
(24)         MS. SHERWIN:  Q.  Okay.  And she was also
(25)  terminated in part for failing to put Mr. Harrison on

---

234

(1)  CIWA.  Right?
(2)         A. That was a criticism based on your legal
(3)  documents that we read earlier today.
(4)         Q. Okay.  And you saw in Miss Sancho's deposition
(5)  that she only ever put patients on CIWA withdrawal
(6)  protocols when the patient was actually intoxicated on
(7)  intake.  Right?
(8)         A. Uh --
(9)         MS. STRINGER:  Possibly misstates evidence.
(10)         MS. HUDGINS:  Join.
(11)         MR. ANDRADA:  Yeah.  Join.
(12)         THE WITNESS:  I would have to reread that.  It's
(13)  been a while so I could not say one way or the other.
(14)         MS. SHERWIN:  Q.  Did you bring Miss Sancho's
(15)  deposition with you today?
(16)         A. We've already discussed that.  No, I did not.
(17)         MS. SHERWIN:  Well, let's take a break and I'll go
(18)  get that page from her transcript since you'd like to
(19)  review it.
(20)         (Recess.)
(21)         MS. SHERWIN:  Q.  I've handed the witness pages 122
(22)  and 123 of Ms. Sancho's deposition.
(23)         Now Ms. Sancho testified that she only ever put
(24)  patients on CIWA when the patients were actually
(25)  intoxicated at the time she assessed them.  Right?

---

235

(1)         MS. HUDGINS:  I'll object.  It mischaracterizes her
(2)  testimony.  I'm not sure the yellow part actually says
(3)  that, but the -- the part you've highlighted for him.
(4)         THE WITNESS:  And I'm glad that I looked at it
(5)  because the part that's not highlighted in this line of
(6)  questioning:
(7)         You have initiated a CIWA protocol on other
(8)  occasions?
(9)         Yes, sir.
(10)         When you've done that in those cases did those
(11)  people smell of alcohol?
(12)         Yes.  And plus a lot of symptoms together with the
(13)  smell of alcohol.
(14)         And then there's the yellow highlighted part.
(15)         Now, when they were smelled of alcohol when other
(16)  people who were initiated on CIWA would it smell of
(17)  alcohol?  They smelled similar to the way Mr. Harrison
(18)  smelled?
(19)         Answer:  It's more.  They smell more.  More.  Plus
(20)  they are -- they cannot sit straight.  So they are
(21)  actually intoxicated, too intoxicated, like sometimes they
(22)  won't even answer the questions.
(23)         MS. SHERWIN:  Q.  Right.  And Miss Sancho said that
(24)  every person she had initiated CIWA protocols on was
(25)  actually intoxicated at the time.  Right?

---

236

(1)         MS. HUDGINS:  Same objections.
(2)         MS. STRINGER:  Misstates evidence.
(3)         THE WITNESS:  It says they smelled of alcohol and
(4)  had a lot of symptoms.
(5)         MS. SHERWIN:  Q.  Doctor, do you see on page 123
(6)  starting on line 9?
(7)         "Question:  Based on your understanding, your
(8)  observation, is it fair to say that each person who you
(9)  had initiated the CIWA protocol on was actually
(10)  intoxicated when you initiated it?
(11)         Answer.  Yes, sir."  Unquote.
(12)         Do you see that, Doctor?
(13)         A. Yes.
(14)         Q. So Miss Sancho testified that she only ever
(15)  initiated CIWA protocols when the inmate was drunk,
(16)  basically, on intake.  Right?
(17)         MS. STRINGER:  Misstates testimony.
(18)         MS. HUDGINS:  Join.
(19)         THE WITNESS:  And further down it says:
(20)         Is it your understanding that the CIWA was to be
(21)  initiated only for people who exhibited signs of actual
(22)  intoxication?
(23)         And her answer is:  No, sir.
(24)         MS. SHERWIN:  Q.  That's right.  But she had only
(25)  ever put patients on CIWA when the patient was actually

---

DEPOSITION OF ROBERT D. JONES, M.D.

237

(1)    intoxicated on intake.  Right?
(2)        MS. HUDGINS:  So now it's argumentative.
(3)        THE WITNESS:  In line 9 that's what it said.
(4)    Further down she clarifies it.
(5)        MS. SHERWIN:  Q.  Did --
(6)        A.  Specifically lines 15 through 18.
(7)        Q.  Right.  She did not have the understanding that
(8)    CIWA was only to be instituted for people who were
(9)    intoxicated.  Right?
(10)       A.  Read the question again.
(11)       Q.  She did not have the understanding that CIWA
(12)   was limited to people who were intoxicated.  Right?
(13)       A.  She -- she's basically saying here, it says:
(14)       Is it your understanding that CIWA was to be
(15)   initiated only for people who exhibited signs of actual
(16)   intoxication?
(17)       And her answer is:  No sir.
(18)       Q.  Exactly.  But her personal practice was that
(19)   she had never instituted CIWA for people who were not
(20)   intoxicated.  Right?
(21)       MS. STRINGER:  Argumentative.  Misstates evidence.
(22)   Personal practice.
(23)       MS. HUDGINS:  Yes.
(24)       MR. ANDRADA:  Join.
(25)       MS. HUDGINS:  It's an experience versus a personal

238

(1)    practice.
(2)        THE WITNESS:  And I would not agree with your
(3)    assessment of that testimony.
(4)        MS. SHERWIN:  Q.  Well, Ms. Sancho testified that
(5)    she only -- every person she initiated the CIWA on was
(6)    actually intoxicated at the time she initiated the CIWA.
(7)    Correct?
(8)        MS. HUDGINS:  Incomplete hypothetical.
(9)    Mischaracterizes her full testimony.
(10)       MS. STRINGER:  Join.
(11)       THE WITNESS:  And as I said, in that single
(12)   statement, yes.
(13)       MS. SHERWIN:  Q.  Okay.
(14)       A.  That does not -- that's not the total portion
(15)   of her testimony.
(16)       Q.  And she also testified that when she initiated
(17)   that CIWA on people who smelled of alcohol, they were what
(18)   she described as, quote, "too intoxicated", end quote.
(19)   Right?
(20)       A.  Uh --
(21)       MS. HUDGINS:  Is that what it says?
(22)       THE WITNESS:  Under line 25 she states:  Too
(23)   intoxicated.  Like they sometimes wouldn't even answer the
(24)   questions.
(25)       MS. SHERWIN:  Q.  That's right.  And she said:

239

(1)    They also cannot sit straight.  Right?
(2)        MS. HUDGINS:  Is that what it says, Doctor?
(3)        THE WITNESS:  Above that, yes.  Okay.  She's
(4)    basically trying to elicit that they are a lot of
(5)    different things and she's naming some of those things.
(6)        MS. SHERWIN:  Q.  Okay.  And Corizon did nothing
(7)    during the entire time Zelda Sancho worked there that you
(8)    saw to make sure that she put patients on CIWA whenever
(9)    they drank regularly regardless of whether or not they
(10)   were actually intoxicated on intake.  Right?
(11)       MS. HUDGINS:  Whoa.
(12)       MS. SHERWIN:  Isn't that right?
(13)       MS. HUDGINS:  Lacks foundation.  Argumentative.
(14)       MS. STRINGER:  Join.
(15)       THE WITNESS:  The only way I can tell you one way
(16)   is if I reviewed every single person she did an assessment
(17)   on.
(18)       MS. SHERWIN:  Q.  Okay.  And you saw no evidence
(19)   that Corizon ever did anything to make sure Nurse Sancho
(20)   put people who were alcohol dependent on CIWA regardless
(21)   of whether or not the person was drunk on intake.  Right?
(22)       MS. HUDGINS:  Same objection.  It lacks foundation,
(23)   A, that she did it; B, that Corizon knew about it.
(24)       That's the lack of foundation.  It's argumentative.
(25)       MS. STRINGER:  Join.

240

(1)        THE WITNESS:  And I cannot answer the question as
(2)    phrased.
(3)        MS. SHERWIN:  Q.  Did you see any documentation
(4)    that Corizon did anything to make sure that Zelda Sancho
(5)    put patients on CIWA if they were alcohol dependent even
(6)    if they were not intoxicated on intake?
(7)        MS. HUDGINS:  Objection.  Argumentative.  Lacks
(8)    foundation.  Are you asking him specific to her, or what
(9)    they train their nurses to do, or what are you asking?
(10)       MS. SHERWIN:  The question stands.
(11)       MS. HUDGINS:  Well, it's argumentative.  It lacks
(12)   foundation.
(13)       MS. STRINGER:  Join.
(14)       THE WITNESS:  I will note that during her hearing,
(15)   that when she was questioned as to why she did not do it,
(16)   she never used the lack of training as an explanation.
(17)       MS. SHERWIN:  Q.  Okay.  But in your review of
(18)   everything Corizon provided you to review in this case,
(19)   you didn't see any evidence that Corizon did anything to
(20)   make sure that Zelda Sancho actually put alcohol dependent
(21)   people on CIWA even if they weren't drunk on intake.
(22)   Right?
(23)       MS. HUDGINS:  It lacks foundation that Corizon knew
(24)   that it had a duty.  It's argumentative.
(25)       MS. STRINGER:  Join.

DEPOSITION OF ROBERT D. JONES, M.D.

241

(1)        THE WITNESS:  And the evidence that I did see is
(2)  when they found that her performance was deficient they
(3)  took appropriate action.
(4)        MS. SHERWIN:  Q.  Did they do anything to find
(5)  whether or not her performance was deficient before
(6)  Martin Harrison went into a coma?
(7)        MS. HUDGINS:  Well, same objections.
(8)        THE WITNESS:  I have not reviewed her entire
(9)  correctional -- her HR file.  I don't have any way to
(10)  answer that question one way or another.
(11)        MS. SHERWIN:  Q.  Did Corizon do anything -- well,
(12)  strike that.
(13)        You understood that Nurse Sancho was fired for
(14)  demonstrating incompetence or gross negligence, in part,
(15)  based on her assessment of Mr. Harrison.  Right?
(16)        MS. HUDGINS:  I'll object.  It's argumentative.  It
(17)  mischaracterizes her testimony.
(18)        MS. STRINGER:  Join.
(19)        THE WITNESS:  In regards to Mr. Harrison, the
(20)  portion that was brought up was the incomplete
(21)  documentation.
(22)        MS. SHERWIN:  And then four days after that was
(23)  raised with her, and she was told to document the type and
(24)  amount of alcohol the patient drinks, Miss Sancho again
(25)  failed to document the type and amount of alcohol the

242

(1)  patient drinks.  Right?
(2)        A.  I believe that was with Patient Y, yes.
(3)        Q.  Okay.  And Corizon did nothing to see whether
(4)  or not Miss Sancho routinely made those errors, did it?
(5)        MS. HUDGINS:  Objection.  It's argumentative.  It
(6)  lacks foundation.  It's vague and ambiguous as to time,
(7)  among other things.
(8)        THE WITNESS:  And I have no way of knowing that one
(9)  way or the other.
(10)        MS. SHERWIN:  Q.  Well, you saw in Bill Wilson's
(11)  testimony that he did nothing to see whether or not
(12)  Miss Sancho routinely made those errors.  Right?
(13)        A.  Mischaracterizes the testimony.  Argumentative.
(14)        MS. STRINGER:  Join.
(15)        THE WITNESS:  When it was determined that her
(16)  performance was substandard they took proximal and
(17)  appropriate action.
(18)        MS. SHERWIN:  Q.  But they did not go back and
(19)  determine whether or not Miss Sancho routinely made the
(20)  errors that she exhibited with respect to Martin Harrison
(21)  and Patient Y.  Correct?
(22)        MS. STRINGER:  Argumentative.
(23)        THE WITNESS:  I don't know whether that was
(24)  identified or even brought up as a problem.
(25)        MS. HUDGINS:  Lacks foundation.

243

(1)        MS. SHERWIN:  Q.  And Corizon never inquired into
(2)  Zelda Sancho's history of failing the registered nurse's
(3)  exam in California three times, did they.
(4)        MS. HUDGINS:  Objection.  Lacks foundation.
(5)  Argumentative.
(6)        MS. STRINGER:  It's not likely to lead to the
(7)  discovery of admissible evidence.
(8)        THE WITNESS:  And to my knowledge she had a current
(9)  license as an LVN and was practicing within that scope.
(10)        MS. SHERWIN:  Q.  Okay.  But they did nothing to
(11)  inquire into her history of having failed the RN exam
(12)  three times, did they.
(13)        MS. HUDGINS:  Same question.  Same objections.
(14)        THE WITNESS:  And same answer.
(15)        MS. SHERWIN:  Q.  Did you see anything in all the
(16)  documents that you reviewed that Corizon did something to
(17)  look into Miss Sancho's history of failing the registered
(18)  nursing exam three times in California?
(19)        MS. HUDGINS:  Same objection.  Same question.
(20)        MS. STRINGER:  And assumes facts.
(21)        THE WITNESS:  And same answer.
(22)        MS. SHERWIN:  Q.  Well, Doctor, you haven't
(23)  answered the question; that's why I keep asking it.  It's
(24)  a simple yes or no question.
(25)        Did you see anything in all of the documents that

244

(1)  you reviewed from Corizon that Corizon did anything to
(2)  look into Zelda Sancho's history of failing the registered
(3)  nurse's exam in California three times?
(4)        A.  They were not hiring her as an RN.  There would
(5)  be no reason for them to.
(6)        MS. HUDGINS:  Yes.  I'm sorry.  Same question.
(7)  Same objections.
(8)        MS. SHERWIN:  Q.  Now, you understood when you
(9)  issued your initial report in this case in November of
(10)  2013 you were required to include all of your opinions.
(11)  Right?
(12)        A.  Based on the information I had at the time that
(13)  I wrote the opinion, yes.
(14)        Q.  And in your report you had no opinions
(15)  regarding Corizon's transfer policies.  Right?
(16)        MS. HUDGINS:  The initial report.
(17)        MS. SHERWIN:  That's right.
(18)        THE WITNESS:  The initial report, that is correct.
(19)        MS. SHERWIN:  Q.  And in your initial report you
(20)  also had no opinions regarding registered nurse screening
(21)  on intake.  Right?
(22)        MS. HUDGINS:  I'm not sure that's accurate.
(23)        THE WITNESS:  I have always had an opinion on
(24)  whether you needed an RN.  It's been a part of both the
(25)  NCC standards, the ACA standards, so yes, I always had an

DEPOSITION OF ROBERT D. JONES, M.D.

245

(1) opinion even before this case.
(2)        MS. SHERWIN:  Q.  Okay.  But you had no opinion in
(3) your report that you stated concerning registered nurse
(4) screening on intake, did you?
(5)        MS. HUDGINS:  Well, I'll object.  It's vague and
(6) ambiguous.  It lacks foundation.  It's argumentative.
(7)        He had an opinion that she was qualified and that
(8) she did it.
(9)        MS. SHERWIN:  Are you testifying again now, Nancy?
(10)       MS. HUDGINS:  I'm telling you what's in the report
(11) he's already testified to.
(12)       MS. SHERWIN:  Your speaking objections are
(13) inappropriate.
(14)       Q.  You didn't state any opinion in your report
(15) from November of 2013 regarding registered nurse
(16) screenings on intakes, did you, Doctor.
(17)       MS. HUDGINS:  Same objections.
(18)       THE WITNESS:  She was qualified.  I did not address
(19) the RN's because she was licensed to do what she was
(20) doing.
(21)       MS. SHERWIN:  Q.  And in your November 2013 initial
(22) report in this case, you also expressed no opinion on
(23) whether or not Martin Harrison had a serious medical need.
(24) Isn't that right, Doctor?
(25)       A.  Whether he had a serious medical need.

246

(1)       Q.  That's right.
(2)       MS. HUDGINS:  Well, I'll object.  It
(3) mischaracterizes what that second report says.  It says it
(4) wasn't apparent that he had serious medical need on
(5) intake.
(6)       MS. STRINGER:  Vague as to time.
(7)       THE WITNESS:  And at the time that he was admitted
(8) and screened by Nurse Sancho he did not have a serious
(9) medical need.
(10)       MS. SHERWIN:  Q.  Okay.  I'm actually asking about
(11) your report, Doctor.
(12)       A.  I was looking for the report.
(13)       Q.  In your report from November of 2013, you
(14) expressed no opinion about whether or not Martin Harrison
(15) had a serious medical need.  Isn't that right?
(16)       MS. HUDGINS:  I'll object.  It's vague and
(17) ambiguous.
(18)       THE WITNESS:  I -- you -- the document, my opinions
(19) speak for themselves, and I've already made those
(20) statements.
(21)       I'm not sure -- I'm not really understanding why
(22) that question is being asked -- not why, excuse me -- what
(23) that question is.
(24)       MS. HUDGINS:  Yes.
(25)       MS. SHERWIN:  Q.  Well, Doctor, you're limited to

247

(1) your opinions expressed in your report which is required
(2) to be a complete statement of all opinions and the bases
(3) for those opinions.
(4)       So I'm just trying to nail down here, is it fair to
(5) say, Doctor, that in your report, your Rule 26 report from
(6) November of 2013, you did not express any opinion about
(7) whether or not Martin Harrison had a serious medical need.
(8)       MS. HUDGINS:  I'll object to the characterization
(9) of the law.  I'll object to your introduction to the
(10) question.  I'll move to strike.
(11)       You can answer the question.
(12)       The question is you did not express any opinion
(13) about whether or not Martin Harrison had serious medical
(14) need.
(15)       THE WITNESS:  In that specific language, no.
(16)       MS. SHERWIN:  Q.  It's correct that you did not
(17) express an opinion in your report about whether
(18) Martin Harrison had a serious medical need.  Right?
(19)       MS. HUDGINS:  Asked and answered.
(20)       THE WITNESS:  I just said no.
(21)       MS. SHERWIN:  Q.  Well, I'm saying, right?  Is it
(22) correct?  So what you're saying is I'm incorrect when I
(23) say you did not -- here's the problem; we have a double
(24) negative here.
(25)       MS. HUDGINS:  So ask another question and get it

248

(1) right.
(2)       MS. SHERWIN:  Q.  So Doctor, is it correct that in
(3) your report from November of 2013, you did not express any
(4) opinion about whether or not Martin Harrison had a serious
(5) medical need.
(6)       A.  Not in that specific language.
(7)       Q.  Do the words "serious medical need" appear
(8) anywhere in your report on November 2013?
(9)       MS. HUDGINS:  Document speaks for itself.
(10)       THE WITNESS:  Not that I recall right now.
(11)       MS. SHERWIN:  Q.  And you opined in your report
(12) that Prison Health Services and Corizon met the standard
(13) of care for approving medical training of deputies through
(14) ongoing dialogue and discussion with Sheriff's Department
(15) supervisors.  Correct?
(16)       A.  That is correct.
(17)       Q.  And you got that information from Bill Wilson
(18) in your telephone call with him.  Right?
(19)       A.  That, and the fact that they had been
(20) accredited multiple times.
(21)       Q.  Okay.  But you did not see any documents
(22) demonstrating the training.  Correct?
(23)       MS. HUDGINS:  I'm just going to put out there that
(24) that question might have been asked and answered before
(25) today.

DEPOSITION OF ROBERT D. JONES, M.D.

---

**249**

(1)       MR. ANDRADA:  Before this minute, you mean.
(2)       MS. HUDGINS:  Yes.
(3)       MR. ANDRADA:  Join in the objection that it's been
(4) asked and answered.  On several occasions.
(5)       THE WITNESS:  And I will give the same answer which
(6) is I've seen the training rosters for the officers; I do
(7) not know the content of those training.
(8)       MS. SHERWIN:  Q.  Okay.  And you said that the fact
(9) that Martin Harrison was screened by Nurse Sancho, quote,
(10) "demonstrates accessibility to health care," end quote.
(11) Right?
(12)       MS. HUDGINS:  Let me see if that's exactly what it
(13) says.
(14)       MS. SHERWIN:  I'm looking at page 3 of your report.
(15)       Q.  You wrote in your report on page 3, quote:
(16)       "According to policy, Mr. Harrison was provided
(17) with receiving health screening by Zelda Sancho, LVN.
(18) This demonstrates accessibility to health care."  End
(19) quote.
(20)       Right?
(21)       A.  Yes, it does.
(22)       Q.  That's what you said.  Right?
(23)       A.  Yes.
(24)       Q.  And Mr. Harrison received no health care after
(25) his initial health screening by Ms. Sancho.  Isn't that

---

**250**

(1) right?
(2)       A.  Uh, there's nothing in the document that she
(3) followed up or did anything else with him.
(4)       Q.  And there's nothing in anything that you
(5) reviewed, you didn't see anything in any of the records
(6) that you were given, that Mr. Harrison had any other
(7) health care after his initial intake screening.  Correct?
(8)       A.  His PPD test was read at 48 -- somewhere
(9) between 48 and 72 hours.  He was seen by a nurse in order
(10) to accomplish that reading.
(11)       And he also demonstrated that he knew how to access
(12) care as he filled out as instructed, I believe, by
(13) Deputy Ahlf a sick call request.
(14)       Q.  Okay.  Well, you understood that Mr. Harrison
(15) went into the Pill Call line asking for medication.
(16) Right?
(17)       A.  Yes.
(18)       Q.  And at that time, he appeared lost to
(19) Deputy Ahlf.  Right?
(20)       MS. HUDGINS:  Object.  Vague as to time.
(21)       THE WITNESS:  I don't remember the specific
(22) language that Deputy Ahlf used.
(23)       MS. SHERWIN:  Q.  Okay.
(24)       A.  But he was informed that there was no
(25) medication for him.

---

**251**

(1)       Q.  Okay.  And, in fact, Mr. Harrison went into the
(2) Pill Call line twice asking Deputy Ahlf for medication.
(3) Right?  Do you recall that from Deputy Ahlf's deposition?
(4)       MS. HUDGINS:  I'm pretty sure that mischaracterizes
(5) the testimony.
(6)       THE WITNESS:  I believe he presented to the pill
(7) line area twice.  His name was not on the roster, and he
(8) was redirected to submit a health care request.
(9)       MS. SHERWIN:  Q.  And both times that he appeared
(10) in the Pill Call line he appeared lost.  Right?
(11)       MS. HUDGINS:  I'll object.  That mischaracterizes
(12) his testimony.
(13)       MR. ANDRADA:  I think it does, but --
(14)       MS. STRINGER:  Join.
(15)       THE WITNESS:  And I don't specifically recall the
(16) language he used.
(17)       MS. SHERWIN:  Q.  Okay.  A patient appearing lost
(18) two days after his arrest, if he's alcohol dependent, his
(19) appearance could be consistent with alcohol withdrawal,
(20) right?
(21)       MS. STRINGER:  Calls for speculation.
(22)       MS. HUDGINS:  Join.
(23)       MR. ANDRADA:  Join.
(24)       MS. HUDGINS:  Vague and ambiguous.
(25)       THE WITNESS:  He could be that or a number of other

---

**252**

(1) things.
(2)       MS. SHERWIN:  Q.  Okay.  But appearing lost is
(3) consistent with alcohol withdrawal.  Right?
(4)       MS. HUDGINS:  Well, calls for speculation as to
(5) what Deputy Ahlf meant by "lost" so how can he answer that
(6) question?  It's vague and ambiguous.
(7)       THE WITNESS:  It's all a possibility is the best I
(8) can say.
(9)       MS. SHERWIN:  Q.  And Mr. Harrison never received
(10) any medication, did he?
(11)       A.  Not to my knowledge.
(12)       Q.  And he filled out the sick call slip stating he
(13) was told to because Deputy Ahlf told him to fill out a
(14) sick call slip.  Right?
(15)       MS. HUDGINS:  Calls speculation as to why he filled
(16) it out that way.
(17)       THE WITNESS:  And I don't know the mind of
(18) Mr. Harrison.
(19)       MS. SHERWIN:  Q.  Okay.  But you saw Deputy Ahlf's
(20) testimony that he told Mr. Harrison to fill out a sick
(21) call slip.  Right?
(22)       A.  Yes.
(23)       Q.  And Mr. Harrison's sick call slip said, quote,
(24) "I was told to," end quote, as the reason why Mr. Harrison
(25) filled it out.  Right?

---

DEPOSITION OF ROBERT D. JONES, M.D.

253

(1)  A. Yes.
(2)  Q. Mr. Harrison was not given any access to
(3)  nursing care that you saw in the records. Is that right?
(4)  MS. HUDGINS: Oh, I'll object to that. That
(5)  totally mischaracterizes, A, how the jail functions; B,
(6)  what happens in the jail; C, what the evidence has been to
(7)  date.
(8)  MS. STRINGER: Join.
(9)  MS. HUDGINS: It's argumentative.
(10)  MR. ANDRADA: Join.
(11)  MS. SHERWIN: Q. Well, Doctor, delirium tremens
(12)  can begin as early as 48 hours after a person's last
(13)  drink. Right?
(14)  A. It can.
(15)  Q. And when Mr. Harrison presented to the
(16)  Pill Call line, on August 15th, he was 48 hours after his
(17)  arrest. Right?
(18)  MS. HUDGINS: Objection. Vague as to time.
(19)  THE WITNESS: I would have to look at the actual
(20)  time line. I don't know for certain whether that's
(21)  correct.
(22)  MS. SHERWIN: Q. Okay. He was arrested on
(23)  August 13th and he presented to the Pill Call line on
(24)  August 15th.
(25)  MS. HUDGINS: There are three Pill Call lines;

254

(1)  that's why it's vague as to time.
(2)  MS. SHERWIN: Q. And you understood from
(3)  Deputy Ahlf that he presented to the evening Pill Call
(4)  line on August 15th. Right?
(5)  A. I do not recall that.
(6)  Q. If Mr. Harrison had been arrested and assessed
(7)  on intake at about 5:00 p.m. on August 13th and presented
(8)  to the evening Pill Call line at night on August 15th, he
(9)  could have been in severe alcohol withdrawal at the time
(10)  he presented to the Pill Call line. Right?
(11)  MS. STRINGER: Calls for speculation. Vague and
(12)  ambiguous as to "severe".
(13)  MS. HUDGINS: Join.
(14)  MR. ANDRADA: Join.
(15)  THE WITNESS: He certainly was functioning well
(16)  enough to follow the instructions that Deputy Ahlf, so I
(17)  would probably say no, he would not have been in severe
(18)  alcohol withdrawal because of his ability to follow a
(19)  complex instruction.
(20)  MS. SHERWIN: Q. Okay. By the time, at 3:30 in
(21)  the morning on August 16th, when he was mumbling
(22)  incoherently, thought he was in his apartment with women
(23)  present, and was engaged in bizarre behavior, was he in
(24)  severe alcohol withdrawal?
(25)  A. He may or may not have been.

255

(1)  Q. And by the time on the evening of August 16th,
(2)  when he had flooded his cell, broken a food tray, was
(3)  hiding under his mattress and screaming that people were
(4)  trying to shoot him, was he in severe alcohol withdrawal?
(5)  MS. HUDGINS: Incomplete hypothetical. Lacks
(6)  foundation. Vague and ambiguous.
(7)  There were other things going on, too.
(8)  THE WITNESS: And he may or may not have.
(9)  MS. SHERWIN: Q. Now you filed a declaration in
(10)  court in this case after you issued your Rule 26 opinion
(11)  that was required to contain your complete opinions.
(12)  Right?
(13)  A. Yes.
(14)  Q. Who wrote that declaration?
(15)  A. It is something that I worked on together with
(16)  Nancy Hudgins. It's my opinions.
(17)  Q. And who physically drafted the declaration?
(18)  A. Oh, physically typed it up?
(19)  Q. That's right.
(20)  A. I believe it was issued from Miss Hudgins'
(21)  office.
(22)  Q. And before filing your declaration you had not
(23)  reviewed any new material. Is that right?
(24)  A. Let me look at the date on that.
(25)  MS. HUDGINS: Well, I think he says in the

256

(1)  declaration he reviewed Burns' stuff so I believe that
(2)  mischaracterizes --
(3)  MS. SHERWIN: Thanks for testifying, Nancy. Your
(4)  speaking objections and attempts to coach the witness are
(5)  highly, highly, highly inappropriate, and you know better.
(6)  MS. HUDGINS: Generally the guy is uncoachable.
(7)  Don't look at me.
(8)  MS. SHERWIN: You know you're engaging in improper
(9)  conduct.
(10)  THE WITNESS: And based on my review of the
(11)  document, I can't tell you specifically what I reviewed or
(12)  had not reviewed. I received documents periodically; I
(13)  just don't remember currently.
(14)  MS. SHERWIN: Q. And your declaration does not say
(15)  that you reviewed the declaration of Dr. Katherine Burns,
(16)  does it.
(17)  MS. HUDGINS: Well, it hadn't been -- I'm not sure
(18)  it had been produced at that point. Didn't yours come
(19)  after ours?
(20)  MS. STRINGER: She was the 27th of December.
(21)  MS. SHERWIN: Q. There's no reference to
(22)  Dr. Burns' --
(23)  A. Not that I recall.
(24)  Q. -- in your declaration, right?
(25)  And as you sit here today you can't think of any

DEPOSITION OF ROBERT D. JONES, M.D.

257

(1) new material that you had reviewed before you produced
(2) your declaration in this case. Right?
(3)     A. I don't recall one way or the other.
(4)     Q. And you understood that you were not allowed to
(5) issue further opinions beyond your Rule 26 report if you
(6) had not reviewed any further materials. Is that right,
(7) Doctor?
(8)     MR. ANDRADA: Okay. Go ahead, Nancy.
(9)     MS. HUDGINS: I think that's your interpretation.
(10) And I think it's argumentative. And I guess the judge is
(11) going to rule on that ultimately. But it's not -- you
(12) know, calls for a legal conclusion.
(13)     MR. ANDRADA: Join.
(14)     MS. STRINGER: Join.
(15)     THE WITNESS: And I'm not a legal expert.
(16)     MS. SHERWIN: Q. Okay. Did you issue further
(17) opinions in your declaration that went beyond your Rule 26
(18) report in this case?
(19)     MS. HUDGINS: The document speaks for itself.
(20)     THE WITNESS: And I would just say whatever the
(21) document has got in it is what I said for this, you know,
(22) stipulation for the summary judgment.
(23)     MS. SHERWIN: Q. And you did not provide a
(24) supplemental Rule 26 report before you filed your
(25) declaration in court in support of Corizon's Motion for

258

(1) Summary Judgment in this case, did you, Doctor?
(2)     MS. HUDGINS: Argumentative. Lacks foundation.
(3)     THE WITNESS: The question was again?
(4)     MS. SHERWIN: Could you read the question back,
(5) please.
(6)     MS. HUDGINS: She's arguing that you should have
(7) filed another report before you filed this document. So
(8) she's asking if you did that or not. Do you remember when
(9) that supplemental report came out?
(10)     THE WITNESS: Not specifically.
(11)     MS. SHERWIN: Could you read the question back,
(12) please.
(13)     THE REPORTER: "And you did not provide a
(14) supplemental Rule 26 report before you filed your
(15) declaration in court in support of Corizon's Motion for
(16) Summary Judgment in this case, did you, Doctor?"
(17)     MS. HUDGINS: Argumentative.
(18)     THE WITNESS: Not that I recall.
(19)     MS. SHERWIN: Q. When you were working at the Utah
(20) Department of Corrections, what training was provided to
(21) corrections officers on recognizing the signs and symptoms
(22) of alcohol withdrawal?
(23)     A. I know that we did it. I can't tell you
(24) specifically what we did. It's been since back in 1996,
(25) '97.

259

(1)     Q. Was that training provided every year?
(2)     A. Um, I don't remember whether it was bi-annually
(3) or annually.
(4)     Q. So it was provided either every year or every
(5) other year. Is that right?
(6)     A. Yes. And the reason why I can state that is
(7) because during that time we became accredited by the NCCHC
(8) standards for prisons.
(9)     Q. Okay. And who provided the training? To
(10) corrections officers.
(11)     A. It has been so long ago. We had a training
(12) academy specifically. I taught in the training academy.
(13) The psychologist taught in the training academy. I could
(14) not recall specifically who did which.
(15)     Q. Okay. Medical personnel provided the health
(16) training to corrections officers when you were working in
(17) the Utah Department of Corrections. Is that right?
(18)     A. By "medical" you mean what?
(19)     Q. People in the health care profession.
(20)     A. Not always.
(21)     Q. By job title what types of people provided
(22) training to corrections officers who worked in the
(23) Utah Department of Corrections on withdrawal from alcohol?
(24)     A. I told you it was clear back in 1996. I would
(25) not recall.

260

(1)     Q. Okay. What training to corrections officers
(2) did the Montana Department of Corrections provide when you
(3) worked there to corrections officers on the topic of
(4) withdrawal from alcohol?
(5)     A. When I joined them they were under a federal
(6) court monitor. The mental health portion of that was
(7) specifically signed off. And approved. And part of that
(8) was the training of officers.
(9)     The major portion of the medical portion of that
(10) suit was accomplished before I left and shortly completed
(11) after I left and moved to Arizona.
(12)     As far as specific documents, I do not recall the
(13) specific training manuals and that. I would assume
(14) they're still available.
(15)     Q. Okay. Did the Montana Department of
(16) Corrections provide training to corrections officers in
(17) recognizing signs and symptoms of alcohol withdrawal when
(18) you worked there?
(19)     A. With Montana?
(20)     Q. Yes.
(21)     A. Yes.
(22)     Q. And did they do that either every year or every
(23) other year?
(24)     A. We did not go for accreditation, but I usually
(25) use that as a guideline, so I would say yes.

DEPOSITION OF ROBERT D. JONES, M.D.

---

**261**

(1)        Q. By job title who were the people who provided
(2)  health-related related training to corrections officers in
(3)  Montana when you worked there?
(4)        A. Well, that would have been 13 years ago since I
(5)  moved to Arizona in 2001.
(6)        Q. You don't recall whether it was health care
(7)  professionals or some other type of person?
(8)        A. We had training academy.  It's a smaller
(9)  system.  We all pitched in and did lots of different
(10) things.
(11)       Q. You also taught the corrections officers
(12) health-related matters.  Right?
(13)       A. I don't even know whether I specifically did
(14) it.  I don't remember.
(15)       Q. What training to custody staff does the Arizona
(16) Department of Juvenile Corrections provide on alcohol
(17) withdrawal?
(18)       A. Of alcohol withdrawal?
(19)       Q. Yes.
(20)       A. The whole issue of substance abuse, suicide,
(21) and withdrawal is taught by our mental health people.
(22)       The individuals who teach it are actually
(23) psychologists.
(24)       I treat -- I do teach the -- in the academy I do
(25) teach specifically infectious disease.  And also

---

**262**

(1)  health-related policies.
(2)        Q. How frequently -- I'm sorry; I didn't mean to
(3)  interrupt you.
(4)        How frequently are custody staff in the Arizona
(5)  Department of Juvenile Corrections provided training on
(6)  the topic of alcohol withdrawal?
(7)        A. Uh, I would assume that it's every two years.
(8)  We have a training roster.  We have training documents.
(9)  We have course outlines.  All of that is done and
(10) recorded.
(11)       We have a training officer who is meticulous on all
(12) training.
(13)       Q. And documentation is maintained regarding that
(14) training in the Arizona Department of Juvenile
(15) Corrections?
(16)       A. Yes, we maintain training records.  The rosters
(17) that we sign in are kept and the information is entered in
(18) by course outline into each individual's training roster.
(19)       Q. Now, NCCHC standard J-E-11 on Nursing
(20) Assessment Protocols states that:  Nursing assessment
(21) protocols are appropriate to the level of skill and
(22) preparation of the nursing personnel who will carry them
(23) out, and comply with the relevant state practice acts.
(24) Right?
(25)       A. I assume that you've read that correctly, yes.

---

**263**

(1)        Q. So it's your understanding that even the NCCHC
(2)  standards require that any nursing assessments comply with
(3)  the relevant state practice acts.  Right?
(4)        MS. HUDGINS:  Objection.  Overbroad.  Vague and
(5)  ambiguous.  Argumentative.
(6)        THE WITNESS:  And may I see the rest of the policy?
(7)        MS. SHERWIN:  Sure.  I'm looking at J-E-11 on
(8)  page 77.
(9)        THE WITNESS:  Actually the Nursing Assessment
(10) Protocols are a specific group of documents which the
(11) nurses use to assess routine and common problems.  I have
(12) had a set of nursing protocols and the issue is whether or
(13) not standing orders should be used.
(14)       A standing order is where they can utilize a
(15) physician to prescribe medication.  And we try to limit
(16) any of that.  Ours are limited to only over-the-counter
(17) medications.
(18)       Q. It's your understanding that even the NCCHC
(19) standards require that any of the nursing assessments
(20) require with the relevant State Practice Act.  Right?
(21)       MS. HUDGINS:  Same question.  Same objection.
(22)       THE WITNESS:  And specific to the standard, having
(23) been a surveyor, it deals specifically with those nursing
(24) protocols.
(25)       MS. SHERWIN:  Q.  That's right.  And we have some

---

**264**

(1)  of the Nursing Assessment Protocols as exhibits in this
(2)  case, right?  Part of one.
(3)        Or we discussed it; I know that.  Here we go.
(4)        Exhibit 8 to your deposition is part of the Nurse
(5)  Assessment Protocol for Prison Health Services.  Right?
(6)        A. Yes, it is.
(7)        Q. And nurse assessments, even under NCCHC
(8)  standards, have to comply with the relevant State Nursing
(9)  Practice Acts, right?
(10)       MS. HUDGINS:  Third time the question is asked.
(11) Same objections.  Asked and answered.
(12)       MS. STRINGER:  Join.
(13)       THE WITNESS:  And the answer is yes, they should
(14) comply with licensure requirements.
(15)       MS. SHERWIN:  Q.  Now you saw in the NCCHC report
(16) that Corizon represented to NCCHC that, quote:  "Trained
(17) registered nurses complete receiving screening."  End
(18) quote.
(19)       Right?
(20)       MS. HUDGINS:  So I'm sorry.  I just have to object
(21) to that because it lacks foundation because it doesn't say
(22) that Corizon represented that to the NCCHC.
(23)       So it calls for speculation.  It lacks foundation.
(24) It's argumentative.
(25)       MS. SHERWIN:  You can go ahead and answer, Doctor.

---

DEPOSITION OF ROBERT D. JONES, M.D.

265

(1)        THE WITNESS:  The NCCHC training is a process; it's
(2)  a standardized process.  The information is the findings
(3)  of that accrediting group.
(4)        MS. SHERWIN:  Q.  Okay.  And NCCHC had the
(5)  understanding that in Alameda County jails, quote,
(6)  "trained registered nurses complete receiving screening."
(7)  End quote.
(8)        Right?
(9)        THE WITNESS:  That's what the --
(10)        MS. HUDGINS:  Lacks foundation.  Calls for
(11)  speculation.  Could be incomplete.  Incomplete
(12)  hypothetical.  Vague and ambiguous.
(13)        THE WITNESS:  That statement as you have read is in
(14)  the document.
(15)        MS. SHERWIN:  Q.  And you don't know what
(16)  information Corizon gave to NCCHC that would give NCCHC
(17)  the impression that trained registered nurses complete
(18)  receiving screening.  Do you, Doctor?
(19)        MS. HUDGINS:  Same objections.
(20)        THE WITNESS:  I believe I answered this question
(21)  before but I will tell you that the officers are
(22)  interviewed, and in addition to that, nursing staff is
(23)  interviewed.
(24)        And also there is a chart audit which also then
(25)  would look at who had completed the receiving screening.

266

(1)        MS. SHERWIN:  Q.  So -- well, strike that.
(2)        NCCHC's understanding that trained registered
(3)  nurses complete receiving screening was incorrect.  Wasn't
(4)  it?
(5)        MS. HUDGINS:  Well, I'll object to that because it
(6)  lacks foundation and it's argumentative and it assumes
(7)  facts, it mischaracterizes the facts that are in evidence.
(8)        MR. ANDRADA:  Join.
(9)        MS. STRINGER:  Join.
(10)        THE WITNESS:  The document speaks for itself.  It's
(11)  what their findings are; it's what they reported; and I
(12)  have basically told you why it's not just simply what
(13)  Corizon says.
(14)        MS. SHERWIN:  Q.  Okay.  But LVN's also do
(15)  receiving screening at Santa Rita jails.  Right?
(16)        A.  Yes.  They do.
(17)        Q.  And NCCHC's understanding that registered
(18)  nurses complete receiving screenings was incorrect, wasn't
(19)  it.
(20)        MS. HUDGINS:  So I'll object.  Julia, I sat here
(21)  while you took Bill Wilson's deposition; you asked him
(22)  that question; he said no, registered nurses do screen --
(23)        MS. SHERWIN:  You're testifying again, Nancy.
(24)        MS. HUDGINS:  -- so I don't know why we're going
(25)  over this over and over and over again.

267

(1)        MS. SHERWIN:  And you're testifying again.  Your
(2)  conduct is highly inappropriate in this deposition and you
(3)  know better.
(4)        Q.  Doctor, you can go ahead --
(5)        MS. HUDGINS:  So --
(6)        MS. SHERWIN:  Q.  Doctor, you can go ahead --
(7)        MS. HUDGINS:  I'm so sorry, but, you know, I'm not
(8)  going to be cut off, so excuse me for just a minute.
(9)        It's argumentative to start with.
(10)        It mischaracterizes prior testimony as I've
(11)  mentioned to try to help Miss Sherwin cure her question so
(12)  that she could get a question which the judge would
(13)  actually let a jury hear.
(14)        And, yeah, that's it.
(15)        MR. ANDRADA:  Join.
(16)        MS. STRINGER:  Join.
(17)        MS. SHERWIN:  Go ahead, Doctor.
(18)        THE WITNESS:  And the answer is I don't know
(19)  whether it was incorrect or not.  I do not know which
(20)  charts they reviewed, and what their findings were.  That
(21)  is what they reported.
(22)        MS. SHERWIN:  Q.  And you understood from Lenore
(23)  Gilbert's testimony that Corizon actually pulled together
(24)  the information for NCCHC to review.  Right?
(25)        MS. HUDGINS:  That would be a partial truth.  And

268

(1)  so it's an incomplete hypothetical.  It lacks foundation.
(2)  It mischaracterizes her full testimony.
(3)        MS. STRINGER:  Join.
(4)        THE WITNESS:  And the answer to your question is
(5)  no, that doesn't.  She testified, and I can tell from the
(6)  process of doing this that the information would have been
(7)  supplied by the Sheriff's Office as well as Corizon.  And
(8)  the information is assimilated by usually somebody who is
(9)  assigned by the responsible health authority.
(10)        They take and create a folder for each standard.
(11)  And in that standard they put supporting documents.
(12)        The interviewers will look at that and they will
(13)  also confirm what they find in those folders as they speak
(14)  to the various staff members they interview.
(15)        MS. SHERWIN:  Q.  Okay.  But Corizon would have
(16)  provided the medical records for NCCHC to review.  Right?
(17)        MS. HUDGINS:  Well, I'll object.  It
(18)  mischaracterizes testimony.  It's inaccurate.  It lacks
(19)  foundation.
(20)        THE WITNESS:  The medical records that were
(21)  reviewed were selected at random.  Corizon did not select
(22)  them.  They would allow the surveyors into the medical
(23)  records to pull the charts and review them.
(24)        MS. SHERWIN:  Q.  But you understood from
(25)  Ms. Gilbert's testimony that she actually pulled together

DEPOSITION OF ROBERT D. JONES, M.D.

269

(1)     the information, the medical information for NCCHC to
(2)     review.  Right?
(3)         MS. HUDGINS:  Again, that's the same question as
(4)     you asked before, and for the same reasons it's
(5)     objectionable, and I reassert those objections.  It's a
(6)     half truth.
(7)         MR. ANDRADA:  Join.
(8)         MS. STRINGER:  Join.
(9)         MR. ANDRADA:  Misstates the evidence.
(10)        THE WITNESS:  And I believe I answered your
(11)    question previously.
(12)        MS. SHERWIN:  Q.  Do you remember whether or not,
(13)    as you sit here today do you remember whether or not
(14)    Ms. Gilbert testified that she pulled together the medical
(15)    records for NCCHC to review?
(16)        MS. HUDGINS:  Again, these are -- I mean it says
(17)    "do you remember" as opposed to "did it happen".  But it's
(18)    the same objections because it's the same question.
(19)        THE WITNESS:  Miss Gilbert was the individual who
(20)    was designated to pool the information together, to put
(21)    the files together.  That's a very normal process; it's a
(22)    part of the accreditation process.
(23)        The actual medical charts were selected at random.
(24)        MS. SHERWIN:  From the information that
(25)    Ms. Gilbert pooled together.  Right?

270

(1)         A.  No.  That is not correct.
(2)         Q.  And how do you know that?
(3)         A.  Because I've done audits and I know what the
(4)     instructions are to do with the random charts.
(5)         Q.  Okay.  But you weren't involved in the audits
(6)     of Corizon's medical facilities in Alameda County, were
(7)     you?
(8)         A.  I was not, but I'm very familiar with the
(9)     accreditation process.
(10)        MS. SHERWIN:  We'll mark the last exhibit in line.
(11)        (Plaintiff's Exhibit 18 was marked for
(12)    identification.)
(13)        MS. SHERWIN:  Q.  I'm going to hand you what has
(14)    been marked as Exhibit 18 to your deposition which is the
(15)    January 2002 Licensed Vocational Nurse Scope of Practice
(16)    Standards from the California Correctional Health Care
(17)    Services.
(18)        MS. HUDGINS:  I'm sorry.  Just a minute.  Just give
(19)    us a minute here.
(20)        Can you give us more information about the --
(21)        MS. SHERWIN:  Yes.  It's from California
(22)    Correctional Health Care Services and it is the Licensed
(23)    Vocational License Nurse Scope of Practice Standards dated
(24)    January 2002.
(25)        MS. HUDGINS:  So this is California Health Care

271

(1)     Services.
(2)         MS. SHERWIN:  California Correctional Health Care
(3)     Services.  You can Google it and you can get it online,
(4)     this exact document.
(5)         MS. HUDGINS:  All right.  Fair enough.
(6)         MS. SHERWIN:  Q.  Doctor, this document about the
(7)     LVN's Scope of Practice for California LVN's provides that
(8)     LVN's are not independent practitioners.
(9)         Is that consistent with your understanding?
(10)        A.  That's what the document states.
(11)        Q.  Is that consistent with your understanding
(12)    about the scope of practice for LVN's?
(13)        MS. HUDGINS:  Objection.  Vague and ambiguous.
(14)    Incomplete hypothetical.  Lacks foundation.
(15)        THE WITNESS:  LVN's, within the scope of their
(16)    practice, can practice; they're not independent but they
(17)    can practice independently.
(18)        MS. SHERWIN:  Q.  And is it your understanding that
(19)    in California it is not within the scope of LVN practice
(20)    to function independently?
(21)        MS. HUDGINS:  Same objections.  Vague and
(22)    ambiguous.  Incomplete hypothetical.  Lacks foundation.
(23)        MR. ANDRADA:  Join.
(24)        THE WITNESS:  There are many things that an LVN
(25)    does in the process of their duties which they do

272

(1)     independently.
(2)         MS. SHERWIN:  Q.  Is it your understanding that in
(3)     California, the LVN must practice under the direction of a
(4)     licensed physician or registered nurse at all times?
(5)         MS. HUDGINS:  Objection.  Incomplete hypothetical.
(6)     Vague and ambiguous.  Lacks foundation.
(7)         THE WITNESS:  That's what the document states.
(8)         MS. SHERWIN:  Q.  Is it your understanding that the
(9)     direction provided by a licensed physician or registered
(10)    nurse may be provided verbally, telephonically or by
(11)    written order?
(12)        MS. HUDGINS:  Objection.  Incomplete hypothetical.
(13)    Vague and ambiguous.  Lacks foundation.
(14)        THE WITNESS:  That's what the document states.
(15)        MS. SHERWIN:  Q.  Is it your understanding in
(16)    California that the LVN may not perform the part of the
(17)    triage process that includes independent evaluation,
(18)    interpretation of data, and determination of treatment
(19)    priorities and levels of care?
(20)        MS. HUDGINS:  It's a five-page document.
(21)        MS. SHERWIN:  I'm on page 2.
(22)        MS. HUDGINS:  Okay.  Are you on the first paragraph
(23)    under Triage Assessment?
(24)        MS. SHERWIN:  I'm on the second paragraph under
(25)    Triage Assessment.

DEPOSITION OF ROBERT D. JONES, M.D.

---

**273**

(1)       MS. HUDGINS:  So it's an incomplete hypothetical.
(2)  Vague and ambiguous.  Lacks foundation.
(3)       MS. SHERWIN:  Go ahead and answer, Doctor.
(4)       THE WITNESS:  That's what your document says.
(5)       MS. SHERWIN:  Q.  Is it your understanding that in
(6)  California, the LVN may not independently determine or
(7)  initiate a course of action?
(8)       MS. HUDGINS:  Objection.  Vague and ambiguous.
(9)  Incomplete hypothetical.  Lacks foundation.
(10)       THE WITNESS:  That's what the document says.
(11)       MS. SHERWIN:  Q.  Is it your understanding that in
(12)  California, while an LVN may assist in the collection of
(13)  data during the assessment process, validation of
(14)  assessment data must be done by the RN?
(15)       MS. HUDGINS:  Objection.  Vague and ambiguous.
(16)  Incomplete hypothetical.  Lacks foundation.
(17)       THE WITNESS:  And it does not define "validation".
(18)       MS. SHERWIN:  Q.  Okay.  But it's your
(19)  understanding that in California, while an LVN may assist
(20)  in collection of data, validation of assessment data must
(21)  be done by an RN?
(22)       MS. HUDGINS:  Same question.  Same objections.
(23)       THE WITNESS:  And that's what the document says.
(24)       MS. SHERWIN:  I have no further questions.
(25)       Thank you.

---

**274**

(1)       MS. HUDGINS:  I appreciate you ending at 5:00.
(2)       (Deposition concluded at 5:04 p.m.)
(3)       ---oOo---
(4)
(5)
(6)
(7)       _____
(8)                ROBERT D. JONES, M.D.
(9)
(10)
(11)
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

---

**275**

(1)  STATE OF CALIFORNIA   )
(2)                        )  ss
    COUNTY OF ALAMEDA      )
(3)
(4)
(5)       I, Karen A. Crangle, hereby certify that the
(6)  witness in the foregoing deposition named
(7)
(8)       ROBERT D. JONES, M.D.
(9)
(10)  was by me duly sworn to testify to the truth, the whole
(11)  truth, and nothing but the truth in the within-entitled
(12)  cause; that said deposition was taken at the time and
(13)  place herein named; that the testimony of said witness was
(14)  reported by me, a certified shorthand reporter and a
(15)  disinterested person, and thereafter transcribed into
(16)  typewriting.
(17)
(18)       And I further certify that I am not of counsel or
(19)  attorney for either or any of the parties to said
(20)  deposition, nor in any way interested in the outcome of
(21)  the cause named in said caption.
(22)
(23)
(24)  Date_____   _____
                                Karen A. Crangle, C.S.R.
(25)

---

**276**

(1)
(2)       UNITED STATES DISTRICT COURT
(3)       NORTHERN DISTRICT OF CALIFORNIA

(4)  M.H., a minor, through his
     Guardian Ad Litem, Michelle
     Henshaw, JOSEPH HARRISON, KRYSTLE
(5)  HARRISON, MARTIN HARRISON, JR.,
     and TIFFANY HARRISON, all          CASE NO. C11-2868
(6)  individually and as Co-Successors   JST (MEJ)
     in Interest of Decedent MARTIN
(7)  HARRISON,
              Plaintiffs,
(8)
(9)       -vs-
(10)  COUNTY OF ALAMEDA, a municipal
     corporation; SHERIFF GREGORY J.
(11)  AHERN, in his individual and
     official capacities; DEPUTIES
(12)  MATTHEW AHLF, ALEJANDRO VALVERDE,
     JOSHUA SWETNAM, ROBERTO MARTINEZ,
(13)  ZACHARY LITVINCHUK, RYAN MADIGAN,
     MICHAEL BARENO, FERNANDO
(14)  ROJAS-CASTANEDA, SHAWN SOBRERO,
     SOLOMON UNUBUN, and DOES 1-20,
(15)  individually, jointly and
     severally,
(16)
(17)          Defendants.
     _____/
(18)
(19)       EXHIBITS TO
(20)  DEPOSITION OF ROBERT D. JONES, M.D.
(21)
(22)       Taken before KAREN A. CRANGLE
          Certified Shorthand Reporter
(23)          State of California
          C.S.R. License No. 3816
(24)
(25)       February 8, 2014

---